UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
———————————————————————————

RASHAD SALAAM,

                                          Plaintiff,

v.                                                                    9:19-CV-689
                                                                      (BKS/TWD)

GORDON STOCK, EVAN VIANESE,

                                          Defendants.
———————————————————————————

APPEARANCES:                              OF COUNSEL:

RASHAD SALAAM
Plaintiff, *pro se*
14-A-3363
Clinton Correctional Facility
P.O. Box 2000
Dannemora, NY 12929

HON. LETITIA JAMES                        LAUREN ROSE EVERSLEY, ESQ.
Attorney General for the State of New York    Assistant Attorney General
Attorney for Defendants
The Capitol
Albany, NY 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## ORDER AND REPORT-RECOMMENDATION

Rashad Salaam ("Plaintiff"), an inmate in the custody of the New York State Department

of Corrections and Community Supervision ("DOCCS"), commenced this *pro se* civil rights

action under 42 U.S.C. § 1983, asserting claims arising out of his incarceration at Auburn

Correctional Facility ("Auburn C.F.").  (Dkt. No. 34, Plaintiff's third amended complaint.)

Correction Officers Gordon Stock ("Stock") and Evan Vianese ("Vianese") (collectively

"Defendants") now move for summary judgment, in lieu of an answer, pursuant to Rule 56 of the

Federal Rules of Civil Procedure.  (Dkt. No. 53.)  In short, Defendants argue Plaintiff

commenced this action before exhausting his administrative remedies.  (Dkt. No. 53-1.)  For the

reasons set forth below, the Court recommends denying Defendants' motion.

## I.    DISCUSSION

### A.    Background

In his third amended complaint, Plaintiff alleges that Stock failed to protect him on July

22, 2017, when an inmate raped him.  (Dkt. No. 34 at 1, 3.)  Furthermore, Plaintiff asserts the

same inmate cut him several times on July 25, 2017, and Vianese did not "pull his pin" or assist

in any way.  *Id.*  More specifically, Plaintiff alleges that Stock was "overlooking the gallery"

when Plaintiff was attacked on July 22, 2017, and "allowed [an] inmate to enter [his] cell without

pulling a pin or addressing the issue[,]" and Vianese "stood at the end of the gallery" and

observed the same inmate attack Plaintiff on July 25, 2017, yet "did nothing" and then allowed

the inmate to follow Plaintiff into his cell where he was stabbed.  *Id*. at 3.  Additionally, Plaintiff

alleges each Defendant was aware Plaintiff is transgender and was subject to repeated

harassment by other inmates leading up to the events at issue.  *Id*. at 2.  The Court construed

Plaintiff's third amended complaint as alleging Eighth Amendment failure to protect claims and

Fourteenth Amendment equal protection claims against Defendants.  (Dkt. No. 35.)

Defendants now bring a motion for summary judgment in lieu of an answer.  (Dkt. No.

53.)  In their motion, Defendants argue Plaintiff never utilized the inmate grievance procedure

available to him at Auburn C.F.  (Dkt. No. 53-1.)  Specifically, Defendants assert Plaintiff never

submitted a complaint regarding the alleged sexual abuse on July 22, 2017, and never filed a

grievance regarding the July 25, 2017, cutting incident.  *Id*. at 8-9.  In a declaration filed in

connection with their motion, Cheryl Parmiter, the Inmate Grievance Program ("IGP")

Supervisor at Auburn C.F., stated she reviewed her internal records and concluded Plaintiff did not file a grievance regarding the allegations in the third amended complaint.  (Dkt. No. 53-3 at ¶ 15.)  Defendants further assert Plaintiff never filed a complaint regarding his alleged sexual assault.  (Dkt. No. 53-2 at ¶ 17.)  Thus, according to Defendants, the third amended complaint should be dismissed for failure to exhaust because Plaintiff commenced this action without completing the administrative grievance procedure.  (Dkt. No. 53-1.)

Plaintiff's response criticizes the Auburn C.F. grievance process as "corrupted" and asserts that he has filed several grievances related to these incidents without any response.  (Dkt. No. 56 at 1; Dkt. No. 56-1 at 1.[1])  Plaintiff further contends he has been threatened by officers for filing grievances and the grievances related to these events were thrown away.  (Dkt. No. 56-1 at 1.)  Plaintiff alleges he contacted the Prison Rape Elimination Act ("PREA") Hotline and the Office of Special Investigation ("OSI") related to the sexual abuse allegation and received counseling, support, and advocacy from Safe Harbor of the Finger Lakes.  (Dkt. No. 56 at 2; Dkt. No. 58 at 1.)  Plaintiff further submitted medical records that indicate he suffered lacerations on his right cheek and forearm on July 25, 2017.  (Dkt No. 56 at 4-6.)  Plaintiff also filed a letter indicating he had an OSI case opened regarding the sexual abuse allegation and provided the OSI case number.  (Dkt. No. 57.)  Finally, he asserts he contacted Prisoners' Legal Services of New

---

[1]  In his response, Plaintiff says he would like "a delay to contact a lawyer to help" with his case or for the Court to appoint a lawyer for him.  (Dkt. No. 56 at 2.)  Any request for the Court to appoint a lawyer to assist with his case must be made as a formal motion and Plaintiff must explain why an attorney should be appointed in his case and what efforts he has made to find a lawyer on his own.  *See Hodge v. Police Officers*, 802 F.2d 58, 61-62 (2d Cir. 1986); *Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1341 (2d Cir. 1994).  Accordingly, to the extent Plaintiff's response (Dkt. No. 56) could be construed as a request for counsel, that request is denied without prejudice.

York to discuss his conditions of confinement and enclosed the related correspondence in his filings.  (Dkt. No. 59.)

In their reply, Defendants argue the Court should deem the assertions in Defendants' Statement of Material facts admitted.  (Dkt. No. 64 at 4.)  Defendants further suggest Plaintiff's conclusory allegations related to Auburn C.F.'s grievance system and his attempt to file grievances in this case should be disregarded.  *Id*. at 4-5.  Defendants also argue that OSI investigations are insufficient to satisfy the exhaustion requirement with respect to the claims against Vianese that do not include allegations of sexual assault.  *Id*. at 5.

### B.    Standard of Review

#### 1.    *Summary Judgment Standard*

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, no genuine issue of material fact exists.  *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Liberty Lobby*, 477 U.S. at 248.

The question as to whether the plaintiff has exhausted his administrative remedies is a question of law.  *See Snider v. Melindez*, 199 F.3d 108, 113-14 (2d Cir. 1999).  Thus, an inmate's failure to exhaust administrative remedies is properly considered on a motion for summary judgment in lieu of an answer.  *Crichlow v. Fischer*, No. 6:15-CV-06252 EAW, 2017 WL 920753, at *5 (W.D.N.Y. Mar. 7, 2017) (citing *Crenshaw v. Syed*, 686 F. Supp. 2d 234, 236

(W.D.N.Y. 2010) (granting a motion for summary judgment made in lieu of an answer where inmate failed to exhaust administrative remedies)).

### 2. *Plaintiff's Failure to Respond to Defendants' Statement of Material Facts*

While courts are required to give due deference to a plaintiff's *pro se* status, that status "does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003). Here, Plaintiff failed to challenge the statement of material facts filed by Defendants in the manner required under N.D.N.Y. L.R. 7.1(a)(3).[2, 3]

Where, as in this case, a party has failed to respond to the movant's statement of material facts in the manner required under L.R. 7.1(a)(3), the facts in the movant's statement to which the plaintiff has not properly responded will be accepted as true (1) to the extent that they are supported by evidence in the record, and (2) provided that the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion.[4] *See Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

---

[2] The Local Rules were amended effective January 1, 2021. In the amendment, L.R. 7.1 was dissected and various subsections were renumbered and relocated to correspond with the appropriate Federal Rule. The relevant substance of the rules did not change. In the currently operative version of the Local Rules, L.R. 56.1 deals with summary judgement motions. However, because these motions were filed in 2020, the Court refers to the Local Rules as they existed at that time.

[3] Local Rule 7.1(a)(3) requires the opposing party to file a response to the movant's Statement of Material Facts. Under the rule, the response "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises." N.Y.N.D. L.R. 7.1(a)(3).

[4] Defendants provided Plaintiff with the requisite notice of the consequences of his failure to respond to the motion. (Dkt. No. 53 at 3.)

Accordingly, the facts set forth in Defendants' Statement of Material Facts (Dkt. No. 53-2) that are supported by record evidence and are uncontroverted by nonconclusory allegations in Plaintiff's third amended complaint and verified opposition submissions will be accepted as true. *See McAllister v. Call*, No. 9:10-CV-610 (FJS/CFH), 2014 WL 5475293, at *3 (N.D.N.Y. Oct. 29, 2014) (finding allegations in plaintiff's verified complaint sufficient to controvert facts in statement of material facts on motion for summary judgment); *Douglas v. Perrara*, No. 9:11-CV-1353 (GTS/RFT), 2013 WL 5437617, at *3 (N.D.N.Y. Sept. 27, 2013) ("Because Plaintiff has failed to raise any question of material fact, the Court will accept the facts as set forth in Defendants' Statement of Facts Pursuant to Rule 7.1(a)(3) . . . supplemented by Plaintiff's verified complaint . . . as true."). As to any facts not contained in Defendants' Statement of Material Facts, in light of the procedural posture of this case, the Court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of Plaintiff. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

## C.    Analysis

The Prison Litigation Reform Act of 1995 ("PLRA"), provides, in pertinent part, "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is required for "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). "[E]xhaustion is mandatory under the PLRA and . . . unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007); *see also Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016) (stating that the mandatory language of § 1997e(a) forecloses judicial discretion to craft

exceptions to the requirement).  To properly exhaust administrative remedies under the PLRA,

inmates are required to complete the administrative review process in accordance with the rules

applicable to the institution to which they are confined.  *Jones*, 549 U.S. at 218 (citing *Woodford*

*v. Ngo*, 548 U.S. 81, 88 (2006)); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011)

(exhaustion necessitates "using all steps that the [government] agency holds out, and doing so

properly").  Because non-exhaustion is an affirmative defense, the defendant bears the burden of

showing a failure to meet exhaustion requirements.  *See Jones*, 549 U.S. at 216.

As noted above, this case involves claims against two corrections officers involving their

conduct on different dates.  In one of those incidents, Plaintiff asserts Stock was aware that

another inmate was sexually assaulting him in his jail cell and did nothing to prevent the attack.

The other incident similarly alleges Vianese was aware Plaintiff was being attacked and did

nothing, however, the second incident did not involve sexual assault.  In their motion,

Defendants argue Plaintiff failed to exhaust his administrative remedies prior to filing suit in

federal court.  (Dkt. No. 53.)  Defendants acknowledge that there are differing requirements

regarding exhaustion that are applicable to each set of claims against each officer.

To that end, with respect to the claims against Vianese, exhaustion requires compliance

with DOCCS' well-established three-step administrative review process, the IGP.[5]  7 NYCRR §

701.1(a).  First, an inmate must file a complaint with the facility's IGP clerk within twenty-one

---

[5]  The Second Circuit has long recognized this procedure as an "available remedy" for purposes
of the PLRA.  *See Hall v. Cty. of Saratoga*, No. 10-CV-1120 (NAM/CFH), 2013 WL 838284, at
*1-2 (N.D.N.Y. Mar. 6, 2013).  Generally, if a plaintiff fails to follow each of the required steps
prior to commencing an action, he has failed to exhaust his administrative remedies as required
under the PLRA.  *See Ruggiero v. Cty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he
PLRA requires proper exhaustion, which means using all steps that the agency holds out, and
doing so *properly* (so that the agency addresses the issues on the merits)." (quotation marks and
citations omitted)).

calendar days of the alleged occurrence.  *Id*. § 701.5(a).  A representative of the facility's inmate

grievance resolution committee ("IGRC") has sixteen calendar days from receipt of the

grievance to informally resolve the issue.  *Id*. § 701.5(b)(1).  If there is no such informal

resolution, then the full IGRC conducts a hearing within sixteen calendar days of receipt of the

grievance, *id*. § 701.5(b)(2), and issues a written decision within two working days of the

conclusion of the hearing.  *Id*. § 701.5(b)(3).

Second, a grievant may appeal the IGRC decision to the facility's Superintendent within

seven calendar days of receipt of the IGRC's written decision.  *Id*. § 701.5(c)(1).  If the

grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the

Superintendent must issue a written decision within twenty calendar days of receipt of the

grievant' s appeal.  *Id*. § 701.5(c)(3)(ii).

Third, a grievant may appeal to CORC within seven working days of receipt of the

Superintendent's written decision.  *Id*. § 701.5(d)(1)(i).  CORC is to render a written decision

within thirty calendar days of receipt of the appeal.  *Id*. § 701.5(d)(3)(ii).

However, for complaints regarding sexual abuse or sexual harassment—as in this case

regarding Stock—DOCCS has established a different procedure.  *See* DOCCS Directive 4040

§ 701.3(i); 7 NYCRR § 701.3(i).  "Revised in 2014 pursuant to the Prison Rape Elimination Act

("PREA"), *see Henderson v. Annucci*, No. 14-CV-445A, 2016 WL 3039687, at *3 (W.D.N.Y.

Mar. 14, 2016), Directive 4040 § 701.3(i) creates a relaxed exhaustion requirement for

allegations concerning incidents of sexual assault."  *Sheffer v. Fleury*, No. 9:18-cv-1180

(LEK/DJS), 2019 WL 4463672, at *4 (N.D.N.Y. Sept. 18, 2019).  Specifically, "an inmate is not

required to file a grievance concerning an alleged incident of sexual abuse or sexual harassment

to satisfy the [PLRA] exhaustion requirement."  7 NYCRR § 701.3(i).  Instead:

> any allegation concerning an incident of sexual abuse or sexual
> harassment shall be deemed exhausted if official documentation
> confirms that: an inmate who alleges being the victim of sexual
> abuse or sexual harassment reported the incident to facility staff; in
> writing to Central Office Staff; to any outside agency that the
> Department has identified as having agreed to receive and
> immediately forward inmate reports of sexual abuse and sexual
> harassment to agency officials under the PREA Standards; or to the
> Department's Office of the Inspector General.

*Id.* (citations omitted). If an inmate does file a grievance regarding a complaint of sexual abuse or sexual harassment, "[t]he complaint shall be deemed exhausted upon filing." *Id.* Finally, "[a] sexual abuse or sexual harassment complaint may be submitted at any time." *Id.*

In this case, Defendants have asserted in their Statement of Material Facts that Plaintiff never filed a grievance related to the incidents that occurred on July 22, 2017, and July 25, 2017, at Auburn C.F. (Dkt. No. 53-3 at ¶ 16.) Furthermore, Defendants contend "Plaintiff never submitted a complaint under the PREA" regarding the July 22, 2017, incident at Auburn C.F. involving a sexual assault. *Id.* at ¶ 17.[6]

First, with respect to the claims against Stock, Plaintiff responded to Defendants' motion with documentation supporting his allegation that he reported his claims of sexual harassment to OSI and the PREA help center. Specifically, Plaintiff contends he contacted the PREA Hotline and the OSI related to the sexual abuse allegation and received counseling, support, and advocacy from Safe Harbor of the Finger Lakes. (Dkt. No. 56 at 2; Dkt. No. 58 at 1.) Plaintiff

---

[6] To support this fact, Defendants cite to Plaintiff's first amended complaint at Dkt. No. 16 page 1. In that document, Plaintiff asserts the inmate who raped him told him not to tell about the incident or he would be killed and that he, therefore, did not tell. (Dkt. No. 16 at 1.) The Court is skeptical that this evidence is sufficient to satisfy Defendants' burden to prove their contention that Plaintiff never submitted a complaint regarding the alleged sexual assault. In any event, as discussed below, Plaintiff submitted evidence sufficient to refute this assertion and the Court finds Defendants' motion should be denied on that basis alone.

also filed a letter indicating he had an OSI case opened regarding the sexual abuse allegation and it is OSI Case Number SCU-19-0120.  (Dkt. No. 57.)

As noted above, "an inmate is not required to file a grievance concerning an alleged incident of sexual abuse or sexual harassment to satisfy [PLRA] exhaustion requirement . . . before bringing a lawsuit regarding an allegation of sexual abuse as long as the matter was reported."  7 NYCRR § 701.3(i).  Rather, making a complaint regarding the alleged sexual assault to OSI and through the PREA helpline is sufficient to satisfy the exhaustion requirement.  *See id*.  Therefore, the Court finds there is a genuine dispute as to whether Plaintiff complained about the sexual assault and recommends denying Defendants' motion for summary judgment related to his claims against Stock.

With respect to Plaintiff's claims against Vianese, Plaintiff asserts that he attempted to file grievances related to the assault but that his grievances were destroyed and that Auburn C.F.'s grievance system is corrupted.  (Dkt. No. 56 at 1; Dkt. No. 56-1 at 1.)  The Court is aware that Plaintiff has not provided any further evidence substantiating his claims that he filed these supposed grievances besides a letter to Prisoner Legal Services of New York and medical records that tend to support he was injured on the relevant date.  In some instances, as Defendants argue, Courts have found that such allegations are insufficient to overcome a properly supported motion for summary judgement.  (Dkt. No. 64 at 5 (citing cases).)

However, given the posture of this case, the Court recommends giving Plaintiff the benefit of the doubt and denying Defendants' motion at this time so that the parties can conduct discovery on this issue.  That is, "[s]ince the Court is required to draw reasonable inferences in Plaintiff's favor, the Court must infer that the grievance was never filed because prison authorities did not file it, not because Plaintiff did not submit it."  *McLean v. LaClair*, No. 9:19-

CV-1227 (LEK/ATB), 2021 WL 671650, at *8 (N.D.N.Y. Feb. 22, 2021); *Fann v. Graham*, No. 15-CV-1339 (DNH/CFH), 2018 WL 1399331, at *6 (N.D.N.Y. Jan. 11, 2018) ("Viewing the facts in the light most favorable to plaintiff, the record suggests that plaintiff's grievances were submitted, but were unfiled and unanswered, creating an issue of fact as to whether the grievance process was available and whether plaintiff attempted to exhaust his administrative remedies[.]"), *report and recommendation adopted*, 2018 WL 1399340 (N.D.N.Y. Mar. 19, 2018); *Thaxton v. Simmons*, No. 10-CV-1318, 2013 WL 4806457, at *4 (N.D.N.Y. Sept. 9, 2013) ("[A] question of fact exists as to whether [p]laintiff never filed his initial grievance on April 29, as [d]efendants claim, or that, as [p]laintiff claims, he filed a timely grievance that was lost or tampered with by [d]efendants. Such credibility assessments are to be resolved by a trier of fact."); *see also Woodward v. Lytle*, No. 9:16-CV-1174 (NAM/DEP), 2018 WL 4643036, at *4-5 (N.D.N.Y. Sept. 27, 2018) (finding an issue of fact as to the availability of the grievance process where plaintiff drafted and submitted a grievance that was never filed or answered) (collecting cases).

In sum, the Court finds Defendants have failed to adequately demonstrate Plaintiff failed to exhaust his administrative remedies before filing suit in federal court. Therefore, the Court recommends denying Defendants' motion for summary judgment with leave to renew after discovery has concluded.

## II.    CONCLUSION

After carefully considering the record, the Court finds Defendants failed to establish that there are no genuine disputes as to the material facts related to exhaustion.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 53) be **DENIED**; and it is further

**ORDERED** that to the extent Plaintiff's response (Dkt. No. 56) is construed as a request for counsel, that request is **DENIED** without prejudice; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[7]  Such objections shall be filed with the Clerk of the Court.  **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.</u>**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a).


Dated:  May 12, 2021
        Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[7]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

Case 9:19-cv-00689-AMN-TWD Document 72 Filed 05/12/21 Page 13 of 110

Crichlow v. Fischer, Not Reported in Fed. Supp. (2017)

KeyCite Yellow Flag - Negative Treatment

Clarified on Denial of Reconsideration by *Crichlow v. Fischer,* W.D.N.Y., March 26, 2018

2017 WL 920753
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Kevin Damion CRICHLOW, Plaintiff,

v.

Brian FISCHER et al., Defendants.

6:15-CV-06252 EAW
|
Signed March 7, 2017

**Attorneys and Law Firms**

Kevin Damion Crichlow, Romulus, NY, pro se.

Hillel David Deutsch, NYS Attorney General's Office Department of Law, Rochester, NY, for Defendants.

**DECISION AND ORDER**

ELIZABETH A. WOLFORD, United States District Judge

**INTRODUCTION**

**\*1** Plaintiff Kevin Damion Crichlow ("Plaintiff") filed this action pursuant to 42 U.S.C. § 1983 in the Southern District of New York on October 16, 2012. (Dkt. 2). Plaintiff filed an amended complaint seeking relief against 136 Defendants on June 17, 2013. (Dkt. 12). The action was transferred to this Court on April 28, 2015. (Dkt. 168). The action was then severed by this Court on February 10, 2017. (Dkt. 223). Following severance, 35 Defendants (together "Defendants") remain. (*See id.* at 5-6).

Presently before the Court are: Defendants' motion for summary judgment (Dkt. 177); Plaintiff's motion for discovery (Dkt. 182); Plaintiff's motion to appoint counsel (Dkt. 182); Plaintiff's motion for a stay (Dkt. 182); Plaintiff's motion for a medical exam (Dkt. 187); Plaintiff's motion for reconsideration (Dkt. 192); Plaintiff's motion to amend (Dkt. 192); Plaintiff's motion for a hearing (Dkt. 192); Defendants'

motion for sanctions (Dkt. 195); and Plaintiff's motion for sanctions (Dkt. 198).

For the reasons stated below, Defendants' motion for summary judgment is granted in part and denied in part; Plaintiff's motion for discovery is denied without prejudice; Plaintiff's motion to appoint counsel is denied without prejudice; Plaintiff's motion for a stay is denied without prejudice; Plaintiff's motion for a medical exam is denied; Plaintiff's motion for reconsideration is denied; Plaintiff's motion to amend is denied as moot; Plaintiff's motion for a hearing is denied; Defendants' motion for sanctions is denied without prejudice; and Plaintiff's motion for sanctions is denied.

**I. Plaintiff's Allegations**

Plaintiff's amended complaint spans 142 pages. (*See* Dkt. 12). Following severance of the action into three separate parts, this Court retained Plaintiff's claims in which he asserts violations of his constitutional rights by Defendants relating to Plaintiff's incarceration at the Wende Correctional Facility ("Wende") and treatment at Wyoming Community Hospital. (*See* Dkt. 223).

Plaintiff alleges actions occurring at Wende beginning on or about September 27, 2008—the date Plaintiff was transferred to Wende—through his transfer to Eastern Correctional Facility on November 16, 2010. (*See* Dkt. 12 at 14-36; Dkt. 12-1 at 1-12).

Plaintiff alleges inadequate or nonexistent medical care throughout his incarceration at Wende, in violation of the Eighth Amendment. Plaintiff argues that he was not provided mental health treatment as required (Dkt. 12 at 19), and that he was "unreasonably exposed to infectious disease" (*id.* at 25, 36; Dkt. 188 at 35-36, 38-39). Plaintiff alleges deficient dental care from "2008 into 2013 at 3 [New York Department of Corrections and Community Supervision] prisons." (Dkt. 12 at 36). He contends he was not provided care for "alot of pain hip, jaw, hand, tooth's also need replacement of four's lost teeths & restoration of function and 'oral surgery & periodontics.' " (*Id.* at 31; *see, e.g.,* Dkt. 12-1 at 1). Plaintiff further alleges that he was denied dental care at Wende on June 30, 2008, to fix a "broken jaw." (Dkt. 12 at 36). As to his medical care, Plaintiff states that Defendant George Boucher, M.D., was grossly negligent in misdiagnosing an injury to Plaintiff's hand, which led to Plaintiff's receiving the "wrong surgery" on January 13, 2010. (Dkt. 12-1 at 2). Plaintiff complains that he was denied treatment for "injuries

Case 9:19-cv-00689-AMN-TWD    Document 72    Filed 05/12/21    Page 14 of 110

Crichlow v. Fischer, Not Reported in Fed. Supp. (2017)

hip, back, shoulder, head" for "about 68 months." (*Id.* at 3). Plaintiff also asserts that he was subjected to a risk of disease due to asbestos in Wende. (Dkt. 12 at 21-24, 31; Dkt. 188 at 35).

**\*2** Plaintiff also charges he was deprived of adequate nutrition and hygiene while incarcerated at Wende. Plaintiff claims that from April to September 2009, Defendants C.O. Bartels and C.O. Kevin Barlow "routinely deprived [Plaintiff] ... meaningful opportunities for yard, food, shower, exercise, adequately nutrition." (Dkt. 12 at 25). He makes similar claims against Defendants C.O. Richard Brooks ("Brooks") (*id.* at 32), and C.O. Alicia Humig ("Humig") (*id.* at 26). Plaintiff complains that he was "taken off" of a mandatory religious diet for months because he was not allowed to go to the mess hall. (*Id.* at 32). Plaintiff also alleges that because he is H.I.V. positive, a nutritious diet is critical to his health, and he was deprived of such a diet. (Dkt. 12-1 at 1, 3). Plaintiff asserts that on November 11, 2009, Humig and Defendant Sergeant Paul Olszewski ("Olszewski") refused to let him out of his cell, and placed him in keeplock for about six weeks. (Dkt. 12 at 32). Plaintiff further alleges that he was refused basic laundry services from 2008 through November 1, 2009. (*Id.* at 27).

Plaintiff complains that Defendant T.M.C. Christopher Zaluski ("Zaluski") and others failed to provide reasonable accommodations for Plaintiff's hearing disability. (Dkt. 12 at 14-16; Dkt. 12-1 at 1). Plaintiff alleges that he was in New York Department of Corrections and Community Supervision ("DOCCS") custody for six months before receiving hearing aids. (Dkt. 12 at 30; Dkt. 12-1 at 1). He also claims that he was denied equal access to opportunities and recreation in Wende because of his hearing disability, and that the failure to accommodate his hearing disability was retaliation for his standing up for himself and other disabled inmates. (Dkt. 12 at 33-35; Dkt. 12-1 at 11-12).

Plaintiff claims he was harassed and verbally abused while at Wende. He alleges numerous instances of sexual harassment by Defendant C.O. Attea, and states that he reported such harassment to others, including the superintendent of Wende. (*Id.* at 17-18, 19, 31). Plaintiff claims that on June 18, 2010, Brooks verbally abused and threatened Plaintiff. (Dkt. 12-1 at 8-9). Plaintiff asserts C.O. Corey Petties verbally abused and threatened Plaintiff on July 12, 2010. (*Id.* at 9-10). Plaintiff alleges that DOCCS has a "common practice to encourage and further its employee's, and officers

discrimination and harassment and assault and [deprivation] of proper nutrition." (Dkt. 12 at 20).

Plaintiff also raises Fourteenth Amendment due process claims. Plaintiff complains of unspecified disciplinary proceedings that led a total of 180 days of disciplinary confinement between 2008 and 2010. (*Id.* at 29). Plaintiff claims his due process rights were violated because of the handling of "over 150" grievances filed through November 16, 2010, by Defendants Director Karen Bellamy ("Bellamy") and Sergeant William Scott ("Scott"). (*Id.* at 27-30). Plaintiff asserts that he was retaliated against for filing grievances and that no investigations were conducted into his claims. (*Id.* at 28). Plaintiff states that he filed over 300 grievances. (Dkt. 209-3 at 8; *see, e.g.,* Dkt. 211 at 1).

He also alleges that on July 4, 2010, C.O. Hojsan destroyed Plaintiff's legal documents in the Wende law library, thereby depriving Plaintiff of an opportunity to be heard by the courts. (Dkt. 12-1 at 10-11). Hojsan also allegedly denied Plaintiff access to the law library. (*Id.* at 11).

Plaintiff complains that a fire broke out in his cell block on April 12, 2010, and that the correctional officers in the area, including Olszewski, failed to respond to calls for help. (*Id.* at 6-7). Plaintiff claims that he was denied "fresh-air" and was thereafter denied medical care. (*Id.* at 7).

Plaintiff further contends that on some unspecified date Zaluski instructed others not to let Plaintiff out of his cell, in retaliation for Plaintiff's filing of grievances against Zaluski. (Dkt. 12 at 30).

Plaintiff complains that Defendant Brian Fischer ("Fischer") —the commissioner of DOCCS during Plaintiff's incarceration at Wende—knew of constitutional violations against Plaintiff and failed to take action. (Dkt. 12-1 at 4-5). Plaintiff states that he personally sent "several letters" detailing inadequate health care and assault. (*Id.* at 4). Plaintiff also contends that Defendants "disregarded conditions posing an excessive risk to [his] health and safety ...," and that prison staff was inadequately trained. (*Id.*).

## II. **Defendant's Motion for Summary Judgment**

### A. **Standard of Review**

**\*3** Federal Rule of Civil Procedure 56 provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material

Case 9:19-cv-00689-AMN-TWD    Document 72    Filed 05/12/21    Page 15 of 110

Crichlow v. Fischer, Not Reported in Fed. Supp. (2017)

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party. *See Scott v. Harris,* 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986)). The standard for granting summary judgment is the same whether the motion is made in lieu of an answer or after discovery has occurred. *See Anderson v. Rochester-Genesee Reg'l Transp. Auth.,* 337 F.3d 201, 206 (2d Cir. 2003).

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*" *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir. 2002) (emphasis in original) (quoting *Matsushita Elec.,* 475 U.S. at 586-87). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment...." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986) (emphasis in original).

"[A] party may file a motion for summary judgment at any time until 30 days after the close of all discovery." Fed. R. Civ. P. 56(b). But, summary judgment is generally not appropriate until after some discovery has occurred. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986) (stating that summary judgment is appropriate on the proper showing "after adequate time for discovery"); *see, e.g., Hellstrom v. U.S. Dep't of Veterans Affairs,* 201 F.3d 94, 97 (2d Cir. 2000) ("[S]ummary judgment should only be granted if *after discovery,* the nonmoving party has failed to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof." (emphasis original) (internal quotation marks and citations omitted)). "Only in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery." *Hellstrom,* 201 F.3d at 97; *see also Trebor Sportswear Co. v. The Ltd. Stores, Inc.,* 865 F.2d 506, 511 (2d Cir. 1989) ("The nonmoving party should not be

'railroaded' into his offer of proof in opposition to summary judgment." (citing *Celotex,* 477 U.S. at 326)).

**B. Statute of Limitations**

Defendants argue that some of Plaintiff's claims are time-barred by the statute of limitations. (Dkt. 177-5 at 3). "In [§] 1983 actions, the applicable limitations period is found in the 'general or residual state statute of limitations for personal injury actions....' " *Pearl v. City of Long Beach,* 296 F.3d 76, 79 (2d Cir. 2002) (quoting *Owens v. Okure,* 488 U.S. 235, 249-50 (1989)). A § 1983 action filed in New York is subject to a three-year statute of limitations. *Hogan v. Fischer,* 738 F.3d 509, 517 (2d Cir. 2013).

Here, Plaintiff filed this action October 16, 2012. (Dkt. 1). Therefore, any claim arising before October 16, 2009, is barred by the statute of limitations. Plaintiff points to the "continuing violation doctrine" to save his otherwise time-barred claims. (Dkt. 209-3 at 21-22).

> [The continuing violation doctrine] applies to claims composed of a series of separate acts that collectively constitute one unlawful practice. The continuing violation doctrine thus applies not to discrete unlawful acts, even where those discrete acts are part of a serial violation, but to claims that by their nature accrue only after the plaintiff has been subjected to some threshold amount of mistreatment. Accordingly, where the continuing violation doctrine applies, the limitations period begins to run when the defendant has engaged in enough activity to make out an actionable claim. A claim will be timely, however, only if the plaintiff alleges some non-time-barred acts contributing to the alleged violation.

**\*4** *Gonzalez v. Hasty,* 802 F.3d 212, 220 (2d Cir. 2015). Although the continuing violation doctrine generally applies to claims "composed of a series of separate acts that

collectively constitute one unlawful practice," *id.* at 220, a plaintiff "must allege both the existence of an ongoing policy of discrimination and some non-time-barred acts taken in furtherance of that policy." *Fahs Constr. Grp., Inc. v. Gray,* 725 F.3d 289, 292 (2d Cir. 2013) (quoting *Harris v. City of N.Y.,* 186 F.3d 243, 250 (2d Cir. 1999)); *see, e.g., Shomo v. City of N.Y,* 579 F.3d 176, 182 (2d Cir. 2009).

Here, Plaintiff alleges four patterns of conduct which occurred both before and after October 16, 2009: (1) denial of adequate medical and dental treatment; (2) denial of adequate nutrition and hygiene; (3) discrimination and failure to accommodate based on Plaintiff's disability; and (4) denial of due process rights.

The continuing violation doctrine applies to Eighth Amendment claims for deliberate indifference to medical needs. *See Shomo,* 579 F.3d at 182 ("[T]he continuing violation doctrine can apply when a prisoner challenges a series of acts that together comprise an Eighth Amendment claim of deliberate indifference to serious medical needs."). Plaintiff raises a number claims that he was denied adequate medical and dental treatment, which, taken together, could comprise an Eighth Amendment claim for deliberate indifference to serious medical needs. Plaintiff also complains of ongoing deprivations of adequate food and access to showers and laundry. Prison officials' Eighth Amendment obligations require that they "ensure that inmates receive adequate food, shelter, and medical care...." *Farmer v. Brennan,* 511 U.S. 825, 833 (1994).

Defendants argue that Plaintiff failed to allege the existence of a policy of deliberate indifference. (Dkt. 196-2 at 10). The Court disagrees. Plaintiff's amended complaint includes allegations that senior prison officials, including Fischer, knew of ongoing violations related to Plaintiff's inadequate heath care but failed to take action. Plaintiff claims he sent letters to Fischer to point out the inadequacies of his health care at Wende. Plaintiff also attaches a reply letter from Bellamy in which Bellamy states that she is responding to Plaintiff's letters on behalf of "governor Cuomo and Commissioner Fischer." (Dkt. 209-4 at 2). Plaintiff also asserts that the practices complained of "are widespread, longstanding, and deeply embedded in the culture of all [DOCCS] agenc[ies], constitut[ing] unwritten [DOCCS] policies & customs." (Dkt. 12-1 at 5).

Similarly, the amended complaint can be read as alleging a continuing violation as to Defendants' indifference to Plaintiff's nutrition and hygiene needs. Plaintiff alleges that he was routinely deprived of meaningful opportunities to shower and exercise, and was not provided adequate nutrition. (Dkt. 12 at 25; *see, e.g., id.* at 26). Plaintiff states that while he was in keeplock, corrections officers were told not to feed him. (*Id.* at 26). He also claims that he was only allowed to shower six times in a nine-month period, and that "his clothing and linen's [sic] were never laundered." (*Id.* at 27).

Plaintiff's allegations are sufficient to establish a plausible claim of "an ongoing policy of deliberate indifference and acts taken in accordance with that policy." *See Taylor v. Goord,* Civil Action. No. 9:09-CV-1036 (FJS/DEP), 2010 WL 3825661, at *7 (N.D.N.Y. Sept. 2, 2010), *report and recommendation adopted by* No. 9:09-CV-1036 (FJS/DEP), 2010 WL 3825656 (N.D.N.Y. Sept. 24, 2010). *Cf. Bussey v. Fischer,* Civil Action No. 9:10-CV-1021 (NAM/DEP), 2011 WL 4862478, at *5 (N.D.N.Y. Aug. 1, 2011) (finding a plaintiff failed to allege an ongoing policy of deliberate indifference sufficient to show a continuing violation where the alleged unwritten policy was inconsistent with written policies and requirements), *report and recommendation adopted by* No. 9:10-CV-1021 (NAM/DEP), 2011 WL 4499324 (N.D.N.Y. Sept. 27, 2011). Thus, particularly at this stage of the proceedings, Plaintiff's pre-October 16, 2009, claims as to inadequate medical and dental treatment, as well as inadequate food and hygiene, survive Defendants' statute of limitations defense.

**\*5** Similarly, Plaintiff alleges ongoing discrimination because of his hearing disability in violation of the Eighth and Fourteenth Amendments, as well as the "Rehabilitation Act" and the Americans with Disabilities Act. [1] (Dkt. 12-1 at 1). Plaintiff alleges a pattern of discriminatory conduct, arguing that DOCCS and individual Defendants at Wende failed to accommodate his hearing disability. The last complained-of act of discrimination at Wende occurred on August 18, 2010, well within the three-year statute of limitations. Plaintiff alleges that prison staff at Wende continuously failed to provide him reasonable accommodations, such as providing working hearing aids. Plaintiff also states that other disabled prisoners were not provided reasonable accommodations. Such *pro se* allegations are sufficient, at this stage, to state the existence of an ongoing policy of disability discrimination against Plaintiff.

Plaintiff also claims due process violations related to the processing of his grievances and disciplinary hearings. In this context, the continuing violation doctrine does not apply to Plaintiff's Fourteenth Amendment due process claims because "[e]ach decision made without due process is a discrete violation, and the statute of limitations begins to run from the date that the plaintiff was denied the full and fair hearing he was entitled to." *Bunting v. Fischer,* 14-CV-0578-RJA-MJR, 2016 WL 4939389, at *3 (W.D.N.Y. Aug. 4, 2016) (citing *Gonzalez,* 802 F.3d at 223), *report and recommendation adopted by* 14-CV-578A, 2016 WL 4804099 (W.D.N.Y. Sept. 14, 2016). Thus, all of Plaintiff's claimed due process violations which occurred before October, 16, 2009, are subject to the statute of limitations and must be dismissed.

In sum, at this stage in the proceedings, Plaintiff's claims of deliberate indifference to medical care, inadequate food and hygiene, and the failure to provide reasonable accommodations for his hearing disability all survive Defendants' statute of limitations challenge. Plaintiff's due process claims which are based on the processing of his grievances and which arose before October 16, 2009, are time barred and must be dismissed.

### C. Failure to Exhaust Administrative Remedies
Next, Defendants argue that many of Plaintiff's claims must be dismissed for failure to exhaust administrative remedies. (Dkt. 177-5 at 4-6.) An inmate's failure to exhaust administrative remedies is properly considered on a motion for summary judgment made in lieu of an answer. *See Crenshaw v. Syed,* 686 F. Supp. 2d 234, 236 (W.D.N.Y. 2010) (granting a summary judgment motion made in lieu of answer where inmate failed to exhaust administrative remedies).

Pursuant to 42 U.S.C. § 1997e, "[n]o action shall be brought with respect to prison conditions under [§ 1983], or any other Federal law, by a person confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

> To satisfy that requirement, prisoners in New York must ordinarily follow a three-step [DOCCS] grievance process. The first step in that process is the filing of a grievance with the Inmate Grievance

> Resolution Committee. Next, the inmate may appeal an adverse decision to the prison superintendent. Finally, the inmate may appeal the superintendent's decision to the Central Office Review Committee ("CORC"). In general, it is only upon completion of all three levels of review that a prisoner may seek relief in federal court under § 1983.

*Crenshaw,* 686 F. Supp. 2d at 236 (citations omitted). "Exhaustion is mandatory—unexhausted claims may not be pursued in federal court." *Amador v. Andrews,* 655 F.3d 89, 96 (2d Cir. 2011). "[D]efendants bear the burden of proof and prisoner plaintiffs need not plead exhaustion with particularity." *McCoy v. Goord,* 255 F. Supp. 2d 233, 248 (S.D.N.Y. 2003). Pursuant to the Second Circuit's decision in *Hemphill v. New York,* 380 F.3d 680 (2d Cir. 2004), a failure to exhaust administrative remedies may be excused where: "(1) the administrative remedies were not in fact available; [or] (2) prison officials have forfeited, or are estopped from raising, the affirmative defense of non-exhaustion; or (3) 'special circumstances justify the prisoner's failure to comply with administrative procedural requirements.' " *Dabney v. Pegano,* 604 Fed.Appx. 1, 3 (2d Cir. 2015) (quoting *Hemphill,* 380 F.3d at 686). However, the third prong of *Hemphill,* relating to "special circumstances" was abrogated by the Supreme Court's decision in *Ross v. Blake,* 136 S. Ct. 1850 (2016). *Williams v. Corr. Officer Priatno,* 829 F.3d 118, 123 (2d Cir. 2016). The inquiry which used to be under the third prong of *Hemphill,* is now considered "entirely within the context of whether administrative remedies were actually available to the aggrieved inmate." *Id.*

**\*6** Here, Plaintiff claims he filed over 300 grievances, and seems to suggest that this is sufficient to exhaust his administrative remedies. (*See* Dkt. 209-3 at 8; *see, e.g.,* Dkt. 211 at 1). Plaintiff misunderstands the exhaustion requirement. The filing of a grievance is but the first step in exhausting administrative remedies. To exhaust DOCCS administrative remedies, a prisoner must appeal to CORC. Plaintiff's filing of 300 grievances, even if true, is insufficient to exhaust his remedies under § 1997e.

Case 9:19-cv-00689-AMN-TWD    Document 72    Filed 05/12/21    Page 18 of 110

Crichlow v. Fischer, Not Reported in Fed. Supp. (2017)

In response to Defendants' assertion that Plaintiff failed to exhaust his administrative remedies for most of his claims, Plaintiff claims that DOCCS lost or destroyed his grievances. (Dkt. 209-3 at 19 (claiming that DOCCS destroyed meritorious grievances); Dkt. 211 at 1 (same)). "Plaintiff's wholly conclusory and unsupported allegations that grievances are tampered with at [Wende] do not create a material issue of fact in this case." *See Mims v. Yehl,* Nos. 13-CV-6405-FPG, 14-CV-6304-FPG, 14-CV-6305-FPG, 2014 WL 4715883, at *4 (W.D.N.Y. Sept. 22, 2014).

However, Defendants' submissions show that Plaintiff has satisfied the exhaustion requirement for some potential claims. Defendants' sworn declaration from Jeffery Hale—the Assistant Director of the DOCCS Inmate Grievance Program —states that Plaintiff exhausted 25 grievances between the beginning of his incarceration in 2008 and the filing of this action in October 2012. (Dkt. 177-3 at 2). Of those 25 exhausted grievances, 23 relate to Plaintiff's incarceration at Wende. (*See id.* at 5-6). Defendants provide only a printout listing the titles and grievance numbers of the 23 exhausted grievances that arose at Wende (*see id.*); they did not submit any paperwork relating to the grievances themselves or the final resolution of any exhausted grievance. (*See* Dkt. 177).

Plaintiff clearly exhausted some potential claims which could be raised in federal court pursuant to § 1997e. However, the Court cannot determine whether the claims Plaintiff raises in this action are those which have been exhausted because neither party submitted sufficient information which would allow the Court to make such a determination. It is possible that none of Plaintiff's exhausted grievances relate to the named Defendants in this action; it is equally possible that all 23 exhausted grievances relate to actions taken by the named Defendants. Since Defendants seek summary judgment on this basis, it is their burden to establish the lack of any issue of material fact on the exhaustion argument. They have failed to meet this burden. Thus, Defendants' motion based upon Plaintiff's alleged failure to exhaust is denied.

### D. Plaintiff's Due Process Claims

Regardless of whether grievances were exhausted or whether the claims were timely asserted, Plaintiff's due process claims relating to disciplinary confinement and grievance processing fail as a matter of law and summary judgment is appropriate.

### 1. SHU Confinement

Plaintiff alleges due process claims related to disciplinary proceedings which led to disciplinary confinement. (Dkt. 12 at 29). "[A] prisoner asserting a § 1983 claim for denial of due process at a disciplinary hearing must first identify a liberty interest protected by the Due Process Clause of which he was deprived, and then show that he was deprived of that interest without due process of law." *Aguirre v. Kendra,* 123 F. Supp. 3d 419, 422 (W.D.N.Y. 2015). "Prison discipline implicates a liberty interest when it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Ortiz v. McBride,* 380 F.3d 649, 654 (2d Cir. 2004) (quoting *Sandin v. Conner,* 515 U.S. 472, 484 (1995)). Where a prisoner alleges that he was confined to the Special Housing Unit ("SHU") as the result of a disciplinary hearing, the court considers how long the confinement lasted, along with "the conditions of the prisoner's segregated confinement relative to the conditions of the general prison population," in determining whether a liberty interest is implicated. *Vasquez v. Coughlin,* 2 F. Supp. 2d 255, 259 (N.D.N.Y. 1998). "Both the conditions and their duration must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." *Sealey v. Giltner,* 197 F.3d 578, 586 (2d Cir. 1999) (internal citation omitted).

**\*7** There is no "bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights." *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir. 2004). However, the Second Circuit has held that confinement for fewer than 101 days under "normal" SHU conditions does not amount to an atypical and significant hardship and thus does not implicate a liberty interest under the Due Process Clause. *Ortiz,* 380 F.3d at 654-55; *see also Tafari v. McCarthy,* 714 F. Supp. 2d 317, 375 (N.D.N.Y. 2010) (stating that SHU confinements of up to 90 days "fall within the 'short range' of disciplinary confinement and thus implicate a liberty interest only if 'the conditions were more severe than the normal SHU conditions.' " (quoting *Palmer,* 364 F.3d at 65)).

Here, Defendants argue that none of Plaintiff's disciplinary confinements violated Plaintiff's due process rights. (Dkt.

Case 9:19-cv-00689-AMN-TWD    Document 72    Filed 05/12/21    Page 19 of 110

Crichlow v. Fischer, Not Reported in Fed. Supp. (2017)

177-5 at 6-7). Defendants submitted Plaintiff's prison disciplinary record. (*See* Dkt. 177-4). The records show Plaintiff was subjected to only one non-time-barred SHU confinement at Wende. (*See id.* at 8). That SHU confinement was for 30 days. (*Id.*). Plaintiff does not argue that the conditions of his confinement were in any way abnormal or atypical. Because Plaintiff's disciplinary confinement fell within the "short" range and did not involve any abnormalities, it did not implicate any liberty interest sufficient to raise a due process violation. Plaintiff's due process claims as to disciplinary confinement at Wende fail as a matter of law.

### 2. Grievance Processing

Plaintiff also raises due process complaints about the handling of his grievances. (*See* Dkt. 12 at 27-30; Dkt. 209-2 at 21). It is well-established that inmates do not have a protected liberty interest in the processing of their prison grievances. *See Torres v. Mazzuca,* 246 F. Supp. 2d 334, 342 (S.D.N.Y. 2003). "[Although] there is a First Amendment right of meaningful access to the courts and a right to petition the government for redress, inmate grievance procedures are not required by the Constitution and therefore a violation of such procedures does not give rise to a claim under 🔖 § 1983." 🔖 *Cancel v. Goord,* No. 00 CIV 2042 LMM, 2001 WL 303713, at *3 (S.D.N.Y. Mar. 29, 2001) (internal citations omitted).

Plaintiff has no liberty interest in the prison grievance program. Even if Defendants violated their own procedures in processing Plaintiff's grievances, Plaintiff cannot find relief under 🔖 § 1983. A prisoner may raise due process claims related to disciplinary hearings. *Montalvo v. Lamy,* 139 F. Supp. 3d 597, 608 (W.D.N.Y. 2015); *Richard v. Fischer,* 38 F. Supp. 3d 340, 358-59 (W.D.N.Y. 2014). However, Plaintiff's allegations here relate only to allegedly faulty grievance processing; Plaintiff makes no allegations of due process violations related to disciplinary hearings. Therefore, these claims fail as a matter of law.

Plaintiff's only claim against Defendants Bellamy and Scott are the due process claims related to the grievance process. Because Plaintiff's claims fail, Defendants Bellamy and Scott must be dismissed from the action.

### E. Retaliation

Finally, Plaintiff alleges that he was retaliated against because he filed grievances. (Dkt. 12 at 28).

> A prisoner has a substantive due process right not to be subjected to false misconduct charges as retaliation for his exercise of a constitutional right such as petitioning the government for redress of grievances. Retaliating against inmates for filing grievances by filing false disciplinary reports violates the First Amendment. In fact, our Circuit has held that the filing of a false disciplinary report is a serious enough action that temporal proximity between an inmate grievance and the filing of a report is enough to state a retaliation claim. Accordingly, a plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action.

**\*8** *Richard v. Fischer,* 38 F. Supp. 3d 340, 358 (W.D.N.Y. 2014) (internal quotation marks and citations omitted). Here, Plaintiff asserts that because of his filing of numerous grievances, unspecified Defendants retaliated by filing false misbehavior reports. (*See* Dkt. 12 at 28). Defendants have not raised any argument related to Plaintiff's retaliation claim. (*See* Dkt. 177-5). Therefore, the Court will not dismiss the retaliation claim.

### F. Summary

For the foregoing reasons, Defendants' motion for summary judgment is granted with respect to Plaintiff's alleged due process claims, but is denied as to Plaintiff's Eighth Amendment claims related to the alleged denial of adequate medical treatment and adequate food and nutrition, and it is also denied with respect to Plaintiff's claims alleging retaliation and the failure to provide reasonable accommodations for Plaintiff's disability.

### III. Plaintiff's Motion for Discovery

Plaintiff moves this Court to open discovery. (Dkt. 182). Plaintiff states that he is "asking for interrogatory answers

Case 9:19-cv-00689-AMN-TWD   Document 72   Filed 05/12/21   Page 20 of 110

Crichlow v. Fischer, Not Reported in Fed. Supp. (2017)

and other evidence [to] show that the material facts are in dispute." (*Id.* at 2). Plaintiff also states that discovery will allow him to show that he filed "over 300 grievances." (*Id.*).

The Court construes Plaintiff's motion as one under Fed. R. Civ. P. 56(d). In opposing a summary judgment motion, if a nonmovant "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d).

> A party seeking to delay resolution of a summary judgment motion on grounds that he has been deprived of certain discovery materials "must show that the material sought is germane to the defense, and that it is neither cumulative nor speculative, and a bare assertion that the evidence supporting a plaintiff's allegation is in the hands of the defendant is insufficient."

*Alphonse Hotel Corp. v. Tran,* 828 F.3d 146, 151 (2d Cir. 2016) (quoting *Paddington Partners v. Bouchard,* 34 F.3d 1132, 1138 (2d Cir. 1994)).

Here, Plaintiff has not submitted any sworn affidavit or declaration requesting particular information, nor has he described how the material requested is germane to his defense related to the due process claims (the only claims on which the Court has granted summary judgment). As discussed above, the due process claims are barred as a matter of law, and Plaintiff has not made a showing that discovery would alter that conclusion. Therefore, the motion for discovery is denied without prejudice to Plaintiff seeking discovery with respect to the claims that remain.

### IV. Plaintiff's Motion to Appoint Counsel

As part of Plaintiff's motion for discovery, he also moves this Court to appoint counsel "to assist [Plaintiff] in preparing his case...." (Dkt. 182 at 5). Under 28 U.S.C. § 1915(e), the Court may appoint counsel to assist indigent litigants, *see, e.g., Sears, Roebuck & Co. v. Charles Sears Real Estate, Inc.,* 865 F.2d 22, 23-24 (2d Cir. 1988), and the assignment of *pro bono* counsel in civil cases is within the trial court's discretion. *In re Martin-Trigona,* 737 F.2d 1254, 1260 (2d Cir. 1984). The court must evaluate "the merits of [the] plaintiff's case, the plaintiff's ability to pay for private counsel, his efforts to obtain a lawyer, the availability of counsel, and the plaintiff's ability to gather the facts and deal with the issues if unassisted by counsel." *Cooper v. A. Sargenti Co., Inc.,* 877 F.2d 170, 172 (2d Cir. 1989). Particular attention must be paid to the merits of the plaintiff's claim. *Id.* ("Even where the claim is not frivolous, counsel is often unwarranted where the indigent's chances of success are extremely slim." (quoting *Hodge v. Police Officers,* 802 F.2d 58, 60 (2d Cir. 1986))). Additionally, for prison inmates, the court must also give weight to the plaintiff's lack of practical access to attorneys. *Id.* at 173-74.

**\*9** Plaintiff was in prison when he filed the complaint, and remains in custody. (*See* Dkt. 1; Dkt. 4). Plaintiff has already been granted *in forma pauperis* status in this case. (Dkt. 5). In his *in forma pauperis* motion, Plaintiff stated that he was incarcerated, had not worked in the past 12 months, and did not have any cash or other assets. (Dkt. 4 at 1-2). A prison official certified that Plaintiff's average account balance for the previous six months was $1.07. (*Id.* at 3). Plaintiff has conclusively shown that he is indigent, and has met the threshold test for appointing counsel.

However, the *Cooper* factors all weigh against appointing counsel at this time. Plaintiff's motion papers provide no information suggesting that he attempted to obtain counsel to assist in his case. (*See* Dkt. 182 at 5). As the Second Circuit has noted, "[t]he vast majority of litigation on behalf of personal claimants is financed initially by lawyers who accept the representation for a contingent fee in the expectation of being rewarded by a share of the winnings." *Cooper,* 877 F.2d at 173. In the absence of an affirmative statement by Plaintiff otherwise, the Court assumes that he has not sought an attorney to represent him. This weighs against the appointment of counsel.

The Court also finds that the Plaintiff has failed to show anything more than a remote possibility of success on the merits. Plaintiff's ultimate success on the merits faces significant hurdles, including Defendants' defense that Plaintiff failed to exhaust his administrative remedies. This too weighs heavily against the appointment of counsel.

Balancing the factors set forth in *Cooper,* the Court finds that appointing counsel is inappropriate at this time, and Plaintiff's motion is denied without prejudice.

### V. Plaintiff's Motion for a Stay

Case 9:19-cv-00689-AMN-TWD   Document 72   Filed 05/12/21   Page 21 of 110

Crichlow v. Fischer, Not Reported in Fed. Supp. (2017)

Plaintiff moves this Court to stay the action while he undergoes surgery on his wrist, arm, and back. (Dkt. 182 at 6). Plaintiff does not disclose the date of the surgery, or any further information which would allow the Court to evaluate the necessity of such a stay. (*See id.*). Plaintiff has not sufficiently shown a need for a stay in the litigation. Therefore, the motion is denied without prejudice.

## VI. **Plaintiff's Motion for a Medical Exam**

Plaintiff asks this Court, pursuant to Fed. R. Civ. P. 35, to order a medical examination so that he can access medical care for currently occurring medical issues. (Dkt. 187). Rule 35 permits a court to order "a party whose ... condition ... is in controversy to submit to a physical or mental examination by a suitably licensed or certified examiner. The court has the same authority to order a party to produce for examination a person who is in its custody...." Fed. R. Civ. P. 35. "In order to obtain a medical examination under Rule 35, the moving party must establish 'good cause....' " *Kelly v. Times/review Newspapers Corp.,* CV 14-2995 (JMA) (SIL), 2016 WL 2901744, at *1 (E.D.N.Y. May 18, 2016). " 'Rule 35 does not, however, authorize a party to file a motion for his own physical examination.' Neither may a plaintiff invoke Rule 35 in order to receive medical care." *Rodriguez v. Conway,* No. 10-CV-6243L, 2011 WL 4829725, at *3 (W.D.N.Y. Sept. 6, 2011) (citations omitted), *affirmed in relevant part by* No. 10-CV-6243L, 2011 WL 4829869 (W.D.N.Y. Oct. 12, 2011).

Here, Plaintiff's current medical condition is not "in controversy." Plaintiff has already submitted records regarding his medical and dental maladies for the time period at issue in this action. (*See* Dkt. 209-5 at 1-27). Defendants have in no way challenged the substance of Plaintiff's claimed medical needs during his incarceration at Wende from 2008 to 2010. Further, Plaintiff cannot use Rule 35 to receive medical care. Therefore, Plaintiff's motion is denied.

## VII. **Plaintiff's Motion for Reconsideration**

**\*10** Plaintiff titles his motion at Dkt. 192 as a "motion for reconsideration," however, he does not point to any order or decision of the Court for which he seeks reconsideration. Although the Court has the inherent power to reconsider and modify interlocutory orders prior to the entry of judgment, *see* Fed. R. Civ. P. 54(b) ("[A]ny order or other ... that adjudicates fewer than all the claims ... does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."); *Williams v. Cty. of Nassau,*

779 F. Supp. 2d 276, 280 & n.2 (E.D.N.Y. 2011) ("A district court retains absolute authority to reconsider or otherwise affect its interlocutory orders any time prior to appeal."), *aff'd*, 581 Fed.Appx. 56 (2d Cir. 2014), Plaintiff has not provided sufficient information to allow the Court to decide his motion. Therefore, Plaintiff's motion is denied.

## VIII. **Plaintiff's Motion to Amend**

Plaintiff also filed a motion which, in essence, asks the Court to allow Plaintiff to amend his response to Defendants' motion for summary judgment. (Dkt. 192). The Court granted such relief already (Dkt. 208), and Plaintiff already filed amended response papers (Dkt. 209; Dkt. 211). Therefore, Plaintiff's motion is denied as moot because he has already received the requested relief.

## IX. **Plaintiff's Motion for a Hearing**

Plaintiff further asks the Court to hold a hearing "to cover several issue[s] that Plaintiff [does not] fully[ ] understand." (Dkt. 192 at 3). Plaintiff also seeks scheduling conferences or orders pursuant to Fed. R. Civ. P. 16(b) and 26(f). The Court finds that neither a hearing nor a scheduling order is necessary at this time. If Plaintiff has legal questions, he may retain an attorney or do further legal research to answer those questions. It is not the Court's role to answer such questions. Thus, Plaintiff's motion is denied. Once an answer is filed, the case will proceed to discovery.

## X. **Defendant's Motion for Sanctions**

Defendants move this Court to impose sanctions on Plaintiff pursuant to Fed. R. Civ. P. 11. (Dkt. 195). Defendants argue that, as part of his response to the motion for summary judgment, Plaintiff filed a grievance exhausted by another inmate, claiming the grievance as one Plaintiff had himself exhausted. (Dkt. 195-2 at 1-2 (citing Dkt. 188-8 at 2)). Plaintiff allegedly did so in an attempt to show that the Jeffery Hale declaration was knowingly false and that Defendants had destroyed Plaintiff's grievances. (*Id.* (citing Dkt. 188 at 12)).

A party or counsel for a party is required by the Federal Rules of Civil Procedure to certify that, to the best of their knowledge, the factual contentions made have evidentiary support. Fed. R. Civ. P. 11(b)(3). Rule 11 allows the court to "impose an appropriate sanction on any attorney, law firm, or party that violated [Rule 11(b)] or is responsible for the violation." Fed. R. Civ. P. 11(c)(1). "Sanctions may be—

Crichlow v. Fischer, Not Reported in Fed. Supp. (2017)

Case 9:19-cv-00689-AMN-TWD     Document 72     Filed 05/12/21     Page 22 of 110

but need not be—imposed when court filings are used for an 'improper purpose,' or when claims are not supported by existing law, lack evidentiary support, or are otherwise frivolous." *Ipcon Collections LLC v. Costco Wholesale Corp.,* 698 F.3d 58, 63 (2d Cir. 2012) (citation omitted). "Further, even when a district court finds a violation of Rule 11, 'the decision whether to impose a sanction is committed to the district court's discretion.' " *Id.* (quoting *Perez v. Posse Comitatus,* 373 F.3d 321, 325 (2d Cir. 2004)).

Defendants argue that "the only appropriate sanction in this matter is dismissal." (Dkt. 195-2 at 3). The Court disagrees. The grievance at issue relates to a complaint which arose during 2012 and 2013. (Dkt. 188-8 at 2). Even if Plaintiff was the grievant, the grievance itself would be irrelevant to this Court's inquiry into Plaintiff's incarceration conditions from 2008 until 2010. Indeed, the grievance at issue was not taken into account during the Court's review of the motion for summary judgment because it is irrelevant to the time frame at issue. Further, although the filing of false documents in bad faith to a court can, in egregious cases, result in dismissal, *see* 🔖 *Ceglia v. Zuckerberg,* No. 10-CV-00569A(F), 2013 WL 1208558 (W.D.N.Y. 2013), *report and recommendation adopted by* 2014 WL 1224574 (W.D.N.Y. 2014), *aff'd,* 600 Fed.Appx. 34 (2d Cir. 2015), such an extreme sanction is not warranted at this time. However, **Plaintiff is hereby warned that any future violation of Rule 11 may result in dismissal of the action or other appropriate sanctions.**

**\*11** Defendants' motion is denied without prejudice.

## XI. **Plaintiff's Motion for Sanctions**

Finally, Plaintiff asks this Court to impose sanctions on Defendants for making materially misleading and false statements to the Court in its response in opposition (Dkt. 174) to Plaintiff's letter motion (Dkt. 172). (Dkt. 198). The Court denied Plaintiff's motion as unrelated to the claims at issue in this action. (Dkt. 176).

Read generously, Plaintiff argues that Defendants' counsel failed to acknowledge in his response that one of the individuals named in the letter motion was also a named Defendant in this action. (*See* Dkt. 198 at 1-2). Such a misstatement is immaterial and does not warrant sanctions.

As Plaintiff failed to assert any material violation of Rule 11, sanctions are inappropriate, and Plaintiff's motion is denied.

## **CONCLUSION**

For the foregoing reasons, the Court

GRANTS IN PART AND DENIES IN PART Defendants' motion for summary judgment (Dkt. 177);

INSTRUCTS the Clerk of Court to terminate Defendants Bellamy and Scott from this action;

DIRECTS Defendants to answer the complaint within 30 days of the filing of this Decision and Order;

DENIES Plaintiff's motion for discovery (Dkt. 182) without prejudice;

DENIES Plaintiff's motion to appoint counsel (Dkt. 182) without prejudice;

DENIES Plaintiff's motion for a stay (Dkt. 182) without prejudice;

DENIES Plaintiff's motion for a medical exam (Dkt. 187);

DENIES Plaintiff's motion for reconsideration (Dkt. 192);

DENIES Plaintiff's motion to amend (Dkt. 192) as moot;

DENIES Plaintiff's motion for a hearing (Dkt. 192);

DENIES Defendants' motion for sanctions (Dkt. 195) without prejudice; and

DENIES Plaintiff's motion for sanctions (Dkt. 198).

SO ORDERED.

## **All Citations**

Not Reported in Fed. Supp., 2017 WL 920753

**Footnotes**

1    Defendants have not made any statute-of-limitations arguments regarding Plaintiff's claims under the Rehabilitation Act or the Americans with Disabilities Act. (*See* Dkt. 177-5 at 3). Thus, the Court only addresses Defendants' statute-of-limitation argument as it relates to Plaintiff's constitutional claims of discrimination under § 1983.

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by McDonald v. Zerniak, N.D.N.Y., November 4, 2016

2014 WL 5475293
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Charles McALLISTER also known
as Charles McCallister, Plaintiff,
v.
Harold CALL, Vocational Supervisor,
Mohawk Correctional Facility, Defendant.

No. 9:10–CV–610 (FJS/CFH).
|
Signed Oct. 28, 2014.
|
Filed Oct. 29, 2014.

**Attorneys and Law Firms**

Charles McAllister, Westbury, NY, pro se.

Hon. Eric T. Schneiderman, Office of the New York State Attorney General, The Capitol, Keith J. Starlin, AAG, of Counsel, Albany, NY, for Defendant.

**ORDER**

SCULLIN, Senior District Judge.

**\*1** Currently before the Court are Magistrate Judge Hummel's October 9, 2014 Report–Recommendation and Order, *see* Dkt. No. 81, and Plaintiff's objections thereto, *see* Dkt. No. 83.

Plaintiff, a former inmate who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision, commenced this action pursuant to 42 U.S.C. § 1983. In his original complaint, Plaintiff asserted claims against Brian Fischer, Lucien J. LeClaire, Patricia LeConey, Carol Woughter, and John and Jane Does. Defendants moved for summary judgment. *See* Dkt. No. 49. By Report–Recommendation and Order dated July 6, 2012, Magistrate Judge Homer recommended that this Court dismiss all claims against the named individuals and direct Plaintiff to join Harold Call as a Defendant. *See* Dkt. No.

55. This Court accepted the Report and Recommendation and Order in its entirety and directed Plaintiff to file an amended complaint to "include only one cause of action a procedural due process claim in connection with his disciplinary hearing and one Defendant hearing officer Call ." *See* Dkt. No. 58 at 4–5.

Plaintiff thereafter filed his amended complaint and requested compensatory and punitive damages. *See* Dkt. No. 64, Amended Complaint at 4. In this amended complaint, Plaintiff alleged that Defendant violated his constitutional rights under the First, Eighth and Fourteenth Amendments. *See* Dkt. No. 64, Amended Complaint at ¶¶ 33, 34, 43.

On May 9, 2014, Defendant filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See* Dkt. No. 74. In a Report–Recommendation and Order dated October 9, 2014, Magistrate Judge Hummel recommended that this Court grant Defendant's motion in part and deny his motion in part. *See* Dkt. No. 81 at 33. Plaintiff filed objections to Magistrate Judge Hummel's recommendations. *See* Dkt. No. 83.

Where a party makes specific objections to portions of a magistrate judge's report and recommendation, the court conducts a *de novo* review of those recommendations. *See Trombley v. Oneill,* No. 8:11–CV–0569, 2011 WL 5881781, *2 (N.D.N.Y. Nov. 23, 2011)* (citing Fed.R.Civ.P. 72(b)(2); 28 U.S.C. § 636(b)(1)(C)). Where a party makes no objections or makes only conclusory or general objections, however, the court reviews the report and recommendation for "clear error" only. *See Salmini v. Astrue,* 3:06–CV–458, 2009 WL 1794741, *1 (N.D.N.Y. June 23, 2009)* (quotation omitted). After conducting the appropriate review, a district court may decide to accept, reject, or modify those recommendations. *See Linares v. Mahunik,* No. 9:05–CV–625, 2009 WL 3165660, *10 (N.D.N.Y. Sept. 29, 2009)* (quoting 28 U.S.C. § 636(b)(1)(C)).

Although Plaintiff's objections are, in most respects, general or conclusory, given his *pro se* status, the Court has conducted a *de novo* review of Magistrate Judge Hummel's Report–Recommendation and Order. Having completed its review, the Court hereby

**\*2 ORDERS** that Magistrate Judge Hummel's October 9, 2014 Report–Recommendation and Order is **ACCEPTED**

**in its entirety** for the reasons stated therein; and the Court further

**ORDERS** that Defendant's motion for summary judgment is **GRANTED in part** and **DENIED in part;** and the Court further

**ORDERS** that Plaintiff's First Amendment claims, his Eighth Amendment claims, and his challenge to the constitutionality of Directive 4913 are **DISMISSED;** and the Court further

**ORDERS** that, to the extent that Plaintiff has asserted claims against Defendant in his official capacity, those official-capacity claims are **DISMISSED;** and the Court further

**ORDERS** that Defendant's motion for summary judgment is **DENIED** with respect to Plaintiff's Fourteenth Amendment due process claims and with respect to Defendant's qualified immunity defense; and the Court further

**ORDERS** that this matter is referred to Magistrate Judge Hummel for all further pretrial matters; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**REPORT–RECOMMENDATION AND ORDER** [1]

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

Plaintiff *pro se* Charles McAllister ("McAllister"), a former inmate who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"), [2] brings this action pursuant to 42 U.S.C. § 1983 alleging that defendant Harold Call ("Call"), Vocational Supervisor, Mohawk Correctional Facility ("Mohawk"), violated his constitutional rights under the First, Eighth and Fourteenth Amendments. Am. Compl. (Dkt. No. 64) ¶¶ 33, 34; 4. McAllister initially commenced this civil rights action against defendants Brian Fischer, Lucien J. LeClaire, Patricia LeConey, Carol Woughter, and John and Jane Does. Defendants moved for summary judgment. Dkt. No. 49. By report and recommendation dated July 6, 2012, (1) all claims against identified defendants were dismissed; and (2) defendant was directed to join Call, who was identified in the motion papers as a John

Doe defendant. Dkt. No. 55; Dkt. No. 58. The report and recommendation was accepted in its entirety, and McAllister was directed to file an amended complaint to "include only one cause of action—a procedural due process claim in connection with his disciplinary hearing—and one Defendant—hearing officer Call." Dkt. No. 58 at 4. McAllister thereafter filed his amended complaint wherein he requested punitive and compensatory damages. Am. Compl. at 4. Presently pending is Call's motion for summary judgment on the amended complaint pursuant to Fed.R.Civ.P. 56. Dkt. No. 74. McAllister did not respond. For the following reasons, it is recommended that Call's motion be granted in part and denied in part.

### I. Failure to Respond

The Court notified McAllister of the response deadline and extended the deadline for his opposition papers on two occasions. Dkt. No. 75; Dkt. No. 77; Dkt. No. 80. Call also provided notice of the consequence of failing to respond to the motion for summary judgment in his motion papers. Dkt. No. 74–1. Despite these notices and extensions, McAllister did not respond.

**\*3** Summary judgment should not be entered by default against a *pro se* plaintiff who has not been given any notice that failure to respond will be deemed a default." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Thus, "[t]he fact that there has been no response to a summary judgment motion does not ... mean that the motion is to be granted automatically." *Id.* at 486. Even in the absence of a response, defendants are entitled to judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. *Id.; FED. R. CIV. P. 56(c).* "A verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist...." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (internal citations omitted); *see also Patterson v. Cnty. of Oneida, N.Y.,* 375 F.3d 206, 219 (2d Cir.2004) (same). The facts set forth in defendant's Rule 7.1 Statement of Material Facts (Dkt. No. 74–2) are accepted as true as to those facts that are not disputed in McAllister's amended complaint. N.D.N.Y.L.R. 7.1(a)(3) ("The Court shall deem admitted any properly supported facts set forth in the Statement of Facts that the opposing party does not specifically controvert.").

## II. Background

The facts are reviewed in the light most favorable to McAllister as the non-moving party. *See* subsection III(A) *infra.* At all relevant times, McAllister was an inmate at Mohawk. Am. Compl. ¶ 3.

On or about July 15, 2009, nonparty Correction Officer Femia, pursuant to authorization from nonparty Captain Dauphin, searched McAllister's personal property while McAllister was confined in a secure housing unit ("SHU").[3] Dkt. No. 74–3, Exh. A, at 14; Am. Compl. ¶¶ 5–6. Femia confiscated approximately twenty documents from McAllister's locker, including five affidavits that were signed by other inmates. Dkt. No. 74–3, Exh. A, at 14. As a result of the search, Femia issued McAllister a Tier III misbehavior report, alleging violations of prison rules 113.15[4] (unauthorized exchange) and 180.17 (unauthorized assistance).[5] *Id.;* Am. Compl. ¶ 7.

McAllister was assigned as his inmate assistant nonparty Correction Officer A. Sullivan. Am. Compl. ¶ 7; Dkt. No. 74–3, Exh. A, at 11. McAllister requested five inmate witnesses, documents, prison directives 4933 and 4982, and a facility rule book. Am. Compl. ¶ 8; Dkt. No. 74–3, Exh. A, at 11. He also asked Sullivan for permission to retrieve documents from his personal property. *Id.* The requested witnesses were those inmates whose signatures were affixed to the five confiscated affidavits. Dkt. No. 74–3, Exh. A, at 14. Sullivan retrieved the requested materials, and all inmate witnesses agreed to testify. *Id.* at 11.

On or about July 21, 2009, a Tier III disciplinary hearing was held before Call, who served as the hearing officer. Am. Compl. ¶ 10. McAllister pleaded not guilty to both alleged violations. Dkt. No. 74–3, Exh. A, at 38. McAllister objected to the misbehavior report as violative of prison directive 4932 because the copy he was given (1) provided insufficient notice of the charges against him and (2) differed from the report that Call read into the record. *Id.* at 39–41. McAllister stated that his copy did not list the names of the inmates to whom the confiscated affidavits allegedly belonged. *Id.* Call acknowledged the difference between the reports but concluded that the misbehavior report informed McAllister of the charges against him and the bases for the charges. *Id.* 39, 41–42. McAllister also argued that his copy of the misbehavior report referred to confiscation of twenty

documents from his cell, but did not identify the papers that were taken. *Id.* at 42. He contended that the misbehavior report's general reference to "legal work" was insufficient to provide him with notice of the documents to which the report was referring because he had several volumes of legal work. *Id.* at 42, 59. In response to this objection, Call recited the body of the misbehavior report, which described the confiscated documents as "[a]rticles of paper which appear to be legal work including some signed affidavits" and asked McAllister, "[t]hat didn't ring a bell for you? How much paperwork did you have that fit that description?" *Id.* at 42. Call also expressed his belief that the affidavits qualified as legal work. *Id.* at 45, 57–58.

**\*4** McAllister next argued that he did not provide unauthorized legal assistance to another inmate in violation of rule 180.17 because the inmate affidavits were used as evidence to prove that the Division of Parole had a "practice" of "fail[ing] to respond to appeals over the last four years .... " Dkt. No. 74–3, Exh. A at 45–49, 56. These inmates were aware that their affidavits were created for, and to be used solely in support of, McAllister's case and that they were receiving no legal benefit. *Id.* at 48–49. McAllister further contended that he did not need permission from prison personnel to collect the affidavits. *Id.* at 64.

McAllister also argued that rule 113.15 is ambiguous because it does not list the specific items which, if found in an inmate's possession, would violate the rule. Dkt. No. 74–3, Exh. A, at 54. Finally, to the extent it can be determined from the hearing transcript, McAllister objected to the SHU procedures for handling his personal property. *Id.* at 70.

At the conclusion of the hearing, Call informed McAllister that he would be considering testimony from a confidential witness. Dkt. No. 73–3, Exh. A, at 13, 38, 73. McAllister objected to consideration of confidential testimony without being informed of the contents. *Id.* at 74. Finally, McAllister declined to call the inmates that he had requested as witnesses. *Id.* at 37, 71.

Call found McAllister guilty of violating prison rules 113.15 and 180.17. Dkt. No. 74–3, Exh. A, at 8–9, 76. He imposed a penalty of three months in SHU and three months loss of privileges. *Id.* at 8. Call relied upon the misbehavior report, the confidential testimony, the packet of legal work containing the other inmates' affidavits, and McAllister's testimony and statements. *Id.* at 9.

The disciplinary determination was reversed upon administrative appeal on the ground that the evidence failed to support a finding of guilt. Dkt. No. 74–3, Exh. B, at 79; Exh. C, at 81. In May 2010, McAllister commenced this action pursuant to 42 U.S.C. § 1983.

### III. Discussion [6]

McAllister argues that Call violated his rights under (1) the First Amendment, by (a) retaliating against him by finding him guilty and (b) hindering his access to the courts; (2) the Eighth Amendment, by imposing a three-month SHU assignment, plus ten additional days following reversal of the disciplinary hearing; and (3) the Fourteenth Amendment, because (a) he was given insufficient notice of the charges against him, (b) he was denied advance notice of the use of a confidential witness, (c) he was forced to spend approximately fifty-two days in SHU as a result of the misbehavior report, (d) Call failed to follow certain DOCCS directives and prison regulations, (e) Call demonstrated bias against him during the Tier III hearing and prejudged his guilt, and (f) he was denied equal protection.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact, it was supported by affidavits or other suitable evidence, and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by providing the court with portions of pleadings, depositions, and affidavits which support the motion. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

**\*5** The party opposing the motion must set forth facts showing that there is a genuine issue for trial, and must do more than show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

For a court to grant a motion for summary judgment, it must be apparent that no rational finder of fact could find in favor of the non-moving party. *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

Where, as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-movant special solicitude. *See Triestman v. Federal Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law....

*Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant,* 537 F.3d 185, 191–92 (2d Cir.2008).

### B. Eleventh Amendment

Call argues that he is entitled to Eleventh Amendment immunity relating to McAllister's claims for money damages against him in his official capacity. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. AMEND. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984) (citing *Hans v. Louisiana,* 134 U.S. 1, 21 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of

its agencies or departments is proscribed by the Eleventh Amendment. *Halderman,* 465 U.S. at 100. Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. *See Quern v. Jordan,* 440 U.S. 332, 340–41 (1979).

A suit against a state official in his or her official capacity is a suit against the entity that employs the official. *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) (citing *Edelman v. Jordan,* 415 U.S. 651, 663 (1974)). "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer. *Kentucky v. Graham,* 473 U.S. 159, 166 (1985). Here, because McAllister seeks monetary damages against Call for acts occurring within the scope of his duties, the Eleventh Amendment bar applies.

**\*6** Accordingly, it is recommended that Call's motion on this ground be granted.

## C. Personal Involvement

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered personally involved if:

(1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon,* 58 F.3d at 873 (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)).[7] Assertions of personal involvement that are merely speculative are insufficient to establish a triable issue of fact. *See e.g., Brown v. Artus,* 647 F.Supp.2d 190, 200 (N.D.N.Y.2009).

As to any constitutional claims beyond those surrounding the denial of due process at the Tier III hearing, the undersigned notes that evaluation of such is unnecessary as it is outside of the scope set forth in this Court's prior order. Dkt. No. 58 at 4. However, to the extent that Call acknowledges these claims and provides additional and alternative avenues for dismissal, McAllister fails to sufficiently allege Call's personal involvement in impeding his access to the courts, in violation of the First Amendment. McAllister argues that, as a result of Call's determination that he violated rules 113.15 and 180.17, his legal paperwork was confiscated, which impaired his ability to continue to represent himself in pending state and federal court claims. Am. Compl. ¶¶ 38–40. However, McAllister does not suggest that Call was personally involved in either the search and confiscation of paperwork that led to the filing of the misbehavior report nor the subsequent reduction in his paperwork pursuant to directive 4913. To the contrary, McAllister concedes that the paperwork was reduced pursuant to the directive.

McAllister also fails to sufficiently allege Call's personal involvement in the SHU procedures for storing property or in holding him in SHU for ten additional days following the reversal of the Tier III determination. Call stated that hr had no involvment with the storage of property in SHU. Dkt. No. 74–3, at 5. Call also contended that he "was not responsible for plaintiff's being held in SHU for additional days following the August 26, 2009 reversal of the disciplinary hearing decision of July 22, 2009." *Id.* McAllister does not allege Call's involvement in this delay. McAllister's sole reference to the ten-day delay is his claim that he "was not released from Special Housing until September 4, 2009, approximately 10 days after the reversal" Am. Compl. ¶ 43. This conclusory statement is insufficient to demonstrate Call's personal involvement in an extension of his time in SHU

following the reversal of the Tier III determination. *Brown, 647 F.Supp.2d at 200.*

 *7 Accordingly, it is recommended that Call's motion be granted insofar as McAllister alleges that Call: denied him access to the courts in violation of the First Amendment, was at all involved with the storage of his property while he was in SHU, and caused him to be held an additional ten days in SHU following administrative reversal of the Tier III determination.

### D. First Amendment

McAllister appears to argue that, in retaliation for his filing of grievances and lawsuits, Call found him guilty of the misconduct in the Tier III hearing and imposed SHU time. He suggests that his transfer to SHU, as a result of the Tier III determination, triggered enforcement of his compliance with directive 4913, which impeded his ability to proceed with active legal matters and resulted in dismissals. Am. Compl. ¶ 41. Thus, McAllister also argues that he was denied access to the courts. Am. Compl. ¶ 38. As a preliminary matter, McAllister's First Amendment retaliation and access claims are beyond the scope of the prior order of this Court directing McAllister to limit his amended complaint "include only one cause of action—a procedural due process claim in connection with his disciplinary hearing." Dkt. No. 58, at 4. Regardless, McAllister fails to plausibly allege either retaliation or denial of access to the courts.

Courts are to "approach [First Amendment] retaliation claims by prisoners with skepticism and particular care." *See e.g., Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), overruled on other grounds by *Swierkiewicz v. Sorema, NA,* 534 U.S. 506 (2002)). A retaliation claim under section 1983 may not be conclusory and must have some basis in specific facts that are not inherently implausible on their face. *Ashcroft,* 556 U.S. at 678; *South Cherry St., LLC v. Hennessy Group LLC,* 573 F.3d 98, 110 (2d Cir.2009). To survive a motion to dismiss, a plaintiff must show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dawes*

*v. Walker,* 239 F.3d 489, 492 (2d Cir.2001), overruled on other grounds by *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *Taylor v. Fischer,* 841 F.Supp.2d 734, 737 (W.D.N.Y.2012). If the plaintiff meets this burden, the defendants must show, by a preponderance of the evidence, that they would have taken the adverse action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977). "Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *See* *Barclay v. New York,* 477 F.Supp.2d 546, 588 (N.D.N.Y.2007).

 *8 Here, McAllister baldly states that Call's disciplinary determination was imposed in retaliation for his filing of grievances and lawsuits; however, McAllister does not identify these grievances and lawsuits nor does he claim that any of these were lodged against Call. *See generally Ciaprazi v. Goord,* No. 02–CV–915, 2005 WL 3531464, at *9 (N.D.N.Y. Dec. 22, 2005) (dismissing the plaintiff's claim of retaliation where the plaintiff could "point to no complaints lodged by him against or implicating the conduct of [the] defendant ... who issued the disputed misbehavior report."). McAllister also provides no time frame for the apparent grievance and lawsuits. Thus, it cannot be discerned whether or how these unnamed grievances and lawsuits were a "motivating factor" in Call's Tier III determination. *Doyle,* 429 U.S. at 287 (internal quotation marks and citation omitted). McAllister's unsupported, conclusory claim fails to plausibly demonstrate that Call's determination was a product of retaliatory animus.

Undoubtedly, prisoners have a constitutional right to meaningful access to the courts. *Bounds v. Smith,* 430 U.S. 817, 824 (1977); *Lewis v. Casey,* 518 U.S. 343, 350 (1996) ("The right that *Bounds* acknowledged was the (already well-established) right of access to the courts."). This right is implicated when prison officials "actively interfer[e] with inmates' attempts to prepare legal documents[ ] or file them." *Lewis,* 518 U.S. at 350 (internal citations omitted). To establish a denial of access to the courts claim, a plaintiff must satisfy two prongs. First, a plaintiff must show that

the defendant acted deliberately and maliciously. *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). Second, the plaintiff must demonstrate that he suffered an actual injury. *Id.; Monsky v. Moraghan,* 123 F.3d 243, 247 (2d Cir.1997) (internal citations, quotation marks, and alterations omitted) (quoting *Lewis,* 518 U.S. at 329) ("In order to establish a violation of access to courts, a plaintiff must demonstrate that a defendant caused actual injury, *i.e.,* took or was responsible for actions that hindered a plaintiff's effort to pursue a legal claim"). Thus, a plaintiff must allege that the defendant was "responsible for actions that hindered his efforts to pursue a legal claim." *Davis,* 320 F.3d at 351 (internal quotation marks omitted).

Here, there is insufficient evidence to give rise to a genuine dispute of fact regarding either element of a denial of court access claim. As noted, McAllister merely states that, as a result of the property reduction pursuant to directive 4913, his "ability to continue litigation in Federal and State court caused adverse decisions by the court and dismissals." Am. Compl. ¶ 41. This claim is insufficient to demonstrate that Call was responsible for actions that hindered his legal claims. Insofar as McAllister's claim could be read to suggest that Call denied him access to the courts by confiscating his legal documents, as noted *supra,* McAllister fails to present any plausible facts to support a finding that Call was involved in the initial search of his property or in the later reduction of his property or that it was maliciously imposed by Call. As noted, the initial cell search which led to the misbehavior report was ordered by Captain Dauphin and executed by Correction Officer Femia. Similarly, McAllister concedes that his property was reduced pursuant to directive 4913. Although McAllister suggests that his transfer to SHU as a result of the Tier III hearing triggered the application of directive 4913, he was transferred to SHU on July 9, six days before the initial cell search occurred. *Id.* ¶ 5. Thus, if McAllister were forced to comply with directive 4913 because of his transfer to SHU, he failed to demonstrate that the compliance arose from the SHU term ordered by Call rather than the unknown incident that resulted in his transfer to SHU on July 9. Further, McAllister failed to establish any actual injury because he did not specify which cases were allegedly dismissed as a result of the property reduction. *See Monsky,* 123 F.3d at 247.

**\*9** Accordingly, it is recommended that Call's motion for summary judgment be granted on this ground.

### E. Eighth Amendment

In his amended complaint, McAllister references the Eighth Amendment. Am. Compl. ¶ 31. However, McAllister's only reference to the Eighth Amendment is his assertion that Call's use of a confidential witness violated his Eighth Amendment right to be free from cruel and unusual punishment. However, in support of this argument, McAllister states only that this right was violated when Call stated, "[s]o, um there is a lot of stuff going on through my paperwork and I want to bring it to your attention before we move on ..." *Id.* ¶ 33; Dkt. No. 74–3, at 73. When read in context, it becomes clear that Call made this statement immediately before informing McAllister of his consideration of confidential information. Dkt. No. 73–3, at 73. Although, in referencing this portion of the hearing transcript McAllister alleges that he was subject to cruel and unusual punishment, it appears that McAllister intended to assert that the use of a confidential witness was a due process violation. Even if McAllister had intended to argue that use of a confidential witness violates the prohibition of cruel and unusual punishment, such a claim would necessarily fail because the Eighth Amendment protects an inmate's right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 834 & 837 (1994). As McAllister makes no claim that he faced conditions of confinement imposing a risk to his health or safety and instead focuses his argument on notice of a confidential witness, giving McAllister due solicitude, his claim regarding the use of a confidential witness will be incorporated as part of the due process analysis below.

### F. Fourteenth Amendment

#### 1. Due Process

Well-settled law provides that inmates retain due process rights in prison disciplinary hearings. *Hanrahan v. Doling,* 331 F.3d 93, 97 (2d Cir.2003) (per curiam) (citing cases). However, inmates do not enjoy "the full panoply of rights" accorded to a defendant in a criminal prosecution. *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974). For a plaintiff to state a claim that he was denied due process at a disciplinary hearing, the plaintiff "must establish (1) that he possessed a liberty interest and (2) that the defendant(s)

deprived him of that interest as a result of insufficient process." *Ortiz v. McBride,* 380 F.3d 649, 654 (2d Cir.2004) (per curiam) (quoting *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001)). To satisfy the first prong, a plaintiff must demonstrate that the deprivation of which he complains is an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995). "A liberty interest may arise from the Constitution itself, ... or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin,* 545 U.S. 209, 221 (2005) (citations omitted).

### a. Denial of Liberty Interest

**\*10** In assessing whether an inmate plaintiff was denied procedural due process, the court must first decide whether the plaintiff has a protected liberty interest in freedom from SHU confinement. *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). If the plaintiff demonstrates the existence of a protected liberty interest, the court is then to determine whether the deprivation of this interest "occurred without due process of law." *Id.* at 351, citing *Kentucky Dept. of Corr. v. Thompson,* 490 U.S. 454, 460–61 (1989). Due process generally requires that a state afford an individual "some kind of hearing" prior to depriving them of a liberty or property interest. *DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir.2003). Although not dispositive, duration of disciplinary confinement is a significant factor in determining atypicality. *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000); *Blackshear v. Woodward,* No. 13–CV–1165, 2014 WL 2967752 (N.D.N.Y. July 1, 2014).

McAllister suggests that his confinement in SHU for forty-two to fifty-two days is a sufficient deprivation that requires procedural protections. Freedom from SHU confinement may give rise to due process protections; however, the plaintiff must allege that the deprivation imposed "an atypical and significant hardship." *Sandin,* 515 U.S. at 484; *Gaston v. Coughlin,* 249 F.3d 156, 162 (2d Cir.2001) (concluding that SHU confinement does not give rise to due process protections where inmate failed to demonstrate atypical hardship while confined). Although the Second Circuit has cautioned that "there is no bright-line rule regarding the

length or type of sanction" that meets the *Sandin* standard (*Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999)), it has made clear that confinement in SHU for a period of one year constitutes atypical and significant restraint on inmates, deserving due process protections. *See e.g. Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000) (holding confinement in SHU exceeding 305 days was atypical); *Sealey v. Giltner,* 197 F.3d 578, 589 (2d Cir.1999) (concluding confinement for fewer than 101 days in SHU, plus unpleasant but not atypical conditions, insufficient to raise constitutional claim). Although the Second Circuit has generally held that confinement in SHU for 101 or fewer days without additional indicia of atypical conditions generally does not confer a liberty interest (*Smart v. Goord,* 441 F.Supp.2d 631, 641 (2d Cir.2006)), it has "explicitly noted that SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions of *Sealey* or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer v. Richards,* 364 F.3d 60, 65 (2d. Cir.2004) (citing, *inter alia, Ortiz,* 323 F.3d at 195, n. 1).

The undersigned notes that it is unclear what portion of McAllister's relatively brief time in SHU is attributable to the Tier III determination, because it appears that McAllister was already in SHU when the instant disciplinary report was filed. Am. Comp. ¶ 5; Dkt. No. 74–3, Exh. A, at 14. The undersigned also notes that there is no indication that McAllister endured unusual SHU conditions. The only reference McAllister makes to his time in SHU is that, upon his transfer to SHU, several bags of his paperwork were confiscated pursuant to directive 4913. *Id.* ¶ 37. However, review of directive 4913 reveals that the personal and legal property limit set forth in directive 4913 applies to the general prison population and inmates in other forms of segregated confinement. Dkt. No. 49–2, at 5–19. Thus, the fact that McAllister was forced to comply with directive 4913 does not indicate that he was subjected to conditions more severe than the normal SHU conditions or conditions imposed on the general prison population. Dkt. No. 74–3, Exh. A, at 14.

**\*11** Although the record is largely absent of detail of the conditions McAllister faced in SHU, there is also nothing in the record comparing the time McAllister was assigned and spent in disciplinary confinement with the deprivations endured by other prisoners "in the ordinary course of prison

administration," which includes inmates in administrative segregation and the general prison population. *Welch v. Bartlett,* 196 F.3d 389, 394 (2d Cir.1999) (holding that, after *Sandin,* "the relevant comparison concerning duration is between the period of deprivation endured by the plaintiff and periods of comparable deprivation typically endured by other prisoners in the ordinary course of prison administration, including general population prisoners and those in various forms of administrative and protective custody"). Because "[t]he record does not reveal whether it is typical for inmates not being disciplined to spend similar periods of time in similar circumstances," Call's motion for summary judgment should be denied. *Id.* at 394 (citing *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997)).

Accordingly, it is recommended that defendant's motion for summary judgment on this ground be denied.

### b. Procedural Due Process

Assuming a liberty interest exists, it must be determined whether McAllister was denied due process at his Tier III hearing. Where disciplinary hearings could result in SHU confinement or loss of good time credit, "[i]nmates are entitled to advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition," including supporting facts and reasons for the action taken." *Luna v. Pico,* 356 F.3d 481, 487 (2d Cir.2004) (citing *Kalwasinski v. Morse,* 201 F.3d 103, 108 (2d Cir.1999)); *see also Wolff,* 418 U.S. at 556; *Sira v. Morton,* 380 F.3d 57, 59 (2d Cir.2004).

### i. Notice

McAllister first appears to argue that he was denied procedural due process because the misbehavior report (1) violated unnamed DOCCS rules, regulations, and procedures, and (2) failed to provide him with adequate notice of the charges against him because it did not list the five inmates whose affidavits were confiscated and, thus, impacted his ability to prepare a defense to the charges. Am. Compl. ¶¶ 11–13, 16–17. Although inmates are entitled to advance written notice of the charges, "[t]his is not to suggest that

the Constitution demands notice that painstakingly details all facts relevant to the date, place, and manner of charged inmate misconduct ...." *Sira,* 380 F.3d at 72 (2d Cir.2004) (citing *Wolff,* 418 U.S. at 564). "[T]here must be sufficient factual specificity to permit a reasonable person to understand what conduct is at issue so that he may identify relevant evidence and present a defense." *Id.*

First, to the extent that McAllister's argues that the differing disciplinary reports violated unspecified DOCCS rules, regulations, and procedures (Am.Compl.¶¶ 12–13), this claim must fail. A section 1983 claim is not the "appropriate forum" in which to seek review of a violation of a prison regulation. *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) ("a § 1983 claim brought in federal court is not the appropriate forum to urge violations of prison regulation or state law ... the allegations asserted must constitute violations of constitutional due process standards."). Next, McAllister fails to plausibly allege the existence of a question of fact whether the difference between the misbehavior reports deprived him of the ability to identify relevant evidence so that he could prepare a defense. Although McAllister's copy of the report was missing the names of the inmates whose affidavits were confiscated, it informed McAllister of the date, time, and location of the alleged violations; the rules alleged to have been violated; and a description of the documents that were confiscated. *Johnson v. Goord,* 305 Fed. Appx. 815, 817 (2d Cir.2009) (concluding where the inmate's copy of misbehavior report included details of alleged violation and charges against him, a sentence missing from the inmate's copy of report did not violate the inmate's due process rights). It is clear that the discrepancy between the misbehavior reports did not affect McAllister's ability to prepare and present a defense. Prior to the hearing, McAllister requested as witnesses the five inmates whose affidavits were found during the property search. Indeed, the record demonstrates that McAllister was able to both identify the documents referenced in the misbehavior report and address them at the hearing. Dkt. No. 74–3, Exh. A at 45, 47–48.

**\*12** Thus, because he received sufficient notice of the charges and was able to prepare and present a defense on his behalf, McAllister fails to raise a question of fact as to whether he was denied sufficient notice of the charges against him.

## ii. Hearing Officer Bias/Pre-determination of Guilt

McAllister also contends that his procedural due process rights were violated because Call was biased against him and prejudged his guilt. The Fourteenth Amendment guarantees inmates the right to the appointment of an unbiased hearing officer to address a disciplinary charge. *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996). An impartial hearing officer "does not prejudge the evidence" and is not to say "how he would assess evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 570 (2d Cir.1990); *see also Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989) ("it would be improper for prison officials to decide the disposition of a case before it was heard"). However, "[i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Russell v. Selsky,* 35 F.3d 55, 60 (2d Cir.1996). "A hearing officer may satisfy the standard of impartiality if there is 'some evidence in the record' to support the findings of the hearing." *Nelson v. Plumley,* No. 9:12–CV–422, 2014 WL 4659327, at *11 (N.D .N.Y. Sept. 17, 2014) (quoting *Allred v. Knowles,* No. 06–CV–0456, 2010 WL 3911414, at * 5 (W.D.N.Y. Oct. 5, 2010) (quoting *Waldpole v. Hill,* 472 U.S. 445, 455 (1985)). However, "the mere existence of 'some evidence' in the record to support a disciplinary determination does not resolve a prisoner's claim that he was denied due process by the presence of a biased hearing officer." *See Smith v. United States,* No. 09–CV–729, 2012 WL 4491538 at *8 (N.D.N.Y. July 5, 2012).

Prison officials serving as hearing officers "enjoy a rebuttable presumption that they are unbiased." *Allen,* 100 F.3d at 259. "Claims of a hearing officer bias are common in [inmate section] 1983 claims, and where they are based on purely conclusory allegations, they are routinely dismissed." *Washington v. Afify,* 968 F.Supp.2d 532, 541 (W.D.N.Y.2003) (citing cases). "An inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact." *Johnson v. Fernandez,* No. 09–CV–626 (FJS/ATB), 2011 WL 7629513, at *11 (N.D.N.Y. Mar. 1, 2011) (citing *Francis,* 891 F.2d at 46).

McAllister first argues that Call prejudged his guilt. He supports this contention by pointing to moments during the Tier III hearing where Call expressed his belief that McAllister's possession of affidavits signed by other inmates was sufficient to support a violation of prison rules 113.15 and 180.17. Am. Compl., ¶¶ 13, 15, 23–25, 36. Here, however the challenged affidavits were not evidence that Call prejudged because he had the opportunity to review the affidavits and did so at the hearing. Although McAllister disagreed with Call's opinion that possession of such documents would be a *per se* violation of the rules, Call's assertion of belief in this matter was an opinion he reached following his personal review of this evidence. *See Johnson v. Doling,* No. 05–CV–376, 2007 WL 3046701, at * 10 (N.D.N.Y. Oct. 17, 2007) (holding that where the "[p]laintiff was provided the opportunity to testify, [and] call and question witnesses .... [d]isagreement with rulings made by a hearing officer does not constitute bias"). Thus, it does not appear that Call prejudged this evidence.

**\*13** To support his claim that Call exhibited bias and partiality against him in the Tier III hearing, McAllister points out that, after he objected to the misbehavior report for failing to provide him sufficient notice of the documents confiscated, Call read the portion of the misbehavior report describing the documents as "[a]rticles of paper which appear to be legal work including some signed affidavits," and stated "that didn't ring a bell for you?" *Id.* ¶¶ 19, 32). When read in context, this statement does not establish bias on Call's part, rather it appears to be a genuine question. Though it may be said that Call could have couched this question in a kinder manner, this statement does not demonstrate bias. Moreover, that the Tier III determination was reversed on appeal, without more, is not evidence of bias or other due process violation. *Eng v. Therrien,* No. 04–CV–1146, 2008 WL 141794, at *2 (N.D.N.Y. Jan. 11, 2008).

Thus, McAllister fails to plausibly allege the existence of question of fact whether Call prejudged his guilt or was otherwise biased in the Tier III hearing.

### iii. Failure to Investigate

McAllister next suggests that he was denied procedural due process because Call declined to interview the law library officer. Am. Compl. ¶ 29. Call permitted McAllister to present testimony on his behalf and afforded him the opportunity call witnesses. Had McAllister wished to hear testimony from the law library officer, he could have requested the law library officer as a witness. *Wolff,* 418 U.S. at 566

(inmates have a right to call witnesses in their defense at disciplinary hearings). That Call found it unnecessary to independently interview the law library officer—especially where McAllister did not demonstrate that his testimony would be relevant—does not result in a denial of due process because "[t]here is no requirement ... that a hearing officer assigned to preside over a disciplinary hearing conduct an independent investigation; that is simply not the role of a hearing officer." *Robinson v. Brown,* No. 9:11–CV–0758, 2012 WL 6799725, *5 (N.D.N.Y. Nov. 1, 2012).

Accordingly, McAllister fails plausibly raise a due process violation based on Call's alleged failure to investigate.

#### iv. **Confidential Witness**

To the extent it can be discerned, McAllister contends that he was denied due process because Call relied on confidential witness testimony, yet failed to provide him with advance notice of the confidential witness and refused to inform him of his or her identity or the nature of the testimony. Am. Compl. ¶¶ 30–34. The Second Circuit has held that a hearing officer must perform an independent assessment of a confidential informant's credibility for such testimony to be considered reliable evidence of an inmate's guilt. *Sira,* 380 F.3d at 78 (noting that, "when sound discretion forecloses confrontation and cross-examination, the need for the hearing officer to conduct an independent assessment of informant credibility to ensure fairness to the accused inmate is heightened.").

 **\*14** Here, the record provides no indication that Call independently assessed the credibility and reliability of the confidential witness. The confidential witness form merely states that Call "was provided confidential information relating to the misbehavior report ." Dkt. No. 74–3, at 13. Similarly, Call does not provide whether or how he performed an assessment of the witness's credibility. *Id.* at 4. Therefore, there exist questions of fact whether Call deprived McAllister of due process by relying on this testimony without an independent assessment of the witness's credibility.

To the extent that McAllister argues that he was denied due process by Call's decision to refuse to disclose the content of the confidential witness's testimony, the law in this circuit provides that where a prison official decides to keep certain witness testimony confidential, he or she "must offer a reasonable justification for their actions, if not

contemporaneously, then when challenged in a court action." *Sira,* 380 F.3d at 75 (citing *Ponte v. Real,* 471 U.S. 491, 498 (1985)). Although "[c]ourts will not readily second guess the judgment of prison officials with respect to such matters ... the discretion to withhold evidence is not unreviewable...." *Id.* (citations omitted). Here, Call failed to provide his rationale for refraining to share the substance of this testimony, stating merely that McAllister could not be told the substance of the testimony because "it is by definition it is ... confidential." Dkt. No. 74–3, at 74. As Call presented no reason to justify withholding the identity or substance of the confidential witness's testimony, McAllister presents a viable due process claim based on the nondisclosure of this evidence. *Sira,* 380 F.3d at 76.

Accordingly, Call's motion for summary judgment should be denied on this ground.

#### v. **Some Evidence**

"Once a court has decided that the procedural due process requirements have been met, its function is to determine whether there is some evidence which supports the decision of the [hearing officer]." *Freeman v. Rideout,* 808 F.2d 949, 954 (2d Cir.1986) (citations omitted). In considering whether a disciplinary determination is supported by some evidence of guilt, "the relevant question is whether there is any evidence in the record [before the disciplinary board] that could support the conclusion reached by the disciplinary board." *Superintendent v. Hill,* 472 U.S. 445, 455–56 (1985) (citations omitted); *Sira,* 380 F.3d at 69. The Second Circuit has interpreted the "some evidence" standard to require "reliable evidence" of guilt. *Luna,* 356 F.3d at 488.

In making his determination, Call relied upon McAllister's testimony and statements, testimony of a confidential witness, the misbehavior report, and the legal documents confiscated during the property search. Dkt. No. 74–3, at 4. As noted, based on the record provided, Call did not perform an independent assessment of the witness's credibility. Thus, Call's reliance on confidential testimony would be insufficient to support a finding of guilt. *Taylor v. Rodriguez,* 238 F.3d 188, 194 (2d Cir.2001) (determining that reliance on confidential informant's testimony insufficient to provide

"some evidence" of guilt where there was no independent examination of indicia relevant to informant's credibility). The remaining evidence relied upon—McAllister's testimony, the misbehavior report, and the affidavits—does not constitute some evidence of guilt, as required by the Due Process clause.

**\*15** The affidavits alone do not constitute some evidence of guilt because mere possession of affidavits signed by other inmates would not violate prison rules 113.15 and 180.17 were it true that these documents were McAllister's property and drafted solely for his benefit. Similarly, although a written misbehavior report may serve as some evidence of guilt, such is the case where the misbehavior report charges the plaintiff for behavior that the author of the misbehavior report personally witnessed. *Creech v. Schoellkoph,* 688 F.Supp.2d 205, 214 (W.D.N.Y.2010) (citations omitted) (misbehavior report drafted by officer who personally observed plaintiff possess and transfer pieces of sharpened metal to another inmate constituted some evidence of guilt). In this case, where a determination of guilt would appear to turn on knowledge of the ownership of the documents and an understanding of the circumstances under which the papers were drafted, a misbehavior report which merely states that papers appearing to be legal work signed by other inmates were found in McAllister's property, it does not establish a per se violation of rules 113.15 and 180.17. *See Hayes v. Coughlin,* No. 87 CIV. 7401, 1996 WL 453071, at \*3 (S.D.N.Y. Aug. 12, 1996) ("if a misbehavior report can serve as 'some evidence' for a hearing decision and thereby insulate a hearing from review, there would be little point in having a hearing"); *see also Williams v. Dubray,* No. 09–CV–1298, 2011 WL 3236681, at \*4 (N.D.N.Y. July 13, 2011) (holding that there were questions of fact whether the determination was based upon some evidence of guilt where the hearing officer relied on misbehavior report that was based on a corrections officer's unsupported accounts, without additional evidence to support its charges). Thus, absent additional evidence that these papers belonged to other inmates or that McAllister drafted the documents for other inmates' use, the fact that the misbehavior report identified these documents as being found in McAllister's secured property does not constitute reliable evidence of guilt.

Finally, McAllister's testimony does not constitute reliable evidence of guilt. In response to the charge of violating rule 113.15, McAllister testified that the affidavits were his property because he drafted them solely as evidence in his personal litigation against the Department of Probation.

Similarly, in defense of the charge for violating rule 180.17, McAllister repeatedly testified that he did not provide legal assistance to the inmates in question because the affidavits were written solely to serve as supporting evidence in his personal action, the inmates were aware that they would receive no legal benefit as a result, and he did not receive any compensation from the inmates. Regardless whether Call considered McAllister's testimony to be credible, without some other reliable evidence, such as, perhaps, a statement from one of the other inmates claiming that he signed the affidavit under the belief that McAllister would provide him with legal assistance, McAllister's testimony denying violations of the charged prison rules would not constitute some evidence of guilt.

**\*16** Accordingly, it is recommended that Call's motion for summary judgment be denied as to McAllister's procedural due process claim.

### c. Directive 4913

McAllister further argues that, as a result of the SHU placement, he suffered an unconstitutional deprivation of his legal and personal property because he was required to comply with the limits set forth in directive 4913. This Court has already ruled upon this claim when it was raised at earlier stages. In deciding Call's motion for summary judgment on the McAllister's first complaint, this Court held that the directive did not violate his Fourteenth Amendment rights:

> Directive # 4913 was reasonably related to valid institutional goals given DOCCS' responsibility to provide for the health and safety of its staff and inmates and the alternatives provided to inmates in being able to seek exceptions and choose which four or five draft bags of material would remain with them. Moreover, the rules were neutral and reasonably related to the ultimate goals of the facility, security and safety.

*McAllister v. Fischer,* 2012 WL 7681635, at \*12 (N.D.N.Y. July 6, 2012) (Dkt. No. 55, at 22–23), *Report and Recommendation adopted by* 2013 WL 954961 (N.D.N.Y.

Mar. 12, 2013) (Dkt. No. 58), *appeal dismissed* 2d Cir. 13–111 (Jan. 13.2014). Further, the Court concluded that directive 4913 "did not violate[ ] McAllister's Fourteen Amendment rights" and was "reasonably related to valid institutional goals." Dkt. No. 55, at 23–24; Dkt. No. 58. Thus, any such claim is barred by the law of the case. *Arizona v. California,* 460 U.S. 605, 618 (1983) (citations omitted); *see also United States v. Thorn,* 446 F.3d 378, 383 (2d Cir.2006) (internal quotation marks and citations omitted) ("The law of the case doctrine counsels against revisiting our prior rulings in subsequent stages of the same case absent cogent and compelling reasons ....")); *Arizona,* 460 U.S. at 618 (citations omitted); *Wright v. Cayan,* 817 F.2d 999, 1002 n. 3 (2d Cir.1987) (citations omitted) ("Even when cases are reassigned to a different judge, the law of the case dictates a general practice of refusing to reopen what has been decided.").

Accordingly, it is recommended that defendant's motion for summary judgment be granted on this ground.

### 2. Equal Protection

McAllister's only reference to an equal protection violation in the amended complaint is his conclusory claim that Call's reference to a confidential witness during the Tier III hearing was in violation of his right to equal protection. Am. Compl. ¶ 31. Further, in this Court's previous order, McAllister's equal protection claim was dismissed for failure to demonstrate, among other things, that he was part of a protected class or that he was treated differently from any similarly-situated inmates. Dkt. No. 58, at 4; Dkt. No. 55, at 24–25. Thus, any such claim would also be barred by the law of the case. *Thorn,* 446 F.3d at 383. Regardless, McAllister's equal protection claim must also fail for the reasons discussed *infra.*

**\*17** To establish an equal protection violation, a plaintiff must show that "he was treated differently than others similarly situated as the result of intentional or purposeful discrimination." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005). McAllister has not identified, nor does the record disclose, any basis for a reasonable fact-finder to conclude that he was treated differently from similarly-situated individuals. Rather, plaintiffs only support for his equal protection claim is the following:

Call, throughout the entire disciplinary hearing deprive [sic] plaintiff equal protection when he stated: "This is hearing officer Call, this is 2:21 as I was going through my paperwork I realized something that I wanted to point out to Mr. McAllister."

Defendant Call discriminated against plaintiff when he stated: "I reviewed it this morning the 22nd when it was received again is confidential"

Am. Compl. ¶¶ 31–32. McAllister does not explain how these statements denied him equal protection. McAllister fails to plausibly suggest that he was treated differently from any similarly-situated individuals. Further, even if these statements demonstrate the existence of questions of fact regarding whether McAllister was treated differently from similarly-situated persons, he fails to identify disparity in the conditions "as a result of any purposeful discrimination directed at an identifiable suspect class." *See Dolberry v. Jakob,* No. 11–CV–1018, 2014 WL 1292225, at \*12 (N.D.N.Y. Mar. 28, 2014).

Accordingly, it is recommended that defendant's motion on this ground should be granted.

### G. Qualified Immunity

Call contends that, even if McAllister's claims are substantiated, he is entitled to qualified immunity. The doctrine of qualified immunity is an affirmative defense which "shield[s] an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson v. Callahan,* 555 U.S. 223, 244 (2009). Even if a disciplinary disposition is not supported by "some evidence," prison officials are entitled to qualified immunity if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Luna,* 356 F.3d at 490 (quoting *Wilson v. Layne,* 526 U.S. 603, 614 (1999)) (internal quotation marks omitted). This assessment is made "in light of the legal rules that were clearly established at the time it was taken." *Wilson,* 526 U.S. at 614; *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991). To determine whether a state official is entitled to qualified immunity for acts taken during the course of his or her employment, a reviewing court is to determine: "(1) whether plaintiff has

shown facts making out violation of a constitutional right; (2) if so, whether that right was clearly established; and (3) even if the right was clearly established, whether it was objectively reasonable for the [official] to believe the conduct at issue was lawful." *Phillips v. Wright,* 553 Fed. Appx. 16, 17 (2d Cir.2014) (citing *Gonzalez v. City of Schenectady,* 728 F.3d 149, 154 (2d Cir.2013)).

**\*18** First, as discussed, McAllister presented a viable due process claim that the determination was not based on some evidence of guilt because Call (1) relied on confidential witness testimony without making an independent assessment of the witness's credibility and (2) did not otherwise have sufficient reliable evidence to support his finding of guilt. McAllister has also raised issues of fact whether the remaining evidence relied upon—the misbehavior report, McAllister's testimony and statements, and the confiscated legal papers—provided reliable evidence of guilt.

Addressing the second prong of the analysis, there is a clearly-established right to procedural due process protections, including the right to have a disciplinary determination be based on some evidence of guilt. There is also a clearly-established right to an independent assessment of confidential witnesses performed where a hearing officer relies on the witness's testimony (*Vasquez v. Coughlin,* 726 F.Supp. 466, 472 (S.D.N.Y.1989) (right clearly established by 1986); see also *Sira,* 380 F.3d at 80). Further, although there is no bright-line for what suffices as "some evidence" in every prison disciplinary proceeding (*Woodard v. Shanley,* 505 Fed. Appdx. 55, 57 (2d Cir.2012)), there were questions of fact surrounding the allegedly reliable evidence demonstrating that McAllister was in possession of other inmates' legal documents or that he provided them with unauthorized legal assistance. *Cf. Turner v. Silver,* 104 F.3d 354, at \*3 (2d Cir.1996) (some evidence to support determination that the defendant violated rule against unauthorized legal assistance where documentary evidence indicated the plaintiff received payment from other inmates, author of misbehavior report testified regarding an interview with informant who implicated defendant, prison official testified that inmate told her he had been charged for law library services and inmate testified the same). Call both failed to perform an independent assessment of the confidential witness's credibility and provided no explanation for why both the identity of the witness and the substance of his or her testimony could not

be disclosed to McAllister. *Sira,* 380 F.3d at 75 (citing *Ponte,* 471 U.S. at 498).

Thus, given the state of the law regarding the rights to which an inmate is entitled in his disciplinary hearing, it was not objectively reasonable for Call to have believed that (1) he need not perform an independent assessment of the witness credibility or (2) the misbehavior report, confiscated affidavits, and McAllister's consistent testimony and statements, without more, sufficiently supported a determination that McAllister violated rules 113.15 and 180.17.

Accordingly, defendant's motion for summary judgment should be denied on this ground.

## IV. **Conclusion**

For the reasons stated above, it is hereby **RECOMMENDED** that defendant's motion for summary judgment (Dkt. No. 74) be

**\*19** 1. **GRANTED** insofar as:

a. dismissing plaintiff's First Amendment claims;

b. dismissing plaintiff's Eighth Amendment claims;

c. dismissing plaintiff's challenge to the constitutionality of Directive 4913;

d. defendant's Eleventh Amendment immunity defense;

2. **DENIED** as to:

a. plaintiff's Fourteenth Amendment procedural due process claims;

b. defendant's qualified immunity defense.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)).

**FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE**

**REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).

Dated: October 9, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 5475293

## Footnotes

1    This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2    McAllister is no longer incarcerated and is currently under the supervision of DOCCS.

3    SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population ...." N .Y. COMP.CODES R. & REGS. tit 7, § 300.2(b) (1999). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

4    Rule 113.15 provides that "[a]n inmate shall not purchase, sell, loan, give or exchange a personally owned article without authorization." 7 NYCRR 270.2.

5    Rule 180.17 provides that "[a]n inmate may not provide legal assistance to another inmate without prior approval of the superintendent or designee. An inmate shall not receive any form of compensation for providing legal assistance." 7 NYCRR 270.2.

6    All unpublished decisions referenced herein are appended to this report and recommendation.

7    Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision affected the five Colon factors which were traditionally used to determine personal involvement. *Pearce v. Estate of Longo,* 766 F.Supp.2d 367, 376 (N.D.N.Y.2011), *rev'd in part on other grounds sub nom., Pearce v. Labella,* 473 F. App'x 16 (2d Cir.2012) (recognizing that several district courts in the Second Circuit have debated Iqbal's impact on the five Colon factors); *Kleehammer v. Monroe Cnty.,* 743 F.Supp.2d 175 (W.D.N .Y.2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster ...."); *D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010) (disagreeing that Iqbal eliminated Colon's personal involvement standard).

---

**End of Document**                                               © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 5437617
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

David DOUGLAS, Sr., Plaintiff,

v.

PERRARA, Corr. Officer, Great Meadow
C.F.; Lawrence, Corr. Officer, Great
Meadow C.F.; Whittier, Corr. Officer, Great
Meadow C.F.; Mulligan, Corr. Officer,
Great Meadow C.F.; Deluca, Corr. Sergeant,
Great Meadow C.F.; and Russel, Deputy
Superintendent, Great Meadow C.F, Defendants.

No. 9:11–CV–1353 (GTS/RFT).
|
Sept. 27, 2013.

**Attorneys and Law Firms**

David Douglas, Sr., Liverpool, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State
of New York, Colleen D. Galligan, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

*DECISION and ORDER*

GLENN T. SUDDABY, District Judge.

 **\*1** Currently before the Court, in this *pro se* civil rights
action filed by David Douglas, Sr., ("Plaintiff") against the
six above-captioned New York State correctional employees,
are the following: (1) Defendants' motion for partial summary
judgment (requesting the dismissal of Plaintiff's claims
against Defendant Russell, and his claims against the
remaining Defendants in their official capacities); and (2)
United States Magistrate Judge Randolph F. Treece's Report–
Recommendation recommending that Defendants' motion be
granted. (Dkt.Nos.70, 80.) Neither party filed an objection
to the Report–Recommendation, and the deadline by which
to do so has expired. (*See generally* Docket Sheet.) After
carefully reviewing the relevant filings in this action, the
Court can find no clear error in the Report–Recommendation:
Magistrate Judge Treece employed the proper standards,
accurately recited the facts, and reasonably applied the law
to those facts. As a result, the Court accepts and adopts the

Report–Recommendation for the reasons stated therein. (Dkt.
No. 80.)

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Treece's Report–
Recommendation (Dkt. No. 80) is *ACCEPTED* and
*ADOPTED* in its entirety; and it is further

**ORDERED** that Defendants' motion for partial summary
judgment (Dkt. No. 70) is *GRANTED;* and it is further

**ORDERED** that the following claims are *DISMISSED* from
this action: (a) all claims asserted against Defendant Russell,
and (b) all claims asserted against Defendants in their official
capacities only. The Clerk is directed to terminate Defendant
Russell from this action; and it is further

**ORDERED** that the following claims *REMAIN PENDING*
in this action: (a) Plaintiff's claim that Defendants Whittier,
Mulligan, Perrara and/or Lawrence subjected him to
inadequate prison conditions by depriving him of meals for
approximately five consecutive days in December 2009, in
violation of the Eighth Amendment; (b) Plaintiff's claim
that Defendants Whittier, Mulligan, Perrara and Lawrence
used excessive force against him, and that Defendant Deluca
failed to protect him from the use of that excessive force,
in violation of the Eighth Amendment and New York State
common law; and (c) Plaintiff's claim that Defendant Deluca
was deliberately indifferent to Plaintiff's serious medical
needs (following the assaults) in violation of the Eighth
Amendment; and it is further

**ORDERED** that Pro Bono Counsel be appointed for the
Plaintiff for purposes of trial only; any appeal shall remain
the responsibility of the plaintiff alone unless a motion for
appointment of counsel for an appeal is granted; and it is
further

**ORDERED** that upon assignment of Pro Bono Counsel, a
final pretrial conference with counsel will be scheduled in
this action before the undersigned, at which time the Court
will schedule a jury trial for Plaintiff's remaining claims as set
forth above against Defendants Whittier, Mulligan, Perrara,
Lawrence and DeLuca. Counsel are directed to appear at the
final pretrial conference with settlement authority from the
parties.

### *REPORT–RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

**\*2** *Pro se* Plaintiff David Douglas brought a civil rights Complaint, pursuant to 42 U.S.C. § 1983, asserting that Defendants violated his constitutional rights while he was in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") and housed in the Great Meadow Correctional Facility. Specifically, Plaintiff alleges that in early December 2009, he wrote a letter to Defendant Eileen Russell[1] complaining that he had been denied meals for several days. *See* Dkt. No. 1, Compl. at ¶¶ 8, 64, & 66. Plaintiff further alleges that the remaining Defendants violated his constitutional rights when they used excessive force against him on several occasions and denied him medical care in order to treat the injuries he sustained therewith. *See generally id.* And, according to Plaintiff, Defendant Russell's failure to take disciplinary action against these individuals and curtail their "known pattern of physical abuse of inmates" renders her liable for violating his constitutional rights. *Id.* at ¶ 66.

Presently pending is Defendants' Motion for Partial Summary Judgment whereby they seek dismissal of Defendant Russell from this action as well as dismissal of all claims against the remaining Defendants in their official capacities. Dkt. No. 70. A response to that Motion was due on February 22, 2013. To date, the Court has not received a response from Plaintiff.

### I. DISCUSSION

#### A. Standard of Review

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I. C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir.1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure

56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ( "Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

**\*3** When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991). Summary judgment

is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

Pursuant to the Local Rules of Practice for the Northern District of New York, "[w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers ... shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown." N.D.N.Y.L.R. 7.1(b)(3). "The fact that there has been no response to a summary judgment motion does not, of course, mean that the motion is to be granted automatically."

*Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Even in the absence of a response, Defendants are entitled to summary judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. *Id.;* FED. R. CIV. P. 56(c). Because Plaintiff has failed to raise any question of material fact, the Court will accept the facts as set forth in Defendants' Statement Pursuant to Rule 7.1(a)(3) (Dkt. No. 70–2), supplemented by Plaintiffs' verified Complaint (Dkt. No. 1), as true. *See Lopez v. Reynolds,* 998 F.Supp. 252, 256 (W.D.N.Y.1997).

## B. Personal Involvement

As noted above, Plaintiff brings this civil rights action for alleged violations of his constitutional rights during his incarceration in December 2009 at Great Meadow Correctional Facility. Plaintiff claims that in early December 2009, he was subjected to threats and harassment by other inmates and correctional officers. Compl. at ¶ 1. Plaintiff alleges that beginning on December 11, 2009, he was denied several meals for several consecutive days by unnamed individuals, prompting him to file grievances and write two letters to Defendant Russell. *Id.* at ¶¶ 2–8.[2] Thereafter, on December 16, 2009, Plaintiff's meals were delivered to him and, on the following date, he was moved to protective custody. *Id.* at ¶¶ 9–10. The remainder of Plaintiff's Complaint describes a series of events wherein the remaining Defendants are accused of using excessive physical force against him and denying him medical attention.

**\*4** With regard to the pending, unopposed Motion, the Court notes that there is a paucity of factual allegations

contained in the Complaint concerning Defendant Russell. In fact, the only factual allegation that this Court can point to is that Plaintiff wrote two letters to Defendant Russell complaining about being denied meals. Defendant Russell is not named nor referenced throughout the remainder of the Complaint. Nevertheless, in the section of the Complaint where Plaintiff lists his causes of action, he seemingly seeks to hold Defendant Russell liable for her alleged failure to intervene and take disciplinary action against the Defendants in order to curb their known pattern of physical abuse against inmates. *Id.* at ¶¶ 64 & 66.

According to Defendants' uncontroverted submissions, Defendant Eileen Russell is employed by DOCCS and worked at Great Meadow in 2006 as the Assistant Deputy Superintendent for Special Housing assigned to the Behavioral Health Unit. Dkt. No. 70–3, Eileen Russell Decl., dated Feb. 4, 2013, at ¶¶ 1, 3, & 4. During her tenure in that position, Plaintiff neither worked nor was housed as a patient in the Behavioral Health Unit. Russell Decl. at ¶ 11. Russell did not have any responsibilities related to delivery of meals to inmates nor does she have any recollection of speaking with Plaintiff or seeing any correspondence from him. *Id.* at ¶ 13. Furthermore, at no time was she made aware of any assault against Plaintiff by any DOCCS employee. *Id.* at ¶ 15.

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz,* 1997 WL 576038, at *2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995) & *Wright v. Smith,* 21 F.3d at 501) (further citations omitted)). Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Ashcroft v. Iqbal,* 556 U.S. 662, 676 (2009).

It appears that Plaintiff seeks to hold Defendant Russell liable due to her employment as a supervisor at Great Meadow. The Second Circuit has stated that a supervisory defendant may have been personally involved in a constitutional deprivation within the meaning of § 1983 if she: (1) directly participated in the alleged infraction; (2) after learning of the

violation, failed to remedy the wrong; (3) created a policy or custom under which unconstitutional practices occurred or allowed such policy or custom to continue; (4) was grossly negligent in managing subordinates who caused the unlawful condition or event; or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.[3] *Colon v. Coughlin,* 58 F.3d at 873 (citations omitted); *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986) (citations omitted).

**\*5** Here, the evidence shows that Defendant Russell did not directly participate in any constitutional wrongdoing, she was not aware that Plaintiff had been experiencing any problems with other inmates and staff, in her assignment to the Behavioral Health Unit she did not come into contact with the Plaintiff, and she was not responsible for creating policies or customs nor for rectifying any of the alleged constitutional infirmities Plaintiff is alleged to have been subjected to. Because Plaintiff failed to respond to Defendants' Motion, he has not created any material issue of fact regarding Russell's non-involvement in any constitutional wrongdoing. Thus, based upon the record before the Court, we find that Defendant Russell was not personally involved in any wrongdoing and should be **dismissed** from this action. *See Wright v. Smith,* 21 F.3d at 501 (defendant may not be held liable simply because he holds a high position of authority).

### C. Eleventh Amendment

By their Motion, Defendants seek dismissal of claims brought against them in their official capacities. Dkt. No. 70. In making this request, the Defendants note that during the pendency of this action, Plaintiff was released from DOCCS's custody, thereby rendering moot any request he has made for injunctive relief. Dkt. No. 70–4, Defs.' Mem. of Law, at pp. 7–8. After reviewing the Complaint, the Court notes that Plaintiff primarily seeks monetary compensation for both compensatory and punitive damages. *See* Compl. at Relief Requested. In addition, he seeks a declaratory judgment that his rights have been violated, but does not seek other injunctive relief. *Id.*

The Eleventh Amendment states, "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens

or Subjects of any Foreign State." U.S. CONST. amend. XI. Although by its terms, the amendment bars suit by citizens of one state against another state, the Supreme Court has held that such amendment similarly bars suits against a state by its own citizens. *Hans v. Louisiana,* 134 U.S. 1 (1890). "The Eleventh Amendment thus 'affirm[s] that the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III.' " *Richardson v. New York State Dep't of Corr. Servs.,* 180 F.3d 426, 447–48 (2d Cir.1999) (citing *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984)). Thus, sovereign immunity provided for in the Eleventh Amendment prohibits suits against the state, including a state agency in federal court. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. at 98–101; *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993); *Daisernia v. State of New York,* 582 F.Supp. 792, 796 (N.D.N.Y.1984). To the extent a state official is sued for damages in his or her official capacity, "such a suit is deemed to be a suit against the state, and the official is entitled to invoke the eleventh amendment immunity belonging to the state." *Rourke v. New York State Dep't. of Corr. Servs.,* 915 F.Supp. 525, 539 (N.D.N.Y.1995) (citing *Berman Enters., Inc. v. Jorling,* 3 F.3d 602, 606 (2d Cir.), *cert. denied,* 510 U.S. 1073 (1994); *Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993)); *see also Mathie v. Fries,* 121 F.3d 808, 818 (2d Cir.1997) ("A claim against a government officer in his official capacity is, and should be treated as, a claim against the entity that employs the officer ....").

**\*6** However, whether state officials sued in their official capacities are entitled to Eleventh Amendment immunity depends also upon the relief sought in the complaint. The Second Circuit has held that in accordance with *Ex parte Young,* 209 U.S. 123 (1908), "acts of state officials that violate federal constitutional rights are deemed not to be acts of the state and may be subject of injunctive or declaratory relief in federal court." *Berman Enters., Inc. v. Jorling,* 3 F.3d at 606 (citations omitted); *see also Rourke v. New York State Dep't of Corr. Servs.,* 915 F.Supp. at 540. While much of the relief sought herein is compensatory and punitive monetary relief, to the extent Plaintiff seeks some form of declaratory relief, such claims against the Defendants in their official capacities could go forward insofar as the Plaintiff seeks prospective relief. However, in light of his release from DOCCS's custody, the Court finds that any request for

prospective injunctive relief is moot and the claims against the remaining Defendants in their official capacities should be **dismissed.** *Khalil v. Laird,* 353 F. App'x 620 (2d Cir.2009) (citing *Muhammad v. City of New York Dep't of Corr.,* 126 F.3d 119, 123 (2d Cir.1997)).

## II. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Partial Summary Judgment (Dkt. No. 70) be **GRANTED** and all claims against Defendant Russell be **DISMISSED** and claims against the remaining Defendants in their official capacities be **DISMISSED;** and it is further

**RECOMMENDED,** that if the above recommendations are accepted, this case be set down for a final pre-trial conference with the parties to assess whether this matter is trial ready; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 5437617

## Footnotes

1    Although Plaintiff spells this Defendant's name as "Russel," it is clear from Defendants' submissions that the correct spelling of this individual's name is "Russell" and the Court will refer to her accordingly. Compl. at ¶ 8; Dkt. Nos. 10 & 70–3.

2    Plaintiff alleges that in addition to filing several grievances he submitted sick call requests and sent letters to the Inspector General, all explaining how his Eighth Amendment rights were being violated. Compl. at ¶¶ 5–8.

3    The Second Circuit has yet to address the impact of *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), upon the categories of supervisory liability under *Colon v. Coughlin,* 58 F.3d 865 (2d Cir.1995). *See Grullon v. City of NewHaven,* 720 F.3d 133 (2d Cir.2013) (noting that the Court's decision in *Iqbal* "may have heightened the requirements for showing a supervisor's personal involvement," but declining to resolve the issue). Lower courts have struggled with this issue, specifically whether *Iqbal* effectively calls into question certain prongs of the *Colon* five-part test for supervisory liability. *See, e.g., Sash v. United States,* 674 F.Supp.2d 531, 543 (S.D.N.Y.2009). While some courts have taken the position that only the first and third of the five *Colon* categories remain viable and can support a finding of supervisory liability, *see, e.g., Bellamy v. Mount Vernon Hosp.,* 2009 WL1835939, at *6 (S.D.N.Y. June 26, 2009), *aff'd,* 387 F. App'x 55 (2d Cir.2010), others disagree and conclude that whether any of the five categories apply in any particular cases depends upon the particular violations alleged and the supervisor's participatory role, *see, e.g., D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010). Nevertheless, this Court, until instructed to the contrary, continues to apply the entirety of the five-factor *Colon* test.

WESTLAW    © 2021 Thomson Reuters. No claim to original U.S. Government Works.                    5

2013 WL 838284
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

William HALL, Plaintiff,

v.

COUNTY OF SARATOGA, John Doe, Individually
and in his capacity as an Employee of the County
of Saratoga, New York, Sheriff's Department
and the Saratoga County Sheriff, Lt. Corbet,
Jane Doe, the persons intended being all Civilian
personnel as employees or under Contract as
independent medical personnel, Defendants.

No. 1:10–CV–1120 (NAM/CFH).
|
March 6, 2013.

**Attorneys and Law Firms**

Grasso, Rodriguez & Grasso, Nicholas J. Grasso, Esq., of Counsel, Schenectady, NY, for Plaintiff.

Bailey Kelleher & Johnson, P.C., Nannette R. Kelleher, Esq., of Counsel, Albany, NY, for Defendants.

MEMORANDUM–DECISION and ORDER

NORMAN A. MORDUE, District Judge.

**I. INTRODUCTION**

**\*1** This action arises under the auspices of 42 U.S.C. § 1983. Plaintiff asserts that while he was an inmate at the Saratoga County Correctional Facility ("SCCF"), defendants denied him adequate medical care, committed a battery upon him and are liable in negligence for personal injuries he sustained while in their custody. Defendants have moved for summary judgment dismissing the complaint. Plaintiff has not submitted papers in opposition to this motion. [1]

**II. DISCUSSION**

**A.** *Standard of Review*

Summary judgment is appropriate when there is no genuine issue with regard to any material fact, and the moving party

is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). Stated otherwise, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party [.]" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). When deciding a summary judgment motion, the Court must "resolve all ambiguities and draw all factual inferences in favor of the party opposing the motion." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999).

When, as here, a summary judgment motion is unopposed, "[t]he fact that there has been no [such] response ... does not ... [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996); *see also Vt. Teddy Bear Co. v. 1–800 Beargram Co., Inc.,* 373 F.3d 241, 244 (2d Cir.2004). Instead, a court must (1) determine what material facts, if any, are disputed in the record presented on the motion; and (2) assure itself that, based on those undisputed material facts, the law indeed warrants judgment for the moving party. *See Champion,* 76 F.3d at 486. The motion may fail if the movant's submission fails to establish that no material issue of fact remains for trial, *Amaker v. Foley,* 274 F.3d 677, 681 (2d Cir.2001), or if the "undisputed facts fail to show that the moving party is entitled to judgment as a matter of law," *Vt. Teddy Bear,* 373 F .3d at 244 (internal citation and quotation marks omitted).

**B.** *Exhaustion of Administrative Remedies*

The Prisoner Litigation Reform Act of 1995 ("PLRA"), mandates exhaustion by prisoners of all administrative remedies before bringing an action regarding prison conditions of confinement. *See* 42 U.S.C. § 1997e(a). Specifically, the PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." *Id.* The Supreme Court has held that the PLRA's "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002).

**\*2** " 'Conditions of confinement' is not a term of art; it has a plain meaning." *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999). "It quite simply encompasses all conditions under which a prisoner is confined for his term of imprisonment." *Id.* These include terms of disciplinary or administrative segregation such as keeplock or solitary confinement, as well as more general conditions affecting a prisoner's quality of life such as ... the deprivation of exercise, medical care, adequate food and shelter, and other conditions that, if improperly imposed, could violate the Constitution. *Id.* (citing *Figueroa v. Rivera,* 147 F.3d 77, 82 (1st Cir.1998); *Channer v. Mitchell,* 43 F.3d 786, 788 (2d Cir.1994)) (*per curiam* ). In short, any deprivation that does not affect the fact or duration of a prisoner's overall confinement is necessarily a condition of that confinement.

In *Hemphill v. New York,* 380 F.3d 680 (2d Cir.2004), the Second Circuit "read together," *Macias v. Zenk,* 495 F.3d 37, 41 (2d Cir.2007), a number of decisions and consolidated cases and formulated a three-part test for examining the scope of the PLRA's exhaustion requirement:

> Depending on the inmate's explanation for the alleged failure to exhaust, the court must ask whether administrative remedies were in fact available to the prisoner. The court should also inquire as to whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense. If the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped and have not forfeited their non-exhaustion defense, but that the plaintiff nevertheless did not exhaust available remedies, the court should consider whether special circumstances have been plausibly

alleged that justify the prisoner's failure to comply with administrative procedural requirements.

*Hemphill,* 380 F.3d at 686.

New York State law provides a three tier inmate grievance procedure applicable to plaintiff's claims. *See,* N.Y. Correct. Law § 139; N.Y. Comp.Codes R. & Regs. tit. 7, § 701.1 *et seq.* (2003). Courts in the this Circuit have long recognized this procedure as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* No. 96–CV–5396, 2004 WL 324898, at \*4 (S .D.N.Y. Feb. 20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003) and *Snider v. Melindez,* 199 F.3d 108, 112–13 (2d Cir.1999)). Richard Emery, the Chief Administrator with the rank of Colonel for SCCF submitted an affidavit wherein he averred that the facility maintained an inmate grievance program established by the New York State Department of Corrections and Community Supervision ("DOCCS") pursuant to the above-referenced law and regulations. Further, Emery stated that the grievance program is enumerated in the policies and procedures of SCCF and is distributed to each inmate in an Inmate Handbook. Review of the complaint and the entire record for that matter reveals no suggestion that plaintiff filed or attempted to pursue a grievance of his claims administratively at SCCF prior to filing the instant action.

**\*3** Regarding part two of the *Hemphill* analysis, plaintiff does not allege in the complaint or anywhere in the record that defendants inhibited his ability to utilize the grievance program which was indisputably available to him at SCCF. Finally, review of the record does not reveal any "special circumstances" which would justify plaintiff's failure to comply with administrative requirements prior to filing the present federal claim. *See Hemphill,* 380 F.3d at 686. Thus, the Court finds there is no genuine issue of material fact concerning plaintiff's failure to have exhausted administrative remedies prior to commencing his § 1983 claims against defendants. Based thereupon, these federal claims are subject to dismissal on procedural grounds.

C. *Plaintiff's Claims Under* 42 U.S.C. § 1983

1. Inadequate Medical Treatment

Even if the Court ignored plaintiff's procedural failings, his § 1983 claims fare no better on their merits. According to the complaint and his response to interrogatories filed in this matter, plaintiff claims that defendants violated the Eighth Amendment when failed to provide adequate medical care to him while he was an inmate at SCCF by: 1) failing to comply with care and treatment consistent with the diagnosis of renal failure; 2) failing to address the plugging of an A.V. fistula in his left arm in a timely fashion despite his complaints about it, putting a shunt in his neck; 3) not allowing him to shower or bathe for eight days which led to a septic infection; and 4) failing to follow a special diet of low calcium, phosphorous and potassium which was recommended by plaintiff's physician, Dr. Daoui and the Rubin Dialysis Center.

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments" on those convicted of crimes, which includes punishments that "involve the unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173 (1976) (citations omitted). The Eighth Amendment also applies to prison officials when they provide medical care to inmates. *See Estelle v. Gamble,* 429 U.S. 97, 103 (1976). To establish an unconstitutional denial of medical care, a prisoner must prove "deliberate indifference to [his] serious medical needs." *Id.* at 104.

The deliberate indifference standard embodies both an objective and a subjective prong. First, the alleged deprivation must be, in objective terms, "sufficiently serious." *Wilson v. Seiter,* 501 U.S. 294, 298 (1991). *See Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting) (standard contemplates "a condition of urgency, one that may produce death, degeneration, or extreme pain") (citations omitted). Second, the charged official must act with a sufficiently culpable state of mind. *See Wilson,* 501 U.S. at 298. Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm. *See Farmer v. Brennan,* 511 U.S. 825, 835 (1994). More specifically, a prison official does not act in a deliberately indifferent manner unless that official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

**\*4** "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). Nevertheless, a pattern of omissions may permit the inference of deliberate unconcern for the prisoner, and gross negligence by prison employees creates a strong presumption of deliberate indifference. *Doe v. New York City Department of Soc. Servs.,* 649 F.2d 134, 143–44, 145 (2d Cir.1981), *cert. denied,* 464 U.S. 864 (1983); *Langley v. Coughlin,* 715 F.Supp. 522, 537 (S.D.N.Y.1989). Furthermore, a health provider cannot claim to have exercised his or her "best judgment" where that judgment is based on a cursory examination or inadequate diagnostic procedures. *Williams v. United States,* 747 F.Supp. 967, 1009 (S .D.N.Y.1990). Finally, prison officials cannot defend practices that fall below the norm of what is generally accepted in the medical community merely on the ground that such practices are common throughout the correctional system. *See Todaro v. Ward,* 565 F.2d 48, 53 (2d Cir.1977).

Stephen Strader, the Medical Director at SCCF, who oversees all medical personnel at SCCF and participates in the care and treatment of all inmates at the facility, submitted an affidavit detailing the medical care provided to plaintiff during the relevant time period. According to Dr. Strader, plaintiff entered the facility on December 1, 2008, on a driving while intoxicated charge. Thus, he was automatically subject to monitoring for ETOH withdrawal. An Inmate Physical Assessment Form completed at the time of his arrival indicated that plaintiff was being treated for Stage IV Renal Disease. Dr. Strader explained that chronic renal disease is the gradual loss of kidney function which can occur over months or years. According to Dr. Strader, Stage IV is considered the most severe stage of the disease; it is usually irreversible and will often progress to complete kidney failure. At that point, Dr. Strader explained, the kidneys can no longer adequately filter waste and excess fluids from the body and dangerous levels of fluids, electrolytes and wastes can accumulate. Dr. Strader stated that the only option available to patients at this stage of kidney disease is dialysis or renal transplant.

Dr. Strader noted that when an inmate enters SCCF with a chronic disease such as plaintiff's, the facility obtains the inmate's medical records when possible and facilitates continuing treatment by local specialists in accordance with security policies. According to Dr. Strader, inmates are transferred to all outside medical provider appointments by the Saratoga County Sheriff's Department road patrol unless emergency ambulatory services are required. Dr. Strader

averred that review of plaintiff's medical records confirmed the diagnosis of Stage IV chronic kidney disease or renal failure and a medical evaluation by plaintiff's nephrologist prior to his incarceration evidenced worsening renal failure. Dr. Strader noted that when plaintiff entered SCCF, he had an A.V. fistula already in place. Dr. Strader explained that an A.V. fistula is essentially an artificial vein that connects directly to an artery. Dr. Strader stated that A.V. fistulas are commonly created surgically to be used for dialysis treatments. According to Dr. Strader, plaintiff's A.V. fistula was inserted in 2007 due to his progressing kidney disease and anticipation that dialysis would be necessary in the future.

**\*5** Within the first few days of plaintiff's incarceration, SCCF contacted plaintiff's nephrologist, Dr. Daoui to determine when he would have to be seen and what treatment was necessary. According to Dr. Strader, Dr. Daoui advised that plaintiff would need monthly blood work to monitor his kidney function and electrolyte levels. Dr. Daoui asked that the results of the bloodwork be faxed to his office for review. Plaintiff saw Dr. Daoui for evaluation on January 9, 2009. Dr. Strader averred that in the course of his duties as the facility physician, he reviewed Dr. Daoui's notes and recommendations following each visit. Dr. Strader also stated that while it was his practice to defer to specialist recommendations, he maintained final authority over the medical treatment provided to inmates. Dr. Strader stated that his review of the notes from plaintiff's follow-up evaluation with Dr. Daoui on March 9, 2009, revealed worsening kidney function in the months prior to plaintiff's incarceration and Dr. Daoui's observation that plaintiff would likely soon need dialysis.

On May 11, 2009, Dr. Strader averred that Dr. Daoui recommended that plaintiff adhere to a low potassium diet. Dr. Strader understood this recommendation to require that plaintiff avoid eating excess potassium. According to Dr. Strader, limiting one's potassium intake is necessary in advanced stages of kidney disease. This is because when one's kidney's are failing, it leads to the inability to maintain a normal potassium level as the kidneys begin to lose the ability to remove potassium from the blood. Dr. Strader stated that it was likely that the base diet provided to plaintiff at SCCF already contained lower levels of potassium than he would be ingesting outside the facility. Notably, Dr. Strader opined that "when a renal patient is placed on a low potassium diet, it is because his kidneys have already failed thereby leading to the inability to maintain normal potassium levels. A high potassium diet will not cause kidney failure." Nevertheless,

as Dr. Daoui did not prescribe a specific level of potassium intake for plaintiff, SCCF medical staff advised the kitchen staff to restrict plaintiff's meals so they did not include overly high levels of potassium. Dr. Strader stated that SCCF also continued monitoring plaintiff's metabolic blood panel and electrolytes to gauge whether his kidney functions were worsening and unable to maintain normal potassium levels.

Dr. Strader also stated that in his May 9, 2009, office note, Dr. Daoui recommended that plaintiff start hemodialysis. Indeed, the Court notes that in the May 9, 2009, note, Dr. Daoui changed plaintiff's diagnosis to " 'CKD' [or chronic kidney disease] stage 5." However, on May 17, 2009, days before plaintiff's dialysis was to start, he complained that the fistula in his left arm had stopped working. Dr. Strader averred that while he was not a nephrologist, he had a medical understanding of how fistulas are used, complications that can arise with a fistula, and what procedures may be needed to correct those complications. According to Dr. Strader, one complication that can arise is that a fistula can clot or clog which prevents fluid from passing through it. Dr. Strader's review of plaintiff's medical records revealed that a clot or clog in plaintiff's A.V. fistula had occurred at least one time before he entered SCCF. Dr. Strader stated that a clogged or clotted fistula is not a life threatening condition and it is unlikely to cause any pain to a patient. When it occurs, Dr. Strader stated that a nephologist will examine the fistula to determine if a surgical revision will need to be performed. If the patient is on dialysis, Dr. Strader stated that a temporary catheter is placed to allow continuing dialysis pending repair of the fistula.

**\*6** When plaintiff complained that his fistula had stopped working, a nurse at SCCF contacted Dr. Daoui to see how he would like to proceed as plaintiff was scheduled to begin dialysis. Dr. Daoui recommended that a temporary catheter be placed to allow dialysis to proceed while the fistula was repaired. Dr. Strader said that he then scheduled a fistulogram, a procedure used to determine whether any fluid can pass through a fistula, for the beginning of June. On May 21, 2009, Dr. Strader stated that plaintiff underwent a procedure at Saratoga Hospital for the insertion of a temporary right internal jugular tunnel hemodialysis catheter. Following this procedure, Dr. Strader averred that Dr. Dempsey at Saratoga Hospital contacted SCCF and expressed concern regarding plaintiff being returned to the general inmate population with the catheter in place. Dr. Dempsey recommended that plaintiff be taken out of the general population to reduce the risk that the catheter would be pulled out which could cause plaintiff

to bleed to death before medical help could arrive. Though plaintiff strenuously objected to the restriction, Dr. Strader stated that plaintiff was separated from the general population and placed on medical watch unit.

Dr. Strader stated that following the catheter insertion on May 21, 2009, showering restrictions were placed on plaintiff because it was deemed medically necessary to keep the catheter site dry. On May 28, 2009, SCCF medical staff were advised by plaintiff's specialists at the Rubin Dialysis Center that he could resume showering and the restriction was lifted. Plaintiff began his dialysis treatments on May 29, 2009, and received a total of 17 dialysis treatments between then and the time of his release from the facility in July 2009.

Dr. Strader opined to a reasonable degree of medical certainty that the treatment plaintiff received at SCCF did not hasten his kidney disease and did not cause his fistula to become clotted. Rather, according to Dr. Strader, the care and treatment provided to plaintiff at SCCF was in compliance with all accepted standards of care and in compliance with the recommendations of plaintiff's own specialists. Overall, Dr. Strader said that plaintiff's blood pressure and weight were monitored weekly and at times daily during his six month incarceration and blood work was performed once to twice monthly to monitor his kidney function and electrolyte levels. Plaintiff's medical records confirm Dr. Strader's statement that plaintiff was evaluated three times by his nephrologist and was in daily contact with the medical staff at SCCF. Dr. Strader averred:

> His medications were constantly monitored, he was placed on a restricted diet [ ], and relocated to a medical unit to ensure his safety. [Plaintiff's] records evidenced that his kidney was [sic] worsening with each visit to his nephrologist before he entered SCCF. [Plaintiff] received the same care for his renal disease while at SCCF that he would have received had he not been incarcerated. I can affirm to a reasonable medical certainty that it was not [plaintiff's] incarceration which resulted in his requiring dialysis, but the natural progression of his disease.

### a. Treatment of Plaintiff's Fistula

**\*7** Turning to plaintiff's claims of inadequate medical care, plaintiff alleges that defendants "fail[ed] to address the plugging of the A.V. fistula in his left arm in a timely fashion." Plaintiff testified at a 50–h hearing and at his deposition in connection with this matter that defendants waited five to six weeks to treat the clogged fistula. Notably, plaintiff did not allege or testify that the clogged fistula caused him extreme pain and there is no medical evidence in the record which indicate that the failure to treat plaintiff's condition immediately as he requested would or could have resulted in "death, degeneration or extreme pain." 🔖 *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (quoting *Nance,* 912 F.2d at 607). Based thereupon, defendants are correct when they argue that there is no evidence to support plaintiff's claim that failure to act immediately to remedy his clogged fistula, in and of itself, was a deprivation "sufficiently serious" to warrant review under the Eighth Amendment. 🔖 *Wilson v. Seiter,* 501 U.S. at 298.

Nevertheless, even if a clogged fistula is a serious medical condition under the standard described in *Nance, supra,* the record here reveals that defendants' treatment of the problem was reasonable and in accordance with the directives of Dr. Daoui. Plaintiff alleges that SCCF's actions in evaluating the clogged fistula took too long and caused him to have a catheter inserted. However, it was Dr. Daoui who recommended insertion of the catheter to ensure plaintiff's dialysis treatments could start as scheduled. Plaintiff believes that he should have had the fistula repaired immediately instead of having to undergo placement of the catheter. However, it is well settled that "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a 🔖 Section 1983 claim. 🔖 *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001). "These issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment." *Id.* (citing 🔖 *Estelle v. Gamble,* 429 U.S. at 107

### b. Inadequate Diet

The intentional failure to provide an inmate with a medically prescribed diet for a prolonged period of time can state

a viable Eighth Amendment claim. *Abdush—Shahid v. Coughlin,* 933 F.Supp. 168, 180 (N.D.N.Y.1996) (citing

*Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (Eighth Amendment's prohibition against cruel and unusual punishment requires serving inmates nutritionally adequate food prepared and served under conditions that do not present imminent danger to health and well-being of inmates who consume it)). However, the "objective component" of an Eighth Amendment claim requires a plaintiff to show evidence of some adverse health impact caused by the discontinuance of or failure to provide the prescribed diet. *Davidson v. Desai,* 817 F.Supp.2d 166, 190 (W.D.N.Y.2011).

**\*8** Plaintiff asserts that defendants failed to follow the special diet of low calcium, phosphorous and potassium recommended by his doctor and the specialists at the Rubin Dialysis Center. However, there is no evidence in the record that Dr. Daoui ever ordered that plaintiff's intake of calcium and phosphorous be limited. Indeed, the only restriction Dr. Daoui placed on plaintiff's diet was "low potassium." The record shows that once, Dr. Daoui placed this restriction on plaintiff's diet, the facility kitchen was made aware of the restriction and plaintiff's diet was altered. Although plaintiff asserts that his diet was not properly altered, defendants are correct when they contend that plaintiff's blood levels were continuously monitored and Dr. Daoui made no changes based on his subsequent review of plaintiff's laboratory results. Thus, there is no evidence that plaintiff received an inadequate diet while incarcerated at SCCF. Moreover, there is no objective evidence that the alleged inadequacy of his diet caused any worsening of his health or renal condition. As referenced above, Dr. Strader opined that high levels of potassium do not cause kidney failure. Rather, Dr. Strader noted that plaintiff's inability to maintain normal potassium levels was due to the natural progression of his kidney disease.

### c. Showering Restriction

Plaintiff asserts that he was not allowed to shower for several days after placement of the catheter for dialysis and that this caused a "septic infection." Regardless of whether restriction of shower privileges for the time period in question rises to level of denial of a serious medical need, there is no evidence in the record that plaintiff ever developed any type of septic infection while incarcerated at SCCF. Indeed, while plaintiff testified at his 50–H hearing that he got a septic infection at the site of the catheter placement and was "in the hospital for four days," the Court finds no record of such a hospital visit or infection his medical records. Moreover, the showering

restriction was implemented at the instruction of plaintiff's specialists at the Rubin Dialysis Center who ordered that the catheter site be kept dry. On the day that medical personnel at SCCF were advised by the Rubin Dialysis Center that plaintiff could resume showering, the restriction was lifted.

### d. Overall Treatment of Plaintiff's Renal Disease

Plaintiff contends that the care he received at SCCF resulted in his requiring dialysis and was not in his "best interest." However, as referenced above, plaintiff entered the facility with Stage IV renal disease and his medical records demonstrate that his condition was worsening in the months just prior to his incarceration. Plaintiff arrived at SCCF with an A.V. fistula because his physician anticipated that he would soon require dialysis. Within three months of entering the facility, Dr. Daoui noted that plaintiff's bloodwork warranted a change in his diet and the initiation of hemodialysis. The record fully supports defendants' contention that it was the natural progression of plaintiff's disease, not the care or treatment he received at SCCF, which led to his requiring dialysis. There is nothing in the record which suggests that plaintiff's care and treatment at SCCF was not in accordance with generally accepted medical principles and the advice and recommendation of his own specialists.

**\*9** Consequently, there are no material questions of fact concerning plaintiff's claims of inadequate medical treatment under the Eighth Amendment and these claims must be dismissed.

### 2. Excessive Force

Defendants contend that while plaintiff's complaint did allege a claim for deliberate indifference to his medical needs, he did not assert a claim under 42 U.S.C. § 1983 for excessive force. Defendants argue that even if his complaint was deemed to include a claim of excessive force under § 1983, it would still fail. "The test of whether use of force in prison constitutes excessive force contrary to the Eighth Amendment is whether the force was used in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Scott v.Coughlin,* 344 F.3d 282, 291 (2d Cir.2003) (citing *Hudson v. McMillian,* 503 U.S. 1, 7 (1992)). "The absence of serious injury is ... relevant to the Eighth Amendment inquiry, but does not end it." *Id.* (quoting *Hudson,* 503 U.S. at 7.)

In this case, plaintiff's complaint alleges simply that defendant Corbett struck him in the face with a dish, milk and other objects. The complaint does not assert that plaintiff suffered any injury as a result of this incident. In his response to interrogatories, plaintiff asserts further that on May 11, 2009, "Lt. Corbett committed an assault on [him] by intentionally smashing a plate of food against the edge of a table and hitting [plaintiff] in the face with it and then throwing a glass of milk in his face causing [plaintiff] reasonable apprehension of the immediate harmful and offensive contact, which was the food and milk hitting [his] face." However, in the Court's record, plaintiff's interrogatory responses are not complete and it is unclear whether they are signed or sworn to by plaintiff. At his 50–H hearing, plaintiff testified that he was "not real happy that Lieutenant Corbett threw that plate of food in my face and a glass of milk." Following this answer, there is only one additional page of testimony provided by defendant in which plaintiff testified further concerning the incident:

> I wasn't real happy about the shunt being put in my neck, and I told them that they lied to me and I wasn't pleased with it, and I told him, and I said, Give me a phone. I'll call my lawyer and I'll have this thing out of my neck tomorrow, and he smashed a plate of food into my face and threw a glass of milk at me and said, Do you know how much money they've spent on you upstairs over that? And I said, I don't care.

When plaintiff was asked what he meant when he said that Corbett "smashed a plate of food into [his] face," he said "The plate was sitting on the table, and we were arguing back and forth across the table, and he smashed it on the edge and it flipped up in my face."

In an affidavit submitted in connection with defendants' motion, Lt. Corbett averred:

> [Plaintiff] had recently returned from Saratoga Hospital, where he had a catheter inserted in his neck.... [Corbett] was advised by the on-duty nurse, R.N. Bilka, that [plaintiff]

> became angry upon learning that he was to be separated from general population.... As [plaintiff] was extremely agitated about this move, [Corbett] was asked to speak with him to attempt to calm him down.

**\*10** Corbett further stated that when he entered plaintiff's cell, he was "quite angry." "[Plaintiff] claimed that the hospital had lied to him by telling him that he could remain in general population. [Plaintiff]'s anger continued to escalate and he began yelling and threatened to remove the catheter himself."

> There was a metal table in the room that held [plaintiff]'s plate of food with a glass of milk. I sat across the table from [plaintiff] and reminded him that he was being separated from general population for his own safety. [Plaintiff's] temper was further escalated and I went to leave the holding cell to afford him the opportunity to calm down. When I rose from the table, my hand accidently knocked into [plaintiff]'s glass of milk, spilling milk on both [plaintiff] and me. I had [plaintiff] moved to another holding cell so that the cell could be cleaned while he had a chance to calm down.

> ...

> I understand that [plaintiff] has now alleged that I assaulted him by throwing the glass of milk at him during this incident. At no point, did I intentionally cause milk to spill on [plaintiff.] Had I acted in an aggressive manner towards [plaintiff] during that incident and physically assaulted him, the matter would have been reviewed by SCCF administration. Further, at no point did [plaintiff] complain of our interaction during his incarceration....

The force plaintiff describes herein not sufficiently serious or harmful to reach constitutional dimensions. *See* 📗 *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993). Plaintiff does not maintain that he experienced any pain or injury as a result of the milk or food being allegedly thrown in his face, even assuming the incident occurred as he states. Moreover, plaintiff does not allege facts that show that Lt. Corbett used force "maliciously and sadistically to cause harm," rather than "in a good-faith effort to maintain or restore discipline" or calm him down and prevent him from removing his

catheter." *Hudson,* 503 U.S. at 7. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973). Indeed, not even "every **malevolent** touch by a prison guard gives rise to a federal cause of action." *Hudson,* 503 U.S. at 9. (emphasis added). Plaintiff has therefore not stated facts that meet either the objective or subjective component of the test used to determine whether Lt. Corbett's alleged excessive physical force constituted cruel and unusual punishment.

### D. Qualified Immunity

Even if the above were not true, Lt. Corbett and the other individually named defendant are also protected against plaintiff's various *§ 1983* claims by qualified immunity. As noted recently in the Supreme Court case of *Pearson v. Callahan,* 555 U.S.223, 129 S.Ct. 808, 815 (2009):

> The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Groh v. Ramirez,* 540 U.S. *551, 567 (2004)* (KENNEDY, J., dissenting) (citing *Butz v. Economou,* 438 U.S. 478, 507 (1978) (noting that qualified immunity covers "mere mistakes in judgment, whether the mistake is one of fact or one of law")).

**\*11** For example, excessive force claims are properly analyzed under the Fourth Amendment's "objective reasonableness standard," because of the uncertainty and rapidity inherent in police work. *Graham v. O'Connor,* 490 U.S. 386, 396 (1989). Indeed, *Graham* sets forth a list of factors relevant to the merits of the constitutional excessive force claim which include analysis of the crime at issue, the threat posed by a suspect and any attempt by the suspect

to evade or resist arrest. *See id.* If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed. *See id.* "[T]he concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct." *Saucier v. Katz,* 533 U.S. 194, 205 (2001), overruled on other grounds, *Pearson, supra:*

> It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

*Id.* Indeed:

> [O]fficers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause or exigent circumstances, for example, and in those situations courts will not hold that they have violated the Constitution. Yet, even if a court were to hold that the officer violated the Fourth Amendment by conducting an unreasonable, warrantless search, *Anderson [v. Creighton,* 483 U.S. 635 (1987)] still operates to grant officers immunity for reasonable mistakes as to the legality of their actions.

*Id.* at 206 (emphasis added).

In the circumstances presented to defendant Corbett who was asked to attempt to calm plaintiff who was threatening to pull out his catheter which medical personnel said could cause him to bleed to death, he was justified in using a degree of force to prevent plaintiff from harming himself. However, Lt. Corbett averred that no such force was necessary and that the spilled milk was simply an accident. While plaintiff's 50–H testimony indicated that defendant Corbett intentionally spilled milk and food on him, the Court's conclusion that no cause of action lies here is confirmed by the "uncontested fact that the force was not so excessive that [plaintiff] suffered hurt or injury." See 🚩 *Saucier, supra,* 533 U.S. at 208.

At the very least, defendants Buttofocco and Smith have established that reasonably competent police officers could disagree on the question of excessive force in this case. Based thereupon, the motion by defendants to dismiss plaintiff's claim of excessive force on the alternative ground of qualified immunity must be granted.

## E. State Law Claims

### 1. Battery

 **\*12**  Defendants assert that plaintiff's cause of action for battery is barred by the statute of limitations. The normal statute of limitations for battery is one year. See 📙 N.Y. C.P.L.R. § 215(3). However, in this case, the defendant is a municipal subdivision so the one-year period is extended per General Municipal Law by 90 days. See N.Y. Gen. Municipal Law 50–i. Thus, plaintiff was required to file his complaint within one year and ninety days from the date the alleged battery occurred. Here, plaintiff testified at his 50–H hearing that the battery occurred on the "day that [he] got the shunt put in [his] neck," which his medical records establish was May 21, 2009. Plaintiff testified that the incident with Lt. Corbett happened "as soon as he returned from the hospital," for the outpatient procedure. Plaintiff filed his Summons and Complaint in New York Supreme Court for Saratoga County on August 26, 2010. Accordingly, plaintiff's complaint was filed one year and 96 days after the alleged battery occurred. As such, the Court agrees his action for battery is time-barred as a matter of law and must be dismissed.

### 2. Negligence

Plaintiff claims that defendants were negligent in failing to address his medical needs at SCCF in three ways: first, that they ignored refused to follow the dietary restrictions set

by his nephrologist, Dr. Daoui; second, that they failed to timely address his A.V. fistula; and third, that they refused to allow him to shower following his catheter surgery which resulted in a septic infection. Fatal to plaintiff's claims is the absence of any expert medical evidence submitted in support of thereof. "Whether the claim is grounded in negligence or medical malpractice, '[w]here medical issues are not within the ordinary experience and knowledge of lay persons, expert medical testimony is a required element of a *prima facie case'* " *Myers v. State of New York,* 46 A.D.3d 1030, 1031 (3d Dep't 2007) (citing *Tatta v. State of New York,* 19 A.D.3d 817, 818 (3d Dep't 2005), *lv. denied* 5 N.Y.3d 712 (2005) quoting *Wells v. State of New York,* 228 A.D.2d 581, 582 (2d Dep't 1996), *lv denied* 88 N.Y.2d 814 (1996); *see Trottie v. State of New York,* 39 A.D.3d 1094, 1095 (3d Dep't 2007)). In *Myers,* the claimant inmate contended that medical personnel at the Sullivan Correctional Facility erred in the treatment of his knee injury by delaying necessary surgery. 46 A.D.3d at 1030. Specifically, the claimant alleged that he was required to undergo physical therapy, which he contended worsened his condition, instead of knee surgery, despite the medical personnel's knowledge that he had a foreign object lodged in his knee. *See id.* Following a trial, at which claimant was his only witness, the Court of Claims, in a written decision, dismissed the claim. *See id.* at 1030–31.

Plaintiff's claims of medical negligence are likewise subject to dismissal. Setting aside the proof offered by SCCF that its treatment of plaintiff was entirely reasonable and within the standards of care established by his own specialists, plaintiff has offered no expert medical evidence demonstrating that SCCF deviated from accepted standards of medical care and treatment in this case. Based thereupon, his claims of negligence or malpractice must be dismissed.

## III. CONCLUSION

 **13**  Based on the foregoing, it is therefore

ORDERED that defendants' motion for summary judgment (Dkt.# 24) is hereby GRANTED and it is further

ORDERED that the complaint is dismissed in its entirety.

IT IS SO ORDERED.

## All Citations

Not Reported in F.Supp.2d, 2013 WL 838284

## Footnotes

1    The Court's Docket indicates that defense counsel initially served plaintiff's counsel, Mr. Grasso, with the present motion papers via the Court's mandated electronic filing system ("CM/ECF") system, unaware that he is exempt from use of the ECF system as he has been in practice for over fifty years. Mr. Grasso contacted the Court on September 12, 2012, requesting an extension due to his exemption and the fact that he had just received notice that a dispositive motion had been filed. Though defendants opposed his request, the Court granted Mr. Grasso's request for a thirty day extension to prepare responsive papers. Mr. Grasso did not file his response papers as ordered by October 12, 2012. On October 19, 2012, this Court received additional correspondence from defense counsel requesting that no further extensions be granted to Mr. Grasso and that the pending motion for summary judgment be granted in its entirety. Mr. Grasso did not respond to this correspondence. The Court granted the former request and denied the latter pending review of the motion on its merits. The Court has had no further communication with Mr. Grasso.

**End of Document**                              © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:19-cv-00689-AMN-TWD    Document 72    Filed 05/12/21    Page 54 of 110

Henderson v. Annucci, Not Reported in Fed. Supp. (2016)

KeyCite Yellow Flag - Negative Treatment

Distinguished by   Animashaun v. Afify,   W.D.N.Y.,   July 2, 2020

2016 WL 3039687

Only the Westlaw citation is currently available.

United States District Court, W.D. New York.

Thomas Adam HENDERSON, Plaintiff,

v.

Anthony ANNUCCI, et al., Defendants.

14-CV-445A

|

Signed 03/14/2016

**Attorneys and Law Firms**

Thomas Adam Henderson, Alden, NY, pro se.

Christopher L. Boyd, NYS Attorney General's Office, Buffalo, NY, for Defendants.

**REPORT, RECOMMENDATION AND ORDER**

JEREMIAH J. MCCARTHY, United States Magistrate Judge

**\*1**  This case has been referred to me by Hon. Richard J. Arcara for supervision of pretrial proceedings, including the preparation of a Report and Recommendation on dispositive motions. [23].[1]  Plaintiff Thomas Adam Henderson brought this action pursuant to 42 U.S.C. § 1983 claiming that his civil rights were violated when the defendants allegedly assaulted him on September 10, 2013, October 22, 2013 and May 16, 2014. Complaint [1], pp. 11,13. Before me are defendants' motion to dismiss [22], plaintiff's motion to amend the complaint [31], and plaintiff's motion for appointment of counsel [32].

For the reasons stated below, I recommend that defendants' motion to dismiss be granted in part and denied in part, the plaintiff's motion to amend be granted in part and denied in part, and that plaintiff's motion for the appointment of counsel be denied.

**BACKGROUND**

Plaintiff commenced this civil rights action pursuant to 42 U.S.C. § 1983 alleging that while he was incarcerated at the Attica Correctional Facility, Correction Officer Dunford sexually assaulted him during a frisking on September 10, 2013. He asserts that after being cut down from a suicide attempt, Officer Dunford pulled up the waistband of his underwear so as to give him a "wedgie", and then swiped his fingers between plaintiff's butt cheeks "roughly pressing" against his anus. Complaint [1], p. 11. After complaining about this conduct, plaintiff states that he was informed that this procedure is known as a "credit card check", performed to determine if an inmate is hiding weapons. Id. at 11, 13, 14, 17. Plaintiff argues that the procedure constitutes a sexual assault.

He also asserts that the "credit card check" procedure was performed on him twice during a pat frisk on October 22, 2013 by Corrections Officer J. Hoinski.[2] Id. at p. 13. Finally, plaintiff alleges that Correction Officer B. Naab performed the "credit card check" on him on May 16, 2014. Id. at pp. 16-17.

Plaintiff claims that he complained to New York State Department of Corrections and Community Supervision ("DOCCS") Commissioner Anthony Annucci, DOCCS Chief Inspector General Vernon J. Fonda, Attica Correctional Facility Superintendent Mark L. Bradt, and others about the conduct which he considered to be sexual assaults. Id. at pp. 12, 15. He argues that these supervisory defendants failed to properly investigate and respond to his complaints in violation of his Eighth Amendment rights. Id. at 12.[3]

**\*2**  In his original complaint, plaintiff stated that he did not file a grievance as to any of the incidents because he did not believe he had to file a grievance. Instead, he contended that he complied with DOCCS Directive 4028A. Id. at pp. 5, 19. The defendants move to dismiss on the grounds that plaintiff failed to exhaust his administrative remedies. Motion to Dismiss [22-1], p. 4. Subsequently, the plaintiff sought leave to amend his Complaint to allege that he did, in fact, file a grievance regarding one of the three "credit card check" incidents. Plaintiff's Motion to Amend [31], p.3. The defendants oppose that motion.

**DISCUSSION**

**A. Standard of Review**

Case 9:19-cv-00689-AMN-TWD  Document 72  Filed 05/12/21  Page 55 of 110

Henderson v. Annucci, Not Reported in Fed. Supp. (2016)

The defendants move to dismiss the claims in the Complaint pursuant to Rule 12 of the Federal Rules of Civil Procedure. The court accepts the material facts alleged in the complaint as true and draws all reasonable inferences in favor of the plaintiff and against the defendants. *See* Chance v. Armstrong, 143 F.3d 698, 701 (2d Cir. 1998). However, legal conclusions, deductions or opinions couched as factual allegations are not given a presumption of truthfulness. Albany Welfare Rights Org. Day Care Center, Inc. v. Schreck, 463 F.2d 620 (2d Cir. 1972). The court is required to read the complaint broadly and with great latitude on a motion to dismiss. Yoder v. Orthomolecular Nutrition Institute, 751 F.2d 555, 558 (2d Cir. 1985). The court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient". Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).

The Supreme Court has clarified the pleading standard required to withstand a motion to dismiss. "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense". Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009) (internal citation omitted). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief". Id.; *see also* Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 565-66 (2007) (factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)). Under Iqbal, factual allegations must be sufficient to support necessary legal conclusions. Iqbal, 556 U.S. at 680-81. "A court 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth' ". Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010). The court must then consider the factual allegations in the complaint to determine if they plausibly suggest an entitlement to relief. Iqbal, 556 U.S. at 681; *see also* Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009).

Thus, while the pleading standard under Fed. R. Civ. P. ("Rule") 8 does not require detailed factual allegations, it demands more than unadorned, conclusory accusations. A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action is not sufficient. To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility requirement is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief. Iqbal, 556 U.S. at 681.

**B. Exhaustion of Administrative Remedies**

**\*3** The Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e(a), states in relevant part, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted". 42 U.S.C. § 1997e(a). This administrative exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong". Porter v. Nussle, 534 U.S. 516, 532 (2002).

"Congress enacted § 1997e(a) to reduce the quantity and improve the quality of prisoner suits; to this purpose, Congress afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case". Nussle, 534 U.S. at 524-25. The act's "dominant concern [is] to promote administrative redress, filter out groundless claims, and foster better prepared litigation of claims aired in court" (id. at 528), and clarify the contours of the controversy once it is litigated. Id. at 525. In Woodford v. Ngo, 548 U.S. 81, 83-84, 90, 126 (2006), the Court held that the exhaustion requirement of the PLRA cannot be satisfied by an "untimely or otherwise

procedurally defective administrative grievance or appeal", and that the PLRA requires "proper exhaustion", which "means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)".

Although exhaustion under the PLRA is an affirmative defense, not a jurisdictional requirement, *see* Jones v. Bock, 549 U.S. 199, 211 (2007), a demonstrated failure to exhaust warrants dismissal of the plaintiff's claims. Jones, 549 U.S. at 216; *see also* Wilson v. Yussuff, 2015 WL 77433, *5 (E.D.N.Y. 2015) (holding that court must dismiss action where inmate did not exhaust administrative remedies).

However, the exhaustion requirement may be excused under the following circumstances: "(1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedure, justify the prisoner's failure to comply with the exhaustion requirement". Ruggiero v. County of Orange, 467 F.3d 170, 175 (2d Cir. 2006).

**C. Available Grievance Procedure**

DOCCS maintains a three-tiered administrative review and appeals system for prisoner grievances. *See* N.Y. Comp. Codes R. & Regs. § 701.5. Prior to pursuing a § 1983 action in federal court, a prisoner in the DOCCS system must exhaust all three levels. *See* Porter, 534 U.S. at 524. First, an inmate may file an inmate grievance complaint form or a written grievance (if forms are not available) with the Inmate Grievance Resolution Committee ("IGRC"). *See* 7 N.Y.C.R.R. § 701.5(a). Second, if the inmate is dissatisfied with the IGRC decision, he may appeal to the prison superintendent. *Id.*, § 701.5(c). Finally, DOCCS permits an inmate to appeal the superintendent's written decision to the Central Office Review Committee ("CORC"). *Id.*, § 701.5(d).

On May 15, 2014, DOCCS amended Directive 4040, relating to sexual abuse and sexual harassment complaints. As revised, Directive 4040 states:

> "The Department has zero tolerance for sexual abuse and sexual harassment. Consistent with this policy and the Prison Rape Elimination Act (PREA) Standards (28 C.F.R. § 115.52(a)), an inmate is not required to file a

grievance concerning an alleged incident of sexual abuse or sexual harassment to satisfy the [PLRA] exhaustion requirement (42 U.S.C. § 1997e(a)) before bringing a lawsuit regarding an allegation of sexual abuse as long as the matter was reported as set forth below."

**\*4** *See* DOCCS Directive 4040, Plaintiff's Opposition to Motion to Dismiss, [27], Exhibit B, p.1.

Under the revised procedure, an allegation of sexual abuse shall be deemed exhausted for purposes of the PLRA "if official documentation confirms that:

> (1) An inmate who alleges being the victim of sexual abuse or sexual harassment reported the incident to facility staff; in writing to Central Office staff; to any outside agency that the Department has identified as having agreed to receive immediately forward inmate reports of sexual abuse and sexual harassment to agency officials under the PREA Standards (28 C.F.R. § 115.51(b)); or to the Department's Office of the Inspector General; or

> (2) A third-party reported that an inmate is the victim of sexual abuse and the alleged victim confirmed the allegation upon investigation."

*Id.*

**D. Plaintiff's Efforts to Exhaust as to Defendants Dunford, Hoinski and Nabb**

The defendants' motion to dismiss is based entirely on the argument that plaintiff failed to exhaust his administrative remedies by filing grievances relating to the three "credit card check" incidents set forth in the complaint. Defendants' Motion to Dismiss [22]. As noted above, plaintiff's original complaint states that he did not utilize the three-tiered administrative grievance procedure to complain about the September 10, 2013, October 22, 2013 and May 16, 2014 incidents. Complaint [1], pp. 5, 19. Instead, plaintiff argued that he was not required to utilize the grievance procedure because of Directive 4028A. *Id.* In response to the motion to dismiss, plaintiff also points to the revised language of Directive 4040 as eliminating the need to follow the inmate grievance procedure. Plaintiff's Opposition to Motion to Dismiss [27], p. 5.

Directive 4028A addresses sexual abuse prevention and intervention (staff on inmate). The argument that Directive 4028A eliminated the need to utilize the inmate grievance

procedure was asserted, but rejected, in Omaro v. Annucci, 68 F. Supp.3d 359 (W.D.N.Y. 2014). [4] In that case, Omaro's claim that he was sexually assaulted in connection with the pat-frisk procedure was remarkably similar to the claims asserted in this case. Id. at p. 361. In response to the defendant's motion that plaintiff failed to exhaust his administrative remedies, Omaro argued that pursuant to PREA and Directive 4028A, he was not required to utilize the grievance procedure with respect to his sexual assault claim. Id. at 364-65. The court held that nothing in the text or legislative history of PREA suggested that it was intended to abrogate the PLRA's exhaustion requirement. Id. at 364 citing Porter v. Howard, 531 Fed. Appx. 792, 793 (9th Cir. 2013) (plaintiff provides no support for his contention that he was excused from the requirement that he file an administrative grievance by operation of PREA).

Similarly, the court in Omaro determined that nothing in the text of Directive 4028A suggested that it was intended to limit or abrogate the administrative remedies available to an inmate who alleged sexual misconduct by a staff member. Omaro, 68 F. Supp. 3d at 365. The court found that Directive 4028A addressed the manner in which a complaint of staff-on-inmate sexual misconduct may be initiated and obligations of the staff following such a complaint, but did not establish or address an inmate's administrative remedies once such a complaint has been made. Id. at p. 366. [5] Thus, the court held that the plaintiff's unexhausted claims were precluded by the PLRA. Id. at p. 368.

**\*5** Unlike Omaro, however, this case involves the application of the revised language in Directive 4040, and to that extent, appears to be a case of first impression. Omaro did not discuss the revised language of Directive 4040, which was raised for the first time in this case by the plaintiff in response to the defendants' motion to dismiss. Plaintiff's Opposition to Motion to Dismiss [27], Exhibit B. Neither party has presented authority interpreting the revised language of Directive 4040. In their reply, defendants do not dispute that Directive 4040, as revised, alleviates an inmate's need to exhaust the normal grievance procedure with respect to sexual assault and sexual harassment claims. Instead, the defendants argue that the revised language of Directive 4040 does not apply here because the plaintiff's allegations are insufficient to constitute a sexual assault under PREA. Defendants Reply in support of Motion to Dismiss [28], pp. 3-4. Defendants construe plaintiff's claims as merely challenging the "pat-frisk" procedure, and argue that such

a claim would have to be pursued in the inmate grievance process through exhaustion to satisfy the PLRA. Id. at pp. 5-6.

Plaintiff's claims relating to the "credit card check" procedure as set forth in the complaint, however, are presented as sexual assault claims. For example, plaintiff alleges that "Defendant Dunford's sexual abuse cause[d] me pain, suffering and mental distress". Complaint [1], p. 11, ¶ 2. He claims that he complained to defendant Annucci and others regarding the "sexual misconduct of staff-on-inmate sexual abuse". Id. at p. 12, ¶6. Plaintiff characterizes the defendants' conduct as constituting sexual assault or sexual abuse throughout his complaint. Id. at p. 13, ¶¶10, 13, 14, 15; p. 14, ¶¶ 16, 17, 18, 19, 21; p. 15, ¶¶ 22, 23, 24, 26, 27; p. 16, ¶¶ 29, 30, 31; p. 18, ¶¶ 43, 44, 45, 46. The conduct being challenged involves corrections staff contacting plaintiff's genitals, which, depending upon the manner in which performed, could arguably fall within the scope of conduct that can be construed as "sexual" in nature.

Whether these allegations by plaintiff are sufficient to establish a "sexual assault" or "sexual harassment" under PREA (or the Fourth and Eighth Amendments) is not currently before me. The defendants' motion to dismiss raised solely the issue of whether plaintiff had exhausted the inmate grievance procedure. Defendants' Motion to Dismiss [22]. The defendants did not put plaintiff on notice that their argument in support of dismissal was based upon the fact that plaintiff's allegations were insufficient to constitute sexual conduct under PREA. In any event, while I take no position as to whether the plaintiff's allegations allege sexual conduct sufficient to state a claim under the Fourth or Eighth Amendments, [6] inasmuch as they are presented as "sexual assault" claims, the revised language of Directive 4040 applies. [7] An inmate would be placed in an untenable position if he were required to adjudicate whether his allegations of sexual assault were sufficient under PREA prior to relying upon the language in Directive 4040 alleviating the need to utilize the normal grievance procedure. [8] Here, plaintiff presented his claims as sexual assault claims. Although the sufficiency of those claims is uncertain, the language in Directive 4040 clearly states that an inmate need not utilize the grievance procedure to exhaust such claims prior to bringing a federal court action for redress.

**\*6** Directive 4040 was revised with respect to sexual assault claims on May 15, 2014. Plaintiff's Opposition to Motion to Dismiss [27], Exhibit B. Although the defendants note that the amendment has not been incorporated into the

Case 9:19-cv-00689-AMN-TWD    Document 72    Filed 05/12/21    Page 58 of 110

Henderson v. Annucci, Not Reported in Fed. Supp. (2016)

New York Code, Rules and Regulations (*see* 7 N.Y.C.R.R. 701, *et seq.*), they do not argue that the revision is not in effect. Indeed, defendants acknowledge that if the revised language of Directive 4040 applies, plaintiff's claim against defendant Nabb involving the May 16, 2014 incident has been exhausted. Defendants' Reply in Support of Motion to Dismiss [28], p. 6. Because plaintiff reported the May 16, 2014 incident involving defendant Nabb to the facility staff in a letter dated May 19, 2014 (Complaint [1], Exhibit P), this claim is deemed exhausted pursuant to Directive 4040.

Because the September 10, 2013 and October 22, 2013 incidents preceded the revision of Directive 4040, plaintiff was required to exhaust the typical inmate grievance process with respect to those incidents.[9] Plaintiff makes no attempt to argue that he exhausted the inmate grievance process with respect to his September 10, 2013 claim. That claim against defendant Dunford should be dismissed with prejudice.[10] In his motion to amend the complaint [31], plaintiff asserts that he did, in fact, exhaust the inmate grievance process with respect to his claim relating to the October 22, 2013 involving defendant Hoinski. As discussed below, the plaintiff will be allowed to amend the complaint to assert the exhaustion of that claim.

### E. Failure to Exhaust as to Defendants Annucci, Fonda, Bradt and Hughes

Defendants also seek to dismiss the claims against defendants Annucci, Fonda, Bradt and Hughes because plaintiff has not exhausted administrative remedies by naming those defendants in any grievance relating to the "credit card check" incidents. Defendants' Reply in Support of Motion to Dismiss [28], p.8-10. These claims survived the initial screening only to the extent that they alleged that the defendants "were made aware of the sexually assaultive pat-frisks but failed to remedy them or take any corrective action". November 17, 2014 Decision & Order [7], pp. 10, 22.[11]

**\*7** The plaintiff does not argue that he has exhausted his claims against defendants Annucci, Fonda, Bradt or Hughes by naming them in any grievance. In response to the motion to dismiss, plaintiff asserts generally that, because the revisions to Directive 4040 stated that a "sexual abuse or sexual harassment complaint may be submitted at any time", he can cure any failure to exhaust by now filing a complaint under Directive 4040. Plaintiff's Opposition to Motion to Dismiss [27], p. 11. Initially, it is not clear that the revised procedure set forth in Directive 4040, which eliminates the need to

follow the typical inmate grievance procedure with respect to sexual assault and sexual harassment claims, applies to claims against supervisory officials for failing to remedy or take corrective action regarding such a claim.

In any event, as noted above, plaintiff has not cited, and I have not found, any authority supporting the retroactive application of a revised DOCCS directive. Instead, although not discussed in depth, the courts in Smith and Goodson expressly applied the version of Directive 4040 which was in effect at the time of the incidents in question in those cases.

As a general rule, a new statutory provision does not apply retroactively to conduct that occurred prior to the provision's enactment. As the Supreme Court has noted, "the presumption against retroactive legislation is deeply rooted in our jurisprudence" Landgraf v. USI Film Products, 511 U.S. 244, 265, (1994). For example, the revision of § 1997e(a) which instituted the mandatory exhaustion requirement of the PLRA, was not applied retroactively. Shariff v. Coombe, 2002 WL 1392164, *3 (S.D.N.Y. 2002).

This is not a case where the revision of Directive 4040 merely clarified ambiguous language of the prior regulation. *See* Leshinsky v. Telvent GIT, S.A., 873 F. Supp.2d 582 (S.D.N.Y. 2012). Instead, the revision of Directive 4040 sets forth a new procedure relating to the reporting and processing of sexual abuse and sexual harassment claims. The new procedure bypasses the previously required inmate grievance procedure altogether and institutes an expedited process for the lodging and investigation of a sexual abuse or sexual harassment claim. The revised language does not expressly or indirectly suggest that it is to be applied in a retroactive manner to incidents predating the revision. The parties have submitted no authority suggesting that DOCCS intended the revision to apply retroactively to conduct occurring years earlier.

Since the record does not reflect any intention that the revision of Directive 4040 be applied retroactively, I find that it does not apply to incidents predating the date of the revision. With respect to the post-revision "credit card check" incident of May 16, 2014, the plaintiff's letters dated May 19, 2014 and May 20, 2014 (Complaint [1], Exhibits P and Q) relating to this incident do not name or discuss the conduct of defendants Annucci, Fonda, Bradt or Hughes. Thus, even if the procedure set forth in Directive 4040, as revised, applied to claims

Case 9:19-cv-00689-AMN-TWD  Document 72  Filed 05/12/21  Page 59 of 110

Henderson v. Annucci, Not Reported in Fed. Supp. (2016)

against supervisory officials, it was not utilized by plaintiff to complain of conduct by these defendants.

Because plaintiff has failed to exhaust his administrative remedies with respect to defendants Annucci, Fonda, Bradt and Hughes, the claims against these defendants should be dismissed with prejudice.

## F. Motion to Amend Complaint

Plaintiff moves to amend his complaint, principally to modify the assertion in his original complaint that he did not exhaust his administrative remedies. Plaintiff's Motion to Amend [31], p. 3. He states that because he had been transferred between facilities and or prison cells several times since the underlying incidents, he misplaced or lost various legal documents. Id. at p. 4. Further, he asserts that because he was reprocessed at one point and provided with a new inmate number, some of the documentation related to these claims was filed under a previous inmate number. Id. Thus, plaintiff seeks to amend the complaint to assert that he has administratively exhausted the grievance process with respect to the October 22, 2013 incident and his claim against Hoinski. Id. at pp. 3-4. Attached as exhibits to plaintiff's motion are documents supporting plaintiff's utilization of the inmate grievance process with respect to the October 22, 2013 incident. Id., Exhibits A-D.

**\*8** Plaintiff's proposed amended complaint is substantively identical to his original complaint except that he has modified his allegations regarding the exhaustion of administrative remedies and has removed some of the allegations and claims previously dismissed by Judge Arcara. [12]

Rule 15(a) provides that leave to amend should be "freely given when justice so requires". New York State National Organization for Women v. Cuomo, 182 F.R.D. 30, 36 (S.D.N.Y. 1998); see also Forbes & Wallace, Inc. v. Chase Manhattan Bank, 79 F.R.D. 563, 565 (S.D.N.Y. 1978). It has long been "well-established that 'outright dismissal for reasons not going to the merits is viewed with disfavor in the federal courts.' " Harrison v. Enventure Capital Group, Inc., 666 F. Supp. 473, 479 (W.D.N.Y. 1987). For this reason, "dismissals for insufficient pleadings are ordinarily with leave to replead". Stern v. General Electric Co., 924 F.2d 472, 477 (2d Cir. 1991). Leave to amend a pleading need not be granted, however, if it would be futile to do so. See O'Hara v. Weeks Marine, Inc., 294 F.3d 55, 69 (2d Cir. 2002).

Defendants oppose the motion to amend on several grounds. Defendants' Opposition to Motion to Amend [34]. First, defendants argue that plaintiff's motion should be denied because he failed to attach a proposed amended complaint to the motion papers. Defendant's Opposition to Motion to Amend [34] p., 2. "A movant's failure to submit a proposed amended complaint constitutes sufficient grounds to deny a motion to amend". Murray v. New York, 604 F.Supp.2d 581, 588 (W.D.N.Y. 2009) (citing LaBarbara v. Ferran Enterprises Inc., 2009 WL 367611, *3 (E.D.N.Y. 2009) ("In order to meet the requirements of particularity in a motion to amend, a complete copy of the proposed amended complaint must accompany the motion so that both the court and the opposing party can understand the exact changes sought.")). Where, however, "the movant's papers adequately explain the basis for, and nature of, the proposed amendment, ... the failure to attach a proposed amended complaint to the motion is not necessarily fatal". Murray, 604 F.Supp.2d at 588.

The determination whether to deny a motion to amend based upon such a failure the subject to the discretion of the court. Id. Here, plaintiff's motion papers sufficiently articulated the basis for his motion to amend such that the defendants were able to respond to the substance of the proposed changes. Moreover, plaintiff attached a proposed amended complaint to his Memorandum of Law in reply to defendant's opposition. See Proposed Amended Complaint attached to Plaintiff's Reply in Support of Motion to Amend [37-1]. Under these circumstances, plaintiff's failure to attach a proposed amended complaint to his initial motion papers is not fatal to the motion.

**\*9** Defendants also argue that plaintiff's motion to amend the complaint should be denied based upon "futility, bad-faith, undue delay or undue prejudice to the opposing party". Defendants' Opposition to Motion to Amend [34], p. 3. [13] Defendants state that they made the motion to dismiss based upon plaintiff's affirmative statements in the complaint that he had not exhausted the inmate grievance process with respect to his claims. Defendants claim that they would not have filed a motion to dismiss "[h]ad plaintiff not made these affirmative statements in his complaint" and that allowing plaintiff to amend the complaint would prejudice the defendants because they would be required to bring another motion to dismiss. Id. Defendants allege that the "striking reversal" as to exhaustion by the plaintiff "suggests the possibility of bad-faith". Id.

The prejudice alleged by the defendants is insufficient to warrant denial of plaintiff's motion to amend the complaint. Initially, it should be noted that defendants had access to plaintiff's inmate grievance records, and could have checked those records prior to filing any motions regarding exhaustion in this case. The plaintiff has asserted that he had lost or misplaced much of the documentation relating to his claims due to a series of transfers between correctional facilities or jail cells. Defendants have not rebutted this contention, which plaintiff offers as his explanation as to why his original complaint contained an "erroneous statement" regarding exhaustion. Plaintiff's Motion to Amend [31], p. 3-4. Defendants have not articulated a sufficient basis to conclude that the plaintiff's allegations in the original complaint were made in bad faith. Finally, defendants' claim of prejudice is undermined by the fact that this motion to dismiss will result in my recommendation that several of plaintiff's claims be dismissed.

Defendants also argue that plaintiff's motion to amend should not be granted because plaintiff has not alleged that he has received a final decision from the Central Office Review Committee ("CORC") with respect to his grievance relating to the October 22, 2013 incident. Defendants Opposition to Motion to Amend [34], p. 4-5. This argument is also unpersuasive. Plaintiff has submitted documentation from the Director of the Inmate Grievance Program, dated January 24, 2014, stating that his grievance was still pending before CORC. Plaintiff's Motion to Amend [31], Exhibit D. This correspondence was in response to plaintiff's January 20, 2014 letter noting that his grievance had already been pending before CORC for more than 60 days without a decision. Id., Exhibit C.

It appears by this documentation, the validity of which has not been challenged by the defendant, that plaintiff has been waiting for more than *two years* for a decision from CORC with respect to this grievance. Defendants cannot rely upon CORC's refusal to render a decision with respect to plaintiff's grievance for two years as support for an argument that plaintiff has failed to exhaust his administrative remedy because he has not been provided with a final decision. As discussed in Rossi v. Fishcer, 2015 WL 769551, *4-5 (S.D.N.Y. 2015):

> "A number of federal circuit courts have held that a failure to respond to a grievance within the time limit prescribed by the prison grievance process renders an administrative remedy unavailable for purposes of exhaustion.... While the Second Circuit has not directly addressed this issue,

it has treated [cases holding that such a failure renders the administrative remedy unavailable] favorably. *See* [ Hemphill v. New York],380 F.3d 680, 686 n. 6 (2004) (noting that when an inmate does not receive a response to a grievance there may be a question as to whether administrative remedies were available); Giano v. Goord, 380 F.3d 670, 677 (2d Cir. 2004) (citing favorably to [ Underwood v. Wilson, 151 F.3d 292, 295 (5th Cir. 1998)] and [ Foulk v. Carrier, 262 F.3d 687, 698 (8th Cir. 2001] with regard to availability of administrative remedies)). The Second Circuit in [ Abney v. McGinnis, 380 F.3d 663, 668 (2d Cir. 2004)] cited to Hemphill for the proposition that 'exhaustion may be achieved in situations where prison officials fail to timely advance the inmate's grievance'. 380 F.3d at 667."

**\*10** *See also* Peoples v. Fischer, 2012 WL 1575302, *6 (S.D.N.Y. 2012) *on reconsideration in part,* 898 F.Supp.2d 618 (S.D.N.Y. 2012) ("When a prisoner complies with all of the administrative requirements and makes a good-faith effort to exhaust, he should not be denied the opportunity to pursue his grievance in federal court simply because the final administrative decision maker has neglected to issue a final administrative determination"); Dimick v. Baruffo, 2003 WL 660826, *4 (S.D.N.Y. 2003) (holding that plaintiff's claims were properly exhausted where CORC rendered an untimely decision and plaintiff filed his complaint almost two months after CORC had been required to respond pursuant to the prison grievance procedures). [14]

Since plaintiff has been awaiting a decision from CORC for more than two years with respect to his grievance relating to the October 22, 2013 incident, such an administrative remedy is no longer available to him for purposes of exhaustion under the PLRA. Plaintiff's motion to amend the complaint is granted to the extent plaintiff seeks to assert allegations that he exhausted his administrative remedies with respect to the October 22, 2013 incident involving defendant Hoinski. Plaintiff's motion to amend is denied to the extent the amended complaint seeks to reassert claims against Dale Artus (or any other defendants) which were previously dismissed by Judge Arcara.

In light of the age of this case, and to expedite further proceedings in this matter, I direct that the Clerk of the Court separately file the Proposed Amended Complaint [37-1]

Case 9:19-cv-00689-AMN-TWD    Document 72    Filed 05/12/21    Page 61 of 110

Henderson v. Annucci, Not Reported in Fed. Supp. (2016)

as the Amended Complaint in this matter. The Amended Complaint does not add any new claims or parties. All of the defendants in this case are represented by counsel. By virtue of its attachment to the plaintiff's motion papers, and by the filing directed above, the defendants will have received a copy of the Amended Complaint. The defendants shall answer, or otherwise respond, to the Amended Complaint within 30 days of the date it is filed by the Clerk of the Court as directed above.

### G. Motion for Appointment of Counsel

**\*11**  Plaintiff also moves for the appointment of counsel [32]. There is no constitutional right to appointed counsel in civil cases. However, under 📄 28 U.S.C. § 1915(e), the Court may appoint counsel to assist indigent litigants. *See* Sears, Roebuck & Co. v. Charles W. Sears Real Estate, Inc., 865 F.2d 22, 23 (2d Cir. 1988). Assignment of counsel in this matter is clearly within the judge's discretion. 📄 In re Martin-Trigona, 737 F.2d 1254 (2d Cir. 1984).

The factors to be considered in deciding whether or not to assign counsel include the following: (1) whether the indigent's claims seem likely to be of substance; (2) whether the indigent is able to investigate the crucial facts concerning his claim; (3) whether conflicting evidence implicating the need for cross-examination will be the major proof presented to the fact finder; (4) whether the legal issues involved are complex; and (5) whether there are any special reasons why appointment of counsel would be more likely to lead to a just determination. 📄 Hendricks v. Coughlin, 114 F.3d 390, 392 (2d Cir. 1997).

In considering a motion for the appointment of counsel, the court may also consider the merits of the plaintiff's claim. The Second Circuit has held that "every assignment of a volunteer lawyer to an undeserving client deprives society of a volunteer lawyer available for a deserving cause." Cooper v. A. Sargenti Co., Inc., 877 F.2d 170, 172 (2d Cir. 1989). Therefore, the court must first look to the "likelihood of merit" of the underlying dispute, Cooper, 877 F.2d at 174, and "even though a claim may not be characterized as frivolous, counsel should not be appointed in a case where the merits of the ... claim are thin and his chances of prevailing are therefore poor." 📄 Carmona v. United States Bureau of Prisons, 243 F.3d 629, 632 (2d Cir. 2001) (denying counsel on appeal where petitioner's appeal was not frivolous but nevertheless appeared to have little merit). See also Smolen v. Corcoran,

2013 WL 4054596 (W.D.N.Y.,2013) (In deciding whether to grant a request to appoint pro bono counsel, district courts should evaluate several factors, including the merits of the claim, the factual issues and complexity of the case, plaintiff's ability to present the case, and the plaintiff's inability to obtain counsel.).

I have reviewed the facts presented herein in light of the factors required by law as discussed above. At this time, it does not appear the legal issues presented are unduly complex. Plaintiff's filings in this case reflect that he understands the issues presented and can adequately articulate his factual and legal arguments. Plaintiff's motion for appointment of counsel is denied at this time without prejudice, subject to renewal at a later date. It is plaintiff's responsibility to retain an attorney or press forward with this lawsuit *pro se*. 28 U.S.C. § 1654.

### CONCLUSION

For these reasons, I recommend that defendant's motion to dismiss [22] be granted in part and denied in part as follows: the motion should be granted as to plaintiff's claim against defendant Dunford relating to the September 10, 2013 incident, and plaintiff's supervisory claims against defendants Annucci, Fonda, Bradt and Hughes, but denied as to plaintiff's claims against defendants Nabb and Hoinski. Also, plaintiff's motion [31] to amend the complaint is granted in part and denied in part such that plaintiff may amend the complaint to assert that he has exhausted administrative remedies with respect to the October 22, 2013 incident involving defendant Hoinski, but may not reassert previously dismissed claims and is otherwise denied. Plaintiff's motion for appointment of counsel [32] is denied.

**\*12**  Unless otherwise ordered by Judge Arcara, any objections to this Report and Recommendation must be filed with the clerk of this court by March 31, 2016 (applying the time frames set forth in Rules 6(a)(1)(C), 6(d), and 72(b) (2)). Any requests for extension of this deadline must be made to Judge Arcara. A party who "fails to object timely ... waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); 📄 Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider de novo arguments, case law and/or evidentiary material which could have been, but were not, presented to the

Henderson v. Annucci, Not Reported in Fed. Supp. (2016)

Case 9:19-cv-00689-AMN-TWD   Document 72   Filed 05/12/21   Page 62 of 110

magistrate judge in the first instance. 📖 Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection ... supported by legal authority", and must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objections.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 3039687

---

## Footnotes

1    Bracketed references are to the CM/ECF docket entries.

2    The allegations in the plaintiff's original complaint attribute this conduct to "John Doe Number 1". Id. at 13. John Doe Number 1 was later identified as Officer Hoinski. *See* Decision & Order of Hon. Elizabeth A. Wolford dated December 29, 2014 [11].

3    Plaintiff's original complaint asserted various other claims against numerous defendants which did not survive the initial screening in this case. Plaintiff's claims that defendants failed to comply with the requirements of the Prison Rape Elimination Act of 2003 ("PREA") were dismissed because PREA does not create a private right of action. Decision and Order of Hon. Richard J. Arcara filed November 17, 2014 ("November 17, 2014 Decision & Order") [7], p. 7. Also, plaintiff's claims based upon a failure to investigate, failure to intercede, harassment, retaliation, and failure to provide medical treatment against defendants Superintendent Dale Artus, Capt. Brown Lieut.Kaczmarek, Sgt.Olles, Sgt. Brown, Sgt.Diehl, Officer Higgins, Officer Andrews, Officer Sippel, and Nurse Kekich were all dismissed. Id. at pp. 11-19.

4    The plaintiff in Omaro was an Attica inmate Derrick R. Omaro, 92A0608. Omaro, 68 F. Supp. 3d. at 359. Henderson, identifies inmate Omaro as one of his witnesses in this case. Complaint [1], p. 19.

5    Plaintiff argues that because claims of sexual abuse are sensitive and should be dealt with confidentially, he should be excused from the exhaustion requirement. Plaintiff's Memorandum of Law [27], pp. 4-6. He provides no authority in support of this proposition. While the interests of confidentiality may have motivated the revision of Directive 4040, as discussed in Omaro, prior to the May 15, 2014 revision the plaintiff was required to utilize the inmate grievance process. Omaro, 68 F. Supp. 3d. at p. 367.

6    With respect to the plaintiff's pat-frisk claims, Judge Arcara dismissed the claims to the extent that they were asserted under PREA, but allowed them to proceed as asserted under the Fourth and Eighth Amendments. November 17, 2014 Decision & Order [7], p. 7. The defendants are free to file a motion to dismiss or for summary judgment challenging the sufficiency of the plaintiff's allegations with respect to any surviving Fourth and Eighth Amendment claims.

7    Although the revised language in Directive 4040 refers to PREA, assuming notice was provided as set forth in the directive, Directive 4040 states that "an inmate is not required to file a grievance concerning an alleged incident of sexual abuse or sexual harassment to satisfy [the PLRA] exhaustion requirement ... before bringing a lawsuit regarding an allegation of sexual abuse". Plaintiff's Opposition to Motion to Dismiss [27], Exhibit B. Thus, this language applies to sexual assault claims brought by an inmate under the Fourth and Eighth Amendments.

8    It is likely that by the time there was a resolution, either administrative or judicial, as to whether the plaintiff's claims qualify as a "sexual assault" under PREA, an inmate's time to commence the typical grievance process would have passed.

Case 9:19-cv-00689-AMN-TWD   Document 72   Filed 05/12/21   Page 63 of 110

Henderson v. Annucci, Not Reported in Fed. Supp. (2016)

9    The plaintiff argues that the revision of Directive 4040 eliminated the deadline for reporting sexual abuse, and therefore, he can cure the failure to exhaust his claims by reporting the incidents now under the terms of the directive. Plaintiff's Opposition to Motion to Dismiss [27], p.11. As discussed more fully below, plaintiff has presented no authority suggesting that the revisions in Directive 4040 apply retroactively to incidents prior to the effective date. To the contrary, the case law suggests that Directive 4040 is applied as it was in effect at the time of the incident at issue. *See* Smith v. Kelly, 985 F. Supp. 2d 275, 285 (N.D.N.Y. 2013) (referring to the version of Directive 4040 that was in effect at the time in question); Goodson v. Silver, 2012 WL 4449937, *8 (N.D.N.Y. 2012) (court decision based upon the version of DOCCS' Directive 4040 in effect during the time in question).

10   Plaintiff asserts, generally, that his failure to exhaust any of his claims can be cured. Plaintiff's Reply in Support of Motion to Amend [37], p. 9. However, plaintiff's time to file a grievance relating to the September 10, 2013 incident has long passed. Although plaintiff cites to Bridgeforth v. Bartlett, 686 F. Supp.2d 238 (W.D.N.Y. 2010) in support of his right to cure, that case actually supports the dismissal of plaintiff's claim with prejudice. Bridgeforth, 686 F. Supp.2d, at 240 ("Since the time limits for plaintiff to file an administrative appeal have long since passed, administrative remedies are no longer available to him, as a result of his own inaction. This case, then, is precisely the kind of case that the PLRA was intended to foreclose. It is therefore dismissed with prejudice").

11   Judge Arcara cited Colon v. Coughlin, 58 F.3d 865, 873 (2nd Cir. 1995) for the proposition that a prison official who is made aware of a violation but fails to remedy the wrong may be determined to be "personally involved" and subject to § 1983 liability. However, he noted that "[r]eceiving *post hoc* notice does not constitute personal involvement in the unconstitutional activity and cannot be said to have proximately caused the damage suffered by the inmate. Therefore, a supervisor may be liable for her failure to remedy a violation only in those circumstances where the violation is ongoing and the defendant has an opportunity to stop the violation after being informed of it. Similarly, liability may attach when a supervisor fails to act on reports of a staff member's previous assaults on the plaintiff and the plaintiff is assaulted again by that same staff member". November 17, 2014 Decision & Order [7], p.10 *citing* Rahman v. Fisher, 607 F. Supp. 2d 580, 585 (S.D.N.Y. 2009). Given the preliminary stage of the litigation, Judge Arcara allowed these claims to proceed to service. Id. at p. 11. The plaintiff's exhaustion of these claims was not addressed in that decision.

12   Plaintiff's proposed amended complaint is type-written, as opposed to the original hand written complaint. Proposed Amended Complaint [37-1]. Under the heading "Defendant's Information", plaintiff did not include information relating to the previously dismissed defendants with the exception of Dale Artus., Id., p.2. The proposed amended complaint eliminated ¶5 of the original complaint, making the paragraph numbers of the proposed amended complaint one off from those in the original complaint. Paragraph numbers between the two documents re-synchronized at ¶42 after plaintiff split the substance of the original ¶40 into two paragraphs (¶¶40-41) of the proposed amended complaint. Plaintiff's amended complaint identified the "John Doe" defendant as Hoinski (¶¶ 10-14, 20, 24, 29, 30, 35-36). Plaintiff's amended complaint also occasionally included expanded or enhanced allegations without changing the substance of his claims (*see* i.e. ¶ 30).

13   Although defendants mention "futility" in their opposition, they do not assert the insufficiency of the plaintiff's allegations of sexual assault as a basis to deny the proposed amended complaint. Defendants' Opposition to Motion to Amend [34].

14   *But see* Bennett v. Wesley, 2013 WL 1798001, *6 (S.D.N.Y. 2013) ("[T]he Court of Appeals has not adopted the position that a delay in responding to a grievance demonstrates *per se* unavailability.") (*quoting* Mateo v. O'Connor., 2012 WL 1075830, *7 (S.D.N.Y. 2012)); Rivera v. Anna M. Kross Ctr., 2012 WL 383941, *4–5 (S.D.N.Y. 2012) (asserting that the Second Circuit has declined to hold that administrative remedies are deemed unavailable when a plaintiff receives no response from prison authorities within the prescribed time limits.). Also, some courts have questioned whether the equitable exclusions from exhaustion set forth in Hemphill remain viable after the Supreme Court's decision in Woodford. The Second Circuit has declined

Henderson v. Annucci, Not Reported in Fed. Supp. (2016)

Case 9:19-cv-00689-AMN-TWD     Document 72     Filed 05/12/21     Page 64 of 110

to address this question. *See* Amador et al. v. Andrews et al., 655 F.3d 89, 102-03 (2nd Cir. 2011). In Woodford, plaintiff's grievance was administratively rejected because it was filed beyond the 15-day limitations period. The district court granted summary judgement on the grounds that plaintiff failed to exhaust his administrative remedies. The Ninth Circuit reversed finding that plaintiff had exhausted his remedies because no such remedies remained available to him. The Supreme Court vacated that decision, holding that "proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings". Woodford, 548 U.S. at 90-91. Here, unlike Woodford, the failure to achieve complete exhaustion is due to the inaction by the prison grievance officials, not because of any failure on the part of plaintiff. In any event, I do not believe that Woodford stands for the proposition that CORC can frustrate or unduly delay an inmate's ability to bring a federal claim to address an alleged constitutional violation by refusing to issue a final decision for several years so as to preclude exhaustion under the PLRA.

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 4463672
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Joshua SHEFFER, Plaintiff,

v.

Correction Officer FLEURY, et al., Defendants.

9:18-CV-1180 (LEK/DJS)
|
Signed 09/18/2019

**Attorneys and Law Firms**

Joshua Sheffer, Marcy, NY, pro se.

Konstandinos D. Leris, New York State Attorney General, Albany, NY, for Defendants.

## DECISION AND ORDER

Lawrence E. Kahn, U.S. District Judge

## I. INTRODUCTION

 **\*1** Pro se plaintiff Joshua Sheffer brought this action under 42 U.S.C. § 1983 alleging, inter alia, that officials at New York's Upstate Correctional Facility ("Upstate") violated his Eighth Amendment rights when they failed to protect him from a series of sexual assaults by his bunkmate in September 2017. Dkt. No. 1 ("Complaint"). After a sufficiency review by the Court pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A, Plaintiff's failure-to-protect claims proceeded against the following defendants: Correction Officer Travis Bond ("Bond"), Correction Sergeant John Doe ("Doe"),[1] Correction Officer Nicholas Fleury ("Fleury"), New York State Department of Corrections and Community Supervision ("DOCCS") Deputy Commissioner for Administration Daniel Martuscello, III ("Martuscello"), DOCCS Director of Special Housing Units Albert Prack ("Prack"), Offender Rehabilitation Counselor Luann Smith ("Smith"), and DOCCS Policy and Complaint Review Chairperson Frances Sullivan ("Sullivan").[2] Dkt. No. 8 ("November 2018 Decision and Order"). In the same order, the Court dismissed Plaintiff's failure-to-protect claims against DOCCS, Correction Officer Chase, and acting Upstate Superintendent Donald Uhler, and dismissed Plaintiff's sexual harassment claims brought against only two defendants,

Doe and Correction Officer Labarge. Nov. 2018 Decision and Order. Bond, Fleury, Martuscello, Prack, and Smith then moved for summary judgment under Federal Rule of Civil Procedure 56(a), arguing that Plaintiff had failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e. See Defs.' Mem. at 9; Dkt. No. 30 ("Defendants' Reply") at 9–10. In the alternative, Defendants requested an opportunity to depose Plaintiff on the limited issue of exhaustion followed by an evidentiary hearing pursuant to Messa v. Goord, 652 F.3d 305 (2d Cir. 2011), and Martuscello, Prack, and Smith moved to dismiss under Federal Rule of Civil Procedure 12(b)(6) for lack of personal involvement. Defs.' Mem. at 9. Plaintiff does not oppose the motion to dismiss by Prack and Martuscello, but opposes the remainder of the motions. Dkt. No. 31-3 ("Plaintiff's Response") at 10. The Honorable Daniel J. Stewart, United States Magistrate Judge, issued a Report-Recommendation and Order in response to Defendants' motions, Dkt. No. 39 ("Report-Recommendation"), to which Defendants timely objected, Dkt. No. 40 ("Objections"). For the following reasons, the Court approves and adopts the Report-Recommendation in its entirety.

## II. BACKGROUND

 **\*2** The facts and allegations in this case were detailed in the November 2018 Decision and Order and the Report-Recommendation. See Nov. 2018 Decision and Order at 3–6; R. & R. at 2–4. Familiarity is assumed.

### A. Magistrate Judge Stewart's Report-Recommendation

Magistrate Judge Stewart recommended: (1) denying Defendant's Motion for Summary Judgment because Plaintiff had exhausted his administrative remedies under the Prison Rape Elimiation Act ("PREA"), 34 U.S.C. § 30301, et seq., and DOCCS Directive 4040 § 701.3(i), which establishes the exhaustion requirements for inmate complaints of sexual abuse or harassment; (2) denying Smith's Motion to Dismiss because Plaintiff had pled sufficient facts to demonstrate Smith's personal involvement in the alleged Eighth Amendment violation; and (3) granting the Motion to Dismiss by Prack and Martuscello, which Plaintiff did not oppose. R. & R. at 17. Magistrate Judge Stewart did not address Defendants' request to depose Plaintiff nor their request for a Messa hearing. Id.

## B. Defendants' Objections to the Report-Recommendation

With regard to their Motion for Summary Judgment, the Court reads Defendants' Objections to argue that Plaintiff has failed to exhaust his administrative remedies because the exhaustion procedure for incidents of sexual assault found in § 701.3(i) does not apply to Plaintiff's claims. Objs. at 2–5. Specifically, Defendants object that § 701.3(i) does not apply to Plaintiff's failure-to-protect claim because the claim is not "necessarily intertwined" with the underlying sexual assault allegation, as Magistrate Judge Stewart held it was. Id. at 4. Additionally, Defendants take issue with a factual finding by Magistrate Judge Stewart that Plaintiff told Bond on September 25, 2017 that he feared he would be "sexually assaulted" by his bunkmate. Id. at 2 (citing R. &. R. at 3). They argue that Plaintiff failed to produce evidence proving that he told any defendant at any time about his fears of sexual assault. Objs. at 3.

As for the Motion to Dismiss, Smith objects generally that Plaintiff pled insufficient facts to plausibly show that Smith was personally involved in the events underlying this dispute. Id. at 5. More specifically, Smith argues that Plaintiff never alleged that he told her he was afraid of being sexually assaulted by his bunkmate, and she questions Magistrate Judge Stewart's "reliance" on two letters Plaintiff alleges he sent to Smith regarding his fears. Id. at 5–6. Thus, Smith argues, Plaintiff has not plausibly alleged that Smith was personally involved in the alleged failure to protect Plaintiff from his bunkmate.

## III. STANDARD OF REVIEW

### A. Review of Report-Recommendation

Within fourteen days after a party has been served with a copy of a magistrate judge's report-recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b); L.R. 72.1(c). If objections are timely filed, a court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). However, if no objections are made, or if an objection is general, conclusory, perfunctory, or a mere reiteration of an argument made to the magistrate judge, a district court need review that aspect of a report-recommendation only for clear error. Barnes v. Prack, No. 11-CV-857, 2013 WL 1121353, at *1

(N.D.N.Y. Mar. 18, 2013); Farid v. Bouey, 554 F. Supp. 2d 301, 306–07 (N.D.N.Y. 2008), abrogated on other grounds, Widomski v. State Univ. of N.Y. at Orange, 748 F.3d 471 (2d Cir. 2014); see also Machicote v. Ercole, No. 06-CV-13320, 2011 WL 3809920, at *2 (S.D.N.Y. Aug. 25, 2011) ("[E]ven a pro se party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal...."). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." § 636(b).

### B. Legal Standard for Summary Judgment

**\*3** Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with ... affidavits, if any," that there is no genuine issue of material fact. F.D.I.C. v. Giammettei, 34 F.3d 51, 54 (2d Cir. 1994) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial and cannot rest merely on allegations or denials of the facts submitted by the movant. Fed. R. Civ. P. 56(c); see also Scott v. Coughlin, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case.");

Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525–26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... [sworn statements] are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion," and the credibility of such statements is better left to a trier of fact.

Scott, 344 F.3d at 289 (citations omitted).

"[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution."

Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d

1219, 1224 (2d Cir. 1994). When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant.

Nora Beverages, Inc. v. Perrier Group of Am., Inc., 164 F.3d 736, 742 (2d Cir. 1998). Furthermore, where a party is proceeding pro se, the court must "read his supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994); accord Soto v. Walker, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### C. Legal Standard for Motion to Dismiss

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter ... 'to state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. In assessing whether this standard has been met, courts "must accept all allegations in the complaint as true and draw all inferences in the light most favorable to the non-moving party[ ]...." In re NYSE Specialists Sec. Litig., 503 F.3d 89, 95 (2d Cir. 2007) (internal citation omitted). Where, as here, the complaint was filed pro se, it must be construed liberally with "special solicitude" and interpreted "to raise the strongest claims that it suggests." Hill v. Curcione, 657 F.3d 116, 122 (2d Cir. 2011) (internal quotation marks and citation omitted). Nonetheless, a pro se complaint must state a "plausible claim for relief." See Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009).

### IV. ANALYSIS

As an initial matter, and before turning to the balance of the Report-Recommendation, the Court notes that Plaintiff has not opposed the motion to dismiss by Martuscello and Prack. Pl.'s Resp. at 9. The Court finds no clear error in Magistrate Judge Stewart's recommendation that the claims

against Martuscello and Prack be dismissed, R. & R. at 12–13, and adopts the recommendation.

**\*4** Turning to Defendants' Motion for Summary Judgment and Smith's Motion to Dismiss, after reviewing the papers and the Report-Recommendation, the Court finds no clear error in the unobjected-to portions of the Report-Recommendation. And, after reviewing de novo the portions of the Report-Recommendation to which Defendants object, the Court finds no error. Magistrate Judge Stewart employed the proper legal standards, accurately recited the facts alleged, and correctly applied the law to those facts. As a result, the Court accepts and adopts the Report-Recommendation for the reasons stated therein. The Court adds the following discussion.

### A. Denial of Defendants' Motion for Summary Judgment

Defendants moved for summary judgment on the grounds that Plaintiff failed to exhaust his administrative remedies through the DOCCS Inmate Grievance Program ("IGP"), as was required under the PLRA. Defs.' Mem. at 7–11; Defs.' Reply at 4–8. The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion in prisoner cases covered by § 1997e(a) is mandatory, Ross v. Blake, 136 S. Ct. 1850, 1856 (2016), and must be "proper," which means using all steps of the agency's administrative process and complying with "deadlines and other critical procedural rules," Woodford v. Ngo, 548 U.S. 81, 94 (2006).

To satisfy the PLRA's exhaustion requirement, an inmate-plaintiff in DOCCS' custody must typically follow the IGP's three-step process, which involves filing an initial grievance with the IGP clerk at the prison where the inmate is incarcerated and, in the case of an adverse ruling, two subsequent levels of appeals. See DOCCS Directive 4040 § 701.5; N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5; Carleton v. Annucci, No. 17-CV-245, 2018 WL 7917921, at *5–6 (N.D.N.Y. Nov. 21, 2018), report and recommendation adopted, 2019 WL 422530 (N.D.N.Y. Feb. 4, 2019) (describing three-step process in detail). Generally, a plaintiff must properly appeal through all three levels of

review before seeking relief in a federal court under § 1983. See Ruggiero v. Cnty. of Orange, 467 F.3d 170, 176 (2d Cir. 2006).

However, for complaints regarding sexual abuse or harassment, DOCCS has established a different procedure. See DOCCS Directive 4040 § 701.3(i); N.Y. Comp. Codes R. & Regs. tit. 7, § 701.3(i). Revised in 2014 pursuant to the Prison Rape Elimination Act ("PREA"), see Henderson v. Annucci, No. 14-CV-445A, 2016 WL 3039687, at *3 (W.D.N.Y. Mar. 14, 2016), Directive 4040 § 701.3(i) creates a relaxed exhaustion requirement for allegations concerning incidents of sexual assault. Specifically, "an inmate is not required to file a grievance concerning an alleged incident of sexual abuse or sexual harassment to satisfy the [PLRA] exhaustion requirement." Directive 4040 § 701.3(i) (citations omitted). Instead,

> [A]ny allegation concerning an incident of sexual abuse or sexual harassment shall be deemed exhausted if official documentation confirms that: an inmate who alleges being the victim of sexual abuse or sexual harassment reported the incident to facility staff; in writing to Central Office Staff; to any outside agency that the Department has identified as having agreed to receive and immediately forward inmate reports of sexual abuse and sexual harassment to agency officials under the PREA Standards; or to the Department's Office of the Inspector General.

Id. (citations omitted). If an inmate does file a grievance regarding a complaint of sexual abuse or sexual harassment, "[t]he complaint shall be deemed exhausted upon filing." Id. Finally, "[a] sexual abuse or sexual harassment complaint may be submitted at any time." Id.

**\*5** Magistrate Judge Stewart found that Plaintiff had properly exhausted his remedies under the relaxed procedures found in § 701.3(i). The Magistrate Judge held that an "incident" of sexual abuse under § 701.3(i) could include "not only the acts of sexual abuse by an inmate or a

corrections officer, but also other events which are necessarily intertwined with such a claim, such as a physical assault during the course of the abuse; the failure of correctional staff to intervene to stop the rape; or acts or failures to act making a jail official legally accountable for the sexual abuse." R. & R. at 8–9 (citing Abreu v. Miller, 2018 WL 5660409, at *4 (N.D.N.Y. Aug. 16, 2018)), report and recommendation adopted, 2018 WL 4502007 (N.D.N.Y. Sept. 20, 2018), order amended and superseded on reconsideration on other grounds, 2019 WL 761639 (N.D.N.Y. Feb. 21, 2019) (finding that allegations that an inmate was a victim of a "non-sexual physical assault" could be subject to § 701.3(i)'s relaxed exhaustion requirement where, at the summary judgment stage, it was not clear "that the physical assault was discrete from the sexual assault"). Because Plaintiff grieved that DOCCS employees failed to protect him from sexual abuse by his bunkmate, Magistrate Judge Stewart held that Plaintiff's failure-to-protect claim was necessarily intertwined with the underlying sexual assault and, thus, subject to § 701.3(i)'s relaxed exhaustion requirement. R. & R. at 8–9. And because "[t]here appears to be no question that Plaintiff alleged to prison officials that he was the victim of a sexual assault ... [Plaintiff's] report was [thus] documented as required" and "was sufficient to exhaust his administrative remedies." R. & R. at 8 (citing Medina v. Kaplan, 2018 WL 797330, at *5 (S.D.N.Y. Feb. 8, 2018)). On this basis, the Magistrate Judge recommended denying Defendants' Motion for Summary Judgment. R. & R. at 9.

Defendants appear to raise two objections to this recommendation. First, they dispute Magistrate Judge Stewart's determination that Plaintiff's failure-to-protect allegations against Defendants are necessarily intertwined with the sexual assault committed by Plaintiff's bunkmate. Second, they object to the Magistrate Judge's factual finding that Plaintiff informed DOCCS employees that he was in fear of sexual assault.[3] The Court addresses these objections in turn.

*1. Plaintiff's Failure-to-Protect Claim Is Necessarily Intertwined with His Claim that His Bunkmate Sexually Assaulted Him*

The crux of Defendants' objection is that "plaintiff['s] alleg[ations] that defendants failed to protect him from being sexually assaulted by another inmate" are "not necessarily intertwined with the alleged sexual assault or harassment

committed by Plaintiff's bunkmate." Objs. at 4. The Court disagrees. [4]

**\*6** As an initial matter, Defendants did not object to Magistrate Judge Stewart's interpretation that claims "necessarily intertwined" with an underlying sexually abusive act fall under § 701.3(i)'s relaxed exhaustion requirements. Objs. at 4 ("[D]efendants assume, for the purposes of this motion, that allegations that are 'necessarily intertwined' with sexual assault or sexual harassment are encompassed within [the § 701.3(i)] exception of the exhaustion requirement."). As such, the Court reviews this determination only for clear error, and it finds none. [5]

Turning to Defendants' objection, to the extent the objection is a general one—that a "failure-to-protect" claim can never be necessarily intertwined with an underlying sexual assault—such an interpretation does not comport with the language of § 701.3(i). When explaining which allegations are subject to § 701.3(i)'s special exhaustion requirements, the section cites to Directive 4027A, "Sexual Abuse *Prevention* & Intervention – Inmate-on-Inmate" and Directive 4028A, "Sexual Abuse *Prevention* & Intervention – Staff-on-Inmate." Directive 4040 § 701.3(i) (emphasis added). In turn, Directive 4027A "provides information concerning ... the prevention of ... allegations of inmate-on-inmate sexual abuse ..." and states that, "[all] allegations of sexual abuse, sexual harassment, or retaliation against ... an inmate ... will be thoroughly investigated." Directive 4027A. This suggests that § 701.3(i) was intended to cover allegations that DOCCS employees failed to prevent inmate-on-inmate sexual abuse, exactly the issue raised in this case. Moreover, the Court agrees with Magistrate Judge Stewart that reading § 701.3(i) to encompass failure-to-protect claims "is not only consistent with its language, but also comports with its purpose in attempting to prevent [sexual assault]." R. & R. at 9.

Defendants also object specifically that Plaintiff's "allegations against the defendants in this case are not necessarily intertwined" with the underlying sexual assault. Objs. at 4. In making this objection, Defendants rely on a letter Plaintiff received from the IGP supervisor at Upstate, "advising [Plaintiff] that the PREA portions of his complaint were deemed exhausted and the additional allegations of harassment, retaliation, and threats by staff" were under investigation. Id. (citing Dkt. No. 29-1 (the "IGP Letter") at 6). Defendants claim that there "is no ambiguity" that the "PREA portions" of Plaintiff's complaint referenced in the letter included only "his complaint that he was

assaulted by his cellmate on three occasions." Objs. at 4. Defendants thereby suggest that Plaintiff's failure-to-protect claim falls within the "additional allegations of harassment, retaliation, and threats by staff" referenced in the IGP Letter and imply that such treatment by the IGP supervisor is dispositive. Id. ("[T]he portions of [Plaintiff's] grievance subject to the PLRA's exhaustion requirements – his complaints of harassment and threats against the defendants – were forwarded to the Superintendent [in accordance with DOCCS' standard appeals procedure] ... thus, it is respectfully submitted that plaintiff was required to utilize the three-step grievance procedure with respect to his claims of harassment and threats against defendants.").

**\*7** Assuming, *arguendo*, DOCCS' treatment of an inmate grievance were binding upon this Court, this argument fails on its own terms. The portions of the record Defendants cite to support their claim that there is "no ambiguity about which part [of Plaintiff's] grievance was deemed exhausted" are far from unambiguous. See IGP Letter (stating without further explanation that "your PREA allegations will be deemed exhausted upon filing...."); see generally Oct. 1 Grievance (describing in detail Plaintiff's experience at Upstate and listing grounds for complaint, including, inter alia, that correction officers tampered with Plaintiff's clothes, failed to provide him with a mattress and necessary toiletries when he first arrived at Upstate, prevented him from accessing his "legal work," "religious articles," and the law library, and that Correction Officer Chase threatened to "make [Plaintiff's] breakfast tray special and Defendant Fleury threatened to lodge Plaintiff with the "perfect bunkie"). [6] Given the litany of allegations contained in Plaintiff's grievance, Magistrate Judge Stewart correctly noted that Plaintiff could "reasonably interpret" the "PREA allegations" referenced in the IGP Letter to encompass his failure-to-protect claim, and the "additional allegations of harassment, retaliation, and threats" to refer to his claims about the correction officers tampering with his food, clothes, and possessions. See R. & R. at 9. The IGP Letter was ambiguous enough that "it would be justifiable for [Plaintiff] to rely" on the IGP Letter's statement "that his PREA allegations had been deemed exhausted." Id.

For these reasons, the Court agrees with Magistrate Judge Stewart's holding that Plaintiff's failure-to-protect claim is necessarily intertwined with his underlying allegation of sexual assault by his bunkmate, that § 701.3(i) therefore encompasses Plaintiff's failure-to-protect claim, and that Plaintiff successfully exhausted this claim pursuant to the §

701.3(i) procedure when he filed a grievance with DOCCS officials.

### 2. The Factual Finding that Plaintiff Told Bond About His Fear of "Sexual Assault"

In describing the facts of this case, Magistrate Judge Stewart wrote that "Plaintiff informed Bond that he feared he would be sexually assaulted." R. & R. at 3. Defendants object to this statement, arguing that "there is nothing in the record to suggest that plaintiff complained to any ... defendant[ ] at any time that he was in fear of being sexually abused." Objs. at 2. In doing so, Defendants urge the Court to read Plaintiff's Complaint narrowly. The Court declines.

As an initial matter, while Defendants' objection on this point is certainly relevant to the merits of Plaintiff's failure-to-protect claim,[7] it is less obviously relevant to the question of exhaustion. Under § 701.3(i)'s relaxed exhaustion procedure, which the Court has already determined governs Plaintiff's claim, filing an official grievance ex post regarding a failure-to-protect from sexual assault is sufficient to exhaust administrative remedies. See 701.3(i) ("Any inmate grievance filed regarding a complaint of sexual abuse or sexual harassment shall ... be deemed exhausted upon filing for PLRA purposes."). Here, there is no dispute that Plaintiff filed such a grievance, explicitly naming Fleury and Smith. Defs.' Mem. at 5 ("[P]laintiff filed a grievance with the Upstate grievance office against defendants C.O. Fleury and Smith relating to his failure to protect claims."); Dkt. No. 24-2 ("Declaration of Donna Wilcox in Support of Defendant's Motion for Summary Judgment") ¶ 14 (same). And while the grievance does not name Bond, see Oct. 1 Grievance at 2 ("On September 25, 2017 ... I told the C.O. that walked by that I can't live [with my bunkmate]...."); cf. Compl ¶ 26 ("On or about September 25, 2017 ... Plaintiff told defendant Bond ... that he cannot live in this cell...."), it was not required to, see Shepherd v. Lempke, No. 10-CV-1524, 2016 WL 8732639, at *6 (N.D.N.Y. Oct. 28, 2016), report and recommendation adopted in part, rejected in part, 2017 WL 1187859 (N.D.N.Y. Mar. 30, 2017) ("[I]nmate-plaintiffs need not identify each and every defendant implicated in a civil rights lawsuit in grievances that predate the lawsuit.") (citing Jones v. Bock, 549 U.S. 199, 217 (2007)). Therefore, by filing this grievance, Plaintiff properly exhausted his remedies under § 701.3(i). Since Defendants have moved for summary judgment solely on the basis of a failure to exhaust

remedies, Defs.' Mem. at 3; Defs.' Reply at 1, other issues not germane to exhaustion are not before the Court at this time.

**\*8** Yet, entertaining this objection, the Court sees no error in the recitation of the facts found in the Report-Recommendation. Magistrate Judge Stewart found, and the record demonstrates, that Plaintiff attempted to express his fears to DOCCS employees on at least four occasions. See R. & R. at 2–3. On September 18, 2017, Plaintiff told Smith "I fear for my safety and ... I am being harassed by the staff." Oct. 1 Grievance at 1–2; see also Dkt. No. 31-1 at 2–4 ("Amended Grievance") ("[I] told [Defendant Smith] that I fear for my life and safety."). Later that day, Plaintiff mailed letters to Martuscello, Prack, Smith, and Sullivan expressing the same concerns. Compl. ¶ 25. Then, on September 25, 2017, after Plaintiff received his new bunkmate, he told Bond that he "can't live" with his new bunkmate, Oct. 1 Grievance at 2; Am. Grievance at 3, and that he feared being "assaulted." Compl. ¶ 26. That same day, Plaintiff was sexually assaulted by his bunkmate, Compl. ¶ 27; Oct. 1 Grievance at 1–2; Am. Grievance at 3, after which he placed letters to Martuscello, Prack, and Smith in the feed up slot to his cell door informing them of the assault. Compl. ¶ 28.

Defendants bear the burden of proving a failure to exhaust. See Grant v. Kopp, No. 17-CV-1224, 2019 WL 368378, at *4 (N.D.N.Y. Jan. 3, 2019), report and recommendation adopted, 2019 WL 367302 (N.D.N.Y. Jan. 30, 2019) ("[T]he failure to exhaust administrative remedies is an affirmative defense and ... the party asserting failure to exhaust ... typically bears the ultimate burden of proving its essential elements.")

(citing Jones, 549 U.S. at 216). However, they have submitted no evidence contradicting Plaintiff's allegations. See generally Defs.' Mem.; Defs.' Reply. Instead, they point out that nowhere in his grievance letters or in his Complaint does Plaintiff use the precise words "sexual assault" when he describes his communications with the guards at Upstate, or with any other DOCCS official. Objs. at 2–3. Thus, Defendants argue, "plaintiff did not complain to Bond that he was in fear of being sexually assaulted rather than merely assaulted," nor did he "advise[ ] any defendant that he was in fear of being sexually assaulted by his bunkmate." Objs. at 3. The Court declines to read Plaintiff's evidence so narrowly.

While the Court acknowledges that Plaintiff's pleadings and the available record evidence do not conclusively indicate that Plaintiff voiced an explicit fear of *sexual* assault to any defendant, at this stage of the litigation, it is reasonable to infer that Plaintiff did. Defendants do not dispute that

Plaintiff told Bond he feared being "assaulted" by his bunkmate. Objs. at 3; see also Compl. ¶ 26. Additionally, the record indicates that, throughout this period, Plaintiff was concerned about his risk of sexual abuse and harassment because of "several of [Plaintiff's] personal characteristics," Defs.' Mem. at 4 (citing Compl. ¶¶ 34, 36), including his sexual orientation and his previous sexual victimization, Oct. 1 Grievance at 2; Am. Grievance at 2–3. It also appears that Plaintiff was concerned about sexual violence when he reported to Smith on September 18, 2017 how Doe had misrepresented Plaintiff's history of sexual victimization on Plaintiff's 3278RC form, which is used to determine if an inmate is susceptible to being sexually abused while in prison. Compl. ¶ 24; Oct. 1 Grievance at 1–2.

Given these contextual factors, and in light of the liberal reading afforded to a pro se litigant's papers, Burgos, 14 F.3d at 790, the Court finds it reasonable to infer that when Plaintiff told Bond he feared "assault" and Smith he feared for his safety, these conversations encompassed Plaintiff's fear of sexual assault. See also Hailey v. N.Y. City Transit Auth., 136 F. App'x. 406, 407–08 (2d Cir. 2005) ("The rule favoring liberal construction of pro se submissions is especially applicable to civil rights claims."). The legal definition of "assault" is capacious, see Assault, Black's Law Dictionary (11th ed. 2019) (listing definitions and noting that "assault" is popularly defined as "any attack"), and encompasses Plaintiff's sexual assault by his bunkmate. It would be unreasonable to expect a non-lawyer, pro se litigant to appreciate the legal niceties that distinguish the different forms of assault. For these reasons, and "[r]esolv[ing] all ambiguities and draw[ing] all reasonable inferences in favor of the non-movant," as the Court must do on a motion for summary judgment, Berhanu v. New York State Ins. Fund., 13 F. App'x 30, 31 (2d Cir. 2001), it is reasonable to infer that Plaintiff related his fear of sexual assault to DOCCS employees. Therefore, the Court adopts Magistrate Judge Stewart's factual findings in their entirety.

### B. Denial of Smith's Motion to Dismiss

**\*9** In recommending that the Court deny Smith's motion to dismiss, Magistrate Judge Stewart concluded that Plaintiff had pled sufficient facts to plausibly show that Smith was "personally involved" in the failure to protect Plaintiff from sexual assault by his bunkmate. R. & R. at 15–16. Smith objects to this conclusion.

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006) (quoting Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)). An official may implicate her or himself in "constitutional wrongdoing if [she or] he ... 'exhibited deliberate indifference ... by failing to act on information indicating that unconstitutional acts were occurring' or would occur." Tubbs v. Venettozzi, No. 19-CV-126, 2019 WL 2610942, at *3 (N.D.N.Y. June 26, 2019) (Kahn, J.) (quoting Vincent v. Yelich, 718 F.3d 157, 173 (2d Cir. 2013)); see also Salahuddin v. Goord, 467 F.3d 263, 280 (2d Cir. 2006) (deliberate indifference "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result."). Moreover, the § 1983 plaintiff must show a "tangible connection" between the acts of the defendant and the plaintiff's injuries. Bass v. Jackson, 790 F.2d 260, 263 (2d Cir. 1986). By contrast, a mere "linkage" to the unlawful conduct through "the prison chain of command" is insufficient to show a defendant official's personal involvement in that unlawful conduct. Richardson v. Goord, 347 F.3d 431, 435 (2d Cir. 2003).

Smith argues that Plaintiff never alleged that he told her he was afraid of being sexually assaulted by his bunkmate, either in their September 18, 2017 conversation or in the letter Plaintiff sent to Smith later that day. Smith appears to suggest that if she did not know Plaintiff was at risk or in fear of sexual assault, she could not be personally involved in failing to protect him. See Green, 2009 WL 3064749, at *6 (quotations omitted) ("In the failure-to-protect context, a prison official ... has sufficient culpable intent if [s]he has knowledge that an inmate faces a risk of serious harm and [s]he disregards that risk by failing to take reasonable measures to abate the harm."). Yet as described above, and in light of the liberal pleading requirements due pro se litigants, see Hill, 657 F.3d at 122, Plaintiff has pled sufficient facts to support the reasonable inference that when he told—and wrote to—Smith that he was in "fear[ ] for his life and safety, because of the threats made by defendant[ ] Fleury," Compl. ¶ 24, that fear encompassed sexual assault.

Further, Smith argues that Plaintiff has alleged no facts indicating that she failed to respond to a second letter Plaintiff allegedly sent her the day he was sexually assaulted by his

bunkmate. Objs. at 5. She points out that the day after Plaintiff wrote this letter, he was placed in a new cell without a bunkmate. Id. at 5–6 (citing Compl. ¶ 30). Though Smith does not spell out the implication of this point, the Court reads it to suggest that she might have stepped in to protect Plaintiff from his bunkmate and that, therefore, Magistrate Judge Stewart's "reliance" on the letter was misplaced. Objs. at 5–6. However, the Court does not read the Report-Recommendation as relying unduly on this or any other letter. Instead, Magistrate Judge Stewart considered the letters in conjunction with the conversation Plaintiff had with Smith on September 18 and gave the letters their appropriate weight. R. & R. at 13–16. And while it is possible the Complaint could be read to suggest that, after receiving the second letter, Smith stepped in to arrange Plaintiff's transfer to a new bunk, such a reading would be inappropriate on a motion to dismiss. See NYSE Specialists Sec. Litig., 503 F.3d at 95 (on a motion to dismiss, the Court must "draw all inferences in the light most favorable to the non-moving party...."). Nor would it address the earlier letter or conversation, which alone are adequate to support Magistrate Judge Stewart's recommendation. See, e.g., Ferrer v. Fischer, No. 13-CV-31, 2014 WL 1763383, at *3 (N.D.N.Y. May 1, 2014) (plaintiff's allegations that he sent multiple letters to a named defendant, the defendant was "fully aware" of his situation, and the defendant failed to respond to the letters or take appropriate action was sufficient to defeat defendant's motion to dismiss); Whitley v. Ort, 2018 WL 4684144, at *7 (S.D.N.Y. Sept. 28, 2018) (nurse allegedly failed to provide plaintiff with medical treatment and take action under the PREA after plaintiff told nurse in person he had been sexually assaulted).

**\*10**  Smith relies on Price v. Oropallo, No. 13-CV-563, 2014 WL 4146276 (N.D.N.Y. Aug. 19, 2014) to argue that, where an inmate-plaintiff sends a letter to prison officials regarding the inmate's fear of a bunkmate, and where the officials had no "knowledge of, or personal involvement in" placing the bunkmates together, nor were the officials "aware of" the bunkmate's dangerousness, the plaintiff's case cannot survive summary judgment. See Defs.' Mem. at 12 (citing Price at *9-10). However, Price is distinguishable.

Price was decided on summary judgment rather than, as here, a motion to dismiss, a distinction that matters because "personal involvement is a question of fact." See Grullon v. City of New Haven, 720 F.3d 133, 140 (2d Cir. 2013). In Grullon, the Second Circuit reversed the district court's dismissal of an inmate's § 1983 claim because an earlier

case "invoked by the district court" in granting the defendant prison warden's motion to dismiss, Sealey v. Giltner, 116 F.3d 47 (2d Cir. 1997), "did not involve a dismissal pursuant to Rule 12(b)(6) for failure to state a claim," but instead "was dismissed on summary judgment." Id. The Second Circuit had affirmed Sealey on summary judgment because "the record ... showed that [the Sealey defendant] had in fact taken steps to have the prisoner's grievance resolved." Id. By contrast, since there was no equivalent factual record in Grullon itself, and thus no evidence as to whether the Grullon defendant had responded to the inmate's complaints, the Second Circuit reversed the district court's finding of no personal involvement. Id. Here, there is likewise no evidence as to what action Smith may or may not have taken in response to Plaintiff's communications with her.

Further, solely at issue in Price was the defendant prison officials' failure to protect the plaintiff from a physical assault by his cellmate. But, in this case, Plaintiff also alleges that Smith failed to protect him from retaliatory action by other correction officers, which took the form of putting Plaintiff in harm's way for sexual assault. See Compl. ¶ 24 ("Plaintiff told defendant, [sic] Smith that he fears for his life and safety, because of the threats made by defendant[ ] Fleury...."); see also Hayes v. Dahkle, 2018 WL 7356343, at *18–19 (N.D.N.Y. Dec. 11, 2018), report and recommendation adopted, 2019 WL 689234 (N.D.N.Y. Feb. 19, 2019) (finding personal involvement at the motion to dismiss stage where plaintiff expressed his fear regarding a certain correction officer to defendant prison official). Under these circumstances, Price is inapposite.

Smith's remaining objections largely restate points raised in Defendants' Motion for Summary Judgment and Reply. Compare Objs. at 5–6 ("Plaintiff did not allege that defendant Smith: (1) knew plaintiff was going to be placed with a bunkmate that would sexually assault him; (2) made the decision to place plaintiff's bunkmate in his cell with him; (3) was ever informed who plaintiff's bunkmate was; or (4) was aware of whether his bunkmate had any prior record of violence or sexual assault.") with Defs. Mem. at 12 ("[T]here are no allegations in the Complaint which plausibly suggest that defendant[ ] Smith ...: (1) made the decision to place plaintiff's bunkmate in his cell with him; (2) were ever informed who plaintiff's bunkmate was; or (3) were aware of whether his bunkmate had any prior record of violence or sexual assault.") and Reply at 9 ("[P]laintiff has not alleged any facts plausibly suggesting that defendant Smith: (1) made

the decision to place plaintiff's bunkmate in his cell with him; or (2) was aware of whether his bunkmate had any prior record of violence or sexual assault."). Accordingly, the Court reviews these portions of the Report-Recommendation only for clear error and—for the reasons stated above and in the Report-Recommendation—finds none.

### C. Defendant's Requests to Depose Plaintiff and for an Evidentiary Hearing

**\*11** The Federal Rules of Civil Procedure require that a party obtain leave of court when seeking to depose an individual "confined in prison." Fed. R. Civ. P. 30(a) (2)(B). Additionally, because "exhaustion is a matter of judicial administration," a plaintiff "is not entitled to a jury trial relating to his exhaustion of administrative remedies." Woodward v. Lytle, No. 16-CV-1174, 2018 WL 6179427, at \*3 (N.D.N.Y. Nov. 27, 2018) (citing Messa, 652 F.3d at 308–10). For this reason, "the court, not a jury, determines factual disputes regarding an inmate's alleged failure to exhaust." Id.

The Report-Recommendation does not address Defendants' request for "an opportunity to depose Plaintiff on the limited issue of exhaustion followed by an evidentiary hearing pursuant to Messa v. Goord, 652 F.3d 305 (2d Cir. 2011)," in the event their summary judgment motion is denied. See generally R. & R. Presumably, this is because such a deposition and hearing would be unnecessary. As Magistrate Judge Stewart explains in the Report-Recommendation:

> There appears to be no question that Plaintiff alleged to prison officials that he was the victim of a sexual assault and that he received notice from the IGP Supervisor stating his PREA claim has been exhausted for PLRA purposes, and thus his report was documented as required. Pursuant to DOCCS Directive 4040 that was sufficient to deem his claims regarding the alleged sexual assault exhausted. This was sufficient to exhaust his administrative remedies.

R. & R. at 8 (citations omitted). The Court agrees with this explanation and finds that a deposition and Messa hearing on exhaustion issues are unnecessary at this time. Should Defendants submit evidence calling into question whether Plaintiff "allege[d] being the victim of sexual abuse or sexual harassment [and] reported the incident to facility staff," Directive 4040 § 701.3(i), they are free to renew the request then.

### V. CONCLUSION
Accordingly, it is hereby:

**ORDERED**, that the Report-Recommendation (Dkt. No. 39) is **APPROVED and ADOPTED in its entirety**; and it is further

**ORDERED**, that Defendants' Motion for Summary Judgment (Dkt. No. 24) is **DENIED**; and it is further

**ORDERED**, that Defendants Martuscello and Prack's Motion to Dismiss (Dkt. No. 24) is **GRANTED**; and it is further

**ORDERED**, that the Clerk shall terminate Defendants Martuscello and Prack from this action; and it is further

**ORDERED**, that Defendant Smith's Motion to Dismiss (Dkt. No. 24) is **DENIED**; and it is further

**ORDERED**, that Defendants' request to depose Plaintiff on the limited issue of exhaustion of remedies followed by an evidentiary hearing pursuant to Messa v. Goord, 652 F.3d 305 (2d Cir. 2011) (Dkt. No. 24) is **DENIED** with leave to renew upon the submission of sufficient evidence; and it is further

**ORDERED**, that the Clerk serve a copy of this Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

### All Citations

Slip Copy, 2019 WL 4463672

## Footnotes

1    Doe was subsequently identified as Correction Sergeant Michael Walantus. Dkt. No. 14.

2    Doe and Sullivan have not yet been served or appeared in this action, see Dkt. No. 24-9 ("Defendants'
      Memorandum") at 3, n.1, n.2; Dkt. No. 14; Dkt. No. 19, and take no part in the motions that are the subject
      of this Decision and Order. Therefore, when the Court writes generally of "Defendants" in this Decision and
      Order, it refers to Bond, Fleury, Martuscello, Prack, and Smith. When discussing an individual defendant's
      motion, the Court refers to the defendant by name.

3    The Court has reversed the order of Defendants' objections for analytical clarity.

4    Defendants' objection on this point is not a model of clarity. For example, Defendants state that "[w]hile the
      alleged underlying assault on plaintiff by his bunkmate was sexual in nature, the defendants object because
      the nature of the assault, in this circumstance, is not subject to the sexual abuse provisions of Directive 4040."
      Objs. at 4. It is unclear to the Court how "the nature of the assault" perpetrated by Plaintiff's bunkmate—an
      assault that Defendants do not dispute involved coerced sexual acts—could *not* be subject to "the sexual
      abuse provisions of Directive 4040." Additionally, Defendants argue that "plaintiff was required to utilize the
      three-step grievance procedure with respect to his claims of harassment and threats against defendants,"
      Objs. at 4, without explaining which "claims of harassment and threats" they mean. It is possible to read the
      objection to refer to Plaintiff's claims in his grievance that, inter alia, Correction Officer Chase stated "he will
      get [Plaintiff], one way or the other," Compl. ¶ 23, or that certain correction officers tampered with Plaintiff's
      clothes and food and prevented him from accessing his "legal work," "religious articles," and the law library,
      see generally Dkt. No. 24-4 at 1–2, Dkt. No. 31-1 at 1 (together, the "October 1 Grievance"), claims that
      either were never at issue in or have already been dismissed from this case, see generally Compl.; Nov.
      2018 Decision and Order. Or, the objection could refer specifically to allegations, such as Fleury's threat to
      lodge Plaintiff with the "perfect bunkie," Compl. ¶ 22; Oct. 1 Grievance at 1, that are directly relevant to the
      failure-to-protect claim at issue. Despite this lack of clarity, the Court has construed Defendant's objections
      as generously as possible, and it still finds them wanting.

5    The Court notes that case law interpreting the 2014 revisions to Directive 4040 is limited. See Abreu, 2018
      WL 5660409, at *2; Fox v. Lee, No. 15-CV-390, 2018 WL 8576600, at *10 (N.D.N.Y. Dec. 18, 2018),
      report and recommendation adopted, 2019 WL 1323845 (N.D.N.Y. Mar. 25, 2019); Lewis v. Martinez, No.
      15-CV-55, 2018 WL 7917916, at *7 (N.D.N.Y. Nov. 9, 2018), report and recommendation adopted, 2019 WL
      642678 (N.D.N.Y. Feb. 15, 2019), reconsideration denied, 2019 WL 2105562 (N.D.N.Y. May 14, 2019); Allen
      v. Graham, No. 16-CV-47, 2017 WL 9511168, at *6–7 (N.D.N.Y. Sept. 26, 2017), report and recommendation
      adopted, 2017 WL 5957742 (N.D.N.Y. Dec. 1, 2017); McCray v. City of Albany, No. 13-CV-949, 2017 WL
      1433336, at *2 (W.D.N.Y. Apr. 24, 2017); Henderson, 2016 WL 3039687, at *3–4; Medina, 2018
      WL 797330, at *5. A review of this case law reveals no rulings contrary to Magistrate Judge Stewart's
      interpretation.

6    Because Defendants submitted an incomplete copy of Plaintiff's grievance in support of their Motion for
      Summary Judgment, the October 1 Grievance is found in two places in the record: Docket Number 24-4 at
      pages one to two and Docket Number 31-1 at page one. For purposes of clarity in pagination, this Decision
      and Order treats Docket Number 24-4 as pages one and two, and Docket Number 31-1 as page three.

7    See Green v. Leubner, No. 07-CV-1035, 2009 WL 3064749, at *6 (N.D.N.Y. Sept. 22, 2009) (Kahn, J.)
      (describing how a failure-to-protect claim requires a prison official to have "sufficient culpable intent," which
      occurs when the official has "knowledge that an inmate faces a risk of serious harm and ... disregards that
      risk by failing to take reasonable measures to abate the harm").

**End of Document**                                         © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 671650
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jermell MCLEAN, Plaintiff,
v.
Darwin LACLAIR, et al., Defendants.

9:19-CV-1227 (LEK/ATB)
|
Signed 02/22/2021

**Attorneys and Law Firms**

Jermell McLean, Malone, NY, pro se.

Lauren Rose Eversley, New York State Attorney General, Albany, NY, for Defendants.

### MEMORANDUM-DECISION AND ORDER

Lawrence E. Kahn, Senior U.S. District Judge

**I. INTRODUCTION**

 **\*1** Pro se plaintiff Jermell McLean brings this action against several officials at Franklin Correctional Facility ("Franklin C.F."), asserting Eighth Amendment claims related to the alleged denial of his medical needs while he was incarcerated there. Dkt. No. 9 ("First Amended Complaint" or "FAC"). [1] Defendants filed a combined motion for summary judgment and motion to dismiss. Dkt. Nos. 17 ("Motion"); 17-3 ("Tavernier Declaration"); 17-4 ("Seguin Declaration"); 20 ("Response"); 21 ("Reply"). In a Report-Recommendation issued on August 5, 2020, the Honorable Andrew T. Baxter, United States Magistrate Judge, granted Defendants' motion for summary judgment on exhaustion grounds, while also reaching the substance of Plaintiff's claim against Defendant Darwin LaClair, dismissing it for failure to state a claim. Dkt. No. 22 ("Report-Recommendation"). Plaintiff filed objections. Dkt. No. 23 ("Objections"). For the reasons that follow, the Court rejects the Report-Recommendation with respect to exhaustion, while adopting its conclusion regarding Plaintiff's claim against LaClair.

**II. BACKGROUND**

 **A. Factual Background**

*1. Medical Transport Incident*

The facts are detailed in the Report-Recommendation, familiarity with which is assumed. For convenience, the Court summarizes facts relevant to this Memorandum-Decision and Order, while noting factual disputes.

On July 29, 2019, Plaintiff was transported by Correction Officers Theodore Harris and Todd Raymond to Alice Hyde Hospital for a surgical procedure to repair the torn anterior cruciate ligament in his left knee. FAC ¶ 10. [2] Harris and Raymond remained with Plaintiff "the entire time, during pre-operative preparation, surgery, recovery, and post-operative discharge examination and instructions." Id. ¶ 11. "Both Harris and Raymond were present when the hospital staff gave [P]laintiff specific instructions to not bear any weight on [his left] leg, to allow the surgical adhesive time to cure and to allow the ligament to knit back together." Id. ¶ 12.

 **\*2** Following the surgery, hospital staff attempted to provide Plaintiff with metal crutches. See id. ¶ 13. However, one of the correction officers, citing a policy of Superintendent Darwin LaClair, told the hospital staff that Plaintiff "could not have metal crutches, and ... would be given a pair of [permitted] crutches ... when he arrived at the facility." See id. Plaintiff left the hospital at approximately 3:35 p.m. Id. ¶ 14.

For "reasons unknown to [Plaintiff]," his transport van, upon arriving back at Franklin C. F., was unable to enter the prison complex through the "Truck-Trap, which is the way prisoners are commonly transported and returned." Id. ¶ 22. Had the van been able to proceed through this entrance, it could have dropped Plaintiff off at the medical unit. See id. ¶ 23. Upon realizing that he would not receive pay for waiting until the Truck-Trap accepted the van, Raymond remarked, "We have to get [Plaintiff] to medical fast so we can get the hell out of here." Id. ¶ 17. Harris replied, "[Y]eah, I'm not staying here any longer if I am not getting paid for it." Id. Harris and Raymond then parked the van in Franklin C. F.'s front parking lot and told Plaintiff he had to walk to the prison. See id. ¶ 24.

Before exiting the van, Plaintiff "protest[ed] about being made to walk on [his] recently repaired leg in direct contradiction of the discharge instructions." Id. ¶ 25. In response to Plaintiff's concerns, Raymond stated, " 'Come on, you can make it with my help,' and Harris added that Raymond "was giving [Plaintiff] a 'direct order[.]' " Id.

As Plaintiff exited the van, Raymond "did not brace the plaintiff to prevent him from bearing weight on the leg," because the handcuffs on Plaintiff's wrists, which were affixed to a "[b]lack [b]ox" and a "[b]elly [c]hain," prevented Raymond from physically supporting Plaintiff's arm. See id. ¶¶ 26–27 (internal quotation marks omitted). Instead, Raymond "merely 'guided' plaintiff's arm" as Plaintiff stepped down from the van. See id. ¶ 26. Harris and Raymond then "forced the plaintiff to walk on his left leg, without the aid of any crutches, cane or a wheelchair, through the Administration Building, to a holding area, a distance of between 500-1000 feet." Id. ¶ 24 (emphasis in original).

As Plaintiff entered the prison, he "felt something snap, and immediately felt an intense heightened pain, and burning in the surgery area ... shooting up into his hip and down to his foot." Id. ¶ 30. Once Plaintiff reached a metal bench on the other side of the Administration Building, a non-party correction officer arrived at the scene and "call[ed] medical [to] have them bring a wheelchair for the rest of plaintiff's journey to the medical unit[.]" See id. at ¶ 28.

Since his return from the hospital, Plaintiff "has suffered and continues to suffer constant pain and burning sensations in [his] knee, trouble sleeping, w[a]lking, standing, and performing every day tasks." Id. ¶ 32. Plaintiff has also "developed a mold-like rash covering the skin on his left hip, which was not there prior to the surgery." Id. ¶ 33.

Plaintiff avers that he might not have been harmed had LaClair: (1) instituted a policy that allowed Plaintiff to bring metal crutches into Franklin C. F.; (2) "properly trained" Harris and Raymond on how to handle inmates in Plaintiff's condition; and (3) instituted a policy that paid Harris and Raymond for waiting with Plaintiff until the Truck-Trap accepted the van. See id. at p. 2,[3] ¶¶ 21, 46.

**\*3** Plaintiff brings medical indifference claims against Harris, Raymond, and LaClair. See Dkt. No. 11 ("April 2020 Order") at 7.

### 2. Grievance Process

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent

of the Facility. Id. § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC"). Id. § 701.5(d).

As the magistrate judge notes, in the First Amended Complaint and Response, Plaintiff provides a detailed account of his attempts to file grievances and appeals regarding the incident in question. See R. & R. at 9. As summarized in the Report-Recommendation:

Plaintiff states that on July 29, 2019, the same day of the incident in question, and while he was in the infirmary, he wrote a grievance on plain paper because he did not have a grievance form. (FAC ¶ 35). Plaintiff states that he placed the grievance in an envelope, addressed it to the IGP Supervisor, sealed the envelope, and gave it to a corrections officer to place in the mail because there is no mail box or "grievance box" in the infirmary. (Id.) Plaintiff states that he wrote the grievance "quickly" because he did not know how many days he would be in the infirmary. (Id.) In the FAC, he states that he kept a copy of the grievance, and he has submitted it as an exhibit to his opposition papers. (FAC ¶ 36 & Dkt. No. 20, Ex. A).

Plaintiff states that he received no response to this grievance. (FAC ¶ 36). Plaintiff states that, on August 14, 2019, he mailed a letter to the IGP Supervisor, along with a copy of the grievance, explaining that he had not received a response, and he was "construing the failure or refusal to respond as a denial and appealing to the Superintendent." (FAC ¶ 37). Plaintiff has attached a copy of this letter to his opposition papers. ([Resp.], Ex. B).

Plaintiff claims that he received no response to his August 14, 2019 letter. (FAC ¶ 38). As a result, plaintiff states that he wrote another letter to the IGP Supervisor at Franklin, dated September 3, 2019. (FAC ¶ 38). Plaintiff states that he attached another copy of the July 29, 2019 grievance to the September 3rd letter. (Id.) Plaintiff claims that in the September 3rd letter, he "explain[ed] that he was construing the subsequent failure or refusal to answer the appeal letter as a denial of same, and appealing to the CORC by said letter." (Id.) Plaintiff has not included a copy of this letter in his opposition papers.

Plaintiff then states that he did not receive a response to the September 3rd letter. (FAC ¶ 39). He claims that on September 27, 2019, he had one of his family members contact the CORC in Albany. (Id.) Plaintiff states that his "family member" spoke to "a Ms. Mary Furcinetti

(phonetic)," who was "very nice," and who "looked in the computer," and verified that no grievance, written by plaintiff, had been filed "by the IGP Supervisor," nor was it ever forwarded to the CORC. (FAC ¶ 40).

**\*4** R. & R. at 9–11.

### B. The Motion, Response, Report-Recommendation, and Objections

#### 1. Motion

Defendants move for summary judgment on exhaustion grounds and move to dismiss Plaintiff's claim against LaClair. Regarding exhaustion, they argue that Plaintiff failed to file or appeal any grievance pertaining to the events giving rise to his claims. See Mot. at 6–10. In support of this contention, Defendants offer the following evidence. Inmate Grievance Program ("IGP") Coordinator Judy Tavernier attests that upon a review of all grievances filed at Franklin C.F. between January 1, 2016 the date she signed her declaration, June 10, 2020, she uncovered no grievances filed by Plaintiff. See Tavernier Decl. ¶¶ 10, 15. IGP Assistant Director Rachel Seguin attests that upon a review of all grievance appeals for the current year and the four previous calendar years, she did not uncover any grievance appeal filed by Plaintiff. See Seguin Decl. ¶¶ 8, 12. Attached as an exhibit to her declaration is a computer print-out from the CORC database, dated June 4, 2020, which shows no appeals filed by Plaintiff. See id., Ex. A.

Defendants also argue that LaClair lacks personal involvement in the alleged constitutional violations. See id. at 10–12. Defendants do not address the merits of Plaintiff's claims against Harris or Raymond. See generally id.

#### 2. Response

In his Response, Plaintiff argues that the factual contentions that he submitted his grievance and that he submitted his appeals are consistent with Defendants' contentions that they have no record of the grievance or appeals having been filed. See Resp. at 2. Plaintiff asks the Court to infer that prison officials somehow thwarted the filing of his grievance and appeals after Plaintiff attempted to submit them. See id. at 3. On this basis, Plaintiff argues that he should be excused from the exhaustion requirement, as the grievance process was

"unavailable." See id. at 2–3; see also 📙 Riles v. Buchanan, 656 F. App'x 577, 580 (2d Cir. 2016) ("An administrative procedure is unavailable when ... 'prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.' ")

(quoting 📙 Ross v. Blake, —— U.S. ——, 136 S.Ct. 1850, 1859–60, 195 L.Ed.2d 117 (2016)).

Plaintiff presents the following evidence supporting his factual claim that he submitted his grievance and appeals: (1) his sworn complaint, in which he attests that he did so, see FAC ¶¶ 35–40; (2) a copy of his grievance, Resp. Ex. A; and (3) a copy of his August 14, 2019 letter to the IGP Supervisor appealing his grievance to the Superintendent, Resp. Ex. B.

Plaintiff does not address Defendants' arguments regarding the merits of Plaintiff's claims against LaClair. See generally Resp.

#### 3. Report-Recommendation

The magistrate judge recommended granting summary judgment on exhaustion grounds. In doing so, the magistrate judge relied on a string of lower court cases in this Circuit doing the same when a plaintiff offered only "bare" or "unsupported" assertions that he submitted a grievance but that it was never filed. See R. & R. at 12–15 (citing Davis v. Grant, No. 15-CV-5359, 2019 WL 498277, at \*10 (S.D.N.Y. Feb. 8, 2019) ("Plaintiff's bare assertions that he submitted his grievances but never received a response fall squarely into the category of assertions that courts in the Second Circuit have found do not excuse the exhaustion requirement."); Engles v. Jones, No. 13-CV-6405, 2018 WL 6832085, at \*10 (W.D.N.Y. Dec. 28, 2018) ("Plaintiff's unsupported assertion that he filed a grievance but that it was somehow lost or destroyed is insufficient to establish a genuine issue of

material fact."); 📙 Scott v. Kastner Smith, 298 F. Supp. 3d 545, 555 (W.D.N.Y. 2018) ("[C]ourts have consistently held ... that an inmate's general claim that his grievance was lost or destroyed does not excuse the exhaustion requirement.") (internal quotation marks omitted); Mims v. Yehl, No. 13-CV-6405, 2014 WL 4715883, at \*4 (W.D.N.Y. Sept. 22, 2014) (inmate's "unsupported statement" that he has submitted a grievance is "insufficient at the summary

judgment stage"); 📙 Veloz v. New York, 339 F. Supp. 2d 505, 516 (S.D.N.Y. 2004) ("[An] inmate's unsupported claims that

his grievances were lost at the Grievance Committee Office or destroyed by officers ... fails to excuse [the] inmate from fully grieving remedies[.]") (internal citation omitted)).

**\*5** Regarding the merits of Plaintiff's claim against LaClair, the magistrate judge determined that Plaintiff's allegations were too vague and conclusory to establish supervisory liability under any of the routes recognized in 🚩 Colon v. Coughlin, 58 F.3d 865 (2d Cir. 1995). See id. at 16–19.

*4. Objections*

In his Objections, Plaintiff reiterates an argument from his Response regarding exhaustion. Namely, he clarifies that, while he does not dispute that his grievance was never filed, he, in fact, gave the grievance to the officer on duty at the infirmary and asked him to submit it: "I gave my grievance to the officer that was working that day. I don't know why it was never filed and why it's not in their system. But I know I put one in." Objs. at 1.

Regarding his claim against LaClair, Plaintiff restates his allegation that in denying Plaintiff metal crutches, Harris and Raymond were following a facility policy instituted by LaClair. Id. at 1–2. [4]

## III. STANDARDS OF REVIEW

### A. Report-Recommendation

Within fourteen days after a party has been served with a copy of a magistrate judge's report-recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b); L.R. 72.1(c). If objections are timely filed, a court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 📑 28 U.S.C. § 636(b). However, if no objections are made, or if an objection is general, conclusory, perfunctory, or a mere reiteration of an argument made to the magistrate judge, a district court need only review that aspect of a report-recommendation only for clear error. Barnes v. Prack, No. 11-CV-857, 2013 WL 1121353, at \*1 (N.D.N.Y. Mar. 18, 2013); 🚩 Farid v. Bouey, 554 F. Supp. 2d 301, 306–07 (N.D.N.Y. 2008), abrogated on other grounds by Widomski v. State Univ. of N.Y. at Orange, 748 F.3d 471 (2d Cir. 2014). "A [district] judge ... may accept, reject, or

modify, in whole or in part, the findings or recommendations made by the magistrate judge." 📑 § 636(b).

### B. Summary Judgment

Federal Rule of Civil Procedure 56 instructs courts to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is " 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." 📑 Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, while "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if ... the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.; see also 📑 Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted.").

**\*6** The party seeking summary judgment bears the burden of informing the court of the basis for the motion and identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact. 📑 Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Similarly, a party is entitled to summary judgment when the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." 📑 Id. at 322, 106 S.Ct. 2548.

In attempting to repel a motion for summary judgment after the moving party has met its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." 📑 Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. 📑 Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Hence, "a court's duty in reviewing a motion for summary judgment is 'carefully limited' to finding genuine disputes of fact, 'not to deciding them.' " Macera v. Vill. Bd. of Ilion, No. 16-CV-668, 2019 U.S. Dist. LEXIS 169632, at \*26, 2019 WL 4805354, at \*8

(N.D.N.Y. Sept. 30, 2019) (Kahn, J.) (quoting Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994)).

## IV. DISCUSSION

As Plaintiff's Objections reiterate arguments he has already presented, the Court reviews the Report-Recommendation for clear error. [5] Having done so, the Court concludes that the magistrate judge committed clear error in his exhaustion analysis, by straying from well-established summary judgment principles.

The magistrate judge placed a greater evidentiary burden on Plaintiff than he is required to meet to survive summary judgment. With respect to the parties' factual disagreement over whether Plaintiff submitted his initial grievance, the Court notes that this dispute essentially boils down to a clash of sworn statements. Plaintiff attests that he gave his grievance to the correction officer on duty at the infirmary on July 29, 2019, FAC ¶ 35, and Defendants submit a sworn statement indicating that a review of their records revealed that no grievance was filed, see Tavernier Decl. ¶¶ 10, 15. To the extent that these statements are in contradiction, the Court cannot resolve this contradiction at the summary judgment stage, because the Court is prohibited from making credibility determinations. See, e.g., Gen. Elec. Capital Corp. v. NET Transportation, Inc., No. 04-CV-316, 2006 WL 8447262, at *3 (D. Conn. May 4, 2006) ("In ruling on summary judgment, the Court cannot credit averments made in plaintiff's affidavit over that of the defendants."); Lupyan v. Corinthian Colleges, Inc., 761 F.3d 314, 320-321 (3d Cir. 2014) ("[A] single, non-conclusory affidavit or witness's testimony, when based on personal knowledge and directed at a material issue, is sufficient to defeat summary judgment. This remains true even if the affidavit is 'self-serving.' ") (internal citations omitted); Curry v. City of Syracuse, 316 F.3d 324, 333 (2d Cir. 2003) (noting that "credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment").

*7 The magistrate judge cites a number of cases in which courts granted summary judgment when a plaintiff offered only "bare" or "unsupported" assertions that he submitted a grievance but that it was never filed. See R. & R. at 12–15. But Plaintiff's factual contention that he gave his grievance to a correction officer *is* supported—by a sworn statement based

on personal knowledge. See *supra* note 2; Fed. R. Civ. P. 56(c) (4). This is sufficient in itself to enable Plaintiff to survive summary judgment. The Court notes, however, that Plaintiff's factual contention is also supported by a dated, handwritten copy of his grievance. See Resp., Ex. A. The magistrate judge apparently determined that this piece of evidence should be discounted in determining whether Plaintiff meets his burden on summary judgment, citing one other case in this District for support. See R. & R. at 13 (citing Means v. Olmstead, No. 17-CV-746, 2019 WL 4395289, at *7 (N.D.N.Y. June 3, 2019), report and recommendation adopted, 2019 WL 3451127, at *2 (N.D.N.Y. July 31, 2019)). But Means offers no reasoning or legal authorities to support this legal conclusion, see id., which appears to entail the improper weighing of evidence and assessment of credibility, see Curry, 316 F.3d at 333. Especially given that Defendants in this case have not even addressed the authenticity of Plaintiff's copy of his grievance, it is improper for the Court to discount Plaintiff's claim that this is a genuine, contemporaneous copy.

The magistrate judge appears to have applied a burden-shifting framework that courts in this District generally employ in adjudicating PLRA exhaustion at the summary judgment stage. As Judge Suddaby has explained:

[T]he defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action. See, e.g., Howard v. Goord, No. 98-CV-7471, 1999 WL 1288679, at *3 (E.D.N.Y. Dec. 28, 1999). However, once a defendant has produced reliable evidence that such remedies were generally available, and the plaintiff nevertheless failed to exhaust those remedies, the plaintiff must then counter the defendant's proof by showing that, as to him or her, the remedy was unavailable. Smith v. Kelly, 985 F.Supp.2d 275, 284 (N.D.N.Y. 2013). "As a result, practically speaking, while the burden on this affirmative defense remains at all times on the defendant, the plaintiff may sometimes have to adduce evidence in order to defeat it." Id. ... [W]hile the burden of production may shift to a plaintiff when a court considers whether the grievance process was unavailable, the ultimate burden of proof with respect to the exhaustion defense remains, at all times, with the defendant. [6]

Coleman v. Nolan, No. 15-CV-40, 2018 WL 4732778, at *4 (N.D.N.Y. Oct. 2, 2018) (other internal quotation marks omitted).

This burden-shifting framework does not ultimately mandate a greater evidentiary showing from Plaintiff than would otherwise be required at summary judgment. A presumption is not a form of super-evidence that heightens the opposing party's evidentiary burden in rebuttal. Indeed, a presumption is not evidence at all, but rather merely "an assumption of fact resulting from a rule of law which requires such fact to be assumed from another fact or group of facts found or otherwise established in the action." 21B Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5124 (2d ed. 2005); see also 🚩 Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 n.10, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (describing presumption as "legally mandatory inference"); Emhart Industries, Inc. v. Universal Instruments Corp., No. 89-CV-6, 1992 U.S. Dist. LEXIS 13458, at *10, 1992 WL 442248 (N.D.N.Y. June 22, 1992) Emhart Industries, Inc. v. Universal Instruments Corp., No. 89-CV-6, 1992 U.S. Dist. LEXIS 13458, at *10, 1992 WL 442248 (N.D.N.Y. June 22, 1992) ("[A] presumption is not evidence.") (quoting 🚩 A.C. Aukerman Co. v. R.L. Chaides Construction Co., 960 F.2d 1020, 1037–38 (1992)). A presumption's "only effect is to require the party contesting it to produce enough evidence substantiating the presumed fact's absence to withstand a motion for summary judgment[.]" 🔖 Lupyan, 761 F.3d at 320; see also ITC Ltd. v. Punchgini, Inc., 482 F.3d 135, 149 (2d Cir. 2007) ("Courts and commentators are in general agreement that proffered evidence is sufficient to rebut a presumption as long as the evidence could support a reasonable jury finding of the nonexistence of the presumed fact.") (collecting authorities) (internal quotation marks omitted). "[A] presumption vanishes upon the introduction of evidence sufficient to support a finding of the nonexistence of the presumed fact." Punchgini, Inc., 482 F.3d at 148 (internal quotation marks omitted).

*8  In other words, once Defendants introduced evidence that they generally operated a functioning grievance system, see Seguin Decl. ¶¶ 5–6, Plaintiff could not have survived summary judgment simply by pointing to Defendants' failure to introduce evidence that this process was available to him specifically. Rather, in order to make the presumption of availability "vanish," Plaintiff had to produce competent evidence supporting unavailability. But once he did so, by submitting a sworn statement that he gave his grievance to a correction officer, he was not then required to produce a greater quantum of evidence than normally required of

a non-movant at the summary judgment stage. Since a sworn statement based on personal knowledge is generally sufficient when opposed only by a movant's conflicting sworn statement, Plaintiff's evidence is sufficient here.

Moreover, all of the Court's foregoing analysis rests on an assumption that is unjustifiably charitable to Defendants—namely, that there is a conflict between Plaintiff's sworn statement that he gave his grievance to a correction officer for submission and Defendants' statement that the grievance was never filed. As Plaintiff correctly argues, these competing sworn statements are not necessarily inconsistent. See Resp. at 2–3; Objs. at 1. Since the Court is required to draw reasonable inferences in Plaintiff's favor, the Court must infer that the grievance was never filed because prison authorities did not file it, not because Plaintiff did not attempt to submit it. See Zulu v. Barnhart, No. 16-CV-1408, 2019 WL 2997226, at *13 (N.D.N.Y. Apr. 22, 2019) ("Defendants' evidence is largely consistent with plaintiff's claim that, for whatever reason, the timely grievances that he attempted to submit while confined to the SHU at Marcy were not filed. The absence of any official records of plaintiff's initial attempts to grieve the incident comports with plaintiff's assertion that once he handed a grievance through the feed-up hatch in the SHU, it was out of his possession and it was not filed."), report and recommendation adopted, No. 16-CV-1408, 2019 WL 2150628 (N.D.N.Y. May 17, 2019). Defendants have, thus, failed to demonstrate the absence of a material factual dispute.

The Court reaches the same conclusion with respect to Plaintiff's appeals. Plaintiff attests that, on August 14, 2019, he mailed a letter to the IGP supervisor, along with a copy of his grievance, explaining that he had not received a response and that he was "construing the failure or refusal to respond as a denial and appealing to the Superintendent." FAC ¶ 37. Plaintiff has submitted a copy of this letter. Resp., Ex. B. Plaintiff additionally attests that he wrote another letter to the IGP Supervisor on September 3, 2019, explaining "that he was construing the subsequent failure or refusal to answer the appeal letter as a denial of same, and appealing to the CORC by said letter." Id. ¶ 38. Plaintiff has not submitted a copy of the September 3, 2019 letter. Seguin attests that upon a review of all grievance appeals for the current year and the four previous calendar years, she did not uncover any grievance appeals filed by Plaintiff. See Seguin Decl. ¶¶ 8, 12. Attached as an exhibit to her declaration is a computer print-out from the CORC database, dated June 4, 2020, which shows no appeals to the CORC filed by Plaintiff. See id., Ex. A.

Here, there is again a clash of sworn statements: Plaintiff attests that he attempted to submit the appeals, and Defendants attest that they were never filed. As discussed, the Court cannot credit Defendants' sworn statements over Plaintiff's. See Joshi v. Ashcroft, 389 F.3d 732, 735 (7th Cir. 2004) ("Most letters are delivered, but some aren't, and so if there is a sworn denial of receipt the trier of fact has to weigh the credibility of the denial in light of the fact that the vast majority of letters are delivered and that the intended recipient has a strong incentive to lie."). [7] Defendants additionally present documentary evidence that Plaintiff's appeals were not filed, namely the CORC print-out. See Seguin Decl., Ex. A. Importantly, while Defendants state in conclusory fashion that they infallibly maintain records of all grievances and appeals, they do not specifically represent that the CORC print-out is a log of all incoming mail, or describe Defendants' mail-processing practices in a manner that would support an inference that the absence of a record of Plaintiff's appeals being filed reliably indicates non-receipt of his letters. See Seguin Decl. ¶ 8 ("[T]he CORC computer database contains records of appeals of grievances received from facility Inmate Grievance Program offices[.]"); Tavernier Decl. ¶ 10 ("All documents ... related to a particular grievance ... are stored in the Franklin grievance office in the regular course of that office's activities as they are created or received."); cf. Lupyan, 761 F.3d at 322 ("When the intended recipient is a commercial or legal entity, it may be routine business practice to log incoming mail. In such cases, the absence of an entry in a mail log near the time that mail would likely have arrived, can be used to establish that mail was not received."); Guerra v. CONRAIL, 936 F.3d 124, 137 (3d Cir. 2019) ("OSHA's denial of receipt is strengthened by its practice of tracking correspondence and its unavailing search for a trace of Guerra's letter."). As before, there is no necessary inconsistency between Plaintiff's claim that he mailed the appeals and Defendants' claim that they were never filed; and the Court must grant Plaintiff the favorable inference that his grievance was sent and received, but not filed, for reasons out of his control. [8]

**\*9** Accordingly, Defendants have failed to demonstrate the absence of a material factual dispute as to whether the grievance process at Franklin C.F. was "unavailable" due to the machinations or misrepresentations of prison officials who inhibited the filing of Plaintiff's submissions. See Riles, 656 F. App'x at 580; see also Gill v. Frawley,

No. 02-CV-1380, 2006 U.S. Dist. LEXIS 101694, at \*44, 2006 WL 1742738 (N.D.N.Y. May 9, 2006) (noting that "[s]ome courts have suggested that an inmate has exercised a reasonable effort to exhaust his administrative remedies when he has tried to properly file a grievance and that grievance has been lost or destroyed by a prison official," and collecting cases); Fann v. Graham, No. 15-CV-1339, 2018 WL 1399331, at \*6 (N.D.N.Y. Jan. 11, 2018) ("Viewing the facts in the light most favorable to plaintiff, the record suggests that plaintiff's grievances were submitted, but were unfiled and unanswered, creating an issue of fact as to whether the grievance process was available and whether plaintiff attempted to exhaust his administrative remedies[.]"), report and recommendation adopted, No. 15-CV-1339, 2018 WL 1399340 (N.D.N.Y. Mar. 19, 2018); Thaxton v. Simmons, No. 10-CV-1318, 2013 WL 4806457, at \*4 (N.D.N.Y. Sept. 9, 2013) ("[A] question of fact exists as to whether [p]laintiff never filed his initial grievance on April 29, as [d]efendants claim, or that, as [p]laintiff claims, he filed a timely grievance that was lost or tampered with by [d]efendants. Such credibility assessments are to be resolved by a trier of fact.").

In order to determine whether Plaintiff properly exhausted administrative remedies, the Court must hold a hearing, at which a fact-finder can assess the credibility of witnesses and the relative weight of the evidence the parties present. See, e.g., Woodward v. Lytle, No. 16-CV-1174, 2019 WL 2527342, at \*8 (N.D.N.Y. May 24, 2019), report and recommendation adopted, No. 16-CV-1174, 2019 WL 2524756 (N.D.N.Y. June 19, 2019) (issuing a decision on exhaustion subsequent to a hearing); see also Messa v. Goord, 652 F.3d 305, 310 (2d Cir. 2011) (affirming the constitutionality of adjudicating PLRA exhaustion issues by bench trial).

With respect to the magistrate judge's conclusion that the claim against LaClair should be dismissed due to his lack of personal involvement, the Court concurs and finds no clear error.

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the Report-Recommendation (Dkt. No. 22) is **REJECTED in part and ADOPTED in part**. Defendant's Motion (Dkt. No. 17) is denied as to exhaustion and granted as to Plaintiff's Eighth Amendment claim against LaClair; and it is further

**ORDERED**, that the Clerk **TERMINATE** LaClair from the docket; and it is further

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2021 WL 671650

## Footnotes

1   Plaintiff refers to this document as his "First Amended Complaint"; thus, the court will do the same.

2   Because Plaintiff has sworn to the allegations in his First Amended Complaint on penalty of perjury, the Court treats the First Amended Complaint as the legal equivalent of an affidavit, for evidentiary purposes. See Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit for summary judgment purposes, and therefore will be considered in determining whether material issues of fact exist, provided that it meets the other requirements for an affidavit under Rule 56(e)."). The Court does so even though the First Amended Complaint is not notarized. See, e.g., Franco v. Kelly, 854 F.2d 584, 587 (2d. Cir. 1988) (noting that documents sworn under penalty of perjury may suffice for summary judgment purposes even if they do not meet all of the formal requirements of a notarized affidavit) (citing Pfeil v. Rogers, 757 F.2d 850, 859, 859 n.15 (7th Cir. 1985)); Tolbert v. Koenigsmann, No. 13-CV-1577, 2018 U.S. Dist. LEXIS 36451, at *6 n.8, 2018 WL 1605573 (N.D.N.Y. Mar. 2, 2018) ("Although plaintiff's amended complaint is not notarized, in light of his pro se status, I have considered it as the legal equivalent of an affidavit for purposes of the pending summary judgment motion."); BMS Entm't/Heat Music LLC v. Bridges, No. 04-CV-2584, 2005 WL 2482493, at *2 n.1 (S.D.N.Y. Oct. 7, 2005) (accepting as a declaration under 28 U.S.C. § 1746 an affidavit that was not notarized but "certified" that "each of the statements contained herein is true to the best of my information and belief" and contained a "penalty of perjury" clause).

3   While the First Amended Complaint is largely organized in numbered paragraphs, some allegations appear in an introductory section prior to the first numbered paragraph.

4   Plaintiff also offers arguments relevant to Harris and Raymond's liability. See id. The Court disregards these arguments, because Defendants did not move for dismissal or summary judgment on grounds related to the merits of those claims.

5   Since Plaintiff did not respond to Defendants' motion to dismiss Plaintiff's claims against LaClair, Plaintiff's arguments with respect to that claim could be construed, alternatively, as "new" arguments improperly introduced in objections. See Ross v. Koenigsmann, No. 14-CV-1321, 2016 WL 5408163, at *2 (N.D.N.Y. Sept. 28, 2016) ("[A] district court will ordinarily refuse to consider an argument that could have been, but was not, presented to the magistrate judge in the first instance."). Either way, the Court would review this aspect of the Report-Recommendation for clear error. See Barnes, 2013 WL 1121353, at *1.

6   Citing Bailey v. Fortier, No. 09-CV-0742, 2012 WL 6935254, at *5-6 (N.D.N.Y. Oct. 4, 2012), report and recommendation adopted, 2013 WL 310306 (N.D.N.Y. Jan. 25, 2013); Nelson v. Plumley, No. 12-CV-422, 2015 WL 4326762, at *7-8 (N.D.N.Y. July 14, 2015), report and recommendation adopted, 2013 WL 1305338 (N.D.N.Y. Mar. 18, 2013).

7   In a variety of legal contexts, Courts adjudicate disputes over whether a letter was sent or received by employing the "mailbox rule," according to which "[a] rebuttable presumption of receipt [arises] on evidence that a properly addressed piece of mail is placed in the care of the postal service." Witt v. Roadway

Express, 136 F.3d 1424, 1429–30 (10th Cir. 1998); see also Godfrey v. United States, 997 F.2d 335, 338 (7th Cir. 1993); Anderson v. United States, 966 F.2d 487, 491 (9th Cir. 1992). Plaintiff's sworn statement that he mailed the letters would establish his entitlement to this presumption, which Defendants would have the burden to rebut. See, e.g., United States v. Ekong, 518 F.3d 285, 287 (5th Cir. 2006) ("A sworn statement is credible evidence of mailing for the purposes of the mailbox rule."); Schikore v. BankAmerica Supplemental Ret. Plan, 269 F.3d 956, 964 (9th Cir. 2001) (same); Witt, 136 F.3d at 1430 ("Because the presumption is rebuttable ... evidence denying receipt creates a credibility issue that must be resolved by the trier of fact.") (citing Rosenthal v. Walker, 111 U.S. 185, 193–94, 4 S.Ct. 382, 28 L.Ed. 395 (1884); Anderson, 966 F.2d at 491–92; 9 Wigmore, Evidence § 2519).

8    Defendants also argued that, even assuming *arguendo* that Plaintiff had properly filed his grievance and appeals, his claims should be denied for failure to exhaust, because he did not file his complaint in this action after waiting thirty days from his final appeal. See Reply at 2–3. In addition to being improperly raised for the first time in a reply, this argument is meritless, because the complaint was filed on October 4, 2019, Docket, which is more than thirty days after September 3, 2019, the date on which Plaintiff attests he filed his final appeal, FAC ¶ 38.

---

**End of Document**                                            © 2021 Thomson Reuters. No claim to original U.S. Government Works.

  © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Fann v. Graham, Not Reported in Fed. Supp. (2018)

Case 9:19-cv-00689-AMN-TWD    Document 72    Filed 05/12/21    Page 85 of 110

2018 WL 1399331
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jermaine FANN, Plaintiff,

v.

H. GRAHAM, Superintendent Auburn
Correctional Facility, et al., Defendants.

No. 9:15-CV-1339 (DNH/CFH)
|
Signed 01/11/2018

**Attorneys and Law Firms**

Jermaine Fann, 430 Main Street, Apt. 306, Dunkirk, New York 14048, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, OF COUNSEL: WILLIAM A. SCOTT, ESQ., NICOLE E. HAIMSON, ESQ., Assistant Attorneys General, The Capitol, Albany, New York 12224, Attorney for Defendants.

**REPORT-RECOMMENDATION AND ORDER** [1]

Christian F. Hummel, U.S. Magistrate Judge

**\*1** Plaintiff pro se Jermaine Fann ("plaintiff"), a former inmate who was, at all relevant times, in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983, alleging that defendants Superintendent ("Supt.") H. Graham, Deputy Superintendent ("DSS") Fagan, Lieutenant ("Lieut.") Ouimetto, Sergeant ("Sgt.") Ederer, Corrections Officer ("C.O.") M. Cornell, C.O. Lovejoy, C.O. Steinberg, C.O. C. Thomas, and C.O. R.F. Schramm—who, at all relevant times, were employed at the Auburn Correctional Facility ("Auburn")—violated his constitutional rights under the First, Fourth, and Fourteenth Amendments. Dkt. No. 79. ("Am. Compl."). Presently pending before the Court are plaintiff's Motion for Summary Judgment and defendants' Motion for Summary Judgment, both filed pursuant to Federal Rules of Civil Procedure ("Fed. R. Civ. P.") 56. Dkt Nos. 119, 120. Plaintiff and defendant opposed the respective motions, and defendant filed a reply. Dkt. Nos. 124, 125, 126. For the following reasons, it is recommended that defendants' motion

be granted in part and denied in part, and plaintiff's motion be denied.

**I. Arguments**

**A. Plaintiff's Motion for Summary Judgment**

In support of his Motion for Summary Judgment, plaintiff filed a Statement of Material Facts. [2] On review of plaintiff's Motion for Summary Judgment, the facts will be related herein in the light most favorable to defendants as the nonmoving party. See subsection II (A) infra; Rattner v. Netburn, 930 F.2d 204, 209 (2d Cir. 1991) ("In assessing the record ... to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom judgment is sought."). On May 10, 2015, plaintiff filed a grievance against C.O. Thomas for denying him the right to attend morning breakfast. Dkt. No. 119-2 ¶¶ 7-8. On June 6, 2015, C.O. Thomas approached plaintiff regarding the May 10, 2015 grievance. Id. ¶ 10. The next day, C.O. Thomas informed plaintiff that he was confined to his cell because of the grievance plaintiff filed against him. Id. ¶ 11. C.O. Thomas then issued plaintiff a false misbehavior report because of plaintiff's May 10, 2015 grievance against him. Id. ¶ 12. On June 12, 2015, plaintiff received thirty days confinement and loss of all privileges pursuant to C.O. Thomas' June 7, 2015 misbehavior report. Id. ¶ 13.

**\*2** On June 3, 2015, C.O. Cornell and C.O. Steinberg performed an "unreasonable" visual body cavity search—also known as a "strip frisk" or "strip search"—on plaintiff "under filthy prison conditions." Dkt. No. 119-2 ¶¶ 14-15, 17. The strip frisk room "was filthy, bug infested, and extremely cold." Id. ¶ 16. Supt. Graham, who has worked at Auburn for ten-and-a-half years, knew Auburn corrections officers were conducting unreasonable searches. Id. ¶¶ 18-19. The same day, plaintiff filed a grievance against C.O. Cornell and C.O. Steinberg alleging an unreasonable strip frisk. Id. ¶ 20. On June 13, 2015, C.O. Cornell "responded to the plaintiff's [ ] grievance." Id. ¶ 21. On July 8, 2015, C.O. Cornell confronted plaintiff regarding the June 3, 2015 grievance plaintiff filed against him. Id. ¶ 22. On July 9, 2015, Sgt. Ederer authorized C.O. Cornell to perform a visual body cavity search on plaintiff. Id. ¶¶ 29, 32. During the strip frisk, C.O. Cornell "made statements" to plaintiff regarding the

Case 9:19-cv-00689-AMN-TWD    Document 72    Filed 05/12/21    Page 86 of 110

Fann v. Graham, Not Reported in Fed. Supp. (2018)

June 3, 2015 grievance that plaintiff filed against him. Id. ¶ 28. C.O. Cornell was not supervised during the strip frisk, nor did he conduct the search in a "suitable and comfortable location." Id. ¶¶ 30, 31.

The same day, C.O. Cornell and C.O. Lovejoy conducted a cell search of plaintiff's cell. Dkt. No. 119-2 ¶ 33. During the search, C.O. Cornell, C.O. Lovejoy, and C.O. Schramm destroyed plaintiff's legal materials and medication. Id. ¶ 34. C.O. Lovejoy escorted plaintiff to the hospital for a urine test. Id. ¶ 35. C.O. Lovejoy and C.O. Schramm "harassed and threatened the plaintiff for his grievance activities." Id. ¶ 36. C.O. Cornell "planted drugs on the plaintiff for filing [a] grievance." Id. ¶ 37. On July 10, 2015, C.O. Cornell issued plaintiff a misbehavior report in retaliation for his June 3, 2015 grievance that plaintiff filed against him. Id. ¶¶ 38-39. On July 28, 2015, "plaintiff was found guilty of the false misbehavior report written by [C.O.] Cornell." Id. ¶ 40. On October 1, 2015, "Albany" reversed the July 28, 2015 disciplinary decision. Id. ¶ 41.

In opposition, defendants argue that the Court should deny plaintiff's motion because plaintiff's motion papers "affirmatively demonstrate" that his claims are without merit, and, therefore, should be dismissed. Dkt. No. 124-1 at 6.

### B. Defendants' Motion for Summary Judgment

In support of their Motion for Summary Judgment, defendants filed a Statement of Material Facts. Dkt. No. 120-1. The facts relating to defendants' Motion for Summary Judgment are related herein in the light most favorable to plaintiff as the nonmoving party. See subsection II (A), infra; Rattner, 930 F.2d at 209 ("In assessing the record ... to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought."). On June 3, 2015, plaintiff alleges that C.O. Cornell and C.O. Steinberg strip frisked him. Dkt. No. 120-1 ¶ 11. C.O. Cornell conducted a pat frisk on that date, but did not perform a strip frisk. Id. ¶ 12. C.O. Steinberg did not perform a pat frisk or strip frisk on June 3, 2015. Id. ¶ 13.

On June 7, 2015, C.O. Thomas issued plaintiff a Tier II disciplinary ticket for sleeping during morning count. Dkt. No. 120-1 ¶ 18. On June 12, 2015, Lieut. Ouimette commenced a Tier II disciplinary hearing. Id. ¶ 19. During the

hearing, Lieut. Ouimette denied plaintiff's request to call Supt. Graham as a witness because he did not issue the disciplinary ticket, and was not present during the incident that resulted in the ticket. Id. ¶¶ 20-21. Although Lieut. Ouimette denied plaintiff's request, he allowed plaintiff to testify that he had filed a prior grievance against C.O. Thomas. Id. ¶¶ 22, 23. Lieut. Ouimette found plaintiff guilty, and sentenced him to thirty days keeplock. [3]

**\*3** On July 9, 2015, Sgt. Ederer authorized C.O. Cornell and C.O. Lovejoy to conduct a cell search of plaintiff's cell. Dkt. No. 120-1 ¶ 27. In conjunction with the cell search, C.O. Cornell performed a pat frisk of plaintiff. Id. ¶ 28. During the pat frisk, C.O. Cornell found a "green leafy substance" on plaintiff that was later found to be marijuana, along with a "suspicious lump" in plaintiff's "groin area." Id. ¶ 29. C.O. Cornell requested permission to conduct a strip frisk. Id. ¶ 30. C.O. Cornell found no further contraband during the strip frisk. Id. ¶ 31. C.O. Cornell was the only officer present during plaintiff's strip frisk. Id. ¶ 32. C.O. Lovejoy completed the search of plaintiff's cell and found no other contraband. Id. ¶ 34. Because plaintiff possessed marijuana, Auburn staff took plaintiff to the hospital for urine sample testing. Id. ¶ 35. Plaintiff tested positive for marijuana use. Id. ¶ 36. C.O. Cornell issued plaintiff a misbehavior report for possession and use of marijuana. Id. ¶ 37.

On July 14, 2015, Lieut. Ouimette commenced a Tier III disciplinary hearing regarding the July 9, 2015 misbehavior report. Dkt. No. 120-1 ¶ 38. At the outset, Lieut. Ouimette dismissed the drug use charge because plaintiff had already tested positive for marijuana use within the past thirty days, and the July 9, 2015 test results could not be validated. Id. ¶¶ 39-40. Lieut. Ouimette found plaintiff guilty of drug possession, and sentenced him to ninety days keeplock. Id. ¶ 41. The disciplinary disposition was reversed on appeal, and plaintiff served approximately sixty days in keeplock. Id. ¶ 42.

In opposition, plaintiff argues that the Court should deny defendants' motion because: (1) he exhausted his administrative remedies; and (2) he has stated claims against the defendants. Dkt. No. 125. In reply, defendants contend that plaintiff failed to exhaust his administrative remedies. Dkt. No. 126.

### II. Discussion [4]

Case 9:19-cv-00689-AMN-TWD　Document 72　Filed 05/12/21　Page 87 of 110

Fann v. Graham, Not Reported in Fed. Supp. (2018)

## A. Legal Standards

"A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the burden of showing the absence of disputed material facts by providing the Court with portions of "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which support the motion. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is material if it may affect the outcome of the case as determined by substantive law, such that "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "In determining whether summary judgment is appropriate, [the Court will] resolve all ambiguities and draw all reasonable inferences against the moving party." Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

To avoid summary judgment, a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Carey v. Crescenzi, 923 F.2d 18, 19 (2d Cir. 1991) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)) (internal quotation marks omitted). A non-moving party must support such assertions by evidence showing the existence of a genuine issue of material fact. Id. "When no rational jury could find in favor of the non-moving party because the evidence to support is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Services, Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude.

See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

**\*4** [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest,".... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law....

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191-92 (2d Cir. 2008).

## B. Exhaustion

As a threshold matter, defendants contend that plaintiff has failed to exhaust his administrative remedies. Dkt. No. 120-4 ("Def. Mem. of Law") at 10-13. Defendants argue that because plaintiff failed to exhaust his administrative remedies as to Supt. Graham, DSS Fagan, Sgt. Ederer, C.O. Lovejoy, and C.O. Schramm, any claims involving those defendants should be dismissed. Def. Mem. of Law at 13. Defendants further argue that plaintiff failed to exhaust his administrative remedies as to the July 9, 2015 incident. Id. [5] Plaintiff contends that he properly filed a grievance regarding the July 9, 2015 incident. Dkt. No. 125 at 7-8. Plaintiff also claims that he was aware "of the facility attitude toward the grievance program" and "properly followed all steps to exhaust his claims." Id. at 8. Plaintiff argues that "the [d]efendants failure to properly deliver and or have a program where grievances are safe and secure does not fall at [his] feet, [and] should not be an escape route for claims to be dismissed." Id. In reply, defendants argue that plaintiff supports his "conclusory allegation" that he exhausted his administrative remedies with "handwritten letters that, by [p]laintiff's own acknowledgement [sic], were never acknowledged as received by DOCCS." Dkt. No. 126 at 4. Defendants contend that plaintiff's prior grievance filings and Jeffery Hale and Cheryl Parmiter's declarations invalidate plaintiff's claim of unavailability. Id.

The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration. See Porter v. Nussle, 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); see also Woodford v. Ngo, 548 U.S. 81, 82, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). The exhaustion requirement applies

Case 9:19-cv-00689-AMN-TWD    Document 72    Filed 05/12/21    Page 88 of 110

Fann v. Graham, Not Reported in Fed. Supp. (2018)

"to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter, 534 U.S. at 532, 122 S.Ct. 983. Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as monetary damages. Id. at 524, 122 S.Ct. 983. To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated. Jones v. Bock, 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) (internal citation omitted).

Although the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." Ruggiero v. Cty. of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (citation omitted). The Supreme Court recently held that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement." Ross v. Blake, ___ U.S. ___, 136 S.Ct. 1850, 1862, 195 L.Ed.2d 117 (2016). Thus, the "special circumstances" exception in Hemphill v. New York, 680 F.3d 680, 686 (2d Cir. 2004) is no longer consistent with the statutory requirements of the PLRA. Williams v. Priatno, 829 F.3d 118, 123 (2d Cir. 2016). [6]

**\*5** Although Ross eliminates the "special circumstances" exception, courts must still consider the PLRA's "textual exception to mandatory exhaustion." Ross, 136 S.Ct. at 1858. Under this exception, courts must determine whether administrative remedies were "available" to a prisoner. Id. The Supreme Court identified three circumstances where administrative remedies may be unavailable to a prisoner. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001)). "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a

grievance process through machination, misrepresentation, or intimidation." Id. at 1860.

### 1. Did Plaintiff Exhaust his Administrative Remedies?

Although plaintiff seems to suggest that the Auburn grievance process was unavailable, there is no genuine dispute that at all relevant times, DOCCS had in place a three-step inmate grievance program. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5. [7]

#### a. DSS Fagan

Plaintiff concedes that he did not exhaust his administrative remedies as to claims against DSS Fagan, and that summary judgment should be granted. Dkt. No. 125 at 9. Accordingly, it is recommended that defendants' Motion for Summary Judgment, insofar as it relates to claims against DSS Fagan, be granted.

#### b. Supt. Graham and Lieut. Ouimetto

Insofar as plaintiff seeks relief against Supt. Graham for supervisory liability and Lieut. Ouimetto for Fourteenth Amendment due process, plaintiff has failed to exhaust his administrative remedies. DOCCS records establish that plaintiff did not name either Supt. Graham or Lieut. Ouimetto in grievances pertaining to the conduct at issue. See Dkt. No. 120-30; Dkt. No. 120-29 ("Hale Decl.") at 4 (detailing plaintiff's subject grievances). Notably, in opposition, plaintiff does not allege that he exhausted his administrative remedies as to Supt. Graham or Lieut. Ouimetto, and does not claim that defendants prevented or obstructed him from filing grievances against Supt. Graham or Lieut. Ouimetto. Further, there is nothing in the record indicating that Supt. Graham, Lieut. Ouimetto, or any other defendant prevented him from filing grievances. See Dkt. No. 125 at 8 (noting, in plaintiff's exhaustion section, that he "properly exhausted" claims against defendants Cornell, Lovejoy, Ederer, and Schramm). [8] Therefore, because plaintiff failed to exhaust his administrative remedies as to Supt. Graham and Lieut. Ouimetto, it is recommended that defendants' Motion for Summary Judgment, insofar as it relates to claims against Supt. Graham and Lieut. Ouimetto, be granted.

Fann v. Graham, Not Reported in Fed. Supp. (2018)

Case 9:19-cv-00689-AMN-TWD    Document 72    Filed 05/12/21    Page 89 of 110

### c. July 9, 2015 Incident

**\*6**  Plaintiff claims that on July 14, 2015, he filed a grievance regarding the July 9, 2015 "retaliatory cell search, visual body cavity search, urine test, verbal threats, harassment, and the false misbehavior report." Am. Compl. ¶ 169. Plaintiff testified that he handed this grievance to the "rounds officer" while he was on keeplock confinement. Dkt. No.120-3 ("Pl. Dep.") at 213. On July 17, 2015, after he did not receive a copy of the grievance or a grievance number, plaintiff filed a second grievance. Am. Compl. ¶ 171. Plaintiff testified that he handed the second grievance to the sergeant on duty. Pl. Dep. at 217. On August 13, 2015, after not receiving a response from Auburn's IGRC, plaintiff filed a notice of appeal "in accordance with the rules and regulations" requesting that his grievance be sent to CORC. Am. Compl. ¶ 177.

Defendants contend that plaintiff never filed a grievance with respect to the July 9, 2015 strip frisk by C.O. Cornell, cell search by C.O. Cornell, C.O. Lovejoy, C.O. Schramm, and Sgt. Ederer, destruction of property by C.O. Cornell and C.O. Schramm, and a falsified misbehavior report. Def. Mem. of Law at 12-13. Auburn's IGP Supervisor Cheryl Parmiter declared that a search of the DOCCS database confirms that, although plaintiff filed six grievances while housed at Auburn, five were filed prior to July 9, 2015. Dkt. No. 120-35 ("Parmiter Decl.") at 3. The grievance filed after July 9, 2015 does not relate to the wrongdoings plaintiff alleged occurred on July 9, 2015. Id. at 4. DOCCS' Assistant Director of IGP Jeffery Hale declared that a search of the CORC database confirms that "plaintiff filed a number of grievance appeals with CORC, but none of those appeals concern matters stemming from incidents of an allegedly improper strip frisk, an allegedly improper cell search, or the issuance of an allegedly false misbehavior report on July 9, 2015." Hale Decl. at 4. However, plaintiff has proffered a copy of the July 17, 2015 grievance alleging that "several officers" [9] subjected him "to an unnecessary pat frisk, strip, frisk, cell search, verbal threats, and an [sic] urine test and false report." Dkt. No. 125-2 at 18. Plaintiff further provides his August 13, 2015 notice of appeal to CORC, which details plaintiff's attempts to exhaust his administrative remedies and expresses his desire to further "appeal to the next level of review." Id. [10]

Viewing the facts in the light most favorable to plaintiff, the record suggests that plaintiff's grievances were submitted, but were unfiled and unanswered, creating an issue of fact as to whether the grievance process was available and whether plaintiff attempted to exhaust his administrative remedies as to C.O. Cornell, C.O. Lovejoy, C.O. Schramm, and Sgt. Ederer in relation to the July 9, 2015 incident. See Williams, 829 F.3d at 126 (concluding that "the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it."); Thaxton v. Simmons, No. 9:10-CV-1318 (MAD/RFT), 2013 WL 4806457, at \*4 (N.D.N.Y. Sept. 9, 2013) ("[A] question of fact exists as to whether [p]laintiff never filed his initial grievance on April 29, as [d]efendants claim, or that, as [p]laintiff claims, he filed a timely grievance that was lost or tampered with by [d]efendants. Such credibility assessments are to be resolved by a trier of fact."). Accordingly, the undersigned recommends that defendants' Motion for Summary Judgment on plaintiff's claims arising from the July 9, 2015 incident be denied, without prejudice and with the opportunity to renew by way of an exhaustion hearing, should defendants request such a hearing.

### C. Fourth Amendment

**\*7**  Plaintiff alleges that C.O. Cornell and C.O. Steinberg violated his Fourth Amendment rights during a June 3, 2015 strip search. Dkt. No. 119-3 ("Pl. Mem. of Law") at 4-5. Defendants argue that the strip frisk never occurred, and in the alternative, neither C.O. Cornell nor C.O. Steinberg had physical contact with plaintiff. Def. Mem. of Law at 19. The Fourth Amendment establishes that "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures[ ] shall not be violated." U.S. CONST. amend. IV. However, inmates are generally not afforded the same privacy rights as non-inmates because "[l]oss of ... privacy [is an] inherent incident[ ] of confinement." Bell v. Wolfish, 441 U.S. 520, 536, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); Perez v. N.Y.S. Dep't of Corr. Servs., No. 9:08-CV-1031, 2010 WL 1235637, at \*5 (N.D.N.Y. Mar. 17, 2010). "Strip frisks pass constitutional muster, even if the strip frisk is conducted without probable cause, so long as the search is reasonable and not abusive." Shabazz v. Pico, 994 F.Supp. 460, 473 (S.D.N.Y. 1998) (citing Bell, 411 U.S. at 558-60, 93 S.Ct. 1713). In assessing reasonableness under the Fourth Amendment, "[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is

Case 9:19-cv-00689-AMN-TWD   Document 72   Filed 05/12/21   Page 90 of 110

Fann v. Graham, Not Reported in Fed. Supp. (2018)

conducted." Bell, 441 U.S. at 558, 99 S.Ct. 1861. C.O.
Cornell concedes that he pat frisked plaintiff on June 3, 2015,
but denies conducting a strip frisk. Def. Mem. of Law at 19;
Dkt. No. 120-18 ("Cornell Decl.") ¶ 4. C.O. Steinberg denies
strip frisking plaintiff on June 3, 2015. Def. Mem. of Law at
19; Dkt. No. 120-21 ("Steinberg Decl.") ¶ 4. C.O. Steinberg
further states that he did not witness C.O. Cornell pat frisk
plaintiff on June 3, 2015. Steinberg Decl. ¶ 4.

The record contains disputed issues of material fact as to
whether the June 3, 2015 strip frisk occurred, and if it did
occur, whether the strip frisk was reasonable under the Fourth
Amendment. However, even assuming the strip frisk occurred
as plaintiff alleges, and occurred without probable cause,
plaintiff fails to establish that the June 3, 2015 strip frisk was
unreasonable. Plaintiff testified that the June 3, 2015 search
was illegal, in part, because C.O. Cornell conducted it in
a "racist manner" by forcing plaintiff to "have [his] hands
above [his] head, strapped to some bars, standing naked."
Pl. Dep. at 222-23. DOCCS Directive 4190 states that a
corrections officer may require an inmate to "lift[ ] his arms
to expose his armpits" during a strip frisk. Dkt. No. 120-8
at 6. Plaintiff has not further demonstrated how standing
with his "hands above [his] head, strapped to some bars"
constitutes racist conduct on behalf of C.O. Cornell or C.O.
Steinberg. Pl. Dep. at 222-23. Moreover, there is no indication
that C.O. Cornell or C.O. Steinberg exceeded the scope of
the strip frisk, as plaintiff concedes that neither C.O. Cornell
or C.O. Steinberg made physical contact with him during
the frisk. Pl. Dep. at 152. Insofar as plaintiff suggests that
C.O. Cornell and C.O. Steinberg violated DOCCS Directive
4190 by conducting the strip search in the alleged unsanitary
area at issue in C-Block, C.O. Cornell and C.O. Steinberg's
failure to follow a DOCCS directive does not amount to a
constitutional violation. See Burroughs v. Petrone, 138
F.Supp.3d 182, 219 (N.D.N.Y. 2015); Sanders v. Gifford, No.
11-CV-0326, 2014 WL 5662775, at *4 (N.D.N.Y. Nov. 4,
2014). Therefore, viewing the facts in the light most favorable
to plaintiff, plaintiff fails to establish that the June 3, 2015
strip frisk was unreasonable. Accordingly, it is recommended
that plaintiff's Motion for Summary Judgment as to the June
3, 2015 strip search be denied, and defendants' Motion for
Summary Judgment be granted.

### D. First Amendment

Plaintiff claims that C.O. Thomas subjected him to a false
misbehavior report in retaliation for filing a grievance against
him. Pl.'s Mem. of Law at 6-7. Defendants argue that
defendants "has no viable claim for Officer Thomas' filing of a false
misbehavior report [because] [h]e was granted a hearing on
the charges and does not raise any viable claim that such
hearing failed to provide him due process." Def.'s Mem.
of Law at 20. Moreover, defendants argue that the only
evidence plaintiff offers of C.O. Thomas' retaliation are the
inadmissible declarations of inmates who purported to have
overheard conversations between C.O. Thomas and plaintiff.
Dkt. No. 124-1 at 8-9.

**\*8** Courts are to "approach [First Amendment] retaliation
claims by prisoners 'with skepticism and particular care[.]'
" See, e.g., Davis v. Goord, 320 F.3d 346, 352 (2d Cir.
2003) (quoting Dawes v. Walker, 239 F.3d 489, 491 (2d
Cir. 2001), overruled on other grounds by Swierkiewicz
v. Sorema, N. A., 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d
1 (2002)). A retaliation claim under Section 1983 may
not be conclusory and must have some basis in specific
facts that are not inherently implausible on their face. See
Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173
L.Ed.2d 868 (2009); South Cherry St., LLC v. Hennessee
Grp. LLC, 573 F.3d 98, 110 (2d Cir. 2009). "To prove a
First Amendment retaliation claim under Section 1983,
a prisoner must show that '(1) that the speech or conduct
at issue was protected, (2) that the defendant took adverse
action against the plaintiff, and (3) that there was a causal
connection between the protected speech and the adverse
action.' " Espinal v. Goord, 558 F.3d 119, 128 (2d Cir.
2009) (quoting Gill v. Pidlypchak, 389 F.3d 379, 380 (2d
Cir. 2004), overruled on other grounds by Swierkiewicz,
534 U.S. at 560, 122 S.Ct. 999).

To satisfy the first element of a retaliation claim, a plaintiff
must show that he engaged in a protected activity. See
Espinal, 558 F.3d at 128. The Second Circuit has
concluded that use of the prison grievance system constitutes
a protected activity. See Gill, 389 F.3d at 384; Franco
v. Kelly, 854 F.2d 584, 589 (2d Cir. 1988) ("Moreover,
intentional obstruction of a prisoner's right to seek redress of
grievances is precisely the sort of oppression that section
1983 is intended to remedy.") (alteration and internal

quotation marks omitted); see also Roseboro v. Gillespie, 791 F.Supp.2d 353, 367 (S.D.N.Y. 2011) (finding that the filing of a grievance is a protected activity); Mateo v. Fischer, 682 F.Supp.2d 423, 433 (S.D.N.Y. 2010) (same). Plaintiff states that he filed a grievance against C.O. Thomas on May 10, 2015. Pl.'s Mem. of Law at 6-7; Dkt. No. 119-4 at 4. Thus, plaintiff satisfies the first prong of the test as he has engaged in a protected activity. See id.; Gill, 389 F.3d at 384.

A defendant's retaliatory filing of a falsified misbehavior report that results in disciplinary segregated confinement constitutes adverse action. See Gill, 389 F.3d at 384 (finding that a false misbehavior report that resulted in the plaintiff's placement in keeplock constituted adverse action); Gayle v. Gonyea, 313 F.3d 677, 682 (2d Cir. 2002) (emphasis added) ("An allegation that a prison official filed false disciplinary charges in retaliation for the exercise of a constitutionally protected right, such as the filing of a grievance, states a claim under § 1983."). "[T]he mere allegation that a false misbehavior report has been issued to an inmate, standing alone, does not rise to [a] level of constitutional significance." Reed v. Doe No. 1, No. 9:11-CV-0250 (TJM/DEP), 2012 WL 4486086, at *5 (N.D.N.Y. July 26, 2012) (citing Boddie v. Schnieder, 105 F.3d 857, 862 (2d Cir. 1997)). However, a plaintiff's allegation that a defendant issued a false misbehavior report in response to the plaintiff's protected activity can support a claim of unlawful retaliation. Id. (citing Franco v. Kelly, 854 F.3d 584, 589 (2d Cir. 2008)). The plaintiff bears the burden of establishing that "the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff." Gayle, 313 F.3d at 682.

> In determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, a number of factors may be considered, including: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter;

and (iv) statements by the defendant concerning his motivation.

*9 Baskerville v. Blot, 224 F.Supp.2d 723, 732 (S.D.N.Y. 2002). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." Id. In assessing temporal proximity, the Second Circuit has held that, generally, to establish a temporal proximity sufficient to support an inference of causal connection, there may be no more than six months between the temporal proximity and the adverse action. See Espinal, 558 F.3d at 129.

Plaintiff alleges that on May 10, 2015, he filed a grievance against C.O. Thomas. Pl.'s Mem. of Law at 6-7; Dkt. No. 119-4 at 4. On June 6, 2015, C.O. Thomas submitted a memorandum to the Auburn IGP denying the allegations set forth in the grievance. Dkt. No. 119-4 at 6. The following day, C.O. Thomas confined plaintiff to his cell. Pl.'s Mem. of Law at 7. When plaintiff questioned why he was confined, C.O. Thomas stated, "you filed [a] grievance, this is what you had asked for." Id. C.O. Thomas issued plaintiff a misbehavior report for failure to comply with facility count procedures (112.21) and refusing a direct order (106.10) stemming from plaintiff's failure to wake up during morning count. Id.; Dkt. No. 119-4 at 15. Lieut. Ouimette conducted a disciplinary hearing on June 12, 2015 and sentenced plaintiff to thirty days keeplock. Id. at 17.

Defendants argue that plaintiff "provides no admissible evidence in support of this claim and Officer Thomas has specifically denied the allegations of retaliation." Dkt. No. 124-1 at 8. Defendants also discredit plaintiff's reliance on Kenneth Boyd's Declaration, which they contend is "insufficient and inadmissible as it is based upon his own supposition regarding Officer Thomas' mental state and his alleged conversations with the Plaintiff." Id. at 9. Although defendants are correct that "[a]ffidavits submitted in support of or in opposition to the summary judgment motion must 'be made on personal knowledge, ... [and] set forth facts as would be admissible in evidence,' " plaintiff's submission of the Boyd Declaration is not fatal to his claim. Patterson v. County of Oneida, N.Y., 375 F.3d 206, 219 (2d Cir. 2004) (quoting FED. R. CIV. P. 56(e)). Indeed, the record establishes that plaintiff has presented sufficient circumstantial and direct

evidence to raise a material question of fact whether C.O. Thomas retaliated against him.

Plaintiff has suggested facts supporting two of the factors set forth in ⚠️ 🏠 Baskerville. Baskerville, 224 F.Supp.2d at 732. Plaintiff filed a grievance against C.O. Thomas on May 10, 2015. Pl.'s Mem. of Law at 6-7; Dkt. No. 119-4 at 4. On June 6, 2015, C.O. Thomas submitted a memorandum to the Auburn IGP in conjunction with the grievance investigation denying the allegations against him. Dkt. No. 119-4 at 6. The next day, C.O. Thomas filed an allegedly false misbehavior report. Pl.'s Mem. of Law at 7; Dkt. No. 119-4 at 15. C.O. Thomas learned of plaintiff's grievance, at the latest, on June 6, 2015, and issued the misbehavior report on June 7, 2015; therefore, the temporal proximity sufficiently supports an inference of causal connection. See Washington v. Afify, 681 Fed.Appx. 43, 46 (2d Cir. 2017) (summary order) (finding that the defendant's questioning of the plaintiff about a grievance he filed, and subsequently filing an allegedly false misbehavior report against the plaintiff two days later supports an inference of causal connection). Moreover, upon confining plaintiff in his cell, C.O. Thomas stated, "you filed [a] grievance, this is what you had asked for." Pl.'s Mem. of Law at 7. In support of that contention, plaintiff has proffered the sworn affidavit of inmate Rodolfo Casiano, who testified that he was housed in a neighboring cell and witnessed the conversation between plaintiff and "the officer that worked that day." Dkt. No. 119-4 at 8. Mr. Casiano states that he heard C.O. Thomas make the abovementioned comment, as well as the statement, "it's funny how things work." Id. Although C.O. Thomas denies issuing the misbehavior report in retaliation for plaintiff's grievance, affording plaintiff special solicitude, a question of material fact is raised as to whether C.O. Thomas had retaliatory intent. See Washington, 681 Fed.Appx. at 46. Defendants do not argue that plaintiff would have been issued a misbehavior report but for the exercise of his First Amendment rights. See Gayle, 313 F.3d at 682 ("The burden then shifts to the defendant to show that the plaintiff would have received the same punishment even absent the retaliatory motivation."). Arguably, defendants may be suggesting that plaintiff received a misbehavior report because he slept through the morning facility count; however, as plaintiff denies this conduct, a material fact is in dispute. See Dkt. No. 119-4 at 15. Because a genuine issue of material fact exists with regard to C.O. Thomas' retaliatory intent, it is recommended that plaintiff's Motion for Summary Judgment be denied, and defendants' Motion for Summary Judgment be denied as to plaintiff's First Amendment claim against C.O. Thomas.

### III. Conclusion

**\*10 WHEREFORE**, for the reasons stated herein, it is hereby

**RECOMMENDED**, that plaintiff's Motion for Summary Judgment (Dkt. No. 119) be **DENIED**; and it is further

**RECOMMENDED**, that defendants' Motion for Summary Judgment (Dkt. No. 120) be **GRANTED IN PART**:

(1) Insofar as it seeks dismissal of plaintiff's supervisory liability claims against Deputy Superintendent Fagan;

(2) Insofar as it seeks dismissal of plaintiff's supervisory liability claim against Supt. Graham;

(3) Insofar as it seeks dismissal of plaintiff's Fourteenth Amendment due process claim against Lieut. Ouimette,

(4) Insofar as it seeks dismissal of plaintiff's Fourth Amendment unreasonable search claim against C.O. Cornell and C.O. Steinberg,

the motion be **GRANTED**, and the claims be **DISMISSED** with prejudice; and it is further

**RECOMMENDED**, that defendants' Motion for Summary Judgment (Dkt. No. 120) be **DENIED IN PART**:

(1) Insofar as it seeks dismissal of plaintiff's First Amendment retaliation claim against C.O. Thomas, the motion be **DENIED**,

(2) Insofar as it seeks dismissal of plaintiff's First and Fourth Amendment claims against C.O. Cornell, C.O. Lovejoy, C.O. Schramm, and Sgt. Ederer for the incidents occurring on July 9, 2015, the motion be **DENIED**, without prejudice, to defendants renewing this argument and requesting a hearing to assess whether plaintiff exhausted his administrative remedies, and it is further,

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED**.

Fann v. Graham, Not Reported in Fed. Supp. (2018)

Case 9:19-cv-00689-AMN-TWD    Document 72    Filed 05/12/21    Page 93 of 110

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72. [11]

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1399331

## Footnotes

1    This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2    Local Rule 7.1(a)(3) states:

   Summary Judgment Motions

   Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits.

   The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.

   N.D.N.Y. L.R. 7.1(a)(3).

3    "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." Green v. Bauvi, 46 F.3d 189, 192 (2d Cir. 1995); N.Y. COMP. CODES R. & REGS. tit. 7, § 301.6.

4    All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

5    Defendants concede that plaintiff exhausted his administrative remedies regarding C.O. Cornell and C.O. Steinberg's June 3, 2015 strip frisk, and C.O. Thomas' June 7, 2015 misbehavior report. Def. Mem. of Law at 13.

6    In Williams v. Priatno, the Second Circuit debated Ross's effect on Hemphill's estoppel exception. See Williams, 829 F.3d at 123. The Williams Court stated that "Ross largely supplants our Hemphill inquiry by framing the exception issue entirely within the context of whether administrative remedies were actually available to the aggrieved inmate." Id. (citing Ross, 136 S.Ct. at 1858-59).

7    First, the inmate must file a complaint with an inmate grievance program ("IGP") clerk within twenty-one days of the alleged incident. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(a)(1). An IGP representative has sixteen calendar days to informally resolve the issue. Id. § 701.5(b)(1). If no informal resolution occurs, the IGRC must hold a hearing within sixteen days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the hearing. Id. §§ 701.5(b)(2)(i)-(ii). If

Fann v. Graham, Not Reported in Fed. Supp. (2018)

Case 9:19-cv-00689-AMN-TWD    Document 72    Filed 05/12/21    Page 94 of 110

the determination is unfavorable to the inmate, the inmate may appeal the IGRC's determination to the facility superintendent within seven calendar days of receipt of the determination. Id. § 701.5(c)(1). If the superintendent's determination is unfavorable, the inmate may appeal to CORC within seven days after receipt of the superintendent's determination. Id. §§ 701.5(d)(i)-(ii). CORC must "review each appeal, render a decision on the grievance, and transmit its decision to the facility, with reasons stated, for the [inmate], the grievance clerk, the superintendent, and any direct parties within thirty (30) calendar days from the time the appeal was received." Id. § 701.5(d)(3)(ii).

8    Plaintiff testified that he filed a grievance against Supt. Graham for failure to release him from keeplock, such conduct—by plaintiff's own admission—is not related to the instant case. Dkt. No. 120-3 ("Pl. Dep.") at 125, 222; Dkt. No. 120-34.

9    In New York State, the IGP regulations do not require that an inmate's grievance contain the name of the offending corrections officer. See Espinal v. Goord, 558 F.3d 119, 126 (2d Cir. 2009). "[T]he IGP regulations offer the general guidance that a grievance should 'contain a concise, specific description of the problem,' ... and the complaint form does not instruct the inmate to name the officials allegedly responsible for misconduct." Id. (internal citations omitted). Therefore, an inmate "is not required to name responsible parties in a grievance in order to exhaust his administrative remedies." Id.

10   Plaintiff's July 2015 grievance involves staff misconduct or harassment, which follows an expedited procedure and is immediately sent to the superintendent for review. See N.Y. COMP. CODES R. & REGS. tit. 7, § 701.8(a), (b); Dkt. No. 125-2 at 18.

11   If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).

---

**End of Document**                                           © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 4806457
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Ronnie THAXTON, Plaintiff,

v.

A. SIMMONS, Corrections Officer, Upstate
Correctional Facility, Bush, Corrections Officer,
Upstate Correctional Facility, K. Garneau, Nurse,
Upstate Correctional Facility, John Doe, Corrections
Officer, Upstate Correctional Facility, Defendants.

No. 9:10–CV–1318 (MAD/RFT).
|
Sept. 9, 2013.

**Attorneys and Law Firms**

Ronnie Thaxton, Ossining, NY, pro se.

Office of the New York State Attorney General, Christopher
W. Hall, AAG, of Counsel, Albany, NY, for Defendants.

Hon. Eric T. Schneiderman, Attorney General of the State
of New York, Christopher W. Hall, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**

MAE A. D'AGOSTINO, District Judge.

**I. INTRODUCTION**

*1  *Pro se* plaintiff, Ronnie Thaxton, brought this civil
rights action pursuant to 42 U.S.C. § 1983 alleging (1)
Defendant Simmons retaliated against Plaintiff because of
past grievances he filed, (2) Defendants Bush and Doe
deprived Plaintiff of nutritional meals, and (3) Defendant
Garneau violated Plaintiff's First and Eighth Amendment
rights by his deliberate indifference to Plaintiff's serious
medical needs. *See* Dkt. No. 60 at 1. Defendants have moved
for summary judgment on the grounds that (1) Plaintiff failed
to exhaust the available administrative remedies regarding his
claims against Defendants Bush and Garneau, (2) Defendants
Bush and Simmons were not personally involved in the
claimed constitutional violations, and (3) Plaintiff did not

suffer a serious injury to support his medical deliberate
indifference claim against Defendant Garneau. *See* Dkt. No.
50–5. In a May 23, 2013 Report–Recommendation and Order,
Magistrate Judge Treece recommended that Defendants'
motion for summary judgement be granted.

Currently before the Court are Plaintiff's objections to
Magistrate Judge Treece's Report–Recommendation and
Order.

**II. BACKGROUND**

Plaintiff's claims arose from events between January 12,
2009, and April 28, 2009, while he was in the custody
of the New York State Department of Corrections and
Community Supervision ("DOCCS") as an inmate in the
Upstate Correctional Facility ("Upstate C.F."). *See* Dkt. No.
50–1 at ¶ 1.

On January 12, 2009, Plaintiff filed a grievance, which
the parties have agreed implicated Defendant Simmons,
complaining about receiving his meals later than other
prisoners. *See id.* at ¶¶ 2–3. On April 6, Defendant Simmons
delivered Plaintiff's evening meal which contained several
strands of hair. *See id.* Plaintiff complained to Defendant
Simmons about the hair and he promptly gave Plaintiff
another tray of food. *See* Dkt. No. 50–3 at 25. [1] Plaintiff
did not see anyone place the hair in his meal, did not see
Defendant Simmons remove the plastic wrap from the meal,
and Defendant Simmons stated that he had not "played"
with Plaintiff's food. *See id.* at 26, 28. Plaintiff contends that
Defendant Simmons placed the hair in the food as a means of
retaliating against him for the January 12 grievance. *See id.*
at 31.

On April 28, 2009, Defendants Bush and Doe served Plaintiff
his evening meal containing a piece of metal in his sardines.
*See* Dkt. No. 50–1 at ¶¶ 16–17, 25. Defendant Doe did not
touch the food and only delivered Plaintiff his Kool–Aid and
hot water. *See* Dkt. No. 50–3 at 39. Plaintiff did not see
Defendant Bush tamper with the food and discovered the
piece of metal when he bit into his sardine sandwich. *See id.*
at 38. Plaintiff "noticed drops of blood in the food" after the
piece of metal cut his mouth, at which point he called for
medical attention. *See id.* at 45.

Defendant Nurse Garneau and Sergeant Lombard came to
Plaintiff's cell within twenty minutes of his request for

medical attention. *See id.* at 34. Defendant Garneau did not inspect Plaintiff's mouth, but stated that there was not much damage and that Plaintiff should not "be a cry baby." *See id.* at 34. Plaintiff's bleeding completely stopped within an hour and was not "actually a cut anymore" within three or four days. *See id.* at 50. Plaintiff experienced slight difficulty eating and sleeping directly after the incident, but was able to get the "right amount" of food and sleep. *See id.* at 54, 56. Plaintiff requested sick call at the Attica Correctional Facility ("Attica C.F.") about a week after the incident. *See id.* at 54. There, he saw another nurse and a dentist and neither reported any lasting injuries or effects from the incident. *See id.*

**\*2**  In a May 23, 2013 Report–Recommendation and Order, Magistrate Judge Treece recommended that the Court grant Defendants' motion for summary judgment and close this case. *See* Dkt. No. 60. In his objections to the Report–Recommendation and Order, Plaintiff generally just reiterates arguments he made in opposing the motion for summary judgment. *See* Dkt. No. 61. Specifically, Plaintiff presents the following arguments: (1) the metal placed in his sardine sandwich deprived him of the "minimal civilized measures of life's necessities which was nutritionally adequate food that is 'prepared' and 'served' under conditions which do not present imminent danger to health and well being of inmates who consume it;" (2) Defendant Garneau violated his Eighth Amendment rights when she refused to examine or treat his injuries; and (3) that the injury to his mouth lasted approximately thirty days and he was prescribed Tylenol for the injury, which shows that it was more than a *de minimis* injury. *See* Dkt. No. 61 at 2–4.

## III. DISCUSSION

### A. Standard of review

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, \*1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings

or recommendation made by the magistrate judge." 28 U.S.C. § 636(b) (1).

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36–37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)(e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers,* 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2502, 2513–14, 91 L.Ed.2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.,* 322 F.3d 139, 143 n. 5 (2d Cir.2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

**\*3**  "[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Govan v. Campbell,* 289 F.Supp.2d 289, 295

(N.D.N.Y.2007) (qquoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)). "However, this does not mean that a *pro se* litigant is excused from following the procedural requirements of summary judgment. *See id.* at 295 (citing *Showers v. Eastmond,* 00 CIV. 3725, 2001 WL 527484, \* 1 (S.D.N.Y. May 16, 2001)). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidence" is not sufficient to overcome a motion for summary judgment."

*Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (citing *Cary v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

## B. Exhaustion

The Prison Litigation Reform Act ("PLRA") states that "no action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U .S.C. § 1997e(a). This exhaustion requirement applies to all suits brought by inmates regarding aspects of prison life. *See Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

New York State has a three-step administrative review process. First, a grievance is submitted to the Inmate Grievance Resolution Committee ("IGRC") which reviews and investigates the formal complaint before issuing a written determination. *See* N.Y. COMP.CODES R. & REGS. tit. 7, § 701.5(b). Second, if the IGRC decision is appealed, the superintendent of the facility issues a decision after reviewing the IGRC's determination. *See id.* at § 701.5(c). Third, if the superintendent's decision is appealed, the final administrative decision is made by the Central Office Review Committee ("CORC"). *See id.* at § 701.5(d). If all three of these levels of review are exhausted, then the prisoner may seek relief in federal court pursuant to § 1983. *See Bridgeforth v. Bartlett,* 686 F.Supp.2d 238, 239 (W.D.N.Y.2010) (citing *Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)).

In determining whether a prisoner has failed to exhaust all available administrative remedies, the Second Circuit has instructed the district courts to consider:

"(1) whether administrative remedies were actually available, (2) whether the defendants forfeited their right to raise the affirmative defense or by their own actions precluded the plaintiff from using administrative grievance procedures, and (3) whether special circumstances have been plausibly alleged that justify the prisoner's failure to comply with administrative procedural requirements."

**\*4** *Singh v. Goord,* 520 F.Supp.2d 487, 495–96 (S.D.N.Y.2007) (quoting *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).

In the current case, Defendants claim that Plaintiff failed to exhaust all available administrative remedies in his claims against Defendants Bush and Garneau for meal tampering and deliberate indifference because he did not file a timely grievance with the IGRC. *See* Dkt. No. 50–5 at 10. Plaintiff contends that he filed a timely grievance and that special circumstances prevented him from complying with the administrative procedural requirements. *See* Dkt. No. 54 at 11–13.

Plaintiff claims that on April 29, 2009, he filed a grievance for both incidents and sent the superintendent a letter describing the events. Plaintiff has provided a copy of both the grievance and the letter to support his claim. *See* Dkt. No. 55 at 4–5, 8–9. On June 1, 2009, Plaintiff followed up his grievance by requesting an update on its status and received notice on June 8 stating "there is no grievance on file" concerning his complaints allegedly filed on April 29, and that "[Plaintiff's] complaint is being returned to [him] to file at [his] present facility." *See id.* at 7. On June 16, 2009, Plaintiff filed another grievance with the IGRC at Lakeview Correctional Facility about the April 28 incidents which was denied because of untimely service. *See id.* at 8, 10. Plaintiff then appealed this decision to the superintendent, who affirmed the IGRC decision. *See id.* at 10. On June 22, Plaintiff made a final appeal to the CORC who affirmed the superintendent's decision. *See id.* at 13.

While an untimely grievance does not properly exhaust available administrative remedies under the PLRA, a question of fact exists as to whether Plaintiff never filed his initial grievance on April 29, as Defendants claim, or that, as Plaintiff claims, he filed a timely grievance that was lost or tampered with by Defendants. Such credibility assessments are to be resolved by a trier of fact. Accordingly, the Court finds that a material issue of fact exists as to whether Plaintiff's failure to exhaust administrative remedies should be excused due to special circumstances. Therefore, Defendants' motion for summary judgment is **DENIED** on exhaustion grounds.

## C. Personal Involvement

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Further, in regards to § 1983, "the doctrine of *respondeat superior* cannot be applied ... to satisfy the prerequisite of personal involvement." *Kinch v. Artuz,* No. 97 CIV. 2419, 1997 WL 576038, *2 (S.D.N.Y. Sept.15, 1997). Therefore, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Ashcroft v. Iqbal,* 556, U.S. 662, 676 (2009).

### 1. Defendant Simmons

**\*5** Plaintiff contends that, on April 6, Defendant Simmons delivered him a tray of food covered with hair in retaliation for a grievance Plaintiff had previously filed. Plaintiff did not see Defendant Simmons place hair on the food or see him remove the plastic wrap from the food. *See* Dkt. No. 50–3 at 26. According to Plaintiff, Defendant Simmons stated that he did not play with Plaintiff's food, and if he did, "[Plaintiff] would know it." *See id.* Plaintiff further testified that "the only reason why I held [Simmons] responsible is because he's the one that's giving me the tray." *See id.* at 28.

Based upon the evidence presented, no rational juror could conclude that Defendant Simmons was personally involved in tampering with Plaintiff's food on April 6 merely because he served the food that day. Therefore, Defendants' motion for summary judgment on this matter is **GRANTED,** and Plaintiff's claim against Defendant Simmons is **DISMISSED.**

### 2. Defendant Bush

Similar to the claims against Defendant Simmons, Plaintiff claims Defendant Bush contaminated his food by placing a piece of metal in the meal served on April 28. *See id.* at 38. Plaintiff testified that Defendant Bush delivered his meal on this date, but Plaintiff did not see Defendant Bush tamper with the food. *See id* . Plaintiff assumed Defendant Bush was responsible for the metal because of "the relationship of ... the officers and when I told him that I had the metal in there, the smirk, the look that he had, that's what made me think he purposely put it in there, because he was smirking like it was a joke or something." *See id.*

Based upon the evidence presented, no rational juror could conclude that Defendant Bush was personally involved in contaminating Plaintiff's food simply because he delivered the meal and then "smirked" after Plaintiff complained of the metal. Therefore, Defendants' motion for summary judgment on this claim is **GRANTED,** and Plaintiff's claim against Defendant Bush is **DISMISSED.**

## D. Deliberate Indifference

In order for a plaintiff to effectively state an Eighth Amendment claim for denial of adequate medical care, he must demonstrate that the prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). This does not mean that every prisoner that has not received adequate medical attention has an Eighth Amendment claim, but rather the alleged conduct must be "repugnant to the conscience of mankind" and constitute "an unnecessary and wanton infliction of pain." *Id.* at 105–06.

The deliberate indifference standard for denial of medical care requires demonstration of (1) a sufficiently serious depravation, and (2) deliberate indifference with a "sufficiently culpable state of mind." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citation omitted). The first element is an objective standard to assess the seriousness of a prisoner's medical condition. *See Brock v. Wright,* 315 F.3d 158, 162 (2d Cir.2003) (citation omitted). This standard includes consideration of "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.' " *Id.* (quoting *McGuckin v. Smith,* 974 F.2d 1050, 1059–60 (9th

Cir.1992)) (other citation omitted). The Second Circuit has recognized that dental injuries may require unique attention due to the likelihood of continuing pain and discomfort, however, "not all claims regarding improper dental care will be constitutionally cognizable." *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998). While the decision of whether or not to treat a prisoner's injury may rely on an assessment of its seriousness at the moment it occurs, "in most cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Smith v. Carpenter,* 316 F.3d 178, 187 (2d Cir.2003).

**\*6** The second element of the deliberate indifference standard is a subjective test requiring the plaintiff to show that the defendant acted with the requisite culpable state of mind. This state of mind is similar to criminal recklessness and requires "something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

In this case, it is uncontroverted that Defendant Garneau responded to Plaintiff's cell after he cut his mouth biting into a piece of metal on April 28, 2009. It is also uncontroverted that Defendant Garneau did not inspect Plaintiff's mouth and told him not to "be a cry baby." *See* Dkt. No. 50–3 at 34. Plaintiff testified that he experienced "pain in [his] teeth" and that, while he "was not leaking blood, [he] was cut, you know in the mouth." *See id.* at 49. The bleeding in Plaintiff's mouth completely stopped within one hour and the cut healed without medical attention within three or four days. *See id.* at 50. Plaintiff experienced some mild difficulty eating and sleeping directly after the incident but was still able to get the "right amount" of food and sleep. *See id.* at 54, 56. About a week after the incident, when Plaintiff requested sick call, his injury was "no longer a cut" and a subsequent examination by a dentist revealed no dental injuries. *See id.* at 54.

While Plaintiff claims that his injury was sufficiently serious to require medical care, "[t]he mere fact that plaintiff disagrees with defendants about the nature of his condition does not give rise to a genuine issue of material fact." *Tindal v. Goord,* 530 F.Supp.2d 465, 467 (W.D.N.Y.2008) (citing *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998)). Based on the evidence presented, no reasonable juror could

conclude that Plaintiff's injury, which stopped bleeding within an hour and completely healed on its own accord within three or four days, was objectively a sufficiently serious injury. Since the Court finds that Plaintiff did not suffer a sufficiently serious medical injury, the Court need not determine if Defendant Garneau's actions of ignoring medical complaints and calling Plaintiff a "cry baby" rise to the requisite culpable state of mind of deliberate indifference. Therefore, Defendants' motion for summary judgment on this claim is **GRANTED** and the claims against Defendant Garneau are **DISMISSED**.

### E. Defendant Doe

In Plaintiff's October 31, 2010 complaint, he named a John Doe Defendant. While the Court has reminded Plaintiff several times that he must ascertain the true identity of, and serve the Doe Defendant, Plaintiff has failed to do so. Rule 4 of the Federal Rules of Civil Procedure states that the plaintiff is responsible for service of the summons and complaint on each defendant within 120 days of filing the complaint. *See* FED. R. CIV. P. 4(c)(1), (m). The Northern District of New York requires that the plaintiff must effectuate service within sixty days. The Court may, upon motion or its own initiative, dismiss a case without prejudice as to any defendant that has not been properly served. *See id.* at 4(m). Since Plaintiff has failed to timely identify and serve the John Doe Defendant and no valid cause of action has been asserted, all claims against Defendant John Doe are **DISMISSED**.

### IV. CONCLUSION

**\*7** After carefully considering Magistrate Judge Treece's Report–Recommendation, Plaintiff's objections thereto, and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Treece's May 23, 2013 Report–Recommendation and Order is **ADOPTED** in its entirety for the reasons stated therein; and the Court further

**ORDERS** that Defendants' motion for summary judgment is **GRANTED** in its entirety; and the Court further

**ORDERS** that the Defendant John Doe is **DISMISSED** due to Plaintiff's failure to timely identify and serve him; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum–Decision and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED.**

### REPORT–RECOMMENDATION and ORDER

RANDOLPH F. TREECE, United States Magistrate Judge.

*Pro se* Plaintiff Ronnie Thaxton brings this civil rights action, pursuant to 42 U.S.C. § 1983, alleging that (1) Defendant Simmons retaliated against him for grievances Plaintiff filed against him, (2) Defendants Bush and Doe deprived him of nutritional meals, and (3) Defendant Garneau was deliberately indifferent to his serious medical needs, in violation of his First and Eighth Amendment rights. *See* Dkt. No. 1, Compl. [1] Defendants have moved for Summary Judgment on the grounds that (1) Plaintiff failed to exhaust his administrative remedies regarding his claims against Defendants Bush and Garneau, (2) Defendants Simmons and Bush were not personally involved in any constitutional violations, and (3) Plaintiff did not suffer a sufficiently serious injury to support his medical deliberate indifference claim against Defendant Garneau. *See generally* Dkt. No. 50–5, Defs.' Mem. of Law. We recommend that Defendants' Motion be **GRANTED.**

### I. STANDARD OF REVIEW

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

**\*8** To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

## II. DISCUSSION

### A. Summary of Facts

The following facts are uncontroverted.

Plaintiff's claims arise out of events which occurred while he was an inmate at Upstate Correctional Facility ("UCF"), in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). Dkt. No. 50–1, Defs.' Statement of Material Facts Pursuant to Local Rule 7.1(A)(3) (hereinafter "Defs.' 7.1 Statement"), at ¶ 1; *see generally* Compl.

On January 12, 2009, Plaintiff filed a grievance, complaining that he was getting his meals later than other prisoners; although not mentioned by name, it is agreed by the parties that this grievance implicated Defendant Simmons. Defs.' 7.1 Statement at ¶¶ 2 & 3. On April 6, Plaintiff found several strands of hair in the evening meal that Defendant Simmons had delivered to him. He talked to Defendant Simmons about the hair and Defendant Simmons stated that he had not "played" with Plaintiff's food, and if he had that Plaintiff "would know it." *Id.* at ¶¶ 7–10. Plaintiff did not see Defendant Simmons tamper with his meal. *Id.* at ¶ 13. After Plaintiff complained, Defendant Simmons gave him another food tray. *Id.* at ¶ 15.

**\*9** On April 28, 2009, Defendants Bush and Doe served Plaintiff his dinner meal. *Id.* at ¶¶ 16 & 25. Plaintiff later found a piece of metal in his food when he bit into his sardine sandwich. *Id.* at ¶ 17. Plaintiff "noticed drops of blood in the food," and requested medical attention. *Id.* at ¶¶ 17 & 31. Defendant Bush then left to get a sergeant and a nurse. *Id.* at ¶ 23. Plaintiff did not see Defendant Bush nor Defendant Doe tamper with his meal. *Id.* at ¶¶ 20 & 25.

Thereafter, Defendant Nurse Garneau and Sergeant Lombard [2] appeared at Plaintiff's cell. *Id.* at ¶ 27. Plaintiff requested that Defendant Garneau examine his mouth, to which Defendant Garneau stated that "she did not see much damage," that Plaintiff should not "be a cry baby," and then "walked off" without examining Plaintiff's mouth. *Id.* at ¶¶ 29–30.

### B. Exhaustion

The Prison Litigation Reform Act ("PLRA") provides, in pertinent part, that "no action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) (citations omitted). Exhaustion is similarly required even if the prisoner asserts futility as an excuse. *See Booth v. Churner,* 531 U.S. 731, 741 n. 6 (2001) (refusing to "read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise") (cited in *Marvin v. Goord,* 255 F.3d 40, 43 (2d Cir.2001)). Accordingly, the exhaustion requirements apply even where the grievance process does not permit an award of money damages and the prisoner seeks only money damages, provided the grievance tribunal has the authority to take some responsive action. *See Thomas v. Wright,* 2002 WL 31309190, at *5 (N.D.N.Y. Oct.11, 2002) (citing *Booth v. Churner,* 531 U.S. 731 (2001)).

In New York State, the administrative remedies consist of a three-step review process. First, a grievance is submitted to the Inmate Grievance Resolution Committee ("IGRC"), a committee comprised of both inmates and facility employees. [3] N.Y. COMP.CODES R. & REGS. tit. 7, § 701.5(b). The IGRC reviews and investigates the formal complaints and then issues a written determination. *Id.* Second, if the IGRC decision is appealed, the superintendent of the facility reviews the IGRCs determination and issues a decision. *Id.* at § 701.5(c). Finally, if the superintendent's decision is appealed, the Cental Office Review Committee ("CORC") makes the final administrative determination. *Id.* at § 701.5(d). Only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to § 1983 in federal court. *Bridgeforth v. .Bartlett,* 686 F.Supp.2d 238, 239 (W.D.N.Y.2010) (citing, *inter alia,* *Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)); *see also* *Neal v. Goord,* 267 F.3d 116, 121 (2d Cir.2001), *overruled*

on other grounds by *Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12.

**\*10** In determining whether a prisoner has failed to exhaust all available administrative remedies, the Second Circuit has instructed district courts to ask: "(1) whether administrative remedies were actually available, (2) whether the defendants forfeited their right to raise the affirmative defense or by their own actions precluded the plaintiff from using administrative grievance procedures, and (3) whether special circumstances have been plausibly alleged that justify the prisoner's failure to comply with administrative procedural requirements." *Singh v. Goord,* 520 F.Supp.2d 487, 495–96 (S.D.N.Y.2007) (quoting *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).

Here, Defendants argue that Plaintiff's claims against Defendant Bush, for meal tampering, and Defendant Garneau, for deliberate indifference, were not properly exhausted because Plaintiff failed to timely file a grievance regarding the events of April 28, 2009. Defs.' Mem. of Law at pp. 8–11. Plaintiff alleges that certain special circumstances justify his failure in this regard. Dkt. No. 54, Pl.'s Mem. of Law, at pp. 5–7. Because we find that a material issue of fact exists as to whether Plaintiff's failure to exhaust should be excused, we recommend that Defendants' Motion for Summary Judgment be **DENIED** on exhaustion grounds.

Plaintiff's claims against Defendants Bush and Garneau arise out of Plaintiff's allegations that on April 28, 2009, Defendant Bush put metal in his food in which he bit into causing him to injure his mouth, and that thereafter, Defendant Garneau refused to treat his injury. *See* Compl. at ¶ 6, pp. 3–4. Plaintiff claims that on April 29, 2009, he grieved both of these issues and sent the superintendent a letter describing these events. Pl.'s Mem. of Law at p. 5. In support of this claim Plaintiff has produced a copy of both the grievance and the letter. *See* Dkt. No. 55, Pl.'s Exs., at (unnumbered) pp. 4–5, Lt., dated Apr. 28, 2009, & Grievance, dated Apr. 28, 2009. Defendants maintain that no such grievance was ever filed. Defs.' Mem. of Law at pp. 9–10; Dkt. No. 50–4, Grievance R.

On or about May 3, Plaintiff was transferred to Attica Correctional Facility ("ACF"). Dkt. No. 50–3, Ronnie Thaxton Dep., dated Aug. 3, 2012, at p. 50. On June 1, 2009, Plaintiff wrote to UCF's Superintendent inquiring about the status of his April 28, 2009, grievance. *Id.* at (unnumbered) p. 3, Lt., dated June 1, 2009. On June 8, 2009, while Plaintiff

was incarcerated at Lakeview Correctional Facility ("LCF"), Plaintiff received a response to his June 1 letter, informing him that "there is no grievance on file ... with a written date of 4/28/09 concerning metal being put in your food .... [and that i]n accordance with [DOCCS] Directive # 4040 .... your complaint is being returned to you to file at your present facility." *Id.* at (unnumbered) p. 7, Mem., dated June 8, 2009. On June 15, 2009, Plaintiff filed a grievance at LCF about the incidents which occurred on April 28, 2009, and further complainied that his grievance was tampered with in retaliation for previous grievances he filed. That grievance was rejected as untimely. It is uncontroverted that Plaintiff appealed the determination that his June 15, 2009 grievance was untimely through each and every level of administrative appeal that was available to him. *Id.* at (unnumbered) pp. 8–13; Dkt. No. 50–4, Grievance R.; Defs.' Mem. of Law at pp. 8–11; Pl.'s Mem. of Law at pp. 5–7.

**\*11** Although it is true that filing an untimely grievance does not properly exhaust an issue for purposes of the PLRA, *see* *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), a question of fact exists as to whether or not Plaintiff actually filed a timely grievance on April 29, 2009, and whether it was lost or tampered with by Defendants. If Defendants lost or tampered with Plaintiff's April 29 grievance, then this Court would be inclined to recommend that Defendants' actions bar them from asserting the affirmative defense of exhaustion. *See* *Singh v. Goord,* 520 F.Supp.2d at 495–96. However, given that both sides have produced documentary evidence, in order to reach such a determination we would have to make credibility assessments that would be improper at the summary judgment stage. *See* *Scott v. Coughlin,* 344 F.3d at 287–89. Because such a determination can only be made by a trier of fact, we recommend that Defendants' Motion for Summary Judgment be **DENIED** on this ground.

### C. Personal Involvement

Plaintiff claims that Defendant Simmons put hair in his food on April 6, 2009, in retaliation for a grievance that he filed against Defendant Simmons on January 12, 2009, and that Defendant Bush deprived him of adequate nutrition by giving him a tray of food contaminated with a piece of metal on April 28, 2009. Compl. at ¶ 7, Third and Fourth Causes of Action. Defendants argue that Plaintiff cannot prove that Defendant

Simmons or Defendant Bush were personally involved in either incident. Defs.' Mem. of Law at pp. 5–7.

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. Wright v. Smith, 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz,* 1997 WL 576038, at *2 (S.D.N.Y. Sept.15, 1997) (citing *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995) & *Wright v. Smith,* 21 F.3d at 501) (further citations omitted). Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Ashcroft v. Iqbal,* 556 U.S. 662, 676, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

### i. Defendant Simmons

Plaintiff claims that on April 6, Defendant Simmons delivered him a tray of food that was covered in hair. Compl. at ¶ 6, p. 1. According to Plaintiff's Deposition testimony, the meals at UCF are served in styrofoam containers that are assembled in the kitchen, completely wrapped in cellophane, and then brought to the inmates in their cells on a cart. The cellophane is then removed from the styrofoam and the meal is given to the inmate through the feed up slot in the cell door. Thaxton Dep. at pp. 25–26. It is uncontroverted that on April 6, the cellophane wrapper was removed from Plaintiff's meal before it was given to him, however, it is also uncontroverted that Plaintiff did not see Defendant Simmons either remove the cellophane wrapper nor tamper with his food. *Id* . at p. 26–27. Plaintiff alleges that he confronted Defendant Simmons, asking him why "it seems like he always had an attitude and a problem when dealing with [his] food," and Defendant Simmons stated "I don't play with your food. I wouldn't play with your food. If I did, you would know it." *Id.* at p. 19. Plaintiff testified that "the only reason why I held him responsible is because he's the one that's giving me the tray." *Id.* at p. 27.

 **\*12** Based upon the evidence presented, no rational juror could conclude that Defendant Simmons tampered with Plaintiff's food on April 6, 2009, merely because he happened to deliver it that day and made a statement denying he had

done so. Therefore, we recommend that Defendant Simmons be **DISMISSED.**

### ii. Defendant Bush

Likewise, based on the record, no reasonable juror could conclude that Defendant Bush contaminated Plaintiff's food with a piece of metal on April 28, 2009. Just as above, it is uncontroverted that Plaintiff did not see Defendant Bush tamper with his food. Thaxton Dep. at pp. 36–37. Moreover, when asked how he knows that Defendant Bush was responsible for placing the piece of metal in his food, Plaintiff admitted that he assumed Defendant Bush was responsible "because of his reaction with the smirk on his face." *Id.* at p. 37. And stated further that "I believe it because the relationship of, you know, the officers and when I told him that I had the metal in there, the smirk, the look that he had, that's what made me think he purposely put it in there, because he was smirking like it was a joke or something." *Id.*

Because no rational juror could conclude that Defendant Bush was personally involved in contaminating Plaintiff's food merely because Defendant Bush delivered Plaintiff's meal and then smirked at Plaintiff, we recommend that Defendant Bush be **DISMISSED.**

### D. Eighth Amendment

Plaintiff claims that Defendant Garneau was deliberately indifferent to his serious medical needs in contravention of the Eighth Amendment when she failed to examine or treat him for injuries he claims he sustained after biting into a piece of metal concealed in his anchovy sandwich. Compl. at ¶ 7, Second Cause of Action. Defendants argue that Plaintiff cannot establish such a claim because he did not suffer from a sufficiently serious medical condition. Defs.' Mem. of Law at pp. 11–13. We agree.

To state an Eighth Amendment claim for denial of adequate medical care, a prisoner must demonstrate that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp. 35,

44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105–06).

To state a claim for denial of medical care, a prisoner must demonstrate (1) a serious medical condition and (2) deliberate indifference. *Farmer v. Brennan,* 511 U.S. 825, 834–35, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Hathaway v. Coughlin ("Hathaway I"),* 37 F.3d 63, 66 (2d Cir.1994). The first prong is an objective standard and considers whether the medical condition is sufficiently serious. The Second Circuit has stated that a medical need is serious if it presents "a condition of urgency that may result in degeneration or extreme pain ." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (internal quotation marks and citation omitted). Among the relevant factors to consider are "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individuals' daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong,* 143 F.3d at 702 (quoting *McGuckin v. Smith,* 974 F.2d 1050, 1059–60 (9th Cir.1992)). The second prong is a subjective standard requiring a plaintiff to demonstrate that the defendant acted with the requisite culpable mental state similar to that of criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *Hathaway I,* 37 F.3d at 66. A plaintiff must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm. *Farmer v. Brennan,* 511 U.S. at 836. This requires "something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835; *see also Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) (citing *Farmer* ). Further, a showing of medical malpractice is insufficient to support an Eighth Amendment claim unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance v. Armstrong,* 143 F.3d at 702 (quoting *Hathaway v. Coughlin ("Hathaway II"),* 99 F.3d 550, 553 (2d Cir.1996)); *see also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citations omitted).

**\*13** It is uncontroverted that Defendant Garneau responded to Plaintiff's cell on April 28, 2009, in response to his claims that he had injured his mouth by biting down on a piece of metal concealed in his food. It is also uncontroverted that she neither examined the inside of Plaintiff's mouth nor provided him with any treatment. With regards to the extent of his injury Plaintiff maintains that while "I was not leaking blood, I was cut, you know in the mouth. It was a little bit on the side of my jaw and it was more to my teeth. The pain in [his] teeth was more actually than the blood was." And that, within an hour the bleeding stopped. Thaxton Dep. at p. 49. Thereafter, Plaintiff experienced some continuing pain, an inability to eat on the right side of his mouth, paranoia, and some sleeplessness. *Id.* at pp. 52–55. Three or four days after the incident, Plaintiff was transferred to Attica Correctional Facility ("ACF"). *Id.* at p. 50. Plaintiff did not request sick call between April 28 and the day that he was transferred to ACF. By the time he requested sick call at ACF, about a week after April 28, his injury was "no longer a cut," and he was given Tylenol. *Id.* at pp. 49–51 & 53.

Although we certainly do not countenance ignoring the medical complaints of inmates as merely the petulant whining of a "cry baby," it is clear that the Constitution is not invoked every time a prison nurse chooses not to immediately treat a broken lip or cut tongue. While Plaintiff's injury may have been painful, no rational juror could conclude that an injury which healed on its own in a matter of days was objectively sufficiently serious to sustain an Eighth Amendment deliberate indifference claim. Therefore, we recommend that Defendants' Motion for Summary Judgment be **GRANTED** as to this claim.

### E. Defendant Doe

In his Complaint, filed on October 31, 2010, Plaintiff named a John Doe Defendant. *See generally* Compl. However, to date, and despite multiple reminders by this Court, [4] Plaintiff has failed to identify the Doe Defendant. Under FED. R. CIV. P. 4(c)(1) and 4(m), the plaintiff is responsible for service of the summons and complaint for each defendant within 120 days of the filing of the complaint. [5] Failure to properly serve any defendant in accordance with the Federal Rules will result in the court, upon motion or on its own initiative, to dismiss the case without prejudice as to that defendant. *Id.* at 4(m). Because Plaintiff has failed to timely identify and serve the John Doe Defendant, and because as outlined above, no cognizable cause of action is asserted herein,

we recommend dismissal of all claims asserted against him. *Cooks v. Delpiano,* 2008 WL 4186337, at *1 n. 1 (N.D.N.Y. Sept.10, 2008); *Pravada v. City of Albany,* 178 F.R.D. 25, 26 (N.D.N.Y.1998).

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Summary Judgment (Dkt. No. 50), be **GRANTED in its entirety;** and it is further

**\*14 RECOMMENDED,** that the Doe Defendant be dismissed due to Plaintiff's failure to timely identify and serve him; and it is further

**RECOMMENDED,** that, in light of the above recommendations, this matter be closed; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs. .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 4806457

### Footnotes

1    To avoid confusion, any time the Court references a specific page number for a document on the docket, the Court will cite to the page number assigned by the Court's electronic filing system.

1    Plaintiff's Complaint contained additional claims and Defendants. However, the claims and Defendants outlined above are all that remain after the Court's initial review of the Complaint and Defendants' Motion to Dismiss. *See* Dkt. Nos. 6, Mem.-Dec. and Order, dated Mar. 29, 2011, & 31, Rep.-Rec. and Order, dated Jan. 5, 2012.

2    Sergeant Lombard was dismissed as a Defendant in this action. Dkt. No. 32.

3    The IGRC is a five-member body consisting of two voting inmates, two voting staff members, and a non-voting chair (who may be an inmate, staff member of volunteer). N.Y. COMP.CODES R. & REGS tit.7, § 701.4.

4    This Court has specifically directed, or reminded, Plaintiff of his obligation to ascertain the true identity of, and serve the Doe Defendant on at least four separate occasions. *See* Dkt. Nos. 6, Order, dated Mar. 29, 2011, at pp. 9–10, 31, Rep.-Rec., dated Jan. 5, 2012, at p. 7 n. 6, & 32, Order, dated Feb. 2, 2012, at p. 5; *See also* Text Order, dated June 14, 2012.

5    Under the Local Rules for the Northern District of New York, a plaintiff must effectuate service within sixty (60) days. N.D.N.Y.L .R. 4.1(b)

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Woodward v. Lytle, Not Reported in Fed. Supp. (2018)

Case 9:19-cv-00689-AMN-TWD    Document 72    Filed 05/12/21    Page 106 of 110

KeyCite Yellow Flag - Negative Treatment

Distinguished by Sawyer v. Locy, N.D.N.Y., October 21, 2020

2018 WL 4643036
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Shawn WOODWARD, Plaintiff,

v.

LYTLE, Correctional Officer, Cape Vincent
Correctional Facility, et al., Defendants.

9:16-CV-1174 (NAM/DEP)
|
Signed 09/27/2018

**Attorneys and Law Firms**

SHAWN WOODWARD, Plaintiff Pro Se, 00-A-6563,
Collins Correctional Facility, P.O. Box 340, Collins, New
York 14034.

Attorneys for Defendants: Hon. Barbara D. Underwood,
Attorney General of the State of New York, Helena Lynch,
Esq., Assistant Attorney General, The Capitol, Albany, New
York 12224.

**MEMORANDUM-DECISION AND ORDER**

Hon. Norman A. Mordue, Senior U. S. District Judge

### I. INTRODUCTION

**\*1** Plaintiff *pro se* Shawn Woodward, a New York State
prison inmate, brings this 42 U.S.C. § 1983 action
against seven individual Defendants employed by the New
York State Department of Corrections and Community
Supervision ("DOCCS"), alleging civil rights claims related
to his confinement at Cape Vincent Correctional Facility
("Cape Vincent"). (Dkt. No. 1). Plaintiff's remaining claims
are for First Amendment retaliation against all Defendants
and Eighth Amendment excessive force against Defendant
Dawley. (Dkt. Nos. 30, 36). On February 9, 2018, Defendants
filed for summary judgment, on the basis that Plaintiff's
claims were barred based on his failure to exhaust the
available administrative remedies prior to filing this action.
(Dkt. No. 41). The matter was referred to United States
Magistrate Judge David E. Peebles, who, on August 13,
2018, issued a Report & Recommendation, recommending

that Defendants' motion for summary judgment be granted
and that the case be dismissed because Plaintiff failed to
exhaust his available administrative remedies. (Dkt. No.
57). Plaintiff then filed timely objections to the Report
& Recommendation, arguing, *inter alia*, that he could not
have exhausted his administrative remedies since they were
"opaque and incapable of use." (Dkt. No. 60, p. 12).

### II. STANDARD OF REVIEW

This court reviews *de novo* those portions of the Magistrate
Judge's findings and recommendations that have been
properly preserved with a specific objection, as is the case
here. *Petersen v. Astrue*, 2 F.Supp.3d 223, 228-29 (N.D.N.Y.
2012); 28 U.S.C. § 636(b)(1)(C).

Summary judgment may be granted only if all the
submissions taken together "show that there is no genuine
issue as to any material fact and that the moving party is
entitled to judgment as a matter of law." *In re World Trade
Center Lower Manhattan Disaster Site Litig.*, 758 F.3d 202,
210 (2d Cir. 2014). A fact is material if it "might affect the
outcome of the suit under the governing law." *Anderson
v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505,
91 L.Ed.2d 202 (1986); *see also Jeffreys v. City of New
York*, 426 F.3d 549, 553 (2d Cir. 2005). A fact is genuinely
in dispute "if the evidence is such that a reasonable jury could
return a verdict for the nonmoving party." *Id.* In ruling on a
summary judgment motion, the court "must construe the facts
in the light most favorable to the non-moving party and must
resolve all ambiguities and draw all reasonable inferences
against the movant." *Dallas Aerospace, Inc. v. CIS Air
Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Where the plaintiff
proceeds *pro se*, the Court must read his submissions liberally
and interpret them "to raise the strongest arguments that they
suggest." *McPherson v. Coombe*, 174 F.3d 276, 280 (2d
Cir. 1999) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790
(2d Cir. 1994) ).

### III. DISCUSSION

#### a. Exhaustion of Administrative Remedies

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C.
§ 1997e(a), requires an inmate to exhaust all available

Woodward v. Lytle, Not Reported in Fed. Supp. (2018)

Case 9:19-cv-00689-AMN-TWD    Document 72    Filed 05/12/21    Page 107 of 110

administrative remedies prior to bringing a federal civil rights action. *See* *Espinal v. Goord*, 558 F.3d 119, 123–24 (2d Cir. 2009). To properly exhaust his administrative remedies, an inmate must complete the administrative review process in accord with the applicable state procedural rules. *Jones v. Bock*, 549 U.S. 199, 218–19, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006) ). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." *Woodford*, 548 U.S. at 90–91, 126 S.Ct. 2378. The defendant bears the burden of proving that a plaintiff failed to exhaust available administrative remedies. *See* *Samuels v. Fischer*, 168 F.Supp.3d 625, 651 (S.D.N.Y. 2016).

**\*2** The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). 7 N.Y.C.R.R. §§ 701.5(a)(1), (b). The grievance must be filed within 21 days of the alleged occurrence, using an "inmate grievance complaint form (form #2131)," but if this form is not readily available, "a complaint may be submitted on plain paper." *Id.* at § 701.5(a)(1). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* at § 701.5(c) (1). If the grievant wishes to appeal to the Superintendent, "he or she must complete and sign the appeal section on the IGRC response form (form #2131) and submit it to the grievance clerk within seven calendar days after receipt of the IGRC's written response." *Id.* Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC"). *Id.* at § 701.5(d)(1). If the grievant wishes to appeal to the CORC, "he or she must complete and sign form #2133 and submit it to the grievance clerk within seven calendar days after receipt of the superintendent's written response to the grievance." *Id.* If the grievance concerns employee harassment, there is an expedited process: the grievance skips the IGRC level and goes to the Superintendent, who has twenty-five days to make a decision, after which the inmate has seven days to appeal to the CORC. *Id.* at § 701.8. During the grievance process, "matters not decided within the time limits may be appealed to the next step." *Id.* at § 701.6(g)(2). Inmates in special housing units have access to Form #2131, and "[t]he IGP supervisor shall monitor and ensure the proper functioning of the grievance procedure in SHU's." *Id.* at § 701.7.

There is also an exception to the mandatory exhaustion requirement, in the event the administrative remedies are "unavailable." *Williams v. Correction Officer Priatno*, 829 F.3d 118, 123 (2d Cir. 2016) (quoting *Ross v. Blake*, ––– U.S. ––––, 136 S.Ct. 1850, 1858, 195 L.Ed.2d 117 (2016) ). An inmate "must exhaust available remedies, but need not exhaust unavailable ones." *Ross*, 136 S.Ct. at 1858. The Supreme Court has identified three circumstances in which an administrative remedy, while "officially on the books," is not available. *Id.* at 1859. An administrative remedy is unavailable when: (1) "it operates a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) it is "so opaque that it becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Williams*, 829 F.3d at 123–24 (quoting *Ross*, 136 S.Ct. at 1859–60).

### b. Evidence of Exhaustion & Availability

On or about April 3, 2015, Plaintiff was incarcerated at Cape Vincent Correctional Facility in Cape Vincent, New York. (Dkt. No. 1, p. 3). Plaintiff helped other inmates prepare complaints about corrections staff, and he was allegedly warned by the staff against "writing up staff" and "testifying at hearings" in support of other inmates, and he was allegedly subjected to retaliation for doing so. (*Id.*, pp. 7–12). On or about July 3, 2015, Plaintiff was confined to the Special Housing Unit ("SHU"), after being found guilty of charges of fighting and drug use. (*Id.*, p. 13). Although the determinations were eventually reversed, Plaintiff spent nearly two months in the SHU as a result of the charges. (*Id.*). Plaintiff alleges that, on July 14, 2015, while in the SHU, he submitted a grievance complaining of retaliatory conduct by various Defendants, but that "[l]ater that week when the Inmate Grievance Program Supervisor made her rounds [,] she told me that she was not filing my grievance because she knew some of the officers and did not believe what I was saying." (Dkt. No. 52-2, pp. 1–2). There is no record of this particular grievance being filed. (*See* Dkt. No. 41-3). On July 22, 2015, Plaintiff successfully filed a grievance related to the food served in the SHU. (Dkt. No. 41-4).

Woodward v. Lytle, Not Reported in Fed. Supp. (2018)

Case 9:19-cv-00689-AMN-TWD    Document 72    Filed 05/12/21    Page 108 of 110

On July 27, 2015, Plaintiff wrote a letter to Acting DOCCS Commissioner Anthony Annucci, informing him that Plaintiff had attempted to file a grievance on July 14, 2015 but was thwarted by the IGP Supervisor. (Dkt. No. 52-2, p. 1). Plaintiff wrote that "because of this [,] I sent a handwritten copy to the facility's superintendent since he is the next in the chain of the grievance appeal process." (*Id.*, p. 2). Plaintiff wrote that he spoke with the Superintendent on July 27, 2015, who referred him back to the "grievance department." (*Id.*). Plaintiff continued:

> **\*3** Therefore, because step one (1) and two (2) in the grievance level are refusing to file my complaint, I'm sending it to you to either one (1) order the facility's Grievance Program Supervisor to file such or two (2) delegate this matter to Central Office Review Committee (CORC)[.]

(*Id.*). Annucci referred Plaintiff's letter to Karen Bellamy, the DOCCS Director of the IGP, who wrote Plaintiff in response on August 3, 2015. (Dkt. No. 52-3). In relevant part, Bellamy wrote as follows:

> Contact with the [Cape Vincent] administration reveals that the IGP Supervisor did not receive or refuse to file a July 15, 2015 complaint from you alleging staff misconduct. Further, she does not recall speaking with you during rounds on July 15, 2015.
>
> You are advised that Directive #4040 makes no provision for an inmate to refer grievances directly to Central Office, and that specific grievance concerns should be directed to the IGP Supervisor for the most expeditious means of resolution.

(*Id.*). On August 27, 2015, Plaintiff wrote again to Annucci, addressing the Bellamy letter. (Dkt. No. 52-4). Plaintiff expressed confusion as to what to do next, writing that:

> This is problematic because if a facility's IGP's Supervisor refuses to file an inmate grievance [,] then what can the inmate do? Especially when as in this case the facility's

Superintendent also refuses to except [sic] an inmate's grievance for filing?

(*Id.*). Plaintiff asked that his grievance be forwarded "to the proper facility's staff for filing," since by that time he had been transferred to Southport Correctional Facility in Pine City, New York. (*Id.*). By letter dated October 8, 2015, Bellamy responded to Plaintiff, writing in relevant part that: "Please be advised that your IGP issues were addressed in my August 3, 2015 letter to you ... You have not presented any compelling evidence to indicate that your grievances are not being processed in accordance with Directive #4040." (Dkt. No. 52-5). According to DOCCS, "[n]either Plaintiff's July 27, 2015 letter nor his August 27, 2015 letter was a grievance or an appeal of a grievance." (Dkt. No. 52-1, ¶ 7). There is no record of an appeal related to the alleged July 14, 2015 grievance. (*See* Dkt. No. 41-5).

### c. Analysis

In their motion for summary judgment, Defendants argued that Plaintiff failed to exhaust his administrative remedies and could not show that the administrative remedies were unavailable to him. (Dkt. No. 41-1). In the Report & Recommendation, Magistrate Judge Peebles correctly found that Plaintiff failed to exhaust his administrative remedies, since Plaintiff never actually filed a grievance related to the claims in this action, nor did he appeal any such grievance to the CORC. (Dkt. No. 57). That left one question: "whether the IGP was unavailable to plaintiff such that he may be excused from his failure to fully exhaust the administrative remedies." (*Id.*, p. 18). After careful review of the record, the Court finds that an issue of fact remains as to this question, in accordance with the Second Circuit's decision in *Williams v. Correction Officer Priatno*, 829 F.3d 118, 123 (2d Cir. 2016).

In that case, the plaintiff was housed in the SHU at Downstate Correctional Facility, and while there, he allegedly drafted a grievance concerning staff misconduct and then gave it to a correction officer to forward to the grievance office on his behalf. *Williams*, 829 F.3d at 120–21. The plaintiff never received a response to the grievance, he never appealed it, and he was transferred to another facility about two weeks later. *Id.* at 121. He alleged that the correction officer in

Woodward v. Lytle, Not Reported in Fed. Supp. (2018)

Case 9:19-cv-00689-AMN-TWD    Document 72    Filed 05/12/21    Page 109 of 110

the SHU never filed the grievance for him. *Id.* The plaintiff filed a civil rights action, but the defendants successfully moved to dismiss, on the basis that the plaintiff failed to exhaust his administrative remedies, citing records that he never filed an appeal of the grievance. *Id.* But the Second Circuit reversed, finding that the administrative remedies were unavailable to the plaintiff under the circumstances, where he had an unfiled and unanswered grievance:

> **\*4** However, even if Williams technically could have appealed his grievance, we conclude that the regulatory scheme providing for that appeal is "so opaque" and "so confusing that ... no reasonable prisoner can use [it]." *Ross,* 136 S.Ct. at 1859 (quoting Tr. of Oral Arg. 23). The regulations simply do not contemplate the situation in which Williams found himself, making it practically impossible for him to ascertain whether and how he could pursue his grievance.

*Williams,* 829 F.3d at 124. The Circuit explained that the regulations do not outline any process to appeal an unfiled grievance:

> On their face, the regulations only contemplate appeals of grievances that were actually filed. For example, if the grievance had never been filed, the superintendent would never have received it and the timeline for her to provide a response within 25 days "of receipt of the grievance" would never have been triggered. NYCRR tit. 7, § 701.8(f). In turn, the textual provision allowing a grievant to appeal to the CORC would never have come into effect. *See id.* § 701.8(g) ("If the superintendent fails to respond within the required 25 calendar day time limit the grievant may appeal his/her grievance to CORC.").

*Id.* The Circuit concluded that "the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it." *Id. at 126.* Further, the "obscurity" of the regulations "was compounded by the fact that Williams was transferred to another facility approximately two weeks after giving his grievance to the correction officer," since the regulations also do not provide guidance "on how a transferred inmate can appeal his grievance with the original facility without having received a response." *Id.* The Circuit recommended that, to avoid confusion going forward, "DOCCS revise its grievance procedures to instruct inmates how to appeal grievances that were not properly filed by prison staff, and how to appeal a grievance, to which the inmate never received a response, after being transferred." *Id. at 126–27.*

Likewise, there is evidence in this case that: 1) Plaintiff drafted a grievance while in the SHU on or about July 14, 2015; 2) he gave it the IGP Supervisor for filing; and 3) the grievance was never filed or answered. (Dkt. No. 1; Dkt. No. 52-2). On the other hand, there is evidence that the IGP Supervisor never received or refused to file any such grievance. (Dkt. No. 52-3). It is undisputed that DOCCS has no record of this grievance or any related appeal. Drawing all inferences in the non-moving party's favor, Plaintiff drafted and submitted the grievance, but it went unfiled and unanswered. Under these particular circumstances, "the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it." *Williams,* 829 F.3d at 126. Moreover, Plaintiff was also transferred after attempting to file the grievance, further compounding the problem. *Id.* Plaintiff's understandable confusion about the process is evident in his letters dated July 27, 2015 and August 27, 2015 to Acting Commissioner Annucci. (Dkt. No. 52-2, 52-4). And in response, DOCCS made no attempt to explain that Plaintiff had to appeal the non-response to his alleged unfiled grievance to the CORC, the position taken by Defendants in this case.[1] In fact, Plaintiff was advised that "Directive #4040 makes no provision for an inmate to refer grievances directly to Central Office, and that specific grievance concerns should be directed to the IGP Supervisor for the most expeditious means of resolution." (Dkt. No. 53-3). Plaintiff correctly identifies this confounding situation in his objections to the Report & Recommendation. (Dkt. No. 60, p. 16).

**\*5** In sum, viewing the evidence in the light most favorable to Plaintiff, the Court finds that an issue of fact exists as to the availability of the grievance process, which precludes summary judgment.[2] *See Williams,* 829 F.3d at 126–27; *see also Medina v. Napoli,* 725 F. App'x 51, 54 (2d Cir. 2018) ("The record establishes that Medina's allegations, supported by witness testimony, about defendants' actions to prevent the filing of Medina's grievances concerning the June 2007 incident are sufficient, when viewed in the light most favorable to Medina, to raise a genuine issue of material fact as to whether the grievance process was 'available' to Medina under the *Ross* and *Williams* exhaustion analysis.");

**Woodward v. Lytle, Not Reported in Fed. Supp. (2018)**

Case 9:19-cv-00689-AMN-TWD    Document 72    Filed 05/12/21    Page 110 of 110

*Jackson v. Downstate Correctional Facility*, No. 16 Civ. 267, 2018 WL 3650136, at *9, 2018 U.S. Dist. LEXIS 128980 (S.D.N.Y. July 31, 2018) (denying summary judgment motion based on failure to exhaust administrative remedies where evidence showed that the plaintiff "submitted a grievance, but that grievance was never filed," and the appeal procedures were "prohibitively opaque") (citing *Williams* ); *Hurst v. Mollnow*, No. 16 Civ. 1062, 2018 WL 4178226, at *10, 2018 U.S. Dist. LEXIS 122624 (N.D.N.Y. July 20, 2018) ("In light of *Williams*, the Court finds material issues of fact as to the availability of the grievance process and whether Plaintiff attempted to exhaust his administrative remedies, precluding summary judgment."), *report and recommendation adopted*, No. 16 Civ. 1062, 2018 WL 4153926, 2018 U.S. Dist. LEXIS 147670 (N.D.N.Y. Aug. 30, 2018); *Fann v. Graham*, No. 15 Civ. 1339, 2018 WL 1399331, at *6, 2018 U.S. Dist. LEXIS 6717 (N.D.N.Y. Jan. 11, 2018) ("Viewing the facts in the light most favorable to plaintiff, the record suggests that plaintiff's grievances were submitted, but were unfiled and unanswered, creating an issue of fact as to whether the grievance process was available and whether plaintiff attempted to exhaust his administrative remedies...."), *report and recommendation adopted*, No. 15 Civ. 1339, 2018 WL 1399340, 2018 U.S. Dist. LEXIS 43887 (N.D.N.Y. Mar. 19, 2018); *Reid v. Marzano*, No. 15 Civ. 761, 2017 WL 1040420, at *3, 2017 U.S. Dist. LEXIS 38547 (N.D.N.Y. Mar. 17, 2017) (denying summary judgment motion based on exhaustion argument, noting that "it is DOCCS' borderline incomprehensible regulation governing this situation that is to blame").

## IV. CONCLUSION

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge Peebles's Report & Recommendation (Dkt. No. 57) is **REJECTED**; and it is further

**ORDERED** that Defendants' Motion for Summary Judgment (Dkt. No. 41) is **DENIED without prejudice** to renew should the Defendants request an exhaustion hearing pursuant to *Messa v. Goord*, 652 F.3d 305 (2d Cir. 2011); and it is further

**ORDERED** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order in accordance with the Local Rules of the Northern District of New York.

**IT IS SO ORDERED.**

## All Citations

Not Reported in Fed. Supp., 2018 WL 4643036

---

## Footnotes

1    The obscurity of this Kafkaesque suggested process is further demonstrated by the fact that the regulations spell out that any appeal to the CORC requires Form #2133, while inmates in the SHU only have access to Form #2131. *Compare* N.Y.C.R.R. §§ 701.5(d)(1), 701.7(a); *see also Davis v. State of New York*, 311 F. App'x 397, 399 n.2 (2d Cir. 2009) (explaining that Form #2133 is the form which has the Superintendent's grievance decision printed on the top half of a single sheet and on the bottom half contains the form an inmate is required to file to appeal the Superintendent's decision to the CORC).

2    The fact that Plaintiff successfully filed one grievance while in the SHU related to the food served there does not demonstrate that he could have filed one about employee misconduct or that he could have appealed an unfiled grievance to the CORC, so as to eliminate the issue of fact as to the availability of administrative remedies.

---

**WESTLAW**    © 2021 Thomson Reuters. No claim to original U.S. Government Works.