UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

RASHAD SALAAM,

                              Plaintiff,

        v.                                              9:19-cv-00689-AMN-TWD

GORDON STOCK and TRAVIS M. ZEHR,

                                    Defendants.
_____

APPEARANCES:                                    OF COUNSEL:

RASHAD SALAAM
*Plaintiff, pro se*
14-A-3363
Clinton Correctional Facility
P.O. Box 2001
Dannemora, NY 12929


LETITIA JAMES                                   STEVE NGUYEN, ESQ.
Attorney General of the State of New York       Assistant Attorney General
*Attorney for Defendants*
The Capitol
Albany, NY 12224

        **THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

                **REPORT-RECOMMENDATION AND ORDER**

I.      **INTRODUCTION**

        This matter has been referred for a report and recommendation by the Hon. Anne M

Nardacci, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

On May 30, 2019, *pro se* Plaintiff Rashad Salaam ("Plaintiff"), an inmate in the custody of the

New York State Department of Corrections and Community Supervision ("DOCCS"),

commenced this action pursuant to 42 U.S.C. § 1983 ("Section 1983").  (Dkt. No. 1.)  Plaintiff's

fourth amended complaint was accepted for filing on August 11, 2021, and alleged Fourteenth

Amendment equal protection and Eighth Amendment failure to protect claims against Correction

Officer ("CO") Gordon Stock and CO Travis M. Zehr.  (Dkt. No. 83.)

      Currently before the Court is Defendants' motion for summary judgment.  (Dkt. No.

108.)  For the reasons set forth below, the Court recommends Defendants' motion be granted in

part and denied in part.

## II.    LEGAL STANDARD

      Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is warranted

if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-52

(1986).  The moving party bears the initial burden of demonstrating "the absence of a genuine

issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Salahuddin v.

Gourd*, 467 F.3d 263, 272-73 (2d Cir. 2006).  A fact is "material" if it "might affect the outcome

of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248; *see

Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).  The movant may meet this

burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

      If the moving party satisfies its burden, the nonmoving party must move forward with

specific facts showing there is a genuine issue for trial.  *Salahuddin*, 467 F.3d at 273.  In that

context, the nonmoving party must do more than "simply show that there is some metaphysical

doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

The Second Circuit instructs that on summary judgment motions, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Jeffreys*, 426 F.3d at 554 (emphasis in original). In other words, "a nonmoving party must offer some hard evidence showing that [his] version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). Accordingly, statements "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obligated to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, that status "does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003).

In applying the summary judgment standard, the district court should not weigh evidence or assess the credibility of witnesses. *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996); *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) ("Assessments of

credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment").

### III.    DEFICIENCIES IN PLAINTIFF'S OPPOSITION SUBMISSION

While courts are required to give due deference to a plaintiff's *pro se* status, that status "does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen*, 351 F.3d at 50.  In opposing Defendants' motion for summary judgment, Plaintiff failed to respond to the statement of material facts filed by Defendants in the manner required under Local Rule 56.1(b).[1]  (*See* Dkt. No. 110.)  "This requirement is not a mere formality; rather 'this and other local rules governing summary judgment are essential tools intended to relieve the district court of the onerous task of hunting through voluminous records without guidance from the parties.'"  *Cao-Bossa v. New York State Dep't of Lab.*, No. 1:18-CV-0509 (GTS/TWD), 2021 WL 3674745, at *1 (N.D.N.Y. Aug. 19, 2021).

Nevertheless, the Second Circuit has ruled that "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules," including local rules relating to requirements regarding the submission of and response to statements of material facts on summary judgment motions, and to "conduct an assiduous review of the record."  *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks omitted).

---

[1] Local Rule 56.1(b) requires the opposing party to file a Response to the movant's Statement of Material Facts.  Under the rule, the Response "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs.  Each denial shall set forth a specific citation to the record where the factual issue arises."  L.R. 56.1(b).

In deference to Plaintiff's *pro se* status, the Court has reviewed the entire record. *See Parker v. Fantasia*, 425 F. Supp. 3d 171, 176 n.2 (S.D.N.Y. 2019) (noting that special solicitude afforded to *pro se* litigants suggests that courts should review the record when *pro se* plaintiff fails to appropriately respond to defendants' properly supported statement of material facts).

## IV.    BACKGROUND

Plaintiff's claims stem from two specific incidents: the first on July 22, 2017, and the second on July 25, 2017.  Plaintiff alleges on July 22, 2017, CO Stock was overlooking the gallery as he opened the cells for breakfast around 7:30AM and during that time, another inmate, Jason Williams ("Williams"), was able to enter Plaintiff's cell and sexually assault him.  (Dkt. No. 83 at 3; Dkt. No. 108-4 at 22-23, 25; Dkt. No. 110 at 2-3.)  The incident lasted around 3 minutes.  (Dkt. No. 108-4 at 25.)  Williams threatened to kill Plaintiff if he told anyone about the attack.  (Dkt. No. 108-4 at 25-27.)  Plaintiff alleges he would not have been assaulted if CO Stock would have made his rounds on time or pulled a pin during the attack.  (Dkt. No. 83 at 1.)

Plaintiff alleges CO Stock knew he was at serious risk of harm due to his background.  Plaintiff was sexually assaulted at other facilities and previously identified as transgender.  (Dkt. No. 83 at 2-3; Dkt. No. 108-4 at 48.)  This information had supposedly spread throughout his block and the prison.  (Dkt. No. 83 at 2-3; Dkt. No. 108-4 at 48.)  As a result, other inmates loudly taunted him, but the COs did nothing about it.  *Id.*  Plaintiff claims CO Stock would overhear the inmates in other tiers harassing him and would then walk past Plaintiff's cell grinning at him "in a childlike manner" while he continued his rounds.  (Dkt. No. 83 at 2-3.)

On July 25, 2017, CO Zehr was opening cells for the inmates after recreation at or around 10PM.  (Dkt. No. 83 at 3-4; Dkt. No. 108-4 at 36.)  The same inmate who assaulted Plaintiff three days prior, Williams, came up behind Plaintiff and cut his face with a razor.  (Dkt. No. 108-

4 at 35.)  Plaintiff went back into his cell, but Williams followed him and cut Plaintiff's right arm before returning to his own cell.  (Dkt. No. 108-4 at 35, 39-40.)  The incident lasted about a minute and a half.  (Dkt. No. 108-4 at 38.)  CO Zehr allegedly stood at the end of the gallery watching as this occurred.  (Dkt. No. 83 at 3-4.)  According to Plaintiff, CO Zehr did not pull a pin or give attention to the situation.  *Id.*  Plaintiff also claims CO Zehr walked by his cell "smiling in a childish way" four to five minutes after the incident while Plaintiff was bleeding from his arm and face.  (Dkt. No. 108-4 at 35-36, 40.)   Plaintiff alleges he had to call CO Zehr back and ask him to go to the infirmary.  (Dkt. No. 108-4 at 35-36.)  CO Zehr allegedly told Plaintiff to wait, did his rounds, and then sent Plaintiff to the infirmary.  (Dkt. No. 108-4 at 36.) Plaintiff still has scars on his face and arm from the incident.  (Dkt. No. 108-4 at 46.)

Plaintiff claims as a result of the attacks on July 22 and July 25, 2017, other inmates have "tried"[2] him in the shower and while using the phone; spit in his food at every meal; took his commissary and packages; and extorted his mother for money—resulting in the police being called.  (Dkt. No. 83 at 4.)

## V.    DISCUSSION

Plaintiff claims COs Stock and Zehr failed to protect him from the July 22, 2017, and July 25, 2017, incidents, violating his Eighth Amendment rights.  (Dkt. No. 83 at 1-4.)  Plaintiff also claims COs Stock and Zehr treated him differently because he previously identified as transgender and because he murdered someone related to a CO, violating his Fourteenth Amendment equal protection rights.  (Dkt. No. 83 at 3.)  Defendants assert Plaintiff's claims fail as a matter of law because (1) COs Stock and Zehr were unaware of Plaintiff's risk of harm at

---

[2] The Court interprets "tried" to mean other inmates attempted to assault or start an altercation with Plaintiff.

the time of the two incidents; (2) Plaintiff was not a member of a protected class or treated differently from others similarly situated; and (3) Defendants' actions were not discriminatory. (Dkt. 108-5 at 7-14.)  In the alternative, Defendants claim they are entitled to qualified immunity.  (Dkt. 108-5 at 15.)

### A.    Fourteenth Amendment Equal Protection Claim

The Equal Protection Clause provides that "no State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  This is "essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  The Equal Protection Clause "bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if 'such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'"  *Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir. 2005) (quoting *LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980)).  Governmental action may also violate the Equal Protection Clause where the defendants intentionally treat the plaintiff "differently from others with no rational basis for the difference in treatment."  *Id.* (citing *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).  Thus, a plaintiff asserting an equal protection claim must allege facts plausibly suggesting that (1) he was treated differently from similarly situated individuals; and (2) the defendants treated him differently due to his membership in a suspect class, inhibited his exercise of a fundamental right, acted out of malice, or acted irrationally and arbitrarily.

When a suspect classification is not at issue, the Equal Protection Clause still requires that individuals be treated the same as "similarly situated" individuals.  *Fortress Bible Church v.*

*Feiner*, 694 F.3d 208, 222 (2d Cir. 2012). Thus, a plaintiff may bring a "class of one" equal protection claim "where the plaintiff alleges that [he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook*, 528 U.S. at 564. In the Second Circuit, class of one plaintiffs "must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves." *Clubside v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006) (citation omitted). A high level of similarity between the plaintiff and comparators provides "an inference that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose—whether personal or otherwise—is all but certain." *See Witt v. Vill. of Mamaroneck*, No. 12-CV-8778 (ER), 2015 WL 1427206, at *5 (S.D.N.Y. Mar. 27, 2015), *aff'd*, 639 F. App'x 44 (2d Cir. 2016).

To summarize, to state a class of one claim, a plaintiff must allege (1) that he was intentionally treated differently from other similarly situated individuals; and (2) that the disparate treatment was either (a) "irrational and wholly arbitrary" or (b) motivated by animus. *Assoko v. City of New York*, 539 F. Supp. 2d 728, 735 (S.D.N.Y. 2008).

### 1. Suspect Class

Plaintiff claims COs Stock and Zehr "neglected" to protect or "ignored" Plaintiff because he had previously identified as transgender and because he murdered someone related to a CO. (Dkt. No. 83 at 3.) To start, Plaintiff has not demonstrated he was a member of a suspect class due to his gender identity. This Circuit has previously grappled with what level of scrutiny to apply to transgender individuals and whether transgender individuals are a suspect class for equal protection purposes. *See Adkins v. City of New York*, 143 F. Supp. 3d 134 (S.D.N.Y. 2015); *White v. City of New York*, 206 F. Supp. 3d 920 (S.D.N.Y. 2016). However, Plaintiff no

longer identified as transgender by the time the incidents occurred.  (Dkt. No. 108-4 at 19-20.)

Plaintiff testified he identified as transgender from 2009 to 2011.  *Id.*  In 2011, he began to

identify as a cisgender[3] man again.  *Id.*  Because Plaintiff no longer identified as transgender at

the time the incidents occurred in 2017, the Court need not determine which level of scrutiny

applies to transgender individuals or whether transgender individuals are a suspect class.  *See*

*generally Adkins*, 143 F. Supp. 3d at 134; *White*, 206 F. Supp. 3d at 920.  Alternatively, Plaintiff

has not demonstrated any of the criteria needed to qualify "individuals who previously identified

as transgender" as a suspect class.[4]

    Moreover, Plaintiff was not a member of a suspect class as someone convicted of murder.

*Lee v. Governor of State of N.Y.*, 87 F.3d 55, 60 (2d Cir. 1996) ("prisoners either in the aggregate

or specified by offense are not a suspect class"); *Mathie v. Dennison*, No. 06 CIV. 3184(GEL),

2007 WL 2351072, at *8 (S.D.N.Y. Aug. 16, 2007), *aff'd*, 381 F. App'x 26 (2d Cir. 2010)

("Prisoners are not a suspect class . . . . Nor are violent prisoners a suspect class. A history of

violent crime is the very opposite of a morally irrelevant, immutable trait: it reflects a voluntary

choice by the offender to commit a dangerous and harmful criminal act when he could have

complied with the law); *Scott v. Dennison*, 739 F. Supp. 2d 342, 362 (W.D.N.Y. 2010) ("neither

violent felons nor non-violent felons are a 'suspect class' under the United States Constitution.")

---

[3] Cisgender means "of, relating to, or being a person whose gender identity corresponds with the sex the person had or was identified as having at birth."  Cisgender, Merriam-Webster, https://www.merriam-webster.com/dictionary/cisgender (last accessed Feb. 27, 2023).

[4] In *Adkins*, the court used the four factors outlined in *Windsor v. United States*, 699 F.3d 169 (2d Cir. 2012) in its determination that transgender individuals are a quasi-suspect class: (1) the group has suffered a history of persecution and discrimination; (2) the group has sufficiently discernable characteristic(s); (3) the group's characteristic(s) have no relation to ability to contribute to society; (4) the group is politically weakened or powerless.  *Adkins*, 143 F. Supp. 3d at 139-40.

Therefore, Plaintiff has not demonstrated he was a member of a suspect class at the time the incidents occurred.

### 2. Class of One

Plaintiff has also not sufficiently demonstrated he is a class of one for equal protection purposes. Plaintiff must demonstrate both (1) he was intentionally treated differently from other similarly situated individuals; and (2) the disparate treatment was either (a) "irrational and wholly arbitrary" or (b) motivated by animus. *Assoko*, 539 F. Supp. 2d at 735. Plaintiff has provided no examples of similarly situated individuals for use of comparison. *Ruggiero v. Fischer*, 807 F. App'x 70, 74 (2d Cir. 2020) (finding the district court properly granted summary judgment on an equal protection claim when Plaintiff "made no showing at all that he was treated differently from SHU inmates at other institutions" and "did not attempt to identify a specific comparator at [his facility] or another facility with whom he had a high degree of similarity."); *Rasheen v. Adner*, 356 F. Supp. 3d 222, 242 (N.D.N.Y. 2019) (dismissing complaint when Plaintiff failed "to allege any facts suggesting how he was treated differently than any similarly situated inmate" and "Plaintiff's vague and conclusory allegations [were] insufficient to plausibly suggest an equal protection violation."); *Ippolito v. Goord*, No. 05-CV-6683 MAT, 2012 WL 4210125, at *19 (W.D.N.Y. Sept. 19, 2012) ("Plaintiff has offered no evidence that he was treated differently from other, similarly situated inmates. Accordingly, his 'class of one' equal protection claim fails as a matter of law and is dismissed."). As a result, the Court cannot determine if disparate treatment existed, and Plaintiff has not demonstrated he was a class of one for equal protection purposes. Therefore, the Court recommends granting Defendants' motion as to Plaintiff's Fourteenth Amendment equal protection claim. (Dkt. No. 108-5 at 10-16.)

**B.**     **Eighth Amendment Failure to Protect Claims**

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishments," U.S. Const. amend. VIII, and requires prison officials to take "reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996) (citing *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994)). In particular, prison officials "have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833 (quoting *Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988)). Prison officials are liable under the Eighth Amendment for harm incurred by an inmate if they act with deliberate indifference to the inmate's safety. *Morales v. New York State Dep't of Corr.*, 842 F.2d 27, 30 (2d Cir. 1988) ("[A] state prison guard's deliberate indifference to the consequences of his conduct for those under his control and dependent upon him may support a claim under [Section] 1983.").

To prevail on a failure to protect claim, a plaintiff must demonstrate two elements, one objective and one subjective. To satisfy the objective prong, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. That is, the deprivation "must be, in objective terms, 'sufficiently serious.'" *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). The standard "contemplates 'a condition of urgency, one that may produce death, degeneration, or extreme pain.'" *Id.* (quoting *Nance v. Kelly*, 912 F.2d 605, 607 (2d Cir. 1990)). Under this standard, the plaintiff "must demonstrate that this grave harm was 'actual or imminent.'" *Dublin v. New York City Law Dep't*, No. 10 Civ. 2971 (LAP), 2012 WL 4471306, at *5 (S.D.N.Y. Sept. 26, 2012) (quoting *Benjamin v. Fraser*, 343 F.3d 35, 51 (2d Cir. 2003)).

11

As to the second prong, "[t]o prove deliberate indifference, the plaintiff must show that the 'official [knew] of and disregard[ed] an excessive risk to inmate health or safety.'" *Celestin v. Premo*, No. 9:12-cv-301 (GLS/RFT), 2014 WL 272443, at *5 (N.D.N.Y. Jan. 24, 2014) (quoting *Farmer*, 511 U.S. at 836) (alterations in original). Indeed, "[t]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and* he must also draw the inference." *Id.* (emphasis in original). Mere negligence by a prison official will not suffice. *Hayes*, 84 F.3d at 620; *Hathaway*, 37 F.3d at 66 ("Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm.").

In this case, Defendants do not deny the lacerations Plaintiff received constitute a serious harm for purposes of the objective prong. (Dkt. No. 108-5 at 7.) However, they do argue Plaintiff offered no evidence to satisfy the subjective prong of the test as to CO Stock or CO Zehr. *Id.*

### 1. CO Stock

There is no indication CO Stock was aware of facts from which an inference could be drawn that Plaintiff was at a substantial risk of serious harm during the July 22, 2017, attack. CO Stock stated in his declaration on July 22, 2017, at 7:30AM, the First Officer went around to each company in A-Block and let the residents out for breakfast. (Dkt. No. 108-2 at 2.) CO Stock served as Second Officer and followed behind the First Officer to inspect every A-Block cell to confirm it was vacant. *Id.* This is known as the "chow run." *Id.* CO Stock started from the fifth floor and made his way down to the second floor, where Plaintiff was housed in A-9. *Id.* CO Stock states he did not observe, encounter, or interact with Plaintiff on chow run that

day.  (Dkt. No. 108-2 at 3.)   He further states he did not witness Williams enter Plaintiff's cell or assault him at any point on July 22, 2017.  *Id.*

Plaintiff alleges the July 22, 2017, attack occurred sometime between 7 and 7:30AM. (Dkt. No. 108-4 at 23.)   Plaintiff testified CO Stock was not nearby during the attack but was above him on "[the] second or third floor."  (Dkt. No. 108-4 at 28.)  Additionally, the summary judgment record does not demonstrate CO Stock was present in A-9 between 7 and 7:30AM on July 22, 2017.  (Dkt. No. 108-2 at 2-3; Dkt. No. 108-4 at 28.)  If CO Stock was not in A-9 during the attack, it does not appear it would have been possible for him to see or hear the attack, as companies on the same floor face away from each other and companies on separate floors are separated by concrete floors and walls.  (Dkt. No. 108-2 at 2-3.)  Therefore, it appears CO Stock was not and could not have been aware of a substantial risk of serious harm to Plaintiff during the attack.

Nor is there any evidence suggesting CO Stock was aware of a substantial risk of serious harm to Plaintiff prior to the attack.  Plaintiff alleges CO Stock was aware of Plaintiff's risk of harm prior to the incident on July 22, 2017, due to the other inmates' loud taunting of Plaintiff about his gender identity and the sexual assaults at other prisons.  (Dkt. No. 83 at 2-3; Dkt. No 108-4 at 47-48.)  Plaintiff further claims CO Stock and other COs neglected him because he previously identified as transgender and because he murdered a CO's relative.  (Dkt. No. 83 at 3.)  However, the record evidence does not demonstrate CO Stock had any prior altercations with Plaintiff or had any prior knowledge of Plaintiff's gender identity or prior crimes; the sexual assaults at other prisons; or the other inmates' taunting of Plaintiff.  (Dkt. No. 108-2 at 2; Dkt. No. 108-4 at 34.)  Plaintiff offers no proof to the contrary beyond the conclusory allegation that CO Stock knew this information.  (Dkt. No. 83 at 2-3.)  "Conclusory allegations, conjecture and

speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156

F.3d 396, 400 (2d Cir. 1998). Therefore, the Court recommends granting Defendants' motion on

Plaintiff's Eighth Amendment failure to protect claim against CO Stock. (Dkt. No. 108-5 at 7-

9.)

### 2. CO Zehr

The Court comes to a different recommendation with regard to the Eighth Amendment

claim against CO Zehr. According to Plaintiff, on July 25, 2017, CO Zehr was opening cells for

the inmates after recreation at or around 10PM. (Dkt. No. 83 at 3-4; Dkt. No. 108-4 at 36.)

During that time, Williams came up behind Plaintiff and cut his face with a razor. (Dkt. No.

108-4 at 35-36.) Plaintiff went back into his cell, but Williams followed him and cut Plaintiff's

right arm before returning to his own cell. (Dkt. No. 108-4 at 35, 39-41.) The incident lasted

about a minute and a half. (Dkt. No. 108-4 at 38.) CO Zehr allegedly stood at the end of the

gallery watching as this occurred. (Dkt. No. 83 at 4.) According to Plaintiff, CO Zehr did not

pull a pin or give attention to the situation. *Id.* As with CO Stock, Plaintiff claimed CO Zehr

ignored or neglected him due to his prior gender identity and because he murdered someone

related to a CO. (Dkt. No. 83 at 3.)

CO Zehr states in his declaration that on the evening of July 25, 2017, he was assigned to

A-9. (Dkt. No 108-3 at 2.) At approximately 10:05PM, the A-9 residents returned to their cells

from recreation by walking up a stairwell. *Id.* CO Zehr was stationed between the stairwell and

the front of the company, which is closest to Cell 1, directing residents to their respective cells.

*Id.* He further states because he was the only officer in A-9 he could not leave his post. *Id.* At

one point he observed Williams' "outstretched arm through [Plaintiff's] cell bars" but "could not

determine whose cell it belonged to" at the time. *Id.* He could not "observe who was inside or

what Williams was doing with his extended hand." *Id.*  However, he claims at the time he "believed Williams was trying to pass a pack of cigarettes or something similar." (Dkt. No. 108-3 at 3.)  He confirmed Plaintiff's "cell bars were already closed" but "[s]hortly afterward" he "observed another incarcerated individual obstruct[ing] [his] view of the company." *Id.*  CO Zehr then instructed Williams and the other inmate "to return to their cells, and they complied." *Id.*  When all of the A-9 residents were locked in their cells, CO Zehr conducted the count at 10:10PM.  *Id.*  When he approached Plaintiff's cell, he observed Plaintiff "was bleeding from his face and arm," "immediately" notified his sergeant of the incident, and escorted Plaintiff to medical.  *Id.*  CO Zehr issued an Inmate Misbehavior Report to Williams as a result of the incident and testified at his August 8, 2017, disciplinary hearing.  *Id.*

CO Zehr claims he had no prior altercations with Plaintiff or prior knowledge of his gender identity or previous crimes.  (Dkt. No. 108-3 at 2.)  He further claims he was not deliberately indifferent because "at no point on July 25, 2017, did [he] witness Williams cut [Plaintiff];" he did not have reason to suspect Plaintiff was at risk of being harmed; and he was unaware Plaintiff had been assaulted until he approached his cell.  (Dkt. No. 108-3 at 3-4.)

However, CO Zehr's testimony at Williams' August 8, 2017, disciplinary hearing calls into question what he actually saw and inferred at the time of the July 25, 2017, incident.[5]  (Dkt. No. 108-3 at 16, 17.)  At the hearing, CO Zehr testified he saw Williams walking toward 21 cell and watched as Williams "stop[ped], talk[ed], reach[ed] his hand in [Plaintiff's cell] and *start[ed] making violent swinging motions inside the cell*."  (Dkt. No. 108-3 at 20 (emphasis added).)  While he testified he could see down the company, he claimed he could not see a

---

[5] Defendants provide the August 8, 2017 disciplinary hearing transcript as Exhibit D of their Motion for Summary Judgment.  (Dkt. No. 108-3 at 15.)

weapon from where he was positioned.  (Dkt. No. 108-3 at 19-20.)  While this was occurring, another inmate was acting as a "look out" and was watching CO Zehr "to see if [he] was paying attention to . . . what was going on."  (Dkt. No. 108-3 at 20.)  Interestingly, at this point of the hearing, the hearing officer seemingly misstates CO Zehr's prior testimony by replying "now you couldn't see what was happening inside the cell, you saw his arm kind of moving" to which CO Zehr replied "[y]up."  CO Zehr then went on to testify he did not know what was happening in the cell at the time; he did not see a weapon; and he "thought maybe [Williams] was trying to pass a pack of cigarettes or something."  (Dkt. No. 108-3 at 24-25.)  When asked what he normally does if he sees an inmate being assaulted or someone attempting to assault an inmate, CO Zehr testified "[u]sually I will call a response on my radio or if I have to yell to another officer.  And then I wait for additional staff to arrive to properly deal with the situation.  Then, as soon as that happens, we notify the supervisor and he also responds."  (Dkt. No. 108-3 at 23.)

    Plaintiff asserts CO Zehr watched as he was attacked by Williams the night of July 25, 2017, and did nothing.  (Dkt. No. 83 at 3-4.)  CO Zehr testified both that he believed Williams was handing Plaintiff cigarettes or something similar *and* that he saw Williams "making violent swinging motions inside [Plaintiff's] cell."  (Dkt. No. 108-3 at 20, 24-25.)  Crediting Plaintiff's claims and CO Zehr's hearing testimony, a reasonable jury could find CO Zehr knew of and disregarded an excessive risk to inmate health and safety upon observing Williams' and the other inmate's actions—rendering CO Zehr deliberately indifferent.  *See Mills v. Fenger,* 216 F. App'x 7, 10 (2d Cir. 2006) ("[T]he state of the defendant's knowledge is normally a question of fact to be determined after trial.") (internal quotation marks omitted);  *see also Heisler v. Kralik*, 981 F. Supp. 830, 837 (S.D.N.Y. 1997), *aff'd sub nom. Heisler v. Rockland Cnty.*, 164 F.3d 618 (2d Cir. 1998) (denying defendant's motion for summary judgment where the plaintiff alleged that

another inmate, whom plaintiff had no alleged previous altercations with, attacked him while he

was being held as a pretrial detainee, and officers witnessed the assault but failed to intercede to

stop it); *Stewart v. Schiro*, No. 13-CV-3613 (NGG)(VMS), 2015 WL 1854198, at *8 (E.D.N.Y.

Apr. 22, 2015) ("[U]nder certain circumstances, the commencement of an inmate-to-inmate

altercation could put a prison official on sufficient notice to render the prison official deliberately

indifferent if he or she then fails to intervene in an appropriate manner"); *Candelaria v.

Coughlin*, No. 91 Civ. 2978, 1996 WL 88555, at *9 (S.D.N.Y. Mar. 1, 1996) (inaction by a

correction officer to intercede and halt an attack by a fellow prisoner is sufficient basis for

deliberate indifference).

In short, the record evidence provides differing accounts of what transpired on the night

of the July 25, 2017, incident and resolving what happened is a question for the jury. "While the

weight of the evidence may favor [Defendants], the evidence is not so conclusive that a

reasonable jury could not believe Plaintiff's assertions." *Lewis v. Hanson*, No. 18-CV-0012

(LEK/DJS), 2022 WL 991729, at *9 (N.D.N.Y. Mar. 31, 2022) (citing *Franklin v. Oneida Corr.

Facility*, No. 03-CV-1452 (LEK), 2008 WL 2690243, at *9 (N.D.N.Y. July 1, 2008) ("As

tempting as it may be to conclude that defendants will ultimately prevail at trial, defendants'

invitation to make a credibility determination and reject plaintiff's version of the events on

motion for summary judgment is plainly unwarranted.")); *see, e.g.*, *Cicio v. Lamora*, No. 08-CV-

431, 2010 WL 1063875, at *8 (N.D.N.Y. Feb. 24, 2010), *report-recommendation adopted by*

2010 WL 1063864 (N.D.N.Y. Mar. 22, 2010) ("Plaintiff's testimony that he was beaten by

[Defendant] stands in contrast to the seemingly overwhelming evidence that it did not occur as

he alleges. Nonetheless, the weighing of such competing evidence, no matter how weak

plaintiff's claim may appear, presents a question of credibility that must be left to the trier of fact.").

Relatedly, the Court finds CO Zehr is not entitled to qualified immunity at this stage of the proceeding. *See Villante v. Vandyke*, No. 9:04CV759 FJS DRH, 2008 WL 163596, at *3 (N.D.N.Y. Jan. 15, 2008) ("Since [p]laintiff has raised an issue of fact about whether [d]efendants stood by and allowed other inmates to attack him . . . [d]efendants are not entitled to qualified immunity"); *Decayette v. Goord*, No. 9:06-CV-783, 2009 WL 1606753, at *12 (N.D.N.Y. June 8, 2009) (finding defendant should not be entitled to summary judgment on qualified immunity claim because triable issues of fact existed as to whether she was deliberately indifferent to a serious medical need of Plaintiff's and as to whether she was liable for failing to intervene during the alleged beating of Plaintiff); *Rosen v. City of New York*, 667 F. Supp. 2d 355, 362 (S.D.N.Y. 2009) (denying summary judgment on defendants' qualified immunity claim where genuine issue of material fact existed as to whether it was reasonable for city corrections officer to believe that shouting at inmates to stop beating pretrial detainee fulfilled his duty to protect detainee).

In sum, as to the July 25, 2017, incident, Defendants have not met their burden of showing there is no genuine issue of material fact as to Plaintiff's Eighth Amendment failure to protect claim against CO Zehr.  Accordingly, the Court recommends denying Defendants' motion for summary judgment as to this claim.

## V.    CONCLUSION

After carefully reviewing the record, the parties' submissions, and the applicable law, and for the reasons stated herein, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 108) be **GRANTED** in part and **DENIED** in part as follows: (1) the Fourteenth Amendment equal protection claim against both Defendants be dismissed; (2) the Eighth Amendment failure to protect claim against Defendant CO Stock be dismissed; and (3) the Eighth Amendment failure to protect claim against Defendant CO Zehr proceed to trial; and it is further

**ORDERED** that the Clerk provide to Plaintiff a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report.[6] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

**SO ORDERED.**

Dated: February 27, 2023
Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[6] If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

KeyCite Yellow Flag - Negative Treatment

Supplemented by  Cao-Bossa v. New York State Dep't of Labor,  N.D.N.Y.,
November 16, 2021

2021 WL 3674745
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Weili CAO-BOSSA, Plaintiff,

v.

NEW YORK STATE DEPARTMENT
OF LABOR, Defendant.

1:18-CV-0509 (GTS/TWD)
|
Signed 08/19/2021

**Attorneys and Law Firms**

WEILI CAO-BOSSA, Plaintiff, Pro Se, 1912 East Country
Club Drive, Schenectady, NY 12309.

HON. LETITIA JAMES, Attorney General for the State of
New York, Counsel for Defendant, 300 South State Street,
Suite 300, Syracuse, NY 13202, OF COUNSEL: AIMEE
COWAN, ESQ., Assistant Attorney General.

---

### DECISION and ORDER

Glenn T. Suddaby, Chief U.S. District Judge

 *1  Currently before the Court, in this employment
discrimination action filed by Weili Cao-Bossa ("Plaintiff")
against the New York State Department of Labor
("Defendant"), are the following two motions: (1)
Defendant's motion for summary judgment; and (2)
Defendant's letter-motion to strike Plaintiff's sur-reply. (Dkt.
Nos. 58, 70.) For the reasons set forth below, Defendant's
motion for summary judgment is granted, and its motion to
strike Plaintiff's sur-reply is denied.

## I. RELEVANT BACKGROUND

### A. Plaintiff's Second Amended Complaint
Generally, in her Second Amended Complaint, Plaintiff
claims that Defendant discriminated against her based on
her national origin and age in violation of Title VII of the
Civil Rights Act of 1964 and the Age Discrimination in

Employment Act ("ADEA"). (Dkt. No. 25 [Pl.'s Second
Am. Compl.].) In support of her claims, Plaintiff alleges that
Defendant discriminated against her by (a) refusing to hire
her for a position for which she interviewed in March 2016,
and (b) terminating her employment in another position after
six months. (Id.) More specifically, Plaintiff, who is Chinese
and was 45 years old at the time of her termination, alleges
that she received unfairly poor performance reviews based
on a few sporadic mistakes that resulted in her termination,
but that other American and/or younger employees did not
receive similar negative performance reviews and were not
terminated. (Id.)

### B. Undisputed Material Facts on Defendant's Motion
   for Summary Judgment
Under N.D.N.Y. Local Rule 56.1 (formerly Local Rule
7.1[a][3]), a party opposing summary judgment must file a
response to the moving party's Statement of Material Facts
that "shall mirror the movant's Statement of Material Facts
by admitting and/or denying each of the movant's assertions
in a short and concise statement, in matching numbered
paragraphs," supported by "a specific citation to the record
where the factual issue arises." N.D.N.Y. Local R. 56.1(b).
This requirement is not a mere formality; rather "this and
other local rules governing summary judgment are essential
tools intended to relieve the district court of the onerous
task of hunting through voluminous records without guidance
from the parties." LaFever v. Clarke, 17-CV-1206, 2021 WL
921688, at *6 (N.D.N.Y. Mar. 11, 2021) (Hurd, J.) (quoting
Frantti v. New York, 414 F. Supp. 3d 257, 284 [N.D.N.Y.
2019] [Hurd, J.]). Indeed, "[a] proper response to a movant's
statement of material facts streamlines the summary judgment
analysis 'by allocating responsibility for flagging genuine
factual disputes on the participants ostensibly in the best
position to do so: the litigants themselves.' " LaFever, 2021
WL 921688, at *7 (quoting Alke v. Adams, 16-CV-0845, 2018
WL 5297809, at *2 [N.D.N.Y. Oct. 25, 2018] [Hurd, J.]).
"The Court may deem admitted any properly supported facts
set forth in the Statement of Material Facts that the opposing
party does not specifically controvert." N.D.N.Y. Local R.
56.1(b).

In this case, Plaintiff entirely failed to provide any response
to Defendant's Statement of Material Facts, much less one
that complies with Local Rule 56.1. Where a party has failed
to respond to the movant's statement of material facts in the
manner required under Local Rule 56.1, the facts in the
movant's statement will be accepted as true (1) to the extent
that they are supported by evidence in the record, and (2)

Cao-Bossa v. New York State Department of Labor, Slip Copy (2021)

2021 WL 3674745

provided that the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion. *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).[1] Here, Defendant served on Plaintiff the standard form for this District entitled "Notification of the Consequences of Failing to Respond to a Summary Judgment Motion," which includes a specific notification of the requirement to respond to the defendant's statement of material facts in matching numbered paragraphs with citation to supporting evidence as well as a warning that failure to do so could result in the Court deeming facts to be true that are not properly disputed. (Dkt. No. 58, Attach. 2.) Moreover, four days later, the Court served Plaintiff with a duplicate copy of that Notification. (Dkt. No. 59.) Eight days later, Plaintiff requested an extension of the response deadline. (Dkt. No. 60.) Plaintiff has therefore received sufficient notice of the possible consequences of her failure to respond to Defendant's Statement of Material Facts.

[1]     Notably, although "courts are required to give due deference to a plaintiff's *pro se* status, that status 'does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment.' " *Salaam v. Stock*, 19-CV-0689, 2021 WL 2367123, at *2 (N.D.N.Y. May 12, 2021) (Dancks, M.J.) (quoting *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 [2d Cir. 2003]), report-recommendation adopted by 2021 WL 2102242 (N.D.N.Y. May 24, 2021) (Sannes, J.).

**\*2** Although the Court has ensured that Defendant's asserted facts are supported by the cited record evidence, it does not have the duty to scour the record for any and all evidence that may contradict those asserted facts. *See Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed. R. Civ. P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute."); *Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 291 (2d Cir. 2000) (noting that the Local Rules require the parties "to clarify the elements of the substantive law which remain at issue because they turn on contested facts" and the Court "is not required to consider what the parties fail to point out") (internal quotation marks and citations omitted). As a result, the following facts were asserted and supported with accurate record citations by Defendant in its Statement of Material Facts and deemed admitted by Plaintiff due to her failure to respond and failure to provide any evidence

to dispute the asserted facts. (Dkt. No. 66 [Def.'s Rule 56.1 Statement].)

1. Plaintiff was born on September 21, 1972.

2. Plaintiff is of Chinese national origin.

3. Plaintiff obtained a bachelor's degree in Agriculture in 1996 from Ocean University of China.

4. Plaintiff also received a certificate from Austin Community College in Austin, Texas, in 2012 for "professional accountant with high technology."

5. Plaintiff did not have her Certified Public Accountant ("CPA") license at the time of her deposition.

6. In 2016, Plaintiff did not have the requisite one year of accounting experience, supervised by a CPA, required for CPA licensing.

7. Plaintiff testified that she passed her CPA examinations in 2014.

8. Plaintiff did not have any formal accounting experience before she immigrated from China to the United States in 2008.

9. The first accounting position Plaintiff held after arriving in the United States in 2008 was her position with Defendant in 2016.

10. Defendant is an executive agency of the State of New York, established pursuant to Article 2 of the New York State Labor Law.

11. Defendant's Administrative Finance Bureau ("AFB") is responsible for the budgeting, fiscal management, accounting, and expenditure of all department funds.

12. The AFB also maintains and ensures the accuracy of Defendant's payroll system, provides support operations services, including all procurement and payment activities, and provides property management services covering leasing, space planning, project oversight, and building maintenance.

13. Additionally, the AFB is responsible for the management of Defendant's federal grant funding and ensuring compliance with state and federal reporting requirements.

14. The AFB is divided into multiple sub-units, each with managers who reported to Kathleen Elfeldt when she was the Director of Finance from 2014 until January 2018.

15. The Financial Management Unit ("FMU") is one of the sub-units of the AFB.

16. In March 2016, Defendant posted a job vacancy announcement for an Accountant Trainee 1 & 2 (Grades 14 and 16) and Senior Accountant (Grade 18) position within the AFB's FMU.

17. In order to be eligible for the Accountant Trainee position, a candidate must pass a Civil Service examination and possess a bachelor's degree in accounting, auditing or taxation, or a bachelor's degree or higher degree with 24 semester credit hours of accounting, auditing or taxation courses.

18. A list of candidates who meet these requirements is provided to Defendant by the New York State Department of Civil Service.

19. Plaintiff was the fourth candidate on the Accountant Trainee list, with a score of 90, and thus she was eligible for an interview.

20. On July 12, 2016, Plaintiff was interviewed for the open Accountant Trainee position, and then was interviewed by Director Elfeldt the following day.

21. During the second interview, Director Elfeldt explained that the position for which Plaintiff was interviewing was within the AFB's FMU, which manages Defendant's finances related to federal grants and federal programs.

 *3  22. Director Elfeldt informed Plaintiff that federal requirements made the FMU position unique, but that in the future she expected that there would be open positions in the Accounting Office that could be a better fit for Plaintiff's skills and experience.

23. At the time of her interview, Plaintiff did not have any experience reviewing federal guidance or regulations and was not familiar with federal grant funding and guidance requirements.

24. Plaintiff emailed Director Elfeldt after the interview, asking "[W]hy you set such an interview if government working experience is a necessity to this job?"

25. Director Elfeldt responded that government work experience was not a job requirement for the position, but that the federal grant funding and reporting requirements made the Department of Labor different than a typical state agency, and the position Plaintiff interviewed for was not in the accounting office and would not be entering data into an accounting system.

26. Director Elfeldt indicated that Plaintiff's work experience did not make her a good fit for the position.

27. Plaintiff alleges that she did not receive this position because she was discriminated against based on her age and national origin.

28. Plaintiff does not know the basis for her belief that Director Elfeldt discriminatorily denied her the position based on her age and national origin, other than that "there is no other explanation."

29. Plaintiff admitted at her deposition that she did not have the right experience for this position.

30. On July 15, 2016, Defendant posted another job vacancy for an Accountant Trainee 1 & 2 and Senior Accountant, this one in the Accounting Unit.

31. Plaintiff was again reachable for this position on the Civil Service list.

32. Plaintiff claims that Director Elfeldt had her assistant call Plaintiff to let her know that there was another position open.

33. On July 19, 2016, Plaintiff interviewed for the position in the Accounting Unit.

34. On September 13, 2016, Margaret "Peg" Farrell, the Project Director for the State Financial System ("SFS") Project in the Accounting Unit at the time, requested that Plaintiff be hired for a Senior Accountant Trainee position.

35. Plaintiff's hiring was approved by Michelle Daly, the Director of the Accounting Office, and Director Elfeldt.

36. Plaintiff accepted the offer, and her employment began on October 6, 2016.

37. Plaintiff was hired as a trainee on a probationary basis and her salary grade was equivalent to a Grade 14.

38. Plaintiff's probationary period was to run concurrently with her two-year traineeship.

39. After she was hired, Plaintiff was assigned to the Accounting Office's SFS Project Team.

40. Plaintiff's direct supervisor was Project Assistant Lindsay Pulcher and the team manager was Ms. Farrell.

41. Ms. Farrell was Ms. Pulcher's direct supervisor.

42. Ms. Pulcher was the Project Assistant for the SFS Project Team from April 2014 to April 2017.

43. Supervisors for probationary trainees such as Plaintiff are required to present trainees with an Individual Development Plan and quarterly probationary evaluations, as well as traineeship evaluations at six-month intervals during the traineeship.

44. On October 26, 2016, Plaintiff met with Ms. Pulcher and was provided an Individual Development Plan that listed the activities, tasks, and performance standards that were expected of her in her position.

 *4  45. However, during the month of November 2016, Plaintiff had many issues completing basic tasks and assignments that were required in her position.

46. On or about December 5, 2016, Ms. Pulcher and Ms. Farrell met with Plaintiff to review her Individual Development Plan to ensure that Plaintiff understood the requirements of her position and what was expected of her.

47. During the meeting, Plaintiff was reminded about the tasks she needed to complete as part of her position and she was reminded as to how she should be completing her assignments.

48. Plaintiff was also reminded during this meeting that her position was a two-year traineeship during which she was on probation and could be terminated for poor performance.

49. Plaintiff recalled at her deposition that Ms. Pulcher and Ms. Farrell discussed during this meeting that she needed to choose her wording carefully in emails and on the telephone.

50. Plaintiff recalled at her deposition that Ms. Pulcher and Ms. Farrell discussed that she is not entitled to "flex time" and was not allowed to leave early if she arrived to work early.

51. Plaintiff recalled at her deposition that Ms. Pulcher and Ms. Farrell discussed that she needed to complete her assignments in the format that her supervisor had requested.

52. At no point during the meeting did either Ms. Pulcher or Ms. Farrell discuss Plaintiff's age or national origin.

53. At no point during the meeting did Plaintiff raise any concerns about discrimination.

54. However, following the meeting of December 5, 2016, Plaintiff continued to have issues with her job performance.

55. On January 6, 2017, Plaintiff received a three-month performance evaluation which indicated that she needed to improve in almost all aspects of her job performance.

56. The three-month evaluation was completed by Ms. Pulcher and reviewed by Ms. Farrell.

57. A meeting was held with Plaintiff on January 6, 2017, in which Ms. Pulcher and Ms. Farrell gave the three-month evaluation to Plaintiff.

58. Ms. Pulcher took notes of the meeting, indicating what was reviewed with Plaintiff and Plaintiff's responses.

59. Plaintiff admits that she made mistakes during the first three months of her probationary term.

60. During the meeting, Ms. Pulcher showed Plaintiff an example of an email in which Plaintiff used a harsh, inappropriate tone.

61. Plaintiff testified at her deposition that she disagrees with Ms. Pulcher's assessment of her performance.

62. Following receipt of her three-month evaluation, Plaintiff met with Lin Arbab, a Human Resources Specialist for Defendant.

63. During this meeting, Ms. Arbab explained to Plaintiff that managers and supervisors may appropriately issue evaluations that accurately reflect the quality of an employee's performance.

64. Ms. Arbab explained that sometimes an employee's performance will be rated as "needs improvement" in certain areas, and that it is not unusual for an employee to receive an evaluation that indicates performance areas that need improvement.

65. Ms. Arbab explained that Plaintiff's three-month evaluation reflected her supervisor's assessment of her performance and included examples of the noted performance deficiencies.

*5 66. At the time, Plaintiff did not express to Ms. Arbab any belief that the three-month evaluation was the result of discrimination.

67. On January 12, 2017, Plaintiff wrote an email to Ms. Pulcher and Ms. Farrell, in which she stated that she "appreciate[d] you letting me know your concerns about my performance in the first quarter evaluation," and that she "enjoys very much working" with Ms. Pulcher and Ms. Farrell and "can learn something new every day with [their] help."

68. In the email of January 12, 2017, Plaintiff also listed her plans to improve her performance, including promising to review her emails before sending them to other people, pay attention to formatting details for biweekly downloading and monthly queries, submit a summary of the work she performed that day before she left work every day, take notes so she can stop "asking the same stupid questions," and charge personal time whenever she has to use work time.

69. Plaintiff also asked Ms. Pulcher to remind her if she asks the "same stupid questions" and stated, "Please help me improve my management skills of work assignments. I will improve my quality of work and other virtues required for my work."

70. In the email of January 12, 2017, Plaintiff did not complain about feeling like she was being discriminated against, and did not express disagreement with the three-month performance evaluation.

71. Following the three-month performance evaluation, Plaintiff continued to have job performance issues.

72. Ms. Farrell kept a log of some of the performance issues that Plaintiff exhibited for approximately nine weeks after her three-month evaluation:

a. On January 23, 2017, Ms. Pulcher noted that Plaintiff downloaded the wrong NHRP files.

b. On February 1, 2017, Plaintiff's Monthly Mod Accrual and Stat Ledger queries were for December 2015 rather than December 2016.

c. On February 6, 2017, Ms. Farrell notified Plaintiff that she had made mistakes on the monthly query, to which Plaintiff responded, "[S]orry for the negligence. Will be more careful in the future."

d. Also on February 6, 2017, Ms. Pulcher was forced to remind Plaintiff to download the NHRP522 and NHRP530 files despite the fact that this had been a recurring task for several pay periods.

e. On February 22, 2017, Ms. Pulcher spoke with Plaintiff about her failure to prioritize assignments correctly.

f. On February 27, 2017, Ms. Pulcher emailed Plaintiff to inform her that she

was enrolled in mandatory training courses, but that those courses were not a priority since they did not need to be completed for eight months, and to identify which assignments were a priority. However, Plaintiff completed these training courses before the priority assignments despite Ms. Pulcher's directions.

g. On March 1, 2017, Ms. Farrell asked Plaintiff to complete an assignment immediately, but Plaintiff submitted the assignment the following day, incorrectly. The assignment was still incorrect the second time Plaintiff submitted it.

h. On March 3, 2017, Ms. Farrell asked Plaintiff to create a tab with a pivot table for each ledger on an Excel spreadsheet. Plaintiff submitted the assignment incorrectly and Ms. Farrell was forced to follow up.

*6 i. Also on March 3, 2017, Ms. Pulcher contacted Plaintiff regarding an assignment that she submitted incorrectly the previous day. Plaintiff responded, "You

are right ... I guess I was kind of in a hurry. Sorry for the abbreviation."

    j. On March 8, 2017, Ms. Pulcher requested that Plaintiff provide a summary of an accounting training class Plaintiff had attended; however, Plaintiff did not provide that summary and Ms. Pulcher was forced to follow up on March 21, 2017, at which time Plaintiff still had not completed the assignment.

73. Ms. Farrell recorded at least 13 separate instances between January 11, 2017, and March 20, 2017, on which Plaintiff submitted an incorrect or incomplete assignment or needed to be reminded to complete an assignment.

74. On April 3, 2017, Plaintiff received a six-month evaluation from Ms. Pulcher.

75. Ms. Pulcher recommended that Plaintiff be terminated based on her unsatisfactory performance.

76. Ms. Farrell approved Ms. Pulcher's recommendation for Plaintiff's termination.

77. Director Elfeldt also agreed with the recommendation for termination.

78. Ultimately, termination decisions are made by the Personnel Department.

79. The recommendation was forwarded to Lisa Burrell, Associate Director of Human Resources for Defendant, who made the final determination approving Plaintiff's termination.

80. Plaintiff was presented with the six-month evaluation at a meeting, during which Ms. Pulcher indicated the main reasons why her employment was being terminated, including the fact that her assignments were often not completed per instructions and follow-up was often required, the fact that she needed to be reminded of the same issues repeatedly, and the fact that she did not make the best use of her time or exert a consistent effort.

81. Plaintiff signed the evaluation that recommended her termination.

82. When she received her six-month evaluation, Plaintiff did not complain that her evaluation was the result of discrimination.

83. On April 13, 2017, Plaintiff emailed Director Elfeldt, stating "[T]here were errors in my work because of careless [sic] and inexperience, but they had nothing to do with working abilities."

84. At her deposition, Plaintiff acknowledged that she admitted she was careless and inexperienced during her six months working for Defendant.

85. Plaintiff did not allege in her email of April 13, 2017, that she felt discriminated against.

86. She did, however, thank Director Elfeldt for giving her a chance "to see how unique and complicated the DOL accounting could be."

87. The first time Plaintiff ever expressed that she felt discriminated against while working for Defendant was in an email to Ms. Arbab on April 10, 2017.

88. At no point during her employment with Defendant did anyone make any remarks about Plaintiff's national origin or age.

89. There were "many" employees in Plaintiff's specific unit who were Plaintiff's age or older.

90. On July 17, 2017, Plaintiff filed a complaint with the New York State Division of Human Rights ("NYSDHR").

91. Her complaint was amended on or about August 2, 2017, and in it she alleged that she was subjected to discrimination based on her age and national origin in violation of the New York State Human Rights Law, Title VII, and the ADEA.

**\*7**  92. On December 20, 2017, the NYSDHR issued a Determination and Order After Investigation, in which it determined that there was no probable cause to believe that Defendant engaged in or was engaging in the unlawful discriminatory practices Plaintiff alleged.

93. On January 26, 2018, the Equal Employment Opportunity Commission ("EEOC") adopted the findings of the NYSDHR.

94. Plaintiff alleges in her Second Amended Complaint that two or three other employees were treated more favorably than her because of their national origin.

95. Specifically, Plaintiff alleges that Richard Deitz was treated more favorably than her because of his national origin. However, Plaintiff does not know what position Mr. Dietz held or who he is, and she admits that his job responsibilities were different than her job responsibilities. She also "guesses" that he is "American."

96. According to Mr. Deitz's evaluation in the record, his supervisor was Michelle Daly, not Ms. Pulcher, and Ms. Pulcher has never supervised or evaluated Mr. Deitz.

97. The basis for Plaintiff's belief that Mr. Deitz was treated differently than her is that he was praised for "taking initiative" while she was not.

98. Plaintiff also alleges that Frank Shavel was treated more favorably than her because of his national origin. However, Plaintiff is unaware of where Mr. Shavel worked within Defendant's organization, she did not know what position he held, she did not know who supervised him, she has never worked with him and has never seen him in person, she does not know what his salary grade is, and she does not know whether he was a permanent or probationary employee. Plaintiff also does not know his ethnic background.

99. The only basis for Plaintiff's belief that Mr. Shavel was treated more favorably than her is that he was given a counseling memorandum about failing to complete a mandatory training rather than being terminated, while she did not receive any memoranda before her termination.

100. However, Plaintiff does not know whether Mr. Shavel failed to complete other tasks or training beyond the one related to the counseling memorandum.

101. Plaintiff also alleges that Kayla O'Hara was treated more favorably than her because of her national origin. However, Plaintiff admitted that she does not know Ms. O'Hara's national origin (but she guesses that it is American), she has never worked with Ms. O'Hara or observed her work performance, she has never spoken with anyone who worked with or supervised Ms. O'Hara, she does not know whether Ms. O'Hara made similar mistakes to the ones that are detailed in Plaintiff's own evaluations, and she does not know whether Ms. O'Hara was ever counseled about her time or attendance. Additionally, unlike Plaintiff, who was hired as a Grade 14 Accountant Trainee, Ms. O'Hara was hired as a Grade 18 Senior Budget Analyst effective September 21, 2017.

102. The only basis for Plaintiff's belief that Ms. O'Hara was treated differently than her is because there is no mention of "one-time incident[s]" or "learning process" on Ms. O'Hara's evaluation. Ms. O'Hara's performance evaluation shows that she met performance expectations for her position.

103. Plaintiff also alleges that these employees were treated more favorably than her based on her age.

**\*8** 104. However, Plaintiff admits that Mr. Shavel and Mr. Deitz are both as old or older than her: Mr. Deitz was 45 years old in 2017, and Plaintiff testified that Mr. Shavel is "older than sixty, in his sixties or something .... He's older than me." Mr. Shavel was in fact 61 years old in 2017.

105. Ms. O'Hara was 27 years old in 2017.

106. Ms. Pulcher was not aware of either Ms. O'Hara's or Plaintiff's ages in 2017.

107. The basis for Plaintiff's belief that she was treated differently because of her age was "some clues from [Ms. Pulcher]," such as when Ms. Pulcher "mentioned something about older people. She just didn't believe older people could do good job."

108. Specifically, Plaintiff alleges that Ms. Pulcher commented that a receptionist, Donna, who is around retirement age, "didn't know what she was doing."

109. Plaintiff also alleges that Ms. Pulcher made a comment about a "guy who's doing payroll" and how he needs to retire.

110. Ms. Pulcher denies ever making any comments about "Donna" or "a guy who's doing payroll" with respect to their age or ability to perform their job, and denies making any comments to Plaintiff during her employment about any employees' ages or how their ages impact their ability to perform their jobs.

111. Director Elfeldt was 57 years old at the time of Plaintiff's termination.

112. Assistant Director Cathryn Piccirillo was 51 years old at the time of Plaintiff's termination.

113. Ms. Farrell was 50 years old at the time of Plaintiff's termination.

114. Associate Director of Human Resources Ms. Burrell was 48 years old at the time of Plaintiff's termination.

115. Plaintiff was not the only employee of Asian descent in the AFB at the time Plaintiff was employed there, and there are currently employees of Asian descent employed in Defendant's Finance Bureau.

116. On April 7, 2017, Ms. Burrell sent a letter to Plaintiff indicating that she concurred with the termination recommendation effective close of business April 14, 2017.

117. On April 10, 2017, Plaintiff emailed Ms. Burrell and stated that she felt Ms. Pulcher was an "inexperienced and inapt [sic] supervisor" who was not qualified and who did not provide her with proper training and help, as well as that she felt that Ms. Pulcher was mean to her and that she had been discriminated against.

118. Nowhere in the email of April 10, 2017, does Plaintiff mention that she felt discriminated against specifically based on her age or national origin.

119. At no point during her employment with Defendant did Plaintiff ever complain to Director Elfeldt that she believed she was being discriminated against in any way.

## C. Parties' Briefing on Defendant's Motion for Summary Judgment

### 1. Defendant's Memorandum of Law

Generally, in its motion for summary judgment, Defendant makes three arguments. (Dkt. No. 58, Attach. 1, at 12-43 [Def.'s Mem. of Law].) First, Defendant argues that Plaintiff's discrimination claims should be dismissed as untimely to the extent they are based on Defendant's failure to hire her for a position with the FMU in July 2016. (*Id.* at 12-15.) Specifically, Defendant argues that this alleged act of discrimination occurred more than 300 days before Plaintiff filed her complaint with the NYSDHR on July 17, 2017, and thus any portion of her claims based on that alleged act of discrimination must be dismissed. (*Id.*) Defendant additionally argues that, timeliness notwithstanding, Defendant's actions in not hiring her for that position in July 2016 were not based on discrimination, but rather because she lacked experience with federal grants and

other regulatory considerations that were a feature of that specific position. (*Id.*)

**\*9** Second, Defendant argues that Plaintiff's national origin discrimination claim pursuant to Title VII should be dismissed. (*Id.* at 15-33.) Specifically, Defendant argues as follows: (a) Plaintiff cannot establish a prima facie case of discrimination regarding her termination because (i) she was not qualified for her position in that she did not meet legitimate employer expectations of job performance as evidenced by the job evaluations showing unsatisfactory performance, and (ii) the circumstances of her termination do not give rise to an inference of discriminatory intent given that there was evidence that Plaintiff did many things wrong and there have been no comments alleged to have been made about her ethnic group, and, in particular, the other employees identified by Plaintiff are not sufficiently similarly situated to her to raise such an inference; (b) even if Plaintiff can show a prima facie case, Defendant had a legitimate reason for terminating her employment, namely her repeated poor performance despite having meetings and reviews in which she was informed of the ways in which she was not meeting expectations; and (c) Plaintiff cannot show that Defendant's legitimate reason for terminating her employment was a pretext for discrimination because she has no evidence that her national origin was even a factor in that decision, and her own subjective belief that it is is not sufficient to sustain her claim. (*Id.*)

Third, Defendant argues that Plaintiff's age discrimination claim pursuant to the ADEA should be dismissed. (*Id.* at 33-43.) Specifically, Defendant argues as follows: (a) Plaintiff cannot establish a prima facie case of discrimination regarding her termination because (i) she cannot show that she was performing her job satisfactorily (as already discussed), and (ii) she cannot show that her termination occurred under circumstance giving rise to an inference of discrimination based on her age given that the only alleged co-employee who was younger than her is not sufficiently comparable, and any comments that may have been made by Ms. Pulcher about the ages of other employees were merely stray remarks and Ms. Pulcher was nonetheless not the ultimate decisionmaker as to Plaintiff's termination; (b) even if Plaintiff can show a prima facie case, Defendant had a legitimate reason for terminating her employment (as discussed above); and (c) Plaintiff cannot show that Defendant's legitimate reason for terminating her employment was a pretext for discrimination because her subjective belief that she was discriminated against and a few stray remarks about employees other than Plaintiff do not

show that her age was the but-for cause of her termination. (*Id.*)

### 2. Plaintiff's Opposition Memorandum of Law

In her response to Defendant's motion, Plaintiff requests that the Court deny that motion, noting the reasons she had needed to request an extension in the past to file her response, and noting that, "[w]hile preparing Plaintiff's Memorandum of Law, I found out Defendant's Memorandum of Law did not follow L.R. 7.1. It was 36 pages in length, and it was 45 pages in total with Table of Contents and the cover page." (Dkt. No. 67, at 1-2 [Pl.'s Opp'n Mem. of Law].) Plaintiff does not address any of the substantive arguments made by Defendant, nor does she submit any response to Defendant's Statement of Material Facts, as already discussed above in Part I.B. of this Decision and Order.

### 3. Defendant's Reply Memorandum of Law

Generally, in its reply, Defendant makes three arguments. (Dkt. No. 68 [Def.'s Reply].) First, Defendant argues that it did not violate the Local Rules of Practice for this Court by filing an overlong brief because the pages for the cover page, the table of contents, and the signature block do not count toward the overall page count, and Defendant's substantive brief was 35 pages as allowed by this Court's Text Order of December 21, 2020. (*Id.* at 4.)

Second, Defendant argues that the Court should accept its asserted facts as true due to Plaintiff's failure to respond to its Statement of Material Facts as required by Local Rule 56.1 because, even though Plaintiff is *pro se*, she was twice provided notice of the consequences of failing to do so. (*Id.* at 5-6.)

Third, Defendant argues that Plaintiff's claims should be deemed to have been abandoned because Plaintiff failed to address or oppose any of Defendant's legal arguments. (*Id.* at 6-7.)

### 4. Plaintiff's Sur-Reply

**\*10** Plaintiff also submitted a sur-reply without the permission of the Court. (Dkt. No. 69 [Pl.'s Sur-Reply].) In this sur-reply, Plaintiff asserts that she was not informed

that Defendant had requested or been granted permission to file an overlong brief with 10 additional pages, and that, because she was not aware of this, she "filed the motion of rejection and was waiting for the Judge's further directions about the allowable length." (*Id.* at 1.) She argues that Defendant's brief exceeds the extended page limit because the Conclusion section was on page 36 of that brief and that Conclusion section is "substantive enough to be counted." (*Id.* at 2.) Plaintiff again requests that the Court deny Defendant's motion for being improperly overlong, noting that she "completed [her] response to Defendant's Material Facts Not in Dispute before [she] filed [her] rejection" and indicating that "I will submit my response in whole when Defendant submit [sic] proper memorandum of law or as further directed by the court if otherwise." (*Id.*)

### 5. Defendant's Letter-Motion
### to Strike Plaintiff's Sur-Reply

Defendant filed a motion to strike Plaintiff's sur-reply because such responses are not permitted without permission under the Local Rules of this Court, but that, even if the Court considers the sur-reply, Plaintiff was provided with a copy of Defendant's request for additional pages for its memorandum and the Court's order granting that request was served on Plaintiff by regular mail, and thus she has no basis for claiming she was not reasonably made aware of Defendant's increased page limit. (Dkt. No. 70.)

## II. LEGAL STANDARD GOVERNING A MOTION FOR SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[2] As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law .... Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

[2]     As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted].

As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a), (c), (e). [3]

[3]     Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching number paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 7.1(a)(3).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute–even if that non-movant is proceeding *pro se*. [255] (This is because the Court extends special solicitude to the *pro se* litigant by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.). [4] As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigant must obey a district court's procedural rules. [5]

[4]     *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 426 & n.2 (N.D.N.Y. 209) (Suddaby, J.) (citing cases).

[5]     *Cusamano*, 604 F. Supp. 2d at 426-27 & n.4 (citing cases).

**\*11** Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response ... does not ... [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*,

76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3). What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 56.1 by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement [6] – even where the non-movant was proceeding *pro se*. [7]

[6]     Among other things, Local Rule 56.1(b) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 56.1(b).

[7]     *Cusamano*, 604 F. Supp. 2d at 427 & n.6 (citing cases).

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(a)(3). [8] Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein ...."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

[8]     *See, e.g., Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's

Case 9:19-cv-00689-AMN-TWD    Document 115    Filed 02/27/23    Page 30 of 173
Cao-Bossa v. New York State Department of Labor, Slip Copy (2021)
2021 WL 3674745

failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

## III. ANALYSIS

### A. Whether Plaintiff's Sur-Reply Should Be Stricken

Although Defendant is correct that sur-replies are not permitted under Local Rule 56.1 without permission from the Court, the Court finds that whether or not it considers Plaintiff's sur-reply is immaterial to the ultimate outcome of Defendant's motion because the arguments Plaintiff makes within that sur-reply are not meritorious.

 **\*12**  Plaintiff's argument that she never received the Court's Text Order of December 21, 2020, is unpersuasive. As Defendant argues, there is sufficient evidence that Plaintiff was reasonably apprised of the Court's Text Order granting Defendant's request for 10 additional pages for its memorandum. (Dkt. No. 48 [noting specifically that a copy of the Text Order was served upon Plaintiff via regular mail].) There is no indication that Plaintiff had changed mailing addresses, that the Text Order had been returned as undeliverable, or that there has been any difficulty with her receiving mail throughout the course of this litigation. (*See* Dkt. No. 1 [Pl.'s Comp.] [listing her address at the time of filing in April 2018 as the same address on file with the Court as her current address].) As a result, there is no reason that Plaintiff should not have reasonably known about the request for (and grant of) the additional pages.

Similarly, Plaintiff's argument that Defendant's motion should be denied because the non-substantive portions of Defendant's memorandum were in excess of 35 pages is unavailing. Non-substantive matter such as cover page, table of contents, and signature block do not count toward the substantive page limit. *See Moore v. Syracuse City Sch. Dist.*, 05-CV-0005, 2009 WL 890576, at *2 n.8 (N.D.N.Y. Mar. 31, 2009) (Scullin, J.) (noting that it repaginated plaintiff's memorandum by starting page one following the Table of

Contents and Authorities); *In re Marina Dev., Inc.*, 05-CV-1349, 2007 WL 9752855, at *1-2 (N.D.N.Y. Jan. 11, 2007) (Hurd, J.) (noting that the Local Rules applied to brief format in bankruptcy cases, and concluding that the appellees' briefs should therefore not exceed 25 pages, "exclusive of pages containing the table of contents, table of citations or similar material"). Additionally, although Plaintiff argues that Defendant's one-sentence conclusion is "substantive enough to be counted," the Court disagrees because that conclusion is merely a brief restatement of Defendant's request that the Court grant its motion to dismiss Plaintiff's Second Amended Complaint that contains no additional substantive argument. (Dkt. No. 58, Attach. 1, at 44 [Def.'s Mem. of Law].) Even if the conclusion were considered to be substantive, the proper course of action in this case would be to merely not consider any pages beyond the allowed amount, not to strike the entire motion as Plaintiff requests. *See Helen Cross v. Colvin*, 16-CV-0111, 2016 WL 7011477, at *4 n.3 (N.D.N.Y. Dec. 1, 2016) (Suddaby, C.J.) (noting that, "[b]ecause Plaintiff has exceeded the page limit, the Court will not consider the arguments contained in pages eleven through fifteen of her counsel's reply affidavit"). The Court therefore finds that there is no basis for Plaintiff's arguments that Defendant's motion should be denied based on the length of its memorandum of law.

Also unpersuasive is Plaintiff's argument that she has prepared a more detailed substantive response to Defendant's motion (including a response to Defendant's Statement of Material Facts), but has not yet filed her "response in whole" because she has been waiting for this Court's "further directions about the allowable length" of Defendant's memorandum of law. (Dkt. No. 69 [Pl.'s Sur-Reply].) Even considering Plaintiff's *pro se* status, there is no justification for Plaintiff's blatant failure to comply with the Local Rules by essentially ignoring the Court's imposed deadlines and manufacturing her own procedure that she now expects the Court to follow. Plaintiff was provided with notice that her response to Defendant's motion for summary judgment was due by February 19, 2021, a notice that she received because she subsequently requested (and was granted) two separate 60-day extensions of time on that deadline, such that her response was not ultimately due until June 21, 2021. (Dkt. Nos. 59, 60, 61, 62, 64.) The Notification of the Consequences of Failing to Respond to a Summary Judgment form that was filed along with Defendant's motion clearly states that a failure to file a proper response to the motion including a response to the Statement of Material Facts, copies of all pertinent record evidence, and a response memorandum

containing legal arguments could result in dismissal of some or all of the claims. (Dkt. No. 58, Attach. 2.)

**\*13** Despite being made aware of the need to respond fully and despite being granted multiple lengthy extensions to do so, Plaintiff, without any permission or direction from the Court, chose to instead file a brief "motion" to dismiss Defendant's memorandum due to an alleged failure to comply with the page limits in the Local Rules and seemingly expected (again, without any permission or direction from the Court) that such counter-motion held the deadline for submitting a substantive response to Defendant's motion in abeyance. However, Plaintiff's misunderstanding of the rules of procedure based on her *pro se* status do not excuse her failure to comply with those rules of procedure. *See Alzawahra v. Albany Medical Ctr.*, 546 F. App'x 53, 54 (2d Cir. 2013) (noting that, "[a]lthough a *pro se* litigant is entitled to a liberal construction of his filings, ... his *pro se* status does not relieve him of his obligation to comply with the relevant procedural rules"). This is particularly so given that Plaintiff was informed of what she was required to submit in response to Defendant's motion, and the consequences for failing to do so.

Finally, the Court finds that it would not serve the interests of judicial efficiency to allow Plaintiff to submit any further substantive filings in response to Defendant's motion for summary judgment at this point. As already noted, Plaintiff was granted an additional 120 days in which to file her response. In granting her second request to extend that deadline, the Court stated that no more extensions would be granted without documentary evidence that extension was warranted due to medical issues, and noted that this case has been pending for more than three years. (Dkt. No. 64 [Text Order filed Apr. 19, 2021].) Because Plaintiff's response and sur-reply indicate that her failure to file a full response by the deadline was due to her decision to wait to see what the Court ruled as to the propriety of the length of Defendant's memorandum rather than due to any medical or other issue, there is no basis for allowing Plaintiff additional time to submit a full and proper response. Notably, allowing Plaintiff to do so would require Defendant to expend additional time and effort to prepare yet another reply memorandum despite having already filed a reply and a motion to strike in response to Plaintiff's sur-reply. Lastly, the Court notes that, having reviewed the record on this motion, it is unlikely that providing Plaintiff with additional opportunity to respond to Defendant's motion would result in a different outcome on that motion.

As a result, the Court denies Defendant's motion to strike the sur-reply because the sur-reply offers Plaintiff no relief even if considered.

### B. Whether Plaintiff's Discrimination Claim Based on the July 2016 Failure to Hire Must Be Dismissed as Untimely

After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendant's memorandum of law. (Dkt. No. 58, Attach. 1 [Def.'s Mem. of Law].) To those reasons, the Court adds the following analysis.

"To sustain Title VII or ADEA claims, a plaintiff must file administrative charges with the EEOC within 300 days of the alleged act of discrimination." *Betterson v. HSBC Bank USA, N.A.*, 661 F. App'x 87, 89 (2d Cir. 2016) (citing *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 712 [2d Cir. 1996]; *Tewksbury v. Ottaway Newspapers*, 192 F.3d 322, 328 [2d Cir. 1999]). Thus, any conduct that occurred more than 300 days before the charge is filed is barred in a federal lawsuit unless an exception applies. *Betterson*, 661 F. App'x at 89.

Here, Plaintiff filed her complaint with the NYSDHR on July 14, 2017. (Dkt. No. 58, Attach. 12, at 1, 23.) As a result, only alleged acts of discrimination that occurred on or after September 17, 2016, are covered under that complaint. Because the failure to hire that Plaintiff alleges occurred in July 2016, any claim related to that alleged action is barred unless Plaintiff meets one of the defined exceptions to the 300-day requirement.

**\*14** Recognized exceptions to the 300-day requirement include waiver, estoppel, equitable tolling, or the existence of a continuing violation. *Barr v. Bass Pro Outdoor World, LLC*, 17-CV-0378, 2019 WL 6828987, at \*9 (N.D.N.Y. Dec. 13, 2019) (Sannes, J.). None of these exceptions are applicable here. There is no apparent basis for applying waiver or estoppel.

As to equitable tolling, a plaintiff must show that (1) she has been pursuing her rights diligently, but (2) some extraordinary circumstance stood in the way and prevented timely filing. *Barr*, 2019 WL 6828987, at \*9 (citing *Bolarinwa v. Williams*, 593 F.3d 226, 231 [2d Cir. 2010]). There is no indication of any circumstances between July 2016 and September 2016 that would have prevented her from filing a charge as to the

allegedly discriminatory failure to hire in July 2016, much less an extraordinary one.

There is also no basis for applying the continuing violation doctrine here. "Under the continuing violation exception to the ... limitations period, if a ... plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of discrimination under the policy would be timely even if they would be untimely standing alone." *Chin v. Port Auth. Of New York & New Jersey*, 685 F.3d 135, 156 (2d Cir. 2012). However, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). A discrete act is one that "necessarily 'constitutes a separate actionable unlawful employment practice' " that would be individually actionable, such as "termination, failure to promote, denial of transfer, or refusal to hire." *Chin*, 685 F.3d at 157 (citing *Morgan*, 536 U.S. at 114). It is well recognized that discrete acts that fall outside the limitations period "cannot be brought within it, even when undertaken pursuant to a general policy that results in other discrete acts occurring within the limitations period." *Chin*, 685 F.3d at 157). Because the alleged failure to hire is a discrete act that was actionable in its own right, the continuing violation doctrine cannot be used to make it timely.

For all of the above stated reasons, the Court finds that the portions of Plaintiff's discrimination claims that are based on the failure to hire her in July 2016 are barred due to her failure to file a timely charge as to that act and must be dismissed.

### C. Whether Defendant's Motion Should Be Granted as to Plaintiff's Title VII Claim

After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendant's memorandum of law. (Dkt. No. 58, Attach. 1 [Def.'s Mem. of Law].) To those reasons, the Court adds the following analysis.

Claims for discrimination under Title VII are subject to the *McDonnell Douglas* burden-shifting standard. *Kirkland v. Cablevision Systems*, 760 F.3d 223, 225 (2d Cir. 2014). As an initial matter, the plaintiff must proffer sufficient evidence to state a prima facie case of discrimination. *Kirkland*, 760 F.3d at 225. If the plaintiff can make a prima facie case of discrimination, the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for its actions. *Id.* If the defendant does so, the burden shift back to the plaintiff

to show that the defendant's explanation is a pretext for discrimination. *Id.* As to this last step, "once the [defendant] has made a showing of a neutral reason for the complained of action, to defeat summary judgment ... the [plaintiff's] admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the [defendant's] employment decision was more likely than not based in whole or in part on discrimination." *Id.* (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 [2d Cir. 2003]).

**\*15** "To establish a prima facie case of discrimination under Title VII, a plaintiff must demonstrate [the following four elements]: (1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) circumstances surrounding the employment action give rise to an inference of discrimination." *Fahrenkrug v. Verizon Servs. Corp.*, 652 F. App.'x 54, 56 (2d Cir. 2016). In this case, Defendant concedes that Plaintiff has established the first and third of these requirements, but disputes that Plaintiff can show that (a) she had satisfactory job performance, and (b) her termination occurred under circumstances giving rise to an inference of discrimination.

As to the second element, "[i]n determining whether an employee's job performance is satisfactory, courts may— as they often must—rely on the evaluations rendered by supervisors," because "job performance cannot be assessed in a vacuum" and "the ultimate inquiry is whether an employee's performance 'meets his employer's legitimate expectations.' " *Meiri v. Dacon*, 759 F.2d 989, 995 (2d Cir. 1985); *see Manko v. Deutsche Bank*, 554 F. Supp. 2d 467, 477 (S.D.N.Y. 2008) (noting that "courts routinely rely on evaluations from the plaintiff's supervisors in determining satisfactory job performance"). Whether performance is satisfactory "depends on the employer's criteria for the performance of the job—not the standards that may seem reasonable to the jury or judge." *Thornley v. Penton Publishers*, 104 F.3d 26, 29 (2d Cir. 1997). "Although courts must refrain from intruding into an employer's policy apparatus or second-guessing a business's decisionmaking process, ... they must also allow employees 'to show that the employer's demands were illegitimate or arbitrary.' " *Meiri*, 759 F.2d at 995.

Here, it is undisputed that Plaintiff was a probationary trainee employee during the relevant time period, and thus subject to termination if she did not meet employer expectations. (Dkt. No. 58, Attach. 3, at ¶ 5 [Arbab Decl.]; Dkt. No. 58, Attach. 9.) Under the terms of this probationary trainee employment, her supervisors were

Case 9:19-cv-00689-AMN-TWD    Document 115    Filed 02/27/23    Page 33 of 173
Cao-Bossa v. New York State Department of Labor, Slip Copy (2021)
2021 WL 3674745

required to provide an Individual Development Plan and quarterly probationary evaluations as well as traineeship evaluations at six-month intervals during the traineeship period. (Dkt. No. 58, Attach. 3, at ¶ 6 [Arbab Decl.].) Plaintiff was provided with her Individual Development Plan (which she acknowledged with a signature) on October 25, 2016; this document outlined activities and performance standards for her Grade 14 position. (Dkt. No. 58, Attach. 5.) On January 6, 2017, Plaintiff was provided with a three-month probation evaluation signed by Ms. Pulcher and Ms. Farrell, in which Plaintiff was rated as "needs improvement" in all listed areas except "relationships," with details related to those areas written in the comments section that highlight the specific tasks and ways in which Plaintiff was noted to not be performing up to expected standards. (Dkt. No. 58, Attach. 6.) On April 3, 2017, Plaintiff was provided with a six-month probation evaluation signed by Ms. Pulcher and Ms. Farrell, in which it was noted that Plaintiff was rated as "unsatisfactory" in the areas of management of work assignments, quality of work, productivity, personal work characteristics, and problem solving/decision-making, "needs improvement" in the areas of attendance and communications, and "meets expectations" in the area of relationships; again, the evaluation includes written comments regarding the specific tasks and ways in which Plaintiff was not performing up to specific expectations. (Dkt. No. 58, Attach. 7.) Plaintiff was also provided with a six-month performance evaluation, in which concerns about her performance as to the activities and tasks outlined in the Individual Development Plan were noted. (Dkt. No. 58, Attach. 8.)

**\*16** Based on the evidence, it is clear both what the standards of Plaintiff's position were and the reasons that Plaintiff's performance did not meet those standards. As discussed above in Part I.B. of this Decision and Order, Plaintiff herself acknowledged that she made some mistakes in the course of her performance of her duties, and additional evidence from Ms. Pulcher and Ms. Farrell substantiates multiple specific mistakes. (Dkt. No. 58, Attachs. 28-33, 44, 47-54.) Additionally, there is nothing in the record to show that these expectations were in any way illegitimate or arbitrary. Plaintiff has offered no evidence to support her claim but her own subjective belief that her performance was not as bad as her supervisors stated. In an email to Ms. Arbab on April 10, 2017, Plaintiff stated that she believed Ms. Pulcher provided inadequate training or communication to her; however, there is no evidence to substantiate this subjective belief and the undisputed record reflects that both Ms. Pulcher and Ms.

Farrell provided fairly significant feedback and reminders to Plaintiff about her tasks and duties. (Dkt. No. 58, Attachs. 28-33, 39-41, 43, 45-54.) Based on the record before the Court, no reasonable factfinder could conclude that Plaintiff performed her job satisfactorily.

In the alternative, the Court finds that Plaintiff also has not shown that the circumstances surrounding her termination give rise to an inference of discrimination. Notably, the record is devoid of any indication that any of Defendant's employees ever referenced Plaintiff's national origin during her employment or made any kind of disparaging remarks about her national origin. Additionally, the three employees that Plaintiff holds out as comparators who received better treatment because they were not terminated are not sufficiently similar to her to give rise to an inference of discrimination based on national origin for two reasons. First, Plaintiff's deposition makes clear that she is not even certain what the national origins of these individuals are, but she merely assumes that they are "American." (Dkt. No. 58, Attach. 15, at 102-03, 105-06, 109 [Pl.'s Dep.].) Second, there is no evidence to show that these individuals were in comparable positions with comparable responsibilities and that they made comparable mistakes to those made by Plaintiff. To raise an inference of discrimination from more favorable treatment towards similarly situated individuals outside of the protected group, "a plaintiff 'must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself.' " *De Jesus-Hall v. New York Unified Court Sys.*, 2021 WL 1259581, at \*1 (2d Cir. 2021) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 [2d Cir. 2000]).

As to Ms. O'Hara, although her job tasks and objectives are similar to Plaintiff's, the evidence shows that Ms. O'Hara was hired as Grade 18 Senior Budget Analyst/Senior Accountant (while Plaintiff was a Grade 14 Senior Accountant Trainee) and her performance reviews show that she overwhelmingly performed tasks up to expectations, with the exception of "needs improvement" on her three-month probation evaluation in the areas of managing work assignments and problem solving/decision-making, where it was noted that she needed to improve on working more efficiently to complete her assignments in a timely manner and in completing analyses and problem solving more independently, and "needs improvement" on her six-month probation evaluation in the area of problem solving/decision-making, where it was noted she needed to improve on completing analyses and problem solving more independently; it was noted that she

2021 WL 3674745

had improved in these areas and was meeting expectations by the time of her nine-month probation evaluation. (Dkt. No. 58, Attach. 58.) The evidence therefore shows that, even if Plaintiff and Ms. O'Hara performed the same or similar jobs, Ms. O'Hara did so with fewer mistakes and she gradually improved her performance over the course of the documented time, whereas Plaintiff's evaluations showed that she made far more extensive mistakes and did not show improvement. As a result, the Court finds that Ms. O'Hara is not sufficiently similar and thus the disparate treatment between her and Plaintiff would not allow a reasonable fact finder to infer discrimination.

**\*17** As to Mr. Deitz, he was a Grade 18 Senior Accountant in a different section or unit than Plaintiff, and his listed tasks and objectives are not similar to those listed in Plaintiff's Individual Development Plan. (*Compare* Dkt. No. 25, at 21-24 *with* Dkt. No. 58, Attach. 5, at 1-2; *see* Dkt. No. 58, Attach. 15, at 111-12 [Pl.'s Dep.] [testifying that she did not do many of the tasks listed on Mr. Deitz's tasks and objectives list and admitting that his responsibilities were "different" than hers].) Additionally, Mr. Deitz was supervised by Melinda Hansen and Michelle Daly, not Ms. Pulcher and Ms. Farrell, and a summary of his performance completed by Ms. Daly indicates that Mr. Deitz performed his job satisfactorily in all noted respects. (Dkt. No. 25, at 24, 26-27.) Because there is no evidence that Mr. Deitz was a trainee, the evidence shows that he had different job responsibilities and different supervisors than Plaintiff, and there is no evidence of ongoing job performance issues, the Court finds that no reasonable fact finder could conclude that the treatment Mr. Deitz received raises an inference of discrimination.

As to Mr. Shavel, there is little evidence about the details of his employment. Plaintiff's only allegation regarding Mr. Shavel is that he was given a counseling memorandum for failing to complete mandatory training, but did not have his employment terminated. (Dkt. No. 25, at 31.) However, there is no evidence to suggest that Mr. Shavel had engaged in any other actions that made his job performance unsatisfactory, much less that he committed mistakes similar to those documented related to Plaintiff's job performance. Additionally, there is no evidence to suggest that Mr. Shavel was a trainee employee or that he worked in a similar position or with similar tasks and objectives as Plaintiff's position, and the counseling memorandum suggests that Mr. Shavel was supervised in some way by Ms. Hansen, not Ms. Pulcher or Ms. Farrell. (Dkt. No. 25, at 31.) Based on the evidence, the Court finds that no reasonable fact finder could conclude

that the treatment Mr. Shavel received raises an inference of discrimination.

Because Plaintiff has not provided evidence which can prove a prima facie case of national origin discrimination under Title VII and because there is no outstanding issue of material fact evident from the parties' submissions, the Court grants Defendant's motion for summary judgment on this claim.

### D. Whether Defendant's Motion Should Be Granted as to Plaintiff's ADEA Claim

After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendant's memorandum of law. (Dkt. No. 58, Attach. 1 [Def.'s Mem. of Law].) To those reasons, the Court adds the following analysis.

" 'In order to establish a prima facie case of age discrimination,' the plaintiff 'must show (1) that she was within the protected age group, (2) that she was qualified for the position, (3) that she experienced adverse employment action, and (4) that such action occurred under circumstances giving rise to an inference of discrimination.' " *Green v. Town of East Haven*, 952 F.3d 394, 403 (2d Cir. 2020) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 107 [2d Cir. 2010]). In this case, Defendant concedes that Plaintiff has established the first and third of these requirements, but disputes that Plaintiff can show that she (a) was qualified for the position, and (b) her termination occurred under circumstances giving rise to an inference of discrimination.

Regarding whether Plaintiff was qualified, under the law of this Circuit, "a plaintiff only needs to demonstrate that she possesses the basic skills necessary for performance of the job." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 171 (2d Cir. 2006) (quoting *Owens v. New York City Housing Auth.*, 934 F.2d 405, 409 [2d Cir 1991]). Notably, although misconduct is not a basis for finding an employee lacks the basic qualifications for a position, evidence of performance based on evaluations of an employee's work is appropriate evidence for making that determination. *Owens*, 934 F.2d at 409 (clarifying that it is the ability to perform job duties that is important, not whether the conduct is inappropriate or offensive); *Ralkin v. New York City Transit Auth.*, 62 F. Supp. 2d 989, 998 (E.D.N.Y. 1999) (finding summary judgment appropriate on the issue of whether the plaintiff was qualified for the position because there was no "competing evidence" against the unsatisfactory performance evaluations to create an issue of fact about the plaintiff's performance,

and no evidence that the negative evaluations were unfair or incorrect). Here, Plaintiff has offered no evidence that the performance evaluations were inaccurate other than her own general assertions at her deposition that she does not believe they accurately reflect her performance. Because her unsubstantiated assertions and beliefs cannot outweigh the other evidence, the Court finds that Plaintiff has not sufficiently shown that there is a genuine dispute of material fact about whether she was qualified for her position as that term is defined by the law.

**\*18** Regarding whether Plaintiff has raised an inference of discrimination, as already discussed above in Part III.C. of this Decision and Order, Plaintiff's attempt to show that she was treated less favorably than younger similarly situated individuals is unavailing. Notably, it is undisputed that Ms. O'Hara was the only individual of the three named that was not as old or older than Plaintiff. However, as discussed previously, Ms. O'Hara is nonetheless not sufficiently similarly situated to Plaintiff because there is no evidence that Ms. O'Hara made the same or similar mistakes as Plaintiff did at the level and frequency at which Plaintiff made those mistakes. Rather, the evidence shows that Ms. O'Hara was reported to have made fewer overall mistakes and that she improved with each probation evaluation that was conducted. It is undisputed that Plaintiff is not personally familiar with Ms. O'Hara or her work abilities, and that Plaintiff has no knowledge as to how well or not Ms. O'Hara performed her job on a day-to-day basis. As a result, disparate treatment here does not give rise to an inference of discrimination based on Plaintiff's age any more than it does related to her national origin.

The Court also acknowledges Defendant's correct argument that many courts recognize that "an allegation that a decision is motivated by age animus is weakened when the decisionmakers are of the protected class," and also where "Plaintiff was well within the protected age group when she was hired." *Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 25 (E.D.N.Y. 2015) (collecting cases). However, these factors are not dispositive. *Ehrbar*, 131 F. Supp. 3d at 26. Here, Plaintiff was within the protected age group when she was hired, and Ms. Farrell, who was 50 at the relevant time, approved her termination, as did Ms. Burrell, who was 48 at the relevant time. (Dkt. No. 58, Attach. 3, at ¶ 13 [Arbab Decl.]; Dkt. No. 58, Attach. 25, at ¶¶ 5, 29 [Farrell Decl.].) Ms. Pulcher, however, was not in the protected age group. (Dkt. No. 58, Attach. 3, at ¶ 13 [Arbab Decl.].) Additionally, "where the person who made the decision to fire was the same

person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire." *Schnabel v. Abramson*, 232 F.3d 83, 91 (2d Cir. 2000) (quoting *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 [2d Cir. 1997]); *see also Downey v. Adloox, Inc.*, 789 F. App'x 903, 907 (2d Cir. 2019) (affirming district court's dismissal of age discrimination claim based in part on the fact that plaintiffs were hired and fired by the same executives within a short period of time). Here, Plaintiff's hiring was prompted by a request from Ms. Farrell, and Ms. Farrell also was one of the persons who approved her termination approximately six months later. (Dkt. No. 58, Attach. 25, at ¶¶ 5, 27 [Farrell Decl.].) Although it is unclear who precisely had the last authoritative say about Plaintiff's termination, Ms. Farrell's involvement in both Plaintiff's hiring and firing is a factor to consider in determining whether the evidence can be reasonably interpreted as raising an inference of discrimination based on age.

Unlike the national origin claim, which is unsupported by any evidence of statements made by Plaintiff's supervisors about her or other employee's national origins, there is a genuine dispute of material fact as to whether Ms. Pulcher made comments to Plaintiff about certain other employees being too old to do their jobs effectively. Plaintiff asserts that Ms. Pulcher made such comments, while Ms. Pulcher denies making such comments. It is undisputed that the two employees about whom Ms. Pulcher allegedly made the comments were at, near, or beyond retirement age, while Plaintiff was 45 at the time she was employed by Defendant. (Dkt. No. 58, Attach. 15, at 114-18 [Pl.'s Dep.] [testifying that Ms. Pulcher said that the employees in question did not know what they were doing and should have retired].) However, even if a fact finder were to accept Plaintiff's testimony that Ms. Pulcher made these comments, it would be insufficient to raise an inference of discrimination in light of all of the other evidence, including the fact that Ms. Farrell (who was not alleged to have made any comments about age) was personally aware of Plaintiff's work performance through working directly with her, and also signed Plaintiff's probationary evaluations and recommended her termination. Put another way, even if Ms. Pulcher had made comments suggesting possible age bias, those comments and any inference of discrimination on her part cannot be imputed to Ms. Farrell in the absence of evidence she was aware of any bias Ms. Pulcher may have held, particularly given that Ms. Farrell was directly and independently familiar with Plaintiff's performance issues. As a result, the Court finds that Plaintiff has not established that a reasonable fact finder could

conclude there was an inference of discrimination even if they resolved the issue about Ms. Pulcher's comments in Plaintiff's favor.

**\*19** In the alternative, even if a reasonable fact finder could conclude that Plaintiff was qualified and Ms. Pulcher's statements raised an inference of discrimination, denial of summary judgment is inappropriate here because Plaintiff cannot meet her ultimate burden to show that Defendant's proffered non-discriminatory explanation (i.e., that Plaintiff's performance was poor) was a pretext for discrimination. To establish a claim for discrimination under the ADEA, the plaintiff "must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action and not just a contributing or motivating factor." *Green*, 952 F.3d at 403 (citing *Gorzynski*, 596 F.3d at 106). In other words, Plaintiff's age does not need to have been the only consideration, but rather she still must show that she would not have been terminated without her age being considered. *Perez v. Cnty of Rensselaer, New York*, 14-CV-0950, 2018 WL 3420014, at \*4 (N.D.N.Y. July 13, 2018) (Sharpe, J.) (citing *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169 [2d Cir. 2014]). A few isolated comments that were not even directed at Plaintiff are insufficient to allow a reasonable fact finder to conclude that Plaintiff's age was the but-for cause of her termination in light of all of the evidence discussed above related to Plaintiff's failure to show an inference of discrimination. No reasonable fact finder could conclude that Plaintiff would not have been terminated despite her performance reviews if not for her age.

Because Plaintiff cannot establish a prima facie case and cannot show that her age was the but-for cause of her termination, the Court grants Defendant's motion for summary judgment on this claim.

**ACCORDINGLY**, it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 58) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's claims for national origin and age discrimination pursuant to Title VII and the ADEA are **DISMISSED**; and it is further

**ORDERED** that Plaintiff's Second Amended Complaint (Dkt. No. 25) is **DISMISSED**.

**All Citations**

Slip Copy, 2021 WL 3674745

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 1427206
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

David WITT and Kinuyo Gochaku Witt, Plaintiffs,
v.
The VILLAGE OF MAMARONECK and
Robert Melillo, individually and in his Official
Capacity as the Building Inspector, Defendants.

No. 12–CV–8778 (ER).
|
Signed March 27, 2015.

*OPINION AND ORDER*

RAMOS, District Judge.

**\*1** Plaintiffs David Witt and Kinuyo Gochaku Witt
(together, "Plaintiffs") bring this action against the Village of
Mamaroneck (the "Village") and Building Inspector Robert
Melillo ("Melillo") (collectively, "Defendants") pursuant
to 42 U.S.C. § 1983.[1] The action arises from the legal
requirements Defendants imposed on Plaintiffs in connection
with their efforts to repair their home in the aftermath of
Hurricane Irene. Plaintiffs maintain that similarly situated
homeowners were not subjected to the same treatment, which
therefore constitutes a violation of their equal protection
and substantive due process rights under the Fourteenth
Amendment. Plaintiffs also allege a *Monell* claim against the
Village.

[1]    Plaintiffs previously alleged claims against the
       Village of Mamaroneck Planning Board (the
       "Board"). *See* Am. Compl. They have dropped
       their claims against the Board in their Second
       Amended Complaint.

On March 31, 2014, this Court dismissed Plaintiffs' claims
without prejudice. *See* Doc. 18. Accordingly, Plaintiffs
amended their complaint, which Defendants again move to
dismiss pursuant to Rule 12(b)(6) of the Federal Rules of
Civil Procedure. For the reasons set forth below, Defendants'
motion to dismiss is GRANTED.

**I. Background**[2]

[2]    The following facts are based on the allegations
       in the SAC, which the Court accepts as true
       for purposes of the instant motion. *See Koch
       v. Christie's Int'l PLC,* 699 F.3d 141, 145 (2d
       Cir.2012).

**A. Factual Background**

The Court presumes familiarity with the facts and procedural
history of this case, which are detailed in its March 31,
2014 Order (the "March 2014 Order"), granting Defendants'
motion to dismiss without prejudice. *See* Doc. 18.

The thrust of Plaintiffs' action is unaffected by the amended
pleading. Plaintiffs owned a home in the Village of
Mamaroneck (the "Village"), which they purchased in April
2009 for $366,500. Second Amended Complaint ("SAC"),
Doc. 19 at ¶¶ 36–38. Less than three years later, on August
28, 2011, Hurricane Irene caused the Mamaroneck River to
overflow, flooding Plaintiffs' home and causing substantial
damage. *Id.* at ¶¶ 44–45, 56. A series of events that form
the basis for the instant action prevented Plaintiffs from
successfully completing the necessary repairs. First, they
were initially issued a building permit but subsequently
received a verbal stop-work order by Melillo. *Id.* at ¶ 73.
According to Melillo, the building permit was issued in
error because Plaintiffs' repair work constituted a "substantial
improvement" under Chapter 186 of the Village Code.[3] *Id.*
at ¶¶ 75, 78. In relevant part, the code defined "substantial
improvement" as follows:

[3]    Both the Amended Complaint and Plaintiffs' brief
       refer to "Section 186," but the Court notes that
       the Village Code designates the subdivision in
       question "Chapter 186." The Court will therefore
       refer to "Chapter 186" throughout this Opinion.
       The current version of the Village Code is available
       athttp://ecode360.com/MA0954.

    Any reconstruction, rehabilitation, addition, or other
    improvement of a structure, the cost of which
    equals or exceeds 50% of the market value of
    the structure before the start of construction of
    the improvement. Substantial improvement also means
    "cumulative substantial improvement." The term includes
    structures which have incurred substantial damage,
    regardless of the actual repair work performed.[4]

4    A "cumulative substantial improvement" is defined by the code as "[a]ny reconstruction, rehabilitation, addition, or other improvement of a structure that equals or exceeds 50% of the market value of the structure at the time of the improvement or repair *when counted cumulatively for 10 years.*" Village Code § 186–2 (emphasis added). Chapter 186 was amended in September 2012, and the "cumulative substantial improvement" provision was removed. SAC ¶ 114 n. 2.

*Id.* at ¶ 79. If a home was located in a flood plain, sustained "substantial damage," and required repairs that the Building Inspector deemed to be a "cumulative substantial improvement," the owners were required to reconstruct and elevate the foundation unless they obtained a variance from the Village Planning Board ("the Board").5 *Id.* at ¶ 80. Plaintiffs sought a variance, which they were ultimately granted subject to several conditions. *Id.* at ¶¶ 128, 184. Most notably, Plaintiffs understand one of the conditions to require any future owner to elevate the house if subsequent repairs are needed within a ten-year period. *Id.* at ¶ 191. The end result was that Plaintiffs ran out of money to complete repairs, defaulted on their mortgage, and had foreclosure proceedings brought against them. *Id.* at ¶¶ 28, 186. In the meantime, Melillo was issuing building permits to other nearby homeowners without requiring them to comply with Chapter 186. *Id.* at ¶ 22.

5    Chapter 186 provides that "[w]ithin Zone[ ] ... AE ... new construction and substantial improvements shall have the lowest floor (including basement) elevated to or above two feet above the base flood level." Village Code § 186–5(C).

**\*2** The following facts were not plead in the Amended Complaint ("Am . Compl.") and are drawn solely from the SAC.

First, Plaintiffs provide additional contextual details. Plaintiffs lived on a block on First Street "lined with 14 modest single family homes all similar in size, design, and value as Plaintiffs'."6 *Id.* at ¶ 39. All of First Street—the street on which Plaintiffs resided—was located in a Federal Emergency Management Agency ("FEMA") designated high risk "AE" special Flood Hazard Area. *Id.* at ¶ 3. At the time the dispute arose, Plaintiffs were the only homeowners on the block of mixed race and were the sole residents on their

street who were not long-time residents of the Village.7 *Id.* at ¶¶ 6, 9. While Plaintiffs lacked any personal relationships with Village officials or employees, many of their neighbors worked for the Village or were friends with past or present Village officials. *Id* . at ¶¶ 8, 9. The SAC identifies three sets of neighbors-one that included a former Village employee, another that were friends with members of the local police department, and a final set that were close family friends of the former Board chairperson. *Id.* at ¶¶ 95–97. As a result, Plaintiffs were "vulnerable ... targets[.]" *Id.* at ¶ 160.

6    The Amended Complaint merely stated that Plaintiffs' house was "similar in size, style, and value to *neighboring homes."* Am. Compl. ¶ 15 (emphasis added).

7    Plaintiffs previously alleged that Defendants singled them out "as targets for their draconian tactics" because "as young, new residents in the community, Plaintiffs lacked the local ties and political influence of many other homeowners who received more favorable treatment." Am. Compl. ¶ 120. This claim is now repeated several times throughout the SAC and pled with greater specificity than before.

Second, the SAC further describes Plaintiffs' experience in rebuilding their home in the aftermath of Hurricane Irene vis-à-vis their neighbors. All twelve homes located on First Street were severely damaged as a result of flooding that occurred when the Mamaroneck River overflowed.8 *Id.* at ¶¶ 45, 46. These homes had also sustained damage from prior unspecified "flooding events" which required extensive repairs. *Id.* at ¶ 41. Plaintiffs filed their building permit application on September 29, 2011, within the same one-month time frame that other neighbors on the block filed theirs. *Id.* at ¶¶ 54–55. Plaintiffs' contractor estimated that their repair work would cost approximately $115,000 and require eight to ten weeks to complete. *Id.* at ¶ 63. Plaintiffs' repair plans included renovations that required spending extra money to mitigate against future flood damage by raising "mechanicals and electrical" above flood levels, along with other structural improvements. *Id.* at ¶ 64. Defendants knew that Plaintiffs' neighbors along First Street and Barry Avenue "suffered the same degree of damage to their homes." *Id.* at ¶¶ 85, 85. Nonetheless, several "comparably damaged" homes within five hundred feet of Plaintiffs' house were permitted to complete repairs without the Village requiring them to adhere to Chapter 186 requirements. *Id.* at ¶ 138.

8    Earlier in the SAC, Plaintiffs claim that there were
     fourteen homes on the same block located on First
     Street. SAC ¶ 39.

Finally, the SAC contains additional allegations concerning
the context in which Chapter 186 was enforced against them.
Plaintiffs claim that (1) "[n]o other homeowners on First
Street or in the vicinity" were required to comply with
Chapter 186; (2) "[a]ll the other homeowners on First Street
were allowed to continue with their repairs and move back
into their houses even though Melillo knew that they had all
sustained comparable cumulative flood damage in 2007 and
2001[;]" and (3) "[n]or did Melillo impose [Chapter] 186's
flood damage prevention requirements on other nearby homes
in the AE zone that, even more than Plaintiffs' home, clearly
surpassed the 'cumulative substantial improvement threshold
for damage[.]" *Id.* at ¶¶ 1921.

 **\*3**  Melillo allegedly assisted Plaintiffs' neighbors by
advising them on how to circumvent Chapter 186 by
misrepresenting the actual extent and cost of flood damage
repairs on their building permit applications. *Id.* at ¶ 161.
As a result, these homeowners were allowed to proceed
with undocumented and more extensive repairs without being
subject to Chapter 186. *Id.* at ¶ 164. As to Plaintiffs, Melillo
calculated the value of their house using the tax assessor's
valuation, rather than the market value, as required by the
regulation.[9] *Id.* at ¶ 82. In addition, after the Board granted
Plaintiffs a variance with respect to Chapter 186, Melillo
informed them that they would not be allowed to recommence
work until they obtained a State variance for having a
bathroom on the first floor and a washing machine in the
basement. *Id.* at ¶ 187.

9    Plaintiffs claim that "[i[f the improvements
     were calculated related to 'market value,' the
     repairs would not have met the "cumulative
     substantial improvement" threshold." SAC ¶ 84.
     However, they also state that their neighbors'
     repairs constituted "cumulative substantial
     improvements," even more so than their own. *Id.*
     at ¶ 21.

Plaintiffs conclude by stating that they have been unable
to sell their home because of the condition attached to the
variance that any future owner would be required to elevate
the house in the event that any future repairs were required
within a ten-year period. *Id.* at ¶ 191.

**B. Procedural History**

Plaintiffs filed suit on December 4, 2012 and amended their
Complaint on February 15, 2013. Docs. 1, 4. The Amended
Complaint consisted of equal protection, substantive due
process, and procedural due process claims, along with a
*Monell* claim against the Village and various claims for relief
under state law. *See* Am. Compl., Doc. 4. Defendants filed a
motion to dismiss the Amended Complaint on May 31, 2013,
Doc. 8, which the Court granted in its entirety on March 31,
2014, subject to the specification that "[a]ll dismissals are
without prejudice."[10] Doc. 18 at 28.

10   In responding to Defendants' first motion to
     dismiss, Plaintiffs withdrew their state law claims.
     Pls.' Mem. of Law in Opp'n, Doc. 12 at 43 n. 16

The SAC asserts three causes of action against Defendants,
consisting of an equal protection claim, violations of their
substantive due process rights, and a *Monell* claim against
the Village. *See* SAC ¶¶ 194–226. In their opposition papers,
Plaintiffs also allege that Defendants violated their procedural
due process rights. *See* Pls.' Opp., Doc. 32 at 33–37.

**II. Discussion**

**A. 12(b)(6) Motion to Dismiss Standard**

When ruling on a motion to dismiss pursuant to Federal Rule
of Civil Procedure 12(b)(6), the court must accept all factual
allegations in the complaint as true and draw all reasonable
inferences in the plaintiff's favor. *Nielsen v. Rabin,* 746 F.3d
58, 62 (2d Cir.2014). The court is not required to credit "mere
conclusory statements" or "threadbare recitals of the elements
of a cause of action." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129
S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing *Bell Atl. Corp.
v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d
929 (2007)); *see also id.* at 681 (citing *Twombly,* 550 U.S.
at 551). "To survive a motion to dismiss, a complaint must
contain sufficient factual matter ... to 'state a claim to relief
that is plausible on its face.' " *Id.* at 678 (quoting *Twombly,*
550 U.S. at 570). A claim is facially plausible "when the
plaintiff pleads factual content that allows the court to draw
the reasonable inference that the defendant is liable for the
misconduct alleged." *Id.* (citing *Twombly,* 550 U.S. at 556).
More specifically, the plaintiff must allege sufficient facts to
show "more than a sheer possibility that a defendant has acted
unlawfully." *Id.* If the plaintiff has not "nudged [his] claims
across the line from conceivable to plausible, [the] complaint

2015 WL 1427206

must be dismissed." *Twombly,* 550 U.S. at 570; *Iqbal,* 556 U.S. at 680.

**\*4** The question in a Rule 12 motion to dismiss " 'is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.' " *Sikhs for Justice v. Nath,* 893 F.Supp.2d 598, 615 (S.D.N.Y.2012) (quoting *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 278 (2d Cir.1995)). "[T]he purpose of Federal Rule of Civil Procedure 12(b) (6) 'is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits,' " and without regard for the weight of the evidence that might be offered in support of Plaintiffs' claims. *Halebian v. Berv,* 644 F.3d 122, 130 (2d Cir.2011) (quoting *Global Network Comm'ns, Inc. v. City of New York,* 458 F.3d 150, 155 (2d Cir.2006)).

### B. Ripeness

Once again, Defendants argue that Plaintiffs' claims are not ripe because they did not appeal the stop work order or variance to the Planning Board.[11] Doc. 30 at 5.[12] The Court rejected this argument in its March 2014 Order when it determined that the finality requirement does not mandate that a party exhaust its administrative remedies prior to bringing a federal claim. *See* Doc. 18 at 9 (citing *Williamson County Regional Planning Commission v. Hamilton Bank,* 473 U.S. 172, 192–193, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985)). The Court noted that, although "Plaintiffs may not have exhausted every avenue available to them along the way ... *Williamson* does not demand that they do so." *Id.* at 10. "The failure to appeal may have rendered Plaintiffs' claims unripe had they been brought *prior to* having pursued the variance, but there is nothing in the record indicating that the current state of affairs with respect to Plaintiffs' property is anything less than final." *Id.* (emphasis in original).

[11]   Chapter 186 provides that the Board "shall hear and decide appeals when it is alleged there is an error in any requirement, decision, or determination made by the local administrator in the enforcement or administration of this article." Village Code § 186–6(A)(2). The Building Inspector falls within the definition of "local administrator." *Id.* at § 186–2.

[12]   Given that the Defendants' motion to dismiss and declarations lack page numbers, the Court's

citations to them refer to the page numbers reflected on ECF.

Defendants have not asked the Court to reconsider its opinion, nor have they cited any mistakes in its reasoning or an intervening change in the law. To the extent Defendants base their motion on their argument that Plaintiffs' claims are not ripe, it is denied.

### C. Fourteenth Amendment Equal Protection

The Equal Protection clause of the Fourteenth Amendment commands that "all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (citing *Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982)). There are many ways in which a plaintiff may plead intentional discrimination that violates the Equal Protection Clause. For example, "a plaintiff may claim ... selective enforcement of the law ... based upon his or her membership in a particular class, compared with others similarly situated [.]" *Savino v. Town of Se.,* 983 F.Supp.2d 293, 301 (S.D.N.Y.2013) *aff'd,* 572 F. App'x 15 (2d Cir.2014) (internal citations omitted). Alternatively, a plaintiff may seek to prove discrimination under a "class of one" analysis, which consists of: (1) intentional disparate treatment, (2) from other similarly situated individuals, (3) without a rational basis for the difference in treatment, and (4) without otherwise claiming membership in a particular class or group. *Vill. of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000). Plaintiffs proceed under both theories.

### i. "Similarly Situated" Analysis

**\*5** Both selective enforcement and class of one claims require a showing of similarly situated individuals or groups who were treated differently. *See Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills,* 815 F.Supp.2d 679, 693 (S.D.N.Y.2011).

The Court of Appeals has made clear that, in a "class of one" case, "plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves." *Clubside, Inc. v. Valentin,* 468 F.3d 144, 159 (2d Cir.2006). That is because, in such cases, similarity "is offered to provide an inference that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose—whether personal or otherwise—is all but certain." *Neilson v. D'Angelis,* 409 F.3d 100, 105 (2d

Cir.2005), *overruled on other grounds by Appel v. Spiridon,* 531 F.3d 138 (2d Cir.2008) (per curiam). A plaintiff is required to show that (1) "no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy;" and (2) "the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake." *Ruston v. Town Bd. for Town of Skaneateles,* 610 F.3d 55, 60 (2d Cir.2010) (quoting *Clubside, Inc. v. Valentin,* 468 F.3d 144, 159 (2d Cir.2006)).

However, there is disagreement within the Second Circuit regarding the degree of similarity that a plaintiff must show in order to adequately allege an equal protection claim under the selective enforcement theory. *See Mosdos Chofetz Chaim,* 815 F.Supp.2d at 693–97 (discussing the alternative standards and surveying the disagreement among courts in this Circuit). It is unsettled whether selective enforcement cases require the same high degree of similarity, or whether a "slightly less stringent" standard applies wherein plaintiffs must show that the comparators are "similarly situated in all material respects." *Id.* at 696 (internal quotation marks omitted) (quoting *Vassallo v. Lando,* 591 F.Supp.2d 172, 184 (E.D.N.Y.2008)). As one court put it:

> The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated. Much as the lawyer's art of distinguishing cases, the 'relevant aspects' are those factual elements which determine whether reasoned analogy supports, or demands, a like result. Exact correlation is neither likely or necessary, but the cases must be fair congeners. In other words, apples should be compared to apples.

*Id.* at 696 (quoting *T.S. Haulers, Inc. v. Town of Riverhead,* 190 F.Supp.2d 455, 463 (E.D.N.Y.2002)).

In the March 2014 Order, the Court did not have to decide which standard should be applied because the selective enforcement claim failed to satisfy even the more lenient

standard. *See* Doc. 19 at 12–13 n. 9. In the Amended Complaint, Plaintiffs broadly alleged that that their home "was similar in size, style, and value to neighboring homes" and that many of these "similarly sized and valued homes experienced comparable damage" after Hurricane Irene. Am. Compl. ¶¶ 15, 72. Although they provided more specific allegations about the costs expended on repairs to three nearby properties, they did not allege that the homes were located in an applicable floodplain or that the repairs exceeded fifty percent of their market value. *Id.* at ¶¶ 113–115. Only one property was specifically alleged to have incurred those costs as a result of Hurricane Irene. *See id.* ¶ 113. The Court noted that "there is nothing inherently wrongful in Defendants' deciding to respond to external pressures by enforcing existing regulations[.]" Doc. 19 at 14. Therefore, "in order to demonstrate that their neighbors were similarly situated in all *material* respects, Plaintiffs must identify comparators who were undertaking repairs concurrently, subsequently, or at least within sufficiently close temporal proximity so as to suggest that a proper comparison may be drawn for purposes of the equal protection analysis." *Id.* (citing *Mosdos Chofetz Chaim,,* 815 F.Supp.2d at 698–99) (considering the relative timing of project approvals as a relevant factor in assessing the adequacy of the pleadings). Furthermore, the Court reasoned that since the pleadings expressly alleged that Plaintiffs' neighbors were not required to pursue a variance, they could not claim disparate treatment based on the *outcome* of their variance. *Id.* at 15.

**\*6** Yet again, the SAC fails to allege that any other homeowners were similarly situated in all material respects, let alone establish a high degree of similarity under the more stringent class of one standard.

To begin with, Plaintiffs do not allege that other damaged properties had a similar market value and required the same relative dollar amount of repairs.[13] Plaintiffs' entire street was a "designated high risk flood zone" subject to Chapter 186. SAC ¶ 92. Plaintiffs maintain that the houses on their *block* were "similar in size, design and value as Plaintiffs[,]" *id.* at ¶ 39, and that all of the houses on their street sustained the same degree of damage from the 2007 and 2011 flooding events. *Id.* at ¶¶ 85, 87. Yet, the applicability of Chapter 186 hinges on "the *cost* of any reconstruction, rehabilitation, or other improvement" and whether it "equals or exceeds 50% of the *market value* of the structure before the start of construction of the improvement." Village Code § 186–2 (emphasis added). Beyond the houses located on their street block, Plaintiffs do not make any allegations with respect

Case 9:19-cv-00689-AMN-TWD    Document 115    Filed 02/27/23    Page 42 of 173
Witt v. Village of Mamaroneck, Not Reported in F.Supp.3d (2015)
2015 WL 1427206

to the market value of the other homes identified in the SAC. More importantly, Plaintiffs admit that they spent more money on their own repairs to *prevent* future flood damage, as opposed to simply repairing the damage caused by Hurricane Irene. SAC ¶ 63. Plaintiffs never contend that any of their neighbors similarly went beyond simply repairing the damage to their homes and invested in additional alterations. In fact, the SAC is silent as to whether the other homeowners on Plaintiffs' block spent the same, or even a similar amount, on repairing their homes. [14]

[13]     As a preliminary matter, Plaintiffs have cured the prior defect in their Amended Complaint, which fell short of claiming that other similarly-situated homeowners were undertaking repairs within sufficiently close temporal proximity. The SAC states, "[t]he neighbors repairs were ongoing and at various stages of completion when ... Melillo interrupted Plaintiffs' repair work with the issuance of a stop work order[.]" SAC ¶ 90.

In the prior Amended Complaint, however, Plaintiffs alleged that they did not obtain their permit or begin repairs until their neighbors "had already substantially completed the repairs to their flood-damaged homes." *See* Am. Compl. ¶¶ 41– 42; *see also id.* ¶ 122 (identifying Plaintiffs' "delayed repair schedule" as a factor leading to the alleged disparate treatment). Defendants argue that the Court should not accept these allegations as true because they contradict Plaintiffs' former pleadings. Doc. 30 at 2–4. "[I]n a typical case, a prior inconsistent pleading should not trump the Court's obligation under Rule 12(b)(6) to accept a complaint's allegations as true." *Palm Beach Strategic Income, LP v. Salzman*, No. 10 Civ. 261(JS)(AKT), 2011 WL 1655575, at *6 (E.D.N.Y. May 2, 2011) *aff'd*, 457 F. App'x 40 (2d Cir.2012) *and aff'd*, 457 F. App'x 40 (2d Cir.2012). Nonetheless, some courts have held that "[w]here a 'plaintiff blatantly changes his statement of the facts in order to respond to the defendant['s] motion to dismiss ... [and] directly contradicts the facts set forth in his original complaint,' a court is authorized 'to accept the facts described in the original complaint as true.' " *Colliton v. Cravath, Swaine & Moore LLP*, No. 08 CIV 0400(NRB), 2008 WL 4386764, at *6 (S.D.N.Y. Sept.24, 2008) *aff'd sub nom. Colliton v. Cravath, Swain & Moore LLP*, 356 F. App'x 535 (2d Cir.2009) (internal

citation omitted). Regardless of whether the Court accepts these new allegations as true, Plaintiffs' equal protection claim fails for the reasons stated above.

[14]     The SAC references a house located 2.2 miles away at 615 Forest Zone, which underwent $310,000 in renovations. SAC ¶ 106. It also identifies a home on 1616 James Street, 0.8 miles away from Plaintiffs' house, which sustained flood damage of reportedly $133,000 in 2011 and $116,000 in 2007. *Id.* at ¶ 104. However, although cost of these figures exceed the $115,000 estimated cost of Plaintiffs' repair work, *see id.* at ¶ 63, no information is provided as to the market value of the homes.

The Court also notes that Chapter 186 was only one of the reasons Melillo provided for issuing his stop work order. Plaintiffs admit that Melillo also cited the fact that they failed to file a Flood Development Permit application with their building permit application. [15] SAC ¶ 78. Moreover, after the Board issued the variance with respect to Chapter 186, Melillo advised Plaintiffs that they would not be permitted to recommence repairs until they obtained a New York State variance for having a bathroom on the first floor or a washing machine in the basement. *Id.* at ¶ 187. Plaintiffs do not allege that their neighbors also did not submit a Flood Development Permit application, or that they undertook other repairs requiring a state variance.

[15]     Chapter 186 provides that "[i]t shall be unlawful to undertake any development in an area of special flood hazard ... without a valid floodplain development permit." Village Code § 186–4(B)(1). Furthermore, "[t]he local administrator shall issue, or cause to be issued, a stop-work order for any floodplain development found ongoing without a development permit." *Id.* at § 186–4(D)(6)(a).

Finally, as was the case with the Amended Complaint, the fact that Plaintiffs' neighbors were not required to pursue a variance at all, *see* SAC at ¶ 185, "belies any argument that similarly situated comparators exist with respect to the allegedly 'unprecedented' variance conditions." *See* Doc. 18 at 15; *see also* SAC at ¶¶ 174, 184 (explaining that the variance conditions "had never been imposed on a homeowner seeking a Section 186 variance prior to Plaintiffs' application nor has been imposed on any homeowner since").

**\*7** Since Plaintiffs have failed to allege differential treatment from similarly situated individuals, their equal protection claim must be dismissed. [16]

[16]    The SAC also suggests an alternative explanation for the Village's enforcement of Chapter 186 against Plaintiffs. It states that Melillo "acknowledged that he knew that Plaintiffs had provided the Village a true and accurate estimate of the costs of repairs while their neighbors had not." SAC ¶ 140. Furthermore, he explained that Plaintiffs were "being punished for doing the right thing" while their neighbors failed to report the true extent of their repairs. *Id.* at ¶ 142. Plaintiffs go on to accuse Melillo of helping their neighbors avoid Chapter 186's requirements by submitting false information. *Id.* at ¶¶ 161–165. Of course, these alternative rationales merely highlight the lack of similarity between Plaintiffs and the purported comparators.

**ii. Selective Enforcement**

Even if Plaintiffs had sufficiently alleged that their neighbors were similarly situated, their selective enforcement claim would once again fail. In order to state a viable equal protection claim under the selective enforcement theory, a plaintiff must show that:

> (1) the person, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, or to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the [plaintiff].

*Zahra v. Town of Southold,* 48 F.3d 674, 683 (2d Cir.1995) (quoting *FSK Drug Corp. v. Perales,* 960 F.2d 6, 10 (2d Cir.1992)). The Second Circuit has "described selective enforcement as a 'murky corner of equal protection law in which there are surprisingly few cases.' " *Diesel v. Town of Lewisboro,* 232 F.3d 92, 103 (2d Cir.2000) (quoting *LeClair v. Saunders,* 627 F.2d 606, 608 (2d Cir.1980)).

For the first time in this litigation, the SAC makes a point of calling attention to the fact that, when the events at issue took place, Plaintiffs were the only interracial couple on their block. SAC ¶¶ 9, 27. It also notes that, Plaintiffs "lacked the personal relationships with Village officials that protected their Neighbors." *Id.* at ¶ 160. Taken together, the SAC posits that:

> Melillo transferred his animus to the Plaintiffs who, as new residents of the Village, had no personal ties to Village insiders or decision-makers, and as a young mixed race couple, were convenient targets to serve as his sacrificial lambs in a community where Village affairs were dominated by longtime residents, predominantly white, and many a part of a close knit Italian community.

*Id.* at ¶ 27.

Besides the fact that Plaintiffs have failed to allege the existence of similarly situated homeowners, they also have not shown that "the disparate treatment was *caused by* the impermissible motivation." *Anderson v. City of New York,* 817 F.Supp.2d 77, 94–95 (E.D.N.Y.2011) (quoting *Bizzarro v. Miranda,* 394 F.3d 82, 87 (2d Cir.2005)) (emphasis in original). Plaintiffs "must demonstrate that a discriminatory purpose was a 'motivating factor' in the government decision." *Adler v. Kent Vill. Hous. Co.,* 123 F.Supp.2d 91, 98 (E.D.N.Y.2000) (quoting *Estate of Rosenbaum by Plotkin v. City of New York,* 975 F.Supp. 206, 223 (E.D.N.Y.1997)). "Discriminatory purpose implies that the decisionmaker selected or reaffirmed a particular course of action at least in part because of[,] not merely in spite of its adverse effects upon an identifiable group." *Id.* (quoting *Rosenbaum,* 975 F.Supp. at 223). Throughout the SAC, Plaintiffs contend that the fact that they are a mixed-race couple rendered them vulnerable or convenient targets; however they never claim that they were actually singled out on the basis of their race. *See* SAC ¶¶ 9, 27. Furthermore, although the SAC states that "Plaintiffs were targeted ... because the other homeowners were all longtime Village residents[,]" [17] *id.* at ¶ 94, "such a consideration is not on the same level as race, religion, sex, intent to injure, or a desire to punish plaintiff[s] for exercising

Case 9:19-cv-00689-AMN-TWD    Document 115    Filed 02/27/23    Page 44 of 173
Witt v. Village of Mamaroneck, Not Reported in F.Supp.3d (2015)
2015 WL 1427206

[their] constitutional rights." *Payne v. Huntington Union Free Sch. Dist.,* 101 F.Supp.2d 116, 119 (E.D.N.Y.2000) (holding that a plaintiff's claim that she was fired because she was married to the District's superintendent did not constitute a constitutionally impermissible consideration). Furthermore, the SAC does not allege that Defendants selectively enforced Chapter 186 because of its adverse effects on village newcomers as a group.

[17]    Plaintiffs also assert that because their neighbors had personal ties to Village officials, they had access to advice and assistance from Melillo on how to skirt the obligations of Chapter 186 that Plaintiffs did not have. SAC ¶¶ 161164.

**\*8** Nor do Plaintiffs sufficiently allege that the purported selective treatment was motivated by a malicious or bad-faith intent to injure them. [18] The SAC states that "[t]he genesis of Melillo's actions arose from his animus towards federal and state officials, and some vocal local residents, who criticized Melillo for being lax in his enforcement of flood damage prevention regulations." SAC ¶ 26. As examples of Melillo's "animus" being channeled toward Plaintiffs, the SAC broadly cites "the tone and content of his communications with them and the detrimental and unreasonable decisions he was making in regard to their dire situation." *Id.* at ¶ 144. It also claims that Melillo demonstrated his "animus" at the February 6, 2012 meeting with the Planning Board consultant, in which he stated that Plaintiffs were going to "have a hard time getting the variance" because he was "getting beat up by all these agencies and FEMA[.]" [19] *Id.* at ¶¶ 156. Plaintiffs conclude "[i]t was clear ... that Melillo was targeting Plaintiffs and trying to force them to undertake this more expensive and time consuming option of elevating their house for his own self-serving reasons, i.e. to save his job by creating a false impression to federal and state authorities and local critics that he was enforcing Section 186." *Id.* at ¶ 158. Yet, as was the case before, "[n]one of these allegations suggests any ill will —on the part of any party—directed toward Plaintiffs." [20] Doc. 18 at 17.

[18]    The SAC does not make any allegations that can be construed as alleged bad-faith or malice on the part of any Defendant other than Melillo. It alleges that, at the special Board meeting, "the tone of some of the Board was very antagonistic toward Plaintiffs' application [for a variance]." SAC ¶ 182. Nonetheless, Plaintiffs still received their variance,

and nothing in the pleadings suggests an inference that the conditions imposed on that variance were the product of any hostility or antagonism the Board may have displayed.

[19]    Plaintiffs maintain that this gave them "the impression that he was angry that they were attempting to seek a variance rather than amending their plans to elevate their house[.]" SAC ¶ 157.

[20]    Plaintiffs argue that courts often determine whether a plaintiff has adequately alleged intent by "the drawing of favorable inferences based on factual circumstances at the pleading stage, and not a 'smoking gun' statement which attributes improper motive to a municipality." Doc. 32 at 24. Nonetheless, while the Court is required to draw all reasonable inferences in Plaintiffs' favor, *Twombly* and *Iqbal* make clear that the burden is on Plaintiffs to plead allegations that render their assertions more than merely speculative. At this point, they have not done so.

Therefore, even if Plaintiffs had adequately alleged selective enforcement relative to others who were similarly situated, their claim would be dismissed for failure to plead an intention to discriminate on the basis of impermissible considerations. [21]

[21]    In their papers, Plaintiffs claim that "they exercised their rights to free speech under the First Amendment when they complained about the unequal treatment of their property and to which Melillo responded with retaliatory hostility and by obstructing their variance application." Doc. 32 at 24. The SAC simply does not make a single reference to Plaintiffs' First Amendment rights.

### iii. "Class of One"

In order to adequately allege an equal protection claim on a "class of one" theory, a plaintiff must demonstrate (1) that he was "intentionally treated differently from others similarly situated," and (2) "that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (per curiam); *see also Engquist v. Oregon Dep't of Agric.,* 553 U.S. 591, 128 S.Ct. 2146, 170 L.Ed.2d 975 (2010) (examining *Olech*'s reasoning and determining that it does not apply to public employment cases). Stated differently, a plaintiff asserting a "class of one" equal protection claim must allege

Witt v. Village of Mamaroneck, Not Reported in F.Supp.3d (2015)
Case 9:19-cv-00689-AMN-TWD    Document 115    Filed 02/27/23    Page 45 of 173
2015 WL 1427206

that the intentional disparate treatment was "wholly arbitrary" or "irrational." *Aliberti v. Town of Brookhaven,* 876 F.Supp.2d 153, (E.D.N.Y.2012) (citing *Giordano v. City of New York,* 274 F.3d 740, 751 (2d Cir.2001)). [22] The Second Circuit has made clear that *both* elements of a "class of one" equal protection claim—intentional disparate treatment *and* lack of rational basis—must be analyzed by comparing the plaintiff to those who are similarly situated. *Neilson,* 409 F.3d at 105.

[22] As they did previously, Defendants argue that a "class of one" claim cannot be based on discretionary determinations. *See* Doc. 30 at 12–15. Although the Supreme Court has held the "class of one" theory is inapplicable in public employment cases that involve the exercise of "broad discretion that typically characterizes the employer-employee relationship [,]" *Engquist,* 553 U.S. at 605, the Second Circuit, has explicitly held that "*Engquist* does not bar all class-of-one claims involving discretionary state action." *Analytical Diagnostic Labs, Inc. v. Kusel,* 626 F.3d 135, 142 (2d Cir.2010). Courts within this Circuit have adhered to the judgment that *Engquist* typically does not apply in "cases where the government exercises its regulatory power." *Aliberti,* 876 F.Supp.2d at 163 (citing *Analytical Diagnostic,* 626 F.3d at 142); *see also Missere v. Gross,* 826 F.Supp.2d 542, 560 n. 13 (S.D.N.Y.2011) ("The Court will therefore assume that [plaintiff's] class-of-one claim is cognizable in this context, even though, as the Court has already noted, it involves an area of state action—land use regulation—in which the government exercises considerable discretion."). In the March 2014 Order, the Court expressly declined to reexamine this approach, as it does again here.

Defendants have also repeated their previously rejected argument that a "class of one" claim requires a showing of malicious or vindictive intent. *See* Doc. 20 at 18–20. However, "[w]hile the Second Circuit has repeatedly deferred the question of whether *Olech* eliminated the inquiry into defendant's bad faith intent, district courts have generally assumed that it did and allowed a 'class of one' claim to proceed based only on the government's arbitrary conduct." *Assoko v. City of New York,* 539 F.Supp.2d 728, 735 n. 7 (S.D.N.Y.2008) (citation omitted). Defendants

have not cited to any change in the law to support their argument.

The Court previously found that, without adequate comparators, it was impossible to determine whether there was a legitimate basis for the alleged disparities between Defendants' specific actions with respect to Plaintiffs' property and the ones directed at surrounding properties. Since Plaintiffs are, yet again, unable to identify materially similar, let alone identical comparators, the Court's analysis cannot proceed any further. The Village was certainly within its right to enforce Chapter 186. The question here is whether there were other local residents besides Plaintiffs whose repairs triggered the regulation's provisions. [23] Although Plaintiffs insist that "other nearby homes in the AE zone ... clearly surpassed the 'cumulative substantial improvement' threshold[,]" they fail to proffer the necessary combination of facts to support this conclusory statement. *See supra* Part.II.C .i.

[23] In its March 2014 Order, the Court also noted that "[i]t is fairly self-evident that, to the extent Defendants decided to step up their enforcement efforts in order to qualify for FEMA flood relief, that motivation provides a rational basis for changing the enforcement policy across the board (*i.e.,* for treating everyone who undertook repairs after the change in policy differently from everyone who had undertaken repairs prior to the change in policy)." Doc. 18 at 20. Although the SAC largely cured the prior Amended Complaint's deficiencies in terms of filling in the temporal gap, Plaintiffs still have not sufficiently alleged the existence of similarly situated comparators. *See supra* Part.II.C.i.

**\*9** In their papers, Plaintiffs rely on several decisions that predate *Ruston,* the case in which the Second Circuit set out the pleading standard for "class of one" claims in light of the Supreme Court's holding in *Iqbal.* [24] *See Ruston,* 610 F.3d at 59. Prior to *Ruston,* plaintiffs alleging class of one claims did not have to plead "actual instances where others have been treated differently for the purposes of equal protection" in order to overcome a motion to dismiss. *DeMuria v. Hawkes,* 328 F.3d 704, 707 (2d Cir.2003), *abrogated by Ruston,* 610 F.3d at 59. Furthermore, "[f]ederal courts must be wary 'about transforming run-of-the-mill zoning cases into cases of constitutional right.' " *Adam J. v. Vill. of Greenwood Lake,* No. 10–CV–1753 (CS), 2013 WL 3357174, at \*9 (S.D.N.Y.

2015 WL 1427206

July 3, 2013) (citing *Olech,* 528 U.S at 566 (Breyer, J., concurring)).

24       Plaintiffs also cite a case in which the plaintiff's class of one claims survived summary judgment. Doc. 32 at 27 (citing *Alfaro v. Labrador,* No. 06–CV–1470 (JS)(WDW), 2009 WL 2525128, at *11 (E.D.N.Y. Aug. 14, 2009)). However, in *Alfaro,* the plaintiff identified other neighboring properties that, like his own, were engaged in similar zoning violations that were not subjected to the same treatment. 2009 WL 2525128, at *10. Here, Plaintiffs have not alleged facts that support an inference that their neighbors spent enough on repairs as to exceed fifty percent of the market value of their homes and trigger Chapter 186. *See supra* Part.II.C.i.

Given that Plaintiffs have failed to show "an extremely high degree of similarity between themselves and the persons to whom they compare themselves [,]" *Clubside,* 468 F.3d at 159, they cannot sustain an equal protection claim under a "class of one" theory.

**D. Fourteenth Amendment Substantive Due Process**

**i. Property Interest**

In order to sustain a due process claim, Plaintiffs must have possessed a valid property interest. *See Zahra,* 48 F.3d at 680 ("To state a substantive due process claim, a party must *first* establish that he had a valid 'property interest' in a benefit that was entitled to constitutional protection at the time he was deprived of that benefit.") (emphasis in original) (citing *Brady v. Town of Colchester,* 863 F.2d 205, 211–12 (2d Cir.1988)). Because Plaintiffs have failed to plausibly allege the existence of a cognizable property interest, their due process claim must be dismissed. [25] To possess a federally protected property interest, a person must have a "legitimate claim of entitlement to it." *Bd. of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Such a claim does not arise from the Constitution, but rather from an independent source such as state or local law. *See id.; Donato v. Plainview–Old Bethpage Cent. Sch. Dist.,* 96 F.3d 623, 629 (2d Cir.1996); *G.I. Home Developing Corp. v. Weis,* No. 07–CV–4115 (DRH), 2009 WL 962696, at *5 (E.D.N.Y. Mar.31, 2009). "An abstract need, desire or unilateral expectation is not enough." *Abramson v. Pataki,* 278 F.3d 93, 99 (2d Cir.2002) (citing *Roth,* 408 U.S. at 577).

25       Plaintiffs previously alleged a procedural due process claim under the Fifth and Fourteenth Amendments. Am. Compl. ¶¶ 141–48. Although Plaintiffs' reply papers maintain that SAC states a procedural due process claim, Doc. 32 at 33–34, no such claim is asserted in the SAC as a separate cause of action. Therefore, the Court will not consider Plaintiffs' procedural due process arguments.

The Court previously dismissed Plaintiffs' due process claims for failure to allege a property interest. The Court determined that the Plaintiffs did not have a property right in the building permit, which was erroneously issued. Doc. 18 at 22–23. It did not make a difference that construction was fifty-percent complete at the time Melillo issued the stop work order. *Id.* at 23. Furthermore, even if the building permit constituted a valid property interest, the fact that Plaintiffs were granted a variance and the permit was never actually revoked implies that any such property interest was never denied. *Id.* at 24.

***10** Plaintiffs have modified their pleadings to allege that the building permit in question was not erroneously issued. [26] The SAC claims that, in his calculations, Melillo wrongly used the tax assessor's valuation of their home rather than "market value," as required by Chapter 186. SAC ¶ 208. As a result, "Melillo's actions denied Plaintiffs their protected property interest in a validly issued building permit," *id.* at ¶ 209, because "[i]f the improvements were calculated related to 'market value,' the repairs would not have met the 'cumulative substantial improvement' threshold." *Id.* at ¶ 84. However, the SAC also contradicts itself by suggesting that Plaintiffs' repairs did in fact constitute a cumulative substantial improvement, stating "other nearby homes in the AE zone ... *even more than Plaintiffs' home,* clearly surpassed the 'cumulative substantial improvement' threshold for damage sustained over a 10 year period[.]" *Id.* at ¶ 21 (emphasis added). The Court need not attempt to resolve these inconsistencies because Plaintiffs still have not alleged that their building permit was revoked. [27] As was the case before, "Melillo's alleged instruction that an additional variance would be required from New York State, while presenting a further hurdle to having the stop work order removed, does not amount to a revocation of the underlying permit." Doc. 18 at 24.

26       Chapter 186 provides that "[t]he Planning Board shall hear and decide appeals when it is alleged there is an error in any requirement, decision, or

determination made by the local administrator." Village Code § 186–6(A)(2). Plaintiffs never allege in either the SAC or their papers that they challenged Melillo's calculations in front of the Board.

27    Plaintiffs argue in their opposition papers that the building permit was constructively revoked when Melillo issued his stop work order, "which set in sequence a series of events that rendered the Plaintiffs' expenditures and improvements, and ultimately their home, valueless to them." Doc. 32 at 30–31. Specifically, they maintain that they cannot afford to repair their home and have been unable to find a buyer. SAC ¶¶ 186, 191. However, Plaintiffs are conflating the issuance of a building permit—which granted them permission from the Village to undertake repairs—with their own financial ability to act on the building permit.

In its March 2014 Order, the Court also found that Plaintiffs did not allege a deprivation of their property interest in their home. Doc. 18 at 24. Notably, Defendants' actions "did not directly take Plaintiffs' home away from them, nor did [they] render the property itself valueless." *Id.* Once again, Plaintiffs claim that they were deprived of their property interest in their home to the extent variance conditions had the effect of rendering them unable to afford the remaining repair work. *See id.; see also* SAC ¶ 186 ("By the time the Planning Board made a final decision in February 2012 regarding the variance application, Plaintiffs had run out of money to repair their home and to pay their mortgage."). Plaintiffs further contend that they are unable to sell their home because of the condition placed on the issuance of the variance that any future owner would be required to elevate the house if any subsequent repairs were required within a ten-year period.[28] SAC ¶ 191. However, the Board did not shift the burden of elevating the foundation to the subsequent owner of the home; it merely deferred that burden until the next event triggering a Chapter 186 computation, regardless of who the owner might be at the time.[29] Regardless, through these allegations, Plaintiffs are once again essentially alleging that they were entitled to the building permit and to a conditions-free variance. Doc. 18 at 25 (citing *DLC Mgmt. Corp. v. Town of Hyde Park,* 163 F.3d 124, 131 (2d Cir.1998)) (holding that land ownership alone does not establish a right to a particular zoning status because, if it did, "any owner of zoned land, which presumably includes the vast majority of landowners, would be entitled to assert a claim in federal court alleging a substantive due process violation each time

a local governing body rezoned that land under questionable or unfair circumstances"). They have not effectively alleged a property interest in their home independent of the property interest they claim to have in the building permit and a conditions-free variance.[30]

28    Plaintiffs previously alleged that the variance conditions "rendered Plaintiffs' home worthless as any potential subsequent purchaser would be responsible for elevating the house's foundation." Am. Compl. ¶ 101. The Court found this allegation to be implausible on its face. Doc. 18 at 25–26 n. 22.

29    A copy of the resolution adopting the variance and imposing the conditions is attached as Exhibit D to the Declaration of Terry Rice in support of Defendants' motion to dismiss. Doc. 29 ("Rice Decl."). Because that resolution and its contents are incorporated by reference into the Amended Complaint, the Court may properly consider it on a 12(b)(6) motion. *See Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir.1991). The condition in question provides that "[a]ny expenditures made to date to remediate damage from flooding events will count toward the future determination of substantial improvements, as defined in Section 186–2." Rice Decl., Ex. D at 2.

30    In their papers, Plaintiffs maintain that they have a property interest in the money they spent on repairs and expenses they incurred while they were unable to inhabit their home. Doc. 32 at 29. However, the SAC only alleges a property interest in the $50,000 Plaintiffs spent on repairing their home. SAC ¶ 215. Since the value of repairs is presumably reflected in the overall value of the home, there is no palpable difference between this and their claim to a property interest in the house itself.

**\*11** Since the Court has found that Plaintiffs have not alleged a deprivation of any property interest they may have had in the building permit, the question is whether they have a property interest in a variance without the challenged conditions attached. In order to establish a constitutionally cognizable property interest, Plaintiffs must demonstrate that they have a " 'clear entitlement' to the approval sought from the government official or administrative body." *Villager Pond,* 56 F.3d at 378 (quoting *Walz v. Town of Smithtown,* 46 F.3d 162, 168 (2d Cir.1995)). Whether an entitlement is

"clear" depends on the extent to which the authority has the power to exercise discretion. *Id.* "A clear entitlement, and, in turn, a constitutionally protected property interest, exists only when 'the discretion of the issuing agency is so narrowly circumscribed that approval of a proper application is virtually assured.' " *Id.* (quoting *RRI Realty Corp. v. Inc. Vill. of Southampton,* 870 F.2d 911, 918 (2d Cir.1989)). It is well-settled that zoning boards have discretion in granting or denying variances. *See Tomlins v. Vill. of Wappinger Falls Zoning Bd. of Appeals,* 812 F.Supp.2d 357, 369 (S.D.N.Y.2011) (citing *Lamar Adver. of Penn. LLC v. Pitman,* 573 F.Supp.2d 700, 707 (N.D.N.Y.2008)) ("It is well established under New York law that '[l]ocal zoning boards have broad discretion in considering applications for variances[.]' "). As this Court noted in the March 2014 Order, Chapter 186 expressly provides that "the Planning Board *may* attach such conditions to the granting of variances as it deems necessary to further the purposes of this article."[31] Village Code § 1866(A)(5) (emphasis added). Thus, for the same reasons the Court provided before, Plaintiffs do not have a cognizable property interest in a variance free of any conditions.[32]

[31] Defendants also argue that the issuance of a stop-work order is a discretionary determination. Doc. 20 at 25 n. 6. However, the language of Chapter 186 suggests otherwise, as it provides "[t]he local administrator shall issue, or cause to be issued, a stop-work order for any floodplain development found noncompliant with the provisions of this article." Village Code § 186–4(D)(6)(b).

[32] The SAC alleges that Defendants deprived Plaintiffs of the $2,000 escrow deposit they were required to make in connection with their variance application to cover the Board's consultant fees. SAC ¶ 216. As the Court previously noted, Plaintiffs did not retain an interest in that deposit because their variance was approved. Doc. 18 at 25–26 n. 25. Once again, "[t]here are no allegations suggesting that the funds were not used for their designated purpose—paying the Board's consulting costs-or that any of those monies were wrongfully retained." *Id.* Plaintiffs are not entitled to a refund of payments made as part of the application process simply because they are dissatisfied with the resolution of the variance application.

The Court also notes that, in a case such as this that involves a substantive due process claim implicating local land-use management, "the Second Circuit has been 'mindful of the general proscription that federal courts should not become zoning boards of appeal to review nonconstitutional land [-]use determinations by the [C]ircuit's many local legislative and administrative agencies." *Schubert v. City of Rye,* 775 F.Supp.2d 689, 705 (S.D.N.Y.2011) (alterations in original) (quoting *Zahra,* 48 F.3d at 679).

**ii. Deprivation of a Property Interest**

Even if Plaintiffs had carried their burden of establishing the deprivation of a cognizable property interest, it is doubtful that Defendants' acts against their land were " 'arbitrary,' 'conscience-shocking,' or 'oppressive in the constitutional sense,' not merely 'incorrect or ill-advised.' "[33] *Ferran v. Town of Nassau,* 471 F.3d 363, 369–70 (2d Cir.2006) (quoting *Lowrance v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994)). "Government regulation of a landowner's use of his property is deemed arbitrary or irrational, and thus violates his right to substantive due process, only when government acts with no legitimate reason for its decision ." *Ahmed v. Town of Oyster Bay,* 7 F.Supp.3d 245, 259 (E.D.N.Y. Mar. 18, 2014) (quoting *Southview Associates, Ltd. v. Bongartz,* 980 F.2d 84, 102 (2d Cir.1992)). "[T]he Second Circuit has also held 'numerous times' that 'substantive due process does not forbid governmental actions that might fairly be deemed arbitrary or capricious and for that reason correctable in a state court lawsuit[;][its] standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority.' " *TZ Manor, LLC v. Daines,* 815 F.Supp.2d 726, 746 (S.D.N.Y.2011) *aff'd,* 503 F. App'x 82 (2d Cir.2012) (citing *Harlen Associates v. Inc. Vill. of Mineola,* 273 F.3d 494, 505 (2d Cir.2001)) (alternations in original).

[33] Nor have Plaintiffs alleged that Defendants were motivated by racial animus. *See supra* Part II.C.ii.

**\*12** Under Chapter 186, a homeowner may appeal the application of Chapter 186 by the building inspector to the Board. Village Code § 186–6(A)(2). In turn, "[t]hose aggrieved by the decision of the Planning Board may appeal such decision to the Supreme Court pursuant to Article 78 of the Civil Practice Law and Rules." *Id.* at § 186–6(A)(3). Therefore, to the extent that Plaintiffs thought that Chapter 186 was inapplicable, they could have pursued their grievances in state court. Furthermore, throughout the SAC, Plaintiffs allude to the fact that Defendants' enforcement of Chapter 186 was in response to pressure from the FEMA to

enforce flood regulations. SAC ¶¶ 156, 158, 165. They also concede that Melillo issued a stop work order, in part, because Plaintiffs had failed to file a Flood Development Permit, as required by Chapter 186. *Id.* at ¶ 78, *see also* Village Code §§ 186–4(B)(1); 186–4(D)(a). To the extent that Defendants genuinely believed that Plaintiffs were subject to Chapter 186, they were within their right to enforce it.

Therefore, Plaintiffs' substantive due process claim is dismissed.

### E. *Monell* Claim

A municipality cannot be held liable under § 1983 solely on a theory of *respondeat superior. Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A § 1983 claim can only be brought against a municipality if the action that is alleged to be unconstitutional was the result of an official policy or custom. *Id.* at 690–91. Thus, a plaintiff must allege that such a municipal policy or custom is responsible for his injury. *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown,* 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997); *see also Connick v. Thompson,* — U.S. ——, ——, 131 S.Ct. 1350, 1359, 179 L.Ed.2d 417 (2011) ("A municipality or other local government may be liable under this section [1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation.") (quoting *Monell,* 436 U.S. at 692)).

A *Monell* claim cannot lie absent an underlying constitutional violation. *Bolden v. Cnty. of Sullivan,* 523 Fed. Appx. 832, 834 (2d Cir.2013) (summary order) ("[B]ecause the district court properly found no underlying constitutional violation, its decision not to address the County defendants' liability under *Monell* was correct.") (citing *Segal v. City of New York,* 459 F.3d 207, 219 (2d Cir.2006)) (*"Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation.") (emphasis in original). Since Plaintiffs have not established a constitutional violation, their *Monell* claim also fails. [34]

[34]  For similar reasons, the Court does not reach the question of whether the SAC plausibly states a claim for punitive damages, *see* SAC 11227, or whether Melillo is entitled to qualified immunity. *See* Doc. 30 at 33–35.

## III. Conclusion

For the reasons set forth above, Defendants' motion to dismiss is GRANTED. The Clerk of the Court is respectfully directed to terminate the motion, Doc. 28, and to close the case.

**\*13** It is SO ORDERED.

### All Citations

Not Reported in F.Supp.3d, 2015 WL 1427206

---

KeyCite Overruling Risk - Negative Treatment

Overruling Risk   Appel v. Spiridon,   2nd Cir.(Conn.),   July 2, 2008

2007 WL 2351072
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Michael M.J. MATHIE, IV, Plaintiff,

v.

Robert DENNISON, Chairman, New York State
Division of Parole, Commissioners Walter William
Smith, Jr., Debra J. Loomis, Marietta S. Gailor, G.
Kevin Ludlow, Vanessa A. Clarke-McCarthy, George
C. Johnson, Thomas P. Grant, Livio Lazzari, R. Guy
Vizzie, Jr., Former Commissioner Vernon C. Manley, and
Assistant Counsel Theodore H. Clements, Defendants.

No. 06 Civ. 3184(GEL).
|
Aug. 16, 2007.

Attorneys and Law Firms

Michael M.J. Mathie, IV, pro se.

Eliot Spitzer, Attorney General of the State of New York
(Maria Barous Hartofilis, Assistant Attorney General, of
Counsel), for defendants.

**OPINION AND ORDER**

GERARD E. LYNCH, District Judge.

 **\*1** Plaintiff Michael M.J. Mathie IV, an inmate in the
custody of the New York State Department of Correctional
Services, brings this action, pursuant to 42 U.S.C. §
1983, alleging various violations of his constitutional rights
stemming from his denial of parole in June 2003 and June
2005, and seeking an injunction to prevent such violations
in the future. Defendants Robert Dennison, Chairman of the
New York State Division of Parole ("Division," or "Parole
Board"), various Division commissioners, and Division
Assistant Counsel Theodore H. Clements, move to dismiss
the complaint, arguing that defendant has failed to state a
claim for any constitutional violations. Defendants' motion
will be granted.

**BACKGROUND**

Only the facts relevant to the current motion are recited here.

Mathie is currently serving a sentence of eight to twenty-four
years' imprisonment for his 1989 conviction for manslaughter
in the first degree, a violent felony offense to which Mathie
pled guilty. In addition to the manslaughter charge, Mathie
also pled guilty to conspiracy in the third degree and received
a consecutive sentence of two to six years of incarceration.
(Defs.Ex. A.)

Mathie first became eligible for parole on August 21, 1999.
(Defs.Ex. B.) He was denied parole at that time and held
for an additional 24 months. (*Id.*) He re-appeared before the
Parole Board in July 2001, June 2003, and June 2005; each
time plaintiff was denied release and held for an additional
24 months. (Am. Compl. ¶¶ 54-55, 61-62; Defs. Exs. C, D.)
Mathie appealed the 2003 and 2005 denials of parole to the
Division's Appeal Unit. (Am.Compl.¶¶ 58, 65.) The Appeal
Unit upheld the denials. (Am. Compl. ¶¶ 60, 67; Defs. Reply
Ex. A; Pl.Ex. CcC, at 1268-72.)

In November 2005, Mathie submitted a Freedom of
Information Law ("FOIL") request, seeking certain
documents he had submitted in support of his parole release
in 2003 and 2005. (Pl.Ex. Zz, at 683-84.) Theodore H.
Clements, Division Assistant Counsel, responded that no
such documents existed in the Board's records. (*Id.*) In
December 2005, Mathie wrote to the Appeals Unit seeking
reconsideration of his 2005 appeal, arguing that the Parole
Board could not have considered all of the "relevant
documentary evidence" in rendering its decision because it
did not possess the documents that he had sought in his FOIL
request. (*Id.*) Reconsideration of his appeal was denied. (*Id.*
686.)

Mathie has attacked his parole denials in both federal and
state court. On September 12, 2005, Mathie commenced
this action in federal court, challenging his 2003 and
2005 parole denials and requesting various forms of relief,
including compensatory and punitive damages. On April 25,
2006, Chief Judge Mukasey ordered plaintiff to submit an
amended complaint detailing the specific nature of his claims.
(Defs.Ex. G.) Plaintiff submitted an amended complaint on
June 17, 2006. The case was reassigned to this Court shortly
thereafter.

2007 WL 2351072

**\*2** Meanwhile, on February 27, 2006, Mathie filed an Article 78 petition in state court, raising substantially the same issues as this action with respect to his 2005 parole denial. (Defs.Ex.F.) On August 3, 2006, the state court dismissed Mathie's petition due to improper service. (Defs.Exs.E, F.) On September 25, 2006, Mathie's motion to reargue his Article 78 petition was denied. (*Id.*)

On October 31, 2006, defendants moved to dismiss plaintiff's complaint in this action; plaintiff responded on January 18, 2007. The motion was fully briefed as of April 23, 2007.

**DISCUSSION**

*I. Motion to Dismiss Standard*

The notice pleading standard of Federal Rule of Civil Procedure 8(a)(2) requires that a complaint include a "short and plain statement of the claim showing that the pleader is entitled to relief." Specific facts are not necessary; the statement need only "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Erickson v. Pardus,* --- U.S.----, 127 S.Ct. 2197, 2200 (2007) (citations and internal quotation marks omitted). Further, where a plaintiff is proceeding pro se, the Court must read the pleadings liberally and view them as raising the strongest arguments that are suggested therein. *McEachin v. McGunnis,* 357 F.3d 197, 200 (2d Cir.2004).

A complaint may be dismissed pursuant to Rule 12(b)(6) where the complaint fails to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic v. Twombly,* --- U.S. ----, 127 S.Ct. 1955, 1974 (2007). As the Second Circuit has recently stated, *Twombly* requires that a plaintiff satisfy "a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." *Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of actions will not do." *Twombly,* 127 S.Ct. at 1964-65 (internal quotation marks omitted). In order to state a claim, the factual allegations contained in the complaint "must be enough to raise a right to relief above the speculative level." *Id.* at 1965. Although "[a] pro se complaint ... must be held to less stringent standards than formal pleadings drafted by lawyers," *Erickson,* 127 S.Ct. at 2200, where a plaintiff "ha[s] not nudged [his] claims across

the line from conceivable to plausible, [his] complaint must be dismissed." *Twombly,* 127 S.Ct at 1974.

*II. Constitutional Claims*

Plaintiff brings this action pursuant to 42 U.S.C. § 1983. To state a claim under § 1983, a plaintiff must show that: (1) the defendant officials acted under "color of state law"; and (2) their conduct or actions deprived plaintiff of a right, privilege, or immunity guaranteed by the Constitution or laws of the United States. *LeBlanc-Sternberg v. Fletcher,* 67 F.3d 412, 426 (2d Cir.1995). There is no dispute that the defendants, state officials responsible for implementing New York's parole statutes, acted under "color of state law." 42 U.S.C. § 1983.

**\*3** Plaintiff asserts three distinct constitutional violations. First, plaintiff claims that the 2003 and 2005 parole denials violated his rights to due process by denying him parole in an arbitrary and capricious manner. Second, plaintiff claims that the parole denials violated his right to equal protection, insofar as New York State has adopted a policy of denying parole to all violent offenders, or, alternatively, insofar as the State has singled him out for discriminatory treatment. Third, plaintiff claims that the parole denials constitute ex post facto extensions of his sentence. In addition, plaintiff claims that defendants conspired to deny him the aforementioned rights. Defendants argue that plaintiff has not set forth any viable constitutional claims, either because those claims are barred, or because plaintiff has failed to state a claim as to which relief may be granted.

**A. The *Heck* Bar**

As an initial matter, defendants argue that plaintiff's suit is barred by *Heck v. Humphrey,* 512 U.S. 477 (1994), because plaintiff has not established that "his incarceration has been invalidated by state administrative or judicial proceedings or via federal habeas corpus proceedings." (Defs.Mem.12.) Plaintiff argues that *Heck* does not preclude his suit because he is "challenging the procedures used in determining his parole eligibility, and not the validity of his confinement." (Pl.Mem.44.) Although *Heck* bars plaintiff's suit insofar as he is seeking damages, to the extent plaintiff is "challenging the procedures used" by the Parole Board, his suit is not *Heck*-barred. (*Id.*)

"Although § 1983 provides a broad remedy for the violation of an individual's constitutional rights," *Odom v. Pataki,* No. 00 Civ. 3727, 2001 WL 262742, at \*3 (S.D.N.Y. Mar. 15,

2001), the Supreme Court held in *Heck* that a prisoner may not assert a damages claim under § 1983 where such a claim "attacks the fact or length of the [prisoner's] confinement[,] without first showing that the conviction or sentence has been reversed or otherwise invalidated." *Id.,* citing *Heck,* 512 U.S. at 486-87. Absent such a showing, a prisoner may only seek relief in the federal courts through a petition for habeas corpus. *See Jenkins v. Haubert,* 179 F.3d 19, 23 (2d Cir.1999). The *Heck* bar "applies to § 1983 damage actions challenging the fact or duration of parole release [because] ... the plaintiff is in effect attacking his confinement." *Hill v. Goord,* 63 F.Supp.2d 254, 261 (E.D.N.Y.1999), quoting *Friedland v. Fauver,* 6 F.Supp.2d 292, 309 (D.N.J.1998). Furthermore, *Heck* bars an inmate's § 1983 action "no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit ... *if* success in that action would necessarily demonstrate the invalidity of confinement or its duration." *Wilkinson v. Dotson,* 544 U.S. 74, 81-82 (2005) (emphasis in original). Thus, an inmate may not seek a declaratory judgment overturning a particular parole determination in a § 1983 action. *See, e.g., Butterfield v. Bail,* 120 F.3d 1023, 1025 (9th Cir.1997) (finding that any equitable or monetary relief "based upon the harm to [an inmate] in having his parole denied" is barred by *Heck* ).

**\*4** In his amended complaint, plaintiff seeks several forms of relief, including "an Order declaring the defendants herein have acting in violation of" the federal and New York State constitutions and New York State law, compensatory and punitive damages, and "an injunction to prevent the defendants' actions from occurring at any time, until the end of the world." (Am.Compl.¶¶ 75, 77-79.) However, plaintiff has withdrawn his claim for damages against all defendants except Clements. (Pl.Mem.2.) Indeed, even if plaintiff had not withdrawn his damages claim, that claim is clearly barred by *Heck;* if plaintiff were to receive damages in this action, such a resolution would call into question the validity of his imprisonment. *Heck,* at 486-87; *see Butterfield,* 120 F.3d at 1025 ("Any money damages that would be assessed against defendants ... will inevitably be measured by the denial of parole ....").

To the extent that plaintiff continues to seek damages against defendant Clements, plaintiff's request is similarly barred by *Heck.* Plaintiff claims that Clements violated his constitutional rights by denying reconsideration of plaintiff's parole determination appeal. Plaintiff's claims against Clements are neither conceptually nor practically distinguishable from his claims against the remaining

defendants. [1] His claim for damages against Clements implicates the "fact or duration of [his] confinement," *Hill,* 63 F.Supp.2d at 261; unless and until plaintiff's conviction has been "reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such a determination, or called into question by a federal court's issuance of a writ of habeas corpus," *Heck,* 512 U.S. at 487, he cannot receive damages for any injury allegedly caused by Clements, or any other defendants in this action in denying him parole.

[1]
> In fact, plaintiff specifically acknowledges that his claims against Clements are conceptually indistinct from his claims against the other defendants. (Pl.Mem.7.)

In addition, to the extent that plaintiff seeks an "[o]rder" invalidating his parole determinations (*see* Am. Compl. ¶ 75), or requiring the Parole Board to take specific action with respect to any particular parole determinations, such a request is also barred by *Heck.* Even if the Court were "empowered" to grant such relief, "an order reversing a parole determination would necessarily "be based upon the harm to [plaintiff] in having his parole denied," *Butterfield,* 120 F.3d at 1025, and therefore would be a challenge to the "fact or duration" of his confinement. *Hill,* 63 F.Supp.2d at 261. *See Bodie v. Morgenthau,* 342 F.Supp.2d 193, 201 (S.D.N.Y.2004) (denying plaintiff's request for injunctive relief where plaintiff sought "to compel specific action pertaining to the content of [his] parole records"). Thus, to the extent that plaintiff's complaint could be interpreted as seeking an order reversing his parole determination or "compel[ling]" the Board to take certain action with respect to plaintiff's parole, *id.,* such relief is also barred by *Heck.* [2]

[2]
> Plaintiff also seeks a "formal recommendation for a criminal investigation" of the Parole Board and state legislators. (Am.Compl.¶ 76.) However, such relief is beyond the authority of the Court to grant. Moreover, the Court would not recommend such an investigation even if it could, as plaintiff has not alleged any violations of the criminal law and none of his allegations suggest potential criminal violations.

**\*5** However, plaintiff does not only seek damages or a declaratory judgment in this action; instead, plaintiff also seeks "an injunction to prevent the defendants' actions from occurring at any time, until the end of

the world." (Am.Compl.¶ 79.) Specifically, plaintiff seeks to prevent the Parole Board from applying allegedly unconstitutional procedures to future parole determinations. (Pl.Mem.43-45.) Defendants argue that such relief is similarly barred by *Heck.*

Defendants misinterpret *Heck. Heck* only precludes an inmate's § 1983 suit when resolution of the suit would *"necessarily demonstrate* the invalidity of his conviction or sentence." *McKithen v. Brown,* 481 F.3d 89, 102 (2d Cir.2007) (emphasis in original). Conversely, if "a prisoner's success might be merely helpful or *potentially* demonstrative of illegal confinement," then *Heck* does not apply, *id.* at 103 (emphasis in original), and the suit "should be allowed to proceed." *Heck,* 512 U.S. at 487. Moreover, the fact that plaintiff brought this suit with the motivation of securing faster release is irrelevant to the *Heck* analysis. *McKithen,* 481 F .3d at 102. Instead, "because [Mathie's] claim would [not] necessarily spell speedier release," his claim for future injunctive relief is not barred. *Dotson,* 544 U.S. at 82. *See id.* (finding that requests for *"future"* relief are so "distant" from the "core" of plaintiff's confinement that they are not barred by *Heck* ) (emphasis in original).

In this case, even if success on the merits of plaintiff's claims "might well make it more likely that [Mathie], in a subsequent proceeding, may eventually be able to make a showing that his conviction was unlawful," *McKithen,* 481 F.3d at 103, success on his claims would not necessarily result in plaintiff's immediate release from prison, invalidate his confinement, or direct any particular outcome in his parole proceedings. Instead, the relief plaintiff seeks "will render invalid" only certain of the "state procedures to deny ... parole suitability," and not the Board's particular parole determinations pertaining to plaintiff. *Dotson,* 544 U.S. at 82. "Success for [Mathie] [would] not mean immediate release from confinement or a shorter stay in prison," but rather would merely require that certain of the procedures employed by the Board in making parole determinations be altered. *Id.* Thus, "a favorable judgment will not necessarily imply the invalidity of [his] conviction or sentence," *id.,* and "[p]laintiff may maintain his claim under § 1983 ... to the extent that he is challenging the procedural grounds upon which the Parole Board relied to deny him parole." *Bottom v. Pataki,* No. 9:03 Civ. 835, 2006 WL 2265408, at *5 (N.D.N.Y. Aug. 7, 2006).

**B. Due Process**
Having determined that plaintiff's claim for future injunctive relief is not *Heck*-barred, the Court must now turn to the

merits of plaintiff's constitutional claims. First, plaintiff argues that defendants deprived him of due process by failing to "weigh[ ] all the statutory criteria" as required by New York State law in making its 2003 and 2005 parole determinations. (Pl.Mem.7.) Defendants move to dismiss plaintiff's due process claim, arguing that plaintiff has no constitutional right to parole, and that, even if defendants have failed to comply with New York State law, such conduct does not create a constitutional violation. The Court agrees.

**\*6** It is axiomatic that a prisoner does not have a constitutional right to parole. *Greenholtz v. Inmates of Neb. Penal & Corr. Complex,* 442 U.S. 1, 7 (1979); *Barna v. Travis,* 239 F.3d 169, 171 (2d Cir.2001) (the New York parole system does not "create[ ] in any prisoner a legitimate expectancy of release"). A convicted person has no constitutional right to be conditionally released before the expiration of a valid sentence, and decisions by the state parole board are discretionary. *Greenholtz,* 442 U.S. at 7. Under state law, however, the Parole Board's discretion is not unlimited. In making parole determinations, the Board must consider various factors, including the inmate's institutional record and his or her release plans. *See* N.Y. Exec. Law 259-i(2)(c)(A); N.Y. Exec. Law 259-i(1)(a); *see also Manley v. Thomas,* 255 F.Supp.2d 263, 267 (S.D.N.Y.2003).[3] "[I]f done in accordance with law," the parole determination is generally not subject to judicial review. N.Y. Exec. Law § 259-i(5). However, if judicial review is appropriate, such review is generally a matter for the state courts. *See, e.g.,* N.Y. C.P.L.R. § 7801. An inmate's "federally-protected liberty interest in parole release is limited to not being denied parole for arbitrary or impermissible reasons." *Brown v. Thomas,* No. 02 Civ. 9257, 2003 WL 941940, at *1 (S.D.N .Y. Mar. 10, 2003), citing *Meachum v. Fano,* 427 U.S. 215, 226 (1976); *see Bottom,* 2006 WL 2265408, at *5 ("[A]n inmate may only bring a due process claim if the denial of parole is either arbitrary or capricious.").

3      New York law directs the Parole Board to consider: (i) the institutional record including program goals and accomplishments, academic achievements, vocational education, training or work assignments, therapy and interpersonal relationships with staff and inmates; (ii) performance, if any, as a participant in a temporary release program; (iii) release plans including community resources, employment, education and training and support services available to the inmate; (iv) any deportation order issued by the

2007 WL 2351072

federal government against the inmate while in the custody of the department of correctional services and any recommendation regarding deportation made by the commissioner of the department of correctional services pursuant to section one hundred forty-seven of the correction law; and (v) any statement made to the board by the crime victim or the victim's representative, where the crime victim is deceased or is mentally or physically incapacitated. *See* N.Y. Exec. Law § 259-i(c); 9 N.Y.C.R.R. § 8001.3.

Plaintiff cites numerous statements of former Governor George Pataki and senior members of his administration advocating for the elimination of parole for violent felons. (Am.Compl.¶¶ 46, 72-73.) He alleges that the Pataki administration, unable to secure legislation to this effect, conveyed this "unwritten" position to defendants (*id.* ¶ 24), who proceeded to carry it out by reflexively denying parole to violent felons (including plaintiff) in recent years, and failing to consider inmates' institutional records or other factors required by New York State statute. (*Id.* ¶ 25; Pl. Mem. 32 ("[T]he seriousness of plaintiff's crime is deemed by the Board to be sufficient basis for precluding release.").) Plaintiff includes much information regarding the alleged Pataki policy, as well as statistics allegedly demonstrating a decrease in granting parole as a result of the policy. (Am. Compl. ¶¶ 44-49; *see id.* ¶ 45 (characterizing the Board as a "re-sentencing commission"); Pl. Mem. 8-17.) Plaintiff argues that such a policy violates his right to due process by "render[ing] the plaintiff completely unable to be meaningfully considered for release to parole." (Am.Compl.¶ 74.)

Even assuming the existence of an unwritten, blanket policy to deny parole to all violent felons in New York, plaintiff has not stated a due process claim. First, plaintiff does not argue that the State's alleged policy requires the Board to look outside the statutory factors in making its parole determination; instead, he merely argues that the Board has overvalued the severity of the crime, at the expense of other statutory considerations. However, Mathie's due process rights extend only to a refusal by the Parole Board to deny release arbitrarily or capriciously, for example, based on "inappropriate consideration of a protected classification or an irrational distinction." *Morel v. Thomas,* No. 02 Civ. 9622, 2003 WL 21488017, at *4 (S.D.N.Y. June 26, 2003). A policy that requires the Board to look first and foremost at the severity of the crime when making its parole determination is neither arbitrary nor capricious; instead, the Board is entitled

to "give whatever weight it deems appropriate to the statutory factors" listed in N.Y. Exec. Law § 259-i(c). *Romer v. Travis,* No. 03 Civ. 1670, 2003 WL 21744079, at *6 (S.D.N.Y. July 29, 2003). Indeed, even if such a policy results in the almost total denial of parole to all violent offenders, the Board is "entitled to determine that the nature of the crime outweighed the positive aspects of [plaintiff's] record." *Morel,* 2003 WL 21488017, at *5. The Due Process Clause is not violated by the Board's balancing of the statutory criteria, which is the Board's primary responsibility and is not properly second-guessed by this Court. *See Barna,* 239 F.3d at 171 (finding that the statutory guidelines "are intended only as a guide, and ... not [as] a substitute for the careful consideration of the many circumstances of each individual case"), quoting N.Y.C.R.R. § 8001.3(a).

*7 Second, even if New York State implemented an official policy denying parole to all violent offenders, such a policy would not constitute a due process violation. There is nothing "inappropriate" about a blanket policy denying parole to all members of a particular class, as long as that policy is rational and the classification is not based on a suspect trait such as race, *Morel,* 2003 WL 21488017, at *4; indeed, such a policy could not possibly be a due process violation, as the federal system has abolished parole altogether for all inmates, including both violent and non-violent felons. *See United States v. Reynard,* 473 F.3d 1008, 1014 n. 4 (9th Cir.2007). If the federal government can abolish parole altogether without violating the Constitution, then New York State surely acts within constitutional confines if it decides to restrict parole to only non-violent felons, whom the State could rationally find pose a greater risk to public safety and therefore are not proper candidates for early release. *See Salahuddin v. Unger,* No. 04 Civ. 2180, 2005 WL 2122594, at *7 (E.D.N.Y. Sept. 2, 2005) ("[T]he state's rational basis for a distinction in parole determinations between violent and nonviolent offenders is obvious: preventing the early release of potentially violent inmates.").[4]

[4]    At least one court in this district has found that an unofficial policy of denying parole to all violent felons may violate due process. *See Graziano v. Pataki,* No. 06 Civ. 0480, 2006 WL 2023082, at *8 (S.D.N.Y. July 17, 2006) (Brieant, J.) (characterizing an unofficial policy of denying parole to all violent offenders as an "end run around the legislature" which the Governor is not "permitted" to do). However, the Court finds the reasoning of *Graziano* unpersuasive for the reasons

stated *supra,* as have other courts in this Circuit. *See Cartagena v. Connelly,* No. 06 Civ.2047, 2006 WL 2627567, at *9 (S.D.N.Y. Sept. 14, 2006) (finding that "the purported policy would not by itself reflect an arbitrary or capricious failure to consider statutory factors").

Nor would such a policy violate the Due Process Clause even if the policy were adopted or implemented in violation of state law. Essentially, plaintiff conflates a potential state law claim with a non-existent constitutional claim. Plaintiff may be correct that a blanket policy denying parole to all violent felons violates existing state law; however, constitutional and state law claims are not inherently coextensive. While the Parole Board is afforded wide latitude in making its parole determinations under the Due Process Clause, state law might further limit the Board's discretion. The Court expresses no opinion on the merits of plaintiff's potential state law claim, except to recognize that there is a split among New York courts on the issue.[5] However, to the extent that plaintiff has a potential state law claim against defendants, § 1983 is not the proper vehicle, and this Court is not the proper venue, for vindicating such a claim. Adjudicating the merits of plaintiff's claim would require a determination of the contours of a state law, and "resolution of the question of the proper meaning and significance of [the New York parole law] is best left to the New York courts." *Anthony,* 2006 WL 3859215, at *10.[6] Moreover, New York has implemented specific procedures for hearing claims against state authorities such as the Parole Board. N.Y. C.P .L.R. § 7801; *see Calhoun v. N.Y. State Div. of Parole Officers,* 999 F.2d 647, 653 (2d Cir.1993) ("[E]rroneous determinations [of the Parole Board] may be reviewed promptly in a proceeding under NYCPLR Article 78 ...."). Indeed, plaintiff is clearly aware of the New York procedure, as he has filed an Article 78 petition challenging his 2005 parole denial. (Defs.Ex. F.)

[5]     *Compare Salahuddin,* 2005 WL 2122594, at *6 ("[T]he [New York] law does not forbid the Board from deciding that the seriousness of an offense and a prisoner's institutional record outweigh [other criteria]."), *and Anthony v. N.Y. State Div. of Parole,* No. 06 Civ. 180, 2006 WL 3859215, at * (S.D.N.Y. Jan. 4, 2006) (finding that New York law "allows the denial of parole based solely on the severity of the offense so long as there is 'a showing of some aggravating circumstances beyond the inherent seriousness of the crime itself' "), citing *King v. N.Y. State Div. of Parole,* 598 N.Y.S.2d 245,

251 (1st Dep't 1993), *with Cappiello v. N.Y. State Bd. of Parole,* 800 N.Y.S.2d 343 (Table), 2004 WL 3112629, at *7 (Sup.Ct. Nov. 30, 2004) (granting inmate's Article 78 petition for reconsideration of parole denial on basis that the Board failed to take into account factors other than petitioner's "threat to public safety"), *and Wallman v. Travis,* 794 N.Y.S.2d 381, 388 (1st Dep't 2005) ("[A]s the sole ... basis for the Board's denial was the seriousness of the offense, [the parole denial] was irrational bordering on impropriety.").

[6]     Although federal courts may exercise supplemental jurisdiction over pendent state law claims, *see* 28 U.S.C. § 1367(a), such an exercise is inappropriate here, as plaintiff's federal claims have been dismissed. *Id.* at (c) ("[D]istrict courts may decline to exercise supplemental jurisdiction [if] ... the district court has dismissed all claims over which it has original jurisdiction."). *See Schaefer v. Town of Victor,* 457 F.3d 188, 210 (2d Cir.2006).

**\*8** The argument that a disregard of governing state law inherently renders a parole decision arbitrary or procedurally flawed proves too much. If such an argument were accepted, every state law requirement would ipso facto be incorporated into federal constitutional law. Accordingly, plaintiff's due process claim is dismissed.

### C. Equal Protection

#### 1. "Violent Felons" As Protected Class Claim

Next, plaintiff claims that the state's disparate treatment of violent and non-violent offenders violates his right to equal protection. Defendants argue that plaintiff has failed to state a claim for an equal protection violation because he has not alleged "a purposeful discrimination directed at an identifiable or suspect class." (Defs. Mem. 19, citing *Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995).) The Court agrees.

Under the Equal Protection Clause, "all persons similarly situated should be treated alike." *City of Cleburne, Texas v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985). Prisoners are not a suspect class, *Lee v. Governor of State of N.Y.,* 87 F.3d 55, 60 (2d Cir.1996), and plaintiff does not claim that a fundamental personal right is implicated in the denial of parole. Nor are violent prisoners a suspect class. A history of violent crime is the very opposite of a morally irrelevant, immutable trait: it reflects a voluntary choice by

the offender to commit a dangerous and harmful criminal act when he could have complied with the law. Thus, "disparate treatment by the state in granting parole to violent and nonviolent prisoners is presumed constitutional and need only be rationally related to a legitimate state interest." *Salahuddin,* 2005 WL 2122594, at *7, citing *Benjamin v. Jacobson,* 172 F.3d 144, 165 (2d Cir.1999). *See Harris v. Travis,* No. 97 Civ. 3275, 1998 WL 812617, at *3 (E.D.N.Y. Mar. 24, 1998). "Here, the state's rational basis for a distinction in parole determinations between violent and nonviolent offenders is obvious: preventing the early release of potentially violent inmates ." *Salahuddin,* 2005 WL 2122594, at *7. Thus, plaintiff cannot state an equal protection violation on this basis.

### 2. "Class Of One" Claim

Plaintiff also alleges that the Parole Board specifically selected him for discriminatory treatment by denying him parole. Plaintiff asserts that the Board discriminated against him because of his political and ideological beliefs, and because he is a "young rich ... guy" who has caused New York State authorities "extreme embarrassment." (Am.Compl.¶ 44.) Thus, Mathie claims he has been arbitrarily and intentionally discriminated against as a "class of one." *Village of Willowbrook v. Olech,* 528 U.S. 562, 564 (2000). This claim, in tension with plaintiff's first claim that the Parole Board applied "an inflexible and impermissible policy of denying parole to inmates based on their offense of conviction," asserts that the Board "in fact has granted parole to offenders convicted of first-degree manslaughter," but arbitrarily rejected Mathie's application due to "irrational considerations." *Brown,* 2003 WL 941940, at *2. However, unlike plaintiff's other equal protection claim, plaintiff's claim that he has been arbitrarily discriminated against as a "class of one" cannot be dismissed on a 12(b)(6) motion.

**\*9** Although the standard for *establishing* a "class of one" claim is "extremely high,' " *Celotto v. Brady,* No. 3-06 Civ. 650, 2007 WL 1851170, at *3 (D. Conn. June 25, 2007), citing *Neilson v. D'Angelis,* 409 F.3d 100, 104 (2d Cir.2005), the standard for *stating* a "class of one" claim is not onerous. To state a valid equal protection "class of one" claim, a plaintiff must allege (1) that he has been intentionally treated differently from others similarly situated, and (2) that there is no rational basis for the difference in treatment. *DeMuria v. Hawkes,* 328 F.3d 704, 706 (2d Cir.2003). "General" and "relatively bare" allegations that plaintiff was subjected to a "different standard" than that "typically afforded" to a similarly situated person are "sufficient to meet the minimum

level established ... for 'class of one' claims at the pleading stage." *McCormick v. Town of Clifton Park,* No. 05 Civ. 694, 2006 WL 1454819, at *5 (N.D.N.Y. May 23, 2006), citing *Demuria,* 328 F.3d at 707.

Here, plaintiff alleges that the Board discriminated against him because of the "extreme embarrassment" he has caused to state authorities as a result of a civil suit he brought against a Suffolk County prison warden and his post-conviction financial activities. (Am. Compl. ¶ 44; *id.* ¶ 27, citing *Mathie v. Fries,* 935 F.Supp. 1284 (E.D.N.Y.1996).) After his criminal conviction, Mathie sued the director of security for the Suffolk County Correctional Facility, the pre-trial detention center in which he had been placed awaiting his criminal trial, for sexual assault, and was awarded $250,000 in compensatory damages and $500,000 in punitive damages by the court. *Mathie,* 935 F.Supp. at 1307. [7] Mathie invested the proceeds from his award, which, according to Mathie, has made him the New York State correctional facilities' "Resident Millionaire." (Am.Compl.¶ 42.) Both Mathie's sexual assault trial and his financial activity have garnered some press coverage (*id.* ¶¶ 42-44; Pl.Ex. BbB, at 809-11), which he claims "ha[s] caused extreme embarrassment to very influential and powerful" politicians in New York (*id.* ¶ 44.) He also alleges that this "embarrassment ... is not unknown to every Parole Board Commissioner." (*Id.*)

[7]    The judgment was upheld on appeal, but the punitive damages award was reduced to $200,000. *Mathie v. Fries,* 121 F.3d 808, 818 (2d Cir.1997).

Thus, plaintiff claims, not implausibly, that events surrounding his incarceration have raised some eyebrows within the New York State prison system and legislature. For example, plaintiff alleges that his sexual assault trial was opposed by members of the Pataki administration, that it resulted in the "1996 Prison Rape Act," and that a "powerful" New York Senator cited plaintiff's financial success from the sexual assault trial as the motivation for an "Expanded Son of Sam Law" that would prevent a convicted felon from "profiting from his crime." (Am.Compl.¶¶ 38, 43.) Whether or not the state has actually taken those actions, and whether or not plaintiff is exaggerating his notoriety or influence, are irrelevant considerations in the motion to dismiss context. On a motion to dismiss, the factual allegations in plaintiff's complaint must be taken as true. *Twombly,* 127 S.Ct. at 1965. If it is true that plaintiff has caused "extreme embarrassment" to members of the New York State prison system and legislature (Am.Compl.¶ 44),

then it is plausible-even if just "barely" so, *Demuria,* 328 F.3d at 707-that Mathie was denied parole on that irrational basis, and defendants' motion to dismiss must be denied. *See Iqbal,* 490 F.3d at 157-58. (finding that *Twombly* does not require a "universal standard of heightened fact pleading," but only "some factual allegations" to "amplif[y]" the "plausib[ility]" of a claim).

**\*10** Nevertheless, the Court's inquiry into plaintiff's "class of one" claim does not end there. Although this issue comes before the Court on a motion to dismiss, both parties have also presented to the Court additional materials outside the pleadings relevant to the merits of plaintiff's claim. "[W]hen matters outside the pleadings are presented in response to a 12(b)(6) motion," the district court is authorized to "convert the motion to one for summary judgment under Fed.R.Civ.P. 56." *Friedl v. City of N.Y.,* 210 F.3d 79, 83 (2d Cir.2000). Conversion is permitted as long as the Court "afford[s] all parties the opportunity to present supporting material." *Id.,* citing *Fonte v. Bd. of Managers of Cont'l Towers Condo.,* 848 F.2d 24, 25 (2d Cir.1988). *See Amaker v. Weiner,* 179 F.3d 48, 50 (2d Cir.1999) (finding that the "conversion requirement" is "strictly enforce[d]" where there is a "legitimate possibility" that the district court relied on material outside the complaint in ruling on the motion).

While "a district court ordinarily must give notice to the parties before converting a motion to dismiss pursuant to Rule 12(b) (6) into one for summary judgment and considering matters outside the pleading," the central inquiry in a conversion determination is whether the non-movant "should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or was taken by surprise and deprived of reasonable opportunity to meet facts outside the pleadings." *Gurary v. Winehouse,* 190 F.3d 37, 43 (2d Cir.1999) (citations and internal quotation marks omitted). "Notice [of conversion] is particularly important when a party is proceeding pro se and may be unaware of the consequences of his failure to offer evidence bearing on triable issues." *Beacon Enters., Inc. v. Menzies,* 715 F.2d 757, 767 (2d Cir.1983). However, "a District Court need not advise a pro se litigant as to the nature of summary judgment where an opposing party has already provided the litigant with the requisite notice, or where the record otherwise makes clear that the litigant understood the nature and consequences of summary judgment." *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 621 (2d Cir.1999) (citations omitted).

Though mindful of plaintiff's pro se status, the Court nevertheless finds that conversion is appropriate here. Defendants provided plaintiff with notice pursuant to Local Rule 12.1 that the Court may treat the motion as one for summary judgment under Fed.R.Civ.P. 56. In addition, it is clear from the record that plaintiff "understood the nature" of summary judgment. *Id.* Plaintiff submitted over 1300 pages of exhibits with his response, ranging from the minutes of his parole hearings to various statistical reports regarding New York's allegedly unconstitutional parole policy. In addition, defendants submitted several exhibits in support of their motion. Thus, both parties have been "afford[ed] ... the opportunity to present supporting material," *Friedl,* 210 F.3d at 83, and therefore defendants' motion to dismiss may be properly treated as one for summary judgment.

**\*11** Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court's responsibility is to determine if there is a genuine issue to be tried, and not to resolve disputed issues of fact. *See Anderson v.. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). The Court must draw all reasonable inferences and resolve all ambiguities in the nonmoving party's favor, and construe the facts in the light most favorable to the nonmoving party. *Id.* at 254-55. However, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted).

The party seeking summary judgment bears the burden of showing that no genuine factual dispute exists. *See Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 202 (2d Cir.1995). Once the moving party has made a showing that there are no genuine issues of material fact, the burden shifts to the nonmoving party to raise triable issues of fact. *Anderson,* 477 U.S. at 250. A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the nonmoving party. *Id.* at 248.

Construing the facts in a light most favorable to plaintiff, the record is insufficient to permit a reasonable fact finder to find a denial of equal protection as a "class of one." The "class of one" test requires a "sufficient showing that the [plaintiff] was similarly situated to other persons and was singled out for differential treatment from them in a manner that subjected him to 'irrational and wholly arbitrary acts' and 'intentional disparate treatment.' " *Manley,* 265 F.Supp.2d

at 365, citing *Brown,* 2003 WL 941940, at *2. *See, e.g., Neilson,* 409 F.3d at 104 (requiring "the level of similarity" in a "class of one" claim to be "extremely high"). Plaintiff has not established that he was treated differently from other similarly situated inmates. As indicated by other courts in this Circuit that have considered identical claims, Mathie is not the only first-degree manslaughter offender to be denied parole, *Brown,* 2003 WL 941940, at *2; *see Defino,* 2003 WL 40502, at *4; *Manley,* 265 F.Supp.2d at 366 (listing cases), and Mathie himself argues that such denial is the rule rather than the exception. *See Brown,* 2003 WL 941940, at *2. *See Seltzer v. Thomas,* No. 03 Civ. 00931, 2003 WL 21744084, at *4 (S.D.N.Y. July 29, 2003). Indeed, "[t]he number and variety of factors bearing on the seriousness of the underlying offense and the likelihood that an offender will be a danger to the community make it impossible to conclude, on the basis of the sketchy data presented, that plaintiff has been singled out from among all homicide offenders for disparate treatment." *Brown,* 2003 WL 941940, at *2. There is thus no basis to conclude that he was inviduously treated, "nor, given the numerous factors that can appropriately be considered, is it likely that he could." *Id. See Morel,* 2003 WL 21488017, at *5 (characterizing plaintiff's "class of one" claim as "difficult if not impossible to sustain") (citation and internal quotation marks omitted).

**\*12** Furthermore, even assuming arguendo that plaintiff could show that he was treated differently from similarly situated inmates, there is no evidence in the record that the defendants were motivated by an invidious motive in denying him parole. Plaintiff claims that he was denied parole, not on the basis of any relevant criteria such as his institutional record or severity of his crime, but because of the "embarrassment" caused to defendants by plaintiff's sexual assault trial and financial activity. (Am.Compl.¶ 44.) However, plaintiff's sexual assault trial was never mentioned during the parole hearings, and while plaintiff was questioned about his financial activity during the 2003 parole hearing, the questions were only asked in response to plaintiff's volunteered statement that he had been framed for drug use by individuals who did not approve of his financial activity. (Defs. Ex. C, at 7.) Defendants did not affirmatively elicit information about his financial activity, except to the extent that plaintiff himself affirmatively chose to discuss that topic. Indeed, defendants did not press the issue at all, and quickly moved onto other, relevant considerations. (*See id.* 7-8 ("I don't know if you want to speak about [your financial activity]. Now, you would live with your ... attorney [after release]?").)

In addition, the minutes of plaintiff's 2003 and 2005 parole hearings show that the Commissioners at both hearings deliberately and carefully considered plaintiff's institutional record and other relevant factors, such as his post-incarceration plans, in making their parole determinations. (*See* Defs. Ex. C, at 5-6, 8-10, 17-18; Defs. Ex. D, at 7-14.) Specifically, the Commissioners considered plaintiff's disciplinary record, parole release proposal, prior drug use, and plans to attend college, as well as the severity of plaintiff's crime. Plaintiff's allegation that defendants were motivated by an invidious intent is supported only by plaintiff's own speculation and conjecture. (*See* Pl. Mem. 47 ("The plaintiff will never have a fair, reasoned and individualized parole release hearing in this State.").) However, neither "mere allegations," *Davis v. State of N.Y.,* 316 F.3d 93, 100 (2d Cir.2002), nor "speculation and conjecture" are sufficient to preclude the granting of summary judgment. *Guilbert v. Gardner,* 480 F.3d 140, 145 (2d Cir.2007) (citation and internal quotation marks omitted). Thus, plaintiff has not made the "required ... show [ing]" of "*intentional* disparate treatment," and his claim fails. *Giordano v. City of N.Y.,* 274 F.3d 740, 751 (2d Cir.2001) (emphasis in original). [8]

[8]    Plaintiff also claims that defendants discriminated against him because he is a "white guy," and because of his "political" and "ideological" beliefs. (Am.Compl.¶¶ 22, 44.) Plaintiff seems to regard both of these claims as part of his "class of one" argument, but they could be interpreted as legally distinct claims. To the extent that the Court must consider pro se complaints to raise any arguments they can plausibly be read to state, *see Weixel v. Bd. of Educ. of City of N.Y.,* 287 F.3d 138, 145-46 (2d Cir.2002), the Court assumes without deciding that plaintiff has stated a race discrimination and First Amendment claim as well as a "class of one" claim. However, insofar as plaintiff has stated a race discrimination or First Amendment claim, those claims also fail on summary judgment.

The only evidence plaintiff sets forth that defendants were motivated by a racial animus is his claim that defendants referred to him as a "young rich white guy" during his 2005 parole hearing. (Am.Compl.¶ 44.) However, the transcript of the 2005 parole hearing clearly belies plaintiff's contention. The Commissioners never referred to plaintiff's race during the hearing. The question referred to by plaintiff

2007 WL 2351072

does not ask whether plaintiff is a "white guy," but whether the victim of his crime was a "rich, young guy." (Defs. Ex. D, at 5.) There was no mention of race during the hearing.

Although plaintiff argues that "[t]he accuracy of this transcript is in question," (Pl.Mem.6), plaintiff actually *answered* defendants' question of whether the victim was a "rich, young guy." (Defs. Ex. D, at 6 ("No. I was 21 and I believe he was the age I am today, 38.").) Thus, it was obvious, even to plaintiff, that defendants' question was in reference to the victim, and not to plaintiff, and that defendants had not asked about his, or anybody else's, race. Therefore, a reasonable jury could not find that defendants were motivated by a racial animus in denying plaintiff parole.

Similarly, a reasonable jury could not find that defendants violated plaintiff's First Amendment rights. Plaintiff presents no cognizable evidence of political discrimination, any more than he presents evidence in his "class of one" claim that the Board discriminated against him for reasons unique to himself. Indeed, the only support he has set forth for his First Amendment claim is his own conclusory statement that the Board denied him parole because he is a Democrat and the Board is composed of former Governor Pataki's "Republican comrades." (Am.Compl.¶ 44.) However, "mere speculation and conjecture is insufficient to preclude the granting" of summary judgment. *Guilbert,* 480 F.3d at 145. Thus, plaintiff's First Amendment claim also fails on summary judgment.

### D. Ex Post Facto

Next, plaintiff argues that New York's alleged policy of denying parole to all violent offenders violates the Ex Post Facto Clause. Specifically, Mathie argues that application of the alleged changes in the state's parole standards from the prior policy of full consideration of the statutory factors constitutes an ex post facto extension of his sentence. Defendants argue that, even if the New York State parole standards have changed since plaintiff's incarceration, changes in parole standards cannot violate the Ex Post Facto Clause. The Court agrees. [9]

[9]   Defendants also argue that the Court should reject plaintiff's ex post facto claim because he first

raised it in his opposition to the motion to dismiss, and not in his complaint. (Defs. Reply 7, citing *Wright v. Ernst & Young LLP,* 152 F.3d 169, 178 (2d Cir.1998).) However, pro se plaintiffs must be afforded "special solicitude" in complying with procedural rules. *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988). Thus, "where a pro se plaintiff has submitted other papers to the Court, such as legal memoranda, the Court may consider statements in such papers to supplement or clarify the plaintiff's pleaded allegations." *Milano v. Barnhart,* No. 05 Civ. 6527, 2007 WL 2042954, at *2 (S .D.N.Y. July 12, 2007). The Court will therefore "overlook[ ] this technical default" and consider the merits of plaintiff's ex post facto claim. *Dove v. City of N.Y.,* No. 03-CV-5052, 2007 WL 805786, at *1 n. 3 (E.D.N.Y. Mar. 15, 2007). *See, e.g., Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001) ("A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules.")

**\*13**   The Ex Post Facto Clause prohibits "legislative action that retroactively 'punishes as a crime an act previously committed, which was innocent when done,' 'makes more burdensome the crime, after its commission,' or 'deprives one charged with crime of any defense available according to law at the time when the act was committed.'" *Doe v. Pataki,* 120 F.3d 1263, 1272 (2d Cir.1997), quoting *Beazell v. Ohio,* 269 U.S. 167, 169-70 (1925). "[T]he focus of the ex post facto inquiry is not on whether a legislative change produces some ambiguous sort of 'disadvantage,' ... but on whether any such change ... increases the penalty by which a crime is punishable." *Cal. Dep't of Corr. v. Morales,* 514 U.S. 499, 506 n. 3 (1995). However, the Ex Post Facto Clause does not apply to standards that "are promulgated simply to guide the parole board in the exercise of its discretion." *Barna,* 239 F.3d at 171. Such standards are "merely procedural and do[ ] not increase a prisoner's punishment, ... even when applied retrospectively." *Id.* Thus, any changes to parole guidelines do not constitute "laws within the meaning of the" Ex Post Facto Clause. *Id.; see Salahuddin,* 2005 WL 2122594, at *8; *Gilmore v. Stone,* No. 01-CV-00880, 2003 WL 1923734, at *3 (N.D.N.Y. Apr. 23, 2003).

Mathie argues that New York's alleged new policy of denying parole to all violent felons has transformed the Parole Board into a "re-sentencing" body, thereby extending his incarceration beyond its original term. (Pl.Mem.43.) Plaintiff misunderstands his sentence. Plaintiff was sentenced to a term

of incarceration of eight to twenty-four years for the crime of manslaughter in the first degree, and a consecutive term of two to six years for conspiracy in the third degree. (Defs. Ex. D, at 2.) As a result, his maximum sentence is thirty years. He was convicted in 1989; thus, as of 2005, he had only served sixteen years of his sentence. The parole decision determines what portion of that sentence will be served in a penal institution, and what part on conditional release under supervision. "[A]lthough a denial of parole may appear to make [Mathie]'s time of incarceration longer, [he] is still serving the sentence that the court imposed upon him when he was convicted, consistent with the statutes in effect at the time of the crime." *Bottom,* 2006 WL 2265408, at *7. Therefore, plaintiff has not stated an ex post facto claim.

E. Conspiracy

Finally, plaintiff claims that, by "selectively discriminat[ing] against" him, defendants have engaged in a conspiracy to violate his civil rights. (Am.Compl. ¶ 72.) Defendants argue that plaintiff has not adequately pled a conspiracy claim pursuant to § 1983. They are correct.

"In order to survive a motion to dismiss on his § 1983 conspiracy claim, [a plaintiff] must allege (1) an agreement [between two or more state actors] ...; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v. County of Nassau,* 292 F.3d 307, 324-25 (2d Cir.2002), citing *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999). *See id.* at 325 ("[C]omplaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed."), quoting *Dwares v. City of N.Y.,* 985 F.2d 94, 100 (2d Cir.1993). *See, e.g., Hernandez v. Goord,* 312 F.Supp.2d 537, 546 n. 5 (S.D.N.Y.2004) (characterizing the pleading standard for § 1983 conspiracy

claims as "elevated"). A § 1983 action for conspiracy "will stand only insofar as the plaintiff can prove the sine qua non of a § 1983 action: the violation of a federal right." *Singer v. Fulton County Sheriff,* 63 F.3d 110, 119 (2d Cir.1995), citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150 (1970).

**\*14** In this case, plaintiff has failed to adequately allege the existence of a conspiracy to violate his civil rights. Plaintiff alleges an agreement between state actors (members of the Pataki administration) to commit an overt act (implementation of a blanket policy of denial of parole to all violent felons, which resulted in the denial of plaintiff's parole). However, to survive a motion to dismiss, the actions that plaintiff alleges that the state actors agreed to commit must be acts that would inflict "an unconstitutional injury" on plaintiff. *Ciambriello,* 292 F.3d at 324. As set forth above, the actions alleged by plaintiff do not constitute an illegal conspiracy, either because he has no cognizable federal claim that those actions would violate the constitution or because the record lacks the evidence to support those claims. Thus, even assuming that defendants agreed to implement a blanket policy to deny parole to all violent felons, because such a policy would not be unconstitutional, plaintiff cannot state the "since qua non" of a § 1983 conspiracy claim, *Singer,* 63 F.3d at 119, and his claim must be dismissed.

## CONCLUSION

For the foregoing reasons, defendants' motion is granted and plaintiff's complaint is dismissed.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 2351072

---

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**  © 2023 Thomson Reuters. No claim to original U.S. Government Works.  11

2012 WL 4210125

2012 WL 4210125
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Nicholas IPPOLITO, Plaintiff,

v.

Glenn GOORD, Commissioner of New York State
Department of Correctional Services; Dr. Lester
Wright, Deputy Commissioner for Health Services,
NYS Department of Correctional Services and their
successors in office, all in their official capacities
and individually; Thomas Edwards, Physician
Assistant, Attica Correctional Facility, All Individually;
and New York State Department of correctional
services and their successors in office, all in their
official capacities and individually, Defendants.

No. 05–CV–6683 (MAT).
|
Sept. 19, 2012.

**Attorneys and Law Firms**

Nicholas Ippolito, Comstock, NY, pro se.

J. Richard Benitez, NYS Attorney General's Office,
Rochester, NY, for Defendants.

**DECISION AND ORDER**

MICHAEL A. TELESCA, District Judge.

**I. Introduction**

*1 In this action commenced pursuant to 42 U.S.C.
§ 1983, *pro se* plaintiff Nicholas Ippolito ("Ippolito" or
"Plaintiff"), an inmate in the custody of the New York
State Department of Correctional Services and Community
Supervision ("DOCCS") alleges that defendants were
deliberately indifferent to his serious medical needs in
violation of the Eighth Amendment to the United States
Constitution by failing to treat his chronic Hepatitis C
("HCV"). Defendants have moved for summary judgment
asserting that former DOCCS Commissioner Glenn Goord
("Goord") and Physician's Assistant Thomas Edwards
("P.A.Edwards") lack the personal involvement to be liable
under 42 U.S.C. § 1983; that Plaintiff cannot prove that
Lester Wright, M.D. ("Dr.Wright") acted with deliberate

indifference to his serious medical needs; and that Defendants
are entitled to qualified immunity. This matter was transferred
to the undersigned on June 22, 2012. For the reasons
discussed below, Defendants' motion for summary judgment
is denied in part and granted in part.

**II. Procedural History**

On initial screening, this Court *sua sponte* dismissed the
claims against three Facility Health Services Directors with
DOCCS (Drs. Paolano, Ellen, and Weissman) because those
individuals were involved in incidents that occurred prior to
November 23, 2002, the cut-off date for the three-year statute
of limitations applicable to this action. *See* Dkt # 3 at 4.

Ippolito sought and was granted leave to file an amended
complaint(Dkt # 167) [1] which specifically raises causes
of action based upon the Eighth Amendment. Count I
alleges that Dr. Wright's failure to provide the Rebetron
therapy unanimously recommended by his primary care
physicians constituted deliberate indifference to Plaintiff's
serious medical needs. Dkt # 167, ¶ 99. Count II alleges
that the actions of Dr. Wright and Edwards in "mechanically
following DOCS [sic] substance use history policy and
refusing to prescribe ... Rebetron [i.e., pegylated interferon
and Ribaviran] ... constituted deliberate indifference...." *Id.*, ¶
100. Count III alleges that Dr. Wright, in implementing the
alcohol and substance abuse treatment ("ASAT") prerequisite
to receiving medical treatment for HCV, deprived Plaintiff
of his rights under the Eighth Amendment. *Id.*, ¶ 101. The
fourth count (also denominated as Count III) asserts that
Goord's actions "in tolerating DOCS [sic] substance use
history policy" under which Dr. Wright and Edwards acted,
"constituted deliberate indifference...." *Id.*, ¶ 102.

[1]     In addition to Dr. Wright, Goord, and P.A. Edwards,
the Amended Complaint named individuals
previously dismissed by Order entered March 8,
2006. These individuals are not properly a part of
this lawsuit.

The Amended Complaint further alleges that the application
of the ASAT prerequisite to Plaintiff lacks a rational basis. *See
id.*, ¶ 95(a)-(e). Liberally construed, the Amended Complaint
also raises a claim under the Equal Protection Clause.

Plaintiff seeks injunctive relief against Defendants directing
them to (1) immediately provide Rebetron therapy to Plaintiff,
and (2) cease the practice of requiring inmates with a
history of drug use who have not used drugs for six months

prior to receiving HCV treatment to complete an ASAT program. Dkt # 167, § VII, ¶ 2. Plaintiff also seeks an award of nominal damages against each defendant, jointly and severally; compensatory damages of $100,000 against each defendant; and punitive damages in the amount of $100,000 each against Goord and Dr. Wright, and in the amount of $50,000 against Edwards. *Id.,* § VII, ¶¶ 3–5.

**\*2** Defendants did not submit an answer to the Amended Complaint, apparently relying on their Answer to the original Complaint.

After the parties exchanged written discovery over a period of three years, Defendants filed their first summary judgment motion on December 17, 2008. In a Decision and Order (Dkt # 203) dated November 10, 2009, the Court (Larimer, D.J.) denied the motion on the basis that it lacked citations to appropriate legal authority and failed to mention any of the numerous cases from the Second Circuit, and district courts within this Circuit, dealing with Eighth Amendment issues involving inmates diagnosed with HCV. In addition, Judge Larimer noted, DOCCS and Dr. Wright recently had entered into a settlement as part of a class action challenging the ASAT requirement for inmates testing positive for HCV. *See Hilton v. Wright,* No. 9:05–CV–1038, 2008 WL 53670 (N.D.N.Y. Jan.2, 2008) .[2] However, neither *Hilton* nor any of the other seemingly relevant HCV cases had been cited or discussed by Defendants. Judge Larimer accordingly denied the motion without prejudice to a renewal on proper papers. *Ippolito v. Goord,* No. 05–CV–6683L, 2009 WL 3764194, at \*1 (W.D.N.Y. Nov.10, 2009), *reconsideration denied,* 2009 WL 4825112 (W.D.N.Y. Dec.15, 2009).

[2]   The settlement agreement mandated that DOCCS reevaluate any prisoner who was denied treatment for Hepatitis C because of the ASAT requirement within sixty (60) days of the earlier of the following events: (a) a prisoner is identified by DOCCS as an individual who was previously denied Hepatitis C treatment because of the ASAT requirement; or (b) a prisoner requests reevaluation, personally or through class counsel, and it is confirmed that the prisoner at the last evaluation had previously been denied treatment because of the ASAT requirement. *Hilton,* 2008 WL 53670, at \*1.

On February 4, 2011, Defendants filed their Second Motion for Summary Judgment (Dkt # 215). In their Memorandum of Law (Dkt # 220), Defendants assert that the material facts as to which there is no genuine issue demonstrate that (1) Plaintiff did not suffer a serious medical need, (2) Dr. Wright was not deliberately indifferent to Plaintiff's medical needs, (3) Goord and Edwards were not personally involved in a constitutional violation, and (4) Defendants are entitled to qualified immunity. *See* Dkt # 220 at 2. Plaintiff has opposed the motion. *See* Plaintiff's Statement of Facts (Dkt # 235); Plaintiff's Memorandum of Law (Dkt # 239).

**III. Factual Background**

Unless otherwise noted, the following facts are undisputed, and are derived from the parties' statements pursuant to FED. R. CIV. P. 56.1, affidavits and declarations, and other submissions.

**A. The Parties**

Ippolito has been in DOCCS' custody since August 1992, and tested positive for HCV in June 1996. *See* Declaration of John Cunningham (Dkt # 189), ¶ 3. Ippolito alleges that Defendants have denied him appropriate treatment for that illness since 1999, specifically, "combination therapy" or "Rebetron therapy"[3] on the basis that he declined to enroll in an ASAT program. Plaintiff argues that there is no medical basis for conditioning his treatment for HCV on his enrollment in an ASAT program. Plaintiff admits that he used drugs and alcohol prior to his incarceration, but maintains that he has been free of both drugs and alcohol since 1992. Defendants have offered no evidence to rebut that statement.

[3]        Combination therapy consists of Pegylated Interferon and Ribavirin.

Dr. Wright is the Deputy Commissioner and Chief Medical Officer of DOCCS. *See* Declaration of Lester N. Wright, M.D. ("Wright Decl.") (Dkt # 190), ¶ 2. As Chief Medical Officer, he is responsible for the development and implementation of medical policies and practices for inmates in DOCCS' custody. *Id.,* ¶ 5. Of particular interest here is the Hepatitis C Primary Care Practice Guideline ("PCPG") which, up until October 13, 2005, contained the ASAT prerequisite claimed by Plaintiff to be unconstitutional. Dr. Wright explains that he changed the policy after "losing a class action lawsuit [i.e., the *Hilton* case] challenging the ASAT prerequisite." *Id.,* ¶ 28.

**\*3** Dr. Wright personally never treated Plaintiff, but he was involved in the challenged denial of medical care insofar as he must approve every request by a treating physician to have

an inmate receive any medical treatment for HCV. Dkt # 190, ¶ 26.

Edwards has been employed at Attica since September 2, 1982. As a physician's assistant working under the supervision of a physician, Edwards diagnoses and treats medical conditions and is authorized to prescribe medications. However, Edwards is not authorized to order HCV treatment for inmates. *See* Dkt # 32, ¶ 1.

Goord held the position of Commissioner of DOCCS from 1996 to 2006. [4]

[4]    *See* http://www.corr ectionhistory.org/html/chronicl/goord/goordretires2.html (last accessed Aug. 17, 2012). Defendants did not submit a declaration from Goord in support of either of their summary judgment motions or state anything about his position, apart from asserting that he has no personal involvement.

### B. DOCCS Hepatitis C Primary Care Practice Guidelines

On March 31, 1999, DOCCS' Division of Health Services released a practice guideline regarding the screening of inmates for HCV and the treatment of inmates diagnosed with HCV. The March 1999 PCPG, which was developed by a committee consisting of medical doctors and nurses, purported to be consistent with "community standards of care", to include input from academic medical colleges and hospitals, and to consider "national guidelines, national consensus statements and recommendations, as well as articles in peer-reviewed medical journals." Defendants' Statement Pursuant to Rule 56.1, ¶ 10 (Dkt # 42) (citing Dkt # 190, ¶ 7). The March 1999 PCPG was revised on December 17, 1999, and provided that treatment for HCV should be considered in accordance with the following criteria:

> 10. No evidence of active substance abuse (drugs and/or alcohol during the past six months (check urine toxicology screen if drug use is suspected).
>
> 11. Successful completion of an ASAT program (the inmate may be enrolled concurrently with hepatitis C treatment if time does not allow for prior completion of the program).

December 1999 PCPG at 3 (Dkt # 42–3).

The December 1999 PCPG was revised on December 13, 2000, when the tenth and eleventh criteria were merged into a single paragraph. The next revision relevant to Ippolito's case occurred on October 13, 2005, when the tenth criterion for treatment was omitted, thereby removing the ASAT prerequisite. See Memorandum from Dr. Wright to Facility Health Services Directors dated 10/13/05, submitted as part of Dkt # 41. The eleventh criterion was amended to read as follows:

> 11. No evidence of active substance abuse (alcohol, heroin, cocaine, methamphetamine) during the past six months. Inmates with active substance use will be required to submit drug test samples routinely at least monthly (at random intervals) until they have been free of identified substance use for 6 months. The demonstrable 6 month period of abstinence is deemed to commence on the day following the last incident of substance use.

October 13, 2005 PCPG at 3, submitted as part of Dkt # 41.

### C. Plaintiff's Medical Issues

#### 1. Medical History Prior to November 2002

As noted above, Plaintiff was diagnosed with HCV in June 1996. In October 1997, Ippolito underwent a liver biopsy which revealed mild portal fibrosis and no cirrhosis. See Dkt # 189, ¶ 17 & *id* ., Ex. A. From November 1997 to November 1998, Ippolito was treated with interferon, the only HCV treatment available at that time. *Id.* Ippolito initially responded, with his blood-tests showing an undetectable viral load [5] in November 1998. See *id.* & Ex. B. By June 1999, Ippolito's "viral load had rebounded to 132,000 [sic] [6]," demonstrating that treatment had failed. *Id* ., ¶ 18 (citing Exs. C [7] & C2 (consultation note by gastroenterologist Dr. Agay Goel dated 11/26/99)).

[5]    "Viral load tests are blood tests that measure HCV ribonucleic acid (RNA, or genetic material) in the blood. The presence of viral RNA indicates that

the virus is actively replicating (reproducing and infecting new cells).... Viral load tests confirm whether an individual is actively infected with HCV. Viral load test results were previously measured in number of copies, but are now reported in terms of International Units per milliliter (IU/mL)." http://www .hcvadvocate.org/hepatitis/factsheets_pdf/viralload.pdf (last accessed July 23, 2012).

6    The exhibit to which Dr. Cunningham refers in his Declaration, Ex. C2 to Dkt # 189, indicates that Plaintiff's viral load actually was elevated to 1,132,000 by June 11, 1999.

7    Ex. C to Dkt # 189 is entirely illegible save for the heading, which suggests that it is a laboratory report.

**\*4** Plaintiff underwent a second biopsy on October 5, 1999, which showed "scattered areas of piece meal [sic] necrosis", no "bridging fibrosis", and no cirrhosis. *See* Dkt # 189, Ex. D. Overall appearances were of chronic HCV with mild activity (grade 2) and portal fibrosis (stage 1). *Id.* In light of Plaintiff's high viral load and the results of the second biopsy, Dr. Goel directed that Plaintiff be started on Rebetron therapy without delay, provided that he was cleared by cardiology and psychiatry. *See* Dkt # 189, Ex. C2. At Dr. Goel's request, Dr. Albert Paolano, Facility Health Services Director at Great Meadow, submitted a request for Rebetron to Dr. Wright. *See* Dkt # 101, Ex. A. Dr. Paolano noted that Ippolito had agreed to participate in a non-sectarian ASAT program and that his urine tests showed no drug use. *Id.* at 2. Dr. Wright denied the request on December 5, 2000, noting, "[h]e can be approved as soon as he is signed up for ASAT." *Id.*

On January 14, 2000, Plaintiff's primary care physician at Elmira Correctional Facility, Dr. Uday Desai, personally submitted an order for Alpha Interferon and Ribavirin to Dr. Wright. *See* Dkt # 167, Ex. F; Dkt # 63, Ex. B. Dr. Desai noted that Ippolito's urine tests were negative for drug use. Dr. Wright responded by asking whether Plaintiff had had ASAT or some similar drug counseling. Dkt. # 63, Ex. B at 3. At that point, Ippolito had not been able to sign up for ASAT, apparently because it was not offered at his facility.

In February 2000, Plaintiff was transferred to Riverview Correctional Facility where he received no treatment for his HCV. Dkt # 167, ¶ 29. In May 2000, Plaintiff moved to Great Meadow Correctional Facility, where he reported to sick call

at least five times complaining of joint pain in ankles and fingers, pain in right upper quadrant with radiation to right flank (liver pain), and extreme fatigue. *Id.,* ¶ 31 & Ex. H (ambulatory health records from 8/17/00; 11/20/00; 11/22/00/ 12/21/00; and 1/11/01).

On September 5, 2000, and October 16, 2000, Plaintiff saw Dr. Paolano complaining of joint pain, liver pain, and extreme fatigue. Plaintiff requested combination therapy and stated that he would not participate in ASAT. Dkt # 167, ¶¶ 32, 35. Dr. Paolano denied treatment, stating that Plaintiff must complete ASAT first. *Id.* & Exs. I, K.

After being transferred to Clinton Correctional Facility, Plaintiff saw Dr. Ellen, who denied his Rebetron therapy based upon Plaintiff's refusal to enroll in ASAT. *Id.,* ¶ 38 & Ex. M.

In November 2001, he was transferred to Upstate Correctional Facility's Special Housing Unit. He was seen by sick call nurses several times for his complaints of joint pain, liver pain, and extreme fatigue in January, February, and April 2002. *See* Dkt. # 167, ¶ 44 & Ex. P (ambulatory health records).

After learning from blood test results conducted on April 29, 2002, that his ALT levels were quite elevated (100), he sent a letter to FHSD Dr. Weissman at Upstate, requesting drug therapy for his HCV. Dr. Weissman denied the request on June 5, 2002, noting that "ASAT is a direct recommendation by Dr. Lester Wright before treatment can be started." *See* Dkt. # 167, ¶¶ 46–47 & Exs. Q, R.

**\*5** In October 2002, Plaintiff was transferred to Southport Correctional Facility ("Southport") SHU. He received no treatment for his HCV at that facility.

### 2. Medical History After November 23, 2002

In January of 2003, Ippolito was moved to Attica. Dkt # 167, ¶ 51. Edwards saw Ippolito on a "PA [Physician's Assistant] callout" on February 26, 2003. With regard to his HCV, Edwards offered to place him in Attica's RSAT [8] program but Ippolito declined. *See* Dkt # 33, ¶ 3.

8    *See* http://www.docc s.ny.gov/ProgramServices/substanceabuse.html for descriptions of the RSAT and ASAT programs offered by DOCCS.

Ippolito notes that he reported to sick call at least twelve times while at Attica, complaining of extreme fatigue, joint pain, and liver pain. *See* Dkt # 167., ¶ 55 & Ex. T. From 2003 through 2005, it appears that the only treatment Ippolito received for his HCV was monitoring of his viral load and liver function. See Dkt # 42, ¶ 14.

On June 17, 2003, Ippolito saw Edwards and inquired about treatment for his HCV. Edwards informed him that such treatment was unavailable due to on his failure to complete ASAT or RSAT. On July 1, 2003, Jose DePerio, M.D., the Facility Health Services Director at Attica, wrote a follow-up memo stating, "You have been informed twice ... by PA Edwards, that completion of the RSAT program is a requirement for Hepatitis C treatment ... [which] has not changed." Dkt # 167, Ex. U.

On October 27, 2003, Ippolito filed a grievance challenging the denial of Rebetron therapy based upon the ASAT/RSAT requirement. On November 17, 2003, the Superintendent of Attica denied the grievance stating, "You cannot receive the treatment you are requesting until you have *completed* the RSAT program." Dkt # 167, Ex. DD. Ippolito appealed, and the Inmate Grievance Program, Central Office Review Committee ("CORC"), denied the appeal on January 7, 2004, noting that "in accordance with the Deputy Commissioner's memorandum, dated 1/8/02,[9] *any* inmate who is diagnosed with Hepatitis C and requires medical treatment *must have completed or have enrolled in*[10] an ASAT, [or] RSAT ... program." Dkt # 167, Ex. DD (emphases added). The CORC found that Ippolito had "offered no compelling reason to change" the HCV PCPG. *Id.*

[9]     This memorandum does not appear to have been produced as a part of discovery.

[10]     The problematic ambiguities in the PCPGs, discussed further below, are illustrated by the conflicting statements in the Superintendent's denial of the grievance and the CORC's denial of the appeal. The Superintendent noted that RSAT had to be completed before receiving HCV treatment, while the CORC's denial states that an inmate can be eligible to receive HCV treatment simply upon enrollment in ASAT or RSAT. There apparently was no criteria for determining when enrollment in, as opposed to completion of, ASAT would be sufficient. Additional ambiguity is seen in the CORC's

interpretation of the PCPG as requiring *any* inmate-regardless of whether he or she had a history of substance or alcohol abuse-to enroll in ASAT before receiving HCV treatment. Based upon the Defendants' submissions from, *e.g.,* Dr. Wright and Dr. Cunningham, and their reasons for denying treatment to Ippolito (who had such a history), DOCCS' medical staff instead apparently interpreted the PCPGs as requiring ASAT only for individuals who actually had an alcohol and/or substance abuse history. ii

Edwards ordered blood tests on October 25, 2004, and on February 9, 2005. On both occasions, the results indicated that Ippolito's ALT levels were elevated. Dkt # 167, ¶¶ 60–61, Exs. W & X. Dr. Wright admits that "[e]levated ATL [sic] levels may indicate liver cell damage." Dkt # 60, ¶ 16.

On September 9, 2004, Plaintiff was seen by Dr. Alan Bauer at Erie County Medical Center for a rheumatology consult, complaining of severe pain in his joints, especially his hands. Dr. Bauer, diagnosed Plaintiff as suffering from chronic HCV with arthralgia. In his recommendations, he stated, "Reconsider treatment of hepatitis C [with] Combination Rx." Dkt # 215 at 255.[11] Apparently, no one with authority to do so acted on this recommendation. On January 19, 2005, Plaintiff returned to see Dr. Bauer. Lacking authority to order combination therapy, Dr. Bauer recommended that Plaintiff continue with analgesics to treat his arthralgia. See Dkt # 215 at 249.

[11]     The exhibits attached to Dkt # 215 are stamped with numerals in the lower right-hand corner, but the pages are not ordered sequentially, and some pages numbers are missing. Page citations in Dkt # 215 are to the page numbers stamped in the bottom right corner of the pages.

 **6** Plaintiff saw Dr. Bauer in follow-up on May 16, 2005, at which point Dr. Bauer ruled out rheumatoid arthritis as the cause of Plaintiff's joint pain. Dr. Bauer stated that Plaintiff's arthralgia symptoms were part of the "clinical picture of HCV" and he recommended a follow-up with "GY", presumably, the gastroenterology department. See Dkt # 215 at 250.

In May 2006, blood testing showed that Ippolito was co-infected with two types of HCV-genotype 1a and genotype 2b. Dkt # 189, ¶ 23 & EX. E. Repeat genotyping performed

2012 WL 4210125

in September 2006 confirmed co-infection with genotypes 1a and 2b. *Id.* & EX. G (Dkt # 189).

On September 15, 2006, a request for approval of Rebetron therapy was submitted to Dr. Wright's office by one R. Magee, Registered Physician's Assistant. There is no documentation or explanation as to the events leading up to this request, which was approved by Dr. Wright. Plaintiff was permitted to commence Rebetron therapy on September 28, 2006, *see* Dkt # 189, ¶ 25 & Exs. I, J, about eleven months after the ASAT prerequisite had been removed from the PCPG as the result of the *Hilton* class-action settlement.

Plaintiff underwent combination therapy for 51 weeks. See Dkt # 190, ¶ 29. Based upon the blood test results submitted by Defendants, Ippolito's viral load has been undetectable (i.e., < 3200 copies/mL or < 615 /mL) beginning in March 15, 2007. His viral load has remained undetectable according to the test results from August 28, 2007; November 19, 2007; June 17, 2008; February 20, 2008; August 27, 2008; March 5, 2008; and January 7, 2011. Defendants explain that an undetectable viral load is "the current definition of a cure for [HCV]." Dkt # 42, ¶ 17 (citing Dkt # 189, ¶ 26).

### IV. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Initially, the moving party must show that there is "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has carried its burden, the opposing party must set forth "specific facts showing that there is a genuine issue for trial[,]" FED. R. CIV. P. 56(e), and must introduce evidence beyond the mere pleadings to show that there is an issue of material fact concerning "an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.

A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The reviewing court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." *Aldrich v. Randolph Cent. Sch. Dist.,* 963

F.2d 520, 523 (2d Cir.1992) (citation omitted). Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.) (citing *Anderson,* 477 U.S. at 250–51), *cert. denied,* 502 U.S. 849 (1991). If, "as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc.,* 391 F.3d 77, 83 (2d Cir.2004) (quotation omitted).

**\*7** Although the same standards apply when a *pro se* litigant is involved, such a litigant is given "special solicitude" in responding to a summary judgment motion. *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988) (citations omitted).

### V. Personal Involvement

To bring a § 1983 claim against a prison official, a plaintiff must allege that individual's personal involvement; it is not enough to assert that the defendant is a "link in the prison chain of command." *McKenna v. Wright,* 386 F.3d 432, 437 (2d Cir.2004) (quotation omitted). "[S] upervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on respondeat superior." *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citation omitted); *accord Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003).

#### A. Physician's Assistant Edwards

In his capacity as a physician's assistant, Edwards did not have the authority to override Dr. Wright and order that Rebetron therapy be administered to Ippolito. Accordingly, the claims against Edwards must be dismissed for lack of personal involvement. *See Gillespie v. New York State Dept. of Corr. Servs.,* No. 9:08–CV–1339 (TJM/ATB), 2010 WL 1006634, *6 n. 11 (N.D.N.Y. Feb.22, 2010) ("The claims against defendant Harris would also be subject to dismissal because, as a nurse, she lacked the authority to override the medical decision of the treating prison physician.") (citing *Smith v. Woods,* 9:05–CV–1439 (LEK/DEP), 2008 WL 788573, at *9 (N.D.N.Y. Mar. 20, 2008) (finding that prison social worker and psychologist had no authority to override the decision of the treating psychiatrist regarding appropriate medication for an inmate/patient; further, they had no reason to know that the psychiatrist was not appropriately treating the plaintiff); other citation omitted)). Plaintiff has thus failed to raise a triable issue of fact as to P.A. Edwards's personal involvement

### B. Former DOCCS' Commissioner Goord

Goord was the Commissioner of DOCCS from 1996 until 2006, and thus was the Commissioner during the relevant time-period (November 23, 2002, through the present). Plaintiff alleges that Goord was personally involved insofar as he tolerated an unconstitutional policy, namely, the PCPGs, to be applied to DOCCS inmates with chronic HCV. A supervisory official such as Goord may be personally involved in a constitutional violation in several ways: "(1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring." *Hernandez,* 341 F.3d at 145; *see also Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

 **\*8** Defendants did not submit a declaration or affidavit from Goord in support of either of their summary judgment motions, instead simply asserting in their memorandum of law that there is nothing in Plaintiff's medical records indicating that Goord was involved in the creation of the HCV PCPG or in Plaintiff's medical care or treatment decisions. Notwithstanding the relative sparseness of Defendants' motion papers, the Court is constrained to conclude that Plaintiff has failed to raise a triable issue of fact as to Goord's involvement in the PCPGs or the treatment of HCV-positive inmates in general, or in Ippolito's case in particular. Accordingly, summary judgment is granted to Goord on the basis that he lacked personal involvement.

### C. Dr. Wright, DOCCS' Chief Medical Officer

Defendants do not directly contest Dr. Wright's personal involvement, noting that Plaintiff's claim against him "depends on the unconstitutionality of the condition requiring. participat[ion] in ASAT prior to initiating HCV treatment...." Dkt # 220 at 13. Defendants essentially concede that if the PCPG was unconstitutional, then Dr. Wright may be liable. As discussed below, the Court concludes as a matter of law that the PCPG was ambiguous, medically unsupported, and unconstitutional as applied to Plaintiff.

Defendants' submissions establish that Dr. Wright was and is one of the officials responsible for formulating and implementing DOCCS' PCPG for treating HCV. *See, e.g.,* Edwards' Response to Plaintiff's First Set of Interrogatories dated 10/25/06, at 5, ¶ 6 (naming Dr. Wright as one of the individuals responsible for creating the PCPGs) (Dkt # 33); Wright's Response to Plaintiff's Fifth Request for Admissions, dated 2/02/07 (Dkt # 77) (admitting that he "directed" and "approved" implementation of the PCPG developed by the hepatitis C treatment task force). There is no dispute that treatment was withheld from Ippolito as a result of the PCPG that Dr. Wright promulgated. Thus, to the extent that unconstitutional acts have occurred as a result of applying the PCPG, a reasonable jury easily could find that Dr. Wright "created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom." *Colon,* 58 F.3d at 873; *cf. Brock,* 315 F.3d at 165–66 (holding that a jury could conclude that Dr. Wright was personally involved in an alleged deprivation due to his promulgation of the DOCCS' policy at issue in that case).

## VI. Analysis of Plaintiff's Eighth Amendment Claims

### A. General Legal Principles

The Eighth Amendment prohibits the infliction of "cruel and unusual punishment." U.S. CONST. amend VIII; *see also, e.g., Estelle v. Gamble,* 429 U.S. 97, 101, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). To establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove that the prison official acted with the subjective mental state of "deliberate indifference" to the prisoner's objectively "serious medical needs." *Id.* at 104; *accord, e.g.,Hill v. Curcione,* 657 F.3d 116, 122 (2d Cir.2011). An Eighth Amendment claim for denial of medical care does not require that the inmate actually experience serious physical injury as a result of that denial. *See Harrison v. Barkley,* 219 F.3d 132, (2d Cir.2000) (holding defendants' alleged refusal to treat inmate's tooth cavity would constitute deliberate indifference to serious medical need under Eighth Amendment, even though inmate did not ultimately suffer serious physical harm, provided defendants knew of and disregarded risk to inmate's serious medical needs).

### B. The Objective Component As Applied to Ippolito's Case

 **\*9** Eighth Amendment cases regarding inadequate medical care generally fall into two categories: denial of treatment and delay in treatment. As a threshold matter, the Court must determine whether Ippolito's case is properly viewed under the "denial of treatment" or "delay in treatment" rubric, as

2012 WL 4210125

the analyses are subtly different. *See Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006). Defendants contend that this claim is "properly analyzed as a delay in treatment culminating in [Plaintiff's] cure." Dkt # 220 at 8. Defendants assert that they could not have been deliberately indifferent because Plaintiff was properly treated for his HCV from 1996 to 2006, and the denial of the second round of interferon was appropriate pursuant to the PCPGs, which they describe as reasonable in light of prevailing norms of medical practice. Based upon the record as a whole, the Court disagrees and finds that Plaintiff has raised triable issues of fact with regard to the objective component of the deliberate indifference test.

The Court finds persuasive the analysis conducted by the district court in a recent inmate HCV case where the Eighth Amendment claim was characterized as a denial of, rather than a delay in, treatment. *See Hatzfeld v. Eagen,* No. 9:08–CV–283(LES/DRH), 2010 WL 5579883, at *10– 11 (N.D.N.Y. Dec.10, 2010), *report* and *recommendation adopted by Hatzfeld v. Eagen,* NO. 9:08CV283 LES DRH, 2011 WL 124535 (N.D.N.Y. Jan 14, 2011). The *Hatzfeld* court distinguished *Smith v. Carpenter,* 316 F.3d 178 (2003), a delay-in-treatment case in which an HIV-positive prisoner challenged the failure to provide him with prescription HIV medication during a seven-day period and a five-day period. *Id.* at 185. Because the Eighth Amendment claim in *Smith* was "based on short-term interruptions in the otherwise adequate treatment" that the prisoner was receiving, it was "appropriate to focus on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone" in analyzing whether the alleged deprivation was sufficiently serious. *Id.*

Relying on *Smith,* the medical defendants in *Hatzfeld* argued that the inquiry into the plaintiff's serious medical need should focus on the alleged three-month delay between Hatzfeld's renewed request for HCV treatment and the commencement of treatment. The district court rejected this attempted re-characterization because, unlike the plaintiff in *Smith,* Hatzfeld was not regularly receiving treatment for his underlying chronic HCV, having been denied treatment in 2002 and again in 2005. The district court noted that "[b]ut for the preliminary injunction ..., or the policy change one month later [as the result of the *Hilton* case], Hatzfeld might never have received treatment." *Hatzfeld,* 2010 WL 5579883, at *11. Therefore, the court held, it was inappropriate to treat Hatzfeld's case as one of delayed or interrupted treatment. *Id.*

**\*10** It is true that Ippolito received interferon monotherapy in 1997 for his HCV. Although it initially was successful, his viral load rebounded in June of 1999. Thus, as Defendants' medical experts concede, the first therapy was a failure. Until September 2006, Defendants provided no other medical care specifically directed at treating and curing Ippolito's underlying HCV, or abating the damage HCV was causing to his liver, despite continued requests and recommendations from Ippolito's specialists to commence Rebetron therapy. The only treatment he received apparently was monitoring of his liver-function levels, which consistently revealed that one of the markers indicating impaired liver functioning was elevated above normal range, a finding which Dr. Wright has conceded may indicate liver cell damage.

Defendants further assert Plaintiff cannot argue that he was denied treatment for his HCV because he received "extensive treatment for *other* medical issues." Dkt # 220 at 8 (citations omitted; emphasis supplied). Defendants neglect to mention, however, that a number of these "other medical issues" were caused by his hepatitis, namely, severe arthralgia (joint pain), fatigue, and flank pain. For instance, in September 2004, he was seen by rheumatologist Dr. Bauer complaining of severe pain in his joints, especially his hands. Dr. Bauer ordered non-steroidal anti-inflammatories to treat Ippolito's pain, and requested that DOCCS "reconsider treatment of hepatitis C [with] combination Rx." See Dkt # 215 at 255. Ippolito was seen again by Dr. Bauer on January 19, 2005, and May 18, 2005, regarding his persistent arthralgia, which the doctor described as part of the "clinical picture" of HCV, rheumatoid arthritis having been ruled out. Combination therapy was not ordered for Plaintiff despite Dr. Bauer's recommendation.

Defendants' provision of appropriate medical treatment for Ippolito's non-hepatitis medical conditions (e.g., his incomplete bladder emptying, gastroesphogeal reflux disorder, back cysts, and carpal tunnel syndrome) is not relevant to the issue of whether Defendants were deliberately indifferent to the serious medical need created by Plaintiff's HCV. None of the treatments for Plaintiff's non-HCV-related ailments ameliorated the clinical signs and symptoms of his chronic HCV; stopped the progression of the damage to his liver caused by HCV; or decreased his risk of hepatic cancer, liver failure, or death.

Here, as in *Hatzfeld,* 2010 WL 5579883, at *11, "but for" the October 13, 2005, deletion of the ASAT requirement to the PCPG, Ippolito might never have received Rebetron therapy. Even so, Defendants did not approve the commencement of

Rebetron therapy until September 2006, nearly a year after Defendants were forced to remove the ASAT prerequisite from the PCPGs. Defendants have offered no explanation regarding the eleven-month delay between the removal of the ASAT prerequisite from the PCPG and the commencement of Ippolito's Rebetron therapy. Accordingly, the Court finds that it is "inappropriate to treat this case as one of delayed or interrupted treatment." *Hatzfeld,* 2010 WL 5579883, at *11. Cf. *Harrison v. Barkley,* 219 F.3d at 137 ("This is not a case of delayed treatment as the dissent suggests. Defendants' conduct on this record can be construed as: (1) a flat refusal of medical treatment for a condition that if left untreated is serious and painful; or (2) a conditional refusal of such treatment, subject to [the inmate]'s consent to undergo an unwanted medical procedure that would deprive him of a body part he wished to keep. Either way, a reasonable jury could find that [the inmate] was refused treatment of a degenerative condition that tends to cause acute infections, debilitating pain and tooth loss if left untreated.").

 **\*11** Even if this case were characterized as one of delayed treatment, there remains an issue of fact as to the seriousness of Ippolito's medical condition. Drs. Wright and Cunningham state that Ippolito has achieved a sustained viral response and is essentially cured. However, Ippolito's most recent liver biopsy was in 1999. At that point, the findings were consistent with chronic HCV with mild activity (grade 2) and portal fibrosis (stage 1). Ippolito did not receive Rebetron therapy until 2006–seven years after the second biopsy, and nine years after his first interferon monotherapy. In light of the lengthy delay between Ippolito's first and second interferon treatments, and the fact that his most recent biopsy was over ten years ago, there is a question of fact as to the extent of the liver damage Ippolito has sustained. *Accord Hatzfeld,* 2010 WL 5579883, at *11.

Defendants cite *Pabon v. Wright,* No. 99 Civ. 2196(WHP), 2004 WL 628784, at *5 (S.D.N.Y. Mar.29, 2004), in support of their assertion that Ippolito's eventual "cure" (i.e., the achievement of an undetectable viral load) precludes a finding of Eighth Amendment liability. *Pabon,* which involved Eighth Amendment claims brought by two HCV-positive inmates, Pabon and Ruiz, is distinguishable on its facts. Ruiz was diagnosed with HCV on July 16, 1997, and received a liver biopsy on April 1, 1998, after which he began receiving mono interferon treatments on July 1, 1998. Pabon, after being diagnosed with HCV on or about May 21, 1997, began receiving mono interferon on November 12, 1997. On October 28, 1998, the consulting infectious disease specialist recommended addition of Ribavirin, and DOCCS prescribed the drug for Pabon on November 4, 1998.

Thus, in contrast to the delay of approximately seven years in Ippolito's case, Pabon and Ruiz received treatment for their HCV in a matter of months. Although there was a delay of several months with regard to Ruiz's biopsy, he began receiving interferon three months after the biopsy was completed. The district court in *Pabon* characterized the delays as "minimal" and amounting at most to mere negligence. *Pabon* is neither similar enough to the instant case to be persuasive, nor is it binding authority on this Court.

In *DiChiara v. Wright,* No. 06–cv–6123 (KAM)(LB), 2011 WL 1303867 (E.D.N.Y. Mar. 31, 2011), the medical defendants asserted similar arguments to those asserted by Defendants here. The plaintiff, an HCV-positive inmate denied interferon therapy, was represented by counsel and had the benefit of a medical expert witness, who opined that treatment should be initiated once diagnosis of HCV is established and there is evidence of progressive disease, because treatment at that stage has the best chance of arresting the disease. *DiChiara,* 2011 WL 1303867, at *8 (citations to record omitted). DiChiara's expert stated that treatment with interferon, "protects the liver from further damage by slowing scarring and is therefore beneficial even to patients who end up being non-responders." *Id.* (quotation to record omitted).

 **\*12** The magistrate judge had concluded that the HCV-positive plaintiff-inmate failed to proffer evidence that the one year delay resulted in a "very likely" chance of future harm or that his condition actually worsened as a result of the delay, reasoning that because the plaintiff eventually cleared the HCV and because his expert could not quantify the effect of a one year delay on the success rate for the treatment, he failed to present evidence that the delay violated his constitutional rights. 2011 WL 1303867, at *6 (citation to R & R omitted). The magistrate judge also had found that the plaintiff failed to proffer evidence that his alleged physical symptoms were caused by the delay in treatment, and thus could not recover for alleged mental or emotional injury suffered during the one year of delay. *Id.* (citation to R & R omitted). However, as the district court *DiChiara* noted, "an Eighth Amendment claim may be based on a defendant's conduct in exposing an inmate to an unreasonable risk of future harm and ... actual physical injury is not necessary in order to demonstrate an Eighth Amendment violation." *Smith,* 316 F.3d at 188.

The district court ultimately agreed with DiChiara that the evidence proffered was sufficient to raise a question of fact regarding the seriousness of the delay in treatment. Like Ippolito, DiChiara failed to achieve the desired result from his first round of treatment. *DiChiara,* 2011 WL 1303867, at \*8. Although the plaintiff's expert "could not quantify how the success in treatment would be affected by a delay, it was expert opinion that early treatment presented a better chance of arresting progression of the disease and protecting the liver." *Id.* Notwithstanding the plaintiff's eventual "cure," the district court found that DiChiara had "still presented sufficient evidence to raise a disputed question of material fact for the jury whether the delay in treatment had an adverse medical effect of decreasing his chance of clearing the virus and was sufficiently serious, even if he cannot show a physical injury." *Id.* Thus, it was not fatal to the plaintiff's claim that he ultimately was successful in clearing the virus after he was released from prison. *See id.*

For the foregoing reasons, the Court concludes that Ippolito has raised a question of fact as to the objective prong of the deliberate indifference standard. Defendants' motion for summary judgment on this ground is denied.

**B. The Subjective Component As Applied to Ippolito's Case**

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). To be "sufficiently culpable," the defendant must "know[ ] of and disregard[ ] an excessive risk to inmate health and safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw that reference." *Farmer v. Brennan,* 511 U.S. 825, 837, 839–40, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. at 104. "Prison officials may, of course, introduce proof that they were not so aware, such as testimony that 'they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent.' " *Salahuddin,* 467 F.3d at 281 (quoting *Farmer,* 511 U.S. at 844). The Second Circuit has stated that a jury could infer the absence of a sufficiently culpable state of mind if the jury accepted "that the defendant denied the inmate medical treatment 'because the defendant[ ] sincerely and honestly believed that applying [a prison policy mandating the denial of treatment] was, *in plaintiff's case,*

medically justifiable.' "*Salahuddin,* 467 F.3d at 281 (quoting *Johnson v. Wright,* 412 F.3d 398, 404 (2d Cir.2005) (emphasis supplied)).

**\*13** In *Johnson v. Wright,* 412 F.3d 398, *supra,* the Second Circuit held that denial of HCV treatment solely because a prisoner had not completed the PCPG's ASAT prerequisite could create a triable issue of fact in three scenarios: (1) where there is consensus among the prisoners' medical providers that treatment is necessary regardless of the prerequisite, (2) where prison officials fail to determine whether the justifications for the ASAT prerequisite apply to the individual patient, and (3) where prison officials "reflexively" rely on the purported soundness of the guideline itself, even where they are on notice that a departure might be medically appropriate. *Id.* at 404–06.

Defendants here assert that Dr. Wright "sincerely believed his conduct posed no risk of serous harm or posed an insubstantial risk of serious harm" because he "believed the DOCS HCV Primary Care Practice Guideline was supported by medical literature at the time." Dkt # 220 at 13 (citing Dkt # 190, ¶¶ 16–20, 28; *Salahuddin,* 467 F.3d at 281; other citation omitted). Defendants did not independently assess at the time whether the policy was medically justifiable in Ippolito's particular case, although they have belatedly come forward with other rationalizations, discussed further below. Defendants instead relied on their view of the PCPG as mandating denial of treatment to Ippolito.

Because Defendants have cited policy as the reason for their inaction, the question before this Court is whether following the policy amounted to deliberate indifference to Ippolito's specific medical needs. *Brock v. Wright,* 315 F.3d 158, 166 (2d Cir.2003). "While liability may not be established against a defendant simply because that defendant was a 'policy maker' at the time unconstitutional acts were committed, where unconstitutional acts are the result of a policy promulgated by the defendant, a valid § 1983 action may lie." *Id.* at 165–66 (internal citation omitted). It is not seriously in dispute that Dr. Wright in part was responsible for formulating the PCPG, including the ASAT prerequisite. If following the policy resulted in deliberate indifference to Ippolito's medical needs, the Court may not grant summary judgment in favor of Dr. Wright, "since unconstitutional acts would then have occurred as the result of a policy promulgated by [him]." *Id.* As discussed below, all three scenarios discussed in *Johnson* are supported by the record.

### 1. Consensus Among Plaintiff's Medical Providers

There is no dispute that Ippolito's medical providers were in consensus that combination or Rebetron treatment was necessary and medically appropriate, regardless of Ippolito's participation in ASAT. The first two recommendations by Ippolito's treating physicians occurred in 2000, and thus those denials of care are outside the time-period at issue in this lawsuit, which is November 23, 2002, to the present. However, Plaintiff requested Rebetron therapy when he saw P.A. Edwards on February 26, 2003, and June 17, 2003. He was informed by P.A. Edwards that, as per the PCPG approved and promulgated by Dr. Wright, he was not eligible for Rebetron therapy because he had not participated in ASAT. In September 2004, Dr. Bauer, who saw Plaintiff on a rheumatology consult, reported to the referring DOCCS' physician that Plaintiff should be reconsidered for Rebetron therapy. See Dkt # 215 at 255. Plaintiff did not receive Rebetron therapy at that time, presumably due to his failure to complete ASAT in accordance with the PCPG approved and promulgated by Dr. Wright. The Court notes that Dr. Bauer's recommendation was consistent with the previous recommendations from all of Plaintiff's doctors, dating back to January 2000.

### 2. Failure to Determine Whether the Justifications for the ASAT Prerequisite Applied to Plaintiff

**\*14** There is no evidence in the record that the decision not to prescribe Rebetron therapy to Plaintiff was, in fact, medically justifiable. Defendants' state that denial of Rebetron was based on the PCPG, which in turn was "based on medical consensus" "requir[ing] resolution of a drug treatment issue" before commencement of Rebetron therapy. However, Defendants have not come forward with any evidence substantiating that Ippolito had a current "drug treatment issue". Plaintiff states that he has not used any drugs from August 1992 to the present date. Plaintiff's Declaration in Opposition to Defendants' First Motion For Summary Judgment at 2, ¶ 4 (Dkt # 197). Significantly, Defendants concede that Plaintiff has never tested positive for drug-use during his incarceration. *Id.* (citing Supplemental Reply Affirmation of Thomas Kidera, Esq. dated 9/09/08 (Dkt # 173) ("Urinalysis tests conducted for disciplinary purposes are maintained in an inmate's disciplinary file and would exist outside of the medical record. No such records have yet been located for the plaintiff for any year after 1995."), attached as Ex. A to Dkt # 197); *see also* Dkt # 101, Ex. A (Rebetron treatment request submitted 12/5/00 notes "no dirty urine" results).

Furthermore, Ippolito actually received interferon therapy in 1997 and 1998, notwithstanding the fact that he had not completed ASAT at that time and was not presently enrolled in ASAT. This alone shows the arbitrariness of the decision to deny Plaintiff a second round of interferon therapy. It seriously called into the doubt the sincerity of Defendants' belief that the ASAT requirement not only was medically reasonable in general, but was actually necessary in Ippolito's case.

### 3. "Reflexive" Reliance on the Purported Soundness of the PCPG

There is "no evidence suggesting that the defendants took any step whatsoever to investigate—let alone verify—whether it would be medically appropriate to ignore the unanimous advice of [Ippolito]'s treating physicians, including prison physicians, and apply the Guideline's substance abuse policy in [Ippolito]'s case." *Johnson,* 412 F.3d at 404. Dr. Wright stated that he had "no knowledge" of whether Ippolito had used drugs during 1999 to 2005, *see* Dkt # 42, although this appears to be untrue, given that he had been informed on at least one occasion by Dr. Paolano in December 2000 that Plaintiff's urine tests were negative for drugs or alcohol. P.A. Edwards admitted that when he saw Plaintiff on February 26, 2003, and June 17, 2003, he "took no steps to find out whether [P]laintiff had a history of active alcohol or substance abuse in the prior two years." Dkt # 168, ¶ 6.

### 4. Lack of Support in the Medical Literature for the PCPGs and Ambiguities in the PCPGs

The lack of support in the medical literature for the PCPGs fatally undermines Dr. Wright's contention that he sincerely believed that they mandated denial of Rebetron therapy to Ippolito. As an initial matter, the Court notes that the PCPGs in effect prior to October 13, 2005, did not unambiguously require an inmate such as Ippolito to participate in an ASAT program in order to receive treatment for HCV. The March 1999 and December 1999 PCPGs have two possible meanings. The March 1999 PCPG, which was in place at the time that Plaintiff underwent his second liver biopsy, states that one requirement, in order to receive treatment is "10. [n]o evidence of active substance abuse (drugs and/ or alcohol) during the past 2 years (check urine toxicology screen if drug use is suspected)." March 1999 PCPG at 3. A separate requirement is as follows: "11. [s]uccessful completion of an ASAT program (the inmate may be enrolled concurrently with hepatitis C treatment if time does not allow

for prior completion of the program)." *Id.* The December 1999 PCPG reduced the required two-year "substance-free" period to six-months. *See* December 1999 PCPG at 3. These two versions of the PCPGs could be read as requiring every inmate to enroll in an ASAT program-including those who have never used drugs or alcohol. However, in this lawsuit, Defendants have not argued that the PCPGs were intended to be applied in this manner. Since December 2000, when the active substance abuse criterion was merged with the ASAT criterion, the PCGPs have required inmates with a "substance abuse history" to satisfy the ASAT, yet the PCPGs do not provide guidance as to who qualifies as having a "substance use history."

**\*15** Defendants interpret these ambiguous provisions in the PCPGs as mandating that any inmate who has ever abused drugs and alcohol to enroll in ASAT. Although there is no evidence that Ippolito has actively used drugs or alcohol in the past twenty years, Defendants nonetheless interpreted the pre-October 13, 2005 PCPGs as requiring him to enroll in an ASAT program before receiving treatment for his HCV.

There is no medical justification for such a policy in the medical reports and consensus statements upon which Dr. Wright and the rest of the task force purported to rely in developing the PCPGs. As the district court explained in *Morgan v. Koenigsmann,* 03–CV–3987 (S.D.N.Y. Sept. 24, 2004) (Wood, D.J.) (unreported but attached hereto as Appendix 1), the documents relied upon by Defendants indicate that complications with interferon therapy may arise when treatment is given to persons who are *actively* using drugs or alcohol. *Morgan,* at pp. 19–21 (citing National Institutes of Health, Management of Hepatitis C, NIH Consensus Statement Online 1997 Mar. 24–26; 15(3): 1–41 [12] ("[T]reatment of patients *who are drinking significant amounts of alcohol or who are actively using illicit drugs* should be delayed until these habits are discontinued for at least 6 months. Such patients are at risk for the potential toxic effects of alcohol and other drugs and also present problems with compliance. Treatment for addiction should be provided prior to treatment for hepatitis C.") (emphases added); Centers for Disease Control and Prevention ("CDC"). "Recommendations for Prevention and Control of Hepatitis C Virus (HCV) Infection and HCV–Related Chronic Disease" dated 10/16/98 ("the CDC Recommendations") [13] at 14 ("Treatment of patients who are drinking excessive amounts of alcohol or who *are injecting illegal drugs should be delayed until these behaviors* have been discontinued for ≥ 6 months.") (emphases added)).

[12]  Also available at http:// consensus.nih.gov/1997/1997HepatitisC105html.htm (last accessed Sept. 17, 2012).

[13]  Also available at http:// www.cdc.gov/mmwr/ preview/mmwrhtml/00055154.htm (last accessed Sept. 17, 2012).

Moreover, the 2002 NIH Consensus Statement recommends that treatment of both inmates and active drug and alcohol users be expanded. *See* National Institutes of Health ("NIH"). "Consensus Development Conference Statement, Management of Hepatitis C: 2002", dated Aug. 26, 2002, at 22 & 25 [14] ("[I]t is recommended that treatment of active injection drug use be considered on a case by-case basis, and that *active injection drug use in and of itself not be used to exclude such patients from antiviral therapy.*") (emphases added)).

[14]  Also available at http:// consensus.nih.gov/2002/2002hepatitisc2002116html.htm (last accessed Sept. 17, 2012).

The CDC's Recommendations, which were issued several months before DOCCS adopted the first version of the PCPGs, specifically stated that "[p]ersons *who use or inject drugs* [should] be advised to stop using and injecting drugs [and] to enter and complete substance-abuse treatment, including relapse-prevention programs." CDC Recommendations at 18 (emphases added) (quoted in *Morgan,* at p. 21). Thus, contrary to Defendants' characterization of the medical community's consensus, the CDC was recommending in 1998 that persons who were *actively* drinking excessive amounts of alcohol or who were *actively* injecting drugs be denied treatment for a limited period of time, until such behavior had ceased, and that those particular categories of individuals be encouraged to enter substance abuse treatment programs, presumably for assistance in stopping the behavior that was delaying their ability to receive necessary medical treatment. The CDC's Recommendation cannot be read as supporting a policy of categorically denying treatment to an HCV-positive inmate with an extremely remote substance abuse history and who was not, throughout the time that he was diagnosed with HCV, either actively drinking alcohol or injecting drugs.

**\*16** Apart from the fact that the PCPGs were ambiguous in regards to who must enroll in or complete ASAT, the PCPGs as promulgated by Dr. Wright were without medical

justification and their application to Ippolito by Dr. Wright was made with deliberate indifference to his serious medical needs. *See Brock,* 315 F.3d at 165–67; cf. *Domenech v. Goord,* 196 Misc.2d 522, 531, 766 N.Y.S.2d 287 (Sup .Ct.2003), *aff'd,* 20 A.D.3d 416, 797 N.Y.S.2d 313 (2d Dept.2005) (HCV-positive plaintiff claimed to be drug- and alcohol-free for over 30 years, and prison officials did not controvert this assertion; court concluded that the ASAT program was "irrelevant" for the petition and could not, "as a matter of law, provide a medical justification for the continued denial of medical treatment").

Significantly, Dr. Wright was one of two named defendants in *Morgan v. Koenigsmann,* decided in September 2004. In that case, as discussed above, District Judge Wood thoroughly reviewed the medical literature and explained the myriad ways in which the PCPGs were not in line with the medical community's consensus statements. That Dr. Wright was a named defendant in *Morgan* undermines the validity of his "sincere belie[f]" that the ASAT prerequisite was medically justified based on the various consensus statements.

In sum, the Court finds that the record is sufficient for it to conclude as a matter of law that Dr. Wright approved and promulgated PCPGs that were ambiguous and that resulted in the denial of necessary medical treatment to Plaintiff without adequate medical justification. The Court further finds as a matter of law that Dr. Wright was aware that the ambiguity in the PCPGs created a risk that they would be interpreted to condition HCV treatment for a person, such as Plaintiff, on enrollment in an ASAT program. The Court also determines as a matter of law that Dr. Wright was aware of the medical risks that HCV patients, such as Plaintiff, would fact as a result of such an interpretation. *See Brock,* 315 F.3d at 165–67.

**5. Defendants' Other Reasons For Denying Treatment**
In support of their summary judgment motion, Defendants belatedly have suggested several reasons, other than the ASAT requirement, for their denial of Rebetron therapy to Plaintiff.

Defendants first point to what they characterize as the historically slow progression of Plaintiff's disease, and the fact that his first HCV treatment was a failure, as reasons for denying a second round of interferon therapy. However, these reasons were never cited by Dr. Wright in his denials of the consulting physicians' requests for Rebetron therapy: the only reason given contemporaneously by Dr. Wright and other

prison officials, such as Dr. DePerio, was Ippolito's failure to enroll in ASAT.

Next, Dr. Cunningham, Defendants' medical expert, notes that Plaintiff alleges he suffered "distress and fear concerning his future health and [had] suicidal ideation" as the result of being repeatedly denied Rebetron therapy. Dr. Cunningham suggests that the expression of suicidal ideation may have been a factor in the delay of a second treatment because, he explains, the aggravation of psychiatric disorders is a significant side effect of pegylated interferon and Ribavirin (Rebetron). *See* Dkt # 189, ¶ 7. Dr. Cunningham's attempt provide a *post hoc* rationalization for Defendants' inaction and failure to treat is disingenuous at best. [15] There is no evidence in the record that Plaintiff ever was treated for a depressive disorder or any other psychiatric condition. Finally, Dr. Cunningham's suggestion that psychiatric concerns underlay the denial of combination therapy is completely baseless, since, as noted above, the only reason provided by DOCCS' officials for denying Ippolito a second treatment was his failure to participate in ASAT.

[15]     Even if Ippolito did experience depression and suicidal ideation, it is not for this Court to say such thoughts were unreasonable, given that Ippolito was suffering from a potentially fatal disease.

**\*17** The reasons discussed in the preceding paragraphs were never invoked to deny treatment to Plaintiff for his HCV and are unsupported by the record. As such, they cannot be used to justify the reasonableness of Defendants' inaction and failure to treat Plaintiff's HCV.

## VII. Qualified Immunity
The doctrine of qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (citations omitted); see also *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009) (holding that the sequence of the *Saucier* two-step analysis is not mandatory).

A government official's actions are objectively unreasonable "when no officer of reasonable competence could have made the same choice in similar circumstances." *Lennon v. Miller,*

66 F.3d 416, 420–21 (2d Cir.1995) (citing *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). Whether an official acts reasonably is determined by the state of the law applicable at the time of the alleged acts. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *see also Young v. County of Fulton,* 160 F.3d 899, 930 (2d Cir.1998). "Only Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established." *Moore v. Vega,* 371 F.3d 110, 114 (2d Cir.2004) (citation omitted).

### A. Dr. Wright

Defendants seek qualified immunity from liability for Ippolito's Eighth Amendment claim by essentially arguing that, in the years 2002 to 2006, the law governing the obligations of prison officials to deliver health care to prisoners was not sufficiently clear to warn a reasonable person in Dr. Wright's position that he could not require inmates to enroll in ASAT as a condition for receiving standard treatment of HCV, a progressive and potentially life-threatening illness. Although the PCPGs in effect prior to the *Hilton* case could have caused and did cause the complete denial of prescribed medical treatment for an inmate's serious medical condition, Defendants maintain that a prisoner's clearly established Eighth Amendment right to adequate medical care was not specific enough for Dr. Wright, the chief medical officer for DOCCS, to know that the policies in question were illegal. Instead, Defendants claim that for liability to attach, precedent must have clearly established the right to medical care of a particular illness (here, HCV), specifically without a particular barrier to the treatment (here, the ASAT requirement).

The Court declines to read the Eighth Amendment right here at issue in such a constricted manner. The Supreme Court has explained that "clearly established" for qualified immunity means that

> **\*18** [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful,

but it is to say that in the light of preexisting law the unlawfulness must be apparent.... In other words, the rights as set forth in the holdings of existing cases are clearly established not only as to the facts of the prior cases, but also as applied in contexts that reasonable officers would understand to fall within the scope of those rights.

*Wilson v. Layne,* 526 U.S. 603, 614–15, 640, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). In *Farid v. Ellen,* 593 F.3d 233 (2d cir.2010), the Second Circuit confirmed that qualified immunity can be denied where a rule is "clearly foreshadow[ed]" by past precedent. *Id.* at (citing *Tellier v. Fields,* 280 F.3d 69, 84 (2d Cir.2000) (noting that for a right to be clearly established, "the precise conduct at issue need not previously have been ruled unlawful") (citation omitted).

Because the right in question was clearly established, summary judgment may not be granted if a rational jury could conclude that it was not objectively reasonable for Dr. Wright to believe he was acting in a constitutional manner. Viewing the evidence in the light most favorable to Ippolito, and drawing all permissible inferences in his favor, the Court finds, as a matter of law, that Dr. Wright's belief that his acts were constitutional was objectively unreasonable. As discussed above, as a result of the ambiguous PCPGS, which were not supported by the medical literature, Ippolito was denied necessary medical care for his serious, potentially life-threatening, chronic illness, without medical justification. It was objectively unreasonable for Dr. Wright to believe that it was constitutional to promulgate a policy that requires prison officials who know of an inmate's serious medical needs to disregard those needs, unless the inmate agrees to participate in an ASAT program. The fact that Dr. Wright has extensive experience in supervising and coordinating DOCCS' provision of health services to thousands of inmates further bolsters this Court's conclusion that a jury could find his actions and omissions objectively unreasonable. *See Cuoco v. Moritsugu,* 222 F.3d 99, 111 (2d Cir.2000).

### B. Former Commissioner Goord and P.A. Edwards

Because the Court has concluded that P.A. Goord is entitled to summary judgment with respect to liability on the basis that he lacked the requisite personal involvement, the Court

need not consider whether he would otherwise be entitled to qualified immunity.

## VIII. Equal Protection Claim

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law. Essential to that protection is the guarantee that similarly situated persons be treated equally. *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). To establish an equal protection violation, the plaintiff must show that he was treated differently than other individuals in similar circumstances and must establish that such unequal treatment was the result of intentional and purposeful discrimination. In addition, a valid equal protection claim may be brought by a "class of one" where the plaintiff alleges that he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. *Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000); *see also Neilson v. D'Angelis,* 409 F.3d 100, 105 (2d Cir .2005).

**\*19** Plaintiff has offered no evidence that he was treated differently from other, similarly situated inmates. Accordingly, his "class of one" equal protection claim fails as a matter of law and is dismissed.

## IX. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment (Dkt.# 215) is denied in part and granted in part as set forth above in this Decision and Order. In particular, summary judgment is granted to Goord and Edwards, and the Amended Complaint is dismissed in its entirety as to both of them.

Summary judgment is denied as to Dr. Wright on the Eighth Amendment claims raised in the Amended Complaint as the Court finds as a matter of law that Plaintiff's Eighth Amendment rights were violated, that Dr. Wright had personal involvement in the violations, and that he is not entitled to qualified immunity. Summary judgment is granted to Dr. Wright to the extent that the Amended Complaint's Equal Protection Claim is dismissed with prejudice.

All that remains for determination in this case is the issue of damages sustained by Plaintiff as a result of the Eighth Amendment violations.

A pre-trial scheduling order shall follow forthwith.

**SO ORDERED.**

### Appendix 1

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 4210125

---

End of Document      © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 4471306
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Standish DUBLIN, Plaintiff,

v.

NEW YORK CITY LAW DEPARTMENT,
N.Y.C.D.O.C., Officer Rodriguez # 18480, Defendants.

No. 10 Civ. 2971(LAP).
|
Sept. 26, 2012.

*MEMORANDUM AND ORDER*

LORETTA A. PRESKA, Chief Judge.

**\*1** Plaintiff Standish Dublin ("Plaintiff") filed a complaint against the New York City Law Department (the "City Law Department"), the New York City Department of Correction ("D.O.C."), and Officer Rodriguez (collectively "Defendants") for an alleged deprivation of his constitutional rights. Defendants move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on the grounds that: (1) the City Law Department and D.O.C. are non-suable entities; (2) Plaintiff fails to state a claim for municipal liability; (3) Plaintiff fails to state a failure to protect claim against Officer Rodriguez; and (4) Defendant Rodriguez is entitled to qualified immunity. The Court will address each argument in turn. For the reasons set forth below, Defendants' motion for summary judgment [dkt. no. 23] is GRANTED.

I. *BACKGROUND* [1]

[1]      The facts herein are taken from Defendants' Rule 56.1 Statement ("Defs.' 56.1"), the affidavits submitted thereto, the transcript of the May 20, 2011 Deposition of Standish Dublin, and Plaintiff's 56.1 Statement ("Pl.'s 56.1"). On July 13, 2012, Plaintiff filed a response to Defendants' 56.1 Statement ("Pl.'s Reply). The Court notes that Plaintiff's 56.1 Statement admits all but four of Defendants' facts as set forth in Defendants' 56.1 Statement. The Court also notes that of those four points opposed, Plaintiff does not actually oppose

the statement of fact, rather he clarifies the points by providing additional details.

Plaintiff is an inmate who was housed in the G.R.V.C. correctional facility in Elmhurst, New York, housing area 7B, beginning on January 17, 2009. (Defs.' 56.1 ¶¶ 5–6.) There were approximately forty-seven inmates in housing area 7B on February 9, 2009. (*Id.* ¶ 7.) On February 9, 2009, Correction Officer Rodriguez was at the officer station in housing area 7B at the time of the incident in question. (*Id.* ¶ 4.)

On February 9, 2009, Plaintiff was involved in an altercation with other inmates. (*Id.* ¶ 8.) While standing in the food line, another inmate, previously unknown to the Plaintiff, offered Plaintiff the choice of eating with a fork or a spoon. (*Id.* ¶ 9, 11.) Plaintiff responded, "What are you guys, police?" (*Id.* ¶ 10.) During this exchange, Plaintiff testified that Officer Rodriguez was approximately fifteen feet away. (*Id.* ¶ 12.) Following this verbal exchange, Plaintiff was approached by two inmates, also previously unknown to him, whom he identified as part of the same "crew" as the first inmate he spoke to in the food line. (*Id.* ¶ 14, 15.) One of the inmates told Plaintiff that he needed to watch his mouth, to which Plaintiff responded "I don't have to do anything." (*Id.* ¶¶ 16, 17.) The two inmates walked away, only to return a few minutes later. (*Id.* ¶¶ 18, 19.) One of the inmates told Plaintiff to "pack his shit," and a brief altercation [2] ensued among Plaintiff, the two inmates, and possibly other inmates. (*Id.* ¶¶ 20, 21, 23; Pl. 56.1 ¶ 23.) Plaintiff was hit on the right side of his face and pushed to the floor. (Dublin Dep. Tr. at 45:20–47:25.) He tried to defend himself during the course of what he describes as "more than a fight." (*Id.* at 39:9–12.)

[2]

> Plaintiff opposes paragraph 23 of Defendants' 56.1 statement where it states that the altercation lasted for approximately one minute. Plaintiff's 56.1 statement states that it lasted for one or two minutes. (Pl. 56.1 ¶ 23.) At his deposition, Plaintiff stated that the event lasted "[m]aybe minute or so, two minutes." (*See* Richardson Decl. Ex. B, Depsition of Standish Dubli ("Dublin Dep. Tr.") at 49:18.)

Plaintiff did not know where Officer Rodriguez was when the altercation began. (*Id.* ¶ 21.) After the altercation, Plaintiff went to the shower area, remained there for a few seconds, and when he emerged, Officer Rodriguez directed Plaintiff to "go out into the vestibule area." (*Id.* ¶¶ 24–26.)

Dublin v. New York City Law Dept., Not Reported in F.Supp.2d (2012)

2012 WL 4471306

**\*2** Plaintiff received a laceration on the inside and outside of the right side of his mouth. (*Id.* ¶ 27.) He received treatment for those injuries on Rikers Island. (*Id.* ¶ 28.) While at Urgent Care on Rikers Island, Plaintiff received more than twenty-five stitches. (Dublin Dep. Tr. at 59:15–16, 60:13–14.) Plaintiff received an infraction for time and thirty days of punitive segregation. (Defs.' 56.1 ¶ 33.) Following the incident, Plaintiff returned to the G.R.V.C. but was moved to housing area 15A. (*Id.* ¶ 34.)

## II. *DISCUSSION*

### A. *Legal Standard for Summary Judgment*

Summary judgment is appropriate when no genuine dispute as to any material fact exists and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The substantive law governing the suit identifies the essential elements of the claims asserted and therefore indicates whether a fact is material; a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]he dispute about a material fact is 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In considering a motion for summary judgment, the Court resolves all ambiguities and draws all reasonable inferences against the moving party. *Lindsay v. Ass'n of Prof'l Flight Attendants,* 581 F.3d 47, 50 (2d Cir.2009). To survive summary judgment "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)). "Conclusory allegations, conjecture, and speculation, however, are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998). Rule 56 mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.

Where a litigant is pro se, his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). "Nevertheless, proceeding pro se does not relieve a litigant from the usual requirements of summary judgment. *Garcia v. Rodriguez,* 05 Civ. 5915(RCC)(JCF) 2007 U.S. Dist. LEXIS 15844, at \*11 (S.D.N.Y. Jan. 26, 2007).

### 1. *Plaintiff's Claims Against the City Law Department and D.O.C.*

Chapter 17, § 396 of the New York City Charter provides, "[a]ll actions and proceedings for the recovery of penalties for the violation of any laws shall be brought in the name of the City of New York and not in that of any agency, except where otherwise provided by law." No exception exists for either the Law Department or the Department of Corrections. In *Bogart v. New York City Law Dep't,* 00 Civ. 7417(DLC), 2001 U.S. Dist. LEXIS 21919, at \*8, 2001 WL 1631986 (S.D.N.Y. Dec. 20, 2001), this Court held that the Law Department is not a suable entity. In *White v. Vance,* 10 Civ. 6142(NRB), 2011 U.S. Dist. LEXIS 67799, at \*14, 2011 WL 2565476 (S.D.N.Y. June 21, 2011), this Court held that "as an agency of the City of New York, the D.O.C. is not a suable entity." Accordingly, Plaintiff's claims against the New York City Law Department and City of New York Department of Correction are dismissed.

**\*3** In his original complaint, Plaintiff included the City of New York as a defendant. Plaintiff did not include the City as a defendant in his amended complaint. (*See* Richardson Decl. Ex. A .) Even if the Court were to interpret Plaintiff's claims against the City Law Department and the D.O.C. as claims against the City, his claims would fail.

In order to hold a municipality liable as a "person" within the meaning of Section 1983, a plaintiff must establish that the municipality itself was somehow at fault. *See Monell v. Dep't of Social Services,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). "The plaintiff must first prove the existence of a municipal policy or custom in order to show that the municipality took some action that caused him injuries.... Second, the plaintiff must establish a causal connection-an affirmative link-between the policy and the deprivation of [defendant's] constitutional rights." *Vippolis v. Vill. Of Haverstraw,* 768 F.2d 40, 44 (2d Cir.1985) (internal quotation marks omitted). The "moving force [behind] the constitutional violation" must be an identified municipal policy or practice. *Monell,* 436 U.S. at 694.

The Court of Appeals held that "the simple recitation that there was a failure to train municipal employees does not suffice to allege that a municipal custom or policy caused the plaintiff's injury ... in the absence of allegations of fact tending

2012 WL 4471306

to support, at least circumstantially, such an inference." *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir.1993). "It is well settled that a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691.

Plaintiff's allegations regarding policies and practices diverge. On the one hand, Plaintiff alleges that the D.O.C. has an unwritten policy designed by the officers of the D.O.C. that allows officers to relax instead of protect inmates. (Dublin Aff. in Opp.) On the other hand, Plaintiff seeks the enforcement of the established rules and regulations to the D.O.C. officers. (Compl.V.) The Court will address both possible interpretations of Plaintiff's claims.

In *Overhoff v. Ginsberg Dev. ("Overhoff"),* 143 F.Supp.2d 379, 389 (S.D.N.Y.2001), the Court dismissed plaintiff's claim against the municipality where plaintiff failed to allege that her constitutional rights were violated pursuant to any municipal policy or custom. Plaintiff's argument was "premised on the idea that existing Village policies were not enforced." *Id.* In his amended complaint, Plaintiff states that he would "like for D.O.C. to enforce the rules and regulations to these officers." (Compl. V .) Accordingly, if Plaintiff's intent is for the Court to enforce policies and procedures that are currently in place, that is precisely the situation in *Overhoff,* and "the antithesis of a *Monell* claim." *Monell,* 436 U.S. at 389.

In his Affidavit in Opposition, Plaintiff alternatively alleges that D.O.C. has an unwritten policy that is utilized to allow officers to relax instead of protect inmates and empowers other "groups" within the facility. (Dublin Aff. in Opp.) According to Plaintiff, this unwritten policy allows officers to relax instead of protect inmates and places other dominant groups, such as the Bloods, in command. (*Id.*) Plaintiff goes on to state that the dominant groups are allowed to "direct the other inmates to their cells, deprive other inmate[s of] their full meals, smoke as long as they cover the smell, to receive personal favors from officers." (*Id.*) Plaintiff infers that this unwritten policy is what led to his injuries caused by other inmates. (*Id.* 10.)

**\*4**  Plaintiff's claim against the City for the conduct of Officer Rodriguez is based on a single, isolated incident, the altercation that took place on February 9, 2009. "A municipal agency may not be held liable under § 1983 simply for the isolated unconstitutional acts of its employees." *Sorlucco v. New York City Police Dep't,* 971 F.2d 864, 870 (2d

Cir.1992). "A single incident of unconstitutional activity is insufficient to infer a custom, policy or practice as required by *Monell* to impose municipal liability." *Santiago v. Campisi,* 91 F.Supp.2d 665, 675–76 (S.D.N.Y.2000). Here, Plaintiff only provides the single incident of February 9, 2009 to support his claim that there is an unwritten policy whereby Defendant agencies and the City deprive individual prisoners of their Constitutional rights. Accordingly, Plaintiff's claims against the City are dismissed.

### 2. *Plaintiff's Claims Against Officer Rodriguez*

#### i. *Failure to Protect*
"The Eighth Amendment, which applies to the States through the Due Process Clause of the Fourteenth Amendment prohibits the infliction of 'cruel and unusual punishments' on those convicted of crimes." *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). To establish a violation of the Eight Amendment for failure to protect an individual in custody, a plaintiff must show that the deprivation is so sufficiently serious that it results in a denial of "the minimal civilized measure of life's necessities." *Id.* A plaintiff must also show that the prison officials acted with a "sufficiently culpable state of mind." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). Prison officials may not deprive a prisoner of "basic human needs, *e.g.,* food, clothing, shelter, medical care, and reasonable safety" or expose an inmate to conditions that "pose an unreasonable risk of serious damage to his future health." *Helling v. McKinney,* 509 U.S. 25, 32, 35, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993) (citation omitted).

Under the Eighth Amendment, "prison officials have a duty ... to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan,* 511 U.S. 825, 833, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (internal quotations omitted). "In *Farmer,* the Supreme Court set out a two-pronged test that determines when a failure to protect a prison inmate from assault by other inmates rises to the level of a constitutional violation." *Hines v. Lacy,* 189 F.3d 460 (2d Cir.1999). The first prong requires that the inmate must have been "incarcerated under conditions posing a substantial risk of serious harm." *Farmer,* 511 U.S. at 834. The second prong requires that the prison official must have shown "deliberate indifference" to the prisoner's safety. *Id.* A prison official acts with deliberate indifference when he or she "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn

2012 WL 4471306

that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

### 1. *Prong One*

**\*5** To satisfy prong one, the objective prong, a plaintiff must show that the "alleged deprivation ... in objective terms, [was] sufficiently serious." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). The Court of Appeals has defined sufficiently serious as "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Braxton v. Nichols,* 2010 U.S. Dist. Lexis 25652, at \*11, 2010 WL 1010001 (S.D.N.Y. Mar. 18, 2010). Under the Eighth Amendment standard, a plaintiff must demonstrate that this grave harm was "actual or imminent." *Benjamin v. Fraser,* 343 F.3d 35, 51 (2d Cir.2003). Courts have found that a substantial risk of harm can only be demonstrated where there is evidence of a previous altercation between a plaintiff and his attacker, coupled with a complaint by plaintiff regarding the altercation or a request by plaintiff to be separated from the attacker. *See Desulma v. City of New York,* 2001 U.S. Dist. Lexis 9678, at \*19–20, 2001 WL 798002.

In *Desulma,* the Court held that the Plaintiff did not demonstrate that he was incarcerated under conditions posing a substantial risk of serious harm and therefore did not satisfy prong one. There, the Plaintiff had no prior altercations with the inmates who attacked him, he had not complained about them before, and he did not request separation from them. *Id.* at \*20. Plaintiff testified that the attackers threatened him and said he was "going to pay a price" and to get away because "he smelled." *Id.* The Court held that those verbal statements alone did not indicate a substantial threat of serious harm.

Similarly, Dublin was previously unaware of his attackers until he spoke to them in the food line. In fact, the verbal exchange in the food line between Dublin and the inmate did not include any verbal threats of the sort Desulma experienced. Accordingly, the Court finds that Plaintiff has not satisfied his burden with respect to prong one.

### 2. *Prong Two*

Even if the Court were to find that Plaintiff satisfied prong one, it is abundantly clear that Plaintiff has not satisfied prong two, which requires a showing that Officer Rodriguez was "sufficiently culpable." To be found sufficiently culpable, the prison official must "know[ ] of and disregard[ ] an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a

substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 834, 837. "Direct evidence that prison officials knew of and disregarded a serious risk of harm to a prison inmate will rarely be available," and therefore an inmate may rely on circumstantial evidence. *Desulma,* 2001 U.S. Dist. Lexis 9678, at \*17, 2001 WL 798002 (quoting *Matthews v. Armitage,* 36 F.Supp.2d 121, 125 (N.D.N.Y.1999). The "subjective element of deliberate indifference 'entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.' " *Hathaway,* 99 F.3d at 553 (quoting *Farmer,* 511 U.S. at 835).

**\*6** Whether Officer Rodriguez was approximately fifteen feet away when the verbal exchange took place in the food line is a disputed fact.[3] (Defs.' 56.1 ¶ 12.) In any event, Plaintiff does not allege that Officer Rodriguez overheard the conversation that took place in the food line. Also, Plaintiff did not notify any correction officer of the verbal exchange. (*Id.* ¶ 13.) At most, Plaintiff alleges that Officer Rodriguez should have known about the Bloods and should have been present during the altercation if she had been at her post. The record supports the conclusion that Officer Rodriguez was unaware of Plaintiff's fear of his attackers because the verbal exchange preceding the altercation was never brought to Officer Rodriguez's attention and Plaintiff does not allege that she was herself a witness to the verbal exchange or the altercation.

3
> In his 56.1 Statement, Plaintiff opposes the fact that Officer Rodriguez was fifteen feet away and clarifies "the officer's station is approximately fifteen feet away from the chow line." (Pl. 56.1 ¶ 12.)

Plaintiff was injured when he was attacked by two fellow inmates. In the Complaint, Plaintiff alleges that he could see Officer Rodriguez in the housing area around the time of the altercation. (Compl.II.D.) Plaintiff also stated "[i]f the officer was at the post she saw it all along with the rest of the inmates that were present that night.... The officer was nowhere to be found when I looked for her assistance when I was approached the second time because I was in danger as well as any person who gets in an altercation with the Bloods. And she's been working here long enough to know the danger I was in ..." (*Id.*) Plaintiff's statements seem to indicate that he was in danger because of the presence of the Bloods in the area he was housed in. It was not until after the altercation

2012 WL 4471306

that Plaintiff realized one of his attackers was a member of the Bloods. (Am.Compl.¶ II.D.) Plaintiff had no hostile or threatening exchanges with any of the inmates he identifies as Bloods prior to the altercation. Plaintiff did not know any of the inmates at all prior to the events on February 9, 2009. (Defs.' 56.1 ¶¶ 11, 15.)

At his deposition, Plaintiff testified "I didn't see no correction officer, when it was going down at the beginning. I didn't see no correction officer till I came back out the shower area, from trying to wipe off me-clean off the blood from my face." (Dublin Dep. Tr. at 52:3–7.) Plaintiff's account of events is unclear with respect to the presence of Officer Rodriguez. [4] Drawing all reasonable inferences in favor of the Plaintiff, for purposes of this motion the Court assumes that Plaintiff saw Officer Rodriguez in the vicinity during the altercation. The circumstances suggest that Plaintiff was in actual or imminent harm as he sustained serious injuries to his lip as a result of the altercation.

[4]    If Plaintiff is merely asserting that Plaintiff was in the housing area but not present during the altercation, his claim against Officer Rodriguez is a *respondeat superior* claim, which is not cognizable under § 1983. *See Hines v. Lacy,* 189 F.3d 460, n. 1. Drawing all inferences in favor of the Plaintiff, the Court will assume that Plaintiff did see Officer Rodriguez at the time of the incident.

Officer Rodriguez's failure to intervene in the attack is not, by itself, a basis for liability. Although "[a] correctional officer's presence at an attack of an inmate, where he does nothing to stop an assault, may be sufficient to establish a claim under Section 1983, an isolated omission to act by a state prison guard must be accompanied by evil intent, recklessness or at least deliberate indifference to the consequences of the conduct." *Desulma,* 2001 U.S. Dist. Lexis 9678, at *22–23, 2001 WL 798002 (internal citations omitted). It must also be shown that Defendant had "an extended opportunity to stop the attack but failed to take any action to do so." *Rucco v. Howard,* 1993 WL 299296 (S.D.N.Y. Aug.4, 1993) (citing *Williams v. Vincent,* 508 F.2d 541, 546 (2d Cir.1974)).

*7 Here, there is no evidence suggesting that Officer Rodriguez deliberately disregarded Dublin's safety or had an opportunity to intervene in the attack, that is, that Officer Rodriguez knew of and disregarded a substantial risk of serious harm to Plaintiff. Accordingly, Plaintiff has

not satisfied prong two. Plaintiff's claims against Officer Rodriguez are dismissed.

#### ii. *Qualified Immunity*

The question of qualified immunity is independent of the merits of the underlying action and must be examined independent of the underlying claims. *Saucier v. Katz,* 533 U.S. 194, 204, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Id.* at 202 (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). "Under 42 U.S.C. § 1983, a public official is entitled to qualified immunity if her acts did not violate clearly established rights of which a reasonable officer would have known, or if she reasonably believed that her conduct did not violate those rights." *Desulma,* at *24 (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Government officials performing discretionary functions are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The defense of qualified immunity protects a government official if it was "objectively reasonable" for him or her to believe that his or her actions were lawful at the time of the challenged act. *See Garcia,* 2007 U.S. Dist. LEXIS 15844, at *22. A government official's actions are objectively reasonable, thus entitling a defendant to qualified immunity, if "officers of reasonable competence could disagree" on the legality of defendant's action. *Malley,* 475 U.S. at 341.

"It is clearly established that inmates have the right to be free from harm inflicted by fellow prisoners and that corrections officers have an obligation to protect inmates from a known and substantial risk of serious harm." *Garcia,* 2007 U.S. Dist. LEXIS 15844, at *23. An officer is entitled to qualified immunity only if his or her actions were objectively reasonable. "Thus, if the court determines that the only conclusion a rational jury could reach is that reasonable officers would disagree about the legality of the defendant's conduct under the circumstances, summary judgment is appropriate. *Lennon v. Miller,* 66 F.3d 416, 420 (2d Cir.1995). "Disputes over reasonableness are usually fact questions for juries." But, "[i]f there is no material question of fact, the court decides the qualified immunity issue as a matter of law." *Green v. City of New York,* 465 F.3d 65, 83 (2d Cir.2006).

Plaintiff testified that Officer Rodriguez was approximately fifteen feet away from him when the first verbal exchange occurred. (Defs.' 56.1 ¶ 12.) At the time, there were approximately forty-five other inmates that Officer Rodriguez was monitoring. (*Id.* ¶ 17.) Plaintiff was unaware of the physical location of Officer Rodriguez at the time the altercation began. (*Id.* ¶ 22.) Plaintiff admits that he never told Officer Rodriguez about the verbal exchange in the food line. (*Id.* ¶ 13.) Plaintiff did not testify that he even thought Officer Rodriguez was aware of the situation between him and the inmates who attacked him. It is clear from the facts here that no reasonable jury could conclude that Officer Rodriguez's actions were anything but objectively reasonable. Therefore, Officer Rodriguez is entitled to qualified immunity.

## III. *CONCLUSION*

**\*8** For the foregoing reasons, Defendants' motion for summary judgment [dkt. no. 23] is GRANTED.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 4471306

---

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 272443
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Clives CELESTIN, Plaintiff,

v.

Jeffrey PREMO, Correction Officer, Upstate
Correctional Facility, et al., Defendants.

Civil Action No. 9:12–cv–301 (GLS/RFT).
|
Jan. 24, 2014.

**Attorneys and Law Firms**

Clives Celestin, Attica, NY, pro se.

Hon. Eric Schneiderman, Office of the Attorney General, State of New York, Michael G. McCartin, Esq., Assistant Attorney General, of Counsel, Albany, NY, for the Defendant.

## *ORDER*

GARY L. SHARPE, Chief Judge.

 **\*1** The above-captioned matter comes to this court following a Report–Recommendation by Magistrate Judge Randolph F. Treece, duly filed December 9, 2013. Following fourteen (14) days from the service thereof, the Clerk has sent the file, including any and all objections filed by the parties herein.

No objections having been filed and the court having reviewed the Magistrate Judge's Report–Recommendation for clear error, it is hereby

ORDERED that the Report–Recommendation of Magistrate Judge Randolph F. Treece filed December 9, 2013 (Dkt. No. 68) is ACCEPTED in its entirety for the reasons state therein; and it is further

ORDERED that defendants' motion for partial summary judgment (Dkt. No. 62) is GRANTED; and it is further

ORDERED that defendants Rock, Fischer and Carver are DISMISSED; and it is further

ORDERED that the case is deemed trial ready as to plaintiff's claims against defendants Premo, Tulip and Traux; and it is further

ORDERED that the case has been moved to the court's trial ready list; and it is further

ORDERED that the Clerk of the Court is to mail copies of the Order to the parties in accordance with the court's local rules.

IT IS SO ORDERED.

**CLIVENS CELESTIN,**

Plaintiff,

-v-

**JEFFREY PREMO,** *Correction Officer, Upstate Correctional Facility,* **STANLEY TULIP,** *Correction Officer, Upstate Correctional Facility,* **BRUCE TRAUX,** *Correction Officer, Upstate Correctional Facility,* **D. ROCK,** *Prison Superintendent, Upstate Correctional Facility* **BRIAN FISCHER,** *Commissioner of Dept. of Corrections,* **MRS. J. CARVER,** *Director of Inmate Classification and Movement, New York State Dept. of Corrections,*

Defendants.

## *REPORT–RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

*Pro se* Plaintiff Clivens Celestin brings this civil rights action, pursuant to 42 U.S.C. § 1983, alleging that Defendants used excessive force, tampered with his grievances, failed to provide adequate medical care, and failed to protect him from other officers in contravention of the Eighth and Fourteenth Amendments. *See generally* Dkt. No. 1, Compl. Defendants move for Partial Summary Judgment seeking the dismissal of Defendants Rock, Fischer, and Carver. Dkt. No. 62. Plaintiff opposes the Motion. Dkt. No. 67. For the reasons that follow, we recommend that Defendants' Motion be **GRANTED.**

### I. STANDARD OF REVIEW

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I. C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

**\*2** To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169,

173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

## II. DISCUSSION

### A. Background

According to Plaintiff, on October 26, 1999, while incarcerated at Upstate Correctional Facility ("UCF"), Plaintiff stabbed Corrections Officer Defendant Premo in the arm with a pen. Dkt. No. 62–3, Ex. A, Clivens Celestin Dep., dated Mar. 11, 2013, at pp. 34–38; Dkt. No. 67–1, Pl.'s Opp'n at ¶ G. Disciplinary charges were filed, and after a hearing was held, Plaintiff was found guilty and transferred to Clinton Correctional Facility. Celestin Dep. at pp. 36–38. Over the next several years, Plaintiff was transferred to various correctional facilities throughout New York State. *Id.* at pp. 38–40.

In April or May of 2009, Plaintiff was transferred back to UCF from Green Haven.[1] *Id.* at ¶ 40. Plaintiff alleges that on October 29, 2010, while awaiting transportation from UCF to an outside hospital for a minor surgical procedure, he was attacked and beaten by multiple guards, including Defendant Premo who was still employed as a corrections officer at UCF. Plaintiff claims that as a result of the assault he was sore and swollen and suffered bruises on his shoulder, lower back, knee, and thigh, as well as bruised and fractured ribs. *Id.* at pp. 7, 17, 24–26, & 30; *see also* Compl. at pp. 6–7.[2] Plaintiff further alleges that during the altercation, Defendant Premo called him a "nigger," told him it was "payback time," and asked him if he remembered Defendant Premo "from ten years ago." Celestin Dep. at pp. 33–34.

[1]  The exact date Plaintiff was transferred back to UCF in 2009 is unclear.

[2]  The pages of Plaintiff's Complaint are unnumbered; therefore, all references to Plaintiff's Complaint are to the page numbers automatically assigned by the Court's Electronic Case Filing system.

### B. Interference with Grievances

**\*3** Plaintiff alleges that Defendant Rock, UCF's Superintendent:

> CONCEAL[ED] SERIOUS FACILITY COMPLAINTS BY EXPLOITING [THE PRISON LITIGATION AND REFORM ACT] AND DISCARDING MY GRIEVANCES AND APPEALS BY FINDING THE RELEVANT FACTS WITHOUT MERIT. THE SUPERINTENDENT AND EXECUTIVE TEAM ENGAGES IN NON–INVESTIGATIVE TECH[NIQUES] THAT ULTIMATELY GETS GRIEVANCES DISMISSED. AT TIMES GRIEVANCES AGAINST OFFICERS FOR SERIOUS VIOLATIONS ARE NOT FILED PROPERLY & WITHOUT IMPLEMENTATION OF A RECEIPT SYSTEM IT FURTHER COMPLICATES INMATES ABILITY TO REMAIN DILIGENT ON THEIR ISSUES. WHICH ALSO CONTRADICTS THE FOURTEENTH AMENDMENT, AND A RIGHT TO SUBSTANTIVE DUE PROCESS FOR INMATES. NOT TO MENTION NEW YORK STATE LAWS WITHIN THE FACILITY LEVEL.

Compl. at pp. 8–9.

Defendants move to dismiss this claim on the grounds that it does not state a claim under § 1983. Dkt. No. 62–8, Defs.' Mem. of Law, at p. 9.

Even when construed liberally, complaints that prison officials tampered with, failed to investigate, or improperly processed grievances, without more, do not give rise to liability under § 1983. *See Irvis v. Seally,* 2011 WL 454792, at \*2 (N.D.N.Y. Feb.4, 2011) (Sharpe, J.) ("Thus, regardless of whether and to what extent defendants followed their grievance procedures in investigating or failing to investigate Irvis's complaints, his claims must fail as a matter of law as they are not actionable under § 1983."). Therefore, we recommend Defendants' Motion be **GRANTED** and Plaintiff's claim that Defendant Rock tampered with or failed to follow proper grievance procedures be dismissed.

### C. Supervisory Liability

Defendants have not moved for Summary Judgment on Plaintiff's excessive force claims; therefore, we do not discuss the merits of this claim. However, Defendants move for Summary Judgment as against Plaintiff's allegations that Defendant Fischer, the Commissioner of the Department of Corrections and Community Supervision ("DOCCS"), and Defendant Rock, UCF's Superintendent, were liable in their supervisory capacities for the alleged excessive use of force perpetrated by Defendant Premo and other corrections officers at UCF. The entirety of Plaintiff's allegations in this regard are as follows:

> THE AFOREMENTIONED ASSAULT AND BATTERY AND FAILURE TO PROTECT WAS A PRODUCT PROXIMATE CAUSE OF CUSTOMARY WIDE SPREAD [SIC][ ]ABUSE THROUGHOUT THE NEW YORK STATE DEPARTMENT OF CORRECTIONS AND THE UPSTATE CORRECTIONAL FACILITY IN CONJUNCTION WITH GROSS NEGLIGENCE AND OR DELIBERATE INDIFFERENCE. NEW YORK STATE HAS GAPING HOLES REG[ ]ARDING TRAINING, MONITORING, SUPERVISING, SURV [EILLANCE], INVESTIGATING, AND DISCIPLINING/FIRING THEIR PERSON[N]EL FOR WRONGFUL ACTS [DEFENDANTS FISCHER AND ROCK] KNOWS OF [SIC], AND SHOULD KNOW OF

OR CONDONES OR FAIL TO INTERVENE.

Compl. at pp. 10–11.

An individual cannot be held liable for damages under § 1983 merely because he holds a position of authority, but he can be held liable if he was personally involved in the alleged deprivation.

> **\*4** The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citations omitted); *see also Selah v. Fischer,* 2013 WL 5603866, at \*2 (N.D.N.Y. Oct.11, 2013) (Sharpe, C.J.) (citing *Colon v. Coughlin).*

Even if we assume for the sake of argument that excessive force was used on October 29, 2010, Plaintiff's claim that Defendants Rock and Fischer were liable in their supervisory capacity must fail. Beyond conclusory allegations, Plaintiff fails to allege, much less provide any documentary or record evidence to support, a single fact from which it could be inferred that either Defendant was personally involved in the alleged assault at UCF. Indeed, Plaintiff conceded as much in his Deposition. When asked why he sued Defendant Rock, Plaintiff responded that "I added him to the suit because [ ] he

is the head of it, I mean, he runs the stuff, so I figured I would put him in there." Celestin. Dep. at pp. 45–46. When asked if that was the only reason that he named Defendant Rock Plaintiff responded, "[y]es; I felt he was responsible, too, even though he wasn't at the incident." *Id.* at p.. 46. When asked if "the only reason that you sued [Defendant Fischer] is because he is the boss of the entire department," Plaintiff responded in the affirmative. *Id.* And, he further admitted that Defendant Fischer was neither at the facility at the time of the assault nor physically involved in any way. *Id.* Although Plaintiff alluded, in his Complaint and Deposition, that Defendant Fischer was liable in his capacity as DOCCS' chief policy maker, he fails to identify, with any specificity, which, if any, of the policies he purportedly created or countenanced was responsible for the alleged use of excessive force which spurred the instant action. *Id.*

It is clear that mere linkage in the chain of command is insufficient to establish liability under § 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). Likewise, given Plaintiff's failure to identify any particular policy as having caused the alleged assault, Plaintiff cannot raise a triable issue of material fact as to whether either Defendant had "actual or constructive notice of the unconstitutional practices ..., [or that they] demonstrate[d] gross negligence or deliberate indifference by failing to act" in response to that knowledge. *Meriwether v. Coughlin,* 879 F.2d 1037, 1048 (2d Cir.1989) (internal quotation omitted). Thus, Plaintiff has failed to raise a triable issue of fact with regard to whether Defendants Fisher and Rock were personally involved in the alleged excessive use of force on October 26, 2010.

 **\*5** Therefore, we recommend that Defendants' Motion be **GRANTED** with regard to Plaintiff's claim that Defendants Fischer and Rock were personally involved, *via* a theory of supervisory liability, in the alleged excessive use of force perpetrated by Defendant Premo and others.

### D. Failure to Protect

"The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir.1996) (citing *Farmer v. Brennan,* 511 U.S. 825, 832–33, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)); *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) ("[P]rison officials have a constitutional duty to act reasonably to ensure a safe environment for a prisoner when they are aware that

there is a significant risk of serious injury to that prisoner."); *see also Avincola v. New York State Dep't of Corr. Servs.,* 1998 WL 146280, at *3 (N.D.N.Y. Mar.27, 1998).

In order to state such a claim, the prisoner must demonstrate that the prison officials "acted with deliberate indifference with respect to his safety or with an intent to cause harm to him[.]" *Hendricks v. Coughlin,* 942 F.2d 109, 113 (2d Cir.1991). A showing of mere negligence on behalf of the defendants is not enough to state a constitutional claim. *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (cited in *Hendricks v. Coughlin,* 942 F.2d at 113). The key element of a failure to protect claim is the existence or potential existence of a substantial risk of serious harm and not the actual harm which may or may not ensue. *Farmer v. Brennan,* 511 U.S. at 836. To prove deliberate indifference, the plaintiff must show that the "official [knew] of and disregard[ed] an excessive risk to inmate health or safety." *Id.* at 837 (cited in *Ramirez v. Mantello,* 1998 WL 146246, at *2 (N.D.N.Y. Mar.24, 1998)). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and* he must also draw the inference." *Id.* (emphasis added); *see also Rigano v. Cnty. of Sullivan,* 486 F.Supp.2d 244, 255 (S.D.N.Y.2007) (citing *Farmer v. Brennan,* 511 U.S. at 842–43 n. 8; *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir.2006); & *Candelaria v. Coughlin,* 1997 WL 171256, at *10–11 (S.D.N.Y. Apr.10, 1997) for the proposition that "[b]y now, it is well-established that to defeat a motion for summary judgment on an Eighth Amendment claim, there must be genuine issues as to whether the corrections officers were aware that the plaintiff faced a substantial risk of serious danger.").

Evidence that " 'a substantial risk of inmate attacks [which were] 'longstanding, pervasive, well-documented, or expressly noted by prison officials in the past' " is sufficient to establish the existence of a significant risk of harm. *Walters v. Gardner,* 2012 WL 1029658, at *4 (N.D.N.Y. Feb.15, 2012) (quoting *Coronado v. Le Fevre,* 886 F.Supp. 220, 224 (N.D.N.Y.1995)).

**\*6** Plaintiff claims that Defendant J. Carver, the Director of Inmate Classification and Movement for the New York State Department of Corrections and Community Supervision ("DOCCS"), and her subordinates are

RESPONSIBLE TO ASSURE THE PROTECTION OF INMATE FROM DOCUMENTED CIRCUMSTANCES AGAINST OTHER INMATES OR SECURITY STAFF ... [HOWEVER, HERE THEY] FAILED TO PROPERLY SCREEN OR DELIBERATELY TRANSFERRED PLAINTIFF TO UPSTATE FACILITY WHILE HAVING DIRECT KNOWLEDGE OF THE INCIDENT BETWEEN OFFICER (PREMO) AND PLAINTIFF IN (OCTOBER 26, 1999)[ ] FILES. MRS CARVER AND SUBORDINATE FAILED IN THEIR DUTY TO REASONABLY PROTECT THE PLAINTIFF BY TRANSFER[R]ING THE PLAINTIFF BACK TO UPSTATE CORRECTION FACILITY ... [WHERE] A SERIOUS INMATE/ OFFICER INCIDENT OCCUR [R]ED CREAT[ING] A HIGH PERCENTAGE [RISK THAT] ASSAULT AND BATTERY RETALIATION ... [WOULD] OCCUR BETWEEN THE OFFICERS AND INMATE.

Pl.'s Opp'n at ¶ G; *see also* Compl. at pp. 9–10.

Here, the record is devoid of any evidence, direct or circumstantial, that Defendant Carver was or should have been aware that by transferring Plaintiff to UCF in April or May of 2009 he faced a specific threat of harm from Defendant Premo or any other significant risk of being harmed generally.

To begin with, it is uncontroverted [3] that in her capacity as Director of Movement and Classification, Defendant Carver was responsible for overseeing nine subordinates, and the movement and classification of 50,000 inmates amongst sixty different correctional facilities. Dkt. No. 62–6, Joyce Carver Decl., dated Aug. 1, 2013, at ¶ 2. Defendant Carver was not personaly involved "in determining where Plaintiff

Clivens Celestin ... would have been housed in the 2009 and 2010 time period. This would have been decided by one of [her] subordinates." *Id.* at ¶¶ 3–4. Moreover, nothing in the record indicates that Defendant Carver was aware of the fact that Plaintiff had stabbed Defendant Premo in October of 1999, nor that he was subsequently found guilty of the same at a disciplinary hearing. *See id.* at ¶ 5. For one thing, Defendant Carver did not become the Director of Classification and Movement until December of 2007; thus, there is no indication that she would have learned of Plaintiff's initial transfer out of UCF in 1999 or the circumstances surrounding that transfer when it occurred. *See id.* at ¶ 1.

3    Despite receiving Notice of the potential consequences of failing to properly respond to Defendants' Motion for Partial Summary Judgment, including the potential that his claims might be dismissed, Plaintiff provided only terse single sentence admissions or denials in response to Defendants' Statement of Material Fact Pursuant to Local Rule 7.1 ("7.1 Statement"). Moreover, despite having had the benefit of engaging in discovery, Plaintiff failed to submit a single document, affidavit, or declaration in support of his claims. *See* Dkt. Nos. 62–1, Notice of Consequences, & 67, Pl.'s 7.1 Statement; *see also* Pl.'s Opp'n. Defendants, on the other hand, submitted a proper 7.1 Statement supported, in pertinent part, by the sworn Declaration of Defendant Carver, and Plaintiff's Deposition. Dkt. No. 62–6, Joyce Carver Decl., dated Aug. 1, 2013; Celestin Dep. Consequently, given Plaintiff's lapse, we apply Local Rule 7.1(a)(3), and accept as true Defendants' version of the facts as established in their 7.1 Statement. *See Van Loan v. Hartford Acc. & Indent. Co.,* 2006 WL 3782709, at *2–3 (N.D.N.Y. Dec.22, 2006) (reaching a similar conclusion and citing cases to support that holding).

Likewise, the record lacks any indication that Defendant Carver should have known Plaintiff would be subjected to a significant risk of harm. Critically, more than a year transpired between the time Plaintiff was transferred to UCF in April or May of 2009 and when Plaintiff was allegedly assaulted by Defendant Premo in October of 2010. Yet, there is no evidence that Plaintiff ever complained of any risk to his safety, either before being transferred back to UCF, or during the year between being transferred and the alleged assault. Nor has Plaintiff provided any evidence that such attacks

were widespread or commonplace at UCF. Plaintiff's wholly conclusory and unsupported allegations to the contrary are insufficient as a matter of law to raise a genuine issue of material fact as to the issue of whether Defendant Carver knew or should have known that transferring Plaintiff to UCF placed him at a significant risk of harm. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

*7 Moreover, to the extent that Plaintiff has alleged that Defendant Carver should be held liable because she negligently failed to screen for inmate/guard conflicts before transferring him to UCF in 2009, such a claim, even if true, does not state a cause of action under § 1983. *See Whitley v. Albers,* 475 U.S. at 319; *see also Shell v. Brun,* 585 F.Supp.2d 465, 470 (W.D.N.Y.2008); *cf. Abdul–Matiyn v. New York State Dep't of Corr. Servs.,* 871 F.Supp. 1542, 1547 (N.D.N.Y.1994) (citing *Morales v. New York State Dep't of Corr.,* 842 F.2d 27, 30 (2d Cir.1988) for the proposition that "section 1983 does not provide [a] cause of action for negligent failure of prison officials to protect an inmate from injury at hands of another inmate").

Likewise, Plaintiff's conclusory and unsupported allegation that one of Defendant Carver's subordinates was responsible for the alleged constitutional deprivation is also insufficient to raise a genuine issue of material fact as to whether Defendant Carver could be found liable in her supervisory capacity. *See Bennett v. Fischer,* 2010 U.S. Dist. LEXIS 139587, at *35–36, 2010 WL 5525368 (N.D.N.Y Aug. 17, 2010) (citing *Pettus v. Morgenthau,* 554 F.3d 293, 300 (2d Cir.2009) for the proposition that "[i]t is well settled that vague and conclusory allegations that a supervisor has failed to properly manage a subordinate do not suffice to establish the requisite personal involvement and support a finding of liability."). Indeed, nothing in the record suggests that Defendant Carver had any reason to suspect that one of her subordinates would violate Plaintiff's rights. *See Pettus v. Morgenthau,* 554 F.3d at 300 citing *Poe v. Leonard,* 282 F.3d 123, 140 (2d. Cir.2002) & *Iqbal v. Hasty,* 490 F.3d 143, 166 (2d Cir.) *cert. granted sub nom. Ashcroft v. Iqbal,* 554U.S. 902 (2008), for the proposition that "[t]o the extent that the complaint attempts to assert a failure-to-supervise claim, ... it lacks any hint that [defendant] acted with deliberate indifference to the possibility that his subordinates would violate [plaintiff's] constitutional rights."); *see also Poe v. Leonard,* 282 F.3d at 140 n. 14 ("We have often equated gross negligence with recklessness, and have defined it as the 'kind of conduct [ ] where [the] defendant has reason to know of facts creating a high degree of risk of physical harm to another and

2014 WL 272443

deliberately acts or fails to act in conscious disregard or indifference to that risk.' ") (quoting *Bryant v. Maffucci,* 923 F.2d 979, 985 (2d Cir.1991)).

Therefore, we recommend that Defendants' Motion be **GRANTED** as to Plaintiff's failure to protect claim against Defendant Carver and she be **DISMISSED** from this action.

### E. Qualified Immunity

Defendants have also argued that Defendant Carver was entitled to qualified immunity. Defs.' Mem. of Law at p. 15. However, as we have found no evidence that Defendant Carver was personally involved in any constitutional wrongdoing, the issue of qualified immunity is moot. *See Cathedral Church of The Intercessor v. Inc. Vill. of Malverne,* 353 F.Supp.2d 375, 391 (E.D.N.Y.2005) (citing *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)).

### III. CONCLUSION

**\*8** For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Partial Summary Judgment (Dkt. No. 62) be **GRANTED;** and it is further

**RECOMMENDED,** that Defendants Rock, Fischer, and Carver be **DISMISSED;** and it is further

**ORDERED,** that if the above Recommendation is adopted, this case be deemed trial ready as to Plaintiff's claims against Defendants Premo, Tulip, and Traux; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs. .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

### All Citations

Not Reported in F.Supp.3d, 2014 WL 272443

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Overruling Risk - Negative Treatment

Overruling Risk   Darnell v. Pineiro,   2nd Cir.,   February 21, 2017

2015 WL 1854198
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Alexis STEWART, Plaintiff,

v.

Dora SCHIRO, Kelvin Madison, Latasha
Hicks, and the City of New York, Defendants.

No. 13–CV–3613 (NGG)(VMS).
|
Signed April 21, 2015.
|
Filed April 22, 2015.

**Attorneys and Law Firms**

Alexis Stewart, Attica, NY, pro se.

Rosemari Y. Nam, New York City Law Department, New
York, NY, for Defendants.

**MEMORANDUM & ORDER**

NICHOLAS G. GARAUFIS, District Judge.

**\*1** Pro se Plaintiff Alexis Stewart brings this action against
two employees of the City of New York Department of
Correction ("DOC")—Correction Officer ("C.O.") Latasha
Hicks and C.O. Kelvin Madison—and against the City of
New York (the "City") (collectively, the "Defendants").[1]
Plaintiff asserts claims of failure-to-protect, denial of due
process, cruel and unusual punishment, and municipal
liability, pursuant to 42 U.S.C. § 1983, as well as a state
law negligence claim, in connection with an incident that
occurred on August 16, 2012, while Plaintiff was in custody
at the Otis Bantum Correctional Center ("OBCC") at Rikers
Island.[2] Defendants have moved for summary judgment on
all claims. (Not, of Mot. for Summ. J. (Dkt.103).) For the
reasons explained below, Defendants' motion is GRANTED,
and all claims against all Defendants are DISMISSED.

1    The court previously dismissed an additional
     Defendant, former DOC Commissioner Dora
     Schriro (s/h/a Dora Schiro). (See July 29, 2013,
     Mem. & Order (Dkt.12) at 4.)

2    Plaintiff's pro se Complaint (Dkt.1) does not
     expressly assert these five claims; read in the light
     most favorable to Plaintiff, the court construes the
     Complaint as asserting each of these claims.

**I. BACKGROUND**

**A. Facts**

The following facts are either undisputed, or where facts are
in dispute, viewed in the light most favorable to Plaintiff.[3]

3    Plaintiff addressed the facts asserted in Defendants'
     Rule 56.1 Statement (Dkt.105) in his own opposing
     statement (see Pl.'s Rule 56.1 St. (Dkt.109));
     however, he did not address those facts in
     correspondingly numbered paragraphs. Cf. Local
     Civil Rule 56.1. Plaintiff included additional
     material facts in his Rule 56.1 Statement, but
     also alleged additional facts not included in his
     Rule 56.1 Statement in his other papers, including
     his opposing memorandum (Pl.'s Mem. in Opp'n
     ("Pl.'s Opp'n") (Dkt.119–1)), declaration (Decl.
     of Alexis Stewart in Opp'n to Defs.' Mot. for
     Summ. J. ("Pl.Decl.") (Dkt.110)), and exhibits
     (Pl. Decl., Exs. A–N (Dkts. 110–1 to–14,122)).
     Because Plaintiff is proceeding pro se, the court
     has performed an independent review of the entire
     record submitted by the parties to determine
     whether there are disputed issues of material
     fact. See McClendon v. Cnty. of Nassau, No. 11–
     CV–0190 (SJF)(ETB), 2012 WL 4849144, at *2
     (E.D.N.Y. Oct. 11, 2012); Williams v. City of
     New York. No. 06–CV–6601 (NGG), 2009 WL
     3254465, at *1 n.l (E.D.N.Y. Oct. 9, 2009). The
     court treats Plaintiff's notarized filings, such as
     his opposition memorandum and his Complaint,
     as sworn statements. See Washington v. William
     Morris Endeavor Entm't, LLC, No. 10–CV–9647
     (PKC), 2014 WL 4401291, at *1 n.l (S.D.N.Y.
     Sept. 5, 2014); Geldzahler v. N.Y. Med. Coll., 746
     F.Supp.2d 618, 620 n.l (S.D .N.Y.2010).

     Due to several electronic filing errors, two
     additional notes are warranted. First, Defendants
     mistakenly filed incomplete versions of Exhibits

2015 WL 1854198

D and E to Plaintiff's declaration (*see* Pl.'s Aug. 25, 2014, Ltr. (Dkt.118); Sept. 15, 2014, Order (Dkt.121)); in deciding this motion, the court has considered the corrected versions of the exhibits (*see* Dkt. 122). Second, Defendants originally filed a marked-up version of Plaintiff's opposition brief, mistakenly believing that Plaintiff was under an obligation to send an original copy of his opposition papers to the court. (*See* Defs.' July 29, 2014, Ltr. (Dkt.111) ("Defendants write respectfully to inform the Court that, because plaintiff has failed to send defendants or the Pro Se Office a courtesy copy of his Opposition papers, the undersigned is filing on ECF plaintiff's original Opposition papers with markings made by the undersigned. The undersigned has, to the best of her abilities, used white-out to delete her markings.").) At the court's invitation (*see* Aug. 4, 2014, Order (Dkt.113)), Plaintiff subsequently sent a "clean" copy of his opposition brief to the court (*see* Pl.'s Opp'n (Dkt.119)). There are, however, minimal differences between the marked-up version of Plaintiff's brief filed by Defendants and the clean version of the brief filed by Plaintiff-the court can only guess, but these differences (the majority of which are typographical or stylistic) may reflect the fact that Plaintiff used a copy of the marked-up version sent to him by the court to manually re-type a clean version of the brief. Because the differences between the two briefs are minimal, and because fault lies with Defendants for failing to follow the court's Individual Rules in the first place, the court considers the clean version of the brief filed by Plaintiff for purposes of this motion. Counsel for Defendants is reminded that pursuant to the court's Individual Rules, the moving party is responsible for filing a fully briefed motion and providing a clean set of courtesy copies to the court. *See* Individual Rules of Judge Nicholas G. Garaufis, Rule III.B.2.

1. *August 16, 2012, Incident*
On August 16, 2012, Plaintiff was incarcerated at the OBCC. (Defs .' Rule 56.1 St. ("Defs." 56.1") (Dkt.105) ¶ 1; Pl.'s Rule 56.1 St. ("Pl.'s 56.1") (Dkt.109) ¶ 1.) A crowd of inmates began arguing about which inmate was assigned to a particular bed located next to the bed of inmate William

Simmons. (Tr. of Feb. 20, 2014, Dep. of Alexis Stewart ("Pl.Dep.") (Dkt.123–1) at 6:24–25, 7:56, 8:5–10.)[4] C.O. Hicks entered and told the inmates to go to sleep. (Defs.' 56.1 ¶ 3; Pl.'s 56.1 ¶ 3.) Plaintiff was standing three to four feet away from Simmons. (Pl. Dep. at 7:13–14.) In a playful or joking manner, Plaintiff asked Simmons to confirm that the bed in question was another inmate's bed, and not Simmons's. (*Id.* at 7:3–6.) Simmons responded aggressively and told Plaintiff to "shut the fuck up and get away from my bed." (Defs.' 56.1 ¶ 5; PL's 56.1 ¶ 5.)

[4]     Although Defendants originally filed excerpts of the transcript of Plaintiff's February 20, 2014, deposition, at the court's direction, Defendants electronically filed the entire transcript. (*See* Defs.' Sept. 19, 2014, Ltr. (Dkt.123).)

C.O. Hicks approached Plaintiff and Simmons while they continued to converse. (Defs.' 56.1 ¶ 6; Pl. Dep. at 7:10–12.) Plaintiff attempted to explain to Simmons that he was not trying to get on Simmons's nerves. (Pl.'s 56.1 ¶ 8; Pl. Dep. at 7:8–9.) When C.O. Hicks reached the bed, Simmons, who had been lying down, got up, pushed C.O. Hicks out of the way, and ran towards Plaintiff. (Defs.' 56.1 ¶ 7; Pl.'s 56.1 ¶ 10; Pl. Dep. at 7:13–17, 9:3–7.) Simmons punched Plaintiff approximately three times in the face. (Defs.' 56.1 ¶ 7; Pl.'s 56.1 ¶ 10.) After the third punch by Simmons, Plaintiff punched Simmons in order to defend himself. (Pl.'s 56.1 ¶ 12.)

C.O. Hicks ordered Plaintiff and Simmons to stop fighting, and took out her oleoresin capsicum ("OC") spray, a chemical agent that irritates the eyes and skin. (Defs.' 56.1 ¶ 9; Pl.'s 56.1 ¶ 13.) Plaintiff and Simmons ceased fighting because C.O. Hicks gave them the impression that she would otherwise spray them with the OC spray. (Defs.' 56.1 ¶ 10; Pl. Dep. at 15:23–16:6.) Plaintiff also speculates that he and Simmons stopped fighting because by that point they were tired. (Pl. Dep. at 16:2–3.)

**\*2** In total, the fight lasted one to three minutes. (*Id.* at 9:22–23.) During his deposition, Plaintiff agreed with a statement by defense counsel that the incident was a "random attack" *id.* at 13:21–22), and stated that he had not approached Simmons in an aggressive manner *id.* at 14:1–3). Although the commencement of punching by Simmons occurred "in a split second" (*id.* at 14:17), Plaintiff disputes that the entire incident unfolded so quickly (*see* Pl.'s 56.1 ¶ 21).

Soon after the fight ended, correction officers with body armor, shields, and helmets arrived and escorted Plaintiff and Simmons out of the dorm room in which the fight occurred. (Defs.' 56.1 ¶ 11; Pl.'s 56.1 ¶ 15.) Plaintiff later underwent a disciplinary hearing as a result of the incident and received twelve days of punitive segregation for refusing a direct order and for fighting. (Defs.' 56.1 ¶ 12; Pl.'s 56.1 ¶ 18.)

As a result of the incident, Plaintiff suffered from a bloody mouth, swollen eyes, and bruised hands. (Pl. Dep. at 28:18–19.) Although Plaintiff claims that Simmons suffered no injuries as a result of the altercation (*see* Pl.'s 56.1 ¶ 17), the hearing report that Plaintiff submitted in support of this contention does not fully support it. (*See* Aug. 22, 2012, Hr'g Rep. & Not. of Disciplinary Disposition for William Simmons (Deck of Alexis Stewart in Opp'n to Defs.' Mot. for Summ. J. ("Pl.Deck") (Dkt.110), Ex. J (Dkt.110–10) (showing that during Simmons's disciplinary hearing, no photographs of injuries were included as documentary evidence, and referencing, but not attaching, a "6500A Injury Report")).) In sum, the record before the court does not indicate whether only Plaintiff sustained injuries as a result of the fight, or whether both Plaintiff and Simmons sustained injuries.

Plaintiff never feared for his safety while incarcerated at OBCC. (Defs.' 56.1 ¶ 13; Pl. Dep. at 18:24–19:4.) Plaintiff had never been involved in a physical altercation while incarcerated at OBCC prior to the incident with Simmons. (Defs.' 56.1 ¶ 14; Pl.'s 56.1 ¶ 19.) Plaintiff had no reason to suspect that Simmons would attack him. (Defs.' 56.1 ¶ 15; Pl.'s 56.1 ¶ 20.) Simmons never threatened to harm Plaintiff in advance of the incident. (Defs.' 56 .1 ¶ 16; Pl. Dep. at 12:17–19.) No other inmate had ever threatened Plaintiff with physical harm while he was incarcerated at OBCC. (Defs.' 56.1 ¶ 17; Pl. Dep. at 12:20–22.)

### 2. *C.Q. Madison's Role*

The role C.O. Madison played in the incident is less than clear. For purposes of this motion, the court takes as true that C.O. Hicks was the only correction officer present during the altercation (*see, e.g.,* Defs.' 56.1 ¶ 3; Pl's 56.1 ¶ 3), and that C.O. Madison was *not* present at the time of the fight (*see* Defs.' 56.1 ¶ 20 ("Plaintiff does not allege that C.O. Madison ... was present at the location where the fight occurred."); Pl's 56.1 ¶ 23 ("Plaintiff does not allege that C.O. Madison was[ ] present at the location where the fight occurred."); *id.* ¶ 29 ("The plaintiff is suing C.O. Madison for

issuing a disciplinary infraction against him and correction cover[ups].")).

**\*3** During his deposition, Plaintiff testified that he only remembers seeing a female correction officer during the incident, C.O. Hicks. (*See* Pl Dep. at 16:10–12.) Plaintiff also confirmed that he does not remember seeing C.O. Madison during the incident. (*Id.*) Plaintiff sued C.O. Madison because, according to Plaintiff, C.O. Madison signed the infraction ticket for the incident. (*Id.* at 16:18–19, 17:5–8.) A report and notice of infraction dated August 16, 2012, describes the incident in question and is signed by C.O. Madison. (*See* Aug. 16, 2012, Rep. & Not. of Infraction for Alexis Stewart ("Rep. & Not. of Infraction") (Pl. Decl., Ex F (Dkt.1106)).) In the Report and Notice of Infraction, C .O. Madison stated the following:

> At approx[imately] 0030 hrs I observed several inmates arguing. I gave several direct orders for the inmates to stop arguing and return to their assigned beds. I then witnessed inmate Simmons ... punch inmate Stewart ... in the face with a closed fist. Inmates Simmons [ ] and Stewart [ ] immediately exchanged closed fist punches to the face of each other. I ordered Simmons [ ] and Stewart [ ] to stop fighting and they did not comply. At this time I activated my PBA[5] [ ] and gave another direct order for Simmons [ ] and Stewart [ ] to stop fighting. Inmates Simmons and Stewart complied. Probe team responded to the area and escorted Simmons and Stewart out without further incident.

[5]  The record does not reflect what "PBA" refers to.

(*Id.*) On either August 16, 2012, or August 18, 2012,[6] Plaintiff certified that he received a copy of the Report and Notice of Infraction. (*Id.*) An investigation report, dated August 18, 2012, recounts a similar description of the incident and reflects that the report is based on "written/verbal statements" from C.O. Madison and medical staff. (Aug. 18,

Case 9:19-cv-00689-AMN-TWD    Document 115    Filed 02/27/23    Page 92 of 173

2012, Investigation Rep. ("Investigation Rep.") (Pl. Decl., Ex. N (Dkt.110–14)).)

6        The date is not fully legible.

The Report and Notice of Infraction reflects that C.O Madison was assigned to "1 Upper B," and that the incident occurred in "1 upper aisle of dorm." (Rep. & Not. of Infraction.) Further complicating whether C.O. Hicks and/or C.O. Madison was present during the incident is a DOC logsheet for the week of August 12, 2012, showing the assignment of shifts to various C.O.s and the locations of those shifts within the OBCC. (DOC Logsheet (Pl. Decl., Ex. I (Dkt.110–9)).) Although heavily redacted, the logsheet reflects that C.O. Hicks was assigned to "1 & 2 UPPER A" on August 15, 2012, and August 16, 2012. (*Id.*) It appears that a C.O. Evans was assigned to "1 UPPER B" on August 15, 2012, and August 16, 2012. (*Id.*) The logsheet and the record before the court for purposes of this motion do not reflect C.O. Madison's assignment on August 15, 2012, or August 16, 2012. [7] C.O. Madison's role is discussed in more detail in Part III.B.3.b *infra.*

7        The court notes that both C.O. Hicks and C.O. Madison have been served with copies of the Complaint and are represented by counsel. (*See* Summons (Dkt.19) (C.O.Madison); Am. Summons (Dkt.71) (C.O.Hicks).) Although Defendants are under no affirmative obligation to submit evidence in support of their motion for summary judgment, the court also notes that neither C.O. Hicks nor C.O. Madison submitted a declaration in support of the motion for summary judgment, nor has either been deposed. Indeed, the only materials submitted by Defendants in support of the motion are the Complaint and the transcript of Plaintiff's February 20, 2014, deposition. Although proceeding pro se, Plaintiff submitted several exhibits in support of his opposition, including documents reflecting the discipline that he received as a result of the fight with Simmons.

### 3. The City's Policies

In opposition to the motion for summary judgment, Plaintiff also submitted the following policy documents: (1) a DOC Directive, effective March 29, 2006, with the subject "Inmate Disciplinary Due Process," establishing a procedure for processing pre-hearing detention and inmate disciplinary infractions ("Inmate Disciplinary Due Process Directive")

(Pl. Decl., Ex. D (Dkt.122)); and (2) a DOC Directive, effective January 31, 2008, with the subject "Use of Force," establishing a policy concerning the use of force by prison staff ("Use of Force Directive") (Pl. Decl., Ex. E (Dkt.122–1)). These policies are discussed in more detail in Part III.C *infra.*

### 4. Plaintiff's Status at the Time of August 16, 2012, Incident

**\*4** As discussed in the court's discussion below, an inmate's particular status-e.g., a pretrial detainee, versus a sentenced criminal-at the time of an alleged constitutional deprivation is relevant for certain of the constitutional claims raised by Plaintiff.

The parties, however, did not demonstrate to the court Plaintiff's status at the time of the August 16, 2012, incident. Indeed, Defendants appear simultaneously to argue that Plaintiff was both a pretrial detainee and a sentenced criminal. In their analysis of Plaintiff's failure-to-protect claim, Defendants state that "[P]laintiff was incarcerated as a pretrial detainee at the time of the incident" (Defs.' Mem. in Supp. of Mot. for Summ. J. ("Defs.' Mem.") (Dkt.107) at 4), but further explain that the legal framework governing the failure-to-protect analysis is the same for pretrial detainees (under the Fifth and Fourteenth Amendments) as it is for sentenced criminals (under the Eighth Amendment) (*Id.* at 4–5). *See also infra* Part III. A. Later, however, in connection with their analysis of Plaintiff's procedural due process claim, Defendants analyze the "atypical and significant hardship" legal framework (*see* Defs.' Mem. at 9–11), which applies to sentenced criminals, but which does not apply to pretrial detainees. *See infra* Parts III.B.2 and III.B.3.

For purposes of this motion, the court therefore takes judicial notice of the following facts. *See* Fed.R.Evid. 201. On May 31, 2012, Plaintiff pleaded guilty in New York Supreme Court, Kings County, to charges of Assault in the Second Degree, N.Y. Penal L. § 120.05(12), and Assault in the Third Degree, N.Y. Penal L. § 120.00(1). (*See* Guilty Plea, *People v. Stewart,* No. 1750–12 (N.Y. Sup.Ct., Kings Cnty. May 31, 2012) (attached as Exhibit A to this Memorandum and Order).) On September 12, 2012, Plaintiff was sentenced to a five-year term of imprisonment and three years of post-release supervision. (*See* Original Sentence, *People v. Stewart,* No. 1750–12 (N.Y. Sup.Ct., Kings Cnty. Sept. 12, 2012) (attached as Exhibit B to this Memorandum and Order).) *See also People v. Stewart,* 123 A.D.3d 1064, 997 N.Y.S.2d 332, 332 (N.Y.App.Div.2014) (referencing

September 12, 2012, sentencing date). On December 24, 2012, the New York Supreme Court, Appellate Division, modified the sentence to a term of imprisonment of three years and two years of post-release supervision. *Stewart,* 997 N.Y.S.2d at 332. The court discusses the relevance of these judicially noticed facts in Parts III. A and III.B.2 *infra.* At this stage, suffice it to say that the August 16, 2012, fight and resulting discipline occurred during the few months between Plaintiff's guilty plea and conviction in May 2012, and his sentencing in September 2012.

**B. Procedural History**

Plaintiff filed his Complaint against Defendants on June 17, 2013. (Compl.) As discussed above, the court sua sponte dismissed all claims against former DOC Commissioner Dora Schiro (s/h/a/ Dora Schiro). (*See* July 29, 2013, Mem. & Order at 4.) No motion to dismiss was filed. C.O. Madison and the City filed an Answer to the Complaint on September 25, 2013 (Answer (Dkt.23)), and C.O. Hicks (originally sued as a Jane Doe) filed an Answer to the Complaint on March 11, 2014 (Answer (Dkt.75)). Discovery proceeded before Magistrate Judge Vera M. Scanlon. Upon the close of discovery, Judge Scanlon granted Defendants' request to file a motion for summary judgment and set a briefing schedule. (*See* Mar. 11, 2014, Order.) Defendants filed their fully briefed motion on July 29, 2014. (*See* Not. of Mot. for Summ. J.) Plaintiff opposes the motion.

**II. LEGAL STANDARD**

 **\*5** Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). No genuine dispute of material fact exists if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In evaluating a motion for summary judgment, the court "is required to construe the evidence in the light most favorable to the non-moving party and to draw all reasonable inferences in its favor." *Trammell v. Keane,* 338 F.3d 155, 161 (2d Cir.2003); *see also Anderson,* 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

The moving party bears the initial burden to show an absence of genuine factual dispute. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Summary judgment will be granted if the opposing party then "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To defeat summary judgment, the opposing party must do more than demonstrate "some metaphysical doubt as to the material facts," *Matsushita,* 475 U.S. at 586, and may not rely on "conclusory allegations," *Twin Labs., Inc. v. Weider Health & Fitness,* 900 F.2d 566, 568 (2d Cir.1990). Where the party opposing summary judgment is proceeding pro se, the court must construe his filings liberally. *See Ferran v. Town of Nassau,* 471 F.3d 363, 369 (2d Cir.2006).

**III. DISCUSSION**

Plaintiff brings claims against C.O. Hicks, C.O. Madison, and the City. Specifically, Plaintiff asserts claims against C.O. Hicks and C.O. Madison for "letting another inmate attack [him] and not doing anything about it" (Pl. Dep. at 17:6–8), and against Defendants for imposing 12 days of segregated confinement on Plaintiff for his role in the fight. In addition, Plaintiff asserts that C.O. Madison violated his due process rights by falsely charging him with a disciplinary violation. (*See id.* at 34:19–35:12.) Finally, Plaintiff asserts that the City is liable "for letting another inmate assault [him], for negligence, [and] for deliberate indifference." (*Id.* at 33:13–14.)

**A. Failure–to–Protect Claim**

It is well established that "[a] prison official's 'deliberate indifference' to a substantial risk of serious harm to [a convicted] inmate violates the Eighth Amendment." *Farmer v. Brennan,* 511 U.S. 825, 828, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Where an individual is incarcerated as a pretrial detainee, protection from mistreatment arises from the Due Process Clause of the Fifth Amendment (if in federal custody) or the Due Process Clause of the Fourteenth Amendment (if in state custody). Courts, however, apply the same "deliberate indifference" standard from the Eighth Amendment context to such claims. *See Caiozzo v. Koreman,* 581 F.3d 63, 69–72 (2d Cir.2009) ("Claims for deliberate indifference to a serious medical condition or other serious threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment."). Thus, for Plaintiff's

2015 WL 1854198

failure-toprotect claim, it makes no difference whether he was a pretrial detainee or a sentenced criminal.

**\*6** For purposes of the Eighth Amendment analysis, there is "no significant distinction between claims alleging inadequate medical care and those alleging inadequate conditions of confinement," such as the failure to protect inmates. *Wilson v. Seiter,* 501 U.S. 294, 303, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (internal quotation marks omitted); *see also Mena v. City of New York,* No. 13–CV–2430 (RJS), 2014 WL 4652570, at \*3 (S.D.N.Y. Sept. 18.2014) (explaining that the three basic theories of liability under the Eighth Amendment-denial of medical care, unconstitutional conditions of confinement unrelated to medical care, and failure to protect-are all analyzed under the same framework). Here, Plaintiff's claim is based on Defendants' failure to protect him from another inmate.

"It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer,* 511 U.S. at 834. To state a claim, "an inmate must allege that: (1) objectively, the deprivation the inmate suffered was sufficiently serious that he was denied the minimal civilized measure of life's necessities, and (2) subjectively, the defendant official acted with a sufficiently culpable state of mind ..., such as deliberate indifference to inmate health or safety." *Walker v. Schult,* 717 F.3d 119, 225 (2d Cir.2013) (internal quotation marks and citation omitted).

Under the objective prong, "an inmate must show 'actual or imminent harm.' " *Beniamin v. Fraser,* 343 F.3d 35, 51 n. 17 (2d Cir.2003) (quoting *Lewis v. Casey,* 518 U.S. 343, 350, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996)), *overruled on other grounds, Caiozzo,* 343 F.3d at 70. In other words, under the objective prong, "[f]or a claim ... based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a *substantial risk of serious harm." Farmer,* 511 U.S. at 834 (emphasis added). Under the objective prong, a plaintiff must also show that the alleged deprivation was, "in objective terms, 'sufficiently serious'." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) ("*Hathaway I*") (quoting *Wilson,* 501 U.S. at 298) ..

"[T]he subjective element of deliberate indifference 'entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.' " *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) ("*Hathaway*

*II"* ) (quoting *Farmer,* 511 U.S. at 835). This state of mind "is the equivalent of criminal recklessness." *Id.* To be "sufficiently culpable," the prison official must " 'know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Id.* (quoting *Farmer,* 511 U.S. at 837).

**\*7** Plaintiff claims that C.O. Hicks violated his constitutional rights by failing to protect him from the assault by Simmons. Based on the evidence before the court, however, a reasonable jury could not find that there was an objective, substantial risk of sufficiently serious harm to Plaintiff, or that C.O. Hicks knew of such a risk and disregarded it with the requisite level of culpability.

With respect to the objective prong, it is undisputed that Plaintiff had never been involved in an attack before the incident in question, and certainly had never been attacked by Simmons. (Defs.' 56.1 ¶ 14; Pl.'s 56.1 ¶ 19.) Indeed, Plaintiff himself had no reason to suspect that Simmons would attack him on the night in question. (Defs.' 56.1 ¶ 15; Pl.'s 56.1 ¶ 20.) Thus, Plaintiff has failed to put forward any evidence tending to show that on the night in question, there was a substantial risk of harm to himself or other inmates. *See, e.g., Gilmore v. Rivera,* No. 13–CV–6955 (RWS), 2014 WL 1998227, at \*3 (S.D.N.Y. May 14, 2014) (dismissing claim as a matter of law where "nothing suggests that DOC or the other Defendants would have known [prior to the incident] that Plaintiff himself was at risk"); *Desulma v. City of New York,* No. 98–CV–2078 (RMB)(RLE), 2001 WL 798002, at \*6–7 (S.D.N.Y. July 6, 2001) (report and recommendation) (recommending summary judgment where "[n]othing in the record ... shows that the inmates [who attacked plaintiff] posed a substantial threat"), *adopted,* No. 98–CV–2078 (RMB)(RLE) (S.D.N.Y. Dec. 11, 2011) (Dkt.59).

Plaintiff argues that this case is like *Knowles v. N.Y.C. Dep't of Corr.,* 904 F.Supp. 217 (S.D.N.Y.1995), where the district court denied a motion for summary judgment, finding, in light of evidence submitted by plaintiff of an ongoing "prison war" between Jamaican and Spanish inmates, that there was an objective risk of substantial harm to plaintiff. In *Knowles,* however, plaintiff put forward evidence that prison officials were aware of the "prison war," and that in light of plaintiff's particular physical appearance, " 'risk of assault [was] a serious problem of substantial dimensions.' " *Id.* at 222 (quoting *Walsh v. Mellas,* 837 F.2d 789, 793 (7th Cir.1988)).

2015 WL 1854198

Here, it is undisputed that Plaintiff himself had no reason to believe he was at risk of harm (from any other inmate, including Simmons), and Plaintiff has not put forward any evidence indicating that Simmons was known by prison officials to be a dangerous or unpredictable inmate. [8]

[8]    Plaintiff also points to *Sanchez v. State,* 99 N.Y.2d 247, 754 N.Y.S.2d 621, 784 N.E.2d 675 (2002), arguing that in a case involving an inmate-to-inmate altercation, a plaintiff need only prove that there was a foreseeable risk of harm. *Sanchez,* however, analyzes an inmate's negligent supervision claim against the State of New York, and does not analyze a constitutional claim under the Eighth Amendment standard. *See id.*

With respect to the subjective prong, Plaintiff has offered no evidence showing that C.O. Hicks acted with deliberate indifference or criminal recklessness, or that she knew of and disregarded a substantial risk to Plaintiff's safety. As discussed above, Plaintiff admits that he had not been involved in any incidents with other inmates prior to the August 16, 2012, fight, and that he did not have any expectation that Simmons would attack him. In addition, it is undisputed that C.O. Hicks reacted reasonably to the fight-she approached attentively upon the verbal escalation of the dispute, and upon being pushed out of the way by Simmons, ordered the inmates to cease fighting, and displayed her OC spray to achieve this result.

**\*8** Plaintiff argues that C.O. Hicks's intervention was delayed, and that she should have intervened before Simmons had the opportunity to punch Plaintiff three times and before Plaintiff was required to fight back in self-defense. (*See* Pl.'s Mem. in Opp'n ("Pl.'s Opp'n") (Dkt.119–1) at 7–8 ("C.O. Hicks in this case, knew of a potential harm between plaintiff and the aggressor Mr. Simmons and [had] more than enough time to recognize Mr. Simmons ['s] aggressive behavior [and] notice that an attack to the plaintiff was happening. C.O. Hicks was physically violated as a correction officer by inmate Simmons when he physically pushed her out [of] the way of his path to assault the plaintiff, and this is a fact that C.O. Hicks knew of and disregarded....").) But in the context of a "random" attack, such as the one here, this allegation does not tend to demonstrate that C.O. Hicks knew of and disregarded a substantial risk of harm to Plaintiff *before* the altercation at issue occurred. The court agrees with Plaintiff that under certain circumstances, the commencement of an inmate-to-inmate altercation could put a prison official on

sufficient notice to render the prison official deliberately indifferent if he or she then fails to intervene in an appropriate manner. *Cf. George v. Burton,* No. 00–CV–143 (NRB), 2001 WL 12010, at \*3 (S.D.N.Y. Jan.4, 2001) ("Certainly, the 'pervasive risk of harm' requirement is met when prison guards simply stand by and permit an attack on an inmate by another inmate to proceed." (citing *Davidson v. Cannon,* 474 U.S. 344, 348, 106 S.Ct. 668, 88 L.Ed.2d 677 (1996)). Here, however, Plaintiff's own recounting of the altercation and the undisputed facts submitted by the parties preclude such a conclusion.

Plaintiff argues that C.O. Hicks should have used force in order to break up the fight. (*See* Pl.'s Opp'n at 8.) However, as Defendants explain, "the subjective prong of a deliberate indifference claim demands that correction officers not disregard a substantial risk of harm to a prisoner, not subject themselves [to] danger by directly intervening between two inmates' fighting." (Defs.' Mem. at 5.) The court is sensitive to the fact that Plaintiff received at least three punches before C.O. Hicks was able to intervene, but her undisputed actions do not show, as Plaintiff claims, that she acted with the culpability required by the deliberate indifference standard. *See Desulma,* 2001 WL 798002, at \*7 ("[A]n isolated omission to act by a state prison guard must be accompanied by evil intent, recklessness, or at least deliberate indifference to the consequences of the conduct. The defendant must also be shown to have had an extended opportunity to stop the attack but failed to take any action to do so." (internal quotations marks and citation omitted)); *cf. Williams v. Vincent,* 508 F.2d 541, 546 (2d Cir.1974) (holding that plaintiff failed to state a claim where it was doubtful that defendant's conduct "amounted to more than a split[ ]second decision to jump back when he suddenly perceived danger to both [plaintiff] and himself and where there was no allegation "that [defendant], having jumped back initially, stood by and let the attacker further injure [plaintiff]"). [9] Here, based on Plaintiff's own testimony, a reasonable jury could not find that C.O. Hicks's actions rise to the level of deliberate indifference and therefore constitute a constitutional violation. [10]

[9]    In addition, it is undisputed that the attack here occurred quite suddenly. Courts have rejected constitutional claims based on such a circumstance. *See, e.g., Rivera,* 2014 WL 1998227, at \*4 ("At best, Plaintiff has alleged an unexpected incident, but unexpected incidents are insufficient to propagate a deliberate indifference claim.");

*Fernandez v. N.Y.C. Dep't of Corr.,* No. 08–CV–4294 (KMW), 2010 WL 1222017, at \*4 (S.D.N.Y. Mar.29, 2010) ("Absent clear notice of a risk of harm to the prisoner, '[c]ourts routinely deny deliberate indifference claims based upon surprise attacks.' " (quoting *Zimmerman v. Macomber,* No. 95–CV–882 (DAB), 2001 WL 946383, at \*5 (S.D.N.Y. Aug.21, 2001)). Plaintiff is correct, however, that the suddenness of an attack does not necessarily preclude a finding of deliberate indifference where there was an objective risk of substantial harm and where prison officials knew of but disregarded such a risk. *See, e.g., Knowles,* 904 F.Supp. at 219 (denying motion for summary judgment in spite of "sudden" and "unexpected" stabbing of plaintiff by other inmates).

10    Because Plaintiff must put forward evidence demonstrating deliberate indifference "for each defendant," *Brock v. Wright,* 315 F.3d 158, 162 (2d Cir.2003), his deliberate indifference claim against C.O. Madison also fails, since Plaintiff has offered no evidence tending to show that C.O. Madison (who Plaintiff claims was not present during the fight) knew of and disregarded a substantial risk of harm.

**\*9** Finally, qualified immunity protects government officials from civil damages liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). As discussed above, based on Plaintiff's own testimony, C.O. Hicks's reaction to the unexpected fight was reasonable, and indeed effective at ending the fight without serious injury to Plaintiff. Thus, C.O. Hicks is entitled to qualified immunity with respect to Plaintiff's failure-to-protect claim. *See, e.g., Rivera,* 2014 WL 1998227, at \*6 (dismissing failure-to-protect claim on qualified immunity grounds where plaintiff failed to allege that he was afraid of inmate who attacked him or that defendant knew of any such fear); *Desulma,* 2001 WL 798002, at \*8 (recommending summary judgment against plaintiff's claim on qualified immunity grounds). Plaintiff disputes whether, in light of the way the fight unfolded, C.O. Hicks's actions were reasonable (*see* Pl.'s Opp'n at 25–26), but based on the evidentiary record before the court, no reasonable jury could find that it was not objectively reasonable for C.O. Hicks to believe her actions did not violate a clearly established federally protected right.

For these reasons, Plaintiff's failure-to-protect claim is dismissed.

**B. Procedural Due Process Claim**

As a result of the fight, Plaintiff was disciplined by prison officials, receiving 12 days of segregated confinement, and a $25 fine. (*See* Aug. 22, 2012, Hr'g Rep. & Not. of Disciplinary Disposition for Alexis Stewart ("Stewart Hr'g Rep.") (Pl. Decl., Exs. G, H (Dkts.110–7,–8)).) [11] Plaintiff also testified that as a result of receiving discipline, he lost certain "good-time" credit, lost access to the commissary, was denied medical treatment, and was strip-searched three times per day. (*See* Pl.'s Opp'n at 18.)

11    Plaintiff submitted each page of the Stewart Hearing Report as separate, one-page exhibits.

Throughout this litigation, and including during his deposition, Plaintiff has questioned why C.O. Madison signed the Report and Notice of Infraction, as Plaintiff does not recall C.O. Madison's presence during the fight, and C.O. Madison's name does not appear on the redacted DOC logsheet. In his opposition brief, Plaintiff characterizes Defendants' conduct as a "correctional cover-up," arguing that "if [C.O. Madison] [was] not assigned anywhere in OBCC [on the night in question], how could he have seen this incident let alone have the right to write an Infraction Report AND make mistakes on [the substantive] CHARGES." (Pl.'s Opp'n at 34 (emphases in original).) In other words, as stated during his deposition, Plaintiff has brought suit against C.O. Madison for filing a "false charge" against him, in "violation of [the] due process clause." (Pl. Dep. at 34:16–19.) The court construes Plaintiff's papers to challenge two aspects of his disciplinary hearing: (1) the fact that C.O. Madison filed a charge against him, rather than C.O. Hicks; and (2) the sufficiency of the evidence.

**\*10** The court addresses the merits of Plaintiff's claim below, but first addresses two threshold issues: (1) the significance, under § 1983, of Plaintiff's alleged loss of good-time credit, and (2) Plaintiff's status at the time of the August 16, 2012, incident.

1. *Section 1983 Claims and Good–Time Credit*

Plaintiff asserted during his deposition that as a result of the discipline, he lost good-time credit, although he was unable to calculate a specific amount of good time lost. (*See* Pl. Dep. at 37:2–39:8 ("Q: As it pertains to you, how long were you incarcerated at OBCC and what would two-thirds translate to

you? A: You can't really say that because I was still in court.");
*see also* Inmate Disciplinary Due Process Directive, Attach. I
(indicating that for Grade II penalty, a "sentence inmate" loses
a maximum of two-thirds good time, but not listing any loss
of good-time credit for a "detention inmate").)

Defendants argue in a single sentence of their reply brief that
the loss of "two-thirds of conditional release time is not a basis
for a § 1983 claim." (Defs.' Reply Mem. of Law in Further
Supp. of Mot. for Summ. J. ("Defs.' Reply") (Dkt.112) at 6
(citing *Douglas v. Yarbrough,* 24 F. App'x 61 (2d Cir.2001)
(summary order)).) The reality, however, is not so simple.

In *Edwards v. Balisok,* 520 U.S. 641, 117 S.Ct. 1584, 137
L.Ed.2d 906 (1997), the Supreme Court held that a § 1983
action is not cognizable where an inmate challenges the
procedures used in disciplinary proceedings that resulted
in the deprivation of the inmate's good-time credit. Rather,
where an alleged procedural defect would "necessarily imply
the invalidity of the deprivation of his good-time credits,"
a plaintiff must show that the discipline he received has
previously been invalidated. *Id. See also Heck v. Humphrey,*
512 U.S. 477, 487, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994)
(holding that § 1983 action is not cognizable if a decision in
favor of the plaintiff would necessarily invalidate a criminal
conviction, unless that "conviction or sentence has been
reversed on direct appeal, expunged by executive order,
declared invalid by a state tribunal ... or called into question
by a federal court's issuance of a writ of habeas corpus").
In *Peralta v. Vasquez,* 467 F.3d 98, 104 (2d Cir.2006), the
Second Circuit clarified that the "favorable termination" rule
of *Balisok* and *Heck* is not an absolute bar to suit for an inmate
subject to "mixed" disciplinary sanctions, i.e., "sanctions that
affect both (a) the duration of his imprisonment and (b) the
conditions of his confinement." Thus, the Second Circuit
explained, "a prisoner subject to such mixed sanctions can
proceed separately, under § 1983, with a challenge to the
sanctions affecting his conditions of confinement without
satisfying the favorable termination rule, *but [ ] he can only
do so if he is willing to forgo once and for all any challenge
to any sanctions that affect the duration of his confinement."*
*Id.* (emphasis in original). *See also, e.g., Richardson v. Dep't
of Corr.,* No. 10–CV–6137 (SAS), 2011 WL 4091491, at *4,
*6 (S.D.N.Y.Sept.20, 2011) (dismissing claim when; plaintiff
failed to forgo any challenge to the alleged six-month loss of
good-time credit); *Phelan v. Hersh,* No. 10–CV–011 (GLS)
(RFT), 2010 WL 277064, at *3–4 (N.D.N.Y. Jan. 20, 2010)
(ordering plaintiff who alleged mixed sanction to inform

the court whether he waived any future due process claim
challenging the alleged loss of good-time credit).

*11 Here, the record before the court does not make clear
whether Plaintiff actually lost any good-time credit as a result
of the discipline, or whether it was even possible to lose good-
time credit when Plaintiff had been convicted but not yet
sentenced. Under such circumstances, it is improper for the
court to bar the entirety of his procedural due process claim.
*See, e.g., Johnson v. McClure,* No. 06–CV–0431 (GTS),
2009 WL 2356147, at *15–16 (N.D.N.Y. July 28, 2009) (at
summary judgment, reaching merits of plaintiff's procedural
due process claim related to mixed sanction because "[t]he
applicability of *Balisok* and *Peralta* to the facts of this case
is unclear from the record now before the court"); *Britt v.
Fawcett,* No. 06–CV–633 (LES), 2009 WL 890631, at *4–
5 (N.D.N.Y. Mar.31, 2009) (at summary judgment, reaching
merits of plaintiff's procedural due process claim related to
mixed sanction because "[b]ased on the record before the
Court, it is not clear that [plaintiff's] disciplinary hearing
actually resulted in the loss of good-time credits").

What *Peralta* makes clear, however, is that the loss of good-
time credit cannot serve as the basis of Plaintiffs alleged
deprivation of due process rights. Below, the court considers
the other alleged deprivations raised by Plaintiff; because
the court concludes that Plaintiff failed to offer sufficient
evidence for his procedural due process claim to survive
summary judgment, it need riot decide whether Plaintiff's
claim is, in fact, related to a mixed sanction and barred by
*Balisok* or requiring a waiver of future claims related to
good-time credit under *Peralta. See, e.g., Johnson,* 2009 WL
2356147, at *16–18 (declining to make ruling concerning
mixed sanction because plaintiff's procedural due process
claim related to the discipline in question failed on the merits).

2. *Plaintiff's Status as of August 12, 2012*
Plaintiff's status as a pretrial detainee or convicted criminal
is relevant for his procedural due process claim, as
different legal standards apply to each status. *See generally
Beniamin v. Fraser,* 264 F.3d 175, 188–191 (*"Beniamin I"*
) (2d Cir.2001) (holding that more stringent "atypical and
significant hardship" standard described by the Supreme
Court in *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293,
132 L.Ed.2d 418 (1995), does not apply to pretrial detainees).
Neither the Supreme Court nor the Second Circuit has
addressed which standard applies to an inmate who has been
convicted but not yet sentenced. *See Iqbal v. Hasty,* 490
F.3d 143, 162 n. 8 (2d Cir.2007) ("We do not consider the

question of whether convicted, but unsentenced, inmates are pretrial detainees under the Supreme Court's jurisprudence establishing criteria for evaluating constitutional limits on conditions of confinement."), *overruled on other grounds.* *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

This court agrees with the weight of the authority that an individual such as Plaintiff—who at the time of the alleged constitutional deprivation was awaiting sentencing after pleading guilty to a crime and after being convicted upon such a plea-is no longer a "pretrial detainee" and must meet *Sandin'* s "atypical and significant hardship" standard for his procedural due process claim. *See, e.g., Tilmon v. Prator,* 368 F.3d 521, 524 (5th Cir.2004) ("We hold that a prisoner who has been convicted but has not yet been sentenced has the same status as a sentenced prisoner for purposes of analyzing whether the prisoner has a liberty interest in having certain procedural protections apply before being punished in connection with prison disciplinary proceedings."); *Resnick v. Hayes,* 213 F.3d 443, 448 (9th Cir.2000) (applying *Sandin* framework to procedural due process claim of plaintiff who had been convicted but not yet sentenced); *Maldanado v. Kinlock,* No. 09–CV–8435 (LAP), 2012 WL 3597049, at *4– 5 (S.D.N.Y. Aug.21, 2012) (declining to define inmate as "pretrial detainee" where "at all times during the relevant period" he was a "convicted inmate," even if during a portion of the period he had yet to be sentenced); *Mobaved v. Pastina,* No. 94–CV–6386 (BSJ), 1996 WL 751744, at *4 n. 6 (S.D.N.Y. Dec. 27, 1996) ("Here, plaintiff is a post-trial detainee-he was on Rikers Island awaiting sentencing, not trial...."). This conclusion comports with the parallel determination by other courts that in the Eighth Amendment context, the protections of the Eighth Amendment begin upon conviction, whether or not the inmate has been sentenced. *See, e.g. Berry v. City of Muskogee,* 900 F.2d 1489, 1493 (10th Cir.1990) ("We see no reason to treat incarcerated persons whose guilt has been adjudicated formally but who await sentencing like pretrial detainees, who are detained primarily to ensure their presence at trial and who cannot be punished; and we perceive every reason to treat those awaiting sentencing the same as inmates already sentenced. The critical juncture is conviction, either after trial or, as here, by plea, at which point the state acquires the power to punish and the Eighth Amendment is implicated." (citing *Bell v. Wolfish,* 441 U.S. at 534–44 (1979); *Ingraham v. Wright,* 430 U.S. 651, 664, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977)); *Jeanty v. Cnty. of Orange,* 379 F.Supp.2d 533, 539 (S.D.N.Y.2005) ("Consequently, plaintiff's excessive force claim, which arose after he was convicted but before he was sentenced, is to be analyzed under the Eighth Amendment.").

**\*12** Thus, the court concludes that Plaintiff was not a pretrial detainee, and now applies the *Sandi* n framework to Plaintiff's procedural due process claim. [12]

[12]    If Plaintiff were classified as a pretrial detainee, the *Sandin* framework would not apply. *See Iqbal,* 490 F.3d at 163 ("This Court has said that *Sandin* does not apply to pretrial detainees and that, accordingly, pretrial detainees need not show that an imposed restraint imposes atypical and significant hardships to state deprivation of a liberty interest protected by procedural due process." (citing *Beniamin I,* 264 F.3d at 188– 89)). Rather, for a pretrial detainee, the process due depends on whether a particular restraint is "punitive" or "administrative." *See generally Best v. N.Y.C. Dep't of Corr.,* 14 F.Supp.3d 341, 347–48 (S.D.N.Y.2014) (describing the framework and the due process requirements for punitive restraints under *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), and for administrative restraints under *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983)). The court need not reach whether the Defendants' discipline of Plaintiff was punitive or administrative. However, the court notes that even if the process required by *Wolff* for punitive restraints of a pretrial detainee governed, it appears that Defendants met such requirements. *See Beniamin I,* 264 F.3d at 190 (explaining that *Wolff* requires "written notice, adequate time to prepare a defense, a written statement of the reasons for action taken, and a limited ability to present witnesses and evidence" (citing *Wolff,* 418 U.S. at 561–70)).

3. *Merits of Due Process Claim*

Generally, "to present a due process claim, a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001) (internal quotation marks and citation omitted). Plaintiff's due process claim fails because he cannot establish that a protected liberty interest was implicated by the discipline he received. Second, even if Plaintiff could establish that a protected liberty interest was implicated, he

2015 WL 1854198

has failed to show that he was deprived of the interest as a result of insufficient process.

a. Liberty Interest

"Discipline by prison officials in response to a wide range of misconduct falls within the expected perimeters of the sentence imposed by a court of law." *Sandin v. Connor,* 515 U.S. 472, 485, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). However, "[p]rison discipline implicates a liberty interest when it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Ortiz v. McBride,* 380 F.3d 649, 654 (2d Cir.2004) (quoting *Sandin,* 515 U.S. at 484). Both the duration and the conditions of the confinement are relevant factors. *See Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004).

There is no specific duration of segregated confinement that automatically qualifies as an atypical and significant hardship, nor is there a specific duration that is per se not an atypical and significant hardship. The Second Circuit has made clear that segregated confinement of under 101 days can, depending on the circumstances, constitute an atypical and significant hardship, particularly where "a more fully developed record showed that even relatively brief confinements under normal [segregated] conditions were, in fact, atypical." *Id.* at 65; *see also Welch v. Bartlett,* 196 F.3d 389 (2d Cir.1999) (reversing summary judgment where plaintiff put forward evidence that conditions in segregated confinement were "far inferior" to those for the general prison population). Even so, the Second Circuit has "affirmed dismissal of due process claims ... where the period of time spent in [segregated confinement] was exceedingly short—less than the 30 days that the *Sandin* plaintiff spent in [segregated confinement]—and there was no indication that the plaintiff endured unusual [segregated] conditions." *Palmer.* 364 F.3d at 65–66 (citing cases). [13]

[13]  Defendants argue that for confinements under 30 days in length, "where a plaintiff has not alleged any unusual conditions, district courts are not required to provide a detailed explanation of [their] liberty interest analysis. (Defs.' Mem. at 10 (citing *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998); *Arce v. Walker,* 139 F.3d 329, 336 (2d Cir.1998)), *See also Hynes,* 143 F.3d at 658 ("However, in cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, the district court

need not provide such detailed explanation of its reasoning."). The court does not read *Hynes* to dispose of its obligation to review and adequately analyze the factual record; indeed, as Defendants admit, "the Second Circuit has not adopted a brightline test to determine what specific length of segregated confinement constitutes atypical and significant hardship." (Defs.' Mem. at 10.) While several district courts have dismissed claims based on less than 30 days of segregated confinement, *see Williams v. Keane,* No. 95–CV–0379 (AJP) (JGK), 1997 WL 527677, at *6–8 (S.D.N.Y. Aug. 25, 1997) (citing dozens of cases dismissed where plaintiff alleged less than 30 days of segregated confinement), the Second Circuit has never stated that a confinement under 30 days in length cannot be an atypical and significant hardship.

Where a plaintiff challenges the conditions (as opposed to the duration) of confinement as an atypical and significant hardship, he must show that "the conditions of his confinement result[ed] 'in unquestioned and serious deprivation of basic human needs,' " and "that the defendants imposed those conditions with 'deliberate indifference.' " *Jolly v. Coughlin,* 76 F.3d 468, 480 (2d Cir.1996). In this context, the deliberate indifference standard includes the same objective and subjective prongs discussed above in connection with Plaintiffs failure-to-protect claim. *See id.* at 481.

**\*13** Here, Plaintiff failed to offer any evidence showing that the duration or conditions of his twelve-day segregated confinement were an atypical and significant hardship. The duration of the confinement was quite brief in light of Second Circuit case law holding that lengthier durations of segregated confinement did not implicate a liberty interest. In addition, the conditions to which Plaintiff points did not render the confinement atypical, and thereby implicate a liberty interest. Of most significance, Plaintiff failed to introduce any evidence that the conditions he endured in segregated confinement were any worse than the conditions endured by other inmates under similar confinement, and given the brevity of Plaintiff's stay in segregated confinement, the limited evidence offered by Plaintiff of better treatment of the general prison population is not probative of a constitutional violation in this case. *See Hynes,* 143 F.2d at 658; *Welch,* 196 F.3d at 394 ("Whether the conditions of [an inmate's] confinement constitute an atypical and significant hardship requires that they be considered in comparison to the hardships endured by prisoners in general population, as well

as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration.").

Moreover, the actual conditions to which Plaintiff points are not, in fact, an atypical or significant hardship. First, loss of access to the commissary is the loss of a privilege, not the deprivation of a constitutional liberty interest, and accordingly does not qualify as an atypical and significant hardship. *See, e.g., Borcsok v. Early,* 299 F. App'x 76, 76 (2d Cir.2008) (summary order) (holding that 90–day confinement and "concurrent loss of privileges" did not constitute an atypical and significant hardship); *Torres v. Droun,* No. 01–CV–1844 (DJS)(TPS), 2004 WL 721729, at *7 (D.Conn. Mar. 30, 2014) ("[C]ourts have held that denial of commissary privileges do[ ] not constitute atypical and significant prison conditions." (citing cases)); *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 360, 375–78 (S.D.N.Y.2011) (granting motion for summary judgment where discipline included 21 days of segregated confinement, and loss of visitation, phone, and commissary privileges for ninety days). Second, Plaintiff's allegation that he was denied medical assistance while in segregated confinement fails to rise to the level of an atypical and significant hardship. Plaintiff testified that he sustained a bloody mouth, swollen eye, and bruises to his hands. (Pl. Dep. at 28:11–24.) These injuries do not rise to the level of a serious medical condition that, under the objective prong of the inquiry, would require immediate attention from prison officials; accordingly, the lack of medical assistance during the period of segregated confinement does not constitute an atypical and significant hardship. [14] *See, e.g., Jones v. Vives,* 523 F. App'x 48, 49 (2d Cir.2013) (summary order) (requiring objective showing of "death, degeneration, or extreme pain" (quoting *Hathaway II,* 99 F.3d at 553)); *Benitez v. Straley,* No. 01–CV–l 81(RCC) (RLE), 2006 WL 5400078, at *3, *4, *14–15 (S.D.N.Y. Feb. 16, 2006) (cuts on lips, head, and hands that did not require stiches were not sufficiently serious to require medical attention under Eighth Amendment; *Rodriguez v. Mercado,* No. 00–CV–8588 (JSR)(RFM), 2002 WL 1997885, at *3, *8 (S.D.N.Y. Aug. 28, 2002) (migraine and bruises on head, back, and wrists were not a severe injury protected by the Eighth Amendment). Third, the fact that Plaintiff was subjected to strip searches does not render the confinement an atypical and significant hardship. *See Florence v. Bd. of Chosen Freeholders,* —— U.S. ——, ——, 132 S.Ct. 1510, 1517, 182 L.Ed.2d 566 (2012) ("[C]orrectional officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities.");

*Covino v. Patrissi,* 967 F.2d 73, 75 (2d Cir.1992) (affirming denial of injunction against prison's policy of random visual body-cavity searches). Finally, as discussed above, to the extent Plaintiff alleges a loss of good-time credit, the loss of good-time credit cannot provide the basis for a § 1983 claim. *See supra* Part III.B.l. [15]

[14]  In addition, Plaintiff testified that he in fact received medical treatment for the limited injuries he sustained shortly after the fight. (*See* Pl. Dep. at 29:19–30:12.) Plaintiff failed to introduce any evidence suggesting that the injuries he suffered were urgent or life-threatening, or that they required further care. Indeed, when Plaintiff was transferred to another prison approximately one month after the fight, he had no physical injuries to complain of upon arrival at the new facility. (*Id.* at 31:14–16.) To the extent Plaintiff alleges in passing that his loss of appetite and lack of sleep (due either to the physical injuries or to the fact that he was placed in segregated confinement) constitute a constitutional deprivation, his argument is unavailing.

[15]  The court also notes that Defendants did not move for summary judgment based on their exhaustion of remedies defense. The court therefore expresses no opinion concerning whether that defense may be meritorious, or whether Defendants have waived the defense. *See generally, e.g., Castillo v. Rodas,* No. 09–CV–9919 (AJN), 2014 WL 1257274, at *14–16 (S.D.N.Y., Mar.25, 2014) (surveying case law and analyzing the administrative exhaustion requirement under the Prison Litigation Reform Act of 1996).

b. Adequacy of the Process

**\*14** In its analysis above, the court concluded that Plaintiff failed to show that the duration and conditions of his twelve-day confinement violated a protected liberty interest; absent such a showing, Plaintiff's procedural due process claim necessarily fails. *See, e.g., Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003) ("The corrections officers' failure to properly address [plaintiff's] grievances by conducting a thorough investigation to his satisfaction does not create a cause of action for denial of due process because [plaintiff] was not deprived of a protected liberty interest [as a result of the disciplinary hearing].") But even if Plaintiff could demonstrate that the discipline he received was an atypical

and significant hardship, and therefore implicated a protected liberty interest, he has failed to demonstrate that he was deprived of the liberty interest as a result of insufficient process.

Plaintiff claims that he was falsely accused by C.O. Madison, since C.O. Madison did not witness the fight. "But a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997). "Indeed, '[t]he inmate must show something more, such as that he was deprived of due process during the resulting disciplinary hearing, or that the misbehavior report was filed in retaliation for the inmate's exercise of his constitutional rights." *Mena,* 2014 WL 4652570, at *7 (quoting *Velez v. Burge,* 483 F. App'x 626, 628 (2d Cir.2008) (summary order)). Thus, even if the discipline Plaintiff received implicated his constitutional liberty interest (which, as discussed above, it did not), the mere fact that C.O. Madison signed the infraction report, absent other evidence of procedural irregularities, cannot support Plaintiff's claim.

Plaintiff does not argue that C.O. Madison filed the report in retaliation for Plaintiff's exercise of constitutional rights; nor does he allege that the prison disciplinary process lacked other procedural safeguards, such as an independent decision-maker who did not issue the initial infraction, the right to explain his side of the story, the right to written conclusions, or the right to appeal. Indeed, the materials submitted by Plaintiff indicate that that the Adjudication Captain relied on staff reports, eyewitness reports, the incident report, the Captain's investigation, and an injury report in reaching a disciplinary disposition. (*See* Stewart Hr'g Rep. at 2.) In addition, the materials indicate that Plaintiff was deemed not to be the initial aggressor, but that he did admit to fighting. (*Id.*) Plaintiff was also given several opportunities to defend his actions. (*See* Investigation Rep. ("Statement of Inmate Charged: 'He proceeded to attack me so I had no choice but to defend myself.' "); Stewart Hr'g Rep. at 1 ("Summary of Inmate's Testimony: It was self defense. I didn't start the fight. I asked the inmate be real thats (sic) his bed right. He told me to get the fuck out of my face. He swung on me in front of the officer. I had to defend myself.' ").) And Plaintiff had an opportunity (but declined) to request that witnesses attend his disciplinary hearing. (*See* Stewart Hr'g Rep. at 1.)

**\*15** To the extent Plaintiff challenges the actual decision reached during the prison disciplinary proceeding, "there must be, among other things, 'some evidence' to support the

sanction imposed." *Ortiz,* 380 F.3d at 655 (quoting *Gaston v. Coughlin,* 249 F.3d 156, 163 (2d Cir.2001)). Based on the court's review of the materials, this appears to be the case. *See also Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (noting that the some evidence "standard is extremely tolerant and is satisfied if 'there is *any* evidence in the record that supports' the disciplinary ruling" (quoting *Friedl v. City of New York,* 210 F.3d 79, 85 (2d Cir.2000) (emphasis in original)). The court notes, as well, that it appears that the Adjudication Captain reduced the charges against Plaintiff to account for the fact that was not the instigator and did not cause any bodily injuries. (*See* Stewart Hr'g Rep. at 2 (reducing a charge under rule 101.12 to a charge under rule 101.17; Inmate Disciplinary Due Process Directive, Attach. I (listing rule 101.12 as "assault that results in injury" and listing rule 101.17 as a lesser included offense, "fighting without a weapon that does not result in injury").) [16]

[16]     In light of its determinations that there was no protected liberty interest and no due process violation, the court does not reach whether Defendants are entitled to qualified immunity with respect to the due process claim. The court notes that although Defendants moved for summary judgment on the ground of qualified immunity (among other grounds), Defendants only discussed immunity in connection with Plaintiffs failure-to-protect claim. (*See* Defs.' Mem. at 13–15; Defs.' Reply at 10–11.)

c. Plaintiffs Related Claim of Cruel and Unusual Punishment

Finally, to the extent that Plaintiff challenges the discipline he received as a cruel and unusual punishment in violation of the Eighth Amendment, the claim also fails. "In order to state a valid conditions of confinement claim under the Eighth Amendment, a plaintiff must allege: (1) the conditions were 'sufficiently grave' as to constitute a denial of 'the minimal civilized measure of life's necessities,' and (2) the prison officials acted with 'deliberate indifference.' " *Roseboro,* 791 F.Supp.2d at 381 (quoting *Wilson v. Seiter,* 501 U.S. 294, 29798, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). Here, the court has already determined that the confinement did not constitute an "atypical and significant hardship," and therefore did not implicate a protected liberty interest. Plaintiff has similarly failed to show that the conditions of his confinement were sufficiently grave as to constitute a denial of the minimal civilized measure of life's necessities, or that Defendants were deliberately indifferent to such conditions.

2015 WL 1854198

*See, e.g., Roseboro,* 791 F.Supp.2d at 380–83 (granting summary judgment on Eighth Amendment claim related to short-term placement in segregated confinement and loss of visitation and commissary privileges, and collecting cases); *see also, e.g., Home v. Coughlin,* 155 F.3d 26, 31–32 (2d Cir.1998) ("We do not think [plaintiff's] six-month [segregated] detention for making sexually threatening comments to a civilian volunteer violated [the Eighth Amendment's] standards"). [17]

[17]  The court also notes that with respect to all of Plaintiff's claims related to the discipline he received and procedural safeguards, it is unclear whether the named Defendants were, in fact, personally involved and therefore proper defendants under § 1983. Because Plaintiff's claims fail on the merits, the court need not reach this issue.

**C. Municipal Liability Claims**

A municipality cannot be held liable pursuant to 42 U.S.C. § 1983 under a theory of respondeat superior. *Monell v. Dep't of Social Servs. of N.Y.,* 436 U.S. 658, 692, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). However, under *Monell,* a municipality may be held liable for the constitutional violations of its employees when such violations result from the municipality's official policy. *Id.* at 693. Such a policy may be (1) an express policy, (2) "a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a 'custom or usage' with the force of law,' " *City of St. Louis v. Praprotnik,* 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 168, 90 S.Ct. 1598, 26 L.Ed.2d 142(1970)), or (3) a decision by a person with "final policy making authority," *see City of St. Louis,* 485 U.S. at 112; *Pembaur v. City of Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

*\*16* Among the types of municipal policies and customs that can give rise to *Monell* liability is the failure to monitor, supervise, or discipline employees. In these cases, "[a] Section 1983 plaintiff ... may establish the pertinent custom or policy by showing that the municipality, alerted to the possible [constitutional violation], exhibited deliberate indifference." *Id.* at 1049. "To prove such deliberate indifference, the plaintiff must show that the need for more or better supervision to protect against constitutional violations was obvious." *Id.* "An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Id.* The Supreme Court has cautioned, however, that deliberate indifference in this context "is a stringent standard of fault." *Connick v. Thompson,* ––U.S. ––––, ––––, 131 S.Ct. 1350, 1360, 179 L.Ed.2d 417 (2011) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown,* 520 U.S. 397, 410, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)).

Here, Plaintiff has sued the City, arguing that it is liable for "letting another inmate assault [him], negligence, and deliberate indifference." (Pl.'s 56.1 ¶ 30; *see also* Defs.' 56.122.) The court construes Plaintiff to allege that through its policies, the City exhibited deliberate indifference to his constitutional rights.

First, with respect to Plaintiff's claims based on the City's failure to protect him from Simmons's attack, the court has already determined that Plaintiff failed to demonstrate an underlying constitutional violation. *See supra* Part III.A. Therefore, the *Monell* claim necessarily fails. Moreover, Plaintiff has failed to offer any evidence tending to show that the City is liable for such a constitutional violation. Although the Use of Force Directive is an express City policy, its mere existence-including a provision that a correction officer is authorized to use force to protect one inmate from another inmate-does not tend to demonstrate that the City exhibited deliberate indifference to a risk of constitutional violations. Rather, Plaintiff alleges that he was injured as a result of a single, isolated episode of misconduct by a fellow inmate (and the failure of C.O. Hicks to intervene). If anything, by authorizing the use of force, the policy demonstrates that the City is not deliberately indifferent to a risk to inmates. Plaintiff appears to argue that the City is liable because C.O. Hicks did not use force on this occasion. This, however, is not a proper basis for a *Monell* claim. The claims against the City related to its alleged failure to protect Plaintiff must therefore be dismissed. *See also, e.g. Berry v. N.Y. Dep't of Corr.,* No. 12–CV–7819 (RWS), 2014 WL 2158518, at \*8 (S.D.N.Y. May 22, 2014) (dismissing *Monell* claim predicated on failure-to-protect theory); *Fernandez,* 2010 WL 1222017, at \*6 ("Plaintiff appears to allege a single, isolated episode of misconduct by correction officers ... in failing to adequately provide for his safety and medical needs. Thus, Plaintiff's claim for municipal liability must be dismissed.").

*\*17* Second, the court has already determined that Plaintiff failed to demonstrate an underlying constitutional violation

with respect to his due process claim. *See supra* Part III.B. Therefore, that *Monell* claim also necessarily fails. Moreover, Plaintiff has again failed to offer any evidence tending to show that a City policy, as opposed to an isolated incident, caused the alleged constitutional violation. While Plaintiff did submit the DOC Inmate Disciplinary Process Directive, the existence of the policy does not prove that the City exhibited deliberate indifference. On its face, the policy does not indicate that the City exhibits deliberate indifference towards the procedural due process rights of inmates. Rather, it again appears that Plaintiff alleges an isolated incident (receiving twelve days of segregated confinement upon the false claim of C.O. Madison); accordingly, Plaintiff's *Monell* claim related to the City's disciplinary policy must also be dismissed. *See, e.g., Mena,* 2014 WL 4652570, at *3 (dismissing *Monell* claim based on correction officer's alleged false accusations against inmate); *Jeffers v. City of New York,* No. 13–CV–3305 (JG), 2013 WL 5437337, at *4 (E.D.N.Y. Sept.27, 2013) (dismissing *Monell* claim based on disciplinary placement of inmate into segregated confinement); *Johnson v. Cnty. of Nassau,* No. 01–CV–5996 (DLI)(LB), 2005 WL 991700, at *6–7 (E.D.N.Y. Mar. 31, 2005) (report and recommendation) (dismissing Monell claim based on underlying claim of deliberate indifference to inmate's medical needs), *adopted,* 2005 WL 991703 (E.D.N.Y. Apr.19, 2005).

**D. State Law Negligence Claim**

Finally, Plaintiff has failed to plead or to show that he complied with New York General Municipal Law § 50–i, which provides that "[n]o action or special proceeding shall be prosecuted or maintained against a city ... or employee thereof ... unless a notice of claim shall have been made and served upon the city...." N.Y. Gen. Mun. L. § 50–i(l). Such a notice must be served within ninety days after a claim arises, *id.* § 50–e(l) (a), and a plaintiff must allege in his complaint that at least thirty days has elapsed since the service of such notice, that the defendant refused to pay the claim, and the action commenced within one year and ninety days after the claim arose, *id.* § 50–i(l). A plaintiff pleading state law negligence in federal court must comply with these requirements. *See, e.g., Forney v. Forney,* No. 13–CV–7193 (WFK)(LB), 2015 WL 1470451, at *6 (E.D.N.Y. Mar. 30, 2015) (dismissing state law claims where notice of claim was untimely); *Dingle v. City of New York,* 728 F.Supp.2d 332, 348–49 (S.D.N.Y.2010) ("Federal courts do not have jurisdiction to hear state law claims brought by plaintiffs who have failed to comply with the notice of claim requirement, nor can a federal court grant a plaintiff permission to file a late notice of claim."). Here, Plaintiff failed to plead that he

satisfied these conditions, and the state law negligence claim is therefore dismissed. [18]

[18]     Plaintiff argues that he attempted to file a claim with the Court of Claims on the same day he filed the Complaint in this court. (*See* Pl.'s Opp'n at 27.) But even if Plaintiff had filed a notice of claim on that date, it would have been untimely, as the fight in question occurred almost one year prior to the filing of the Complaint. In addition, Plaintiff argues that he complied with the conditions by bringing suit within one year and ninety days of the fight. (*See id.*) While it is true that Plaintiff filed the Complaint within the one-year-and-ninety-day statute of limitations, this does not rescue his failure also to file a timely notice of claim.

 *18   Even if Plaintiff had complied with the conditions for filing a state law negligence claim against Defendants, he has failed to offer any evidence that his injuries were caused by the negligence of C.O. Hicks and C.O. Madison. Rather, Plaintiff's own deposition testimony demonstrates that the injuries Plaintiff sustained were the result of violence by Simmons (not C.O. Hicks), and that C.O. Hicks intervened and ended the altercation in a reasonable manner. For this additional reason, the negligence claim is dismissed. [19]

[19]     For all of his claims, Plaintiff also relies on the fact that the court screened his Complaint upon its filing and granted Plaintiff in forma pauperis status. (*See* Pl.'s Opp'n at 5.) But the fact that a complaint is deemed to be not frivolous or to plausibly state a valid claim upon which relief can be granted (*see* 28 U.S.C. § 1915(e)) is not determinative of whether a plaintiff has offered sufficient evidence to survive summary judgment.

**IV. CONCLUSION**

For the reasons set forth above, Defendants' motion for summary judgment is GRANTED, and all claims against all Defendants are DISMISSED. The court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Memorandum and Order would not be taken in good faith and therefore in forma pauperis status is DENIED for purpose of any appeal. *See Coppedge v. United States,* 369 U.S. 438, 444–45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). The Clerk of Court is respectfully directed to close the case.

SO ORDERED.

**Stewart v. Schiro, Not Reported in F.Supp.3d (2015)**

2015 WL 1854198

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1854198

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

Case 9:19-cv-00689-AMN-TWD Document 115 Filed 02/27/23 Page 105 of 173

Candelaria v. Coughlin, Not Reported in F.Supp. (1996)

1996 WL 88555, 7 NDLR P 466

1996 WL 88555

United States District Court, S.D. New York.

Juan CANDELARIA, Plaintiff, pro se

v.

Thomas A. COUGHLIN, III, et al., Defendants.

No. 91 Civ. 2978.

|

March 1, 1996.

**Attorneys and Law Firms**

Juan Candelaria, pro se.

Dennis C. Vacco, Attorney General of the State of New York (Clement J. Colucci, New York City, of counsel), for defendants.

OPINION

SAND, District Judge.

**\*1** Plaintiff Juan Candelaria ("Candelaria") is a former inmate of Green Haven Correctional Facility ("Green Haven") who is currently incarcerated at Clinton Correctional Facility ("Clinton"). He brings this civil rights action pursuant to 42 U.S.C. § 1983 against various state officials employed by the New York State Department of Correctional Services ("DOCS"). Plaintiff names as defendants the New York State Commissioner of the Department of Correctional Services, Thomas A. Coughlin, III; former Superintendent of Green Haven, Charles Scully; current Superintendent of Green Haven, Christopher Artuz; Facility Health Services Director, Dr. Jeanty; Correctional Officer Nielson; Correctional Officer Leclair; Correctional Officer Lachance; Correctional Officer Chimino; Correctional Officer McDermott; J.A. Battista; and Lieutenant Sanford. Plaintiff alleges that defendant prison officials negligently and/or deliberately failed to provide adequate responses to his medical and non-medical needs in violation of his rights under the Eighth and Fourteenth Amendments to the United States Constitution. [1] U.S. Const. amends. VIII, XIV. Plaintiff seeks monetary damages.

Both plaintiff and defendants move for summary judgment on the pleadings pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). [2] For the reasons set forth below, we deny plaintiff's and defendants' motions.

I.

BACKGROUND

Juan Candelaria, a paraplegic, entered the New York State penal system on December 26, 1989. He has been under the care and custody of DOCS at all times during this lawsuit. Plaintiff arrived at Green Haven on February 6, 1990, and was assigned to the Unit for the Physically Disabled ("UPD") because of his disability. *See* Plaintiff's Letter Dated December 12, 1994, in lieu of Amended Complaint, (hereinafter referred to as "Am. Compl.") at 2.

A. *Medical Claims*

1. The Wheelchair

Plaintiff states that while in Green Haven, prison personnel took away his wheelchair and gave him an inadequate and unsafe wheelchair. He claims that due to the deteriorated state of the wheelchair, on March 22, 1990, he fell off and suffered a herniated disc. *Id.* at 1. Plaintiff has submitted a copy of a doctor's report from an April 7, 1990, physical examination, which finds a "large disc herniation." Plaintiff's Rule 3(G) Statement ("Pl. Rule 3(G) Stat."); Pl Affirmation in Supp. of Mot. for Summ. J. ("Pl. Affirm.") Ex. 1. Plaintiff also claims that he broke his nose in this fall. A copy of the "Progress Notes" dated March 22, 1990, signed by facility medical personnel, indicates "severe nose bleed" and "edema," but does not indicate a broken nose. Pl. Rule 3(G) Stat.; Pl. Affirm. Ex. 26. Plaintiff claims that doctors recommended corrective surgery for injuries resulting from this fall, but that defendants deliberately ignored these recommendations. Am. Compl. at 1.

Plaintiff states that the wheelchair was inadequate because it lacked removable armrests. Plaintiff has provided at least two medical reports from 1990 and 1991, which demonstrate that doctors had requested that Candelaria be provided a wheelchair with removable armrests. Pl. Rule 3(G) Stat.; Pl. Affirm. Ex. 2. Plaintiff has also furnished a letter from a "Medical Auditor" dated October 24, 1990, which indicates that the Auditor, a medical doctor, "agree[s] that six months is a long time to wait for the ... wheelchair [you] need." *Id.* Defendants claim that removable armrests are not essential elements of a medically safe wheelchair and that the wheelchair occupant can use such armrests as weapons.

Candelaria v. Coughlin, Not Reported in F.Supp. (1996)
1996 WL 88555, 7 NDLR P 466

Defendants' Rule 3(G) Statement ("Defs. Rule 3(G) Stat."); Affidavit of James Manion, M.D. ¶ 4; Affidavit of Darly Jeanty, M.D. ¶ 7.

2. The Heating Pad

**\*2** On May 10, 1990, plaintiff was seen in Helen Hayes Hospital, West Haverstraw, New York, for follow-up treatment for the herniated disc. The attending physician, Dr. Lata Bhansali, ordered that plaintiff be provided with a heating pad. Pl. Rule 3(G) Stat.; Pl. Affirm. Ex. 12. Plaintiff claims that defendants deliberately ignored Dr. Bhansali's order. Defendants respond that because plaintiff is a paraplegic, allowing him to use a heating pad unattended could result in severe injury. Their logic is that someone without sensation in the lower parts of his body is unlikely to be able to protect himself from potential burns. They also claim that plaintiff was permitted to use the heating pad in the clinic. [3] Mem. of Law in Supp. of Defs.' Mot. for Summ. J. ("Defs. Mem.") at 8.

3. The Blood in Plaintiff's Urine

Plaintiff also claims that he had been passing blood in his urine as early as December 26, 1989, when he arrived in DOCS' custody. Pl. Rule 3(G) Stat. ¶ 20. He claims that although defendants were aware of his condition, they failed to provide him with necessary antibiotics until after he had filed a lawsuit. Candelaria provides copies of urinalysis tests to substantiate this claim. Pl. Rule 3(G) Stat.; Pl. Affirm. Ex. 13. He asserts that the delay in treatment caused him to develop bladder and kidney infections. Am. Compl. at 2. Defendants posit that the blood in plaintiff's urine most probably resulted from his self-catheterization and that the treatment that plaintiff claims was belatedly provided was not, in fact, intended to be utilized in treating this particular medical condition. Defs. Mem. at 10.

B. *Non-Medical Claims*

1. The Confinement in H-Block

On March 28, 1990, plaintiff was moved from the wheelchair-accessible UPD to general population confinement. Plaintiff was held in his new cell, H-Block cell #126, which is not wheelchair accessible, until August 14, 1990.

Plaintiff claims that he was moved to H-Block because he is Puerto Rican. Am. Compl. at 3. In response, defendants state that plaintiff was transferred from UPD to H-Block for his own physical security; another inmate in UPD, with whom Candelaria had a dispute, had threatened to attack plaintiff. Defs. Ex. 11. Plaintiff asserts that the allegation by defendants that he was transferred for his own safety is without merit.

Plaintiff claims that he conditions of his life during his confinement in H-Block were "cruel and unusual." Am. Compl. at 2. According to plaintiff, he was forced to drag himself on the floor of the cell in order to move around. Additionally, he had to eat, sleep, defecate, and urinate on the floor because he could not reach the bed, toilet, or sink. Likewise, since the shower in H-Block was not wheelchair accessible, plaintiff was able to shower only by "flicking water towards [him]self." Pl. Rule 3(G) Stat. ¶ 11. Plaintiff has provided two medical reports signed by a doctor from the DOCS Division of Medical Services, which indicate the doctor's recommendations to house plaintiff is UPD (August 11, 1990) and to provide plaintiff with a chair in his cell to allow him to transfer himself from the toilet to the bed (June 15, 1990). Pl. Rule 3(G) Stat.; Pl. Affirm. Ex. 9.

2. The Inmate Assault

**\*3** On November 20, 1990, plaintiff was assaulted in the feed room by another inmate, Jenning. At least one of his injuries required six stitches. Pl. Rule 3(G) Stat.; Pl. Affirm. Ex. 15. Plaintiff claims that the attack was the result of defendants' negligence and indifference to his physical safety. Plaintiff states that defendants were in violation of prison policy and regulations requiring that an officer be present in the feed room and that his injuries resulted from defendants' failure to adhere to their own policy. Am. Compl. at 4. As an alternative argument, Candelaria claims that a correctional officer *was* present, but did nothing to stop the attack: "while plaintiff was being beaten, defendant Chimino was standing by and permitting the inmate to assault plaintiff." Pl.'s Mem. of Law in Supp. of Mot. for Summ. J. ("Pl. Mem.") at 22.

Officer Chimino filed an "Inmate Misbehavior Report," which stated that on November 20, 1990, he entered the UPD feed room after having heard yelling coming from the room. Pl. Rule 3(G) Stat.; Pl. Affirm. Ex. 17. Chimino reported that when he entered the room, plaintiff was already bleeding from the lip and that Candelaria attempted to swing his tray at Jenning. *Id.* Plaintiff was subjected to disciplinary measures, specifically one month of keeplock confinement, following the incident. *Id.*

3. The Fire

1996 WL 88555, 7 NDLR P 466

On December 14, 1990, as a result of a fire in a neighboring cell, plaintiff complained of health problems relating to smoke inhalation and was taken to the clinic. In the clinic he was treated for hyperventilation. Pl. Rule 3(G) Stat.; Pl. Affirm. Ex. 23. Plaintiff claims that his respiratory passages have been damaged by the smoke he inhaled.

C. *Procedural Background*

1. Action I

Plaintiff filed a first law suit (hereinafter "Action I") on November 13, 1990. His complaint arose from an alleged assault on his person by a correctional officer at Green Haven and a subsequent hearing. Defendants in Action I moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6), and we granted their motion. *Candelaria v. Coughlin,* No. 91 Civ. 1117 (LBS), 1991 WL 113711 (S.D.N.Y. June 11, 1991). In that decision, we granted plaintiff leave to file an amended complaint, which he filed on July 8, 1991.

2. Action II

Plaintiff commenced the action now being addressed by this Court (hereinafter "Action II") on April 9, 1991. His complaint focused on inadequate medical treatment at Green Haven, specifically the condition of his wheelchair, his requests for a heating pad, and the blood in his urine. In addition to the medical claims, the complaint included non-medical claims relating to the conditions of his cell during his assignment in H-Block, the inmate assault, the verbal confrontation with a correctional officer, the disciplinary hearing, violations of the New York State Freedom of Information law, and the fire in the neighboring cell.

3. Prior Motions

**\*4** On September 3, 1991, plaintiff filed a motion for a preliminary injunction in Action II, requesting that defendants be ordered to provide various items for plaintiff's medical needs. On September 27, 1991, defendants filed a motion to dismiss the complaint in Action I, or in the alternative, for summary judgment, and to dismiss the complaint in Action II in its entirety. Plaintiff was transferred from Green Haven to Clinton on January 15, 1992; on January 30, 1992, he filed a second motion for a preliminary injunction in Action II, alleging inadequate medical facilities at Clinton, and requesting that defendants be ordered to transfer him back to Green Haven.

On March 17, 1992, this Court issued an opinion, *Candelaria v. Coughlin,* 787 F. Supp. 368 (S.D.N.Y.), *aff'd,* 979 F.2d 845 (2d Cir. 1992), granting defendants' motion in Action I in its entirety and denying defendants' motion to dismiss Action II. Plaintiff's first motion for injunctive relief, seeking medical supplies and treatment at Green Haven, was dismissed because plaintiff was no longer in Green Haven. Plaintiff's second motion for injunctive relief was denied because it was not addressed to officials at Clinton. The medical claims from Action II, therefore, remained.

4. Action III

On June 14, 1993, plaintiff submitted his First Amended Complaint in his third law suit, 93 Civ. 3212 (RWS) (hereinafter "Action III"), claiming that from April 1991 until January 1992 -- when he was transferred to Clinton -- various Green Haven medical personnel continuously refused to provide him with proper medical care, partly in retaliation for his first two lawsuits. Specifically, the lack of proper medical care consisted of the denial of a liquid diet required by his throat problems and the withholding of certain previously prescribed pain medications. On December 15, 1994, the Honorable Judge Robert Sweet granted defendants' motion for summary judgment in Action III. *Candelaria v. Coughlin,* No. 93 Civ. 3212 (RWS), 1994 WL 707004 (S.D.N.Y. Dec. 19, 1994).

5. Remaining Action II

By letter of December 5, 1994, defendants asked this Court to clarify whether the non-medical claims from Action II had been dismissed by the March 17, 1992, opinion. In response to this request, on December 7, 1994, we directed plaintiff to state which claims in 91 Civ. 2978 (LBS) (remaining Action II) he wished to pursue. The Order of December 7, 1994, also stated that all actions would be dismissed without prejudice unless plaintiff responded by January 23, 1995. Plaintiff responded by letter dated December 12, 1994.

In plaintiff's letter, which we treat as plaintiff's Amended Complaint, [4] he makes medical and non-medical claims. In both, he alleges that defendant prison officials, in violation of his Eighth and Fourteenth Amendment Rights, negligently and/or deliberately failed to provide adequate responses to his needs. Specifically, plaintiff's medical claims concern: (1) the injuries sustained from the fall from the faulty wheelchair; (2) the refusal of the prison medical staff to provide him with a heating pad to use in his cell to combat lower back pain; and (3) the failure to treat him for the blood in his urine.

1996 WL 88555, 7 NDLR P 466

Candelaria's non-medical claims involve: (1) the conditions of his H-block confinement; (2) the inmate assault; and (3) inadequate fire safety.

 **\*5** Plaintiffs and defendants have both moved for summary judgment. Plaintiff has also moved to preclude defendants from filing a second motion for summary judgment.[5] For the reasons set forth below, we deny all the motions.

II.

DISCUSSION

A. *Standard for Summary Judgment*
Summary judgment is appropriate where the moving papers and affidavits submitted by the parties "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c).* The court's role is not to resolve disputed factual issues, but rather to determine whether the record, taken as a whole, supports any issues that require a trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).* On a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Garza v. Marine Transport Lines, Inc., 861 F.2d 23, 26 (2d Cir. 1988).* The court also must resolve all ambiguities and draw all reasonable inferences against the moving party. *Eastman Kodak Co. v. Image Technical Services, Inc., 112 S. Ct. 2072, 2076-77 (1992); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).*

Where, as in this case, a plaintiff submits his complaint pro se, the complaint must be liberally construed. *See Haines v. Kerner, 404 U.S. 519, 520 (1972); Platsky v. CIA, 953 F.2d 26, (2d Cir. 1991).* Thus the allegations of Candelaria's amended complaint, "'however inartfully pleaded,' are held 'to less stringent standards than formal pleadings drafted by lawyers.'" *Hughes v. Rowe, 449 U.S. 5, 9 (1980)* (citing *Haines, 404 U.S. at 520).*

The moving party bears the initial burden of establishing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).* However, if the non-moving party would bear the burden of proof on a claim at trial -- as plaintiff would in this case -- the moving party may satisfy its burden by demonstrating an

absence of evidence to support an essential element of the claim. *Id. at 325.* To defeat the motion, the non-moving party (here, plaintiff) must "do more than show that there is some metaphysical doubt as to the material facts," *Matsushita, 475 U.S. at 586,* but instead must point to evidence sufficient to establish each element of its case, *Celotex Corp., 477 U.S. at 322* -- evidence, that is, such that a reasonable jury could return a verdict for the non-moving party on that element. *Anderson, 477 U.S. at 248-49; Burke v. Jacoby, 981 F.2d 1372, 1379 (2d Cir. 1992), cert. denied, 113 S. Ct. 2338 (1993).* In this case, the parties have cross-moved for summary judgment.

B. *Legal Standard for Liability under 42 U.S.C. § 1983*
In *42 U.S.C. § 1983,* Congress created a civil cause of action against any person who, acting pursuant to state government authority or under the color of state law, abridges rights secured by the United States Constitution or by federal law. *See Lugar v. Edmondson Oil Co., 457 U.S. 922, 924 (1982).* In order to prevail on a claim under *§ 1983,* a plaintiff must prove that the defendant(s): (1) acted; (2) "under color of state law"; and (3) in a manner that deprived the plaintiff of "any rights, privileges, or immunities secured by the Constitution." *42 U.S.C. § 1983. See Parratt v. Taylor, 451 U.S. 527, 535 (1981), overruled in part on other grounds by Daniels v. Williams, 474 U.S. 327, 3330-31 (1986).* It has not been questioned that the authority of defendants, employees of the state prison system, arises under color of state law. Therefore, the question in this case is whether the defendants acted in a manner that deprived plaintiff Candelaria of his rights, privileges, or immunities.

C. *Medical Claims*
 **\*6** Under the Eighth Amendment prohibition against "unnecessary and wanton infliction of pain," prisoners have the clearly established right to be free from deliberate indifference to their essential medical needs. *Estelle v. Gamble, 429 U.S. 97, 104 (1976).* In order to withstand a motion for summary judgment on his Eighth Amendment claim, plaintiff must establish that the prison officials were deliberately indifferent to his or her serious medical needs. *Id.*

Since the Supreme Court enunciated the law in *Estelle,* a two-part test, comprising a subjective and an objective inquiry, has developed for determining whether a plaintiff has stated a cognizable claim under the Eighth Amendment. The court must determine whether the defendant(s) acted "with a sufficiently culpable state of mind" and whether the

Case 9:19-cv-00689-AMN-TWD    Document 115    Filed 02/27/23    Page 109 of 173

Candelaria v. Coughlin, Not Reported in F.Supp. (1996)

1996 WL 88555, 7 NDLR P 466

alleged injury was "objectively harmful enough to establish a constitutional violation." *Hudson v. McMillian,* 503 U.S. 1, 8 (1992). Following *Estelle,* the Second Circuit has stated:

> Noting that inmates are utterly dependent upon their custodians, the [[[*Estelle*] Court was careful to observe that the Eighth Amendment forbids not only deprivations of medical care that produce physical torture and lingering death, but also less serious denials which cause or perpetuate pain. To assert otherwise would be inconsistent with contemporary standards of human decency.

*Todaro v. Ward,* 565 F.2d 48, 52 (2d Cir. 1977) (following *Estelle*).

In determining a defendant's culpability, courts have examined the seriousness of a plaintiff's medical needs as well as the length of time such needs were ignored. *See Hathaway v. Coughlin,* 841 F.2d 48, 50 (2d Cir. 1988) (Motion to dismiss denied where plaintiff claimed that defendants' refusal to schedule corrective surgery over period of two years resulted in daily pain from condition that was neither life threatening nor fast degenerating). The Second Circuit has held that deliberate defiance of express medical instructions may constitute more than mere negligence.[6] *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir. 1987) (citing *Martinez v. Mancusi,* 443 F.2d 921, 924 (2d Cir. 1970)). The court in *Gill* also reiterated that deliberate interference with medically prescribed treatment may form the basis of an Eighth Amendment claim. *Id.* (citing *Robinson v. Via,* 821 F.2d 913, 924 (2d Cir. 1987) (holding that lack of permanent or severe injury does not justify granting of summary judgment on issue of excessive force)).

### 1. Subjective Inquiry

Since *Estelle,* the Supreme Court has established a subjective recklessness standard by which to determine deliberate indifference under the Eighth Amendment. *Farmer v. Brennan,* 114 S.Ct. 1970 (1994). "A prison official may be held liable under the Eighth Amendment for acting with deliberate indifference to prisoner health or safety only if

the official has *actual knowledge* that the prisoner faced a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 1977-84.

**\*7** In *Lowrance v. Coughlin,* 862 F.Supp 1090, 1115 (S.D.N.Y. 1994) (Sand, J.), we applied the *Farmer* test "requiring plaintiffs to prove subjective recklessness by demonstrating actual notice." *Lowrance* at 1116. In *Lowrance,* we found the defendants liable because prison medical staff had actual notice of plaintiff's injured knee, "yet failed to provide adequate care." *Id.* Actual notice was determined by the prison medical records.

In the instant case as well, defendants and prison medical staff had actual notice of all of plaintiff's complaints. The determinative question, then, concerns the adequacy of their response to plaintiff's needs.

### 2. Objective Inquiry

Prison officials have a duty to provide prisoners with the "reasonably necessary medical care which would be available to him or her ... if not incarcerated." *Langley v. Coughlin,* 888 F.2d 252, 254 (2d Cir. 1989). "An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." *Estelle,* 429 U.S. at 103. Although prisons cannot be held to same standards of medical care as hospitals, *see Archer v. Dutcher,* 733 F.2d 14, 17 (2d Cir. 1984), *Estelle* established the responsibility of prison officials to provide inmates with a reasonable standard of medical treatment.

Here, Candelaria alleges that: (1) the faulty wheelchair supplied by DOCS resulted in injuries that were not adequately remedied; (2) the refusal to provide him with the doctor-ordered heating pad caused him to suffer additional pain; and (3) the refusal to treat the blood in his urine caused him to develop bladder and kidney infections. Defendants state that "although plaintiff's wheelchair may not have been the most convenient model available, it was safe and medically adequate." Defs. Mem. at 8. They claim that plaintiff was permitted to use a heating pad in the prison clinic, just not in his cell, for safety reasons: a paraplegic without feeling in his lower extremities has a high potential to burn himself.[7] In response to the claim concerning the blood in plaintiff's urine, defendants maintain that plaintiff has asserted medical claims that are, in fact, nonexistent.

Case 9:19-cv-00689-AMN-TWD Document 115 Filed 02/27/23 Page 110 of 173

Candelaria v. Coughlin, Not Reported in F.Supp. (1996)

1996 WL 88555, 7 NDLR P 466

A difference of opinion between an inmate and medical professionals, or even among medical professionals themselves, as to the appropriate course of treatment does not in and of itself constitute an Eighth Amendment violation. *Ross v. Kelly,* 784 F. Supp. 35 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.), *cert. denied,* 113 S.Ct. 828 (1992). In *Ross,* the court determined that almost all of the plaintiff's claims were really disagreements with prison medical personnel concerning the appropriate course of his treatment. *Id.* at 45. In that case, as in the instant matter, plaintiff was seen repeatedly by prison medical personnel and by numerous outside consultants. *Id.* at 46; *see* Pl. Rule 3(G) Stat.; Pl. Affirm. Exs. 1-31; Defs. Exs. 2-10. In *Ross,* the court concluded that treatment inconsistent with doctors' orders was the result only of an attempt on the part of defendants to ascertain "[the inmate's] problems and to determine the appropriate treatment." *Ross,* 784 F. Supp. at 46.

 **\*8** Here, plaintiff asserts that all his medical claims are serious, while defendants maintain that they are not.[8] Both supply medical records to support their positions. In considering a summary judgment motion, all reasonable inferences must be drawn in favor of the nonmoving party, and all ambiguities and differences must be resolved to that party's benefit. *Patrick v. La Ferve,* 745 F.2d 153, 161 (2d Cir. 1984); *Vaughn v. Mobil Oil Corp.,* 708 F.Supp. 595, 596 (S.D.N.Y. 1989). On cross-motions for summary judgment, we are faced with conflicting factual assertions which are incapable of decisive resolution at this juncture. We thus cannot accept plaintiff's and defendants' respective assertions that there is no genuine issue of material fact. Accordingly, we deny both motions for summary judgment on the medical claims. Given that we deny defendants' motion for summary judgment on the medical claims, it is unnecessary to address plaintiff's assertion of claim preclusion. Plaintiff's motion to preclude defendants from filing for summary judgment is thus moot.

D. *Non-Medical Claims*

 1. Confinement in H-Block: Cruel and Unusual Living Conditions

Plaintiff contends that the living conditions to which he was subjected in H-Block violated his Eighth Amendment rights. Candelaria claims that despite his reporting to defendants the poor conditions of his confinement in H-Block, his confinement there continued -- as it had begun -- because he is Puerto Rican. Am. Compl. at 2. Defendants state, and provide evidence showing, that plaintiff was transferred from UPD

to H-Block for his own safety. Defs. Rule 3(G) Stat. ¶ 15; Defs. Mem. Ex. 11. Defendants also contend that conditions in H-Block, while not as inmate-friendly as those in UPD, did not constitute a departure from a "minimal civilized measure of life's necessities." Defs. Rule 3(G) Stat. ¶ 16; Defs. Mem. at 12, (quoting *Anderson v. Coughlin,* 757 F.2d 33, 35 (2d Cir. 1985)). As plaintiff pleads this claim under the Cruel and Unusual Punishment Clause of the Eighth Amendment, not under the Equal Protection Clause of the Fourteenth Amendment, the discussion that follows treats only the *conditions* of Candelaria's confinement in H-Block, rather than the *reasons* behind his transfer.

Conditions of confinement inflict cruel and unusual punishment when they result "in unquestioned and serious deprivations of basic human needs." *Rhodes v. Chapman,* 452 U.S. 337, 347 (1981). In *Langley,* we wrote, "in judging the adequacy of challenged conditions, the central focus appears to be on whether they result 'in pain without any penological purpose.'" *Langley,* 715 F.Supp. at 542 (quoting *Rhodes v. Chapman,* 452 U.S. at 347). We noted that the judgment of prison administrators should be accorded the greatest deference when matters of prison security are involved. *Id.* at 543; *see, e.g., Whitley v. Albers,* 475 U.S. 312, 321-22 (1986). However, less deference is warranted when security concerns are not at issue. *Id.; see, e.g., Rhodes,* 452 U.S. at 362; *Abdul Wali v. Coughlin,* 754 F.2d 1015, 1033 (2d Cir. 1985). Although security reasons may have been the cause of Candelaria's *transfer* to H-Block, the *conditions* in H-Block that form the basis of plaintiff's Eighth Amendment claim are unrelated to those security concerns.

 **\*9** Candelaria claims that he was forced to drag himself on the floor of the cell and to eat, sleep, defecate, and urinate on the floor because he could not reach the bed, toilet, or sink. He also claims that because the shower in H-Block was not wheelchair accessible, he was able to shower only by "flicking water towards [him]self." Pl. Rule 3(G) Stat. ¶ 11. It is the cumulative effects of these individual conditions that must be weighed. *See, e.g., Rhodes,* 452 U.S. at 362-363 (Brennan, J., concurring).

If credited by a trier of fact, these allegations certainly permit the conclusion that the conditions in H-Block threatened plaintiff's mental and physical well-being. *See, e.g., Ramos v. Lamm,* 639 F.2d 559, 566-78 (10th Cir. 1980), *cert. denied,* 450 U.S. 1041 (1981). The existence of these unsanitary conditions is beyond any possible penological justification and therefore is inconsistent with the standards inherent in

1996 WL 88555, 7 NDLR P 466

the Eighth Amendment. *See, e.g., LaReau v. MacDougall,* 473 F.2d 974, 978 (2d Cir. 1972), *cert. denied,* 414 U.S. 878 (1973); *Wright v. McMann,* 387 F.2d 519, 525-26 (2d Cir. 1967), *cert. denied,* 409 U.S. 885, 93 (1972).

We thus cannot agree with defendants that these conditions, as described by plaintiff, necessarily adhere to a "minimal civilized measure of life's necessities." *Anderson v. Coughlin,* 757 F.2d at 35. However, given that defendants do not concede the accuracy of Candelaria's description of his living conditions, *see* Defs. Mem. ¶ 16, we are unable to conclude, at this juncture, that an Eighth Amendment violation has occurred. Faced with conflicting factual allegations in the context of cross-motions for summary judgment, we deny both motions as they pertain to the conditions in H-Block.

### 2. Inmate Assault: Deliberate Indifference

Plaintiff claims that he suffered an assault on the physical integrity of his person as a direct result of defendants' gross negligence and deliberate indifference to his physical safety. He makes two contradicting claims: (1) that defendants were negligent in not having a guard in the feed room and that this negligence rises to the level of deliberate indifference [9] and (2) that a defendant Correctional Officer stood by while plaintiff was being assaulted, in deliberate indifference to plaintiff's safety.

Addressing the first set of facts, there is a body of law holding that the failure to act can amount to deliberate indifference. A municipality, for example, can be held to the standard of "deliberate indifference" where the failure is one of training. *See, e.g., City of Canton v. Harris,* 489 U.S. 378, 109 (1989) (failure to train police officers to respond properly in certain situations evidences deliberate indifference). Alleging defendants' general failure to protect, Candelaria has attempted to make an omission-as-action claim.

Plaintiff's second set of facts -- that a correctional officer was present, but did not attempt to stop the assault -- presents a much clearer case of deliberate indifference in that plaintiff can point to a specific instance of inaction. In response to plaintiff's allegation, defendants contend that plaintiff has failed to establish that the assault was anticipated, thereby converting the event to a mere negligence claim which is not actionable under § 1983. The Courts have addressed this issue in detail. In *Morales v. New York State Department of Corrections,* 842 F.2d 27 (2d Cir. 1988), the Second Circuit

examined an inmate's allegation that the correctional officer on duty had failed to intercede to halt an attack by a fellow prisoner. On facts strikingly similar to those alleged here, the Second Circuit found that such inaction was sufficient basis for a § 1983 claim of deliberate indifference.

**\*10** In addressing plaintiff's motion for summary judgment, we must adopt defendants' version of the facts -- which comports with plaintiff's first set of facts: that no officer was present -- and conclude that, absent further evidence, summary judgment is inappropriate. On the record as it stands, we are unable to determine whether the failure to have a Correctional Officer in the prison feed room constitutes deliberate indifference to inmate safety or whether it demonstrates merely negligence. We thus deny plaintiff's motion for summary judgment on this claim.

Treating defendants' motion for summary judgment, we seek to adhere to plaintiff's description of the facts. Factual ambiguities permeate plaintiff's claim of deliberate indifference. We have addressed plaintiff's first factual scenario in the preceding paragraph and have concluded that the record simply does not warrant a grant of summary judgment in either party's favor. Were we instead to adopt plaintiff's second factual allegation -- that the officer passively watched the attack -- our conclusion would favor Candelaria. Thus, neither set of facts supports a grant of summary judgment for defendants. Accordingly, we deny defendants' motion on the deliberate-indifference claim.

### 3. Unsafe Dwelling: Cruel and Unusual Living Conditions

As a result of the fire in the nearby cell, plaintiff suffered smoke inhalation-related problems for which he sought treatment at the prison clinic. Plaintiff claims that defendants failed to provide him with adequate safety protection from a serious fire hazard, thus violating his Eighth Amendment rights. Defendants respond that plaintiff has once again made out a mere negligence claim.

Defendants no doubt have a duty to provide adequate fire safety for the inmates in Green Haven, including plaintiff. *See e.g., Ruiz v. Estelle,* 679 F.2d 1115, 1153, *vacated in part as moot,* 688 F.2d 266 (5th Cir. 1982), *cert. denied,* 460 U.S. 1042 (1983). Candelaria alleges a lack of useable fire protections at Green Haven. He states that there was neither an electronic cell locking system nor useable fire extinguishers. Pl. Mem. at 19. Defendants state that they had in place adequate fire safety measures. Defs. Rule 3(G) Stat. ¶ 13.

Plaintiff responds that "while defendants maybe had adequate safety measures, the available estinguishers [sic] and other safety devises [sic] were not operable or usable on December 14, 1990." Plaintiff's Letter Dated July 27, 1995, ¶ 9.

Such dissension plainly reveals the existence of a genuine issue of material fact -- namely, whether defendants provided satisfactory fire safety measures. We are thus unable to grant summary judgment to either party on this issue.

III.

CONCLUSION

For all of the foregoing reasons, we deny defendants' motion for summary judgment in its entirety. Plaintiff's motion for summary judgment on the merits is denied and his motion for summary judgment on procedural grounds is moot.

**\*11**  The parties have sixty days in which to submit a pre-trial order. We mark the case ready for trial as of June 3, 1996.

SO ORDERED.

1    Plaintiff, a paraplegic, also claims that the level of his medical care violated the Americans with Disabilities Act of 1990 (ADA) and the Rehabilitation Act of 1973. The substance of this claim does not appear to differ from his constitutional claims, and as we are denying summary judgment, we will not specifically address this claim.

2    Plaintiff also moves to preclude a portion of defendants' motion for summary judgment. Plaintiff claims that because a prior motion by defendants to dismiss the medical claims was denied, defendants' motion for summary judgment on the medical claims is now precluded. Plaintiff's

motion is addressed below, even though, in light of our holdings herein, it is moot.

3    As it appears from the Record that there was no clinic heating pad during this period, *see* Defs. Ex. 2, entry for June 9, 1990, we interpret defendants' claim as stating that plaintiff *would have been* allowed to use the clinic heating pad, as soon as one became available.

4    On January 5, 1995, by memorandum order, this Court declared that plaintiff's letter of December 12, 1994, sufficiently indicated the claims that plaintiff wished to pursue.

5    Presumably, defendants' *first* summary judgment motion was that made on September 27, 1991, seeking to dismiss the Complaint in Action II in its entirety.

6    Mere negligence is not actionable under 42 U.S.C. § 1983.

7    According to plaintiff, however, it was a doctor familiar with plaintiff's paraplegia who originally recommended the heating pad.

8    Plaintiff's claims have already survived a motion to dismiss. In our earlier opinion, we denied defendants' motion to dismiss plaintiff's medical claims, stating that "we cannot say that these claims do not constitute serious medical needs from someone in plaintiff's situation." *Candelaria,* 787 F. Supp. at 378.

9    Plaintiff also claims that defendants were in violation of their own policy requiring that a guard be present in the feed room. Am. Compl. at 4. Plaintiff has not, however, submitted a copy of this policy for the Record.

**All Citations**

Not Reported in F.Supp., 1996 WL 88555, 7 NDLR P 466

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 991729
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Raymond LEWIS, Plaintiff,
v.
Jason HANSON, et al., Defendants.

9:18-CV-0012 (LEK/DJS)
|
Signed 03/31/2022

**Attorneys and Law Firms**

Theresa M. Trzaskoma, Allegra Noonan, Sher Tremonte LLP, Yu Han, Morrison & Foerster LLP, New York, NY, for Plaintiff.

Ryan T. Donovan, Ryan E. Manley, Harris, Conway & Donovan, PLLC, Albany, NY, for Defendant Jason Hanson.

Andrew R. Safranko, Lamarche Safranko Law PLLC, Albany, NY, for Defendant Joseph Sharpe.

Cynthia E. Neidl, Katie Louise Birchenough, Greenberg Traurig, LLP, Albany, NY, for Defendant Scott Mere.

Eric Michael Soehnlein, Sean O'Brien, Lippes Mathias Wexler Friedman LLP, Buffalo, NY, Lawrence H. Schaefer, Lippes Mathias Wexler Friedman LLP, Albany, NY, for Defendant Zachary Peck.

Barry Nelson Covert, Diane M. Perri Roberts, Maxwell C. Radley, Patrick Mackey, Lipsitz Green Scime Cambria LLP, Buffalo, NY, for Defendant Craig Robideau.

Mark G. Mitchell, New York State Attorney General, Albany, NY, for Defendants Jason Kearney, John Kingston.

## MEMORANDUM-DECISION AND ORDER

LAWRENCE E. KAHN, United States District Judge

## I. INTRODUCTION

*1  On April 11, 2019, Raymond Lewis filed his amended complaint against several corrections officers employed by the New York State Department of Corrections and Community Supervision ("DOCCS") at Bare Hill Correctional Facility in Malone, New York ("Bare Hill"), at all times relevant to this matter: Jason Hanson, Joseph

Sharpe, Craig Robideau, Zachary Peck, Scott Mere, Jason Kearney and John Kingston.[1] Dkt. No. 61 ("Amended Complaint"). Plaintiff's claims arise from circumstances surrounding a use of force incident that occurred at Bare Hill on April 23, 2016, and Plaintiff's subsequent requests for medical aid on April 24, 2016. See Am. Compl. at 4. Now before the Court are motions for summary judgment filed by Robideau, Peck, Mere, Kearney, and Kingston (collectively, "Defendants"). Dkt. Nos. 136 ("Robideau Motion"), 136-5 ("Robideau Memorandum"), 136-4 ("Robideau Statement of Material Facts" or "Robideau SMF"), 136-1 ("Roberts Declaration"), 136-2 ("Exhibits A-L"), 136-3 ("Robideau Declaration"); 137 ("Peck Motion"), 137-1 ("Peck Memorandum"), 137-2 ("Peck Statement of Material Facts" or "Peck SMF"), 137-3 ("Soehnlein Declaration"); 138 ("Mere Motion"), 138-2 ("Mere Memorandum"), 138-1 ("Mere SMF"), 138-3 ("Birchenough Declaration"), 138-4 ("Mere Declaration"), Dkt. Nos 139; ("Kearney & Kingston Motion"), 139-16 ("Kearney & Kingston Memorandum"), 139-17 ("Kearney & Kingston Statement of Material Facts" or "Kearney & Kingston SMF"), 139-1 ("Kearney Declaration"), 139-2 ("Kingston Declaration"), 139-3 ("Mitchell Declaration"), 139-4 ("Plaintiff's Deposition"), 139-5 ("Kearney Deposition"), 139-6 ("Kingston Deposition").

[1]    The Amended Complaint also contained claims against Bruce Yelich, but all such claims were dismissed pursuant to the Court's order on the Motion to Dismiss filed by Kearney, Kingston, and Yelich. See Dkt. Nos. 79, 100.

Plaintiff has responded. Dkt. Nos. 149 ("Plaintiff's Response Memorandum"), 149-3 ("Plaintiff's Response to Defendants' Statements of Material Facts and Statement of Material Facts" or "Plaintiff's SMF")[2], 149-1 ("Plaintiff's Declaration"), 149-2 ("Noonan Declaration"). And all five defendants have replied. Dkt. Nos. 154-3 ("Robideau Reply Memorandum"), 154-2 ("Robideau Reply SMF"), 154 ("Roberts Reply Declaration"); 152 ("Peck Reply Memorandum"), 152-1 ("Peck Reply SMF"), 155 ("Mere Reply Memorandum"), 155-1 ("Mere Reply SMF"); 151 ("Kearney & Kingston Reply Memorandum").

[2]    Because Plaintiff has set forth his response to Defendants' statements of material facts in the same document as his own statement of material facts, the Court will cite to the sections responding to Defendants SMFs (pages 1–42) by their page

number, but will cite to the sections setting forth Plaintiff's own material facts (pages 43–54) by their paragraph designation in order to most clearly designate which of Plaintiff's allegedly material facts are being referenced.

For the reasons set forth below, each of Defendants' motions for summary judgment is granted in part and denied in part.

## II. BACKGROUND

### A. Factual Background

#### 1. Plaintiff's Alleged Phone Violation and Transfer to the SHU

**\*2** The following facts are not in dispute except where noted.

In April of 2016, all Defendants were employed as corrections officers at Bare Hill where Plaintiff was incarcerated. Robideau SMF ¶ 2; Mere SMF ¶ 2; Peck SMF ¶ 10; Kearney & Kingston SMF ¶¶ 12, 20; Pl.'s SMF ¶ 1. At this time, Plaintiff had a lawsuit pending against Officer Brian Cowan, who Plaintiff alleged had assaulted him while he was incarcerated at the nearby Franklin Correctional Facility. Pl.'s SMF ¶ 3.

On April 22, 2016, Plaintiff was on "cube confinement" and was restricted from using the telephones. Pl.'s SMF ¶ 8; Kearney & Kingston SMF ¶ 2. That day, Kearney was assigned to the E-1 dorm where Plaintiff resided. Kearney & Kingston SMF ¶ 14. An inmate approached Kearney, asked to use the phone, and provided Plaintiff's ID number. Id. ¶ 15–16. When Kearney saw the ID number belonged to an inmate with restricted phone privileges, he refused the inmate's request and instructed him to return to his cube. Id. ¶ 18. Kearney and Kingston assert that Plaintiff was the inmate who requested to use the phone, id., while Plaintiff insists he never approached Kearney or asked to make a phone call that day, Pl.'s SMF at 4.

The next day, April 23, 2016, Defendant Kingston was on duty as a Watch Commander. Id. ¶¶ 20, 24. Part of his responsibilities as Watch Commander were to check phone logs to see if inmates who had phone restrictions had been using them improperly. Id. at 21. That day, Kingston claims he reviewed the phone logs and found that Plaintiff's log showed significant usage in violation of his phone restriction. Id. at 24. Plaintiff questions the veracity of Kingston's claim that he

did not notice the phone usage until that day, asserting that, since Kingston admitted to reviewing phone logs three out of every five days he worked, he would have noticed before April 23 if Plaintiff's log had indeed shown such significant, long-term usage over an 8-day period. Pl.'s SMF at 6.

When Defendant Hanson came on duty the day of April 23, 2016, Kingston claims he asked Hanson to take Plaintiff to the special housing unit ("SHU") for a phone violation. Kearney & Kingston SMF ¶ 25. Kearney claims that Hanson then approached him, showed him a picture of Plaintiff, and asked if he knew who Plaintiff was. Id. ¶ 26. Apparently recognizing Plaintiff as the inmate who had asked to use the phone the day prior, Kearney described the incident to Hanson and wrote a memorandum describing the alleged interaction. Id. ¶¶27–29. Plaintiff claims that Kearney could not have recognized him from the picture, because Plaintiff did not interact with Kearney on April 22, 2016, and was not the inmate who requested to use the phone that day. Pl.'s SMF at 6.

At some point later on April 23, 2016, Defendants Hanson and Robideau came to Plaintiff's dorm and instructed him to come with them. Pl.'s SMF ¶ 9. The two officers did not tell him why he was being transferred or where he was going, but handcuffed Plaintiff and placed him in a van. Id. ¶ 10. The ride in the van took between 5 and 7 minutes. Robideau SMF ¶ 6; Pl.'s SMF at 41.

**\*3** Plaintiff contends that during the ride in the van, Robideau began punching and kicking him while he was still handcuffed, saying "our buddy told us to give you the special treatment." Id. ¶ 11. Plaintiff further contends that upon arriving at the SHU, he was so severely injured that he could not walk on his own and had to be dragged out of the van and assisted into the building. Pl.'s SMF ¶ 12. Robideau denies that he assaulted Plaintiff in the van or that Plaintiff had to be helped into the SHU building. Robideau Reply SMF at 8–9.

#### 2. The Alleged Assault in the Special Housing Unit

The parties' accounts vary dramatically regarding what happened once Plaintiff entered the SHU.

Plaintiff claims he was placed in the SHU strip-frisk room together with Defendants Hanson, Robideau, Sharpe, Mere, and another unidentified officer. Pl.'s SMF ¶¶ 13–14. Plaintiff claims Hanson said "this nigger gets special treatment

because he filed a lawsuit against one of our brothers" before punching him in the head and taking him to the ground. Pl.'s SMF ¶¶ 15–16. Plaintiff then claims the other officers in the room joined in kicking and punching him. Id. ¶ 17. Plaintiff claims he heard one officer state "lets [sic] say he had a weapon" and another state "lets [sic] say he assaulted one of us." Id. ¶ 18. According to Plaintiff's account, Plaintiff was so severely injured he could not stand, and officers had to help him lean against a wall. Id. ¶ 20. Nurse Harmon then came to examine Plaintiff; Plaintiff asked for pain medication, but she told him to sign up for sick call. Id. ¶ 21; Mere SMF ¶ 17. Plaintiff alleges that Hanson then said Plaintiff looked like he wanted to hurt himself and needed to be placed on suicide watch. Pl.'s SMF ¶ 22. Once Plaintiff was escorted and placed in the suicide watch cell, Plaintiff alleges Hanson grabbed him by the neck and told him "if I hear anything about this, it can all happen again." Id. ¶ 23.

However, Robideau claims he did not enter the SHU with Plaintiff at all, but instead left once Plaintiff entered the SHU building. Robideau Reply SMF ¶ 13–14. Defendant Mere likewise claims that he was never in the SHU strip-frisk room with Plaintiff, but rather was on duty in the gym. Mere Reply SMF ¶ 14, Mere SMF ¶¶ 6, 13. Mere further claims he did not enter the SHU until after Plaintiff was already in the suicide watch cell, because Mere had been assigned to cover the 1:1 suicide watch over Plaintiff, Mere Reply SMF ¶¶ 21–22, and that he was never informed or aware of the use of force in the SHU strip-frisk room, Mere SMF ¶ 24.

Plaintiff claims the Defendants each know Brian Cowan, the officer at Franklin Correctional Facility against whom Plaintiff had a lawsuit pending (the "Cowan Suit"), and assaulted him in retaliation for filing the lawsuit. Pl.'s SMF ¶¶ 14, 31, 35. Defendants each deny any association with or knowledge of Cowan or the lawsuit. Robideau Mem. at 17; Peck SMF ¶ 15; Mere SMF ¶ 55; Kearney & Kingston SMF ¶¶ 66, 67.

### 3. Plaintiff's Requests for Medical Aid

Plaintiff asserts that while in the 1:1 cell, he was in severe pain and was having difficulty breathing. Pl.'s SMF ¶ 24. He further claims that, although Mere was supposed to be watching him, he was not at his post. Id. ¶ 25. Plaintiff began kicking the door to get Mere's attention and request his asthma inhaler. Id. ¶ 26. Mere allegedly appeared after ten minutes and said he would "look into" it. Id. at 27. After over an

hour with no word about his inhaler, Plaintiff again began kicking the door to get Mere's attention. Id. ¶¶ 27, 28. A different officer arrived, but refused to help. Id. ¶ 28. Plaintiff asserts he began kicking the door again. Id. ¶29. A third officer responded, and shortly after, returned with a nurse and Plaintiff's asthma medication. Id.

**\*4** Mere contends that he began his 1:1 watch over Plaintiff on April 23, at 4:05 PM, did not leave his post until 10:20 PM, logged activity every 15 minutes, and that Plaintiff could see and communicate with him that entire time. Mere Reply SMF ¶¶ 25–26. Mere claims that Plaintiff was not only kicking the door, but yelling and slamming his body against it. Id. ¶ 26; Mere SMF ¶ 27. Mere claims Plaintiff engaged in this loud and disruptive behavior on at least 4 occasions, and disregarded his orders to stop. Mere SMF ¶¶ 39–44. Further, Mere asserts Plaintiff only asked for his inhaler one time, after which Mere responded he would "look into" getting it, and that a nurse arrived shortly after with the medication. Mere Reply SMF ¶ 30, Mere SMF ¶¶ 31–32. Mere claims that Plaintiff never complained of pain or requested medical aid. Mere SMF ¶ 37.

The next day, on April 24, 2016, Plaintiff contends he was still in severe pain, but was not given pain medication or breakfast. Pl.'s SMF ¶ 31–34. At 6:30 PM, Plaintiff asserts that he still felt unwell and kicked the cell door again when he could not see an officer outside his cell. Id. ¶ 35–36. When Defendant Peck arrived to start his duty on the 1:1 watch over Plaintiff, Plaintiff claims he told Peck he was having a hard time breathing and was having an asthma attack. Id. at 37. Peck allegedly stated he would call the medical department, but after an hour with no help, Plaintiff again asked Peck for the asthma spray. Id. at 38. Plaintiff claims that Peck responded that he would have to wait, at which time Plaintiff began kicking the door again to get the attention of a sergeant. Id. at 39. Non-party Sergeant Tamer arrived, whereupon Plaintiff explained he was having trouble breathing and Tamer said he would get the spray. Id. 40–41. After an additional one and a half hours with no response, Plaintiff went to his cell door again, but Peck was not there. Id. ¶ 42–43. Plaintiff began kicking his cell door again. Id. ¶ 46. Another officer arrived and provided the inhaler 15 minutes later. Id. ¶ 46.

Peck claims that he did not know of the use of force incident that occurred the prior day. Peck SMF ¶ 13. Peck asserts that he visibly assessed Plaintiff, that everything seemed normal, and that Plaintiff did not ask for medical aid, but merely asked once when nurses would be making rounds. Peck SMF

¶ 16; Peck Dep. at 37. Afterward, Plaintiff began yelling, kicking, and hitting his body against the door. Id. at 38–39. Peck ordered Plaintiff to stop and requested that a roundsman inform a sergeant of the situation. Peck SMF ¶ 20–21. Peck claims that, at that point, Sergeant Tamer arrived and spoke with Plaintiff, after which Plaintiff calmed down. Id. ¶ 22–23. Around two hours later, Plaintiff resumed the same behavior. Id. ¶ 24. When Plaintiff did not comply with a direct order to stop, Peck issued a misbehavior ticket and Plaintiff stopped. Id. ¶ 25. Peck denies that Plaintiff ever said he was having chest pain or trouble breathing. Id. ¶¶ 27–28.

#### 4. Plaintiff's Hospital Treatment

On April 25, two days after the alleged assault, Plaintiff claims he woke up with severe chest pain and trouble breathing. Pl.'s SMF ¶ 47. He informed officers he needed medical attention and was transferred to Alice Hyde Medical Center by ambulance. Id. ¶¶ 47–50. Plaintiff informed the medical staff he had been assaulted by corrections officers. Id. ¶ 54. Plaintiff was diagnosed with two fractured ribs and a collapsed lung caused by trauma which doctors stated "could have been fatal." Id. ¶¶ 53–56.

Plaintiff remained hospitalized until April 27, 2016, when he was released to the Upstate Correctional Facility ("Upstate") where he remained in the infirmary for another week. Id. ¶ 57.

#### 5. Misbehavior Tickets and Investigations

After arriving at Upstate, Plaintiff was issued five misbehavior tickets. Pl.'s SMF ¶ 59. One ticket, issued by Hanson and co-signed by Kearney, alleged Plaintiff had made 18 phone calls from April 15, 2016 to April 22, 2016 in violation of his cube confinement status, and used the phones in violation of a direct order from Kearney. Id. ¶ 60. This ticket purported to justify Plaintiff's April 23, 2016, transfer to the SHU. Id. ¶ 59. Plaintiff denies making any phone calls or being ordered by Kearney not to use the phones, and was found not guilty at a hearing regarding this ticket. Id. ¶ 62.

**\*5** Another ticket was issued by Defendant Sharpe, alleging that during the strip frisk at the SHU, Plaintiff resisted and violently struggled. Id. ¶ 63. Plaintiff was found guilty of this conduct. Id. ¶ 65.

Plaintiff received two tickets written by Mere alleging he created a disturbance while in the SHU on suicide watch. Id. ¶ 66; Mere Reply SMF ¶ 68. Plaintiff was initially found guilty of creating a disturbance, but this finding was reversed on appeal. Pl.'s SMF ¶ 69; Mere Reply SMF ¶ 69.

The final ticket was written by Peck, alleging Plaintiff created a disturbance while in the SHU on suicide watch. Pl.'s SMF ¶ 70, Peck Reply SMF ¶ 70. Plaintiff was found guilty of this conduct. Pl.'s SMF ¶ 71.

#### 6. Plaintiff's Grievance

On May 13, 2016, Plaintiff submitted a grievance regarding the alleged assaults, his struggle to obtain medical care, and the allegedly false tickets filed against him. Pl.'s SMF ¶ 72. Kingston was tasked with investigating the grievance. Id. ¶ 76. Kingston dismissed Plaintiff's allegations, and found the grievance was baseless and filed only to cause harm to the officers involved. Id. ¶ 77–80. On August 8, 2016, Plaintiff's grievance was denied by Superintendent Uhler. Kearney & Kingston SMF ¶ 41.

However, the DOCCS Office of Special Investigations ("OSI") opened an investigation into the use of force event and Plaintiff's subsequent stay in the SHU. Mere SMF ¶ 58; Pl.'s SMF ¶ 81. The OSI investigator, Michael Germano, issued his report on January 3, 2017. See Birchenough Decl. Exhibit T ("Germano Report"). The Germano Report questioned the narrative told by staff regarding the assault and denial of medical care, finding various inconsistencies in their accounts regarding the nature of Plaintiff's resistance, the Nurse's evaluation of Plaintiff, their responses to his request for medical attention, and Plaintiff's physical state after being put on the 1:1 watch. Pl.'s SMF ¶¶ 82–87. The Germano Report did not reach a conclusion regarding Plaintiff's assault allegations, but found that the involved staff failed to give Plaintiff proper medical care after the use of force incident in the SHU. Id. ¶ 81.

Defendant Mere asserts that any findings in the Germano Report are irrelevant as to him because the report did not identify him as "involved staff," he was not interviewed or questioned, and was not named in the final report. Mere SMF ¶ 58–61. Similarly, Robideau argues that the Germano Report supports his innocence because it found that he had "no valuable information to clarify the events documented in the use of force." Robideau Reply SMF ¶ 82.

**B. Procedural History**

Following Plaintiff's filing of his Amended Complaint, and the Court's partial grant of Defendant Kearney and Kingston's motions to dismiss, Dkt. No. 100, Plaintiff has the following claims remaining: excessive force claims against Hanson, Sharpe, Robideau, Mere, Peck, Kearney, and Kingston under the Eighth Amendment, Fourth Amendment, and Fourteenth Amendment; claims for deliberate indifference to a serious medical need against Hanson, Sharpe, Robideau, Mere, and Peck under the Eighth Amendment; and retaliation claims against Hanson, Sharpe, Robideau, Mere, Peck, Kearney, and Kingston in violation of the First and Fourteenth Amendments.

**\*6** Robideau, Mere, Peck, Kearney, and Kingston now move, respectively, for summary judgment arguing they are entitled to judgment as a matter of law on all claims against them. See Robideau Motion, Mere Motion, Peck Motion, Kearney Motion.

**III. LEGAL STANDARD**

Rule 56 of the Federal Rules of Civil Procedure instructs courts to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is " ' genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Thus, while "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if ... the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.; see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted."). The party seeking summary judgment bears the burden of informing the court of the basis for the motion and identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Similarly, a party is entitled to summary judgment when the nonmoving party carries the ultimate burden of proof and has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

In attempting to defeat a motion for summary judgment after the moving party has met its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), may not rely on mere conclusory allegations, speculation, or conjecture, Fischer v. Forrest, 968 F.3d 216, 221 (2d Cir. 2020), and must present more than a mere "scintilla of evidence" supporting its claims, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). Thus, a court's duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

**IV. DISCUSSION**

**A. Robideau Motion for Summary Judgment**

Robideau argues there is no material issue of fact regarding Plaintiff's (1) Eighth Amendment claim for use of excessive force, (2) Fourth and Fourteenth Amendment claims for use of excessive force, and (3) claim for retaliation, and asserts that all claims must be dismissed. See Robideau Mem.

*1. Eighth Amendment Excessive Force*

The Eighth Amendment protects prisoners from cruel and unusual punishment by prison officials. Wilson v. Seiter, 501 U.S. 294, 296–97 (1991). To establish an Eighth Amendment claim, a plaintiff must show both an objective component, "a deprivation that is objectively, sufficiently serious ... [,]" and a subjective component requiring the defendant official have "a sufficiently culpable state of mind." Hayes v. Dahlke, 976 F.3d 259, 274 (2d Cir. 2020); see also Hudson v. McMillian, 503 U.S. 1, 7 (1992).

**\*7** Plaintiff alleges that Robideau used excessive force against him by assaulting him in the back of the van while he was being transferred to the SHU and then by assaulting him again while in the SHU strip-frisk room. Pl.'s SMF ¶¶ 11, 14. Robideau argues there is significant evidence supporting his claim that he was the driver of the van and that he did not enter the SHU, and thus could not have assaulted Plaintiff. Robideau Mem. at 9–12. Robideau argues further that Plaintiff's self-serving testimony set forth on the record,

absent other direct or circumstantial evidence, is insufficient to defeat summary judgment. Id.


#### a. Evidence Supporting Robideau's Version of Events

Robideau argues there is no dispute of material fact that, rather than being in the back of the van as Plaintiff claims, he was the driver of the van. He points to the DOCCS Escort Memorandum forms filled out by Robideau and Hanson that lists only two officers as having been involved in Plaintiff's transfer, Robideau SMF ¶ 10; Roberts Decl. Ex. H ("DOCCS Escort Memorandum"), and the deposition testimony of fellow defendant Sergeant Hanson, in which he stated that he (Hanson) was not driving the van, Robideau Reply at 7; Roberts Decl. Exhibit G ("Hanson Deposition") at 261. Further, Plaintiff has admitted that the driver of the van did not assault or speak to him. Pl.'s SMF at 41.

Robideau contends there is likewise significant evidence supporting his claim that he did not enter the SHU after dropping Plaintiff off. Robideau Mem. at 10. Robideau points to the SHU logbook which shows Robideau did not sign into the SHU building, but that Sergeant Hanson did upon arrival with Plaintiff, Roberts Decl. Exhibit I ("SHU Log Book"); the testimonies of Defendants Hanson and Sharpe that they were the only two officers in the strip-frisk room with Plaintiff that day, Hanson Dep. at 257, Roberts Decl. Exhibit J ("Sharpe Deposition") at 202; and the Germano Report, which found Robideau did not have any "valuable information to clarify the events" surrounding the use of force, Germano Report at 3.

Robideau argues that the only pieces of evidence on the record contradicting his account are Plaintiff's own self-serving statements made in his grievance, his deposition, and his declaration in opposition to summary judgment. Robideau Mem. at 7. Robideau argues his motion for summary judgment should be granted in spite of this contradictory evidence because "[i]t is clear in this Circuit that a nonmoving party's proffer of solely self-serving statements, 'without direct or circumstantial evidence to support the charge, is insufficient to defeat a motion for summary judgment.' " Robideau Reply at 7 (quoting J.F. v. Carmel Cent. Sch. Dist., 168 F.Supp.3d 609, 616 (S.D.N.Y. 2016)).

#### b. Sufficiency of Self-Serving Statements to Defeat Summary Judgment

The Court cannot agree that such clarity exists, and declines to adopt a blanket rule that a self-serving declarations or deposition testimony are per-se insufficient to defeat a motion for summary judgment, even without other evidence to support them.

Robideau is correct that there is a line of decisions from courts in the Southern District of New York that appears to adopt such a rule. See, e.g., Sec. & Exch. Comm'n v. Aly, 2018 WL 1581986, *9 (S.D.N.Y. 2018); J.F., 168 F.Supp.3d at 616; Fincher v. Depository Trust & Clearing Corp., No. 06-CV-9959, 2008 WL 4308126, at *3 (S.D.N.Y. Sept. 17, 2008). The provenance of the rule issued in these decisions can be traced back to the Second Circuit's opinion in Argus, Inc. v. Eastman Kodak Co., where the court held that, in the context of establishing a causal link between a breach of antitrust law and harm to a plaintiff-competitor, "when the fact of injury is in issue, the 'isolated self-serving statements' of a plaintiff's corporate officers may not provide substantial evidence upon which a jury can rely." 801 F.2d 38, 42 (2d Cir. 1986). However, in applying this standard to find no genuine issue of material fact regarding causation of injury, the Argus court refused to allow such statements to defeat summary judgment, not because of their nature as self-serving, but because the testimony was inherently "conclusory" and thus "[fell] woefully short of that necessary to outweigh the volume of contrary facts in the record." Id. at 45.

**\*8** Robideau makes much of the Second Circuit's affirmation of one of the Southern District cases utilizing this rule: Fincher v. Depository Trust. However, even though the Second Circuit eventually affirmed the district court's ruling in Fincher, it disagreed with the district court's decision to use the above-described rule to discredit the plaintiff's testimony at the summary judgment stage because the plaintiff's statements were not conclusory or speculative. See Fincher v. Depository Tr. & Clearing Corp., 604 F.3d 712, 726 (2d Cir. 2010) ("Fincher's testimony ... is not conclusory or speculative, as was the plaintiff's testimony in the case relied upon by the district court in disregarding the remarks, ... we decline to conclude at this stage of the proceedings that Fincher's testimony may be deemed discredited."). The Fincher court eventually affirmed the grant of summary judgment, not because the plaintiff's testimony at issue was self-serving, but because it

2022 WL 991729

concerned statements made by a third-party who concluded the plaintiff had been discriminated against, and the alleged statements represented a mere "scintilla" of evidence "in light of their offhand, conclusory nature and the lack of further support in the record for Fincher's claim [of discrimination]." Id. at 727. However, the court stated that, if the plaintiff had testified that the third-party had made remarks that themselves were discriminatory, rather than merely conceding in conclusory fashion that plaintiff had been discriminated against, "[s]ummary judgment might not have been justified." Id. Heavily implying the Second Circuit would consider such self-serving testimony to be sufficient to defeat summary judgment.

In short, the Second Circuit—rather than holding that a self-serving statement is per se insufficient absent other supporting evidence—has reiterated the traditional standard that when ruling on summary judgment "[the] preliminary question for the judge [is] not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it," id. at 726 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986)), and that "[m]ere conclusory allegations, speculation or conjecture" are insufficient to resist summary judgment, Cifarelli v. Vill. of Babylon, 93 F.3d 47, 51 (2d Cir. 1996). While it may be true that in some cases a party's self-serving affidavit or testimony, unsupported by other evidence on the record, will be insufficient to allow a reasonable jury to properly find a verdict in that party's favor, there are other circumstances where it may very well be sufficient.

### c. Plaintiff's Record Testimony and Statements are Sufficient to Defeat Summary Judgment

Plaintiff's allegations regarding the alleged assaults by Robideau are not conclusory or speculative, rather, they testify to events that allegedly happened in Plaintiff's presence that he observed directly. See Fincher, 604 F.3d at 726 ("Fincher's testimony ... is not conclusory or speculative ... because Fincher was testifying to the content of a conversation at which she was allegedly present."). Thus, the Court must determine if Plaintiff's repeated testimonial statements that Robideau assaulted him in the back of the van on the way to the SHU and assaulted him again in the SHU strip-frisk room represent a mere "scintilla" of evidence, insufficient to create an issue of material fact.

The Court finds the weight of evidence is not so great that no rational jury could credit Plaintiff's testimony and find in his favor. Robideau contends that there is "extensive documentary and testimonial discovery establishing that Robideau was the driver of the van." Robideau Mem. at 10. The only documentary evidence Robideau points to is the Escort Memorandum listing Robideau and Hanson as having been in the van during the transport. Escort Memorandum at 1. However, this memorandum is not purely objective evidence, but rather was created and signed by Robideau and Hanson themselves. Hanson Dep. at 258. Robideau further relies on Hanson's testimony that Hanson was not the one driving the van, thus implying that since there were only two officers in the van according to the Escort Memorandum, the driver must have been Robideau. Robideau Mem. at 10. While Hanson did testify that he does not generally drive the vans, Hanson Dep. at 261, he explicitly stated that he did "not have an independent recollection" of transferring Plaintiff to the SHU, and when asked if he drove the van on that specific day, Hanson responded "not that I recall," id. at 259. Given the nature of this evidence, a reasonable jury could still choose to credit Plaintiff's account that Robideau was not the driver of the van, but was present in back of the van and assaulted him during the trip. [3]

[3]   Robideau also argues for the first time in his reply papers that "[d]riving the van is an exclusive duty of the Rounds 1 position, or of the Rounds 2 position if Rounds 1 is unavailable" and "Robideau without dispute was the only available Rounds person to drive the van at the time of Lewis' transfer because his partner, the Rounds 2, was not available." Robideau Reply Mem. at 3. The Court will disregard these arguments and alleged facts because, as they were not included in Robideau's initial motion, Plaintiff has not had a chance to appropriately respond. See In re Various Grand Jury Subpoenas, 235 F. Supp. 3d 472, 485 (S.D.N.Y. 2017) ("The law in the Second Circuit is clear that arguments or requests for relief raised for the first time in reply briefs need not be considered. Generally, a court does not consider issues raised in a reply brief for the first time because if a party raises a new argument in a reply brief the opposing party may not have an adequate opportunity to respond to it.") (citations omitted).

**\*9** Regarding the alleged assault in the SHU, Robideau asserts he did not enter the SHU at all and points to (1) the

fact that he did not sign the SHU Logbook "when Sergeant Hanson did so upon arrival with Plaintiff," Robideau Mem. at 11 (citing SHU Logbook at 1), (2) Hanson and Sharpe's testimony that no other officers were present in the SHU strip-frisk room during the use of force event with Plaintiffs, id.; Hanson Dep. at 257; Sharpe Dep. at 201–02, and (3) the Germano Report's indication that "Robideau did not have any 'valuable information to clarify the events' documented in the use of force," id. (citing Germano Report 3). [4]

[4]    For the first time in his reply, Robideau makes the argument that he has conclusively established he was not in the SHU strip-frisk room during the assault because Nurse Harmon testified there were only two officers present in the room, and that Robideau had to find his partner for their assignment at 3:30 P.M. Robideau Reply Mem. at 4, 7. Because these alleged facts and arguments are presented for the first time in Robideau's reply memorandum, and Plaintiff has not had an appropriate chance to respond, the Court will disregard them. See supra note 2.

This evidence is similarly not as conclusive as Robideau argues. The SHU Logbook entry for Plaintiff's admission has a designated place for the "escorting supervisor" to sign, but no obvious place where Robideau, who was indicated to be the "escorting officer" would have signed. See SHU Logbook at 1; Escort Memorandum. Robideau has not argued or established that it would have been improbable, or even difficult, for him to enter the SHU without having signed. Indeed, the record indicates other individuals were able to enter and leave the SHU multiple times without signing the logbook. Germano Report 3. In short, a reasonable jury could find other explanations for Robideau's lack of signature. Further, the conclusion in the Germano report that Robideau did not have relevant information was based on Robideau's own testimony. Germano Report 3. Given the repeated consistent statements Plaintiff has made regarding the assault in the SHU, Birchenough Decl. Ex. N ("Plaintiff's Grievance") at 3; Plaintiff's Dep. at 122:6–11, a reasonable jury could choose to credit Plaintiff's testimony over Robideau's, Sharpe's, and Hanson's.

Robideau argues that Plaintiff's testimony should be discredited because he claimed to see Robideau behind him in the strip-frisk room with his "peripheral visions" and one cannot see behind themself with peripheral vision. Robideau Mem. at 11. Robideau further argues that Sharpe and Hanson's

statements "should be given significant weight" because they admit they were the only ones in the strip-frisk room during the use of force, "and there is no reason for them to be untruthful about who else was in the SHU frisk area." Id. Robideau's arguments may hold merit, however such weighing of testimony and determination of credibility is not within in the purview of a court on a motion for summary judgment. See Redd v. N.Y. State Div. of Parole, 678 F.3d 166, 174 (2d Cir. 2012) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."),

While the weight of evidence may favor Robideau, the evidence is not so conclusive that a reasonable jury could not believe Plaintiff's assertions that Robideau was in the back of the transfer van and in the SHU strip-frisk room and participated in the assaults. See Franklin v. Oneida Corr. Facility, No. 03-CV-1452, 2008 WL 2690243, at *9 (N.D.N.Y. July 1, 2008) (Kahn, J) ("As tempting as it may be to conclude that defendants will ultimately prevail at trial, defendants' invitation to make a credibility determination and reject plaintiff's version of the events on motion for summary judgment is plainly unwarranted"); Cicio v. Lamora, No. 08-CV-431, 2010 WL 1063875, at *8 (N.D.N.Y. Feb. 24, 2010), report and recommendation adopted, No. 08-CV-431, 2010 WL 1063864 (N.D.N.Y. Mar. 22, 2010) ("Plaintiff's testimony that he was beaten by MacWilliams stands in contrast to the seemingly overwhelming evidence that it did not occur as he alleges. Nonetheless, the weighing of such competing evidence, no matter how weak plaintiff's claim may appear, presents a question of credibility that must be left to the trier of fact"); see also Harris v. Miller, 818 F.3d 49, 65 (2d Cir. 2016) (holding summary judgment is inappropriate where "a prisoner's allegations and evidentiary proffers could reasonably, if credited, allow a rational factfinder to find that corrections officers used force maliciously and sadistically ... [even where] the proof of excessive force [is] weak.").

**\*10** The Court thus declines to grant Robideau's motion for summary judgment regarding Plaintiff's Eighth Amendment claim of excessive force.

### 2. Fourth and Fourteenth Amendment Excessive Force Claims Against Robideau

Plaintiff does not oppose Robideau's motion regarding his claims for excessive force under the Fourth and Fourteenth

Amendments. See Pl.'s Resp. Mem. at 14. Thus, the Court grants Robideau's motion regarding these claims.

### 3. Eighth Amendment Deliberate Indifference to Serious Medical need Claim against Robideau

Plaintiff likewise does not oppose Robideau's motion regarding his claim for deliberate indifference to a serious medical need under the Eighth Amendment. Id. Thus, the Court grants Robideau's motion regarding this claim.

### 4. First Amendment Retaliation Claim Against Robideau

Robideau argues that Plaintiff's claims against him alleging retaliation should be dismissed, first, because Plaintiff did not appropriately exhaust his administrative remedies, and second, because there is no dispute as to material fact regarding whether Robideau engaged in retaliatory activities.

#### a. Exhaustion of Administrative Remedies

The Prison Litigation Reform Act of 1995 ("PLRA") states that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002). " ' 'Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules' as a precondition to filing a federal lawsuit." Espinal v. Goord, 558 F.3d 119, 124 (2d Cir. 2009) (quoting Woodford v. Ngo, 548 U.S. 81, 90 (2006)). Likewise, "compliance with state procedural rules is necessary to achieve '[t]he benefits of exhaustion [that] can be realized only if the prison grievance system is given a fair opportunity to consider the grievance.' " Id. "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim," because 'it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion.' " Id. (quoting Jones v. Bock, 549 U.S. 199, 218 (2007)).

Robideau asserts that New York State grievance procedures require an inmate to "allege facts sufficient to put corrections officials on notice as 'to the nature of the claim,' and 'provide enough information about the conduct' at issue." Robideau Mem. at 14. Robideau argues that because "[Plaintiff] failed to file a grievance with particularity that implicated Robideau in any retaliatory acts towards Lewis" he has not sufficiently exhausted his administrative remedies as to the retaliation claim against Robideau. See id. at 15.

However, Plaintiff's Grievance alleges involvement of specific officers, including Robideau, Pl.'s Grievance at 2–3, and that he was beaten for retaliatory reasons, id. at 18 ("This is a case where I was severely beaten ... in retaliation for filing a lawsuit against correction officer B. Cowan."). Plaintiff's Grievance also provides a detailed account of the events, including a specific date, time, and location. Plaintiff's Grievance at 13–15.

**\*11** Thus, Plaintiff's Grievance provided prison officials with the "the necessary information to investigate the complaints and the opportunity to learn which officers were involved in the alleged incident" sufficient to advance the benefits of exhaustion, and the Court finds Plaintiff has exhausted his administrative remedies regarding the claim of retaliation against Robideau. See Espinal, 558 F.3d at 127 (finding administrative remedies properly exhausted where grievance alleged involvement of certain security officers and "included the specific date, time, and location of the incident about which he complained, and that he was beaten for retaliatory reasons.").

#### b. Robideau's Alleged Retaliatory Acts

In order to succeed on a claim of retaliation in violation of the First Amendment, a plaintiff must show "(1) the conduct cited as the cause for retaliation is protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected conduct and the adverse action." Davis v. Goord, 320 F.3d 346, 325 (2d Cir. 2003); see also Gill v. Pidlypchak, 389 F.3d 379 (2d Cir. 2004).

It is undisputed that filing a civil lawsuit is activity protected by the First Amendment. Beechwood Restorative Care Ctr. v. Leeds, 436 F.3d 147, 152 (2d Cir. 2006) ("[L]awsuits are protected speech."); see also Houston v. Zen Zen, 388 F.Supp.2d 172, 174 (W.D.N.Y. 2005).

An action is considered to be adverse if it "would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." Tafari v. McCarthy, 714 F.Supp.2d 317, 348 (N.D.N.Y. 2010). Robideau argues that there is no material dispute of fact that he did not take any adverse action against Plaintiff because he was driving the van and did not enter the SHU. Robideau Mem. at 18. Robideau essentially reiterates his argument above, stating that documentary and testimonial evidence establishes his non-involvement, and the Court should disregard evidence to the contrary because it consists of "unsupported, self-serving statements that have not been corroborated." Id. However, as above, the Court finds that a reasonable jury could choose to credit Plaintiff's statements that Robideau assaulted him in the back of the transfer van and in the SHU. See supra Section IV(A)(1). It cannot be disputed that a physical assault on a handcuffed prisoner of the type alleged by Plaintiff would deter an individual of ordinary firmness from exercising constitutional rights. See Baskerville v. Blot, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) ("[Plaintiff's] claim regarding the retaliatory assault sufficiently describes adverse conduct that would deter a reasonable inmate from exercising his constitutional rights."); Flemming v. King, No. 14-CV-316, 2016 WL 5219995, at *5 (N.D.N.Y. June 20, 2016) ("[A] physical assault constitutes adverse action."), report and recommendation adopted, No. 14-CV-0316, 2016 WL 5173282 (N.D.N.Y. Sept. 21, 2016).

Thus, there is a material dispute of fact as to whether Robideau undertook an adverse action.

Robideau further argues that, even if it is accepted that he participated in the assaults, there is insufficient evidence on the record to establish a causal connection between Plaintiff's filing of the Cowan Suit and the assaults. Robideau Mem. at 16.

In determining whether a causal connection exists between a plaintiff's protected activity and a prison official's actions, a court may consider several factors including "(i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation."[5] Baskerville v. Blot, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citing Colon v. Coughlin, 58 F.3d 865, 872–73 (2d Cir. 1995)).

[5]     The court notes that factors (ii) and (iii) are generally employed when an inmate claims a prison

disciplinary or administrative action is taken in retaliation, see, e.g., Faulk v. Fisher, 545 F. App'x 56, 59 (2d Cir. 2013); Morris v. Rabsatt, 2012 WL 976035, at *7 (N.D.N.Y. 2012), and are of dubious relevance when an inmate claims security officers have physically assaulted him.

*12  Notwithstanding the first three factors, the Court finds that alleged statements made by Robideau are sufficient for a reasonable jury to conclude the assaults were connected to the Cowan suit.

Plaintiff claims that while assaulting him in the back of the van, Robideau stated "our buddy wants us to give you the special treatment," Pl.'s Grievance at 13, and that during the alleged attack in the SHU, one officer stated "our buddy wants us to give a nigger like you the special treatment" and "this nigger gets the special treatment because he filed a lawsuit against one of our brothers," id. at 14. Robideau claims he does not know Officer Cowan and did not make these statements, and a jury could choose to disbelieve Plaintiff's claims, but they are sufficient to create a material issue of fact regarding Robideau's retaliatory motive. See Colon, 58 F.3d at 873 (reversing grant of summary judgment where prisoner presented direct evidence of causal connection in the form of an alleged admission of retaliatory motive by defendant prison official, despite defendant's denial on the record of ever making the statement.)

Therefore, the Court finds there are issues of material fact regarding whether Robideau retaliated against Plaintiff for exercising his First Amendment rights and denies Robideau's motion for summary judgment on this claim.

**B. Mere Motion for Summary Judgment**
Mere argues he is entitled to summary judgment on (1) Plaintiff's claim for use of excessive force, (2) Plaintiff's claim for deliberate indifference to a serious medical need in violation of the Eighth Amendment, and (3) Plaintiff's claim of retaliation in violation of the First Amendment. See Mere Mem. at 1. Mere also argues that he is entitled to qualified immunity. Id.

*1. Eighth Amendment Excessive Force*
*Under 42 U.S.C. § 1983 as to Mere*

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a

prerequisite to an award of damages under § 1983.' " Brandon v. Kinter, 938 F.3d 21, 36 (2d Cir. 2019) (quoting Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)).

Mere alleges it is "undisputed" that he was not personally involved in the assaults on Plaintiff, because the record establishes that he was in the gym when Plaintiff was allegedly assaulted in the SHU. [6] Mere Mem. at 7–9. To support this claim, Mere points to (1) his own deposition testimony as well as that of Defendants Hanson and Sharpe which each claim that only Hanson and Sharpe were in the SHU room when the use-of-force event occurred, id. at 8; Mere Dep. at 55; Hanson Dep. at 91–92; Sharpe Dep. at 122–123; (2) Birchenough Decl. Ex. I ("Use of Force Report"), Birchenough Decl. Ex. H ("Unusual Incident Memorandum"), Birchenough Decl. Ex. K ("Sharpe Inmate Misbehavior Report"), and the Germano Report, which each show that the use-of-force event occurred around 3:10 P.M. on April 23, 2016; (3) Mere's deposition testimony, declaration, and the DOCCS Staff Planning Grid from April 23, 2016 purportedly establishing that Mere was in the gym at 3:10 P.M. that day, Mere Dep. at 51, Mere Decl. Ex. A ("DOCCS Staff Planning Grid"); and (4) the fact that the Germano Report created after the OSI investigation did not identify Mere as "involved staff" or present during the use-of-force event. See Germano Report. Mere also contends that Plaintiff's Amended Complaint does not allege he was involved in the use-of-force event in the SHU, and that Plaintiff's Grievance likewise does not state Mere was in the SHU room during the assault and only mentions him for the first time after Plaintiff was placed in his SHU cell. Mere Mem. at 7–8.

[6]    It is undisputed that Mere was not present in the van during the alleged assault on Plaintiff during his transfer to the SHU. Pl.'s SMF at 18.

*13  However, contrary to Mere's assertions, Mere's non-presence in the SHU during the assault is explicitly disputed on the record. Plaintiff testified several times during his deposition that Mere was present in the SHU strip-frisk room during the assault, along with Robideau, Sharpe, Hanson and another unidentified officer, and that all the officers present assaulted him:

Q. Okay. Was Officer Mere one of the individuals who assaulted you once you got to the SHU to the strip frisk room?

A. I believe he was.

Q. I'm sorry?

A. I believe he was because he was in the room with them.

Q. He was in the strip frisk room?

A. Yes.

...

Q. Okay. Was he one of the ones that assaulted you?

A. All of them assaulted me.

Pl. Dep. at 199–200; see also id. at 204, 223, 224. Likewise, in Plaintiff's Declaration, Plaintiff alleges that Mere assaulted him in the SHU. Pl.'s Decl. at 13–19.

The question then is whether this testimony is sufficient to create an issue of material fact, or whether it is nothing more than a mere scintilla of evidence. The Court find that Plaintiff's testimony is sufficient to withstand summary judgment.

Mere appears to argue that Plaintiff's Grievance contradicts his later statements that Mere participated in the SHU assault because the grievance does not name Mere specifically until Plaintiff describes events that occurred while he was in the SHU cell. Mere Mem. at 8.

Where a plaintiff "relies almost exclusively on his own testimony, much of which is contradictory and incomplete[,]" and the account is so contradictory that "no reasonable person could believe [it]," summary judgment may be appropriate. Jeffreys v. City of N.Y., 426 F.3d 549, 554–55 (2d Cir. 2005). It is true that Plaintiff's Grievance does not name Mere as one of the officers present in the SHU strip-frisk room and that Plaintiff relies almost exclusively on his own testimony to establish Mere's presence there. However, the Court does not find that the grievance inherently contradicts Plaintiff's later statements regarding Mere's participation. The grievance states there were several officers in the strip-frisk room during the assault and that "all the officers in the room started kicking and punching." Pl.'s Grievance at 3. The Court does not find this statement, or the allegations in Plaintiff's Complaint, so contradictory that no reasonable person could believe Plaintiff's account.

Further, much of Mere's argument relies on the Staff Planning Grid to establish that it was "physically impossible" for him

to be in the SHU at the time of the use-of-force event, as well as on the testimony of other officers and the Germano Report. Mere Mem. at 8. However, an assignment to a specific area does not conclusively establish that Mere was physically present in that area at the specified time. And a reasonable jury could choose to believe Plaintiff's account over the Staff Planning Grid, the defendant officers' testimonies, and the Germano Report, which was itself largely based on the parties' statements. Germano Report at 1–4.

While the weight of the evidence may favor Mere, a reasonable juror could credit Plaintiff's account, and the weighing of conflicting evidence is more properly left to the jury. Telesford v. Tamer, No. 14-CV-1209, 2016 WL 11480163, at *4 (N.D.N.Y. Aug. 31, 2016) ("Resolving the discrepancy between the parties' competing evidence would require the court to undertake a credibility determination that is not appropriate on summary judgment."). Thus, the Court denies Mere's request for summary judgment as to Plaintiff's Eighth Amendment excessive force claim.

### 2. Eighth Amendment Medical Indifference as to Mere

**\*14**  To establish an Eighth Amendment violation due to medical indifference, an inmate must prove "deliberate indifference to [his] serious medical needs." Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)). The deliberate indifference requirement has both an objective and subjective prong. St. Clair Jones v. Lamont, 379 Fed. Appx. 58, 59 (2d Cir. 2010). Mere only argues that Plaintiff has not satisfied the subjective prong. See Mere Mem. at 9–12.

The subjective prong requires that a defendant prison official act with a sufficiently culpable state of mind. They must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety." Hill v. Curcione, 657 F.3d 116, 122 (2d Cir. 2011) (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)). In other words, they must "act[ ] or fail[ ] to act 'while actually aware of a substantial risk that serious inmate harm will result.' " Acosta v. Thomas, 837 Fed. Appx. 32 (2d Cir. 2020) (quoting Salahuddin v. Goord, 467 F.3d 263, 280 (2d Cir. 2006)).

Mere argues that the record establishes he was not aware of the use-of-force event in the SHU, and thus had no knowledge of any excessive risk of injury, and that Plaintiff only requested his inhaler once, after which it was promptly

provided to him—therefore, Mere did not act indifferently. Mere Mem. at 11–12.

However, as noted above, a reasonable jury could choose to credit Plaintiff's account of events, and that account relates a considerably different story. Plaintiff alleged on the record that Mere was not only aware of the use of force in the SHU, wherein five officer allegedly "beat[ ] up and kick[ed]" Plaintiff while on the ground, but participated as well. Pl.'s Dep. at 199:25–201:5. Shortly after the alleged attack, when Plaintiff had been placed in his SHU cell, Plaintiff claims he informed Mere that he could not breathe and feared he was having a asthma attack. Id. at 209:3–209:8; Pl.'s Decl. ¶ 28. A reasonable jury could conclude that knowledge of a brutal assault on Plaintiff combined with Plaintiff's statements shortly afterward that he couldn't breathe put Mere on notice of an excessive risk to Plaintiff's health. Baumann v. Walsh, 36 F. Supp. 2d 508, 513 (N.D.N.Y. 1999) ("[I]f [the defendants] were aware of [p]laintiff's injuries and subsequent pain at the time those injuries occurred, yet failed to provide access to necessary medical care or treatment, then an Eighth Amendment violation would be established despite the fact that medical treatment was later received.").

Likewise, a dispute as to material fact exists regarding whether Mere reacted with indifference to this excessive risk. While Mere claims Plaintiff was given his inhaler "within a reasonable time" after allegedly saying he couldn't breathe, Mere Mem. at 11–12, the record evidence Mere references to support his argument that this fact is undisputed instead shows the opposite. Mere cites to Plaintiff's deposition testimony, yet in that testimony, Plaintiff states that when he informed Mere he needed his inhaler, Mere said he would "look into it" but never provided assistance, and Plaintiff did not get his inhaler until hours after asking Mere (and then only when a different officer arrived). Pl.'s Dep. at 209:3–209:8, 215:9–215:16. Mere also cites the Germano Report, which states that Plaintiff attempted to gain the attention of "the officer assigned to the watch" but he was met with "negative results" and did not get his inhaler until "approximately one hour later." Germano Report at 1. The Germano Report also found that "[Plaintiff] made several complaints of rib pain and difficulty breathing immediately following the incident" and "involved staff failed to give [Plaintiff] proper medical care immediately after the Use of Force occurred and the following day." Id. at 1, 4.

**\*15**  Indeed, Mere's alleged failure to provide assistance to an inmate struggling to breathe, shortly after participating

in a violent assault on that inmate, could reasonably be inferred to be, not only indifference to a serious medical need, but an intentional delay in access to medical care. See Estelle v. Gamble, 429 U.S. 97, 104–05 (1976) (finding deliberate indifference to serious medical need standard met where "prison guards ... intentionally deny[ ] or delay[ ] access to medical care."); Archer v. Dutcher, 733 F.2d 14, 16 (2d Cir. 1984) (denying summary judgment on claim for medical indifference where some evidence suggested defendants delayed emergency medical aid).

Because there are disputes as to material facts regarding whether Mere was aware of an excessive risk to Plaintiff's health, and whether Mere acted with deliberate indifference to that risk, the Court denies Mere's motion for summary judgment as to Plaintiff's claim for deliberate indifference to a severe medical need.

### 3. Retaliation as to Mere

As stated above, to succeed on a claim of retaliation in violation of the First Amendment, a plaintiff must show "(1) the conduct cited as the cause for retaliation is protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected conduct and the adverse action." Davis v. Goord, 320 F.3d 346, 325 (2d Cir. 2003); see also Gill v. Pidlypchak, 389 F.3d 379 (2d Cir. 2004).

It is undisputed that the filing of a lawsuit constitutes protected conduct. See Mere Mem. at 16. Mere instead argues that his conduct does not constitute an adverse action and there was no causal connection between the alleged conduct and the protected activity. See id. at 16–18.

Plaintiff alleges three actions that could constitute retaliation by Mere: Mere's alleged participation in the assault in the SHU strip-frisk room, Mere's denial of adequate medical care, and Mere's issuance of misbehavior reports.

### a. SHU Strip-Frisk Assault

The Court has already determined that issues of material fact exist regarding whether Mere participated in the alleged assault in the SHU strip-frisk room. See supra Section IV(B) (1). Similar to the assault allegedly perpetrated by Robideau, the physical assault allegedly perpetrated by Mere is sufficient to constitute an adverse action that would deter a similarly situated individual of ordinary firmness from exercising constitutional rights. See Baskerville v, 224 F. Supp. 2d at 732.

Mere argues that Plaintiff "offers only conclusory evidence" to support his claim of a causal connection between Mere's alleged actions and the Cowan Suit. See Mere Mem. at 14. While much of the evidence presented by Plaintiff regarding Defendants' knowledge of the Cowan suit is indeed conclusory or speculative, Plaintiff has also provided direct evidence of a causal link. A reasonable factfinder could credit Plaintiff's account that an officer stated during the assault in the strip-frisk room that they wanted Plaintiff to receive "special treatment because he filed a lawsuit against one of our brothers," Pl.'s Dep at 187:24–188:5; 200:8–200:17, and that Mere participated in that assault. If believed, this is sufficient to create an inference of causation between the protected activity and the alleged assault, even if it is not conclusively established that Mere himself is the one who made the statement. See Roland v. McMonagle, No. 12-CV-6331, 2015 WL 5918179, at *5–6 (S.D.N.Y. Oct. 9, 2015) (finding summary judgment on retaliation claim unwarranted where evidence supported an "inference of causation" between filing of grievances and assault by multiple corrections officers because one had "mocked [plaintiff]" for filing a grievance during the alleged attack").

### b. Denial of Adequate Medical Care

**\*16** A denial of medical care in the face of great pain or need, as is alleged by Plaintiff and supported on the record, constitutes an adverse action sufficient to establish a claim for retaliation. See Abreu v. Lipka, 778 F. App'x 28, 33 (2d Cir. 2019) ("[W]ithholding of medication could constitute sufficiently adverse actions that would deter a prisoner of 'ordinary firmness' from exercising his rights.").

As stated above, a reasonable factfinder could find that Mere's alleged assault was motivated by Plaintiff's filing of a suit against Cowan. Given that Plaintiff' Grievance states the denial of medical care initially occurred only thirty minutes to an hour after Mere supposedly took part in an assault on Plaintiff, Pl.'s Grievance at 6, which itself was allegedly explicitly undertaken in retaliation for the filing of the Cowan suit, see Pl.'s Dep at 187:24–188:5; 200:8–200:17, a factfinder could reasonably infer that this adverse-action

was similarly motivated. Roland, 2015 WL 5918179, at *5–6 ("[S]ummary judgment is unwarranted if the evidence can support an inference of causation.").

### c. Issuance of Misbehavior Tickets

However, the Court finds that Mere's issuance of misbehavior tickets does not constitute an adverse action sufficient to deter a person of ordinary firmness from exercising his rights because the tickets were eventually dismissed and Plaintiff never suffered adverse consequences or repercussions. See Birchenough Decl. Ex. O–Q; compare Berry v. Tremblay, No. 20-CV-177, 2021 WL 1575951, at *4 (N.D.N.Y. Apr. 22, 2021) ("Courts in this district have routinely found the mere filing of a misbehavior report alone, without evidence of other repercussions, does not constitute an adverse action.") (collecting cases), with Hayes v. Dahlke, 976 F.3d 259, 272–74 (2d Cir. 2020) (finding filing of false misbehavior report constituted adverse action where inmate-plaintiff spent time in keeplock as a result), and Gill v. Pidlypchak, 389 F.3d 379, 384 (2d Cir. 2004) (finding adverse action where inmate-plaintiff spent three weeks in keeplock as a result of false misbehavior report.).

Plaintiff argues that he did suffer consequences because, while the misbehavior reports were eventually dismissed, he was initially found guilty and had to appeal the charges. See Pl.'s Resp. Mem. at 35. However, Plaintiff does not present any specific consequences or repercussions he faced as a result of the initial guilty finding or as a result of engaging in the appeals process. See id.

Therefore, the Court denies Mere's motion for summary judgment as to retaliation arising from Mere's alleged use of force in the SHU strip-search room and Mere's alleged denial of adequate medical care, but grants summary judgment as to retaliation arising from Mere's issuance of misbehavior reports.

### 4. Qualified Immunity as to Mere

In order to establish a defense of qualified immunity, a defendant public official must show that one of two conditions is satisfied, either "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." Gorman v. Rensselaer Cty., 910 F.3d 40, 45 (2d Cir.

2018); see also Green v. Montgomery, 219 F.3d 52, 59 (2d Cir. 2000). "The objective reasonableness test is met if 'officers of reasonable competence could disagree' on the legality of the defendant's actions." Green, 219 F.3d at 59 (quoting Salim v. Proulx, 93 F.3d 86, 91 (2d Cir. 1996)). Summary judgment should not be granted on the basis of qualified immunity due to objective reasonableness "unless the defendant shows that no reasonable jury, viewing the evidence in the light most favorable to the Plaintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law." Husain v. Springer, 494 F.3d 108, 131 (2d Cir. 2007).

*17 Mere does not argue that his actions did not violate clearly established law. See Mere Mem. at 18–20. He instead claims that his actions were objectively reasonable and he is thus entitled to qualified immunity as to the claims against him derived from his alleged use of excessive force and denial of adequate medical care. Id.[7]

> [7]    Mere also argues he is entitled to qualified immunity as to any claims arising from his issuance of misbehavior tickets. See Mere Mem. at 20. However, because the Court has already granted summary judgment for these claims, the Court will not address this argument.

Regarding the claims of excessive force and retaliation stemming from the alleged assault in the SHU strip-frisk room, Mere argues he is entitled to qualified immunity because he "was not present during the Use of Force Event ... and therefore it was objectively reasonable that Officer Mere did not intervene in a Use of Force Event of which he had no knowledge." Id. at 18. However, Mere's presence and participation in the strip-frisk room assault is a contested and material issue of fact. Construing the record in the light most favorable to Plaintiff, a jury could reasonably credit Plaintiff's testimony that Mere participated in the assault and thus reasonably find that it was not objectively reasonable for Mere to believe his actions did not violate Plaintiff's Eighth Amendment rights. See Jeanty v. Cty. of Orange, 379 F. Supp. 2d 533, 542 (S.D.N.Y. 2005) (denying summary judgment where plaintiff's testimony created factual dispute regarding defendants' use of excessive force, thus "jury could reasonably conclude that it was not objectively reasonable for the individual defendants to believe that their actions did not violate plaintiff's Eighth Amendment rights."); Brewer v. Kamas, 533 F. Supp. 2d 318, 331 (W.D.N.Y. 2008) (finding, where plaintiff alleged corrections officer used excessive

force, that "if the facts as alleged by Plaintiff are established at trial, no reasonable corrections officer could reasonably believe he was not violating Plaintiff's constitutional rights.").

Mere also argues he is entitled to qualified immunity regarding claims of deliberate indifference to a serious medical need and retaliation stemming from his alleged failure to provide Plaintiff with his inhaler while on the 1:1 suicide watch. See Mere Mem. at 19. Mere asserts it was objectively reasonable for him to not leave his post to personally retrieve the inhaler and that "any reasonable officer similarly assigned to a one-on-one watch would engage the use of other DOCCS officers such as the SHU Roundsmen ... and would rely upon their assistance to alert medical staff." Id.

However, construing the evidence in the light most favorable to Plaintiff, Mere's assertions are heavily disputed. Plaintiff asserts that Mere participated in a vicious assault upon him in the SHU and thus knew he had been severely beaten. Pl.'s Dep at 200:8–200:17. Shortly after, Plaintiff claims he informed Mere he could not breathe, thought he was having an asthma attack, and needed his inhaler. Pl.'s Grievance at 6. Rather than contacting other officers to get medical aid, as Mere claims he did, Plaintiff asserts that Mere simply said he would "look into" it, walked away, and never provided any sort of assistance. Id. at 6–7; Germano Report at 1; Pl.'s Dep. at 209:3–209:8. Plaintiff claims he did not receive his inhaler until hours later, when he was able to contact another officer. Pl.'s Dep. at 215:11–215:16.

**\*18** Again, the test for objective reasonableness is met "if officers of reasonable competence could disagree on the legality of the defendant's actions." Green, 219 F.3d at 59 (quotation marks omitted). Tellingly, Mere states that "*any* reasonable officer" in his position would have engaged the use of other officers to alert medical staff. Mere Mem. at 19 (emphasis added). Thus, Mere implies that if an officer acted as Plaintiff asserts, and never alerted medical staff or sought assistance, no officer of reasonable competence would agree that it was legal or proper.

A reasonable jury could credit Plaintiff's account and find it was not objectively reasonable for Mere to believe denying an inhaler to an inmate who had stated he couldn't breathe, especially after participating in an assault on that inmate, did not violate Plaintiff's right to medical care. Thus, the objective reasonableness of Mere's actions depends on a determination of factual questions that cannot be answered at the summary judgment stage of litigation. See Ellington

v. Whiting, 807 F. App'x 67, 69–70 (2d Cir. 2020) (denying summary judgment on qualified immunity grounds where material issues of fact existed regarding whether defendants were aware of plaintiff's condition); Robinson v. Taylor, No. 16-CV-0285, 2017 U.S. Dist. LEXIS 137233 (N.D.N.Y. Aug. 24, 2017) (denying summary judgment on qualified immunity grounds where "resolution of the objective reasonableness of Defendants' actions 'depends on the determination of certain factual questions that cannot be answered at this stage of the litigation.' ") (quoting Denton v. McKee, 332 F. Supp. 2d 659, 666 (S.D.N.Y. 2004)).

**C. Peck Motion for Summary Judgment**

Peck moves for summary judgment on all claims against him, which include a claim of excessive force in violation of the Eighth Amendment, deliberate indifference to a serious medical need in violation of the Eighth Amendment, and retaliation in violation of the First Amendment.

*1. Excessive Force as to Peck*

Plaintiff does not oppose Peck's motion regarding his claims for excessive force. See Pl.'s Resp. Mem. at 14. Thus, the Court grants Peck's motion for summary judgment regarding any claims of excessive force.

*2. Deliberate Indifference to a
Serious Medical Need as to Peck*

To establish an Eighth Amendment violation due to deliberate indifference to a serious medical need, an inmate must establish both an objective and subjective prong. St. Clair Jones v. Lamont, 379 Fed. Appx. 58, 59 (2d Cir. 2010).

Peck argues that he is entitled to judgment as a matter of law under both the objective and subjective prongs.

a. Objective Prong

The objective prong of the deliberate indifference standard requires that "the alleged deprivation ... be sufficiently serious." Hill v. Curcione, 657 F.3d 116, 122 (2d Cir. 2011) (quoting Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996)). This determination in turn requires two further inquiries. Salahuddin v. Goord, 467 F.3d 263, 280,

279 (2d Cir. 2006). The first inquiry is "whether the prisoner was actually deprived of adequate medical care." Id. This inquiry turns on whether the defendant acted "reasonably" in response to an inmate's health risk or whether he failed "to take reasonable measure in response to a medical condition." Id. at 279–80. The second inquiry is whether the inadequacy in medical care is sufficiently serious. Id. at 280. "[I]f the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." Id.

**\*19** Peck does not dispute that Plaintiff's injuries were sufficiently serious as required by the second inquiry of the objective prong. See Peck Reply. Mem. at 4. Peck instead argues that the record evidence is insufficient to meet the first inquiry of the objective prong because he reacted reasonably. Peck Mem. at 14. Instead, Peck argues he was not aware of the use of force against Plaintiff or Plaintiff's physical condition, or that Plaintiff was having trouble breathing. Peck Mem. at 14. Peck further argues that, on the one occasion Plaintiff asked if he could have his inhaler, Peck acted reasonably by informing medical staff and contacting a supervisor. Id. at 14–15.

Plaintiff contends Peck must have known of the use of force against him, and thus knew of his injuries, because that morning "another officer in the SHU told Lewis he would not receive breakfast because he assaulted another officer." Pl.'s Resp. Mem. at 31. The Court finds that the mere fact that a different officer in the SHU, on duty at a different time of day, knew of the use-of-force incident involving Plaintiff, is entirely too speculative and conclusory to create a triable issue of fact as to whether Peck himself knew of the incident. See Fischer v. Forrest, 968 F.3d 216, 221 (2d Cir. 2020) ("[M]ere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment."). Even if the other officer's knowledge were imputed to Peck, the other officer seemed to believe Plaintiff was the assailant, and would not necessarily have known of any injuries Plaintiff had received. Plaintiff's Grievance at 7A (stating the officer said "no food for you because you assaulted a [sic] officer").

However, Plaintiff offers more than the speculative assertion above to support his claim that Peck knew of a serious risk to his health. Plaintiff testified that he informed Peck he was having a hard time breathing and was having an asthma attack, but Peck did not do anything to help. Pl.'s Dep. at 263:16–24; Pl.'s Grievance at 7B; Germano Report at 1–2. Plaintiff

further alleged that he requested his inhaler from Peck again, after an hour with no assistance, and Peck told him he would "just have to wait." Pl.'s Grievance at 7B; Pl.'s Decl. ¶¶43–44 [8]. According to Plaintiff, he did not receive medical aid until an additional hour and a half had passed. Pl.'s Grievance at 7C. Additionally, a reasonable jury could take into account the Germano Report, which found Peck exhibited "a lack of care custody and control by departmental standards," to find Peck did not act reasonably.

[8]     Peck argues that Plaintiff has relied "almost exclusively on his Declaration to invent questions of fact" in response to Peck's motion. Peck Reply Mem. at 5. Peck further argues that the Court should disregard the assertions Plaintiff makes in his declaration because they contradict Plaintiff's deposition testimony and are "replete with inconsistencies." Id. at 2. The Court disagrees on both counts. Plaintiff's material assertions that he informed Peck he was having trouble breathing and requested his inhaler multiple times find support, not only in Plaintiff's Declaration, but in both his deposition testimony and the Germano Report. Pl.'s Dep. at 263:16–24; Pl.'s Grievance at 7B. Further, while it is true that a declaration made in response to a motion for summary judgment may be disregarded to the extent it contradicts past deposition testimony, the two must be "actually contradictory." Palazzo v. Corio, 232 F.3d 38, 43 (2d Cir. 2000). The Court does not agree that Plaintiff's Declaration is inconsistent with his deposition. Peck claims that Plaintiff states Peck was not at his post in his declaration, but in the deposition, stated that it was Mere who was not at his post. Peck Reply Mem. at 2. While Plaintiff does state that Mere was not at his post in his deposition, Pl.'s Dep. at 208, he also states later that Peck was not at his post the next day, id. at 265:6–8. Similarly, Peck argues it is inconsistent for Plaintiff to claim in his later declaration that he did not receive his inhaler until after Peck did not respond, when he admitted in his previous deposition that he received an inhaler before Peck even began his shift. Peck Reply Mem. at 3. However, Plaintiff makes clear that, while he did receive his inhaler the day before while Mere was on watch, he was still short of breath the next day, and thus requested

2022 WL 991729

the inhaler again from Peck. Pl.'s Grievance at 7B; Pl.'s Decl. ¶¶ 31, 38.

 **\*20**  Further, the record belies Peck's assertion that he acted reasonably because he contacted a supervisor in response to Plaintiff's request. Notably, Peck does not cite to any record material to support this factual assertion. See Peck Mem. at 14. Indeed, Peck denied during his deposition that he ever requested medical attention for Plaintiff, Peck Dep. at 43:2–43:8, Peck testified that when he contacted a roundsmen about getting a supervisor, he did not recall mentioning any need for medical attention and "[t]he only thing [he] wanted to have the roundsman do was to have a sergeant come down," id. at 46:14–47:2, Peck also testified he did not recall ever telling Sergeant Tamer that Plaintiff had requested medical attention and did not contact medical directly at any point, id. at 57:5–57:23.

Construing the evidence in the light most favorable to Plaintiff, the Court concludes that a reasonable jury could find Peck knew Plaintiff was in severe medical need due to his inability to breathe, but did not act to obtain aid, and thus did not act reasonably in response to Plaintiff's requests. Therefore, Peck is not entitled to summary judgment under the objective prong of the deliberate indifference standard.

#### b. Subjective Prong

The subjective prong of the deliberate indifference standard requires that a defendant prison official act with a sufficiently culpable state of mind. They must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety." Hill, 657 F.3d at 122 (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)). In other words, they must "act[ ] or fail[ ] to act 'while actually aware of a substantial risk that serious inmate harm will result.' " Acosta v. Thomas, 837 Fed. Appx. 32 (2d Cir. 2020) (quoting Salahuddin, 467 F.3d at 280).

Peck argues he did not know of and disregard an excessive risk to inmate health or safety because he was not informed of Plaintiff's physical condition, he did not notice any injuries upon beginning his assignment, and that Plaintiff testified that the extent of his medical request was for an inhaler because he was having an asthma attack. See Peck Mem. at 15–16.

However, as stated above, a reasonable jury could credit Plaintiff's account and find that he informed Peck he was having an asthma attack and was unable to breathe. Pl.'s Dep. at 263:16–24; Pl.'s Grievance at 7B; Germano Report at 1–

2. Given Peck's deposition testimony, a reasonable factfinder could likewise find that Peck did not undertake any action to provide medical aid in response to Plaintiff's reports that he could not breathe. Peck Dep. at 43:2–8; 46:14–47:2; 57:5–23.

Thus, a factfinder could find Peck was aware of an excessive risk to Plaintiff's health, and that Peck disregarded it by failing to take any action to provide aid. [9]  See Warren v. City of New York Dep't of Corr. Med. Staff, No. 17-CV-1125, 2021 WL 1163105, at *11 (E.D.N.Y. Mar. 26, 2021) (denying summary judgment where material dispute of fact existed regarding whether defendant provided plaintiff medical attention in response to asthma attack); Ennis v. Davies, No. 87-CV-1465, 1990 WL 121527, at *3 (S.D.N.Y. Aug. 14, 1990) (holding that a jury could reasonably find that inmate's request for his asthma medication was sufficient to make the defendants aware of a serious medical need and failure to provide medication constituted deliberate indifference).

[9]     Peck argues that, to meet the subjective prong of the deliberate indifference claim against a non-medical official, "the plaintiff must establish that the official 'intentionally delayed access to medical care' " after the plaintiff made the problem known. Peck Mem. at 13. However, an examination of the higher court decisions from which this doctrine springs indicates that, while they consider showing intentional delay to be *sufficient* to establish deliberate indifference, they do not state that such a showing is *necessary* to establish deliberate indifference. See Estelle v. Gamble, 429 U.S. 97, 104–105 (1976) ("[D]eliberate indifference to serious medical needs of prisoners ... [is manifested] by prison guards in intentionally denying or delaying access to medical care."); Archer v. Dutcher, 733 F.2d 14, 16 (2d Cir. 1984) ("[I]f defendants did decide to delay emergency medical aid ... in order to make Archer suffer, surely a claim would be stated under Estelle."). However, to the extent such a showing is necessary, the Court finds that a reasonable jury could find intentional delay here due to Peck's alleged complete inaction in the face of Plaintiff's statements he was having an asthma attack and could not breathe. See Baumann v. Walsh, 36 F. Supp. 2d 508, 512 (N.D.N.Y. 1999) (finding dispute of material fact regarding whether defendants intentionally delayed care

where evidence showed they ignored plaintiff's complaints and refused medical care).

**\*21** Thus, because there are disputes as to material facts regarding whether Peck acted reasonably and whether he knew of and acted with reckless disregard regarding an excessive risk to Plaintiff's health, the Court denies Peck's motion for summary judgment as to Plaintiff's claim for deliberate indifference to a serious medical need.

### 3. Retaliation as to Peck

Plaintiff alleges Peck withheld proper medical treatment and filed a false misbehavior report against him as retaliation for his filing of the lawsuit against Cowan. Pl.'s Resp. Mem. at 36.

To succeed on a claim of retaliation in violation of the First Amendment, a plaintiff must show "(1) the conduct cited as the cause for retaliation is protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected conduct and the adverse action." Davis, 320 F.3d at 325; see also Pidlypchak, 389 F.3d at 380. In determining whether a causal connection exists between a protected activity and a prison official's actions, a court may consider several factors including "(i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation." Baskerville, 224 F. Supp. 2d at 732 (citing Colon, 58 F.3d at 872–73 (2d Cir. 1995)).

Peck argues there is insufficient evidence on the record to establish a causal connection between his alleged actions and any retaliatory animus. See Peck Mem. at 22. In response, Plaintiff asserts that there is sufficient circumstantial evidence to infer a causal connection due to the temporal proximity between the protected conduct and Peck's alleged retaliatory conduct and the due to fact that Bare Hill is close geographically to Franklin, the facility where Cowan worked. See Pl.'s Resp. Mem. at 38–39.

Regarding temporal proximity, the Court cannot agree that this factor meaningfully supports a causal connection in this case. Peck's alleged actions took place around ten months after Plaintiff filed the Cowan Suit. Noonan Decl. Ex. 13. While the Second Circuit "has not drawn a bright line to define the outer limits" of temporal proximity in retaliation

cases, Gorman–Bakos v. Cornell Co-op Ext. of Schenectady Cty., 252 F.3d 545, 554 (2d Cir. 2001), a gap of ten months is somewhat longer than most that are found to support a causal connection. See, e.g., Gorman-Bakos, 252 F.3d at 554 (finding five-month gap sufficiently short to support inference of causal connection); Espinal, 558 F.3d at 129 (finding six-month gap sufficiently short). However, it is relevant that the Cowan Suit was ongoing at the time of Peck's alleged retaliatory actions. See Cruz v. Lee, No. 14-CV-4870, 2016 WL 1060330, at *7 (S.D.N.Y. Mar. 15, 2016) (finding temporal proximity sufficient to support retaliation for filing lawsuit where lawsuit was ongoing). Given that the Cowan Suit was ongoing, but nothing occurred in the lawsuit near in time to the alleged retaliatory acts, [10] and the suit was filed ten months prior to the alleged acts, the Court finds this factor does not strongly favor, nor disfavor, an inference of causation.

[10] The only event Plaintiff points to in the Cowan Suit that happened near in time to these events is the denial of pro bono counsel in November 2016, five months after the alleged retaliatory events. Pl.'s Resp. Mem. at 38.

**\*22** Militating against a finding of causal connection, Plaintiff's prior disciplinary record could not be categorized as "good." It contains multiple infractions for violating direct orders and harassment, amongst others. See Mitchell Decl. Ex. D. Also, Plaintiff was eventually found guilty of the misbehavior ticket issued by Peck. Pl.'s SMF at 71.

However, most significantly, Plaintiff's grounds for alleging a causal connection are too conclusory and speculative to create a triable issue of fact regarding Peck's alleged retaliatory motive. Plaintiff's main argument is that "there is ample evidence to conclude that Moving Defendants knew other officers at Franklin – a facility located in the same small town." Pl.'s Resp. Mem. at 39. Namely, Plaintiff references Peck's deposition testimony that when he goes to trainings, there would be officers from Franklin and Upstate Correctional there as well, Peck Dep. at 115:12–115:22, and that Defendants Kingston and Mere stated they would run into officers from Franklin at times, Kingston Dep. at 92:10–92:21, Mere Dep. 18:16–19:2.

Courts must be "careful to require non-conclusory allegations" when dealing with prisoner retaliation claims because they are " 'easily fabricated,' and accordingly 'pose a substantial risk of unwarranted judicial intrusion into matters

of general prison administration.' " Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003). Plaintiff did not file a suit or complaint against Peck himself. The mere fact that Peck works in the same general area as an officer against whom Plaintiff filed a lawsuit, and thus conceivably could have met that officer or others who know him, and in turn could have potentially acted in retaliation for a suit against that officer, is entirely too speculative and conclusory to create an issue of material fact. Even where officers have worked together in the same facility, allegations that one retaliated on behalf of another have generally been found conclusory and insufficient to withstand summary judgment absent other evidence of retaliatory motive. See Faulk, 545 F. App'x at 59 (finding allegations too conclusory to withstand summary judgment because "no evidence suggest[ed] that they were motivated by, or even aware of, [the] grievance," because defendants were not themselves named in the grievance and allegations they had retaliated on behalf of another officer in the same facility were merely "conclusory"); Wright v. Goord, 554 F.3d 255, 274 (2d Cir. 2009) (upholding summary judgment where plaintiff alleged retaliation for filing complaint regarding acts of other inmates and officials at same facility, but did not name defendant). This contrasts with cases where courts have found disputes of material fact to exist, even though a defendant was not directly named in a grievance or suit, because a direct connection was established between the defendant and the officer who was the target of the suit, or the defendant was alleged to have made statements referencing the grievance or suit. See Colon v. Coughlin, 58 F.3d 865 (2d Cir. 1995) ("If this circumstantial evidence represented the sum total of Colon's proof, we might be inclined to affirm the grant of summary judgment ... [but Colon] also presents direct evidence of retaliation, namely, defendant Bezio's alleged admission of the existence of a retaliatory scheme."); Roland v. McMonagle, No. 12-CV-6331, 2015 WL 5918179, at *5 (S.D.N.Y. Oct. 9, 2015) (finding evidence sufficient to support inference of retaliatory motive where one defendant lived with the two officers who were the subject of the past grievance and "most significantly, [plaintiff] testified that a Defendant mocked him for filing grievances during the alleged attack"); Farid v. Goord, 200 F. Supp. 2d 220, 237 (W.D.N.Y. 2002) (finding issue of triable fact existed as to whether false misbehavior report was motivated by complaint against other officer where defendant knew of the complaint "well before the filing of the Misbehavior Report").

*23 Because Plaintiff's allegations that Peck knew of and was motivated by the Cowan Suit are entirely conclusory

and speculative, the Court grant's Peck motion for summary judgment as to Plaintiff's claims of retaliation.

### D. Kearney and Kingston Motion for Summary Judgment

Defendants Kearney and Kingston argue they are entitled to summary judgment as to Plaintiff's claims for excessive force in violation of the Eighth Amendment, Retaliation in violation of the First Amendment, and are entitled to qualified immunity. See Kearney & Kingston Mem. at 7.

### 1. Excessive Force and Personal Involvement as to Kearney and Kingston

Defendants Kearney and Kingston argue that they are entitled to summary judgment as to Plaintiff's claim of excessive force because the record fails to establish that they were personally involved in the constitutional violation. Id. at 8–13. Plaintiff responds by arguing that personal involvement may be established by showing a defendant facilitated or attempted to cover up a constitutional violation. Pl.'s Resp. Mem. at 21–22.

"Because vicarious liability is inapplicable to ...§ 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. 662 (2009) "To hold a state official liable under § 1983, a plaintiff must plead and prove the elements of the underlying constitutional violation directly against the official without relying on a special test for supervisory liability." Tangreti v. Bachmann, 983 F.3d 609, 620 (2d Cir. 2020).

Plaintiff cites several cases holding that if a defendant attempts to facilitate or cover up a constitutional violation, that is sufficient to find that defendant personally participated in the violation. See, e.g., Edwards v. Annucci, No. 17-CV-5018, 2019 WL 1284295, at *7 (S.D.N.Y. Mar. 20, 2019) ("A prisoner's well-pleaded allegation that a defendant 'fil[ed] a false report to his supervisors in order to cover up' constitutional violations will 'give rise to a plausible inference' that the defendant 'was personally involved in the purported constitutional violations.' ") (quoting Randle v. Alexander, 960 F. Supp. 2d 457, 478 (S.D.N.Y. 2013)). Additionally, this Court held in response to Kearney and Kingston's Motion to Dismiss, Dkt. No 79, that these allegations of facilitation and cover-up were sufficient to

establish personal involvement, See Dkt. No. 100 ("Order on Motion to Dismiss") at 8–9. This would imply that if the record now presented sufficient evidence that Defendants facilitated or attempted to cover up the use of excessive force, a reasonable jury could find they personally participated in the Eighth Amendment violation.

However, subsequent to the decisions Plaintiff cites and this Court's Order on Motion to Dismiss, the Second Circuit clarified the requirements for personal involvement in Tangreti.

In Tangreti, an inmate filed suit under 42 U.S.C. § 1983 alleging a prison supervisor displayed deliberate indifference to a risk of sexual abuse because the supervisor was grossly negligent in supervising the abusing officers. Id. at 616. The Second Circuit found that supervisory liability of this type violated the standard set forth in Iqbal, and that "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Id. at 616. Further, " '[t]he factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue' because the elements of different constitutional violations vary." Id. at 618 (quoting Iqbal, 556 U.S. at 676).

**\*24** Thus, while previously many court's only required a § 1983 Plaintiff to establish a "tangible connection" between a defendant's acts and injuries suffered, see Miller v. Annucci, No. 919-CV-0030, 2019 WL 2370295 (N.D.N.Y. June 5, 2019) (Kahn, J.); Austin v. Pappas, No. 04-CV-7263, 2008 WL 857528, at \*2 (S.D.N.Y. Mar. 31, 2008); in Tangreti, the court required the plaintiff to show "that [defendant] violated the Eighth Amendment by [defendant's] own conduct" and establish the elements of her Eighth Amendment claim directly against the defendant. Tangreti, 983 F.3d at 619.

While Plaintiff's allegations regarding excessive force against Kearney and Kingston do not allege supervisory liability, the reasoning in Tangreti applies with equal force here: Plaintiff must show that Defendants violated the Eighth Amendment by their own conduct, and establish the elements of his Eighth Amendment claim for excessive force [11] directly against Kearney and Kingston rather than relying on the conduct of other officers. See Quintin v. Cty. of Nassau, No. 18-CV-5852, 2022 WL 888950, at \*3 (E.D.N.Y. Mar. 25, 2022) (applying Tangreti outside of the supervisory context and stating that "it is well-settled that to establish liability under Section 1983, a plaintiff must 'plead and prove that each

Government-official defendant, through the official's own individual actions, has violated the Constitution' " (quoting Tangreti, 983 F.3d at 618)); Karelefsky v. Brann, No. 20-cv-9485, 2022 WL 624424, at \*2 (S.D.N.Y. Mar. 1, 2022) (observing that to find personal involvement and "hold a state official liable under § 1983, a plaintiff must plead and prove the elements of the underlying constitutional violation directly against the official." (citing Tangreti, 983 F.3d at 620)).

11   While Plaintiff made allegations in his Amended Complaint that "none of the [Defendants] took reasonable steps to protect [Plaintiff] from the objectively unreasonable and conscience shocking excessive force of the others, despite being in a position to do so," Plaintiff seems to have abandoned this argument regarding Kingston and Kearney and thus the Court will not address it. Kingston and Kearney specifically state in their motion for summary judgment that they are moving to dismiss all claims against them, Kearney & Kingston Mem. at 1, but Plaintiff did not argue in his response that they were liable due to a failure to protect. See generally Pl.'s Resp. Mem.; Pukhovich v. City of N.Y., No. 16-CV-1474, 2018 WL 4688943 at \*8 (E.D.N.Y. Sep. 27, 2018) (finding claims abandoned where complaint contained certain claim and defendants moved for summary judgment on "all" claims and neither party mentioned the cause of action in briefing); Singleton v. City of Newburgh, 1 F. Supp. 2d 306, 312 (S.D.N.Y. 1998) (finding claim abandoned on summary judgment because it was not raised in the record after being asserted in the complaint).

As stated above, to establish an Eighth Amendment claim of excessive force, a plaintiff must show both an objective and subjective component. "The objective component of a claim of cruel and unusual punishment focuses on the harm done, in light of 'contemporary standards of decency ... when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency always are violated.' " Wright v. Goord, 554 F.3d 255, 268–69 (2d Cir. 2009). The subjective component requires a plaintiff to show a defendant official had "a sufficiently culpable state of mind." Hayes v. Dahlke, 976 F.3d 259, 274 (2d Cir. 2020); see also Hudson v. McMillian, 503 U.S. 1, 7 (1992).

**\*25** A corrections officer who knowingly facilitates an assault on an inmate could be found to have directly,

through their own actions, deprived an inmate of his right to be free from cruel and unusual punishment by causing physical bodily harm in the same way an officer who directly participates in the assault deprives an inmate of such rights, and thus the facilitating officer has "used force" to cause harm maliciously. C.f. Smith v. Levine, 510 F. App'x 17, 20 (2d Cir. 2013) (finding complaint to have sufficiently alleged defendant's personal participation in constitutional violation where allegations created "obvious inference" that defendant's action was a "precursor" to the violative act). However, an officer who attempts to cover up an assault after the fact, while potentially committing other violations, may not have personally participated in cruel and unusual punishment in the same way such that a plaintiff could establish the elements of an excessive force claim against them directly.

Thus, because it is admitted neither Kearney nor Kingston participated directly in the alleged assaults on Plaintiff, the question before the Court is whether there is sufficient evidence on the record for a reasonable jury to conclude that Defendants knowingly facilitated the assault.

Plaintiff argues there is evidence showing Kearney made up the phone infraction and Plaintiff's request to use the phones out of whole cloth, thus facilitating the assault by establishing a pretext to transfer Plaintiff to the SHU. Pl.'s Resp. Mem. at 23. After being shown a picture of Plaintiff, Kearney informed Hanson that Plaintiff had asked to use the phone the day before in violation of his cube confinement restrictions. Pl.'s Resp. Mem. at 23; Kearney & Kingston SMF ¶ 15–16. Plaintiff disputes that he was the inmate who approached Kearney to make the call, Pl.'s SMF at 4; Pl.'s Resp. Mem. at 22, and there is evidence on the record that could allow a reasonable factfinder to credit Plaintiff's account. Hanson did not remember ever showing Kearney a picture of Plaintiff. Pl.'s Resp. Mem. at 22. Additionally, evidence on the record indicates that another inmate was using Plaintiff's ID to make phone calls during the relevant time, Mitchell Decl. Ex. O ("Germano Deposition") at 76, and Plaintiff was found not guilty of the misbehavior ticket accusing him of making phone calls in violation of cube restrictions, Mitchell Decl. Ex. K at 59.

Making all reasonable inferences in Plaintiff's favor, a factfinder could reasonably credit his account and conclude that he did not ask Kearney for permission to use the phone on April 22, 2016. A reasonable factfinder could thus conclude Kearney was lying when, after seeing a picture of Plaintiff, he

told Hanson Plaintiff was the one who asked to use the phone, and could infer from this dishonesty that Kearney did so to facilitate, or aid in the facilitation of, Plaintiff's transfer to the SHU.

Plaintiff alleges Kingston facilitated the excessive use of force by initiating Plaintiff's transfer knowing and intending that Plaintiff be assaulted. See Pl.'s Resp. Mem. at 24. The alleged basis for the initial transfer of Plaintiff to the SHU was Kingston's review of Plaintiff's phone log that showed significant usage while Plaintiff was on cube confinement. Kingston SMF ¶ 24. It is undisputed that Plaintiff's phone log did indeed show significant usage while Plaintiff was restricted from using the phone. See Mitchell Decl. Ex M ("Phone Log"). However, the record establishes that Kingston reviewed the phone logs 3 out of 5 days every week he worked, Kingston Dep. at 38:9–16, would write a misbehavior report "as soon as he knew" of multiple improper calls made over more than one day, id., at 49:16–50:12, and would typically find out about such a violation within a day or two of it occurring, 50:13–50:18. However, despite this regular review and usual habit of writing misbehavior reports immediately, Kingston did not write a misbehavior report for Plaintiff until after 18 calls had accrued over the course of 8 days. Pl.'s SMF ¶ 60.

**\*26** A reasonable jury could conclude that Kingston did indeed notice the phone infraction prior to April 23, 2016, as he testified he generally would have, but did not write a misbehavior ticket immediately as was his usual practice. A reasonable jury could further infer the reason for delay was to facilitate Plaintiff's transfer to the SHU as a specific time on a specific day. Further, if a jury were to believe Plaintiff's account that he was assaulted on April 26 during and immediately after his transfer, it would not be unreasonable to infer that Kingston initiated the transfer on that day in order to facilitate the assault.

### 2. Retaliation as to Kearney and Kingston

Defendants argue that there is insufficient evidence on the record to establish that their actions were sufficiently adverse or that they were motivated by retaliation for Plaintiff's filing of the Cowan Suit. Kearney & Kingston Mem. at 13. Defendants also argue they would have undertaken the actions even in the absence of the protected conduct. Id.

#### a. Adverse Action

Plaintiff alleges that Kearney retaliated against him by supplying false allegations that supported a false misbehavior ticket and co-signing that ticket, and that both Kearney and Kingston retaliated by facilitating a retaliatory transfer knowing and intending that Plaintiff be assaulted. Pl.'s Resp. Mem. at 35.

The Court holds that, because Plaintiff was found innocent of the allegations in Kearney's allegedly false ticket, Pl.'s SMF ¶ 62, and thus suffered no adverse effects due to its issuance, this does not constitute an adverse action. See Tremblay, 2021 WL 1575951, at *4.

However, a retaliatory transfer to a facility with more restrictions constitutes an adverse action sufficient to discourage other inmates form exercising their rights, see Miller, 2019 WL 2370295, at *10, especially if that transfer is undertaken with the purpose of facilitating an assault upon an inmate, Abreu, 778 F. App'x at 33 ("[A] severe beating, false misbehavior reports, or the withholding of medication could constitute sufficiently adverse actions that would deter a prisoner of 'ordinary firmness' from exercising his rights.").

Thus, if a factfinder finds Defendant's facilitated Plaintiff's transfer to the SHU, intending that he be assaulted during said transfer, a reasonable jury could conclude they had undertaken adverse actions sufficient to support a claim of retaliation.

#### b. Causal Connection

Courts must be "careful to require non-conclusory allegations" when dealing with prisoner retaliation claims because they are " 'easily fabricated,' and accordingly 'pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration.' " Bennett, 343 F.3d at 137. Plaintiff's main basis for asserting a retaliatory motive is that Defendants work in the same general area as an officer against whom Plaintiff filed a lawsuit, Cowan, and thus conceivably could have met him or others who know him. See Pl.'s Resp. Mem. at 39.

While the Court found this was insufficient to create an issue of material fact regarding retaliatory motive as to Defendant Peck, the Court finds differently with regard to Defendants

Kearney and Kingston. This is so because, on summary judgment, the Court must review the record as a whole and make all favorable inferences in favor of the nonmoving party. See Jasco Tools, Inc. v. Dana Corp., 574 F.3d 129, 152 (2d Cir. 2009) (stating that a court considering a summary judgment motion must view the record as a whole and "disregard all evidence favorable to the moving party that the jury is not required to believe" (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 135 (2000))); Howley v. Town of Stratford, 217 F.3d 141, 151 (2d Cir. 2000) ("In determining the appropriateness of summary judgment, the court should not consider the record solely in piecemeal fashion ... for a jury ... would be entitled to view the evidence as a whole.").

**\*27**  On the record before the Court, it has already been determined that a reasonable factfinder could conclude that Kearney and Kingston acted to facilitate Plaintiff's transfer to the SHU for the purpose of his assault and that during and immediately after that transfer Plaintiff was indeed assaulted by other Corrections Officers who specifically stated they were doing so in retaliation for his filing of the Cowan Suit. Thus, a reasonable jury could infer that Defendants acted with a similar retaliatory motive.

#### c. Action Undertaken in Absence of Protected Conduct

Even if a Plaintiff establishes that he engaged in protected activity, the defendant undertook an adverse action, and that there is a causal relationship, a defendant may still defeat liability if they can show by preponderance of the evidence that they would have taken the adverse action against the plaintiff "even in the absence of the protected conduct." McRae v. Fischer, No. 9:17-CV-00146, 2017 WL 3535298, at *7 (N.D.N.Y. July 14, 2017) (quoting Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)). "[I]f taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone." Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996).

Defendants argue that, because it is undisputed the phone log for Plaintiff's PIN showed numerous calls were made in violation of his cube restriction, there was an undisputed legitimate basis for their transfer of Plaintiff to the SHU, and thus there is no dispute as to any material fact regarding whether they would have undertaken the same action regardless of Plaintiff filing the Cowan Suit. Kearney & Kingston Mem. at 18. However, Plaintiff's claim is not

merely that Defendants transferred him, but that they did so at a specific time and date in order to facilitate his assault at the hands of other officers. See Pl.'s Resp. Mem. at 35, 40. Despite the phone logs, a reasonable jury could find that Defendants undertook their retaliatory actions on April 23, 2016 to facilitate an assault, and would not have done so absent a retaliatory motive. Indeed, Kingston's testimony indicates that, under most circumstances, an inmate who had made calls like Plaintiff was accused of doing would have been transferred much sooner. See Kingston Dep. 49:16–50:12.

### 3. Supervisory Liability Claims as to Kearney and Kingston

Kearney and Kingston argue that Plaintiff's claims for supervisory liability should be dismissed because they are no longer viable following the Second Circuit's decision in Tangreti. Kearney & Kingston Mem. at 20. Plaintiff does not contest this assertion, see Pl.'s Mem, and the Court agrees. Therefore, Kearney and Kingston [12] are granted summary judgment on any claims pressed against them based on supervisory liability.

[12]    Supervisory liability claims will be dismissed against all other Defendants for the same reason and on the same grounds.

### 4. Qualified Immunity as to Kearney and Kingston

In order to establish a defense of qualified immunity, a defendant public official must show that one of two conditions is satisfied, "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." Gorman v. Rensselaer Cty., 910 F.3d 40, 45 (2d Cir. 2018); see also Green, 219 F.3d at 59. A public official's actions are objectively reasonable if " 'officers of reasonable competence could disagree' on the legality of the defendant's actions." Green, 219 F.3d at 59 (quoting Salim, 93 F.3d at 91). Summary judgment should not be granted on basis of qualified immunity due to objective reasonableness "unless the defendant shows that no reasonable jury, viewing the evidence in the light most favorable to the Plaintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law." Husain, 494 F.3d at 131.

*28  To establish qualified immunity, Kearney and Kingston rely on their previous arguments that their conduct did not, as a matter of law, violate Plaintiff's rights, asserting that therefore their actions were objectively reasonable and they are entitled to qualified immunity. See Kearney & Kingston Mem. at 22. However, the Court has found that a reasonable jury could conclude that both or either Defendant facilitated Plaintiff's transfer for the purposes of Plaintiff being assaulted, in violation of his Eighth Amendment right to be free of cruel and unusual punishment and in retaliation for his filing of the Cowan suit. See supra Sections IV(D)(1)–(2). Because inmates have a clearly established right not to be retaliated against for exercise of First Amendment rights, Burton v. Lynch, 664 F. Supp. 2d 349, 368-69 (S.D.N.Y. 2009) ("[A] claim of government retaliation for the exercise of First Amendment rights ... alleges the violation of a clearly established right."), and have a clearly established right to be free from cruel and unusual punishment, and excessive, malicious use of force, Green, 219 F.3d at 59 ("It is beyond dispute that the right to be free from excessive force has long been clearly established."), a reasonable be jury could likewise conclude that Defendants' actions, allegedly facilitating these violations, were objectively unreasonable in light of clearly established law.

Thus, the Court finds Defendants Kearney and Kingston are not entitled to qualified immunity regarding Plaintiff's claims of excessive force and retaliation against them.

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendant Robideau's Motion for Summary Judgment, Dkt. No. 136, is hereby **GRANTED in part** and **DENIED in part**; Plaintiff's claims against Robideau for excessive force under the Fourth and Fourteenth Amendments, deliberate indifference to serious medical need under the Eighth Amendment, and any claims alleging supervisory liability are hereby **DISMISSED** from this action; Plaintiff's claims against Robideau for excessive force under the Eighth Amendment and retaliation survive Defendant Robideau's Motion; and it is further

**ORDERED**, that Defendant Mere's Motion for Summary Judgment, Dkt. No. 138, is hereby **GRANTED in part** and **DENIED in part**; Plaintiff's claims against Mere for excessive force under the Fourth and Fourteenth Amendments, retaliation in so far as it relates to issuance of misbehavior tickets, and supervisory liability are hereby

DISMISSED from this action; Plaintiff's claims against Mere for excessive force under the Eighth Amendment, medical indifference under the Eighth Amendment, and retaliation related to use of force in the strip-frisk room and denial of adequate medical care survive Defendant Mere's Motion; and it is further

ORDERED, that Defendant Peck's Motion for Summary Judgment, Dkt. No. 137, is hereby GRANTED in part and DENIED in part; Plaintiff's claims against Peck for excessive force under the Fourth, Fourteenth, and Eighth Amendments, retaliation, and supervisory liability are hereby DISMISSED from this action; Plaintiff's claims against Peck for medical indifference under the Eighth Amendment survive Defendant Peck's Motion; and it is further

ORDERED, that Defendant Kearney's Motion for Summary Judgment, Dkt. No. 139, is hereby GRANTED in part and DENIED in part; Plaintiff's claims against Kearney for excessive force under the Fourth and Fourteenth Amendments and for supervisory liability are hereby DISMISSED from this action; Plaintiff's claims against Kearney for excessive force under the Eighth Amendment

and for retaliation survive Defendant Kearney's Motion; and it is further

ORDERED, that Defendant Kingston's Motion for Summary Judgment, Dkt. No. 139, is hereby GRANTED in part and DENIED in part; Plaintiff's claims against Kingston for excessive force under the Fourth and Fourteenth Amendments and for supervisory liability are hereby DISMISSED from this action; Plaintiff's claims against Kingston for excessive force under the Eighth Amendment and for retaliation survive Defendant Kingston's Motion; and it is further

ORDERED, that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

IT IS SO ORDERED.

All Citations

Slip Copy, 2022 WL 991729

---

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 2690243
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Benjamin FRANKLIN, Plaintiff,

v.

ONEIDA CORRECTIONAL
FACILITY, et al., Defendants.

No. 9:03–CV–1452 (LEK/DEP).
|
July 1, 2008.

**Attorneys and Law Firms**

Benjamin Franklin, pro se.

Office of Attorney General, Risa L. Viglucci, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

## *DECISION AND ORDER*

LAWRENCE E. KAHN, District Judge.

**\*1** This matter comes before the Court following a Report–Recommendation filed on May 22, 2008, by the Honorable David E. Peebles, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern District of New York. Report–Rec. (Dkt. No. 72).

Within ten days, excluding weekends and holidays, after a party has been served with a copy of a Magistrate Judge's Report–Recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations," FED. R. CIV. P. 72(b), in compliance with L.R. 72.1. No objections have been raised in the allotted time with respect to Judge XX's Report–Recommendation. Furthermore, after examining the record, the Court has determined that the Report–Recommendation is not subject to attack for plain error or manifest injustice.

Accordingly, it is hereby

**ORDERED,** that the Report–Recommendation (Dkt. No. 72) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED,** that Defendants' Motion for summary judgment (Dkt. No. 64) is DENIED; and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

## *REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Benjamin Franklin, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this civil rights action pursuant to 42 U.S.C. § 1983 claiming deprivation of his constitutional rights during the course of his confinement. In his complaint, plaintiff alleges that as a result of the failure of prison officials to adequately protect him he was assaulted on several occasions by corrections officers and denied medical treatment for injuries suffered during the course of those incidents. Plaintiff asserts that defendants' actions constituted cruel and unusual punishment, in violation of the Eighth Amendment, and seeks relief of an unspecified nature.

Currently pending before the court is a motion by the defendants requesting the entry of summary judgment dismissing plaintiff's complaint, both procedurally based upon Franklin's alleged failure to satisfy his obligation to exhaust available internal administrative remedies before filing suit, and on the merits, arguing that as a matter of law plaintiff cannot establish the existence of a constitutional deprivation under the Eighth Amendment. Having carefully considered the record now before the court I am unable to conclude at this juncture that that plaintiff's claims are procedurally barred, in light of his contention that he chose not to file a grievance as a result of threats of retaliation by prison officials, and further based upon the fact that in response to a complaint registered by him with the Commissioner of the New York State Department of Correctional Services ("DOCS"), a full investigation was conducted into the plaintiff's allegations, thereby fulfilling the objective of the grievance requirement. Turning to the merits, I find that the facts surrounding plaintiff's excessive force claims are genuinely disputed, and recommend against dismissal of those claims. [1]

2008 WL 2690243

[1] Defendants' motion does not address the merits of plaintiff's failure to protect and medical indifference claims.

I. *BACKGROUND* [2]

[2] In light of the procedural posture of the case, the record now before the court has been interpreted in a light most favorable to the plaintiff, as a non-moving party, with all inferences drawn, and ambiguities resolved, in his favor. *See Wells–Williams v. Kingsboro Psychiatric Ctr.,* No. 03–CV–134, 2007 WL 1011545, at *2 (E.D.N.Y. Mar. 30, 2007)* (citations omitted).

**\*2** At the times relevant to his claims plaintiff was a prison inmate entrusted to the custody of the DOCS. Prior to his temporary transfer into the Downstate Correctional Facility on May 16, 2003, plaintiff was assigned to a special housing unit ("SHU") cell within the Oneida County Correctional Facility ("Oneida"), located in Oneida, New York. [3] Plaintiff maintains that while in SHU confinement, he was regularly assaulted by corrections officers, including defendants Austin and Mullen, denied lunch, and refused medical attention both for the injuries suffered in the fight which led to his transfer into the unit and those resulting from the ensuing staff assaults. *Id.* ¶¶ 18–24. While maintaining that the assaults were continuous during the time of his SHU confinement, plaintiff's complaint makes specific reference to beatings by Austin and Mullen on March 21, 2003, and again on April 7, 2003. *Id.* ¶¶ 16–24, 26. Plaintiff also asserts that prior to the first such assault, he informed defendant Santos that he feared for his safety based upon threats made by those two officers. *Id.* ¶¶ 9–10.

[3] Plaintiff's confinement in the SHU was apparently disciplinary in nature, stemming from his involvement in a fight with a fellow inmate. Fourth Amended Complaint (Dkt. No. 26) ¶¶ 8, 16.

In support of their motion, defendants Mullen and Austin have submitted affidavits in which they deny having assaulted the plaintiff. Mullen Aff. (Dkt. No. 64–11) ¶ 5; Austin Aff. (Dkt. No. 64–10) ¶ 5. In addition, Corrections Officer Mullen notes that he was not even present and working at Oneida on April 7, 2003, one of the two dates specifically mentioned in plaintiff's complaint. Mullen Aff. (Dkt. No. 64–11) ¶ 8.

Sometime prior to May 22, 2003, at which time he was designated to the Upstate Correctional Facility, Franklin sent a handwritten letter to the DOCS Commissioner complaining of various conditions including, *inter alia,* the assaults which are the subject of this action. [4] *See* Viglucci Aff. (Dkt. No. 64–6) Exh. A. That letter prompted an investigation into Franklin's allegations, consisting of interviews of the parties involved, including the plaintiff. *Id.* As a result of that investigation DOCS officials concluded that plaintiff's allegations were unfounded, and he was advised of that determination. *See generally* Fourth Amended Complaint (Dkt. No. 26); *see also generally* Franklin Aff. (Dkt. No. 70).

[4] Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined, generally though not always for disciplinary reasons, for twenty-three hours each day. *See Samuels v. Selsky,* No. 01 CIV. 8235, 2002 WL 31040370, at *4 n. 11 (S.D.N.Y. Sept. 12, 2002).

II. *PROCEDURAL HISTORY*
Plaintiff commenced this action on December 5, 2003, and was thereafter granted leave to proceed *in forma pauperis.* [5] Dkt. Nos. 1, 3. Following the issuance of orders deeming plaintiff's earlier pleadings to be deficient, *see, e.g.,* Dkt. Nos. 5, 12, 15, 25, plaintiff submitted a fourth amended complaint which was ultimately approved for filing. Dkt. Nos. 26, 28. Named as defendants in plaintiff's fourth amended complaint are various DOCS employees, including Corrections Lieutenant Santos, Corrections Officers D.J. Mullen and Austin, and an additional corrections officer identified only as "John Doe". *See* Dkt. No. 26. Plaintiff's complaint, which is modest in terms of specifics, asserts claims of cruel and unusual punishment, based both upon the alleged use of excessive force by defendants Mullen and Austin, the failure of defendant Santos to protect him from those officers, and the refusal of the defendants to provide him with required medical treatment. *Id.*

[5] This action was originally commenced in the Western District of New York, but was subsequently transferred here by order issued by Senior District Judge John T. Elfin on December 5, 2003. Dkt. Nos. 1, 4.

**\*3** On June 27, 2007, following the close of pretrial discovery, defendants moved seeking the entry of summary judgment dismissing plaintiff's complaint. Dkt. No. 64. In their motion, defendants argue that plaintiff's claims are procedurally barred, based upon his failure to exhaust

Case 9:19-cv-00689-AMN-TWD    Document 115    Filed 02/27/23    Page 139 of 173
Franklin v. Oneida Correctional Facility, Not Reported in F.Supp.2d (2008)
2008 WL 2690243

available administrative remedies before filing suit, and additionally assert that as a matter of law, the record fails to establish the existence of an Eighth Amendment violation. *Id.* Plaintiff has since filed papers in opposition to defendants' motion, Dkt. No. 70, which is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P 72(b).

III. *DISCUSSION*

A. *Summary Judgment Standard*

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620–21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material

issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

**\*4** When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

B. *Failure to Exhaust Administrative Remedies*

The record now before the court reflects that the plaintiff did not file a formal grievance, utilizing the available procedures within the DOCS system, concerning the matters raised in his complaint. Plaintiff attributes this failure to his belief that DOCS prison officials would not process any grievance from him concerning the matter, and additionally notes that he has been threatened by corrections officers with retribution for filing any grievances against them. *See, e.g.,* Plaintiff's Opposition (Dkt. No. 70) at p. 30, ¶¶ 6–8. In their motion, defendants argue that this omission provides a procedural basis for dismissal of plaintiff's claims, regardless of their relative merit.

With an eye toward "reduc[ing] the quantity and improv[ing] the quality of prisoner suits[,]" *Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 988 (2002), Congress altered the inmate litigation landscape considerably through the enactment of the Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), imposing several restrictions on the ability of prisoners to maintain federal civil rights actions. An integral feature of the PLRA is a revitalized exhaustion of remedies provision which requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S.Ct. 2378, 2382 (2006); *Hargrove v. Riley,* No. CV–04–4587, 2007 WL 389003, at \*5–6 (E.D.N.Y. Jan. 31, 2007). This limitation is intended to serve the dual purpose of affording "prison officials an

2008 WL 2690243

opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court[l[,]" and to improve the quality of inmate suits filed through the production of a "useful administrative record." *Jones v. Bock,* 549 U.S. 199, 127 S.Ct. 910, 914–15 (2007) (citations omitted); *see Woodford,* 548 U.S. at 91–92, 126 S.Ct. at 2386; *see also Johnson v. Testman,* 380 U.S. 691, 697 (2d Cir.2004). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532, 122 S.Ct. at 992 (citation omitted).

**\*5** The failure of a prisoner to satisfy the PLRA's exhaustion requirement is not jurisdictional, but instead gives rise to a defense which must affirmatively be raised by a defendant in response to an inmate suit. *Jones,* 127 S.Ct. at 918. In the event a defendant named in such an action establishes that the inmate plaintiff failed properly to exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal. *See Pettus v. McCoy,* No. 04–CV–0471, 2006 WL 2639369, at \*1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 94–95, 126 S.Ct. at 2387–88 (holding that the PLRA requires "proper exhaustion" of available remedies). "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95, 126 S.Ct. at 2388; *see also Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (citing *Woodford* ). While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "in a substantive sense", an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his or her available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias,* 495 F .3d at 43 (quoting *Johnson,* 380 U.S. at 697–98) (emphasis omitted).

In a series of decisions rendered since the enactment of the PLRA, the Second Circuit has crafted a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement. *Macias,* 495 F.3d at 41; *see Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). Under the prescribed algorithm, a court must first determine whether administrative remedies were available to the plaintiff at the relevant times. *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. If such a remedy existed and was available, the court must next examine whether the defendants have forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it or whether, through their own actions, by preventing the exhaustion of plaintiff's remedies, they should be estopped from asserting failure to exhaust as a defense. *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. In the event the proffered defense survives these first two levels of scrutiny, the court lastly must examine whether special circumstances nonetheless exist and "have been plausibly alleged" to justify the plaintiff's failure to comply with the applicable administrative procedural requirements. [6] *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686.

[6]    In practicality these three prongs of the prescribed test, though intellectually distinct, plainly admit of significant overlap. *See Hargrove v. Riley,* No. CV–04–4587, 2007 WL 389003, at \*8 n .14 (E.D.N.Y. Jan. 31, 2007); *see also Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

1. *Availability of Remedy*
New York prison inmates are subject to an Inmate Grievance Program ("IGP") established by the DOCS, and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* No. 96 CV 5396, 2004 WL 324898, at \*4 (S.D.N.Y. Feb. 20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003) and *Snider v. Melindez,* 199 F.3d 108, 112–13 (2d Cir.1999)). The IGP consists of a three-step review process. First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within twenty-one days of the incident. [7] 7 N.Y.C.R.R. § 701.5(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. *Id.* §§ 701.4(b), 701.5(b). If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. *Id.* § 701.5(c). The third level of the process affords the inmate the right to appeal the superintendent's ruling to the Central Office Review Committee ("CORC"), which makes the final administrative decision. *Id.* § 701.5(d). Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in a federal court. *Reyes v. Punzal,* 206 F.Supp.2d 431, 432 (W.D.N.Y.2002) (citing, *inter alia, Sulton v. Greiner,* No. 00 Civ. 0727, 2000 WL 1809284, at \*3 (S.D.N.Y. Dec. 11, 2000)).

[7]    The IGP supervisor may waive the grievance timeliness requirement due to "mitigating

Franklin v. Oneida Correctional Facility, Not Reported in F.Supp.2d (2008)

2008 WL 2690243

circumstances." 7 N.Y.C.R.R. § 701 .6(g)(1)(i)(a)-(b).

**\*6** Certain of plaintiff's claims implicate misconduct on the part of corrections officials. In addition to the established IGP described above, the DOCS has implemented an expedited grievance process to address complaints of alleged staff harassment. [8] 7 N.Y.C.R.R. § 701.8; *see Perez v. Blott,* 195 F.Supp.2d 539, 543 (S.D.N.Y.2002) (describing expedited grievance process under prior relevant regulation, 7 N.Y.C.R.R. § 701.11, which has since been re-codified). This expedited process is not exclusive, and does not preclude the filing of an ordinary grievance in the event of perceived staff harassment or retaliation. [9] *See* 7 N.Y.C.R.R. § 701.8(a). An inmate claiming harassment by a DOCS worker must file a grievance, which is then assigned a grievance number and, in the event of allegations of staff harassment, forwarded to the superintendent of the facility. 7 N.Y.C.R.R. § 701.8(b). If, after reviewing the grievance, the superintendent finds it to be facially lacking in merit, the matter reverts back to the inmate grievance resolution committee ("IGRC") for review. 7 N.Y.C.R.R. § 701.8(c). If, on the other hand, the superintendent believes that an investigation is warranted, he or she may initiate an in-house investigation, or instead, request investigation by the inspector general's office. 7 N.Y.C.R.R. § 701.8(d). Once the grievance is determined, a matter which must occur within twenty-five business days of filing, *see* 7 N.Y.C.R.R. § 701.8(f), the inmate may appeal to the CORC, a step which is required in order to satisfy the exhaustion requirement. *See Singh v. Goord,* 520 F.Supp.2d 487, 495 (S.D.N.Y.2007) (indicating that appeal to the CORC is required to exhaust a prisoner's administrative remedies in New York State); *Sulton v. Greiner,* No. 00 Civ. 0727, 2000 WL 1809284, at \*4 (S.D .N.Y. Dec. 11, 2000) (granting summary judgment for failure to exhaust administrative remedies where prisoner neglected to appeal to the CORC).

[8]   Before utilizing this procedure, an inmate generally should first report any incident to an employee's supervisor. 7 N.Y.C.R.R. § 701.8(a).

[9]   The regulations pertaining to the grievance process describe harassment as any allegation involving "employee misconduct meant to annoy, intimidate, or harm an inmate ...." 7 N.Y.C.R.R. § 701.2(e); *see also* DOCS Directive No. 4040.

Despite this entitlement under most circumstances to file and pursue a grievance in accordance with the IGP, there are circumstances under which the grievance procedure nonetheless is deemed not to have been available to an inmate plaintiff. *See Hemphill,* 380 F.3d at 687–88. Thus, for example, "[e]xhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, ... or where defendants' behavior prevents plaintiff from seeking administrative remedies." *Hargrove,* 2007 WL 389003, at \*8 (citations omitted) (noting, for example, that a defendant's failure to advance plaintiff's grievances or the issuance of threats against an inmate to deter the filing of a grievance may effectively render the administrative process unavailable). When testing the availability of administrative remedies in the face of claims that undue influence from prison workers has caused a plaintiff inmate to forego the formal grievance process, courts employ an objective test, examining whether "a similarly situated individual of ordinary firmness [would] have deemed them available." *Id.* at 688 (internal quotations and citations omitted); *see Hargrove,* 2007 WL 389003, at \*8.

**\*7** Based on the record now before the court, construed in a light most favorable to the plaintiff, it appears that a genuine triable issue of fact exists regarding the availability of the IGP to the plaintiff. As was previously noted, plaintiff asserts that he received specific threats of adverse action against him in the event of the filing of any grievances. Under the circumstances the court is unable to conclude at this stage in the proceedings, as a matter of law, that the grievance process was available to the plaintiff.

### 2. *Presentation of Defense/Estoppel*

The second prong of the *Hemphill* analysis focuses upon "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (citations omitted). In their answer to plaintiff's fourth amended complaint, defendants have raised failure to exhaust as an affirmative defense. *See* Answer (Dkt. No. 37) ¶ 10. Because the defendants have properly raised exhaustion as a defense, and plaintiff does not assert any basis to estop them from pursuing it, I find that this prong of the exhaustion test does not come into play in this case.

### 3. *Special Circumstances*

2008 WL 2690243

The third, catchall factor to be considered under the Second Circuit's prescribed exhaustion rubric focuses upon whether special circumstances have been plausibly alleged which, if demonstrated, would justify excusing a plaintiff's failure to exhaust administrative remedies. *Hemphill,* 380 F.3d at 689; *see also Giano v. Goord,* 380 F.3d 670, 676–77 (2d Cir.2004); *Hargrove,* 2007 WL 389003, at *10. Among the circumstances potentially qualifying as "special" under this prong of the test include where a plaintiff's reasonable interpretation of applicable regulations regarding the grievance process differs from that of prison officials and leads him or her to conclude that the dispute is not grievable. *Giano,* 380 F.3d at 676–77; *see also Hargrove,* 2007 WL 389003, at *10 (quoting and citing *Giano* ). As the Supreme Court has noted, "[t]he benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance. The prison grievance system will not have such an opportunity unless the grievance complies with the system's critical procedural rules." *Woodford,* 548 U.S. at 95, 126 S.Ct. at 2388.

In this instance, prompted by plaintiff's letter complaining of the use of excessive force and other deprivations to the DOCS Commissioner, an investigation was conducted into plaintiff's allegations. While in this case the established IGP procedure or the alternative expedited procedure for complaining of staff misconduct was bypassed by the plaintiff, his complaint to the Commissioner resulted in what could be viewed as the functional equivalent of a grievance investigation. Since at trial a finding may be made that the filing of a grievance would have been redundant, and likely would ultimately have led to the same result, with deference undoubtedly being given to the investigation previously conducted, it cannot be definitively said at this point that there exists no sufficient basis to excuse the exhaustion requirement. Accordingly, I recommend denial of the portion of defendants' motion which asserts this procedural basis for dismissal of plaintiff's claims. *See Heath v. Saddlemire,* No. 96–CV–1998, 2002 WL 31242204, at *4–5 (N.D.N.Y. Oct. 7, 2002) (Scullin, C.J.).

### C. *Merits Of Plaintiff's Excessive Force Claim*

**\*8** In their motion, defendants next assert that plaintiff's excessive force claim is subject to dismissal as a matter of law. While acknowledging that plaintiff claims to have been assaulted by prison officials, defendants argue that "[p]laintiff's allegations are so outrageous, that they can only be considered to have been fabricated." Defendants' Memorandum (Dkt. No. 64–3) at 7.

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citations and quotations omitted); *Griffen v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). The lynchpin inquiry in deciding claims of excessive force against prison officials is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6–7, 112 S.Ct. 995, 998 (1992) (applying *Whitley* to all excessive force claims); *Whitley,* 475 U.S. at 320–21, 106 S.Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.) (Friendly, J.), *cert. denied sub nom., John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462 (1973)).

Eighth Amendment analysis requires both objective and subjective examinations. *Hudson,* 503 U.S. at 8, 112 S.Ct. at 999; *Wilson v. Seiter,* 501 U.S. 294, 298–99, 111 S.Ct. 2321, 2324 (1991); *Griffen,* 193 F.3d at 91. The objective prong of the inquiry is contextual, and relies upon "contemporary standards of decency." *Hudson,* 503 U.S. at 8 (quoting *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 290 (1976)). When addressing this component of an excessive force claim under the Eighth Amendment calculus, the court can consider the extent of the injury suffered by the inmate plaintiff. While the absence of significant injury is certainly relevant, it is not dispositive, as the defendants seemingly suggest. *Hudson,* 503 U.S. at 7, 112 S.Ct. at 999. The extent of an inmate's injury is but one of the factors to be considered in determining a prison official's use of force was "unnecessary and wanton"; courts should also consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085 (citing *Johnson,* 481 F.2d at 1033). Under *Hudson,* even if the injuries suffered by a plaintiff " 'were not permanent or severe' ", a plaintiff may still recover if " 'the force used was unreasonable and excessive.' " *Corselli v. Coughlin,* 842 F.2d 23, 26 (2d Cir.1988) (quoting *Robinson v. Via,* 821 F.2d 913, 924 (2d Cir.1987)).

Turning to the subjective element to prevail a plaintiff must establish that defendant acted with a sufficiently culpable state of mind. *Davidson v. Flynn,* 32 F.3d 27, 30 (2d Cir.1994) (citing *Hudson,* 503 U.S. at 8, 112 S.Ct. at 999). That determination is informed by four factors, including 1) the need for application of force; 2) the relationship between that need and the amount of force used; 3) the threat reasonably perceived by the responsible officials; and 4) any efforts made

2008 WL 2690243

to temper the severity of a forceful response. *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085. The principal focus of this inquiry "turns on 'whether force was applied in a good faith effort to maintain discipline or maliciously and sadistically for the very purpose of causing harm.' " *Whitley,* 475 U.S. at 320–21, 106 S.Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d at 1033. When considering the subjective element of the governing Eighth Amendment test, a court must consider that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness since, as the Supreme Court has noted,

> **\*9** [w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.... This is true whether or not significant injury is evident.

> Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury.

*Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000 (citations omitted); *Velasquez v. O'Keefe,* 899 F.Supp. 972, 973 (N.D.N.Y.1995) (McAvoy, C.J.) (quoting *Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000); *see Romaine v. Rewson,* 140 F.Supp.2d 204, 211 (N.D.N.Y.2001) (Kahn, J.). Even a *de minimis* use of physical force can constitute cruel and unusual punishment if it is "repugnant to the conscience of mankind." [10] *Hudson,* 503 U.S. at 9–10, 112 S.Ct. 1000 (citations omitted).

[10]    It should be noted, however, that in practice a truly *de minimis* use of force will rarely suffice to state a constitutional claim. *Hudson,* 503 U.S. at 9–10, 112 S.Ct. at 1000 ("[Not] every malevolent touch by a prison guard gives rise to a federal cause of action"); *Griffen,* 193 F.3d at 91 (citing *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993)); *Johnson,* 481 F.2d at 1033 ("Not every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights").

In his complaint, though unsworn, *see* Dkt. No. 26 ¶¶ 19–21, and as confirmed in affidavits provided in opposition to defendants' motion, *see* Dkt. No. 70 at pp. 10, 27, plaintiff claims to have been assaulted by defendants Austin and Mullen. In support of their motion, defendants assert that the allegations are fabricated and inherently incredible, and thus should be discounted as a matter of law. In support of that position, defendants offer the denial by those corrections officers of any wrongdoing, the results of an investigation by the DOCS in which the allegations were determined to be unfounded, and particulars regarding the procedures at Oneida which, they maintain, make it impossible for the actions to have occurred as described by the plaintiff, without detection.

As tempting as it may be to conclude that defendants will ultimately prevail at trial, defendants' invitation to make a credibility determination and reject plaintiff's version of the events on motion for summary judgment is plainly unwarranted. Under these circumstances I recommend a finding that genuine, triable issues of material fact exist which must be resolved before plaintiff's excessive force claims can be adjudicated.

## IV. *SUMMARY AND RECOMMENDATION*

While the record in this case firmly establishes that plaintiff did not pursue an internal claim under the IGP relating to the violations asserted in his complaint in this action, the record also discloses the existence of fact questions regarding whether he should be excused from that requirement, and additionally whether the claim should be deemed to be exhausted by virtue of his complaint to the DOCS Commissioner and a subsequent investigation into that complaint. Turning to the merits of the only portion of plaintiff's Eighth Amendment claim now challenged, I find the existence of triable issues of material fact surrounding plaintiff's excessive force claim against the defendants and therefore recommend the denial of summary judgment dismissing that claim as a matter of law.

Based upon the foregoing it is hereby

RECOMMENDED that defendants' motion for summary judgment dismissing plaintiff's complaint (Dkt. No. 64) be DENIED in its entirety.

**\*10** Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

2008 WL 2690243

The clerk is directed to promptly forward a copy of this order to the plaintiff by regular mail and defendant via electronic means.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 2690243

---

**End of Document**
© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 1063875
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Terry CICIO, Plaintiff,

v.

R. LAMORA, R. Scott, R. MacWilliams, K. Crossett, E.
Facteau, C.O. Demers, R. Woods, R. Gill, Defendants.

Civ. Action No. 9:08–CV–431 (GLS/DEP).
|
Feb. 24, 2010.

West KeySummary

1    **Civil Rights** 👉 Criminal law enforcement;
      prisons
      **Summary Judgment** 👉 Prisons and jails
      **Summary Judgment** 👉 Prisons and jails

      Genuine issue of material fact existed as to
      whether corrections officer repeatedly hit the
      inmate after the inmate was subdued and
      thus summary judgment was precluded on the
      inmate's excessive force claim. The inmate
      alleged in his complaint, testified under oath
      at his deposition, and stated in a sworn
      affidavit that the corrections officer punched him
      unnecessarily in the head several times during
      the inmate's cell extraction. Although the cell
      extraction was supposed to be videotaped, the
      video was never recorded. Despite the fact that
      the inmate's injuries were slight and were at least
      indirectly brought about by his own action of
      refusing handcuffs, there were credibility issues
      to be determined. U.S.C.A. Const.Amend. 8.

      27 Cases that cite this headnote

**Attorneys and Law Firms**

Terry Cicio, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Office of the Attorney General,
State of New York, C. Harris Dague, Esq., Asst. Attorney
General, of Counsel, Albany, NY, for Defendants.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1**  Plaintiff Terry Cicio, a New York State prison inmate
who is proceeding *pro se* and *in forma pauperis,* has
commenced this action pursuant to 42 U.S.C. § 1983, alleging
deprivation of his civil rights. In his complaint Cicio, who
refused multiple orders from prison officials to exit his cell
in order to effectuate a transfer to another location, complains
that in the course of the ensuing cell extraction, during
which he was removed through the use of force, one of
the corrections officers who participated exerted excessive
force causing him to suffer injuries, while the others involved
failed to intervene, all in violation of the Eighth Amendment's
protection against cruel and unusual punishment. As relief
for the violation, plaintiff seeks the recovery of compensatory
and punitive damages from defendants.

Currently pending before the court is defendants' motion for
summary judgment seeking dismissal of plaintiff's complaint.
In their motion defendants challenge the legal sufficiency of
plaintiff's excessive force and failure to intervene claims and
additionally assert their entitlement to Eleventh Amendment
immunity from suit in their official capacities and good
faith qualified immunity from suit as individuals. Because
a reasonable factfinder could conclude from the record now
before the court that more force than necessary to subdue
and remove Cicio from his cell was applied maliciously
and sadistically by prison officials, I am constrained to
recommend that defendants' motion be denied, except as to
plaintiff's claims against defendant Woods and those against
defendants in their official capacities, which are subject to
dismissal.

I. *BACKGROUND* [1]

[1]    In light of the procedural posture of this case, the
       following recitation is from the record now before
       the court, with all inferences drawn and ambiguities
       resolved in favor of the plaintiff. *Terry v. Ashcroft,*
       336 128, 137 (2d Cir.2003). It should be noted that
       while most of the pertinent facts are undisputed,
       defendants sharply contest plaintiff's allegation

2010 WL 1063875

that he was unnecessarily punched by defendant MacWilliams during the forcible removal from his cell.

Plaintiff is a prison inmate entrusted to the care and custody of the New York State Department of Correctional Services ("DOCS"). *See generally* Complaint (Dkt. No. 1); *see also* Dague Decl. (Dkt. No. 35–16) ¶ 3 and Exh. A (Dkt. No. 35–17). At the times relevant to his claims, plaintiff was designated to the Upstate Correctional Facility ("Upstate"), located in Malone, New York.[2] *Id.*

2      Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined, generally though not always for disciplinary reasons, for twenty-three hours each day. *See Samuels v. Selsky,* No. 01 CIV. 8235, 2002 WL 31040370, at *4 n. 11 (S.D.N.Y. Sept. 12, 2002).

The events giving rise to the claims in this action were set in motion on December 27, 2007, when plaintiff refused to return a razor given to him by prison officials to permit him to shave. Dague Decl. (Dkt. No. 35–16) Exh. B (Dkt. No. 35–18) (Transcript of Deposition of Terry Cicio, conducted on March 12, 2009, hereinafter cited as "Cicio Dep. Tr.") at pp. 29–30; Gill Aff. (Dkt. No. 35–4) ¶ 5 and Exh. A (Dkt. No. 35–5). According to Cicio, he purposefully withheld the razor in order to prompt a transfer out of the gallery on which his cell was located to another area. Cicio Dep. Tr. at pp. 27–28.

Inmates at Upstate are assigned cells based upon a written protocol designated as the Progressive Inmate Movement System, or "PIMS", intended to provide incentive and encourage behavioral adjustment for SHU inmates. *See* Dague Decl. (Dkt. No. 35–16) ¶ 8. Under the PIMS, there are three designated categories of SHU cells; level three affords the most desirable conditions, while PIMS level one inmates enjoy the least privileges. *Id.; see also* Cicio Dep. Tr. at p. 27. At the time of plaintiff's refusal of surrender his razor, he was assigned to a PMS level three cell. Cicio Dep. Tr. at p. 27.

*\*2* On December 27, 2007, following the razor incident, plaintiff was informed that he would be relocated to a PIMS level one cell. Cicio Dep. Tr. at p. 31; Gill Aff. (Dkt. No. 35–4) ¶ 7 and Exh. B (Dkt. No. 35–6). To effectuate the move, prison officials instructed the plaintiff to place his back to the cell door and his hands through the feed up slot in order to permit the application of hand restraints. Gill Aff. (Dkt. No. 35–4) ¶ 8. Plaintiff refused that order as well as several subsequent

directives to voluntarily exit his cell. *Id.* at ¶ 9 and Exh. A. Attempts were made to convince plaintiff to reconsider his refusal; those efforts included interventions by clergy and guidance staff at the facility. *Id.* When those measures proved unsuccessful, orders were given to prepare a cell extraction team. Gill Aff. (Dkt. No. 35–4) ¶ 10.

At 2:30 p.m. on that day Corrections Lieutenant Andrew Lamora issued a final order directing plaintiff to exit his cell, warning that if he persisted in his refusal force would be applied to carry out his removal. Gill Aff. (Dkt. No. 35–4) ¶¶ 11–12; Lamora Aff. (Dkt. No. 35–8) ¶¶ 8–10; *see also* Complaint (Dkt. No. 1) Statement of Facts ¶ 4. Despite that last directive, plaintiff refused to obey defendant Lamora's command. Lamora Aff. (Dkt. No. 35–8) ¶ 9.

Following established facility protocol, prison officials took the first step toward conducting a forcible extraction by administering two one-second bursts of a chemical aerosol into plaintiff's cell, followed by another request for voluntary compliance. Gill Aff. (Dkt. No. 35–4) ¶¶ 12–13 and Exhs. A (Dkt. No. 35–5) and B (Dkt. No. 34–6); Lamora Aff. (Dkt. No. 35–8) ¶ 11. The process was repeated at two minute intervals on four more occasions; each time, corrections officers offered plaintiff the opportunity to comply with their orders before administering another dose. Gill Aff. (Dkt. No. 35–4) ¶¶ 12–14.

When the use of chemicals failed to convince Cicio to exit his cell, the cell extraction team that had been assembled, including Corrections Officers Richard Scott, Richard MacWiliams, Kurt Crossett and Christopher Demers, entered the cell. Gill Aff. (Dkt. No. 35–4) ¶ 17 and Exhs. A (Dkt. No. 35–5) and B (Dkt. No. 35–6); Lamora Aff. (Dkt. No. 35–8) ¶ 15. To accomplish the forced extraction each of those individuals was assigned a specific task. Lamora Aff. (Dkt. No. 35–8) ¶ 16. Corrections Officer Scott was designated to be the first to enter the cell and, through use of a shield, was tasked with attempting to bring Cicio to the ground and assist with the application of handcuffs. *Id.* Corrections Officer MacWilliams' assigned role was to control plaintiff's arms and to assist in the take down and application of handcuffs. *Id.* Corrections Officer Demers was assigned to control Cicio's right leg and assist in the take down and application of ankle restraints, and Corrections Officer Crossett was similarly designated as the person responsible for control of plaintiff's left leg, assisting in the take down, and application of ankle restraints. *Id.* The cell extraction, which proceeded in accordance with this protocol, was successfully

2010 WL 1063875

completed in approximately two minutes or less. Gill Aff. (Dkt. No. 35–4) ¶ 20; Lamora Aff. (Dkt. No. 35–8) ¶ 18; Scott Aff. (Dkt. No. 35–7) ¶ 13; Demers Aff. (Dkt. No. 35–12) ¶ 13; Crossett Aff. (Dkt. No. 35–10) ¶ 13; Facteau Aff. (Dkt. No. 35–11) ¶ 12.

**\*3** Also in accordance with the established protocol, Corrections Officer Eric Facteau was assigned to record the cell extraction using a hand-held camera. Facteau Aff. (Dkt. No. 35–11) ¶¶ 5–6. Unfortunately, however, while Corrections Officer Facteau attempted to videotape the process he later discovered the tape was defective, and none of the cell extraction was recorded. *Id.* at ¶¶ 9, 14.

Following the cell extraction, plaintiff was taken to a decontamination area where his clothes were removed and traces of the chemical aerosol were eliminated. Gill Aff. (Dkt. No. 35–4) Exh. A (Dkt. No. 35–5). Plaintiff was thereafter brought to a holding cell to be medically examined and photographed. *Id.*

During the course of the cell extraction both plaintiff and two of the participating corrections officers suffered injuries. Plaintiff described his injuries as including a scratch to the right side of his face less than an inch long, a contusion above his left eye, a bruise on his left shoulder "the size of a quarter or a little bigger[, n]othing major", and a bruise to the back of his shoulder. Complaint (Dkt. No. 1) Statement of Facts ¶ 6; Cicio Dep. Tr. at pp. 48–52. A medical report prepared following the examination notes the following with regard to plaintiff's injuries:

> Inmate has small abraised/red area to rt. upper/lateral aspect of chest. Has small contused area to left lateral aspect of forehead, has small eccymotic area to rt. lateral aspect of shoulder. No life threatening injuries. No blood present. Alert and oriented. No signs of distress. No treatment necessary.

Gill Aff. (Dkt. No. 35–4) Exh. B (Dkt. No. 35–6). Following the incident plaintiff stated to medical staff that he was "fine" and did not wish to receive treatment. *Id.; see also* Cicio Dep. Tr. at pp. 75–76. During the cell extraction Corrections Officer MacWilliams suffered injury to his right wrist, and

Corrections Officer Scott injured his right hip; no other staff members involved reported any injuries. Gill Aff. (Dkt. No. 35–4) Exh. A (Dkt. No. 35–5).

For the most part, the foregoing facts are not disputed by the plaintiff. He does, however, contend that during the course of the extraction he was "repeatedly punched" by Corrections Officer MacWiliams, who asked "you want to play?" Complaint (Dkt. No. 1) Statement of Facts ¶ 5; Cicio Dep. Tr. at pp. 46–47; Cicio Aff. (Dkt. No. 36) ¶¶ 10, 12. Plaintiff further alleges that while the other members of the cell extraction team, including Sergeant R. Gill and Lieutenant R. Lamora, "had ample time to curb the abuse" he suffered, they stood by without intervening. *Id.* at ¶ 11.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on May 7, 2008. Dkt. No. 1. Named as defendants in Cicio's complaint are Robert Woods, the superintendent at Upstate; Corrections Lieutenant Randy Lamora; Corrections Sergeant Robert Gill; and Corrections Officers Richard Scott, Richard MacWilams, Kirk Crossett, Eric Facteau, and Christopher Demers. Plaintiff's complaint asserts a single cause of action, alleging violation of his Eighth Amendment right against cruel and unusual punishment.

**\*4** Following joinder of issue and completion of pretrial discovery, defendants moved on August 6, 2009 for summary judgment dismissing plaintiff's complaint. Dkt. No. 35. In their motion, defendants argue that plaintiff's excessive force and failure to intervene claims are lacking in merit, that his claims against the defendants in their official capacities are barred by the Eleventh Amendment, and that in any event they are entitled to qualified immunity from suit against them for damages as individuals. *Id.* Plaintiff has since responded in opposition defendants' motion,[3] Dkt. No. 36, which is now ripe for determination and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York 72.3(c). *See* Fed.R.Civ.P. 72(b).

[3]   Plaintiff opposes defendants' motion and, alternatively, requests that he be granted a continuance so that he may pursue additional discovery. In particular, plaintiff seeks discovery regarding the facility's alleged refusal to allow plaintiff to view the DOCS directives regarding use of force, video procedures, chemical agents, and

2010 WL 1063875

cell extractions. As an initial matter, I note that the deadline for completion of discovery expired on March 13, 2009, Dkt. No. 28, several months before defendants filed their pending motion, and plaintiff has shown no reason why he did not timely pursue the discovery now requested. In any event, as will be seen, none of the information now sought by plaintiff would impact my recommendation regarding the defendants' motion, especially considering that nearly all of the material facts are undisputed by the plaintiff.

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

A party seeking summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S.

574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620–21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

**\*5** When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). [4] The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

[4]     With their motion defendants properly filed a statement of materials facts alleged not to be in dispute, as required under Northern District of New York Local Rule 7.1(a)(3). Dkt. No. 35–2. Under that rule when filing papers in opposition to defendants' motion plaintiff was required to submit a response mirroring defendants' Local Rule 7.1(a)(3) Statement and either admitting or denying each of the assertions contained within it in matching numbered paragraphs. N.D.N.Y.L.R. 7.1(a)(3). In light of plaintiff's failure to provide such a statement, the court could deem the assertions set forth in defendants' Local Rule 7.1(a) (3) Statement, including to the effect that defendant MacWilliams did not punch him as alleged, *see* Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 35–2) ¶¶ 34–35, to have been admitted by him. *Id.; see, e.g., Elgamil v. Syracuse Univ.,* No. 99– CV–611, 2000 WL 1264122, at *1 (Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)). In deference to his *pro se* status, and given that he has actively opposed defendants' motion and contested the claim that defendant MacWilliams did not strike him, though without minimizing the importance of Local Rule 7.1(a) (3), I recommend against deeming plaintiff to have admitted the facts set forth in defendants' statement.

Cicio v. Lamora, Not Reported in F.Supp.2d (2010)

2010 WL 1063875

### B. *Excessive Force*

Plaintiff's complaint asserts a cause of action brought under the Eighth Amendment, which proscribes punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291, 50 L.Ed.2d 251 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus, the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)).

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley,* 475 U.S. at 319, 106 S.Ct. at 1084 (citations and quotations omitted); *Griffen v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). The lynchpin inquiry in deciding claims of excessive force against prison officials is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6–7, 112 S.Ct. 995, 998–999, 117 L.Ed.2d 156 (1992) (applying *Whitley* to all excessive force claims); *Whitley,* 475 U.S. at 320–21, 106 S.Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.) (Friendly, J.), *cert. denied sub nom ., John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)).

Analysis of claims of cruel and unusual punishment requires both objective examination of the conduct's effect and a subjective inquiry into the defendant's motive for his or her conduct. *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009) (citing *Hudson,* 503 U.S. at 7–8, 112 S.Ct. at 999 and *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999)). As was recently emphasized by the United States Supreme Court in *Wilkins v. Gaddy,* however, after *Hudson* the "core judicial inquiry" is focused not upon the extent of the injury sustained, but instead whether the nature of the force applied was nontrivial. ——— U.S. – – – – , ——— S.Ct. ———, ——— L.Ed.2d – – – – , 2010 WL 596513, at *3 (Feb. 22, 2010) (per curiam). Accordingly, when considering the subjective element of the governing Eighth Amendment test a court must be mindful that the absence of serious injury, though relevant, does not

necessarily negate a finding of wantonness since, as the Supreme Court has noted,

> **\*6** [w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.... This is true whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury.

*Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000 (citations omitted); *Velasquez v. O'Keefe,* 899 F.Supp. 972, 973 (N.D.N.Y.1995) (McAvoy, C.J.) (quoting *Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000); *see Romaine v. Rewson,* 140 F.Supp.2d 204, 211 (N.D.N.Y.2001) (Kahn, J.). Even a *de minimis* use of physical force can constitute cruel and unusual punishment if it is "repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10, 112 S.Ct. 1000 (citations omitted).

With its focus on the harm done, the objective prong of the inquiry is contextual and relies upon "contemporary standards of decency." *Wright,* 554 F.3d at 268 (quoting *Hudson,* 503 U.S. at 8, 112 S.Ct. at 1000) (internal quotations omitted)). When addressing this component of an excessive force claim under the Eighth Amendment calculus, the court can consider the extent of the injury suffered by the inmate plaintiff. While the absence of significant injury is certainly relevant, it is not dispositive. *Hudson,* 503 U.S. at 7, 112 S.Ct. at 999. The extent of an inmate's injury is but one of the factors to be considered in determining a prison official's use of force was "unnecessary and wanton"; courts should also consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085 (citing *Johnson,* 481 F.2d at 1033). "But when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency are always violated .... This is true whether or not significant injury is evident.' " *Wright,* 554 F.3d at 268–69 (quoting *Hudson,* 503 U.S. at 9, 112 S Ct. at 1000).

That is not to say that "every malevolent touch by a prison guard gives rise to a federal cause of action." *Griffen,* 193 F.3d at 91 (citing *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993)); *see also Johnson,* 481 F.2d at 1033 ("Not every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights"). Where a prisoner's allegations and evidentiary proffers, if credited, could reasonably allow a rational factfinder to find that corrections officers used force maliciously and sadistically, however, summary judgment dismissing an excessive use of force claim is inappropriate. *Wright,* 554 F.3d at 269 (citing *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003)) (reversing summary dismissal of prisoner's complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the "medical records after the ... incident with [that officer] indicated only a slight injury")) (other citations omitted).

**\*7** In this case, although the injuries sustained by Cicio as a result of the incident in question were admittedly slight and at least indirectly brought about by his own actions, because the governing law requires that the evidence be viewed in the light most favorable to the non-moving party, I am compelled to conclude that issues of fact preclude the entry of judgment as a matter of law in favor of the defendants. Plaintiff has alleged in his complaint, testified under oath at his deposition, and stated in a sworn affidavit that defendant MacWilliams punched him unnecessarily in the head several times during the cell extraction. Complaint (Dkt. No. 1) Statement of Facts ¶ 5; Cicio Dep. Tr. at pp. 52–55; Cicio Aff. (Dkt. No. 36) ¶ 10. According to Cicio, when the defendants entered the cell and hit him with a shield he immediately dropped to the floor. Cicio Dep. Tr. at p. 64. At that point, plaintiff asserts, he could no longer resist because the corrections officers involved had his arms pinned, and could have easily handcuffed him. *Id.* Instead, plaintiff claims, "[MacWilliams] just kept hitting me. He hit me several times.... When I say maliciously and sadistically when he tells me that, when he's asking me if I want to play, he's hitting me. That means he's doing it for his own purpose...." *Id.* at pp. 52, 53–54. One could argue further that from the lack of a videotape recording of the relevant events, despite orders to Corrections Officer Facteau to follow the established protocol and record the cell extraction, a reasonable factfinder could infer that excessive force was applied during the incident and that a videotape

of the events would have disclosed the punches thrown by defendant MacWilliams.

Without question, the evidentiary support for plaintiff's claim is far from overwhelming. Plaintiff's assertions are sharply contradicted by defendant MacWilliams who, in a sworn affidavit filed with the court, denies punching or striking Cicio. MacWilliams Aff. (Dkt. No. 35–9) ¶ 13. Each of the co-defendants participating in the removal of the plaintiff from his cell state that they did not see MacWilliams punch or hit him. Additional evidence tending to contradict plaintiff's allegations includes the fact that it took two minutes or less for the corrections officers to perform the cell extraction and the reports of medical examinations conducted of the plaintiff shortly after the incident as well as the photographs of plaintiff's face, both revealing that he sustained only a slight bruise, *see* Gill Aff. (Dkt. No. 35–4) Exh. B (Dkt. No. 35–6), an injury that would also be fully consistent with what would be expected to result when corrections officers must take a resisting inmate to the floor for the purpose of administering arm and leg restraints.[5] Moreover, during his deposition, plaintiff acknowledged that the photographs accurately depict the full extent of the injuries suffered during the cell extraction. Cicio Dep. Tr. at 80–81.

[5]      Not insignificantly, during his deposition plaintiff acknowledged his realization that his refusal to obey a direct order to leave his cell would result in the use of force to accomplish that end. *See* Cicio Dep. Tr. at p. 37. This evidence could provide some support for a finding that defendants' acted reasonably.

**\*8** Plaintiff's testimony that he was beaten by MacWilliams stands in contrast to the seemingly overwhelming evidence that it did not occur as he alleges. Nonetheless, the weighing of such competing evidence, no matter how weak plaintiff's claim may appear, presents a question of credibility that must be left to the trier of fact. *Griffin,* 193 F.3d at 91 ("Although appellant's excessive force claim is weak and his evidence extremely thin, dismissal of the excessive force claim was inappropriate because there are genuine issues of material fact concerning what transpired after appellant was handcuffed and whether the guards maliciously used force against him."). I view of the foregoing, I am obligated to recommend that defendants' motion be denied as to plaintiff's excessive use of force claim.

*C. Failure To Intervene*

2010 WL 1063875

In addition to asserting that defendant MacWilliams beat him excessively, plaintiff alleges that the various other defendants observed the incident but stood by without intervening on his behalf .[6] Defendants contend that plaintiff's failure to intervene claim similarly lacks merit.

[6]    Superintendent Wood has submitted an affidavit indicating that he was not present during the course of the incident, and plaintiff has offered no evidence to the contrary. *See* Woods Decl. (Dkt. No. 35–13) ¶ 7. Under these circumstances, defendant Woods is entitled to dismissal of plaintiff's claims against him on the independent basis of his lack of personal involvement in the constitutional violation alleged. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor).

A corrections worker who, though not participating, is present while an assault upon an inmate occurs may nonetheless bear responsibility for any resulting constitutional deprivation. *See Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994). It is well-established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his presence by other officers. *See Mowry v. Noone,* No. 02–CV–6257 Fe, 2004 WL 2202645, at *4 (W.D.N.Y. Sept.30, 2004); *see also Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001) ("Failure to intercede results in [section 1983] liability where an officer observes excessive force being used or has reason to know that it will be.") (citations omitted).[7] In order to establish liability on the part of a defendant under this theory, a plaintiff must prove the use of excessive force by someone other than the individual and that the defendant under consideration 1) possessed actual knowledge of the use by another corrections officer of excessive force; 2) had a realistic opportunity to intervene and prevent the harm from occurring; and 3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force. *See Curley,* 268 F.3d at 72; *see also Espada v. Schneider,* 522 F.Supp.2d 544, 555 (S.D.N.Y.2007). Mere inattention or inadvertence, it should be noted, does not rise to a level of deliberate indifference sufficient to support liability for failure to intervene. *See, e.g., Schultz v. Amick,* 955 F.Supp. 1087, 1096 (N.D.Iowa 1997) (noting that "liability in a § 1983 'excessive force' action cannot be founded on mere negligence") (citing, *inter alia,*

*Daniels v. Williams,* 474 U.S. 327, 335–36, 106 S.Ct. 662, 667, 88 L.Ed.2d 662 (1986)).

[7]    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

**\*9** Although defendants deny that MacWilliams struck plaintiff, I have already determined that material questions of fact exist with respect to this issue. As to the co-defendants, plaintiff testified that "they had plenty of time during the whole incident to actually stop [MacWilliams] from assaulting [him]." Cicio Dep. Tr. at p. 52. Once again, though the evidence in plaintiff's favor is weak, I find that questions of fact preclude summary judgment with respect to plaintiff's failure to intervene claim and therefore recommend that this portion defendants' motion also be denied.

### D. *Eleventh Amendment*

To the extent that damages are sought against them in their official capacities, defendants' motion also seeks dismissal of those claims on the basis of the protection afforded under of the Eleventh Amendment.

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought. *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 3057–58, 57 L.Ed.2d 1114 (1978). This absolute immunity which states enjoy under the Eleventh Amendment extends both to state agencies, and to state officials sued for damages in their official capacities when the essence of the claim involved seeks recovery from the state as the real party in interest. *Richards v. State of New York Appellate Division, Second Dep't,* 597 F.Supp. 689, 691 (E.D.N.Y.1984) (citing *Pugh* and *Cory v. White,* 457 U.S. 85, 89–91, 102 S.Ct. 2325, 2328–29, 72 L.Ed.2d 694 (1982)). To the extent that a state official is sued for damages in his official capacity the official is entitled to invoke the Eleventh Amendment immunity belonging to the state. *Kentucky v. Graham,* 473 U.S. 159, 166–67, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985); *Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 361, 116 L.Ed.2d 301 (1991).

It is unclear from plaintiff's complaint whether he has sued defendants in their individual or official capacities, or both. Insofar as plaintiff's damage claims against the defendants are brought against them in their official government-employee capacity they are the equivalent of claims against

2010 WL 1063875

the State of New York, and they are subject to dismissal under the Eleventh Amendment state-employee exception. *Daisernia v. State of New York,* 582 F.Supp. 792, 798–99 (N.D.N.Y.1984) (McCurn, J.). I, therefore, recommend dismissal of plaintiff's damage claims against the defendants in their official capacities.

### E. *Qualified Immunity*

In their motion defendants also rely on the doctrine of qualified immunity, arguing that because their actions were reasonable under the circumstances they are immune from suit and plaintiff's complaint should be dismissed.

Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (citations omitted). "In assessing an officer's eligibility for the shield, 'the appropriate question is the objective inquiry whether a reasonable officer could have believed that [his or her actions were] lawful, in light of clearly established law and the information the officer[ ] possessed." *Kelsey v. County of Schoharie,* 567 F.3d 54, 61 (2d Cir.2009) (quoting *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). The law of qualified immunity seeks to strike a balance between the need to hold government officials accountable for irresponsible conduct and the need to protect them from "harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. ——, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009).

**\*10** In *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court "mandated a two-step sequence for resolving government official's qualified immunity claims." *Pearson,* 555 U.S. at ——, 129 S.Ct. at 816. The first step required the court to consider whether, taken in the light most favorable to the party asserting immunity, the facts alleged show that the conduct at issue violated a constitutional right,[8] *Kelsey,* 567 F.3d at 61, with "the second step being whether the right is clearly established", *Okin v. Village of Cornwall–On–Hudson Police Dept.,* 577 F.3d 415, 430 n. 9 (citing *Saucier* ).[9] Expressly recognizing that the purpose of the qualified immunity doctrine is to ensure that insubstantial claims are resolved prior to discovery, the Supreme Court recently retreated from the prior *Saucier* two-step mandate, concluding in *Pearson*

that because "[t]he judges of the district courts and courts of appeals are in the best position to determine the order of decisionmaking [that] will best facilitate the fair and efficient disposition of each case", those decision makers "should be permitted to exercise their sound discretion in deciding which of the ... prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."[10] *Pearson,* 555 U.S. at——, 129 S.Ct. at 818, 821. In other words, as recently emphasized by the Second Circuit, the courts "are no longer *required* to make a 'threshold inquiry' as to the violation of a constitutional right in a qualified immunity context, but we are free to do so." *Kelsey,* 567 F.3d at 61 (citing *Pearson,* 129 S.Ct. at 821) (emphasis in original).

8    In making the threshold inquiry, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151, 150 L.Ed.2d 272.

9    In *Okin,* the Second Circuit clarified that the " 'objectively reasonable' inquiry is part of the 'clearly established' inquiry", also noting that "once a court has found that the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred, it is no defense for the [government] officer who violated the clearly established law to respond that he held an objectively reasonable belief that his conduct was lawful." *Okin,* 577 F.3d at 433, n. 11 (citation omitted).

10    Indeed, because qualified immunity is "an immunity from suit rather than a mere defense to liability ...", *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), the Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." *Pearson,* —— U.S. at——, 129 S.Ct. at 815 (quoting *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 524, 116 L.Ed.2d 589, —— (1991) (per curiam)).

For courts engaging in a qualified immunity analysis, "the question after *Pearson* is 'which of the two prongs ... should be addressed in light of the circumstances in the particular case at hand.' " *Okin,* 577 F.3d 430 n. 9 (quoting *Pearson* ). "The [*Saucier* two-step] inquiry is said to be appropriate

in those cases where 'discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all .' " *Kelsey,* 567 F.3d at 61 (quoting *Pearson,* 129 S.Ct. at 818).

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202, 121 S.Ct. at 2156 (citation omitted). When deciding whether a right was clearly established at the relevant time, a court should consider

> (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the [Second Circuit] support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

**\*11** *Wright v. Smith,* 21 F.3d 496, 500 (2d Cir.1994) (quoting *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993)). The objective reasonableness test will be met, and qualified immunity enjoyed, where government officers of reasonable competence could disagree as to whether by his or her alleged conduct the defendant would be violating the plaintiff's rights. *Okin,* 577 F.3d at 433 (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). "If, on the other hand, no officer of reasonable competence would conclude that the conduct in question is lawful, there is no immunity." *Okin,* 577 F.3d at 433 (citing *Lennon v. Miller,* 66 F.3d 416, 420–21 (2d Cir.1995)).

Undeniably, the right of a prison inmate to be free from excessive use of force has long been established. *Russo v. City of Bridgeport,* 479 F.3d 196, 212 (2d Cir.), *cert. denied,* 552 U.S. 818, 128 S.Ct. 109, 169 L.Ed.2d 24 (2007). Since I have already determined that, if credited, plaintiff's testimony could support a jury finding that defendants acted intentionally to harm him, it follows that a rational trier of fact could also conclude that defendants' conduct was not objectively reasonable under the circumstances. *See id.;*

*see also Dallio v. Santamore,* No. 9:06–CV–1154, 2010 WL 125774, at *14 (N.D.N.Y. Jan.7, 2010) (Suddaby, J. and Homer, M.J.) ("As to [plaintiff's] excessive force and failure to intervene claims, it was clearly established by the incident on November 10, 2003 that inmates had an Eighth Amendment right to be free from excessive force and a failure to intervene. Thus, accepting all of [plaintiff's] allegations about the incident as true, qualified immunity cannot be granted ... since a reasonable person in their position at the time would or should have known that the use of excessive force was a constitutional violation."). As a result, I have determined that material questions of fact exist on the issue of whether defendants are entitled to qualified immunity from suit and therefore recommend that this portion of defendants' motion also be denied.

IV. *SUMMARY AND RECOMMENDATION*
Given the circumstances leading up to the forcible extraction of Cicio from his cell, it is doubtful that he will be viewed by a jury as a particularly sympathetic plaintiff. Plaintiff placed his own safety as well as that of others in jeopardy by refusing a lawful order to exit his cell, admittedly knowing that his actions would result in the use of force to remove him. Plaintiff's refusal to obey prison officials' commands, however, though plainly indefensible, did not provide corrections officers with a license to exact retribution by needlessly punching him after he was subdued and no longer resisting, as he has alleged. Whether Officer MacWilliams did, in fact, needlessly punch the plaintiff raises a question of credibility given the conflicting accounts now before the court. I am therefore compelled to conclude that the existence material questions of fact preclude the court from granting defendants' motion for summary judgment with respect to plaintiff's excessive use of force and failure to intervene claims and on the issue of qualified immunity. Because defendants are immune from suit in their official capacities, however, and plaintiff has adduced no evidence that defendant Woods was personally involved in the offending conduct, defendants' motion dismissing plaintiff's damage claims against them in their official capacities and all claims against defendant Woods should be granted. Accordingly, it is hereby respectfully

**\*12** RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 35) be GRANTED to the extent that plaintiff's claims against defendants in their official capacities and those against defendant Woods be DISMISSED but that defendants' motion otherwise be DENIED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1063875

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Cicio v. Lamora, Not Reported in F.Supp.2d (2010)

2010 WL 1063864

2010 WL 1063864
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Terry CICIO, Plaintiff,
v.
R. LAMORA, R. Scott, R. Macwilliams, K. Crossett, E.
Facteau, C.O. Demers, R.Woods, R. Gill, Defendants.

Civil Action No. 9:08–cv–431 (GLS/DEP).
|
March 22, 2010.

**Attorneys and Law Firms**

Terry Cicio, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State
of New York, C. Harris Dague, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for the Defendants.

***ORDER***

GARY L. SHARPE, District Judge.

 **\*1** The above-captioned matter comes to this court
following a Report–Recommendation by Magistrate Judge

David E. Peebles, duly filed February 24, 2010. Following
ten days from the service thereof, the Clerk has sent the file,
including any and all objections filed by the parties herein.

No objections having been filed, and the court having
reviewed the Magistrate Judge's Report–Recommendation
for clear error, it is hereby

ED, that the Report–Recommendation of Magistrate Judge
David E. Peebles filed February 24, 2010 is ACCEPTED in
its entirety for the reasons state therein, and it is further

ORDERED, that defendants' motion for summary judgment
(Dkt. No. 35) is GRANTED to the extent that plaintiff's
claims against defendants in their official capacities and those
against defendant Woods is DISMISSED but the defendants'
motion otherwise is DENIED, and it is further

ORDERED, that the Clerk of the court serve a copy of this
order upon the parties in accordance with this court's local
rules.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1063864

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 163596
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Dean J. VILLANTE, Plaintiff,

v.

Robert L. VANDYKE, C.O.; and
Robert J. Hall, C.O., Defendants.

No. 9:04-CV-759 (FJS/DRH).
|
Jan. 15, 2008.

**Attorneys and Law Firms**

Dean J. Villante, Jackson Heights, NY, pro se.

Hon. Eliot Spitzer, Attorney General for the State of New York, Office of the New York State Attorney General, Roger W. Kinsey, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

**MEMORANDUM-DECISION AND ORDER**

SCULLIN, Senior District Judge.

**I. INTRODUCTION**

**\*1** Currently before the Court are Magistrate Judge Homer's September 13, 2006 Report-Recommendation and Order and Defendants' objections thereto.

**II. BACKGROUND**

In his complaint, Plaintiff claims that, on December 22, 1998, at approximately 9:30 p.m., some twenty inmates attacked him and another inmate. Plaintiff further alleges that Defendants stood by and watched while these inmates repeatedly kicked him in his lower back and face and cut him with sharp instruments below his right eye, lip and tongue.

On September 13, 2006, Defendants moved for summary judgment on the ground that Plaintiff failed to prove the elements of a failure-to-protect claim. In the alternative, Defendants argued that they were entitled to qualified immunity.

Magistrate Judge Homer issued a Report-Recommendation and Order in which he recommended that the Court deny Defendants' motion for summary judgment. Specifically, Magistrate Judge Homer found that, although Plaintiff failed to raise a material issue of fact as to whether Defendants knew of or disregarded a serious risk to his safety prior to the attack, he did raise a material issue of fact about what Defendants witnessed and whether they intentionally or recklessly failed to intervene in the attack. Magistrate Judge Homer also concluded that Defendants were not entitled to qualified immunity.

**III. DISCUSSION**

**A. Standard of review**

The district court reviews *de novo* those portions of a magistrate judge's report-recommendation and order to which a party objects, *see Singleton v. Caron,* No. 9:03-CV-00455, 2006 WL 2023000, \*1 (N.D.N.Y. July 18, 2006) (citations omitted), and for clear error those portions to which a party does not object, *see Stokes v. Artus,* No. 05 Civ.1975, 2006 WL 1676437, \*2 (S.D.N.Y. June 14, 2006) (citing *Thomas v. Arn,* 474 U.S. 140, 149 (1985)). The district court reviewing a magistrate judge's report-recommendation and order " 'may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.' " *Everson v. New York City Transit Auth.,* No. 1:02-cv-1121, 2007 WL 539159, \*3 (E.D.N.Y. Feb. 16, 2007) (citing 28 U.S.C. § 636(b)(1)).

To grant a motion for summary judgment, the court must find that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). The court "resolve[s] all ambiguities and draw[s] all reasonable inferences against the moving party." *Skubel v. Fuoroli,* 113 F .3d 330, 334 (2d Cir.1997) (citation omitted). However, "[w]hen no rational jury could find in favor of the nonmoving party ... a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs. Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994) (citation omitted).

**B. Plaintiff's failure-to-protect claim**

**\*2** To establish a failure-to-protect claim under § 1983, a plaintiff "must show that he [was] incarcerated under conditions posing a substantial risk of serious harm" and that the defendant was deliberately indifferent to the plaintiff's health and safety. *Farmer v. Brennan,* 511 U.S. 825, 834 (1994) (citation, quotation and footnote omitted). When determining whether conditions pose a substantial risk of serious harm, the courts have adopted an objective test that requires a plaintiff to show that he was subject to a risk of harm. *See Helling v. McKinney,* 509 U.S. 25, 35 (1993). In addition, a finding of deliberate indifference is a subjective test that requires the plaintiff to demonstrate that the defendant knew of and disregarded an excessive risk to the plaintiff's health and safety. *See Farmer,* 511 U.S. at 837. A plaintiff can show deliberate indifference by presenting evidence "that a substantial risk of inmate attacks was 'longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official ... had been exposed to information concerning the risk and thus 'must have known' about it ....' " *Farmer,* 511 U.S. at 842 (quotation omitted).

Plaintiff bases his failure-to-protect claim on two theories. First, Plaintiff alleges that, prior to the attack, Defendants were aware that Plaintiff was in danger and that, despite this knowledge, they did nothing to protect him from attack. Alternatively, Plaintiff contends that, although Defendants saw his fellow inmates attack him, they did nothing to stop the attack. The Court will address each of these theories in turn.

### *1. Defendants' prior knowledge that Plaintiff was in danger*

Plaintiff claims that Defendants were deliberately indifferent to his safety because, based upon DOCS' Unusual Incident Reports from 1997 through 1999 and various news articles discussing gang activity in DOCS' prisons, they should have known that he was in danger of being attacked. However, Plaintiff does not dispute that, prior to the assault, he did not request that Defendants protect him from attack.

Magistrate Judge Homer concluded that neither the newspaper articles nor the Unusual Incident Reports demonstrated that Defendants acted with deliberate indifference. *See* Report-Recommendation and Order at 5.

The parties do not object to this portion of Magistrate Judge Homer's Report-Recommendation and Order. Having reviewed the record in this case, the Court agrees with Magistrate Judge Homer's conclusion that Plaintiff has failed

to raise an issue of fact as to whether Defendants were aware of any danger to Plaintiff's safety prior to the alleged attack. Therefore, the Court adopts Magistrate Judge Homer's recommendation in this regard.

### *2. Defendants' failure to stop the attack on Plaintiff*

Defendants contend that Magistrate Judge Homer erred in finding that Plaintiff had raised a question of fact about whether they failed to stop the attack on Plaintiff. *See* Defendants' Objections at ¶ 1. To support their position, Defendants rely upon the following facts, which they claim are not in dispute: (1) they arrived within seconds of the alleged assault, (2) the entire incident lasted only a few seconds, and (3) Defendant Vandyke was approximately 150 yards away and had no way to know that Plaintiff was in danger. *See id.* at ¶¶ 3, 5-6. Specifically, Defendants contend that they observed a group of inmates proceeding along a walkway, including an inmate who appeared to fall to the ground, that Defendant Hall immediately went to see if the inmate was injured, and that Defendant Vandyke moved toward the area to assist him. *See* Report-Recommendation and Order at 6 (citations omitted). Finally, Defendant Hall asserts that he was unable to identify any of the individuals walking with Plaintiff at the time of the assault because of blowing snow and poor visibility. *See id.* (citation omitted).

**\*3** On the other hand, Plaintiff asserts that Defendants stood and watched the attack and did nothing to prevent it. *See id.* (citation omitted). He also contends that Defendants failed to order the attackers to stop, to call for help or to intervene, and instead waited for the assault to end before calling for assistance. *See id.* (citation and quotation omitted). Lastly, he alleges that the weather was clear that night, which allowed Defendants to witness the attack. *See id.* (citation omitted).

Based upon the parties' conflicting accounts of what occurred, it is clear that there is a material issue of fact as to whether Defendants stood by and watched the assault and did nothing to protect Plaintiff. Thus, the Court adopts Magistrate Judge Homer's recommendation and denies Defendants' motion for summary judgment with respect to this aspect of Plaintiff's failure-to-protect claim.

### C. Qualified immunity

Qualified immunity generally shields government officials to the extent that their conduct does not violate clearly established statutory or constitutional rights. *See Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982) (citations omitted).

When analyzing a claim of qualified immunity, the court must first determine " 'whether plaintiff's allegations, if true, establish a constitutional violation.' " *Aiken v. Nixon,* 236 F.Supp.2d 211, 230 (N.D.N.Y.2002). (citations omitted). Only where there is a constitutional violation will the court proceed to the next step "to determine whether [the] defendant's actions 'violate[d] "clearly established statutory or constitutional rights of which a reasonable person would have known." ' " *Id.* (quotation and other citations and footnote omitted).

Magistrate Judge Homer noted that it was well-established on the date of the assault that prison officials could not stand by and permit an inmate to attack another inmate. *See* Report-Recommendation and Order at 7 (citations omitted). Therefore, Magistrate Judge Homer recommended that the Court deny Defendants' motion for summary judgment on the ground that they were entitled to qualified immunity. *See id.*

Defendants object to this conclusion by citing the well-established legal principle that qualified immunity protects all but the plainly incompetent or those who knowingly violate the law. *See* Defendants' Objections at ¶ 12 (quotation omitted). However, they do not explain how this legal principle applies to the facts of this case, nor do they deny that at the time that the incident occurred it was well-established that they could not stand by and watch one inmate assault another.

In 1986, the Supreme Court clearly established that, when a prison official stands by and watches an inmate attack another inmate, he has violated the constitutional rights of the inmate under attack. *See Davidson v. Cannon,* 474 U.S. 344, 348 (1986) (citations omitted). Since Plaintiff has raised an issue of fact about whether Defendants stood by and allowed other inmates to attack him, the Court concludes that Defendants are not entitled to qualified immunity on this claim.

### IV. CONCLUSION

**\*4** After carefully reviewing Magistrate Judge Homer's Report-Recommendation and Order, Defendants' objections thereto, the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Homer's September 13, 2006 Report-Recommendation and Order is **ADOPTED IN ITS ENTIRETY;** and the Court further

**ORDERS** that Defendants' motion for summary judgment is **GRANTED** to the extent that Plaintiff's failure-to-protect claim is based upon his theory that Defendants were deliberately indifferent to his safety because they were aware that he was in danger prior to the attack; and the Court further

**ORDERS** that Defendants' motion for summary judgment is **DENIED** to the extent that Plaintiff's failure-to-protect claim is based upon his theory that Defendants were deliberately indifferent to his safety because they stood by and allowed other inmates to attack him; and the Court further

**ORDERS** that this matter is referred to Magistrate Judge Homer for all further pretrial matters.

**IT IS SO ORDERED.**

### REPORT-RECOMMENDATION AND ORDER [1]

[1]    This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, United States Magistrate Judge.

Plaintiff pro se Dean J. Villante ("Villante"), formerly an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, two DOCS employees, violated his constitutional rights under the Eighth Amendment when they failed to protect him from an assault by other inmates. Compl. (Docket No. 1). Presently pending is defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. Docket No. 56. Villante opposes the motion. Docket No. 62. For the reasons which follow, it is recommended that defendants' motion be denied.

### I. Background

The facts are presented in the light most favorable to Villante as the non-moving party. *See Ertman v. United States,* 165 F.3d 204, 206 (2d Cir.1999).

At all relevant times, Villante was incarcerated at Marcy Correctional Facility ("Marcy"). On December 22, 1998, at approximately 9:30 p.m., Villante was returning from

Villante v. Vandyke, Not Reported in F.Supp.2d (2008)

2008 WL 163596

the recreation area along an outside walkway when he and another inmate were attacked by approximately twenty inmates. Compl. at 2. Villante was repeatedly kicked in his lower back and face and was cut with a sharp instrument below his right eye, lip, and tongue. *Id.;* Hall Aff. (Docket No. 56) at Ex. D. [2] Defendants Vandyke and Hall "stood by and watched [Villante] be assaulted and scarred for life." Compl. at 2. Villante was provided medical treatment at Marcy and then was transferred to St. Elizabeth's Hospital. Hall Aff. at Ex. D. This action followed.

[2]     Defendants contend that Villante has failed to answer their Statement of Material Facts in violation of N.D.N.Y.L.R. 7.1(a)(3) and, thus, defendants' factual allegations should be deemed admitted for the purpose of this motion. Docket No. 63. However, Villante has submitted an answer. *See* Docket No. 65. Because of plaintiff's pro se status and his substantial compliance with the rule, the Court accepts Villante's Response to Defendants' Statement of Material Facts.

## II. Discussion

Villante asserts two causes of action, each alleging that defendants failed to prevent an assault against him. Defendants seek dismissal on both claims.

## A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Fed.R.Civ.P.* 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

 **\*5** The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there

is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs,* 22 F.3d 1219, 1223-24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988). When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. *Id.* [3] However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247-48.

[3]     Villante is not without litigation experience, however, having filed ten other federal actions since 1989. *See U.S. Party/Case Index* (visited Sept. 12, 2006) <http://pacer.uspci.uscourts.gov/cgi-bin/dquery.pl>.

## B. Failure to Protect

Prison officials have a duty to protect inmates from violence by other inmates. *Farmer v. Brennan,* 511 U.S. 825, 832-33 (1994); *Hayes v. New York City Dep't of Corrs.,* 84 F.3d 614, 620 (2d Cir.1991). However, not every injury suffered by one inmate at the hands of another imposes constitutional liability. *Farmer,* 511 U.S. at 834. Mere negligence by a correctional officer does not state a claim under § 1983. *See Williams v. Vincent,* 508 F.2d 541, 546 (2d Cir.1974). When asserting a failure to protect claim, an inmate must establish that he was "incarcerated under conditions posing a substantial risk of serious harm" and that the defendants acted with deliberate indifference to the inmate's safety. *Farmer,* 511 U.S. at 834. Deliberate indifference is established when the official knew of and disregarded an excessive risk to inmate health or safety. *Id.* at 837. However, "the issue is not whether [a plaintiff] identified his enemies by name to prison officials, but whether they were aware of a substantial risk of harm to [plaintiff]." *Hayes,* 84 F.3d at 621.

### 1. Serious Risk of Harm

Villante contends that defendants were aware of the persistent pattern of assaults at Marcy and were deliberately indifferent to Villante's safety. In support of his contention, Villante

has provided the Unusual Incident ("UI") Reports for DOCS from 1997 through 1999 and various news articles discussing gang activity in DOCS prisons. *See* Pl. Reply Mem. of Law (Docket No. 62) at Exs. 1-4. However, it is undisputed that prior to the assault, defendants did not receive a request for protection from Villante or have any indication that he was in danger. *See* Hall Aff. at ¶ 19; Vandyke Aff. (Docket No. 56) at ¶ 15; Pl. Reply Statement of Material Facts (Docket No. 65) at ¶¶ 19, 34. Further, the various UI Reports and news articles fail to demonstrate that defendants acted with deliberate indifference to Villante's safety. Thus, Villante has failed to raise a material issue of fact as to whether defendants knew of or disregarded a serious risk to his safety. *See Farmer,* 511 U.S. at 837.

*6 Therefore, it is recommended that defendants' motion for summary judgment be granted on this ground.

### 2. Failure to Stop the Assault

Villante contends that defendants witnessed the assault on December 22 but "stood by and did nothing to prevent [the] assault." Comp. at 3-4. A failure to protect violation occurs "when prison guards simply stand by and permit an attack on an inmate by another inmate to proceed." *George v. Corr. Officer Burton,* No. Civ. 00-143(NRB), 2001 WL 12010, at *3 (S.D.N.Y. Jan. 4, 2001) (citing *Davidson v. Cannon,* 474 U.S. 344, 348 (1986)). Defendants offer evidence that on December 22, 1998, they were assigned to monitor the movement of inmates between various buildings during transit times. Hall Aff. at ¶¶ 3-4; Vandyke Aff. at ¶¶ 3-6. That night, at approximately 9:30 p.m., defendants observed a group of inmates proceeding along a walkway, including an inmate who appeared to fall to the ground. Hall Aff. at ¶¶ 6-7; Vandyke Aff. at ¶¶ 10-11. Hall stated that he was approximately thirty feet away from the incident and believed that the inmate had slipped and fallen on the ice. Hall Aff. at ¶¶ 7-8. Hall also stated that he immediately went to see if the inmate was injured and Vandyke moved toward the area to assist Hall. Hall Aff. at ¶ 8; Vandyke Aff. at ¶ 11. Because of blowing snow and poor visibility, Hall was unable to identify any of the individuals walking with Villante at the time of the assault. Hall Aff. at ¶ 16.

However, Villante contends under oath that both defendants "stood and watched" the assault. Comp. at 2.[4] Villante also contends that defendants failed to order "the attackers to stop, call for help or to intervene," instead waiting for the assault

to end before calling for assistance. Pl. Reply Mem. of Law (Docket No. 62) at 9.[5] Villante further contends that the weather was clear that night, therefore allowing defendants to witness the attack. Comp. at 2. Thus, material issues of fact remain as to what defendants witnessed and whether they intentionally or recklessly failed to intervene in the attack.

[4]  Under Fed.R.Civ.P. 56(e), the non-moving party must offer evidence in sworn affidavits to oppose a properly supported motion for summary judgment. A verified complaint meets this requirement. *See Ford v. Wilson,* 90 F.3d 245, 246 (7th Cir.1996); *King v. Dogan,* 31 F.3d 344, 346 (5th Cir.1994). The complaint here was verified, *see* Comp. at 5, and will, therefore, be considered on this motion.

[5]  In his complaint, Villante also refers to this Court's denial of summary judgment as to defendants Hall and Vandyke in a case involving substantially similar facts to the instant case. *See* Comp. at 3-4; *see also Villante v. VanDyke,* No. Civ. 99-830(DRH), at 12 (N.D.N.Y. Mar. 16, 2001), *approved and adopted in its entirety, Villante v. VanDyke,* No. Civ. 99-830(LEK), at 2 (N.D.N.Y. Mar. 30, 2001).

Therefore, it is recommended that defendants' motion for summary judgment on this ground be denied.

### C. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability insofar as their conduct does not violate clearly established constitutional law of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229-30 (N.D.N.Y.2002), *aff'd,* 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003). A court must first determine that if plaintiff's allegations are accepted as true, there would be a constitutional violation. Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, it was well established that on the date of the assault, December 22, 1998, prison officials could not stand by and permit an inmate to attack another inmate. *See Davidson,* 474 U.S. at 348; *see*

2008 WL 163596

*also Fossett v. C.M. Morris,* No. Civ. 86-3800(MJL), 1991 WL 67093, at \*3 (S.D.N.Y. Apr. 22, 1991).

**\*7** Therefore, defendants' motion for summary judgment on this alternative ground should be denied.

### III. Conclusion

For the reasons stated above, it is hereby

**RECOMMENDED** that defendants' motion for summary judgment (Docket No. 56) be **DENIED** as to both defendants.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

### All Citations

Not Reported in F.Supp.2d, 2008 WL 163596

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 1606753
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

David DECAYETTE, Plaintiff,
v.
Glenn S. GOORD, et al., Defendants.

No. 9:06–CV–783.
|
June 8, 2009.

West KeySummary

**1**    **Civil Rights** 🔑 Criminal law enforcement;
prisons

**Summary Judgment** 🔑 Prisons and jails

**Summary Judgment** 🔑 Prisons and jails

Genuine issue of material fact as to whether
prison official had a reasonable opportunity to
intervene in an incident precluded summary
judgment in favor of inmate who brought a
§ 1983 action against a prison official who
allegedly failed to intervene while other prison
officials where beating inmate in violation of his
Eighth amendment right. There were multiple
issues of fact, including whether the other
prison officials actually beat inmate, and if so
whether prison official observed the beating, and
if she observed the beating, whether she was
capable of preventing or mitigating it. U.S.C.A.
Const.Amend 8 42 U.S.C.A. § 1983.

8 Cases that cite this headnote

**Attorneys and Law Firms**

David Decayette, Romulus, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of
New York, Christina L. Roberts–Ryba, Esq., of Counsel, New
York, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

**\*1**   This matter brought pursuant to 42 U.S.C. § 1983
was referred to the Hon. George H. Lowe, United States
Magistrate Judge, for a Report–Recommendation pursuant to
28 U.S.C. § 636(b) and Local Rule 72.3(c).

The Report–Recommendation dated March 31, 2009
recommended that Defendants' motion be granted in part
and denied in part. On April 21, 2009, Plaintiff filed
an objection to the Report–Recommendation. Plaintiff's
objection focused primarily on the dismissal of the Complaint
against Defendant Commissioner Goord for lack of sufficient
personal involvement. On May 19, 2009, Defendant Volpe
filed an objection to the Report–Recommendation on the
grounds that the action against her should be dismissed in its
entirety.

When objections to a magistrate judge's Report–
Recommendation are lodged, the Court makes a *"de novo*
determination of those portions of the report or specified
proposed findings or recommendations to which objection is
made." *See* 28 U.S.C. § 636(b)(1). After such a review, the
Court may "accept, reject, or modify, in whole or in part, the
findings or recommendations made by the magistrate judge.
The judge may also receive further evidence or recommit the
matter to the magistrate judge with instructions." *Id.*

Having reviewed the record *de novo* and having considered
the issues raised in Plaintiff's and Defendant's objections
respectively, with the exception of the Eighth Amendmente
claim of inadequate medical care against Defendant Volpe,
this Court has determined to accept the recommendations of
Magistrate Judge Lowe for the reasons stated in the Report–
Recommendation.

For a plaintiff to succeed on a claim of inadequate medical
care in violation of the Eighth Amendment, two factors must
be shown: (1) that the plaintiff's medical need was sufficiently
serious; and (2) that the defendant was deliberately indifferent
to that serious medical need. *Estelle v. Gamble,* 429 U.S.
97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Chance v.
Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). A plaintiff's
medical need is deemed sufficiently serious under an Eighth
Amendment claim if, looked at objectively, it is "a condition
of urgency, one that may produce death, degeneration, or

2009 WL 1606753

extreme pain." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996) (citations omitted). A defendant acts with deliberate indifference when she "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [s]he must also draw the inference." *Id.*

Plaintiff has failed to show that the alleged injuries present at the time of his interactions with Defendant Volpe were sufficiently serious to satisfy the first prong. While it is unclear from Plaintiff's testimony whether Defendant Volpe was present at the time that the alleged injuries were suffered (Dkt. No. 36–4, at 43, lines 7–23), or whether she was brought into the room shortly thereafter, this distinction is immaterial to this claim. Plaintiff admits that his visible injuries were limited to cuts, bruises and swelling. Dkt. No. 36–4, at 49, lines 12–18. Injuries of this nature are not conditions of urgency that threaten death, degeneration or extreme pain. *Hickey v. City of New York,* No. 01–Civ. 6506(GEL), 2004 WL 2724079, *16 (S.D.N.Y. Nov. 29, 2004) (holding that cuts and bruises do not constitute sufficiently serious medical needs). Moreover, during a meeting with medical personnel on August 5, 2004, which was seven days after the alleged assault, the only injury complained of by Plaintiff was back pain (Dkt. No. 36–4, at 48, 49). Plaintiff admits that his back pain was caused by a 2002 bus accident, and does not allege that it was exacerbated by the incident in question. Dkt. No. 36–4, at 15–16. Accordingly, Plaintiff has failed to demonstrate that he had a sufficiently serious medical need.

**\*2** Assuming, *arguendo,* that Plaintiff's alleged injuries were sufficiently serious, Plaintiff has provided insufficient evidence that Defendant Volpe both knew of and disregarded any such injuries. Plaintiff alleges that he currently suffers nerve damage in his groin area as a result of the alleged assault. Dkt. No. 36–4, at 9. However, the evidence provided by Plaintiff is insufficient to show that Defendant Volpe either knew of or disregarded such injury during her encounters with Plaintiff on or about July 29, 2004 and July 31, 2004.

The first interaction between Defendant Volpe and Plaintiff occurred on July 29, 2004. Dkt. No. 36–12, at 7. According to Plaintiff, Defendant Volpe was either in the room during the alleged assault, or she was brought into the room immediately thereafter. Dkt. No. 36–4, at 43, lines 7–23. However, Plaintiff does not allege that he notified Defendant Volpe of any specific injuries, including to his groin, during

this interaction. Further, the fact that Plaintiff was wearing undershorts during this interaction suggests that, even upon visual inspection, Defendant Volpe would likely have been unable to observe an injury to Plaintiff's groin. While Plaintiff does allege to have had blood visible in his underwear, he did not notice this blood until July 31, 2004 (Dkt. No. 1, at 6), approximately two days after his initial interaction with Defendant Volpe. Accordingly, there is an insufficient basis upon which to conclude that Defendant Volpe was aware of Plaintiff's alleged groin injury at the time of their initial interaction.

The second interaction between Defendant Volpe and Plaintiff occurred on or about July 31, 2004. Dkt. No. 36–4, at 43. On this date, Plaintiff alleges that he noticed blood in his underwear and notified Capt. Felix. Dkt. No. 1, at 5–6. Plaintiff was subsequently removed from his cell to be photographed and inspected. *Id.* Shortly thereafter, Defendant Volpe attended to Plaintiff and attempted to retrieve a urine sample from him. Dkt. No. 36–4, at 43. Plaintiff states that he was unable to provide a urine sample at that time, and that another nurse obtained a urine sample from him the following day. Dkt. No. 36–4, at 46, lines 5–13. Plaintiff admits that he saw medical staff on the day that he was removed from his cell to be inspected and photographed, which was the same day that Defendant Volpe attempted to retrieve his urine sample. Dkt. No. 36–4 at 46–47. Further, Plaintiff admits that he has received consistent medical care from a urologist from the time of the alleged assault to the present date. Dkt. No. 36–4, at 10. As such, there is insufficient evidence to suggest that Defendant Volpe disregarded Plaintiff's injuries once she became aware of the possibility that they may exist.

For the foregoing reasons, Plaintiff has not provided sufficient evidence upon which a fair minded trier of fact could reasonably conclude that he sustained sufficiently serious injuries, or that Defendant Volpe acted with deliberate indifference to a serious injury of which she was aware.

**\*3** It is therefore

**ORDERED** that summary judgment be granted dismissing all claims against Defendants Goord, Allard, Berry, Meeks, Martin, and Sugg; and it is further

**ORDERED** that summary judgment be granted dismissing the Eighth Amendment claim of inadequate medical care against Defendant Volpe; and it is further

Decayette v. Goord, Not Reported in F.Supp.2d (2009)

2009 WL 1606753

**ORDERED** that Defendant Volpe's motion for summary judgment be denied as to the Eighth Amendment claim of failure to intervene.

The case shall proceed to trial against Defendant Volpe on Plaintiff's Eighth Amendment claim of failure to intervene, against Defendants Schewnki and Roberts on Plaintiff's Eighth Amendment claims of excessive force, and against Defendants Schewnki and Roberts on Plaintiff's First Amendment retaliation claims.

## IT IS SO ORDERED.

### *REPORT–RECOMMENDATION AND ORDER*

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Thomas J. McAvoy, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Generally, David Decayette ("Plaintiff") alleges that in July and August of 2004, while he was incarcerated at the Franklin Correctional Facility ("Franklin C.F."), ten employees of the New York State Department of Correctional Services ("DOCS") violated certain of his constitutional rights. (*See generally* Dkt. No. 1 [Plf.'s Compl.].) Currently pending before the Court is Defendants' motion for partial summary judgment [1] pursuant to Fed.R.Civ.P. 56. (Dkt. No. 36.) For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

[1]    The motion is made on behalf of all Defendants except Roberts and Schewnki.

## I. BACKGROUND

### A. Summary of Plaintiff's Complaint

Liberally construed, Plaintiff's Complaint alleges as follows. (Dkt. No. 1.) Plaintiff and another inmate (identified in subsequent pleadings as inmate Rashad) were transferred to Franklin C.F. on or about the same day. Certain of Rashad's personal property was missing. On or about July 13, 2004, Defendants Sgt. Berry and Corrections Officer Sugg confiscated certain of Plaintiff's personal property. These Defendants permitted Rashad, who was gang affiliated,

to view Plaintiff's personal property, including personal photographs.

In his Memorandum of Law submitted in opposition to Defendants' summary judgment motion, Plaintiff alleges that although Rashad's property was not found among Plaintiff's property, Rashad nevertheless believed that Plaintiff possessed it. Rashad threatened Plaintiff, claiming that while viewing Plaintiff's personal property he had obtained information concerning Plaintiff's family and their address. Rashad warned of "serious problems" if he did not get his property back. Dkt. No. 39, at 8–9. [2]

[2]    The page numbers referred to in this Report–Recommendation are those assigned by the ECF system.

In his Complaint Plaintiff alleges that he subsequently filed a grievance concerning this matter. It appears that the grievance was in the form of a letter to Defendant Goord, then the Commissioner of DOCS. Upon the recommendation of Defendant Goord, Plaintiff was interviewed by Defendant Lt. Meeks. Defendant Berry gave Plaintiff "an ultimatum [to] re-write and sign a statement informing Comm. Goord that there was a misunderstanding." Dkt. No. 1, at 2. Plaintiff declined to do so, and he was issued a false misbehavior report.

**\*4** Without being given a formal hearing on the report Plaintiff was taken to the Special Housing Unit ("SHU"). Upon his arrival at SHU he was confronted by Defendants Sgt. Schewnki, Corrections Officer Roberts, and an unidentified Corrections Officer. They "started reminding the plaintiff about the incident with the statement that he refused to write," (Dkt. No. 1, at 4), and then they beat him. He suffered significant injuries and endured severe pain, but he was denied medical treatment.

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of

material [3] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. [4]

[3]   A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

[4]   *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." [5] The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." [6] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [7]

[5]   Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary judgment, if appropriate, shall be entered against the [plaintiff]."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

[6]   *Matsushita,* 475 U.S. at 585–86; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ....").

[7]   *Ross v. McGinnis,* 00–CV–0275, 2004 WL 1125177, at *8 (W.D.N.Y. Mar.29, 2004) [internal quotations omitted] [emphasis added].

The undersigned will provide a copy of all electronically-available-only opinions in this Report–Recommendation to Plaintiff in light of the Second Circuit's recent decision in *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

Where a plaintiff has failed to respond to a defendant's properly filed and facially meritorious memorandum of law (submitted in support of its motion for summary judgment), the plaintiff is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3) of the Local Rules of Practice for this Court. [8] Stated another way, where a defendant has properly filed a memorandum of law (in support of a properly filed motion for summary judgment), and the plaintiff has failed to respond to that memorandum of law, the only remaining issue is whether the legal arguments advanced in the defendant's memorandum of law are *facially meritorious.* [9] A defendant's burden in making legal arguments that are facially meritorious has appropriately been characterized as "modest." [10]

[8]   N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause be shown ."); N.D.N.Y. L.R. 7.1(a) (requiring opposition to motion for summary judgment to contain, *inter alia,* a memorandum of law); *cf.* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's *response* ... must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so *respond,* summary judgment, if appropriate, shall be entered against the adverse party.") [emphasis added]; *see, e.g., Beers v. GMC,* 97–CV–0482, 1999 U.S. Dist. LEXIS 12285, at *27–31, 1999 WL 325378 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment

2009 WL 1606753

for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3] ).

9    *Hernandez v. Nash,* 00–CV–1564, 2003 U.S. Dist. LEXIS 16258, at *7–8, 2003 WL 22143709 (N.D.N.Y. Sept. 10, 2003) (Sharpe, M.J.) (before a motion to dismiss may be granted under Local Rule 7.1[b][3], "the court must review the motion to determine whether it is *facially meritorious"* ) [emphasis added; citations omitted] ).

10    *See Ciaprazi v. Goord,* 02–CV0915, 2005 WL 3531464, at *8 (N.D.N.Y. Dec.22, 2005) (Sharpe, J.; Peebles, M.J.) (characterizing defendants' threshold burden on a motion for summary judgment as "modest") (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Finally, in construing Plaintiff's claims, the Court has afforded Plaintiff's Complaint the liberal construction that all pleadings must be afforded, under Fed.R.Civ.P. 8. *See* Fed.R.Civ.P. 8(f) ("All pleadings shall be so construed as to do substantial justice."). Furthermore, the pleadings of *pro se* litigants are construed with even more liberality than is required under Fed.R.Civ.P. 8,[11] and the Court has done so here. The rationale for extending this special liberality to the pleadings of *pro se* litigants is that, generally, *pro se* litigants are unfamiliar with legal terminology and the litigation process.

11    *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) ("[C]ourts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest.") [internal quotation marks and citation omitted].

## III. ANALYSIS

### POINT I

### The claims against Defendants Goord and Allard should be dismissed because of a lack of personal involvement.[12]

12    Plaintiff failed to respond to Defendants' legal arguments on this point. *See* discussion at pages 4– 5 above. Nevertheless the Court has performed an independent review of the record.

**\*5**  " '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 [2d Cir.1991] ).[13] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant.[14] If the defendant is a supervisory official, such as a DOCS Commissioner or a correctional facility superintendent, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct.[15] In other words, supervisory officials may not be held liable merely because they held a position of authority.[16] Rather, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring.[17]

13    *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

14    *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

15    *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

16    *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

17    *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323– 324 (2d Cir.1986) (setting forth four prongs).

With respect to Defendant Goord, in 2004 he was the Commissioner of DOCS. Dkt. No. 1 at 1. Defendant Allard was the Superintendent of Franklin C.F. *Id.* In his Complaint

Plaintiff alleges that he "wrote a letter" to them,[18] advising them as to what had occurred and his concerns. *Id.,* at 2–3. In his "Statement Pursuant to Rule 7.1(a)(3)," Plaintiff alleges that Goord "ordered an investigation into the incident." Dkt. No. 39, at 3. The investigation was conducted by Defendant Meeks. Dkt. No. 1, at 2; Dkt. No. 39, at 4; Dkt. No. 36–7, at 2–3.

[18]    Beyond Plaintiff's allegation the record reflects only a letter to Defendant Goord, which was forwarded to Defendant Allard. Dkt. No. 36–7, at 5.

The foregoing does not constitute personal involvement in the alleged constitutional violations. "Defendant Goord was, during the time in question, entitled to (1) refer letters of complaint to subordinates ..., and (2) rely on those subordinates to conduct an appropriate investigation and response." *Fletcher v. Goord,* 07–CV–0707, 2008 WL 4426763, at * 17 (N.D.N.Y. Sept.25, 2008) (Sharpe, J., adopting Report–Recommendation by Lowe, M.J., on *de novo* review); *see also Cabassa v. Gummerson,* 01–CV–1039, 2008 WL 4416411, at *7 (N.D.N.Y. Sept.24, 2008) (Hurd, J., adopting Report–Recommendation by Lowe, M.J. on *de novo* review) ("[A]s the superintendent of Auburn C.F., Defendant Walker was entitled to rely on his subordinate correctional officers (including the three members of the Periodic Review Committee) to conduct an appropriate investigation of an issue at the facility, without personally involving Defendant Walker in that issue."); *Garvin v. Goord,* 212 F.Supp.2d 123, 126 (W.D.N.Y.2002) ("[W]here a commissioner's involvement in a prisoner's complaint is limited to forwarding of prisoner correspondence to appropriate staff, the commissioner has insufficient personal involvement to sustain a § 1983 cause of action."); *cf. Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (DOCS Commissioner was not personally involved in alleged constitutional violation where he forwarded plaintiff's letter of complaint to a staff member for decision, and he responded to plaintiff's letter inquiring as to status of matter).

**\*6**  Accordingly, it is recommended that summary judgment be granted in favor of Defendants Goord and Allard, dismissing the Complaint as against them.

### POINT II

**The conduct of Defendants Berry and Sugg in the examination of Plaintiff's personal property did not amount to a constitutional violation.[19]**

[19]    Plaintiff failed to respond to Defendants' legal arguments on this point. *See* discussion at pages 4–5 above. Nevertheless the Court has performed an independent review of the record.

As indicated above, Plaintiff and another inmate ("Rashad") were transferred to Franklin C.F. on the same day. Certain of Rashad's personal property was missing. Plaintiff alleges that "Defendants Berry and Sugg elected to allow inmate Rashad to go through Plaintiff's property to look for his missing items." Dkt. No. 39, at 2. Plaintiff's objection appears to be that Berry and Sugg alone should have examined his property and taken an inventory to ascertain whether Rashad's missing property was included with his. *Id.,* at 2–3. Berry and Sugg have declared under oath that at no time did they "allow the plaintiff's property to be viewed by inmate Rashad or any other inmate." Dkt. No. 36–8, at 2; *see also* Dkt. No. 36–11, at 2–3. In addition, Plaintiff has no non-hearsay evidence to support his claim that Rashad examined his property. Dkt. No. 39, at 3. Finally, Plaintiff has not even alleged, not to mention proffered admissible evidence, that Berry and Sugg knew or should have known that Rashad subsequently would threaten Plaintiff.

In any event, even assuming *arguendo* that Plaintiff's version of the events is correct, there were no constitutional violations. With respect to the Fourth Amendment, it provides that "[t]he right of the people to be secure in their persons ... against unreasonable searches ... shall not be violated." U.S. Const. amend IV. "What is reasonable, of course, depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *Skinner v. Ry. Labor Executives' Ass'n,* 489 U.S. 602, 619, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (internal quotation marks and citation omitted). "Thus, the permissibility of a particular practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Skinner,* 489 U.S. at 619 (internal quotation marks and citations omitted). In so doing, "[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (citations omitted), *accord, Covino v. Patrissi,* 967 F.2d

2009 WL 1606753

73, 77 (2d Cir.1992). The Fourth Amendment's proscription against unreasonable searches does not apply *at all* within the confines of a prison cell. *Hudson v. Palmer,* 468 U.S. 517, 526, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). Therefore, Plaintiff has not stated a Fourth Amendment claim.

With respect to the Eighth Amendment, generally, to prevail on a claim of inadequate prison conditions, a plaintiff must show two things: (1) that the conditions of his confinement resulted in deprivation that was *sufficiently serious;* and (2) that the defendant acted with *deliberate indifference* to the plaintiff's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W.D.N.Y.2005). "[D]eliberate indifference [for purposes of an Eighth Amendment claim] describes a state of mind more blameworthy than negligence." *Farmer,* 511 U.S. at 835. Here, again assuming *arguendo* that Plaintiff's version of the events is correct, for Defendants Berry and Sugg to have allowed Rashad to go through Plaintiff's property to look for his missing items, at a point in time when they had no reason to anticipate the alleged subsequent events, clearly was not a serious deprivation. Similarly, their conduct, at the most, was negligent, and not deliberately indifferent.

**\*7** Accordingly, it is recommended that summary judgment be granted in favor of Defendants Berry and Sugg, dismissing Plaintiff's claims based upon the examination of his personal property.

### POINT III

### Plaintiff's excessive force claims against Defendants Allard, Meeks, Berry, Sugg, and Martin should be dismissed.

In his Complaint Plaintiff alleges that the aforementioned Defendants, along with Defendants Schewnki and Roberts (and John Doe), "wantonly and with malice assaulted and battered him." Dkt. No. 1, at 7. However, in his "Statement Pursuant to Rule 7.1(a) (3)," Plaintiff stated that Defendants Roberts and Schewnki (and John Doe) "beat him"; "those were the only Defendants that beat Plaintiff." Dkt. No 39, at 5. His deposition testimony was consistent with these statements. Dkt. No. 36–4, at 26–33.

Defendants Schewnki and Roberts have not moved for summary judgment on Plaintiff's excessive force claims. Dkt.

No. 36–13, at ii (ftn.1). Given Plaintiff's concession that only Defendants Schewnki and Roberts allegedly beat him, it is recommended that summary judgment be granted in favor of all other Defendants, dismissing as against them Plaintiff's Eighth Amendment excessive force claims.

### POINT IV

### Triable issues of fact exist as to whether Defendant Volpe was deliberately indifferent to a serious medical need.

To prevail on an Eighth Amendment claim of inadequate medical care, a plaintiff must show two things: (1) that the plaintiff had a *sufficiently serious* medical need; and (2) that the defendant was *deliberately indifferent* to that serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). To be sufficiently serious for purposes of the Constitution, a medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting) (citations omitted); *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); *Chance,* 143 F.3d at 702. With respect to the second prong, "deliberate indifference describes a state of mind more blameworthy than negligence;" it is a state of mind akin to criminal recklessness. *Farmer,* 511 U.S. at 827, 835.

The argument of Defendant Volpe (a Registered Nurse) that Plaintiff's Eighth Amendment claim of insufficient medical care should be dismissed as against her opens with the contention that she "was brought into the room after [Plaintiff] was allegedly assaulted by Defendants Roberts and Schewnki." Dkt. No. 36–13, at 10. In support of this contention, Volpe cites to page 39 of the transcript of Plaintiff's deposition, at lines 22–25. It is dismaying to this Court that Volpe failed to cite to the following questions and answers that appear on the same page of the transcript:

> Q: Why is [Volpe] a defendant? Why do you have her listed here as a defendant?
>
> **\*8** A: Because she was—she was—she was in the room at the time during the incident happened and she never entered into the record that she noted that—she noticed that I was bleeding.

2009 WL 1606753

Q: She was in the room when you're claiming that the three officers—

A: Right.

Q:—beat you?

A: Right.

Dkt. No. 36–4, at 39, lines 5–15. In his Memorandum of Law [20] Plaintiff states:

> [20]    In an Affidavit Plaintiff swears that "[a]ll statements made by me in my Complaint and associated documents are true." Dkt. No. 39, at 1. Fed.R.Civ.P. 56(e) provides: "When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Here the Court is mindful of the special leniency to be afforded to a *pro se* litigant alleging a civil rights violation.

Upon Plaintiff's arrival at the S.H.U. Defendant Roberts began to physically assault Plaintiff, and Sgt. Schewnski eventually joined in the assault as Defendant Volpe watched from the doorway.

Dkt. No. 39, at 10. In his "Statement Pursuant to Rule 7.1(a) (3)" Plaintiff states: "during and after he was being beat, he saw Defendant Volpe." Dkt. No. 39, at 5.

In short, there clearly is an issue of fact as to whether Defendant Volpe observed the alleged beating. If the trier of fact concludes that she did, and accepts Plaintiff's version of the alleged beating (punching and slapping both sides of his face, punching him in the ribs, kicking him in the groin area; *see* Dkt. No. 36–4 at 32–37) and further accepts Plaintiff's version of his condition following the alleged beating ("multiple bruises, cut above my eye, and as well as blood that was shown to my underwear and stuff like that"; Dkt. No. 36–4, at 47; *see also* Dkt. No. 1, at 3–5), a finding of an Eighth Amendment violation would not be unreasonable.

Accordingly, it is recommended that Defendant Volpe's motion for summary judgment dismissing Plaintiff's Eighth Amendment claim as against her be denied.

### POINT V

**Triable issues of fact exist as to whether Defendant Volpe is liable for failing to intervene during the alleged beating of Plaintiff.**

Liberally construed, based upon the allegations referenced above in Point IV, Plaintiff has asserted a failure to intervene cause of action against Defendant Volpe.

Law enforcement officials can be held liable under § 1983 for not intervening in a situation where another officer is violating an inmate's constitutional rights. *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008). A state actor may be held liable for failing to prevent another state actor from committing a constitutional violation if "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Id.; see also Ricciuti v. N.Y.C. Transit Authority,* 124 F.3d 123, 129 (2d Cir.1997) ("Failure to intercede to prevent an unlawful arrest can be grounds for § 1983 liability.") Whether an officer can be held liable on a failure to intervene theory is generally a question of fact for the jury to decide. *See Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1992) ( "Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.").

**\*9** Here there are multiple issues of fact, including whether Defendants Schewnki and Roberts beat the Plaintiff, if so whether Defendant Volpe observed the beating, and if so whether she was capable of preventing or mitigating it. Accordingly, it is recommended that dismissal of Plaintiff's Eighth Amendment failure to intervene claim as against Defendant Volpe be denied.

### POINT VI

**Plaintiff's retaliation claims based upon allegedly false misbehavior reports should be dismissed.** [21]

2009 WL 1606753

[21]    Plaintiff failed to respond to Defendants' legal arguments on this point. *See* discussion at pages 4–5 above. Nevertheless the Court has performed an independent review of the record.

In order to state a cause of action for retaliation, a plaintiff must plead facts plausibly suggesting that (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action. *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001)).

In his Complaint Plaintiff alleges that "on or about July 26, 2004, after filing a grievance the plaintiff was interviewed by Lt. Meeks, per recommendation by Comm. Glenn Goord." Dkt. No. 1, at 2. This "grievance" presumably was the letter that he wrote to Defendant Goord. *Id.* at 2–3. In his Memorandum of Law Plaintiff alleges that he "was subjected to retaliation by receiving false misbehavior reports, for exercising his first amendment right to file grievances pertaining to the search for his personal property." Dkt. No. 39, at 8. Again, the only "grievance[ ] pertaining to the search for his personal property" that is reflected in the record is the letter to Defendant Goord.

The Court acknowledges that Plaintiff's right to send a letter of complaint to Defendant Goord was a constitutionally protected activity. *Davis,* 320 F.3d at 352–53. However, first, the only "inmate misbehavior reports" that are reflected in the record were issued by *non-parties. See* Dkt. No. 36, Exhibits B and C. In addition, Plaintiff has proffered no evidence whatsoever that these non-parties were even aware of the existence of his letter to Defendant Goord. Accordingly, there is no party defendant in this action against whom Plaintiff has made a retaliation claim based upon an allegedly false inmate misbehavior report. Furthermore, there is no evidence of a causal connection between the protected conduct, *i.e.,* the letter to Defendant Goord, and the "adverse actions," *i.e.,* the issuance of the inmate misbehavior reports. Therefore it is recommended that summary judgment be granted dismissing Plaintiff's retaliation claims based upon allegedly false misbehavior reports.

### POINT VII

**Triable issues of fact exist with respect to Plaintiff's retaliation claims against Defendants Schewnki and Roberts.** [22]

[22]    Plaintiff has failed to respond to Defendants' legal arguments on this point. *See* discussion at pages 4–5 above. Nevertheless the Court has performed an independent review of the record.

As noted above, Plaintiff's right to send letters of complaint to Defendant Goord was a constitutionally protected activity. *Davis,* 320 F.3d at 352–53. Also as noted above, Defendants Schewnki and Roberts are not seeking summary judgment on Plaintiff's excessive force claims. Questions of fact clearly exist as to whether they took "adverse action" against him.

**\*10**    Finally, on the "causal connection" prong of the retaliation cause of action, in his Complaint Plaintiff alleges, in paragraph "14", that prior to the commencement of the alleged beating, Defendants Schewnki and Roberts "started reminding the plaintiff about the incident with the statement that he refused to write." Dkt. No. 1, at 4. This "incident with the statement that he refused to write" presumably is the one described in paragraph "4" of the Complaint, when Defendant Berry allegedly gave Plaintiff "an ultimatum [to] re-write and sign a statement informing Comm. Goord that there was a misunderstanding." *Id.,* at 2. In short, there clearly are triable questions of fact as to whether there was a causal connection between Plaintiff's letter to Defendant Goord and the alleged beatings by Defendants Schewnki and Roberts. Accordingly, it is recommended that Plaintiff's First Amendment retaliation claims against Defendants Schewnki and Roberts proceed to trial.

### POINT VIII

**Plaintiff's Fourteenth Amendment Due Process claims should be dismissed.** [23]

[23]    Plaintiff has failed to respond to Defendants' legal arguments on this point. *See* discussion at pages 4–5 above. Nevertheless the Court has performed an independent review of the record.

In his Complaint Plaintiff alleges that he was not "afforded substantive Due Process" and that his Fourteenth Amendment

right "against arbitrary and capricious conduct"[24] was violated. Dkt. No. 1, at 6 and 7. However, as the Supreme Court has repeatedly held, "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth ... Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the [more generalized notion of] substantive due process." *United States v. Lanier,* 520 U.S. 259, 272, n. 7, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (citing *Graham v. Connor,* 490 U.S. 386, 392–94 [1989] ). Because the Court has already analyzed Plaintiff's claims under the appropriate specific legal standards, an analysis is not required under the Fourteenth Amendment substantive due process standard.

[24]  "Substantive due process protects individuals against government action that is arbitrary, ... conscience-shocking, ... or oppressive in a constitutional sense, ... but not against constitutional action that is incorrect or ill-advised." *Lowrence v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994) [internal quotations marks and citations omitted], *aff'g,* 91–CV–1196, Memorandum–Decision and Order (N.D.N.Y. Jan. 26, 1993) (DiBianco, M.J.) (granting summary judgment to defendants in inmate's civil rights action).

However, in addition to substantive due process, the Due Process Clause of the Fourteenth Amendment has a procedural component. *Zinernon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). The procedural component bars "the deprivation by state action of a constitutionally protected interest in life, liberty, or property ... *without due process of law." Id.* at 125–126 [internal quotations marks and citations omitted; emphasis in original]. In his Memorandum of Law Petitioner argues that "Defendants Sugg and Berry violated his Procedural Due Process Rights ... against unreasonable searches." Dkt. No. 39, at 8.

"[Courts] examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State ...; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Kentucky Dept. of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989). Here the Court already has conducted the first step analysis of the conduct of Defendants Berry and Sugg and found no deprivation of a property interest. *See*

Point II above. Therefore an analysis is not required under the Fourteenth Amendment procedural due process standard.

 **\*11**  Accordingly, it is recommended that the Defendants' motion for summary judgment dismissing Plaintiff's Fourteenth Amendment due process claim be granted.

### *POINT IX*

### Qualified Immunity[25]

[25]  Plaintiff has failed to respond to Defendants' legal arguments on this point. *See* discussion at pages 4–5 above. Nevertheless the Court has performed an independent review of the record.

The doctrine of qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan,* —— U.S. ——, ——, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 812, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). A determination of this issue involves deciding whether the facts that a plaintiff has alleged, or shown, make out a violation of a constitutional right, and whether the right at issue was clearly established at the time of the defendant's alleged misconduct. *Pearson,* 129 S.Ct. at 815–16 (citing *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)).

A right is sufficiently clearly established if 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' " *Higazy v. Templeton,* 505 F.3d 161, 169, n. 8 (2d Cir.2007). The following three factors are considered when determining whether a particular right was clearly established at the time a defendant acted:

(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would

2009 WL 1606753

have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations omitted), *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992). [26] "As the third part of the test provides, even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy,* 505 F.3d at 169–70 (citations omitted). [27] This "objective reasonableness" part of the test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). As the Supreme Court has explained,

[26]  *See also Pena v. DePrisco,* 432 F.3d 98, 115 (2d Cir.2005); *Clue v. Johnson,* 179 F.3d 57, 61 (2d Cir.1999); *McEvoy v. Spencer,* 124 F.3d 92, 97 (2d Cir.1997); *Shechter v. Comptroller of City of New York,* 79 F.3d 265, 271 (2d Cir.1996); *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995); *Prue v. City of Syracuse,* 26 F.3d 14, 17–18 (2d Cir.1994); *Calhoun v. New York State Division of Parole,* 999 F.2d 647, 654 (2d Cir.1993).

[27]  *See also Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' ") [citation omitted]; *Davis v. Scherer,* 468 U.S. 183, 190, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984) ("Even defendants who violate [clearly established] constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable standard."); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law.... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.

*Malley,* 475 U.S. at 341.

However, when "there are facts in dispute that are material to a determination of reasonableness," dismissal on the basis of a qualified immunity defense is inappropriate. *Thomas v. Roach,* 165 F.3d 137, 143 (2d Cir.1999); *Ali v. Szabo,* 81 F.Supp.2d 447, 461 (S.D.N.Y.2000) ("The Court cannot conclude as a matter of law that [the officers'] conduct was objectively reasonable since there are material issues of fact as to whether [plaintiff] was obeying the officers' order and who started the physical confrontation.").

 ***12** The Court has recommended that Defendant Volpe should not be entitled to summary judgment because triable issues of fact exist as to whether she was deliberately indifferent to a serious medical need of Plaintiff's and as to whether she is liable for failing to intervene during the alleged beating of Plaintiff. Therefore, Defendant Volpe should not be entitled to summary judgment on the defense of qualified immunity. *See Hemphill v. Schott,* 141 F.3d 412, 418 (2d Cir.1998) ("[S]ummary judgment based either on the merits or on qualified immunity requires that no disputes about material facts remain.") (citations omitted); *Deal v. Yurack,* No. 9:04–CV–0072, 2007 WL 2789615, at *14 (N.D.N.Y. Sept.24, 2007) (Kahn, J.) (adopting Report–Recommendation of Magistrate Judge David E. Peebles, finding that whether "the defendants maintained a good faith belief that their actions did not violate clearly established rights depends on the resolution of fact issues similar to those identified as precluding entry of summary judgment on the merits of plaintiff's retaliation and excessive force claims. As such ... the court is not currently positioned to determine defendant's entitlement to qualified immunity."). [28] Accordingly, I recommend denying summary judgment in this regard.

[28]  *See also Jeanty v. County of Orange,* 379 F.Supp.2d 533, 542 (S.D.N.Y.2005) ("[T]he same genuine issues of material fact that preclude summary judgment on plaintiff's excessive force claim, also preclude application of the defense of qualified immunity at the summary judgment

2009 WL 1606753

stage."); *Dellamore v. Stenros,* 886 F.Supp. 349, 352 (S.D.N.Y.1995) (finding that material factual disputes exist on the issue of qualified immunity for the same reasons that the court denied the motion for summary judgment on the plaintiff's Eighth Amendment excessive force claim).

**ACCORDINGLY,** it is

**RECOMMENDED** that summary judgment be granted dismissing all claims against Defendants Goord, Allard, Berry, Meeks, Martin, and Sugg; and it is further

**RECOMMENDED** that Defendant Volpe's motion for summary judgment be denied; and it is further

**RECOMMENDED** that the case proceed to trial against Defendants Volpe, Schewnki and Roberts on Plaintiff's Eighth Amendment claims of excessive force and failure to intervene, against Defendants Schewnki and Roberts on Plaintiff's First Amendment retaliation claims, and against Defendant Volpe on Plaintiff's Eighth Amendment claim of inadequate medical care; and it is further

**ORDERED** that the Clerk serve copies of the electronically-available-only opinions cited on pages 4, 5, 7, and 20 of this Report–Recommendation on Plaintiff.

**ANY OBJECTIONS to this Report–Recommendation must be filed with the Clerk of this Court within TEN (10) WORKING DAYS, PLUS THREE (3) CALENDAR DAYS from the date of this Report–Recommendation (unless the third calendar day is a legal holiday, in which case add a fourth calendar day).** *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); N.D.N.Y. L.R. 72.1(c); Fed.R.Civ.P. 6(a) (2), (d).

**BE ADVISED that the District Court, on** *de novo* **review, will ordinarily refuse to consider arguments, case law and/ or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance.** [29]

[29]    *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137–38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *see also Murr v. U.S.,* 200 F.3d 895, 902, n. 1 (6th Cir.2000) ("Petitioner's failure to raise this claim before the magistrate constitutes waiver."); *Marshall v. Chater,* 75 F.3d 1421, 1426 (10th Cir.1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") [citations omitted]; *Cupit v. Whitley,* 28 F.3d 532, 535 (5th Cir.1994) ("By waiting until after the magistrate judge had issued its findings and recommendations [to raise its procedural default argument] ... Respondent has waived procedural default ... objection[ ].") [citations omitted]; *Greenhow v. Sec 'y of Health & Human Servs.,* 863 F.2d 633, 638–39 (9th Cir.1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by U.S. v. Hardesty,* 977 F.2d 1347 (9th Cir.1992); *Patterson–Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990– 91 (1st Cir.1988) ("[A]n unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.") [citation omitted].

**BE ALSO ADVISED that the failure to file timely objections to this Report–Recommendation will PRECLUDE LATER APPELLATE REVIEW of any Order of judgment that will be entered.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of H.H.S.,* 892 F.2d 15 [2d Cir.1989] ).

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 1606753

---

    © 2023 Thomson Reuters. No claim to original U.S. Government Works.