UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

———————————————————————————

RASHAD SALAAM,

                                        Plaintiff,

v.                                                              9:19-cv-0689
                                                                (AMN/TWD)

TRAVIS ZEHR,

                                        Defendant.

———————————————————————————

APPEARANCES:                            OF COUNSEL:

ARNOLD & PORTER KAYE SCHOLER LLP        MAYA KOUASSI, ESQ.
250 West 55th Street                    MOLLY MCGRATH, ESQ.
New York, NY 10019-9710                 ANGELA VICARI, ESQ.

HON. LETITIA JAMES                      ANTHONY HUNTLEY, ESQ.
New York State Attorney General         ERIN MEAD, ESQ.
Attorney for Defendants
The Capitol
Albany, New York 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## <u>**REPORT-RECOMMENDATION AND ORDER**</u>

## I.    INTRODUCTION

Plaintiff Rashad Salaam ("Plaintiff"), who is currently in the custody of the New York

State Department of Corrections and Community Supervision ("DOCCS") at Clinton

Correctional Facility, commenced this action on May 30, 2019, Dkt. No. 1, and subsequently

filed four amended complaints, Dkt. Nos. 16, 28, 34, 83, pursuant to 42 U.S.C. § 1983.

Plaintiff's sole remaining claim alleges Defendant Travis Zehr ("Defendant") failed to protect

Plaintiff while he was incarcerated at Auburn Correctional Facility (hereinafter, "Auburn")

during an incident which occurred on July 25, 2017.  *See generally*, Dkt. No. 115 at 19; Dkt. No. 117 at 17.

## II.    BACKGROUND

Plaintiff avers on July 25, 2017, while he was incarcerated at Auburn, *see* Dkt. No. 108-4 at 18, 34,[1] as he walked down the tier following nighttime recreation, another inmate approached him from behind and cut his face with a razor.  Dkt. No. 108-4 at 35.  Plaintiff removed the inmate's arm from his face and continued to his cell, but the inmate followed him into the cell and cut his forearm.  *Id*.  Defendant watched as this incident occurred but did not pull a pin or call attention to the situation.  Dkt. No. 83 at 4.

As Plaintiff was bleeding from the face and arm, Defendant walked by his cell smiling. Dkt. No. 108-4 at 40-41.  Plaintiff called him to his cell, but Defendant told Plaintiff to wait and continued to perform rounds.  *Id*. at 36.  Defendant later returned to Plaintiff's cell and sent him to the infirmary.  *Id*.

Plaintiff remained in the infirmary until on or about August 1, 2017, when he was moved to the protective custody unit.  Dkt. No. 157 at 7.  He was subsequently transferred to Elmira Correctional Facility (hereinafter, "Elmira") on August 24, 2017.  *Id*. at 8.  For a more complete statement of the surviving claim, reference is made to the operative pleading, Plaintiff's fourth amended complaint.  *See* Dkt. No. 83.

Plaintiff commenced this action on May 30, 2019.  *See generally*, Dkt. No. 1.  On September 16, 2019, Hon. Brenda K. Sannes, United States Chief District Judge, granted Plaintiff's application to proceed *in forma pauperis*, dismissed Plaintiff's claims, and directed

---

[1] Citations to the parties' submissions will refer to the pagination generated by CM/ECF, the Court's electronic filing system.

him to file an amended complaint.  Dkt. No. 15 at 8-9.  He subsequently filed an amended

complaint, Dkt. No. 16, and then a second amended complaint, Dkt. No. 28, which was

construed as asserting, *inter alia*, an Eighth Amendment failure to protect claim against a John

Doe Officer.  *See generally*, Dkt. No. 29.  The undersigned ordered the New York State Attorney

General's Office to produce information regarding the identity of the John Doe officer.  *Id*. at 7-

8.

      In a third amended complaint, Plaintiff identified the John Doe officer and claimed he

stood at the end of the gallery and watched as an inmate attacked Plaintiff and did nothing on

July 25, 2017.  *See* Dkt. No. 34 at 3.  In a pre-answer motion for summary judgment, the then

defendants alleged, *inter alia*, Plaintiff never filed a grievance regarding the July 25, 2017,

incident.  Dkt. No. 53-1 at 9.  The undersigned recommended the defendants' motion on

exhaustion be denied with leave to renew at the conclusion of discovery.  Dkt. No. 72 at 11-12.

Judge Sannes adopted the Report-Recommendation in its entirety.  Dkt. No. 74 at 3.

      Plaintiff later submitted a letter to the Court indicating he learned through the defendants'

disclosures that he had mistakenly identified the wrong Corrections Officer with respect to his

failure to protect claim.  *See* Dkt. No. 79 at 1.  Accordingly, the Court afforded Plaintiff leave to

submit an amended pleading, Dkt. No. 82, and on August 11, 2021, he filed a fourth amended

complaint naming Defendant Zehr.  *See* Dkt. No. 83.

      Defendant filed an answer, Dkt. No. 100, and a motion for summary judgment, Dkt. No.

108.  On January 18, 2023, the matter was reassigned to Hon. Anne M. Nardacci, United States

District Judge, for all further proceedings.  Dkt. No. 114.  On February 27, 2023, the undersigned

recommended the defendants' motion for summary judgment be denied as to Plaintiff's Eighth

Amendment failure to protect claim against Defendant Zehr and granted as to the other then-

remaining claims.  Dkt. No. 115 at 19.  On May 22, 2023, Judge Nardacci adopted the Report-Recommendation.  Dkt. No. 117 at 17.

By Order dated September 28, 2023, Judge Nardacci ordered the jury trial in this case to commence on January 29, 2024.  Dkt. No. 132 at 1.  By letter dated October 23, 2023, Defendant requested an exhaustion hearing.  Dkt. No. 137.  Accordingly, Judge Nardacci referred the matter to the undersigned for the purpose of conducting an exhaustion hearing pursuant to *Messa v. Goord*, 652 F.3d 305 (2d Cir. 2011).  Dkt. No. 140; *see also* Dkt. No. 147.

## III.    HEARING TESTIMONY

This Court conducted an exhaustion hearing on February 16, 2024.  *See generally*, Dkt. No. 157.  Defendant called four witnesses and Plaintiff also testified.

### A.  The Defendant's Witnesses

#### 1.  Rachel Seguin

Rachel Seguin testified she began working for DOCCS in July of 2012, where she served as Assistant Director of the Incarcerated Grievance Program ("IGP") from July of 2017 until January of 2022, when she became the IGP Director.  *Id*. at 10-11.  Seguin explained the grievance program utilized a three-step process which was available to all incarcerated individuals housed at any DOCCS operated facility.  *Id*. at 13.  The IGP is outlined in DOCCS Directive 4040.  *Id*. at 14.

Seguin testified the only time the IGP would not be available to an incarcerated individual would be if that individual was not in DOCCS custody.  *Id*. at 15.  She explained any incarcerated individuals who did not have physical access to the Incarcerated Grievance Resolution Committee ("IGRC") office, including those in protective custody, could submit

4

complaints through the facility mail, or give them to a grievance supervisor or assigned grievance office staff member during weekly rounds. *Id*. at 15-16.

The first step of the grievance process requires the individual to submit a complaint to the facility's IGRC within 21 calendar days of the alleged occurrence. *Id*. at 12. However, an exception exists for grievances received "between 21 and 45 days" from an incident where the "incarcerated individual is able to provide mitigating circumstances . . . giving a reason of why they were unable to file during that initial 21 calendar days." *Id*. at 16. Mitigating circumstances are those "that would prevent them from being able to file" such as where an incarcerated individual was at an outside hospital or did not have the ability to write or submit a complaint. *Id*.

When an individual is no longer housed at the facility where the incident occurred, "[t]hey would file the grievance at the facility they are currently housed in" and "the grievance supervisor at the facility where the grievance was submitted would forward that on to the respective correctional facility . . . ." *Id*. at 17. If an individual does not hear back after filing a grievance, Seguin explained they could speak with the grievance supervisor to inquire about the status of the grievance. *Id*.

As part of the IGP, the Central Office Review Committee ("CORC") maintains both electronic and physical records. *Id*. at 20. The records can be searched utilizing an incarcerated individual's department identification number ("DIN"). *Id*. at 21. Seguin conducted a search for Plaintiff's DIN, "14-A-3363." *Id*. at 22-23. Her search of the CORC database on January 10, 2024, revealed "there were no active grievance appeals on file at CORC" and "no closed appeals" for Plaintiff's DIN. *Id*. at 23, 26.

On cross-examination, Seguin explained she visited facilities to "make sure the facilities are properly documenting things that are not appealed to CORC, that they're properly recording things, and that the logs are maintained in accordance with policy and procedure." *Id*. at 29. She stated she had conducted rounds at both Auburn and Elmira. *Id*. at 31. Seguin confirmed a grievance would only appear on a CORC report if it had been received by the facility's IGP office. *Id*. at 33.

### 2. Cheryl Parmiter

Cheryl Parmiter testified she worked as the IGP supervisor at Auburn. *Id*. at 37-38. She explained she would process grievances and maintain the facility's grievance records. *Id*. at 38. Parmiter stated the grievance process contained in Directive 4040 was available to all incarcerated individuals at Auburn in 2017. *Id*. at 39.

As IGP supervisor, she conducted rounds of the protective custody unit to speak with the incarcerated individuals housed in that unit. *Id*. at 40. Parmiter explained individuals housed in general population could file grievances by depositing them in a facility mailbox and individuals in the special housing units would place grievances in a locked mailbag. *Id*. at 41.

Upon receiving a grievance, she would assign a code and title, log it into a computer database, and create a folder for it. *Id*. at 42. The individual who filed the grievance would then receive a copy of the logged grievance. *Id*. If the individual did not receive such a receipt, they could write to Parmiter and ask her for it. *Id*. at 43.

Both pending and resolved grievances were stored in the IGP office in a locked cabinet. *Id*. at 44. In 2020, Parmiter conducted a search of the database to determine whether Plaintiff filed any grievances. *Id*. She testified, if Plaintiff had filed a grievance, it would have appeared in the database. *Id*. at 45. She further stated, to her knowledge, the grievance process was

available to Plaintiff while he was housed at Auburn, both while he was in the infirmary and while he was housed in protective custody, and there were no mitigating circumstances which would have allowed for an untimely grievance to be filed with the IGP office. *Id*. at 49-50.

On cross-examination, Parmiter agreed her records would not reflect a grievance that had been submitted by an incarcerated individual but thrown away before it was received. *Id*. at 52. She also stated incarcerated individuals worked in the office, but they were not responsible for logging grievances. *Id*. at 55. On re-direct examination, Parmiter explained individuals housed in the protective custody unit could also hand grievances to her directly as she conducted rounds. *Id*. at 59.

### 3. Zachary Meek

Zachary Meek testified he was employed by Elmira where he held the rank of Correction Sergeant in July and August of 2017. *Id*. at 62. He explained the protective custody unit was a secured unit where individuals removed from the general population for safety reasons were housed. *Id*. at 63. Meek served as supervisor of the protective custody unit during the summer of 2017. *Id*.

Incarcerated individuals housed in the protective custody unit would file grievances by filling out a grievance form or writing on a piece of paper and submitting the document through facility mail to the grievance office. *Id*. at 65. Meek testified grievance forms, paper, pens, and pencils were available to the individuals housed in protective custody. *Id*. He stated the inmate grievance supervisor would make rounds of the unit once a week. *Id*.

Grievances were collected by an officer who brought a mailbag cell-to-cell during a 10:00 or 10:30 p.m. round. *Id*. at 66. The mailbag was locked by a padlock placed over the clasp, which the correspondence office would open with a key. *Id*. at 66-67. Meek explained the

officer who collected the mail would bring the locked mailbag to the correspondence office for the office staff to go through the following morning.  *Id*. at 67.  The correspondence unit employees were civilians who would place mail addressed to the IGP supervisor in the supervisor's mailbox.  *Id*. at 67-68.

Individuals housed in the protective custody unit would receive mail from an officer who would deliver items cell-to-cell using the incarcerated person's name and DIN number.  *Id*. at 70. An individual who submitted a grievance could follow up on their submission with an IGP office employee during weekly rounds, or by written correspondence, or by filing another grievance. *Id*.  Meek testified he did not "have any recollection of there being any complaints about mail or grievances made by inmates . . . in the Protective Custody Unit not being received by the IGP office" in 2017.  *Id*.

On cross-examination, Meek stated most of the inmates in the protective custody unit had their own supply of paper, but could obtain a grievance form by asking a corrections officer.  *Id*. at 71-72.  He explained officers from other areas of the facility could enter the protective custody unit by signing a logbook if they were not assigned to the unit.  *Id*. at 77.

### 4.  Misty O'Dell

Misty O'Dell testified she had been employed as the IGP supervisor at Elmira since January of 2017.  *Id*. at 82.  She explained incarcerated individuals could file grievances utilizing a grievance form, or a piece of paper, and depositing it into a hallway mailbox, the mailroom, or handing it to her as she conducted rounds.  *Id*. at 83.  O'Dell elaborated mailboxes labeled "IGRC" were solely used for collecting grievances, and were kept locked, opened only by herself or the sergeant.  *Id*. at 84.

Upon receiving a grievance, O'Dell stated she would read the document, process it by assigning a code, give the document a grievance number, and log it into the database system. *Id*. at 85-86. The physical paper copies were also kept in an office file cabinet for four years. *Id*. at 86. In 2017, when a grievance was processed and entered into the database, a form containing the grievance number, filing date, and applicable sixteen calendar day deadline was generated and sent to the inmates by mail. *Id*. at 88.

O'Dell testified if a grievance relating to an incident which occurred at another facility was received, she "would file it at Elmira, . . . put it into our system, and then . . . send it . . . to the grievance supervisor at the facility that the incident was alleged to happen at . . . ." *Id*. at 89. Any such correspondence would be maintained on her computer. *Id*. If a grievance related to an incident which occurred more than 21 days ago, O'Dell would fill out a form letter stating "this grievance is past the 21-day time frame. And I have a little blurb on there if there's mitigating circumstances, you can re-request to have this visited, just respond to me and let me know within 45" days from the incident. *Id*. at 91. A record of the form would be kept on the computer. *Id*. at 92.

In late 2023 or early 2024, she conducted a search to determine whether Plaintiff filed a grievance while he was housed at Elmira. *Id*. A search using Plaintiff's DIN revealed he filed no grievances which were logged, no grievances which were rejected as untimely, nor did he request permission to file a late grievance arguing mitigating circumstances. *Id*. at 93-94. On cross-examination, O'Dell stated incarcerated clerks who worked in the IGP office were responsible for inputting data. *Id*. at 95. She also agreed that, if an incarcerated individual had attempted to file a grievance, but the grievance had been destroyed before it had been logged, it would not be reflected in office records. *Id*. at 97.

**B. Plaintiff**

Plaintiff testified that on July 25, 2017, while he was incarcerated at Auburn, he was attacked by another inmate in the presence of Officer Zehr. *Id*. at 103-04. After the attack, he was taken to a hospital, and then the infirmary, where he remained for approximately a week and a half. *Id*. at 104. Plaintiff was then housed in protective custody, where he filed a grievance about the attack. *Id*.

When he first arrived in protective custody, he received grievance and other forms, and completed the form during the course of his protective custody stay, which lasted a few days. *Id*. at 104-05. Plaintiff explained he did not have access to a grievance form while he was in the infirmary. *Id*. at 105. He stated the grievance form was printed on white paper, and he included an extra page because there was not enough space on the form sheet. *Id*. Plaintiff stated the paper was his own, which he had purchased when he was housed in general population. *Id*. at 106.

Plaintiff testified that in this grievance, he reported he "was cut twice and . . . that was mainly it. I told them about that incident." *Id*. He added the grievance included information about a DOCCS employee, explaining:

> I was saying I was getting cut on the tier and the officer didn't, like, pull a ring -- I mean, he didn't pull a pin, he didn't do anything about the situation, he didn't approach the situation, he just let me get cut. I went in my cell and he's saying -- the inmate closed my gate. Because after he left my cell, he closed my gate and went to his cell and locked in. So I'm waiting for the officer to, like, at least approach the situation or make a ring or something. He didn't do that. He waited a while, then he came down the company to make his ring and he walked right past my cell smiling in a childish, like, way. And I said, "officer, officer." I had to call him back. I was bleeding from my face. And when I called him back, that's when he approached and I said, "I'm cut." He said, "okay, I'm going to see you to the infirmary." He didn't say, like, who cut you, he didn't

-- he just went up the tier and a few officers sent me to the infirmary
-- I mean, to the hospital -- to the infirmary.

*Id*. at 107-08.  Plaintiff subsequently confirmed, in response to counsel's questioning, the above

answer was what he wrote in his grievance.  *Id*. at 108.

After he finished writing the grievance, Plaintiff explained he put it in an envelope which

he addressed to the grievance office using a pen.  *Id*. at 109.  He then placed the envelope in a

locked mailbag carried by an officer just before the night count.  *Id*. at 109-10.  Plaintiff stated

the officer was a short, chubby, male, and described the mail bag as medium sized and brown.

*Id*. at 111.  He did not make a copy of the grievance prior to depositing it in the mailbox because

he "wanted to get it out as soon as possible, plus I was in protective custody and I didn't have

access to the law library" where he could use a copy machine.  *Id*.

Plaintiff testified he had other sheets of paper, in addition to the sheet he used for his

grievance, but declined to write another copy of his grievance on such paper because "I was lazy.

I just thought the grievance would go in.  I put the grievance in and I didn't think I would really

need a copy."  *Id*. at 112.  He stated he did not ever receive a filing number or receipt for this

grievance, and did not follow up with anyone about the grievance after placing it in the locked

mailbag, nor did anyone in the grievance office follow up with him.  *Id*. at 113.  However,

Plaintiff testified he was approached about the grievance, "by two officers and a lieutenant."  *Id*.

at 114.

He explained the encounter occurred two or three days after he mailed the grievance.  *Id*.

Plaintiff testified he did not know the names of any of the three individuals, and had never met or

seen the two officers before, but had seen the lieutenant around.  *Id*.  He stated he identified one

of the men as a lieutenant due to his gray pants with a stripe and white shirt.  *Id*.  Plaintiff

described the lieutenant's voice as "raspy" and said the two officers "were just a little aggressive, like they were just backing him up" but did not speak. *Id*. at 115.

After the encounter, Plaintiff felt the lieutenant "thought the grievance were attacking or getting in trouble one of his, you know, coworkers, his officers, and he didn't want that grievance to see the light of day." *Id*. at 116. Plaintiff added he was alone in his cell during the encounter and felt "like this grievance is not even going to go through, like they're trying to attack me." *Id*. He stated the interaction lasted no more than one minute, and he did not mention the incident to anyone, because he felt "afraid" that officers would attack him. *Id*. at 118.

Plaintiff was subsequently transferred to Elmira, where he was housed in general population. *Id*. He did not disclose the encounter with the lieutenant and officers to any other inmate or DOCCS employee at Elmira. *Id*. at 119. However, Plaintiff testified he wrote two grievances about the July 25, 2017, attack while he was housed at Elmira. *Id*. He later clarified both were addressed to the grievance office. *Id*. at 127.

In the first grievance he wrote at Elmira, Plaintiff "basically wrote what happened to me on the 25th of July, the same as my first grievance, because I didn't get a response from the first grievance." *Id*. at 119-20. Plaintiff did not make a copy of the grievance, as he "wanted to get it out as soon as possible." *Id*. at 120. He stated this first Elmira grievance was filed within four months of the date he arrived at the facility. *Id*. Plaintiff testified he believed he wrote a second grievance at Elmira on September 18, 2018. *Id*. at 121. He stated he made a copy of this grievance at the facility's law library, as he did not have access to a copy machine in the "ICP" mental health program where he had been housed at the time. *Id*. at 122. He never received a response as to either of the grievances he submitted at Elmira. *Id*. at 123.

Plaintiff confirmed he filed a total of three grievances about the July 25, 2017, attack, but did not file any appeals as to any of the three grievances, as he never received any response. *Id*. Accordingly, Plaintiff stated he reached out to "Prison Legal Services," "OSI and PREA." *Id*. at 124. Plaintiff testified he viewed OSI, PREA, and Prison Legal Services as additional avenues of administrative exhaustion, explaining:

> I filed a grievance, but officers was, you know, trying to attack me for filing the grievance, so, like, I switched to a new facility, I still filed a grievance, it was late. Being I'm in another facility, it's a late grievance for a situation that happened in another facility, so that's basically why they didn't respond to me, but I tried that. And I've contacted OSI and PREA, you know, to try to exhaust my administrative remedies just in case the grievance doesn't . . . [sic] work for me.

*Id*. at 126.

On cross-examination, Plaintiff agreed that, as an incarcerated individual at Auburn, he was aware of the IGP. *Id*. at 128-29. He knew he was required to file a grievance with the grievance office within 21 days of an incident. *Id*. at 129. Plaintiff denied knowing what "mitigating circumstances" meant, but agreed the grievance process was available to him while he was housed at Auburn and he never lost consciousness or the ability to use his hands after the incident. *Id*. at 130-31.

Plaintiff confirmed he submitted only one grievance about the incident at Auburn and stated he did not check on the status of that grievance because he was "intimidated" by the officers who approached his cell. *Id*. at 132.[2] He was then asked about deposition testimony

---

[2] Specifically, Plaintiff was asked, "[d]id you ever reach out to the grievance office to check on the status of the grievance you filed?" and answered, "I put a grievance in, officers approached my cell, asked me why did I put a grievance in on one of the officers. I was intimidated. They told me to drop this whole thing or they was going to do something to me, so I said I'd drop it. I dropped it." Dkt. No. 157 at 132.

wherein Plaintiff stated he filed two grievances about the July 25, 2017, incident while he was in protective custody at Auburn, *see* Dkt. No. 108-4 at 29, and answered "I don't know.  They must've had a typo.  You can have typos in those, the depositions.  I filed one grievance.  I didn't have enough time to file two grievances.  That's a typo."  *Id*. at 136; *see also id*. at 135.

He further testified he did not hear from the Elmira grievance office about either of his filings, explaining:

> I didn't think it was that -- I didn't think it was that serious.  I tried to put the grievance in and it was -- I was moved.  The situation happened at Auburn, we're in Elmira and it's late and it's something that happened in another facility, so I just gave it a try to see if it would work and they didn't respond to me.  I don't think they respond to grievances like that, something that happens somewhere else that's kind of after 21 days.

*Id*. at 138.  Finally, Plaintiff confirmed the Auburn lieutenant he encountered after filing his first grievance was not present at Elmira.  *Id*. at 139.

On re-direct examination, Plaintiff testified he was not given paper or pens in the medical infirmary.  *Id*. at 140.  He also stated his way of "following up" with the grievance he filed at Elmira was by "filing another grievance."  *Id*. at 141.

**C.  Stipulations**

In addition to the above testimony, at the hearing the parties stipulated to the following facts: Plaintiff was transferred to Auburn on December 13, 2016; and was incarcerated at Auburn on July 25, 2017, the date of the alleged incident; Plaintiff was moved to the infirmary on July 25, 2017; then moved to protective custody on or about August 1, 2017; Plaintiff was moved from Auburn to Elmira on August 24, 2017; and remained at Elmira through April 30, 2019.  *Id*. at 6-8; *see also*, *id*. at 144.

## IV.    LEGAL STANDARD FOR EXHAUSTION

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Ross v. Blake*, 578 U.S. 632, 635 (2016). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007) (citing *Porter*, 534 U.S. at 524).

The PLRA requires "proper exhaustion," which means using all steps required by the administrative review process applicable to the institution in which an inmate is confined and doing so properly. *Jones*, 549 U.S. at 217-18 (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011). DOCCS has a well-established inmate grievance process, set forth in 7 N.Y.C.R.R. § 701 *et seq*.

First, an inmate must submit a complaint to the facility's IGP clerk within twenty-one days of the alleged occurrence. 7 N.Y.C.R.R. § 701.5(a)(1). A representative of the facility's IGRC then has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id*. § 701.5(b)(1). If there is no such informal resolution, the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance, *id*. § 701.5(b)(2), and issues a written decision within two working days of the conclusion of the hearing. *Id*. § 701.5(b)(3).

Second, a grievant may appeal the IGRC's decision to the facility Superintendent within seven calendar days of receipt of the IGRC's written decision. *Id*. § 701.5(c)(1). If the

grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the Superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal.  *Id*. § 701.5(c)(3)(ii).  Grievances regarding DOCCS wide policy uses are forwarded directly to the CORC for a decision under the process applicable to the third step.  *Id*. § 701.5(c)(3)(1).

Third, a grievant may appeal to CORC within seven working days of receipt of the Superintendent's written decision.  *Id*. § 701.5(d)(1)(1).  CORC is to render a written decision within thirty calendar days of receipt of the appeal.  *Id*. § 701.5(d)(3)(ii).  Exhaustion of the grievance process occurs only after CORC has rendered its decision.

While the PLRA mandates exhaustion of administrative remedies, it also "contains its own, textual exception to mandatory exhaustion."  *Ross*, 578 U.S. at 642.  Specifically, the exhaustion requirement contained in § 1997e(a) "hinges on the 'availability' of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones."  *Id*. (citing 42 U.S.C. § 1997e(a)) (alterations in original).  In *Ross*, the Supreme Court identified three circumstances in which a court may find administrative remedies are not "available" for PLRA purposes, holding:

> [A]n administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates. . . . Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. . . . And finally, . . . when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.

*Id*. at 643-44.  In these situations, exhaustion is not required.  Further, the Second Circuit has observed "the three circumstances discussed in *Ross* do not appear to be exhaustive . . . ." *Williams v. Correction Officer Priatno*, 829 F.3d 118, 124 n.2 (2d Cir. 2016).

Because the failure to exhaust administrative remedies is an affirmative defense, the defendant bears the burden of showing that an incarcerated individual has failed to satisfy the exhaustion requirements. *See Jones*, 549 U.S. at 216. Then the plaintiff must establish the administrative review process was unavailable to him under *Ross*. *See id*. "As a result, practically speaking, while the burden on this affirmative defense remains at all times on the defendant, the plaintiff may sometimes have to adduce evidence in order to defeat it." *Smith v. Kelly*, 985 F. Supp. 2d 275, 284 (N.D.N.Y. 2013).

## V.    ANALYSIS

Applying the legal standard set forth above, the issue of exhaustion involves a two-step analysis. First, the Court must determine whether Plaintiff properly exhausted his administrative remedies by following all the steps required by the administrative review process. Second, if Plaintiff did not exhaust his administrative remedies, the Court must then determine whether the administrative remedy was available to Plaintiff.

While Plaintiff testified he submitted a grievance while incarcerated at Auburn and two additional grievances at Elmira concerning the July 25, 2017, incident, it is undisputed that he did not appeal any grievance all the way to CORC. *See* Dkt. No. 157 at 123. As a result, Plaintiff failed to properly exhaust administrative remedies with respect to the incident. *See*, *e.g.*, *Torres v. Carry*, 672 F. Supp. 2d 338, 343 (S.D.N.Y. 2009) ("To properly exhaust administrative remedies, an inmate must file an appeal with the CORC."). Therefore, the Court must determine whether the IGP was "unavailable" to Plaintiff so as to excuse his failure to exhaust.

First, the Court finds credible the testimony of the Defendants' witnesses that the IGP was available to Plaintiff while he was housed at both Auburn and Elmira. *See*, *e.g.*, *McLean v.*

*Harris*, No. 9:19-CV-1227 (BKS/ATB), 2022 WL 1129811, at *10 (N.D.N.Y. Feb. 9, 2022)

(finding "the testimony of the defense witnesses credibly established that the grievance process .

. . was sufficiently reliable that all three submissions plaintiff purportedly made to the IGP . . .

would not have been lost or diverted."), *report and recommendation adopted*, 2022 WL 909159

(N.D.N.Y. Mar. 29, 2022); *Brown v. Dubois*, No. 9:15-CV-1515 (LEK/CFH), 2018 WL

2078823, at *5 (N.D.N.Y. Apr. 10, 2018) (finding "credible the testimony of defendants'

witnesses that in July 2014 there was an inmate grievance program in place at Eastern which

complied with Directive 4040."), *report and recommendation adopted*, 2018 WL 2077891

(N.D.N.Y. May 2, 2018).

　　　　Auburn IGP supervisor Parmiter testified, to her knowledge, the grievance process was

available to Plaintiff both in the infirmary and the protective custody unit. Dkt. No. 157 at 49-

50. However, her search of the facility's database did not reveal any grievance filed by Plaintiff.

*Id*. at 44-45. Corrections Sergeant Meek stated grievance forms, pens, and pencils were

available in the protective custody unit and explained grievances were collected daily by an

officer utilizing a locked mailbag. *Id*. at 65-66. Elmira IGP supervisor O'Dell explained inmates

could submit grievances by handing them to her, mailing through intrafacility mail, or depositing

them into a locked "IGRC" mailbox. *Id*. at 83-84. Further, then-IGP assistant director Seguin

testified the grievance program would only be unavailable to an incarcerated individual not in

DOCCS custody, *id*. at 15, and Plaintiff remained in DOCCS custody from the date of the

incident through September of 2018, when he claimed to submit his final grievance concerning

the incident. *See id*. at 121, 144.

　　　　By contrast, the Court finds Plaintiff's testimony concerning his alleged attempts to

submit grievances concerning the July 25, 2017, incident was not credible. At the exhaustion

hearing, Plaintiff repeatedly testified he filed one grievance while he was housed in the protective custody unit at Auburn.  *See* Dkt. No. 147 at 104 ("Q. Did you write any grievances about the July 25, 2017, attack in protective custody? A. A grievance, yes."), 119 (Plaintiff testified he wrote "Two" grievances about the July 25, 2017, incident while he was housed at Elmira), 122-23 (Plaintiff was asked "how many grievances did you file as to the July 25, 2017, attack?" and answered, "Three."), 133 (Plaintiff was asked "How many grievances did you file total based on the incident that occurred on July 25, 2017?" and answered, "Three." He was then asked "How many grievances did you file while you were at Auburn Correctional Facility?" and answered, "One.").  However, this testimony directly conflicts with his deposition testimony, *see generally*, Dkt. No. 108-4 at 6-65, as Plaintiff testified on May 18, 2022, while he was in protective custody at Auburn, he filed "two grievance."  Dkt. No. 108-4 at 29.

When confronted with this inconsistency at the hearing, Plaintiff suggested the deposition transcript "must've had a typo. You can have typos in those, the depositions."  Dkt. No. 147 at 136.  Plaintiff's proffered explanation is unpersuasive.  As an initial matter, in addition to stating he filed "two" grievances while in protective custody, in a later portion of his deposition, Plaintiff stated "when I got moved to the other -- to another facility, I filed a *third* grievance.  I had that grievance and then I filed another."  Dkt. No. 108-4 at 31 (emphasis added).  He was then asked whether "all *four* grievances" concerned the incidents at issue in this case and answered affirmatively.  *Id*. at 31 (emphasis added).

More significantly, however, Plaintiff's hearing testimony that he filed only one grievance while he was housed in the protective custody unit at Auburn and two additional grievances at Elmira conflicts with his own submissions to this Court.  For example, in response to the then-defendants' motion for summary judgment on the issue of exhaustion, Plaintiff stated:

> The grievance system in upstate prisons such as Auburn CF is corrupted. The officers don't want inmates to file grievances on them because they don't want their fellow officers to be in trouble. So they put a lot of pressure on them just as they did me. Such as approaching my cell asking what the grievance is about in a threatening manner making you not file a grievance. *I've put in two grievances anyway*, and haven't gotten a response. They literally threw it out knowing how important it was for me to file to receive justice. *I were in PC when I filed them*, and the officers go hard on people or inmates in that vicinity, they don't give an answer.

Dkt. No. 56-1 at 1 (emphasis added). Plaintiff also filed an objection to this Court's Report-Recommendation recommending the defendants' motion for summary judgment on the basis of exhaustion be denied, wherein he stated, "The order and report I receive still states that I haven't filed a grievance with the prison when I've filed *over (3)* . . . ." Dkt. No. 73 at 1 (emphasis added). Additionally, in his fourth amended compliant, Plaintiff stated, "I've put in (4) grievances for the incident that happened on July 25, 2017." Dkt. No. 83 at 4.

It necessarily follows that, either in his filings and deposition or in his hearing testimony, Plaintiff made a material misrepresentation to this Court about his submission of grievances, undermining the veracity of his contentions. *See, e.g.*, *Adams v. O'Hara*, No. 9:16-CV-0527 (GTS/ATB), 2019 WL 652409, at *5 (N.D.N.Y. Feb. 15, 2019) (finding "Plaintiff has failed to offer any credible evidence that, while he was at Auburn C.F. . . . he submitted a grievance that a correctional employee either ripped up or threatened him not to continue to pursue" citing, *inter alia*, inconsistencies between the Plaintiff's exhaustion hearing and deposition testimony); *McLean*, 2022 WL 1129811, at *4, 9 (concluding the "plaintiff's testimony regarding his alleged efforts to pursue the grievance process with regard to the . . . incident was not credible" noting the "plaintiff's inconsistent statements . . . undermines plaintiff's credibility and casts substantial doubt on his claim that he previously attempted to submit a grievance on [one occasion] and then again on" a second occasion); *see also, e.g.*, *Smith v. Huggler*, No. 9:20-CV-1435 (GTS/CFH),

2023 WL 5097870, at *6 (N.D.N.Y. Aug. 9, 2023) (citing the plaintiff's "material misrepresentation to this Court" in support of the court's finding that the plaintiff never placed a grievance on his cell bars for collection).

Furthermore, Plaintiff presented no testimony or evidence indicating he ever questioned or sought assistance from the Auburn or Elmira IGP offices or corrections staff regarding the three grievances he claimed to have filed after he received no response.  *See*, *e.g.*, *Smith*, 2023 WL 5097870, at *6 (referencing, *inter alia*, "the lack of any testimony or record evidence that . . . Plaintiff ever questioned, or complained orally to, any of the individuals who made rounds in . . . [the unit where he was housed] regarding the processing of his purported grievance" in support of the court's conclusion that the Plaintiff never placed a grievance to be collected).  Yet Plaintiff admitted he knew about the IGP and was aware grievants would receive a response from the facility's grievance office.  Dkt. No. 147 at 129.

Plaintiff's remaining legal arguments are unavailing.  He argues the IGP was rendered unavailable relying on the Second Circuit's decision in *Williams*, which found "the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it."  *Williams*, 829 F.3d at 126; *see also* Dkt. No. 159 at 20-22.  However, "[t]he procedural posture of this case is far different from that before the Second Circuit in *Williams*."  *Mojica v. Murphy*, No. 9:17-CV-0324 (ML), 2021 WL 1318168, at *10 (N.D.N.Y. Apr. 8, 2021).  "Unlike in *Williams*, where the Court accepted as true the plaintiff's allegation that the correction officer never filed his grievance, this Court has had an opportunity to evaluate the credibility of Plaintiff and the defense witnesses and concludes that Plaintiff's allegation" that he attempted to submit grievances concerning the July 25, 2017, incident while he was housed at Auburn and Elmira "is not credible."  *Id*.

Plaintiff's reliance on *Solano v. Aubin*, is similarly misplaced.  *See generally*, No. 9:20-CV-1378 (BKS/ML), 2023 WL 5200397, at *6 (N.D.N.Y. Aug. 14, 2023).  Plaintiff contends:

> [T]he [*Solano*] court determined that a plaintiff must provide some corroboration of a claim that a grievance was submitted, such as evidence demonstrating when the grievance was written, the content of the grievance, how the plaintiff attempted to file the grievance, or that the plaintiff followed up with prison officials on the disposition of the grievance.  Here, Mr. Salaam's testimony meets the standards of *Solano*.

Dkt. No. 159 at 19 (internal quotations omitted). To the extent Plaintiff's argument is that his ability to offer information about the timing, contents, and manner of submitting grievances which were never received establishes *he did, in fact, submit those grievances*, the undersigned is unpersuaded.  The *Solano* court granted the defendants' motion for summary judgment without holding a hearing to assess witness credibility, *see Solano*, 2023 WL 5200397, at *1 n.1, unlike this case, where the Court conducted such a hearing and determined Plaintiff's testimony was not credible.

Finally, Plaintiff argues the grievance process was unavailable to him because a lieutenant and two officers thwarted his grievance attempt.  *See* Dkt. No. 159 at 22-24.  As an initial matter, the Court notes, in addition to the above conclusions concerning the veracity of Plaintiff's testimony, the absence of deposition testimony concerning the alleged encounter between Plaintiff and the Auburn lieutenant and officers undermines his claims.  In his deposition, Plaintiff stated the facility's grievance office never responded, yet made no mention of any allegedly threatening encounter.  *See generally*, Dkt. No. 108-4 at 29-34.[3]  Further, at the

---

[3] The undersigned also notes, at the conclusion of the questions, Defendant's attorney gave Plaintiff "an opportunity to make a statement or ask any questions", Dkt. No. 108-4 at 48, and Plaintiff did not make any statement concerning an encounter with any Auburn staff members about his attempt(s) to utilize the IGP.  *See* Dkt. No. 48 at 48-51.

hearing, Plaintiff provided abundant details about the lieutenant, describing him as an old, White or Indian, skinny, short, male, with long gray hair and a raspy voice, yet was unable to identify this individual, who he claimed to have seen before the encounter. *See* Dkt. No. 157 at 115; *see also Adams*, 2019 WL 652409, at \*5 (noting, in support of the court's conclusion that the plaintiff's testimony concerning the alleged submission of a grievance was not credible "the inconsistency between Plaintiff's hearing testimony that" he was not able to identify the individual who allegedly threatened him "and the fact that Plaintiff knew the individual's (a) rank . . . , (b) hair color . . . , (c) approximate height . . . , (d) approximate weight . . . , and most importantly (e) his job assignment . . . .").

In any event, Plaintiff's argument that Auburn staff thwarted his attempts to utilize the IGP is baseless. To the extent Plaintiff's argues he felt "intimidated" by the lieutenant and officers and was therefore unable to submit grievances at Auburn, his own filings belie such an assertion. As discussed above, in his response to the 2020 motion for summary judgment, Plaintiff declared officers did not want inmates to file grievances,[4] but he "put in two grievances anyway . . . ." Dkt. No. 56-1 at 1. Alternatively, to the extent Plaintiff's contention is that the Auburn staff members who allegedly confronted him intercepted and destroyed the grievances he attempted to submit, the Court agrees with Defendant that even assuming, *arguendo*, Plaintiff's grievance at Auburn was thwarted, there is nothing in the record to explain why the grievances Plaintiff claimed to have filed at Elmira were never received. *See* Dkt. No. 158-1 at 10-11

---

[4] The undersigned notes, it is unclear from Plaintiff's submission–which alleged the grievance systems in "upstate prisons such as Auburn" were "corrupted" and reported officers "put a lot of pressure on" inmates such as by "approaching" Plaintiff's "cell asking what the grievance is about in a threatening manner . . . "–whether any alleged exchange between Plaintiff and an officer(s) was related to his claimed filing of grievances concerning the July 25, 2017, incident. *See* Dkt. No. 56-1 at 1.

In sum, the undersigned "is not convinced by Plaintiff's contradictory and incredible hearing testimony." *Adams*, 2019 WL 652409, at *7. Considering the foregoing, this Court finds administrative remedies under the DOCCS IGP were available to Plaintiff, therefore, his failure to exhaust cannot be excused.

## VI.    CONCLUSION

**WHEREFORE**, it is hereby

**RECOMMENDED** that the District Court find that Plaintiff has failed to exhaust available administrative remedies with respect to the July 25, 2017, incident that is the subject of this action; and it is further

**RECOMMENDED** that the surviving claim in Plaintiff's fourth amended complaint be **DISMISSED**; and it is further

**ORDERED** that the Clerk serve a copy of the Report-Recommendation on the parties.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

**IT IS SO ORDERED.**

Dated: April 19, 2024
         Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge